UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re BAYCOL LITIGATION | ) | |
| | ) | MDL No. 1431 (MJD/JGL) |
| This Document relates to: | ) | |
| | ) | Case No.02-0200 |
| RONWIN v. BAYER CORP. | ) | |

**PLAINTIFF'S (EDWARD RONWIN'S) REPLY TO DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND OR, IN THE ALTERNATIVE, TO ORDER NEGOTIATION**

Plaintiff, ("RONWIN"), hereby Replies to Defendant's ("BAYER") Memorandum in Opposition, ("RESPONSE"), to RONWIN's Motion to Remand or, in the Alternative, to Order Negotiation, but not Mediation, with Remand to Follow if Negotiation is Unsuccessful, (MOTION").

1. RESPONSE commences it argument, p. 1, by attempting to draw an equivalence between the present MOTION and the prior one which was denied by PTO 13. Aside from the fact that PTO 13 was based on questionable grounds, present MOTION is presented in circumstances changed from those prevailing, when the first motion to remand was presented, by the events which have ensued in the approximately 2.5 years between the filing of each motion. The other matters raised in the "preamble" to RESPONSE, 1st two ¶s, p. 1, are considered below where the ARGUMENT section of RESPONSE is given attention.

2. Citing Lexecon c. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 118 S.Ct. 956 (1998), RESPONSE argues that only the Judicial Panel on Multidistrict Litigation has the power under 28 U.S.C. § 1407(a) to remand MDL cases, pp. 1-2, RESPONSE. True enough, except that if Lexecon is carefully read, BAYER's attorneys would have become aware that, Lexecon, 523 U.S. @ 30, 118 S.Ct. @

SCANNED
JUN 2 3 2004
U.S. DISTRICT COURT MPLS

960:

> Multidistrict Litigation Rule 14(a)...provides that '[t]he Panel is reluctant to order remand absent a suggestion of remand from the transferee district court.'

3. Thus, MOTION can be considered a request for this Court to refer this specific case to said Judicial Panel with the suggestion to remand; which, with such suggestion, it is highly likely that the Judicial Panel would agree and order remand.

4. The next argument posed by BAYER, 1st full ¶, p. 2, RESPONSE, is that remand, (or the suggestion thereof to said Judicial Panel), should be denied because, allegedly, RONWIN's "case will benefit from further coordinated proceedings." However, no showing of how RONWIN's case would benefit is presented. That generic experts will soon have their depositions taken is <u>not</u> evidence that RONWIN's case will benefit one iota therefrom. In fact, RONWIN has reason to believe that none of those depositions will be of value to, or needed for, RONWIN's case, as discussed subsequent hereto.

5. In the 2nd ¶ starting on p. 2 and ending on p. 3, RESPONSE, BAYER improperly describes "<u>all</u>...Baycol cases, including [RONWIN's] case," (emphasis in original), as "consolidated." RONWIN's case is <u>not</u> consolidated, it is only <u>coordinated</u>, which BAYER acknowledges in the 1st full ¶, p. 2, RESPONSE. BAYER then proceeds to argue that, 2nd sentence, 2nd ¶ starting on p. 2, RESPONSE: "[RONWIN] will have full access to this common discovery and his case will clearly benefit from it." However, BAYER fails to present a single fact in proof of its assertion. Furthermore, as will be shown below, the alleged value of the generic expert depo-

sitions is chimerical. It is for RONWIN, not for BAYER, to determine what is or is not valuable to RONWIN's case. At the end of the quoted sentence, BAYER places an argument in a footnote wherein BAYER disputes RONWIN's pecuniary "crises" and states categorically and FALSELY--in contravention of Rule 11--that: "To date, [RONWIN] has not filed for in forma pauperis status under 28 U.S.C. § 1915." On June 11, 2003, RONWIN mailed to this Court on the Court's form an "Application to Proceed Without Payment of Fees and Affidavit." Magistrate Judge LEBEDOFF denied the application citing a one sentence statement in a case in Lexis wherein the court held that because the party had paid the original filing fee, he was no longer eligible for in forma pauperis status. Another case or two in similar vein may have been cited. There are cases holding to the contrary. The idea that payment of the initial filing fee to commence suit automatically rules out subsequent in forma pauperis status is absurd. When RONWIN filed his action in the Wyoming State Court, he had no thought that (i) it would be removed to the U.S. Dist. Ct. and (ii) that it would land in an MDL. While having heard the expression, MDL, RONWIN had never been involved in one and had no idea how being pushed into one would expand his costs of litigation. At the time RONWIN filed said Application for in forma pauperis status, which does not require a statement of current income, RONWIN's sole income source was Social Security payments of $962 per month.[1] As of Jan. 1, 2004, RONWIN income from the same and

[1] A certain amount, currently about $66/month, is held back for Medicare. The Social Security recipient never sees those funds.

only source is $975/month. These "raises" are due to annual COLA increases. Living on $975/month in Fort Collins, CO, is no mean feat. Thus the statement in fn. 1, p. 2, RESPONSE, that: "To date (June 10, 2004), [RONWIN] has not filed for in forma pauperis status..." is false and a violation of Rule 11.

