E-SERVED 07/13/04 03:24 PM ET Baycol MDL 1431

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re BAYCOL LITIGATION | ) | |
| | ) | MDL No. 1431 (MJD/JGL) |
| This document relates to: | ) | |
| | ) | Case No. 02-0200 |
| RONWIN v. BAYER CORP. | ) | |

**MOTION TO RECONSIDER ORDER DATED JULY 1, 2004 DENYING REMAND AND NEGOTIATION**

Plaintiff, RONWIN, hereby moves this Court to reconsider a portion of the Order in this specific case dated July 1, 2004, for the following reasons:

1. The focus of this motion is the content of the 1st full ¶, p. 3, of said ORDER. In that ¶, the Court declares that RONWIN's alternate request for the Court to order negotiation, but not mediation, "...would circumvent the Settlement/Mediation Program [per] PTO Nos. 51, 59, 61 and 64." The Court then states that RONWIN "has not submitted a sufficient basis for doing so," and then denies RONWIN's entire motion.

2. As to whether RONWIN presented a "sufficient basis" on the question of whether negotiation rather than mediation should be ordered, the Court is in error. In the motion to remand, (MOTION), RONWIN stated, in connection with the cost of discovery disks and depositions, that RONWIN is "...without monetary means" to acquire the items. In the Reply, (REPLY), to BAYER's RESPONSE, RONWIN noted the extent of his dollar income and his inability to pay for discovery items, ¶s 5, 6, pp. 2-4, REPLY; and then stated that RONWIN, "...cannot, and will not, undertake to pay anyone, anywhere $150/ hour for any service whatsoever," ¶ 14, p. 7, REPLY. The $150/hour

E-SERVED 07/13/04 03:24 PM ET Baycol MDL 1431

referred to the provision in PTO 59, ¶ 10, wherein the Court stated that in successful mediations, BAYER would pay all mediation fees, but in unsuccessful mediations, the fee would be shared equally by BAYER and the plaintiff involved. The hourly fee for mediators was set in PTO 60, ¶ 7, at $300/hour and the fee payment obligation was changed so that if the parties did not agree upon an allocation of fee, regardless of whether or not the mediation was successful, the Court would determine the allocation. It had been over a year between the time RONWIN read PTO 59 and 60 and when REPLY was drafted so that the $300/hour amount and the split of fees if mediation was unsuccessful ordered in PTO 59 were in RONWIN's mind; hence the use of the $150/hour rate in unsuccessful mediations. Since the fee provisions in ¶ 7, PTO 60 could mean even greater fee obligation to plaintiffs than $150/hour for mediation, RONWIN's exposition of his lack of ability to undertake any mediation fees is a clear declaration of a "sufficient basis" for demanding negotiation rather than mediation unless BAYER agrees to pay the entire mediation fee regardless of the result of mediation efforts.

**3.** While not directly involved in this motion, the change in fee determination procedures from PTO 59 to PTO 60 raises a serious concern. The mediation fee provision in PTO 59 is more friendly to plaintiffs since in successful mediations, plaintiffs are totally relieved of any fee obligation and face a split fee in unsuccessful mediation; whereas, in the fee provision in PTO 60, plaintiffs face a potential fee obligation regardless of whether or not the mediation process is successful; and that obligation could be for the

E-SERVED 07/13/04 03:24 PM ET Baycol MDL 1431

total fee. The change in fee provisions from PTO 59 to PTO 60 was made between Jan. 2, 2003 and Jan. 9, 2003. It is clearly a change against the interests of all plaintiffs in this MDL; yet there does not appear to have been a peep of an objection to the change from the Plaintiffs Steering Committee, (PSC)! Why?

