E-SERVED
09/24/04
12:43 PM ET
Baycol MDL 1431

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re BAYCOL LITIGATION | ) | |
| | ) | MDL No. 1431 (MJD/JGL) |
| This Document relates to: | ) | |
| | ) | Case No. 02-0200 |
| RONWIN v. BAYER CORP. | ) | |

**OPEN LETTER TO THE COURT FROM PLAINTIFF, EDWARD RONWIN**

In RONWIN's opinion several matters need to be aired in this Court. RONWIN cannot attend the Status Conference to be held on Sept. 27, 2004 which leaves this open letter as the only suitable mechanism for presentation of the matters discussed below:

I

It is appropriate that the Court be advised of the true character of Defendant[1]; same as Defendant attacked RONWIN's character and mental status in its Motion to Dismiss against RONWIN filed on Nov. 14, 2002.

The Defendant is a criminal and crooked organization. Proof:

Attached hereto is a report in <u>Chemical & Engineering News</u>, July 19, 2004, p. 9, (a publication of the American Chemical Society), announcing that Defendant has agreed to plead guilty of a violation of Sec. 1 of the Sherman Antitrust Act, (15 U.S.C., §1) and to pay a fine of $66,000,000.00. A copy of the original Information obtained from the U.S. Dept. of Justice is also attached.

This is not the first time Defendant has run afoul of American

[1]As used herein, "Defendant" means either BAYER, A.G., or BAYER CORP; not GSK. BAYER CORP. is a wholly owned subsidiary of BAYER, A.G., and, as such, its actions are inseparable from BAYER, A.G., whose officers and directors make the ultimate decisions as to BAYER CORP.'s activities.

Sep 24 04 11:20a Lexis Nexis 610-205-1039 p.2

E-SERVED 09/24/04 12:43 PM ET Baycol MDL 1431

law. On behalf of the Federal Trade Commission the U.S. Dept. of Justice brought an action against Defendant who had used false advertising and selling methods. Defendant entered into a Consent Decree. All of the items mentioned above constitute Exh. A.

Additionally, it is RONWIN's understanding, based on a dissertation given by JOHN CLIMACO, an attorney on the Plaintiffs Steering Committee, (PSC), that Defendant failed to present negative matter to the Food & Drug Administration, (FDA), in the process wherein it sought permission to market Baycol.

II

RONWIN listened to much of the deposition of Dr. PAUL STOLLEY[2] taken on Sept. 15, 2004 by Defendant's attorney JOSEPH PIORKOWSKI. Dr. STOLLEY was purported to be a Plaintiffs' rebuttal witness and an epidemiologist according to an "agent" for the PSC. During the deposition, and despite the fact that at an earlier stage in this MDL, Plaintiffs' attorneys and pro se Plaintiffs have already executed a document pledging to respect documents marked, "confidential," PIORKOWSKI asked all listeners and persons present at the deposition to agree to the confidentiality of a document whose content, at that point, was not well described, if at all. Intent upon continuing to listen, RONWIN agreed.

Desirous to learn the contents of the "confidential" document, RONWIN made contact with PIORKOWSKI, who explained that the data in the document, when combined with certain unconfidential data, elim-

[2]RONWIN had to quit listening for about an hour or so in order to do other tasks.



Sep 24 04 11:20a Lexis Nexis 610-205-1039 p.3

E-SERVED 09/24/04 12:43 PM ET Baycol MDL 1431

inated the possibility of comparing "apples with oranges," and allowed a comparison of "apples with apples." Although, PIORKOWSKI conducted a very well prepared and professional interrogation of Dr. STOLLEY, it appears to RONWIN that the effort to eliminate a comparison of "apples with oranges," which was largely the crux of the deposition and which was intended to frame Baycol as no more hazardous to human health than any other common statins, merely succeeded in comparing "apples with baloney."

