E-SERVED 10/06/04 02:39 PM ET Baycol MDL 1431

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re BAYCOL LITIGATION ) | MDL No. 1431 (MJD/JGL) |
| This document relates to: ) | Specific Case No. 02-0200 |
| RONWIN v. BAYER CORP. ) | |

**MOTION RE: OCTOBER, 2004 STATUS CONFERENCE**

RONWIN was informed that a status conference was going to be held toward the end of October, 2004. RONWIN may be able to attend and has matter upon which he wishes to address the Court; hence this motion.

In an effort to arrange a possible appearance and presentation of several matters to the Court at any such October status conference, RONWIN called Ms. DUNN, law clerk to Judge DAVIS. DUNN switched the call to the Judge. Judge DAVIS began to berate RONWIN. That performance included shouting and a refusal to listen to RONWIN. What was RONWIN going to say? RONWIN was going to tell the Judge the following, which DUNN refused to hear:

On or about Sept. 1, 2004, RONWIN called to speak to the Judge's clerk in charge of arranging status conference appearances and program. At the time of that Sept. call, RONWIN was considering an appearance at the conference scheduled for Sept. 27th. In a letter early in 2002, the Judge indicated that RONWIN could talk to that person who was labelled a clerk to the Judge. The party who came to the telephone in the Sept. call was one of the Judge's law clerks and was new at it, as she explained. She, (RONWIN did not make a note of her name), said that she did not arrange conferences, but

E-SERVED 10/06/04 02:39 PM ET Baycol MDL 1431

that DUNN did. Hence, it was reasonable, logical and proper to call DUNN. If, under the circumstances, the Judge thought that was somehow improper contact with DUNN, he could have explained that without shouting. In that letter early in 2002, the Judge claimed that calling a judge's law clerk is ex-parting. Aside from the fact that the Judge actually ex-parted by talking to RONWIN on the telephone prior to that early, 2002 letter, talking to law clerks working directly for a judge has never in RONWIN's experience been taken as ex-parting. RONWIN has actually seen a lawyer pick up the telephone and talk to a judge's law clerk and RONWIN has been informed of such activity by other lawyers. On occasion, RONWIN has also talked to judge's law clerks. Lawyers call judge's law clerks to clarify meaning in Orders, etc., to check time changes for proceedings, to inquire about events at a hearing or conference or about pending documents and when court action might be expected, etc. It was news to RONWIN that calling a judge's law clerk is ex-parting. Calling a judge himself/herself is ex-parting; except where a TRO is being sought. The call to DUNN was proper but she began to make a deal of it when RONWIN tried to explain why he was calling her, and, as above, switched the call to Judge DAVIS.

Again, RONWIN may be able to attend the coming October status conference and has a laundry list of matters to present to the Court. However, RONWIN does not care to be shouted at; nor does Judge DAVIS have a right to shout at anyone with whom he disagrees. The U.S. Constitution does not give federal judges the right to shout at anyone; nor does any federal statute RONWIN has ever seen.

E-SERVED 10/06/04 02:39 PM ET Baycol MDL 1431

In response to this matter, and if RONWIN is scheduled to be heard, RONWIN expects totally polite behavior from all at said conference, and RONWIN will so conduct himself, too; regardless of the content of the matters which RONWIN presents which will probably contain elements unwelcome by some, (including Judge DAVIS), or by most who are present. Those who are disturbed or disagree with the matters expounded by RONWIN can and should certainly have their opportunity to present their views.

The foregoing prompts RONWIN to comment on the spirit of tyranny which affects many judicial officers in American judiciaries. In part, the spirit arises and is perpetuated by the failure of those entrusted to police the judiciary to do their jobs; partially because they are judges themselves. Part of the promotion of the spirit arises from the roots of American jurisprudence in the English system. Ancient Monarchs of England resolved disputes in their court. As population grew and as travel took much time and energy, the King could not be everywhere to hear and resolve disputes; hence the need for surrogates, i.e., judges. As the King, so the judges held court. Since the judges were, in effect, the king when holding court and since the king was then absolute, the judges were absolute. The U.S. Constitution changed that or was supposed to. The Constitution created a society of alleged equals, (then meaning only white males, since redressed to a large extent). There is no legal place for judicial tyranny in this nation; but the spirit has lingered on because of the foregoing origins of judicial practice, because of the failure to those who should move to

E-SERVED 10/06/04 02:39 PM ET Baycol MDL 1431

destroy the spirit and because the judiciary operates far from the eyes of the general public. Another factor tending to foster judicial tyranny is the subconscious effect of the term, "my court." The court of any federal judge is "a court of the people of the United States in which the judge is allowed to preside." Rather than repeat such a long phrase, most, if not all, judges simply refer to "my court." Using the possessive, "my," gradually becomes transformed in the minds of too many judges as actual ownership--at least they often so act. On this latter notion, two remedial steps would be to remove the statements usually carved in stone over courthouse doors about "justice," etc., and carve the sentence: "This Court belongs to the People of the United States." The second remedial approach would be to have judges sign a paper every quarter of every year stating that, in making any reference to "my court," or similar comment, they recognize that it is not actually their court but the court of the people of the United States.