6. Additionally, RONWIN cannot pay hundreds of dollars for deposition copies. RONWIN has arranged for copies of depositions that have already been taken in this MDL by PSC and RONWIN considers them sufficient for the purposes of RONWIN's case. RONWIN has already noted to this Court that just the matter of service costs in this MDL are running at least 5 to 10 times greater than what RONWIN would have experienced if the case had remained in the U.S. Dist. Ct. for Wyoming.

7. In the 2nd ¶, p. 2, RESPONSE, BAYER also disputes RONWIN's view that much of the "common discovery" is "highly questionable." The Court is directed to RONWIN's "Objection to Magistrate Judge LEBEDOFF's Report and Recommendation," filed Sept. 10, 2003. The results of RONWIN's efforts to obtain information from the Plaintiff's Discovery Document Depository of the BAYER documents produced are discussed in said Objection and vividly displayed in Exh. B, which relates to Exh. A in said Objection. Reviewing Exh.B, this Court will find that as to a request for materials on Baycol sales, the depository in the smallest group of Exh. A spits out 10 pages of shear, unintelligible garbage. Anyone who claims that in those 10 pages there is anything meaningful is a liar.

8. Following a PSC seminar in Arizona on April 30, 2004, RONWIN

attempted to get information on Baycol Accounting and other topics from said Depository and was met with a response that the Depository could not reply. Checking with those who are in charge of the Depository, they were likewise treated. BAYER should have been required to index their produced documents and to remove all nonsencical garbage. Instead, BAYER flooded the PSC with millions of documents, (the number of documents varies with whom one talks), caused significant costs of sorting and indexing, and have produced the largest useless garbage heap in history. Furthermore, the PSC has done nothing to request this Court to order BAYER (and GSK) to either pay for the sorting and indexing or to do so themselves; at least, RONWIN has never seen a document wherein the PSC made such request. So much for the value of the discovery by PSC to date.

**9.** BAYER claims that RONWIN "misses the point." The point BAYER contends is that the "...issue is not whether the discovery materials help [RONWIN] prove liability but rather whether [RONWIN's] case will be dealt with more efficiently by being part of the structural pre-trial process of this MDL," last 2 sentences, 2nd ¶, p. 2, continued on p. 3, RESPONSE.

**10.** That assertion contradicts the argument that RONWIN's case should not be remanded because it "...will benefit from further coordinated proceedings as part of the MDL", 1st sentence, 1st full ¶, p. 2, RESPONSE. For both arguments, BAYER presents no proofs whatsoever in support.

**11.** Lastly, on this theme, BAYER argues that RONWIN intends to conduct individual discovery if the case is remanded, 1st full ¶,

p. 3, RESPONSE. The sort of discovery RONWIN has in mind is the taking of depositions of MD's who examined and treated RONWIN after he began to experience pain after starting Baycol ingestion pursuant to prescription; (although Wyoming may allow informal statements which may obviate taking formal depositions (as I believe the U.S. Dist. Ct in Colorado permits)). The purpose of those depositions would be to obtain brief verification of the authenticity of the records of the MD's and brief comments on RONWIN's condition as they saw it. Such discovery is "case-specific" and not part of the MDL discovery as well as perfectly permissible. If the PSC wants to take those depositions as part of the MDL and pay for the cost of same, RONWIN has absolutely no objection. Also, a deposition of RONWIN might want to be taken by BAYER. Such discovery has to be done in each specific case and is not necessarily related to any other case nor barred. If RONWIN wanted to conduct such discovery now there might be objection; though it is difficult to see why such case-specific discovery would disturb the MDL process. BAYER's argument is nonsense and ought to have been known by BAYER to be such. Furthermore, as every plaintiff's specific case will be faced sooner or later with this question and to head off BAYER's senseless objections, the Court should specifically address case-specific discovery needs and process.

**12.** The second and last part of BAYER's Argument is presented on pp. 3 and 4, RESPONSE.

**13.** In the 2nd full ¶, p. 3, (1st full ¶ under this section), RESPONSE, BAYER argues that ordering the parties to negotiate would

circumvent the MDL Settlement/Mediation Program. This Court has the right to vary its own Orders in circumstances which it may deem appropriate.

**14.** It is true that RONWIN has not submitted the Settlement/Mediation Program Request Form. However, RONWIN had a telephone conversation with Ms. GRACE BOSE in the program office. In that conversation, or in conversation with a mediator, RONWIN learned that the mediators' fee was $300/hour. However, negotiation was conducted by the parties without any intervening person and the fee was zero. Further, if mediation is successful, BAYER pays the entire mediation fee. If mediation is unsuccessful, the parties are required to pay ½ each. As discussed above at pp. 3-4, RONWIN cannot, and will not, undertake to pay anyone, anywhere $150/hour for any service whatsoever. If BAYER is so hot for mediation and is willing to pay all fees for same regardless of the ultimate outcome, RONWIN will be just a pleased to engage in mediation as in negotiation.