4. Reading 1st full ¶, p. 3, ORDER as implying that RONWIN, on the question of negotiation versus mediation, did not proceed to seek negotiation under the Settlement/Mediation Program, RONWIN spoke with LEWIS REMELE, Special Master on July 6, 2004. REMELE stated that only "Rhabdo" cases qualified for the Program. That is an outrage against thousands of plaintiffs in this MDL and is based on scientific nonsense. RONWIN uses the terms "science" and "scientific" to mean truths established by research and investigation, and facts, and not the nonsense promoted to this Court by BAYER to which the PSC has toadied. It also transpires, as explained by REMELE, that the alleged Settlement Program is a <u>mediation only</u> program; yet, this Court would be more than hard pressed to provide an explanation why mediation is superior in each and every plaintiff's case to direct negotiation between BAYER and any plaintiff as a means to settle. The Settlement Program appears to be a way to create fees for mediators regardless of whether or not settlement can be achieved in any particular plaintiff's case without intercession of a mediator. Furthermore, the great majority of plaintiffs are excluded from any settlement process, which is a violation of the equal protection clause of the United States Constitution. Additionally,the denial of any settlement process to the vast

E-SERVED 07/13/04 03:24 PM ET Baycol MDL 1431

majority of plaintiffs in this MDL without any justification for the discrimination is based on an absurd division of injury designation; and all without objection to the Settlement Program from the alleged advocate for all plaintiffs in this MDL, i.e., the PSC!

5. As to Rhabdomyolysis and the Settlement Program in PTO 59 and 60, the comments of RONWIN in REPLY, ¶s 17 to 23, incl., pp. 8-10, are pertinent and reproduced in part below with additional, appropriate comment:

> (¶ 17). ...The concept of "rhabdo" cases as being separate from other cases of Baycol injury is a fraud. In its objections to PTO 102, the Shannon firm notes that BAYER insists that the definition of "rhabdomyolysis" is 10 times greater than 185 (Creatine (Phospho) Kinase), ("CK" or "CPK"), units/liter of blood. However, a heightened CK level would be seen more by fortune than by deliberate search since it depends upon when the blood sample is taken in an effort to determine the CK value as an indication of tissue damage. Thus, in Exh. A to the Shannon firm's Objection to PTO 102, (filed on Verilaw at 3:50 p.m., ET, on Feb. 18, 2004), credible authorities are quoted to the effect that there are "no standard CK values that establish the diagnosis of rhadomyolysis."

Because of their pertinence, the statements of said authorities as presented in the Shannon firm's Objection to PTO 102 are set forth below:

> The clinical manifestations of rhabdomyolysis range from severe muscle pain, profound weakness, muscle tenderness, stiffness, swelling, and rarely muscular paralysis and diaphragm failure to a relatively asymptomatic state with no abnormal findings despite extensive rhabdomyolysis. BRENNER & RECTOR'S THE KIDNEY, p. 1093 (6th ed. 2000 W.B. Saunders Company).

> Rhabdomyolysis is a syndrome characterized by muscle necrosis and the release of intracellular muscle constituents into the circulation. The severity of illness ranges from asymptomatic elevations of muscle enzymes in the serum to life-threatening cases associated with extreme enzyme elevations, electrolyte imbalances, and acute renal failure. Mark Miller, Editor UP TO DATE; (Volume 11.3, 2003).

> Rhabdomyolysis is a syndrome that results from destruction of

E-SERVED 07/13/04 03:24 PM ET Baycol MDL 1431

> skeletal muscle. It is usually diagnosed from laboratory findings that are characteristic of myonecrosis...there are no standard CK values that establish the diagnosis of rhabdomyolysis...studies have also shown that there is a poor correlation between CK elevations and the morphologic degree of muscle damage. GOLDMAN:CECIL TEXTBOOK OF MEDICINE, p.523 (21st ed. 2000, W.B.Saunders Company)(emphasis added (in original)).

There clearly is no real value to the CK values, which BAYER has promoted herein, as the arch-determinant of the existence of "rhabdomyolysis." The condition can be present in humans without any marked deviation from normal CK values. That is scientific fact, not conjecture, and this Court must guide itself by that situation. There can be no legal determinations based on hocus-pocus.