Here's why, using a comparison of Zocor, (Simvastatin) with Baycol, (Cerivastatin):

The most usual daily dose prescribed for Zocor users is 40 mg[3]. The recommended daily dose for Baycol when it was on the market was 0.4 mg. The molecular weight of Zocor is 418.57. The molecular weight for Baycol is 481.5. Molecular weight is a number. Thus, the molecular weight for water is 18. That figure is arrived at as a result of the facts that an atom of Hydrogen is taken as very, very nearly 1, and that an atom of Oxygen is very, very nearly 16 times the weight of an atom of Hydrogen. Hence, $H_2O$ has a molecular weight of 18. If one had a beaker containing 18 g of $H_2O$, one would have $6.02 \times 10^{23}$ or 602,000,000,000,000,000,000,000 molecules of water in the beaker[4].

The amount, $6.02 \times 10^{23}$ molecules is the number of molecules in

---

[3]RONWIN checked several pharmacists in the Fort Collins, CO area and got uniform agreement that a 40 mg daily dose is the most common for Zocor.

[4]Counting one molecule every second for 24 hours every day for 365 days per year, it would take 22,000,000,000,000,000 <u>years</u> to complete the count! The Universe is estimated to be only 13-14 billion years old!



Sep 24 04 11:20a Lexis Nexis 610-205-1039 p.4

E-SERVED 09/24/04 12:43 PM ET Baycol MDL 1431

any sample of any chemical compound whose weight in grams is equal to the compound's molecular weight. (If the chemical sample consisted solely of the atoms of an element, such as Carbon, then said number is the number of atoms in a sample whose weight in grams is equal to the atomic weight of the element. For Carbon, that weight would be 12 g). The number is known as Avogadro's Number[5]

A 418.57 g sample of Zocor would have $6.02 \times 10^{23}$ molecules of Zocor; likewise, a 481.5 g sample of Baycol would have the same number of molecules. Hence, a 40 mg sample of Zocor would have $5.75 \times 10^{19}$ molecules and a 0.04 mg sample of Baycol would have $5 \times 10^{17}$ molecules. Therefore, a daily dose of Zocor would have 115 times more molecules than a daily dose of Baycol. If both daily doses caused injury at the same rate, (hardly likely, since Zocor is causes less), Baycol would be 115 times more potent in causing injuries than Zocor. That's comparing apples with apples!

RONWIN recommends that every Plaintiff avail themselves of the foregoing to defeat Defendant's attempt to portray Baycol as just an ordinary, harmless statin.

III

As noted in Section II, above, RONWIN listened to most of Dr. STOLLEY's deposition. RONWIN learned of the means to listen when prior to the deposition RONWIN called PIORKOWSKI to learn what sort

[5]For those who are interested, Avogagro's full legal name was: Lorenzo Romano Amadeo Carlo Avogadro di Quaregna e di Ceretto. To his friends he was known as Amadeo.



Sep 24 04 11:20a Lexis Nexis 610-205-1039 p.5

E-SERVED
09/24/04
12:43 PM ET
Baycol MDL 1431

of testimony Dr. STOLLEY might be giving. In that conversation, RONWIN learned that other depositions could have been listened to; however, the PSC--purported guardian of the rights and position of Plaintiffs in this MDL--never informed RONWIN, (and presumably other Plaintiffs' attorneys and Plaintiffs pro se), of this asset. PTO No. 3, Sec.C.f carries a directive requiring the PSC to "prepare and distribute to the parties periodic status reports." No such report from the PSC has ever reached RONWIN which mentions the right to listen in to depositions taken in this MDL; moveover, the number of such items received by RONWIN to date and which might be characterized as a "periodic status report" is no more than seven (7) in the entire 2 and 3/4 years duration of this MDL and of those roughly seven (7) "reports" about three (3) dealt with attorneys fees for the PSC.

Edward Ronwin, pro se
945 Rolland Moore Dr., L-2
Fort Collins, CO 80526
970-221-3837

CERTIFICATE OF SERVICE

I, EDWARD RONWIN, have served this Open Letter to the Court upon the Clerk of this Court, upon Judge Davis's chambers and upon all others in the MDL by Verilaw this 20th day of September, 2004.