ON THE TOPICS RONWIN WISHES TO DISCOURSE

**1.** The difference between the "<u>what</u>" Baycol does and the "<u>why</u>" Baycol does the "what" and the relation to the question of cause. The appropriate experts on cause, (the why and what) questions. Baycol's potency to injure compared to other statins.

**2.** The Court's misplaced use of the concept of "differential diagnosis."

**3.** The double standard: Plaintiffs' counsels cannot lie; Defendants' counsels can lie.

**4.** The <u>Lexecon</u> case and PTO 127's categories and allowing Defen-

E-SERVED 10/06/04 02:39 PM ET Baycol MDL 1431

dants and the PSC to decide whose cases can proceed.

**5.** On the document production by Defendants.

**6.** On PSC Activities:

**a.** The spectacle of Plaintiffs' Expert, Dr. ZIZIC's testimony being used against Plaintiffs.

**b.** On negotiation vs. mediation.

**c.** On the absurd Rhabdomyolysis definition and failure to object to the definition.

**d.** On "medical" expert reports. On twice having to give Defendants the same medical records.

**e.** Refusing to provide RONWIN, and perhaps other plaintiffs or their attorneys, with the name, address and telephone numbers of all of the Plaintiffs' attorneys and pro se Plaintiffs in this MDL.

**f.** Failure to provide regular updates as required by PTO 3.

**g.** Failure to notify RONWIN, and possibly other Plaintiffs of the capacity to listen-in on some of the depositions taken in this action. The matter of the toll-free numbers and/or regular numbers used with the access numbers in order to be allowed to listen-in. RONWIN was unable to listen-in to Dr. K. Sandy PANG's deposition, even though RONWIN has no problem understanding her expert report and had questions to ask her which would have been helpful to Plaintiffs and, in part, to Defendants.

**7.** RONWIN would like to comment on the latest effort of Defendants to force dismissal of cases by demanding a second "medical" expert report even though some of those reports submitted do not follow the form that the PSC had circulated and suggested using, but are

E-SERVED 10/06/04 02:39 PM ET Baycol MDL 1431

well within the requirements of Rule 26(a)(2)(B). (RONWIN was informed that the Defendants had made some such motion at the Status Conference, but has not actually seen exactly what the Defendants have in mind). Furthermore, and contrary to Defendants, the PSC form actually meets the stated requirements of said Rule. While the actual manner by which some MDs and ODs have employed the PSC's form may be questioned as to actual content, the form nevertheless fits the Rule. The Defendants must be forced to address each expert report to which they have objection in the court in which the case arose not in this court as a blanket substitute for a motion for summary judgment against all the currently active cases.

ON THE MECHANICS OF ANY IN-PERSON APPEARANCE BY RONWIN

I can only make this trip financially by flying in on the day of the status conference and flying out that night; and I have to be able to buy the cheapest ticket for which the airline, I have in mind, requires a 14 day advance purchase but does not require a Saturday or other overnight stay.

The first morning flight RONWIN can take leaves Denver at 6:35 a.m. It's scheduled arrival is at 9:23 a.m. An hour is "lost" because of the time zone difference. RONWIN has not been to the Minneapolis airport for some years and is unfamiliar with its layout. RONWIN anticipates that, if the plane is on time, he will be able to arrive at the courthouse by 10:45 to 11:00 a.m.

RONWIN would like to have about 1½ hours to present his views. As an alternative, RONWIN could take the 9:05 a.m. flight which is scheduled for arrival at 11:55 a.m. If the plane is on time that

E-SERVED 10/06/04 02:39 PM ET Baycol MDL 1431

would bring RONWIN to the Court at about 1:15 to 1:30 p.m.

For return, RONWIN would hope to schedule the 9:30 p.m. plane for Denver so that he could stay for further proceedings.

Because of the 14 day advance purchase requirement, RONWIN would need to know 15 to 16 days in advance if he is to be able to appear. Since RONWIN does not have e-mail capacity and U.S. mail often takes 3-4 days to reach RONWIN from Minneapolis, RONWIN suggests a telephone call from the court to indicate whether or not the court agrees to RONWIN's appearance and time for discourse and at what time, (roughly), RONWIN could anticipate being able to speak; and to inform RONWIN of the date of the status conference. In addition, RONWIN requests that a blackboard and chalk be made available, or, alternatively, a projector such that material on an 8½ x 11 sheet of paper can be shown to all in the courtroom. Suggestions for specific means for transportation from the airport to the courthouse and costs for same would be appreciated.

DATE: October 1, 2004

Edward Ronwin

Edward Ronwin, pro se
945 Rolland Moore Dr., L-2
Fort Collins, CO 80526
970-221-3837

CERTIFICATE OF SERVICE

I, Edward Ronwin, have served this Motion per PTOs 4 and 18 and the Verilaw System this 1st day of October, 2004.

Edward Ronwin

Edward Ronwin