**15.** Furthermore, the "settlement" aspect of the term, MDL Settlement/Mediation Procedures, refers to negotiation, Exh. 1, ¶ 3, PTO 64 and, contrary to BAYER's position, (see 3rd ¶, 2nd sentence, p. 3, RESPONSE), <u>mediation</u> is voluntary, Exh. 1, ¶ 4, PTO 64. Also, mail may be used, Exh. 1, ¶ 6, PTO 64.

**16.** In the last sentence starting on p. 3 and running to p. 4, RESPONSE, BAYER asserts that, "...the proper remedy where [BAYER] declines to negotiate is mediation," and adds that [RONWIN] "declines mediation" in [MOTION]; wherefore, BAYER argues that the request for negotiation should be denied. No justification is given

why mediation is the proper or any remedy when BAYER declines to negotiate; nor is any justification given why mediation is the only remedy when RONWIN declines to mediate. <u>Remand is just as good a remedy</u>! If BAYER wants to mediate it can talk to RONWIN directly not through a ventriloquist. RONWIN is capable of presenting his positions on settlement directly to BAYER and BAYER's attorneys can do likewise to RONWIN. RONWIN doesn't need anyone to talk for him. In addition, there is no showing by BAYER to <u>prove</u> that negotiation is worse than mediation. If BAYER truly wants to settle, it can probably do so with ease.

**17.** In the 3rd ¶ on p. 3 running to p. 4, RESPONSE, BAYER notes that the Special Master "determines whether the case is a documented rhabdo case that can be settled. The concept of "rhabdo" cases as being separate from other cases of Baycol injury is a fraud. In its Objections to PTO 102, the Shannon firm notes that BAYER insists that the definition of "rhabdomyolysis" is 10 times greater than 185 (Creatine (Phospho) Kinase), ("CK" or "CPK"), units/liter of blood. However, a heightened CK level would be seen more by fortune than by deliberate search since it depends upon when the blood sample is taken in an effort to determine the CK value as an indication of tissue damage. Thus, in Exh. A to the Shannon firm's Objection to PTO 102, (filed on Verilaw at 3:50 p.m., ET, on Feb. 18, 2004), credible authorities are quoted to the effect that there are "no standard CK values that establish the diagnosis of rhabdomyolysis."

**18.** The scientific fact is that Baycol destruction of tissue runs

the gamut from the very mild to the very extreme in a continuum. CK values might point to possible extreme situations, but one can have extreme tissue destruction and still show no elevated CK values. Recently, RONWIN spoke with Co-lead counsel attorneys and asked them why they accepted the "rhabdo" definition which runs counter to the scientific facts. While admitting that there is no specific sharp distinction between a myolysis that is extreme and a mild one and that the matter is a continuum, they claimed that the Court and BAYER forced it upon them. If so, the Court erred and should reverse its position to bring it in line with the facts, not BAYER's desire to allow fiction to triumph. One should speak of very mild, or mild, or medium, or extreme or very extreme myolysis, but not of rhabdomyolysis which is nonsense.[2] The PSC has made no effort to rectify the arbitrary and fictitious division of injury classification which situation is detrimental to all remaining plaintiffs in this MDL. The injury and medical work on my injury is just as severe an injury as any "rhabdomyolysis" case, except one that led to death.

**19.** Furthermore, as noted below and attached hereto, other tissues besides muscle are also attacked by Baycol.

**20.** According to the Co-lead counsel attorneys, this Court has been steered by both the PSC and BAYER (and GSK), through their agreement, to the notion, (and to the detriment of plaintiffs),

---

[2]The prefix "rhabdo" means wand or rod. Myolysis means tearing up of muscle. Put them together, the idea of extreme or very extreme muscle destruction is still absent.

that the experts needed to establish a causal relationship between a person's injuries and the taking of Baycol need to be MDs, as shown by the content of PTO 102 and PTO 114.

**21.** In virtually all cases, all that an MD can do is describe the injuries a Baycol taker experienced and what medical assistance to elevate or repair the injuries the MD has taken. In other words, the <u>WHAT</u> relationship between Baycol and the observed injuries. However, virtually all MDs are not capable by training and experience to explain the scientific <u>WHY</u> Baycol causes significantly higher incidence of injuries in people compared to other statin drugs.

**22.** Baycol is a biochemical, (a chemical with biological action). As such the WHY it causes injuries resides in its chemical structure and its chemical action potentials an understanding of which is within the ken of biochemists and rarely with MDs.

**23.** Attached hereto, as Exh. A, is a copy of an expert opinion which explains the biochemical basis for Baycol's action and additionally explains why Baycol destroys all manner of body tissues and components. Furthermore, there are attached pages, as Exh. B, from an advanced organic chemistry textbook published this year of 2004 showing that the kind of proposed "electron movements" that RONWIN employs in his expert opinion is as common today as when RONWIN first studied chemistry prior to WWII.

**24.** The PSC experts may have some value, but RONWIN's expertise is also required; however, as the copy of the attached letter shows, and despite Co-lead counsel firms' knowledge of Exh. A, the

PSC refuses to help the case of all other plaintiffs by rejecting RONWIN as an expert.