> (¶ 18). The scientific fact is that Baycol destruction of tissue runs the gamut from the very mild to the very extreme in a continuum. CK values might point to possible extreme situations, but one can have extreme tissue destruction and still show no elevated CK values. [On April 30, 2004], RONWIN spoke with Co-lead counsel attorneys and asked them why they accepted the "rhabdo" definition which runs counter to the scientific facts. While admitting that there is no specific sharp distinction between a myolysis that is extreme and a mild one and that the matter is a continuum, they claimed that the Court and BAYER forced it upon them. If so, the Court erred and should reverse its position to bring it in line with the facts, not BAYER's desire to allow fiction to triumph. One should speak of a very mild or mild, or medium, or extreme or very extreme myolysis, but not of rhabdomyolysis which is nonsense. The PSC has made no effort to rectify the arbitrary and fictitious division of injury classification which situation is detrimental to all remaining plaintiffs in this MDL. The injury and medical work on my injury is just as severe an injury as any "rhabdomyolysis" case, except one that led to death.

> (¶ 19). Furthermore, as noted below and attached [to REPLY], other tissues besides muscle are also attacked by Baycol.

> (¶ 20). According to the Co-lead counsel attorneys, this Court has been steered by both PSC and BAYER (and GSK), through their agreement, to the notion, (and to the detriment of plaintiffs), that the experts needed to establish a causal relationship between a person's injuries and the taking of Baycol need to be MDs, as shown by the content of PTO 102 and PTO 114.

E-SERVED 07/13/04 03:24 PM ET Baycol MDL 1431

(¶ 21). In virtually all cases, all that an MD can do is describe the injuries a Baycol taker experienced and what medical assistance to alleviate or repair the injuries the MD has taken. In other words, the WHAT relationship between Baycol and the observed injuries. However, virtually all MDs are not capable by training and experience to explain the scientific WHY Baycol causes significantly higher incidence of injuries in people compared to other statin drugs.

(¶ 22). Baycol is a biochemical...As such the WHY it causes injuries resides in its chemical structure and its chemical action potentials an understanding of which is within the ken of biochemists and rarely with MDs.

(¶ 23). Attached [to REPLY as Exh. A] is a copy of an expert opinion which explains the biochemical basis for Baycol's action and additionally explains why Baycol destroys all manner of body tissues and components...

In the PSC's Response to the Order to Show Cause Requirements of PTO 102, the PSC quotes its generic expert, Dr. CHARLES E. BOULT, in bold letters. The essence of Dr. BOULT's quoted comments are the same as those argued above; i.e., that CK blood levels are not the essential indicator of extreme tissue destruction. See pp. 2-3 of the PSC's Objections.

**6.** While remand may be properly denied at this time in RONWIN's specific case, there is no justification for an alleged Settlement Program which blocks settlements for the mass of plaintiffs remaining in this MDL and whose terms bar negotiation, but require costly mediation whose only benefit in many cases is to enrich mediators.

**WHEREFORE**, Plaintiff, RONWIN, demands that this Court order BAYER and RONWIN to arrange to meet for at least one negotiation effort in attempt to settle RONWIN's specific action and, while RONWIN does not advocate for all other remaining plaintiffs, RONWIN suggests that the Court order that all other plaintiffs have the right to demand at least one negotiation session with Defendants at any

E-SERVED 07/13/04 03:24 PM ET Baycol MDL 1431

time during the life of this MDL.

DATED: July 9, 2004.

Edward Ronwin, pro se
945 Rolland Moore Dr., L-2
Fort Collins, CO 80526
970-221-3837

CERTIFICATE OF SERVICE

I, Edward Ronwin, hereby certify that I served this Motion by mailing the original to the Clerk of this Court; two copies to Judge Davis' chambers and a copy to Verilaw with adequate funds to cover the cost of placing this motion on Verilaw's notice system. Mailings were made on July 9, 2004.

Edward Ronwin