Sep 24 04 11:20a Lexis Nexis 610-205-1039 p.6

E-SERVED 09/24/04 12:43 PM ET Baycol MDL 1431



# CONCENTRATES

## Clariant continues to slim down

**Clariant has agreed to sell its Lancaster Synthesis unit to** Johnson Matthey for roughly $25 million. And it is mulling the sale of another of its noncore businesses, electronic materials. Lancaster had sales last year of about $35 million in small-quantity lots of organic chemicals to industrial and academic researchers through catalog sales and through distribution facilities in the U.S., Germany, France, and India. Johnson Matthey intends to combine the business, located in northwestern England, with its own research chemicals business, which includes Avocado Research Chemicals, acquired two years ago. Meanwhile, German press reports indicate that Clariant is in advanced talks with U.S. private equity company Carlyle Group over the sale of Clariant's electronic materials division for about $400 million. This business had sales last year of some $360 million in a variety of products, including photoresists, dielectric materials, antireflective coatings, and ancillary chemicals.

## Brazil, Bolivia closer to cracker

**The presidents of Brazil and** Bolivia both pledged their commitment to an ethylene and polyethylene complex based on Bolivian natural gas on their shared border, according to Brazil's government-run Agência Brasil. "Brazil wants to help enable Bolivia to export products with greater added value to the Brazilian and international markets," says Brazil's president, Luiz Inácio Lula da Silva. The plant will be located near Corumbá, Brazil, and Puerto Suárez, Bolivia. According to published reports, Brazil's state oil company, Petrobras, says it will operate the $1.3 billion complex when it comes onstream around 2010. Other participants in the facility will be Brazil's Braskem, Spain's Repsol YPF, and Bolivian state energy company YPFB.

## Bayer settles price-fixing charges

**Bayer has agreed to plead** guilty and pay a fine of $66 million to settle charges that it participated in an international scheme to fix prices of rubber chemicals. The firm says the agreement with the U.S. Justice Department resolves all U.S. criminal charges. In March, Crompton agreed to pay $50 million to settle similar charges. Separately, Bayer struck a more positive note by reducing its planned job cuts. The firm will reduce the number of job losses planned for its German sites from roughly 4,000 to about 3,000 over this year and next, according to Richard Pott, Bayer works director. All employees—from members of the board to staff being paid according to union agreements—will support employees who are laid off by making a "solidarity payment" of up to 10% of each individual's variable income.

## Lonza licenses Chromos Molecular

**Chromos Molecular Systems** of British Columbia has taken a license from Lonza Biologics, in the U.K., to use Lonza's proprietary CHOK1SV cell line with its own proprietary ACE System to produce cellular proteins. Chromos' license will be used for its own developments and for those of third parties, and it has the right to grant sublicenses to third parties for use in developing biopharmaceuticals such as recombinant proteins and monoclonal antibodies.

## Changes at TPC's top

**Abandoning the usual "left** the company to pursue other interests" euphemism, Texas Petrochemicals (TPC) says it has "terminated" Carl S. Stutts, its president and CEO; Joseph Grady, its chief financial officer; and Stephen R. Wright, its senior vice president and legal counsel. Stutts joined the company in April 2003 and led the company through its Chapter 11 bankruptcy reorganization from July 2003 to May 2004. As part of the reorganization effort, TPC plans an initial public offering of stock. TPC quickly announced replacements, appointing Charles W. Shaver, 45, to the positions of president, CEO, and member of the board. Shaver was with Gentek, where he ran the chemicals business. TPC also named Frederick M. Pevow Jr. interim senior vice president and CFO. He is a founder of the small investment banking firm Teal Capital Partners. TPC, which makes chemicals from crude C4 streams, has been hit hard by gasoline reformation, which destroyed demand for one of its main products, methyl *tert*-butyl ether.

## Akzo Nobel Adds To Coatings Operations

**Akzo Nobel's industrial fin**ishes business has opened two new multipurpose coatings facilities in China. These bring the number of its plants in the country to eight, with two more plants, for powder coatings, under construction. One of the newly opened facilities is in Tianjin, 80 miles from Beijing, and the other is in the Shanghai vicinity. Both will focus on production of coatings for wood, coil, and specialty plastics. Separately, Akzo Nobel has bought the coil coating business of Rhenacoat, the French subsidiary of German specialties producer Altana Chemie, for an undisclosed price. Altana had sales of about $15 million last year.

## Applera unit lays off 145

**As part of an ongoing review** of its businesses, the Applied Biosystems unit of Applera is laying off approximately 145 workers—3.5% of its total—in its July-to-September quarter. The company says most of the layoffs will occur at its Foster City, Calif., headquarters and a majority will come from R&D. The company is also phasing in a new organization structure that will divide the company into four business units: molecular biology, proteomics and small molecules, applied markets, and service.