**25.** While some discovery by PSC may be useful, the PSC depository boondoggle; its failure to object to BAYER's throwing millions of unindexed and unsorted paper at it; its failure to object to BAYER's labelling everything, including whole depositions, as "confidential," which is sheer abuse of the protection privilege, its refusal to examine the value of some of the experts it has picked; its failure to keep plaintiffs informed with regularity as the PSC was required to do, (I believe) under PTO 3 and as illustrated by the fact that it admits making an agreement with BAYER (and GSK) which led to PTO 102, then led to several Objections having to be filed by various plaintiffs' attorneys, who represent numerous plaintiffs, then led to PTO 114, when all the PSC had to do to avoid the time waste and expense was simply to come to the plaintiffs and explain their proposed agreement with BAYER (and GSK) and then go back to BAYER (and GSK) and seek reasonable modification of the agreement they planned to make and a better Order from the Court. The foregoing does not exhaust the PSC actions inimical to plaintiffs' situation in this action.

**26.** What the foregoing does connote is that plaintiffs who feel they have enough to prevail in their original district courts are better off getting their cases remanded now, or BAYER (and GSK) can agree to at least attempt honest negotiation with remand if unsuccessful.

**WHEREFORE**, RONWIN asks this Court to:

1. Declare on the question and process of case-specific discovery;

2. To Order the PSC to explain in full detail why RONWIN's expertise is faulty or unnecessary or why it should not be made available to all plaintiffs through the PSC; and,

3. To Order that BAYER and RONWIN attempt honest negotiation only and if unsuccessful, to suggest to the Judicial Panel for Multidistrict Litigation that said Panel order remand of this case to the U.S. District Court for the District of Wyoming.

DATED: June 14, 2004.

Edward Ronwin, pro se
945 Rolland Moore Dr., L-2
Fort Collins, CO 80526
970-221-3837

CERTIFICATE OF SERVICE

I, Edward Ronwin, hereby certify that I served this Reply to BAYER's Opposition to my Motion seeking Remand, etc., by mailing the original to the Clerk of this Court and two copies to Judge Davis' chambers and a copy to Verilaw with adequate funds and directions to have this Reply filed on Verilaw. Said mailings were made on June 14, 2004.

Edward Ronwin

# THE BASIS FOR THE PERNICIOUS ACTION OF BAYCOL(=CERIVASTATIN)

Studies on the relative injurious activity of Baycol on body tissues reveal that Baycol is in significant measure more destructive of body tissues than all the other common statins such as Lipitor (=Atorvastatin), etc.

While the experts arrayed by the PSC have uniformly explained that ingested Baycol destroys muscle cells which can ultimately lead to kidney failure and death, the underlying reason for Baycol's destructive propensity is left unanswered by these experts or by other persons.

Since Baycol is a biochemical, i.e., a chemical with biological activity, the method by which it interacts with body components and the underlying explanation for its action(s) is chemical in nature. Therefore, one needs to look to Baycol's chemical structure in comparison with other statins in any attempt to understand why Baycol is much more destructive than other statins.

Lipitor, which is a Pfizer product and an excellent statin in its ability to reduce blood cholesterol and LDL, (low density lipoprotein) levels, at least for persons whose cholesterol problem arises from a liver capacity to produce greater quantities of cholesterol than needed by the body or whose cholesterol clearance mechanism is faulty, and which drug has garnered approximately 60% of the statin market, provides an excellent comparison with Baycol.

The chemical structures of Baycol, Lipitor and some other common statins are presented on the following page, (page 2), in a portion of a research report published in the journal, Science, which described studies on the inhibition of the liver reductase enzyme that catalyzes a conversion of 3-hydroxy, 3-methyl-glutaryl Coenzyme A to mevalonate, which is then converted in a number of enzyme mediated steps to cholesterol in liver cells.

For the purposes of this discussion, the important portions of the Baycol and Lipitor molecules presented on p. 2 are highlighted and the highlighted portions are reproduced on pp. 3 and 4, respectively. With the intent of adding clarity to this discussion, the structures of Hydrogen ("H"), Carbon, ("C"), Nitrogen ("N") and Fluorine, ("F"), are presented and discussed below:




The center circles represent the nuclei of each atom. The dots represent the electrons that hover around the positively charged nuclei in each atom. Except for H, each atom contains a ring of two electrons situated closest to its nucleus. That two electron ring is full. No more electrons can enter that ring. The next ring for C, N and F is capable of holding a maximum of 8 electrons. For C the ring holds 4 electrons; for N the ring holds 5 electrons and for F the ring holds 7 electrons. Each atom has a "desire" to fill the second ring. Thus C "likes" to share its four electrons with one or more atoms, each contributing one or more electrons until the ring around C has, in effect, 8 electrons. Likewise, N has a desire to obtain by sharing or otherwise 3 additional electrons to fill its second ring and F has a desire to obtain by sharing or otherwise one additional electron to fill its second ring. Of the three atoms, C, N and F, F has the strongest "urge" to fill its second ring and is the most reactive element known to mankind. These considerations feature, in part, in the comparison of the chemical nature of Baycol and Lipitor and in the explanation for Baycol's significant destructive effects on body components.