## Mitsui companies win Iran order

**In a contract worth more** than $225 million, Mitsui Engineering & Shipbuilding, Mitsui Chemicals, and Mitsui & Co. will build a 300,000-metric-ton-per-year high-density polyethylene plant for Iran's National Petrochemical Co. Construction of the unit, which will implement a Mitsui process, is scheduled for completion in 2007 at Ilam, in western Iran. In 1980, Mitsui companies were completing the construction of

EXH. A

E-SERVED
09/24/04
12:43 PM ET
Baycol MDL 1431

This document is available in three formats: this web page (for browsing content), PDF (comparable to original document formatting), and WordPerfect. To view the PDF you will need Acrobat Reader, which may be downloaded from the Adobe site. For an official signed copy, please contact the Antitrust Documents Group.

MICHAEL L. SCOTT (CSBN 165452)
JEANE HAMILTON (CSBN 157834)
VICTOR ALI (CSBN 229544)
Antitrust Division
U.S. Department of Justice
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 436-6660

Original Filed July 14, 2004

Attorneys for the United States

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 04-0235 PJH |
| Plaintiff, | INFORMATION |
| v. | VIOLATION:<br>Title 15, United States Code,<br>Section 1 (Price Fixing) |
| BAYER AG, | |
| Defendant. | San Francisco Venue |

The United States of America, acting through its attorneys, charges:

I.
DESCRIPTION OF THE OFFENSE

1. BAYER AG is made a defendant on the charge stated below.

2. Beginning in or about July 1995 and continuing until in or about December 2001, defendant and co-conspirators participated in a combination and conspiracy to suppress and eliminate competition by maintaining and increasing the price of certain rubber chemicals sold in the United States and elsewhere. The combination and conspiracy engaged in by the defendant and co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).



Sep 24 04 11:23a Lexis Nexis 610-205-1039 p.8

E-SERVED
09/24/04
12:43 PM ET
Baycol MDL 1431

3. The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among the defendant and co-conspirators, the substantial term of which was to suppress and eliminate competition by maintaining and increasing the price of certain rubber chemicals in the United States and elsewhere.

4. For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and co-conspirators did those things that they combined and conspired to do, including, among other things:

(a) participating in conversations and meetings to discuss prices of certain rubber chemicals to be sold in the United States and elsewhere;

(b) agreeing, during those conversations and meetings, to raise and maintain prices of certain rubber chemicals to be sold in the United States and elsewhere;

(c) participating in conversations and attending meetings concerning implementation of and adherence to the agreements reached;

(d) issuing price announcements and price quotations in accordance with the agreements reached; and

(e) exchanging information on the sale of certain rubber chemicals in the United States and elsewhere.

## II.
## DEFENDANT AND CO-CONSPIRATORS

5. The defendant is an entity organized and existing under the laws of Germany, with its principal place of business in Leverkusen, Germany. During the period covered by this Information, the defendant engaged in the business of producing and selling certain rubber chemicals in the United States and elsewhere.

6. Various corporations and individuals, not made defendants in this Information, participated as co-conspirators in the offense charged herein and performed acts and made statements in furtherance of it.

7. Whenever in this Information reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, employees, agents, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

## III.
## TRADE AND COMMERCE

8. Rubber chemicals are a group of additives used to improve the elasticity,

E-SERVED
09/24/04
12:43 PM ET
Baycol MDL 1431

strength, and durability of rubber products. Rubber chemicals are used primarily in the manufacture of tires, outdoor furniture, hoses, belts, and footwear.

9. During the period covered by this Information, the defendant and co-conspirators manufactured, sold, and distributed rubber chemicals in a continuous and uninterrupted flow of interstate and foreign trade and commerce to customers located in states or countries other than the states or countries in which the defendant and co-conspirators produced rubber chemicals.

10. The business activities of the defendant and co-conspirators that are the subject of this Information were within the flow of, and substantially affected, interstate and foreign trade and commerce.