EXHIBIT A

share rigid, hydrophobic groups that are covalently linked to the HMG-like moiety. Lovastatin, pravastatin, and simvastatin resemble the substituted decalin-ring structure of compactin (also known as mevastatin). We classify this group of inhibitors as type 1 statins. Fluvastatin, cerivastatin, atorvastatin, and rosuvastatin (in development by AstraZeneca) are fully synthetic HMGR inhibitors with larger groups linked to the HMG-like moiety. We refer to these inhibitors as type 2 statins. The additional groups range in character from very hydrophobic (e.g., cerivastatin) to partly hydrophobic (e.g., rosuvastatin). All statins are competitive inhibitors of HMGR with respect to binding of the substrate HMG-CoA, but not with respect to binding of NADPH (*6*). The $K_i$ (inhibition constant) values for the statin-enzyme complexes range between 0.1 to 2.3 nM (*5*), whereas the Michaelis constant, $K_m$, for HMG-CoA is 4 μM (*7*).

Although the structure of the catalytic portion of human HMGR in complex with substrates and with products has recently been elucidated (*8*, *9*), it yields little information concerning statin binding. The protein forms a tightly associated tetramer with bipartite active sites, in which neighboring monomers contribute residues to the active sites. The HMG-binding pocket is characterized by a loop (residues 682–694, referred to as "cis loop") (Fig. 2A). Because statins are competitive with respect to HMG-CoA, it appeared likely that their HMG-like moieties might bind to the HMG-binding portion of the enzyme active site. However, in this binding mode their bulky hydrophobic groups would clash with residues that compose the narrow pocket which accommodates the pantothenic acid moiety of CoA; thus, the mechanism of inhibition has remained unresolved.

To determine how statins prevent the binding of HMG-CoA, we solved six crystal structures of the catalytic portion of human HMGR bound to six different statin inhibitors at resolution limits of 2.3 Å or higher (Table 1) (*10*). For each structure, the bound inhibitors are well defined in the electron-density maps (Fig. 3). They extend into a narrow pocket where HMG is normally bound and are kinked at the O5-hydroxyl group of the HMG-like moiety, which replaces the thioester oxygen atom found in the HMG-CoA substrate. The hydrophobic-ring structures of the statins contact residues within helices Lα1 and Lα10 of the enzyme's large domain (Fig. 2B). No portion of the elongated NADP(H) binding site is occupied by statins. The structures presented here illustrate that statins inhibit HMGR by binding to the active site of the enzyme, thus sterically preventing substrate from binding. This agrees well with kinetic studies that indicate that statins competitively inhibit HMG-CoA but do not affect NADPH binding (*6*).

A comparison between substrate-bound and inhibitor-bound HMGR structures clearly illustrates rearrangement of the substrate-binding pocket to accommodate statin molecules (Fig. 2). The structures differ in the COOH-terminal 28 amino acids of the protein. In the electron-density maps of the statin-complex structures, residues COOH-terminal to Gly[860] are missing. In the substrate-complex structure, these residues encompass part of helix Lα10 and all of helix Lα11, fold over the substrate, and participate in the formation of the narrow pantothenic acid–binding pocket (Fig. 2A). In the statin-bound structures, these residues are disordered, revealing a shallow hydrophobic groove that accommodates the hydrophobic moieties of the statins.




**Fig. 2.** Statins exploit the conformational flexibility of HMGR to create a hydrophobic binding pocket near the active site. (**A**) Active site of human HMGR in complex with HMG, CoA, and NADP. The active site is located at a monomer-monomer interface. One monomer is colored yellow, the other monomer is in blue. Selected side chains of residues that contact the substrates or the statin are shown in a ball-and-stick representation (*20*). Secondary structure elements are marked by black labels. HMG and CoA are colored in magenta; NADP is colored in green. To illustrate the molecular volume occupied by the substrates, transparent spheres with a radius of 1.6 Å are laid over the ball-and-stick representation of the substrates or the statin. (**B**) Binding of rosuvastatin to HMGR. Rosuvastatin is colored in purple; other colors and labels are as in (A). This figure and Figs. 3 and 4 were prepared with Bobscript (*22*), GLR (*23*), and POV-Ray (*24*).




**Fig. 1.** Structural formulas of statin inhibitors and the enzyme substrate HMG-CoA. (**A**) Structure of several statin inhibitors. Compactin and simvastatin are examples of type 1 statins; not shown are the other type 1 statins, lovastatin and pravastatin. Fluvastatin, cerivastatin, atorvastatin, and rosuvastatin are type 2 statins. The HMG-like moiety that is conserved in all statins is colored in red. The $IC_{50}$ (median inhibitory concentration) values of the statins are indicated (*21*). (**B**) Structure of HMG-CoA. The HMG-moiety is colored in red, and the $K_m$ value of HMG-CoA is indicated (*7*).