IV.
JURISDICTION AND VENUE

11. The combination and conspiracy charged in this Information was carried out, in part, in the Northern District of California within the five years preceding the filing of this Information.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

Dated: 7/13/04

_____/s/_____
R. Hewitt Pate
Assistant Attorney General

_____/s/_____
James M. Griffin
Deputy Assistant Attorney General

_____/s/_____
Scott D. Hammond
Director of Criminal Enforcement

United States Department of Justice
Antitrust Division

_____/s/_____
Kevin V. Ryan
United States Attorney
Northern District of California

_____/s/_____
Phillip H. Warren
Chief, San Francisco Office

_____/s/_____
Marc Siegel
Assistant Chief, San Francisco Office

_____/s/_____
Michael L. Scott
Jeane Hamilton
Victor Ali
Attorneys

U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 94102
(415) 436-6660



Sep 24 04 11:24a Lexis Nexis 610-205-1039 p.10

E-SERVED
09/24/04
12:43 PM ET
Baycol MDL 1431

ROBERT J. CLEARY
United States Attorney

Assistant United States Attorney
Peter W. Rodino Federal Building
7th Floor
970 Broad Street
Newark, NJ 07102

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

## UNITED STATES OF AMERICA, Plaintiff,
## v.
## BAYER CORPORATION, a corporation, Defendant.

## CIV. ACTION NO.

## CONSENT DECREE

WHEREAS: Plaintiff, the United States of America, has commenced this action by filing the Complaint herein; defendant, Bayer Corporation, has waived service of the Summons and Complaint; the parties have been represented by the attorneys whose names appear hereafter; and the parties have agreed to settlement of this action upon the following terms and conditions, without adjudication of any issue of fact or law and without defendant admitting liability for any of the matters alleged in the Complaint;

THEREFORE, on the joint motion of plaintiff and defendant, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1. This Court has jurisdiction over the subject matter and the parties.

2. The Complaint states a claim upon which relief may be granted against defendant under Sections 5(l), 9, 13(b) and 16(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(l), 49, 53(b) and 56(a).

### DEFINITIONS

3. For purposes of this Consent Decree, "Commission's Order" shall mean the Federal Trade Commission ("Commission") Order in FTC Docket No. 8919, a copy of which is attached as Appendix A to this Consent Decree.

4. For purposes of this Consent Decree, "clearly and prominently" shall mean as follows:

A. In an advertisement communicated through an electronic medium (such as television, video, radio and interactive media such as the Internet and online services), the disclosure shall be presented simultaneously in both the audio and video portions of the advertisement. Provided, however, that in any advertisement presented solely through video or audio means, the disclosure may be made through the same means in which the ad is presented. The audio disclosure shall be delivered in a volume and cadence sufficient for an ordinary consumer to hear and comprehend it. The video

E-SERVED
09/24/04
12:43 PM ET
Baycol MDL 1431

disclosure shall be of a size and shade, and shall appear on the screen for a duration, sufficient for an ordinary consumer to read and comprehend it. In addition to the foregoing, in interactive media the disclosure shall also be unavoidable.

B. In a print advertisement or promotional material, the disclosure shall be in a type size and location sufficiently noticeable so that an ordinary consumer will read and comprehend it, in print that contrasts with the background against which it appears. In multi-page documents, the disclosure shall appear on the cover or first page.

5. For purposes of this Consent Decree, "competent and reliable scientific evidence" shall mean tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that has been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.

## CONSUMER EDUCATION

6. Defendant Bayer Corporation, its successors and assigns, shall conduct a consumer education program that includes dissemination of print advertisements and brochures as set forth in Appendices B, C and D. The cost of this consumer education program is estimated to be $1 million.

7. Within sixty (60) days after complying with paragraph 6 above, defendant shall provide to Commission staff a written report detailing defendant's compliance with paragraph 6 above.

## INJUNCTION

8. Defendant Bayer Corporation, its successors and assigns, and their officers, agents, representatives and employees, and all persons in active concert or participation with any one or more of them who receive actual notice of this Consent Decree by personal service or otherwise, are hereby permanently enjoined from ever, directly or through any corporation, subsidiary, division, or other device, violating any provision of the Commission's Order.