PAGE 2




BAYCOL
(CERIVASTATIN)




LIPITOR
(ATOVASTATIN)

A view of the highlighted portion of the Baycol molecule on p. 3 reveals the following:

The ring containing the nitrogen atom is a pyridine ring. There is a C atom at each of the other 5 "corners" of the ring. The symbols $R, R_1, R_2, R_3$, represent the portions of the Baycol molecule not within the highlighted part shown on p. 3. The C atoms holding the $R_1$ and $R_2$ groups, respectively, are in the "ortho" position on the ring. The C atoms holding the R and $R_3$ groups, respectively, are in the "meta" position on the ring and the C atom holding the "fluorobenzene" ring is in the "para" position.

In the Baycol diagram, and of the five outer electrons of the N atom, two are represented as in a double bond and one is represented as in a single bond. We could have written the double bond where the single bond is written and vice versa. That is true for the double and single bonds in both the pyridine ring in the Baycol molecule and for the benzene (phenyl) ring in the molecule. In truth, it has been determined that the bond lengths in the phenyl ring are all equal in length and shorter than the usual C-C single bond, but longer than the usual C-C double bond. Hence, the electrons connecting the C atoms are uniformly distributed about the phenyl ring and similarly for the pyridine ring. The modern way to represent the situation is shown by the phenyl ring attached to the N-containing ring in the Lipitor molecule on p. 4.

The system of showing the C-C and C-N bonds in the single and double bond fashion allows us to more easily explain the chemical implications of the ring arrangements in the highlighted portions of the Baycol and Lipitor molecules.

In the pyridine ring, the N atom shares two of its five outer electrons with one of the C atoms to which it is bound and one electron with the other C atom to which it is bound. As a result, the N atom "satisfies" its "desire" to have a second ring with 8 electrons. At the same time, two of the N atom's five outer electrons remain unbound. That situation promotes a "movement" of the electrons as shown in the Baycol diagram on p. 3 and the system is a "conjugated" system. If no group is removed from either the pyridine ring or the phenyl ring, the system will be in an equilibrium, i.e., the "movement" of the electrons will continually go "back and forth," unless the milieu, in which the molecule is in, is changed, e.g., rise or fall in temperature and/or pressure, presence of other molecules, etc.

In fact, there is no real movement of electrons "back and forth." The two free electrons of the N atom contribute to negative electric force to the conjugated system which tends to push the two electrons in the C-F bond in the para position on the phenyl group toward the F atom which much "desires" to take the two electrons of the C-F bond.

As bond electrons move toward the F atom, the F atom becomes more electrically negative and the C atom becomes more electrically positive. In the human body, the Baycol molecule is in an aqueous media, (blood, lymph, intracellular, etc.). In that media there are $OH^-$ (hydroxyl), negatively-charged ions arising from the dissociation of the water, HOH, ($H_2O$) molecules. As the F atom pulls both of the C-F bond electrons to it, the $OH^-$ ion can attack the C of the C-F bond and attach to it while the F atom moves off the phenyl group as the $F^-$ ion and into the aqueous media of the body. The positive charge on the C atom is neutralized by the negative charge on the hydroxyl ion and a C-OH bond is created. The negative charge on the F atom remains but is made electrically neutral by the presence in the aqueous media of $H^+$ ions in the media; (actually $H^+ + H_2O = H_3O^+$, which is an hydronium ion).

OH; SH, (thiol groups); COO, (carboxyl groups) and $NH_2$, (amino groups) on the side chains of amino acids which make up proteins and enzymes can also react, as the hydroxyl ion in the aqueous body media, with the positively-charged C atom in the phenyl ring after the F atom has left the ring and form a compound with the Baycol moiety.

Thus, the highlighted portion in the Baycol molecule can result in the formation of $F^-$ ions in body fluids.

Turning attention to the highlighted portion of the Lipitor molecule, p. 4, it is obvious that the two free electrons on the N atom of the ring containing the N atom, (a pyrrole ring), cannot act in a conjugated manner with the flurophenyl group as in Baycol. As a result, one can expect that far less $F^-$ ion will arise from the Lipitor molecule as compared to the Baycol molecule.

However, the fluorophenyl group in both the Baycol and Lipitor molecules is, in itself, a conjugated system, but the push of the electrons toward the F atom in the flurophenyl group in either molecule is considerably less than in the highlighted portion of the Baycol molecule, where the N atom promotes the creation of the $F^-$ ion.

It is interesting that in designing the Baycol molecule, the Bayer biochemists, (same as pharmaceutical chemists), were attempting to ape the Lipitor molecule since Lipitor has been so successful in the statin market. What the Bayer scientists who designed the Baycol molecule failed to appreciate was: (i) the fact that substituting the Lipitor pyrrole ring with a pyridine ring in Baycol gave Baycol a ring which promoted creation of $F^-$ ions and (ii) not realizing the effect stated herein in (i), the Bayer scientists did not expend any concern with the biological effects of $F^-$ ion.

The release of the $F^-$ from the Baycol molecule is the basis for the destructive action of Baycol. Furthermore, that destructive effect is not confined to muscle cells.

In 1983, Dr.John Yiamouyiannis authored a book entitled, <u>Fluorine The Aging Factor</u>, which was published by Health Care Press, (now believed to be out of business). The book is no longer in print, but a 3rd edition was printed in 1993. I obtained a copy of the original version from the Univ. of Colorado at Boulder, CO. Amazon.com and Consumerhealth.org, (a Canadian company), appear to still have copies of the 3rd edition for sale.