9. Defendant Bayer Corporation, its successors and assigns, and their officers, agents, representatives and employees, and all persons in active concert or participation with any one or more of them who receive actual notice of this Consent Decree by personal service or otherwise, in connection with the manufacturing, advertising, promotion, offering for sale, sale or distribution of any aspirin product, in or affecting commerce, as "commerce" is defined in the FTC Act, are hereby permanently enjoined from ever, directly or through any corporation, subsidiary, division, or other device, making any representation, in any manner, expressly or by implication, about the benefits of regular aspirin use, including, but not limited to, the prevention of heart attacks, transient ischemic attacks and strokes, unless:

A. At the time such representation is made, defendant possesses and relies upon competent and reliable scientific evidence that substantiates the representation; and

B. Defendant makes the following disclosure, clearly and prominently, and in close proximity to the representation:

E-SERVED
09/24/04
12:43 PM ET
Baycol MDL 1431

Aspirin is not appropriate for everyone, so be sure to talk to your doctor before you begin an aspirin regimen.

*Provided, however*, that when a representation about the benefits of regular aspirin use is made in any television or video advertisement that has a duration of 15 seconds or less, defendant may comply with subparagraph 9.B. by making the following disclosure, clearly and prominently, and in immediate conjunction with the representation:

Be sure to talk to your doctor before you begin an aspirin regimen.

*Provided further*, that subparagraph 9.B. shall not apply to any representation for aspirin, or a combination of aspirin and other over-the-counter drugs, that is permitted in over-the-counter labeling for any such drug under any tentative final or final standard promulgated by the Food and Drug Administration, or any new drug application approved by the Food and Drug Administration.

*Provided further*, that subparagraph 9.B. shall not apply to the brochure attached hereto as Appendix C.

10. In the event that the Commission's Order is hereafter modified, defendant's compliance with such Order as so modified shall not be deemed a violation of this injunction.

**PERSONS AFFECTED; CONTINUING JURISDICTION**

11. Defendant Bayer Corporation, shall, within thirty (30) days after the entry of this Consent Decree, provide a copy of the Commission's Order and a copy of this Consent Decree to each of its officers, and to each of its agents and employees responsible for the advertising or promotion of any nonprescription internal analgesic product. Within ten (10) days of complying with this paragraph, defendant shall file an affidavit with the Court and serve the Commission, by mailing a copy thereof, to the Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, Washington, D.C. 20580, setting forth the fact and manner of its compliance, including the name and title of each person to whom a copy of the Commission's Order and this Consent Decree has been provided.

12. For a period of five (5) years from the date of entry of this Consent Decree, defendant, its successors and assigns, shall maintain and, upon request, make available to the Commission, copies of all business records demonstrating compliance with the terms and provisions of this Consent Decree.

13. This Court shall retain jurisdiction of this matter for the purpose of enabling any of the parties to this Consent Decree to apply to the Court at any time for such further orders or directives as may be necessary or appropriate for the interpretation or modification of this Consent Decree, for the enforcement of compliance therewith, for the redress of any violations thereof, or for the punishment of any violations thereof.

JUDGMENT IS THEREFORE ENTERED in favor of plaintiff and against defendant, pursuant to all the terms and conditions recited above.

E-SERVED
09/24/04
12:43 PM ET
Baycol MDL 1431

Dated this ________ day of ______________, 2000.

______________________________
United States District Judge

The parties, by their respective counsel, hereby consent to the terms and conditions of the Consent Decree as set forth above and consent to the entry thereof. Defendant waives any rights that may arise under the Equal Access to Justice Act, 28 U.S.C. § 2412, *amended by* Pub. L. 104-21, 110 Stat. 847, 863-64 (1996).

FOR THE UNITED STATES OF AMERICA:

DAVID W. OGDEN
Acting Assistant Attorney General
Civil Division
United States Department of Justice

ROBERT J. CLEARY
United States Attorney
District of New Jersey

By:

______________________________
Assistant United States Attorney
Peter W. Rodino Federal Building
7th Floor
970 Broad Street
Newark, NJ 07102
(973) 645-2700

EUGENE M. THIROLF
Director
Office of Consumer Litigation

______________________________
Attorney
Office of Consumer Litigation
Civil Division
U.S. Department of Justice
Washington, D.C. 20530
(202)

FOR THE FEDERAL TRADE COMMISSION:

ELAINE D. KOLISH
Associate Director for Enforcement

MARY K. ENGLE
Assistant Director for Enforcement



Sep 24 04 11:27a Lexis Nexis 610-205-1039 p.14

E-SERVED 09/24/04 12:43 PM ET Baycol MDL 1431

JOEL C. WINSTON
Assistant Director for Advertising Practices

____________________________

LOUISE R. JUNG
Attorney
Division of Enforcement
Bureau of Consumer Protection
Federal Trade Commission
Washington, D.C. 20580
(202) 326-2989

FOR THE DEFENDANT:

BAYER CORPORATION

By:

____________________________

GARY S. BALKEMA
Executive Vice President

By:

____________________________

WILLIAM E. HAWXHURST
Vice President and Assistant General Counsel
Attorney for Defendant

**APPENDIX B**

**UNITED STATES v. BAYER CORPORATION**

**CONSUMER EDUCATION**

**Background**

1. Pursuant to Paragraph 6 of the Consent Decree, Bayer Corporation shall implement a national consumer education campaign. The goal is to provide consumers with information about

(a) benefits and risks associated with an aspirin regimen for prevention of heart attacks and strokes, and (b) the need to consult a doctor prior to beginning an aspirin regimen.

**Consumer Brochure**

2. As described below, Bayer Corporation shall distribute a consumer brochure, attached to the Consent Decree as Appendix C (hereinafter "brochure").

**Internet Availability of Consumer Brochure**

E-SERVED
09/24/04
12:43 PM ET
Baycol MDL 1431

3. For a period of one (1) year beginning February 1, 2000, Bayer Corporation will place, clearly and prominently, a link to the full text of the consumer brochure on the home page of Bayer Corporation's primary web site for Bayer aspirin products (currently www.bayeraspirin.com). The link to this brochure shall be "Aspirin Regimen Therapy - Is It Right for You?"

**Print Advertisements for Consumer Brochure**

4. Bayer Corporation shall place a full page print advertisement, attached to the Consent Decree as Appendix D, in the following publications from February to May 2000:

a. *Prevention*: publications for the months of February and May;

b. *Newsweek* 50+: publications for the weeks of February 21, March 20 and May 15;

c. *McCalls* Primetime: publications for the months February, April and May;

d. *TV Guide* Mature: publications for the weeks of February 14, March 13 and April 10,

5. If Bayer Corporation, from February 1 through June 30, 2000, disseminates any other print advertisement that contains any representation, directly or by implication, about aspirin's cardiovascular benefits (for example, help save lives, prevent heart attack or stroke, reduce the risk of death from a heart attack, depiction of an EKG trace), Bayer Corporation shall include the following statement, clearly and prominently, in said print advertisement: "For a free brochure on aspirin, heart attack and stroke, call 1-800-332-2253."

**Toll-free Number for Consumers**

6. For a period of one (1) year beginning February 1, 2000, Bayer Corporation shall provide a toll-free number, reasonably accessible 24 hours/day, for consumers to call and leave a message requesting free copies of the brochure. Bayer Corporation shall list this toll-free number in the above-mentioned print advertisements, as well as in the above-mentioned brochure.

7. Within seven (7) calendar days after receiving a consumer's request for brochures, Bayer Corporation shall mail the requested brochures to the consumer. Bayer Corporation shall fulfill all requests for one (1) to twenty-five (25) copies of the brochure, but may, at its own discretion, limit the number of brochures sent to an individual consumer to a total of twenty-five (25).

**Distribution of Consumer Brochures to Physicians and Others**

8. Within six (6) months after the effective date of the Consent Decree, Bayer Corporation, through its medical sales force, shall deliver, by hand or mail, 625,000 copies of the brochure to approximately 25,000 physicians, including cardiologists, general practitioners and obstetricians/gynecologists. Approximately twenty-five (25) copies of the brochure will be delivered to each physician.

9. Within one (1) year after the effective date of the Consent Decree, Bayer Corporation

E-SERVED
09/24/04
12:43 PM ET
Baycol MDL 1431

shall distribute an additional 50,000 copies of the brochure through its consumer relations efforts and ad hoc sampling opportunities, which may include NASCAR events, Walking for Wellness, trade shows, etc.