The book discusses the arguments and scientific research aimed at stopping the fluoridation of drinking waters.

Salient points from the book are as follows:

p. 4: "$F^-$ levels as low as 1 part per million, (ppm) in the drinking water give rise to an increase in urine concentration of certain biological chemicals that signal the breakdown of collagen."

p. 4: Collagen makes up 30% of body protein. It is a major structural component of skin, ligaments, tendons, muscle, cartilage, bones and teeth.

p. 8: $F^-$ inhibits a number of important enzymes, (which are listed on p. 8).

p. 15: $F^-$ attacks hydrogen bonds, thereby distorting protein and DNA shapes and their function. Citing John Emsley, "An unexpectedly strong hydrogen bond, etc.",J. Amer. Chem. Soc., <u>103</u>, 24 (1981).

p. 20: Collagen breakdown in bone, tendon, muscle, skin, cartilage, lung, kidney & trachea. Citing several research reports.

p. 38: "As the tendon approaches the bone, the tendon collagen merges with the bone collagen." Thereby a bridge forms connecting the tendon to the bone.

Clearly, more than muscle tissue is and can be destroyed by Baycol action.

As noted in a review written by Prof. M. Makosza in the English version of the Russian Chemical Bulletin, 45, 491 (1996) at p. 492, the F atom is very much more easily replaced from the phenyl ring than the other halide atoms, i.e., Chlorine, Bromine and Iodine.

It is important to understand that while $F^-$ action can account for much of Baycol's destructive propensity, other mechanisms based on other aspects of different statin molecules might also cause injury to body components. However, the release of $F^-$ ion from Baycol must be a very major factor since Baycol's destructive action is significantly greater than that of all other common statins.

It is important to recognize that in very, very rare instances does a chemical reaction yield 100% product. Oftentimes the yield is much less and a chemical reaction between two or more molecules, or within a molecule, can often take more than one pathway with the result that different products are yielded. Important, too, are the conditions in which the molecule is placed. The media containing the molecule exerts important influence on the speed of chemical reactions and on the product yields.

The speed of chemical reactions is often quite fast. The time periods involved are as small as $10^{-15}$ seconds, (femtoseconds) to $10^{-18}$ seconds, (attoseconds). Written out a femto second is 0.000000000000001 of a second, and an attosecond is 0.000000000000000001 of a second. Such time periods boggle the mind, but scientists are currently able to measure such time periods. We have come a long way from the alchemists laboratories. Of course, there are chemical reactions which are much, much slower.

Just how destructive the $F^-$ ion can be is shown by the fact that hydrofluoric acid, HF, which dissociates in water to $H^+$ and $F^-$, is used to etch metal and glass. Even though body fluids are generally slightly basic, (stomach fluid is very acidic), $F^-$ ions can be expected to "etch" body components.

Edward Ronwin

By Edward Ronwin, PhD, JD

The following pages were copied from:

Advanced Organic Chemistry, Reactions and Mechanisms, by Bernard Miller, (published by: Pearson, Prentice-Hall), 2nd Ed., (2004)

(The book page numbers are shown on each page)

EXHIBIT B

Case 0:02-cv-00200-MJD-SRN Document 63 Filed 06/17/2004 Page 21 of 27






(14a)




(14b)

Cram also found that if the reactions were stopped before they were complete and unreacted **10** and **11** were recovered, **10** was recovered in a completely racemic form (Eq. 14c), while tosylate **11** had retained its optical activity.




(14c)

These results could be accounted for if the phenonium ion and the tosylate ion in each case stayed together as an *intimate ion pair.* The tosylate ions would be in a position to attack the three-membered rings before solvent molecules could intervene. (Winstein later showed that "internal return" by tosylate ions was about four times as fast as attack by acetic acid.[26])

Cyclic, three-membered phenonium ions can now be prepared, and their spectra recorded, in superacid solutions. Their spectra are consistent with those expected of cyclopropane derivatives.[27]




(22a)




(22b)

These reactions are considered to proceed by two-step (*addition–elimination*) mechanisms, as shown in Eq. 22, rather than by direct substitution reactions.

Since additions of nucleophiles to pyridine rings disrupt the aromatic systems, the first (addition) steps in the reactions are normally the rate-limiting steps. Not surprisingly, therefore, reactions of nucleophiles with *N*-alkylpyridinium salts of 2-halo- and 4-halopyridines (Eq. 23) occur billions of times as rapidly as reactions of the neutral pyridines.[21]




(23)

In general, 4-halopyridines are somewhat more reactive toward nucleophilic attack than are 2-halopyridines. 4-Bromopyridine, for instance, is so reactive that it spontaneously dimerizes to form a quaternary salt on standing at 0°C (Eq. 24).




(24)

In contrast, displacements occur more rapidly at C2 than at C4 of *N*-alkylpyridinium and *N*-alkylquinolinium salts.[22]

**Elimination–addition (pyridyne) processes.** The addition of a nucleophile to C3 of a pyridine derivative cannot yield an intermediate in which the negative charge is distributed onto




(41

The reduction reactions of pyridinium salts are of particular interest because of their relation to important biological processes. A dihydropyridine ring in the coenzyme nicotinamide adenine dinucleotide (*NADH*) serves as the source of hydrogen in enzyme-catalyzed biological reductions of carbonyl compounds to alcohols (Eq. 42), while the resulting quaternary pyridinium salt, NAD$^+$, is employed in biological oxidations of alcohols to carbonyl compounds.




(42)

## Substitutions Involving Ring Opening and Reclosure

**Substitution by ANRORC mechanisms.** In the 1970s, a Belgian group led by Henk van der Plas found that some apparently straightforward substitution reactions in heterocycles containing two or more nitrogen atoms actually proceed by rather complex mechanisms.[37]

Reaction of 4-phenyl-6-bromopyrimidine with potassium amide in liquid ammonia yielded, as expected, the 6-amino derivative. However, when the starting material was labeled with $^{15}$N (the isotopic nitrogen being equally distributed between the two nitrogens in the ring), 50% of the $^{15}$N in the product was located in the exocyclic amino group (Eq. 43a)!




(43a)

To explain this result, it was postulated that the amide anion originally added to C2, and that the resulting anion then underwent electrocyclic ring opening, ejection of the bromide anion, and ring closure to yield the 6-aminopyrimidine, as shown in Eq. 43b.

Case 0:02-cv-00200-MJD-SRN Document 63 Filed 06/17/2004 Page 24 of 27





(48)

**Substitution for heteroatoms in the ring.** The reaction of an amine with a pyridinium salt bearing strongly electron-withdrawing substituents on the nitrogen or carbons of the ring can result in the exchange of the ring nitrogen atom, as shown in Eqs. 49 and 50.[38]



(49)



(50)

Substitution of aromatic amines for alkylated ring nitrogen atoms is a useful method for synthesizing *N*-arylpyridinium salts, which, with the exception of salts such as **15** (which can be prepared by reactions of pyridines with 2,4-dinitrohalobenzenes, as in Eq. 51), are not otherwise available.

Pyrrole, however, is converted to 2-carbethoxymethylpyrrole under the same conditions (Eq. 47).[25,26]


(47)

Pyrroles react with chloroform or bromoform and bases to form 3-halopyridines (Eq. 48).[14]


(48)

This interesting rearrangement appears to proceed by way of a cyclopropane intermediate, formed by the reaction of a dihalocarbene with the anion of the pyrrole. It is not clear whether the cyclopropane is formed in one step or via an intermediate carbanion, as shown in Eq. 50.

$$CHBr_3 + RO^{\ominus} \longrightarrow :CBr_2 + ROH + Br^{\ominus} \qquad (49)$$


(50)

Remarkably, reactions of thiophenes, pyrroles, and furans with carbethoxynitrene all result in the formation of products containing pyrrole rings. Sulfur is eliminated in the reaction of thiophene, while the heteroatoms from furan and pyrrole are retained in the products (Eqs. 51 to 53).[27]


(51)

ZIMMERMAN REED
ATTORNEYS AT LAW

June 2, 2004

STACY K. HAUER
Admitted in Minnesota
skh@zimmreed.com

REPLY TO MINNEAPOLIS

Mr. Edward Ronwin
945 Rolland Moore Dr., L-2
Fort Collins, CO 80526

Re: *Baycol Products Litigation, MDL 1431*

Dear Mr. Ronwin:

I write pursuant to our recent telephone conversations. I have discussed your request to be a generic expert for the PSC in the Baycol MDL and have been advised that the PSC respectfully declines your offer. The PSC has gone to great lengths to assemble experts from across the country to participate in this litigation. Furthermore, it appears you have addressed this issue with the Court previously and Judge Davis denied your motion in Pre-Trial Order 13.

The recently issued Pre-Trial Order 120 sets out the procedures for designating expert witnesses in Baycol trials. If you wish to be an expert in your own Baycol case, then please see Pre-Trial Order 120 and respond accordingly. I am enclosing a copy for your convenience.

I am sorry that I cannot be of more assistance to you at this time.

Very truly yours,

ZIMMERMAN REED, P.L.L.P.

Stacy K. Hauer

SKH:tmo
cc: Deanna Dailey
L:\WPDATA\Baycol\MDL\Letters\Ltr734 (Ed Ronwin).wpd

EXHIBIT C

945 Rolland Moore Dr., L-2
Fort Collins, CO 80526
970-221-3837

June 14, 2004

Clerk of Court
U.S. District Court
300 South 4th St., Room 202
Minneapolis, MN 55415

Re: Ronwin v. Bayer Corp., MDL No. 1431; Case No. 02-0200

Dear Sir:

I have enclosed the original of a self-explanatory Reply in the above-identified action. Please file.

Sincerely

Edward Ronwin

Edward Ronwin

RECEIVED
BY U.S. MAIL
2004 JUN 17 AM 9:28
CLERK, U.S. DIST COURT
MINNEAPOLIS, MN