MEMORANDUM IN SUPPORT OF ATTACHED MOTION

Thus far there have been eight (8) depositions taken in this specific case in the following order and on the dates indicated: Dr. EDWARD RONWIN, April 17, 2006, (fact deposition); Dr. WILLIAM R. HIATT, ("HIATT") June 5, 2006; Dr. KEVIN DEANE, ("DEANE"), June 5, 2006; Dr. EUGENE WOLFEL, ("WOLFEL"), June 8, 2006; Dr. RICHARD TORKELSON, ("TORKELSON"), June 19, 2006; Dr. JANE SERVI, ("SERVI"), June 20, 2006; Dr. MARK PRINCE, ("PRINCE"), June 23, 2006; and Dr. SALLY A. KNAUER, ("KNAUER") June 23, 2006. One more deposition is now scheduled: that of Dr. MARK W. KELLER, ("KELLER"), July 14, 2006. RONWIN will appear for further interrogation on the afternoon of July 14, 2006.

At the fact deposition of RONWIN the time approached the maximum seven (7) hours permitted by PTO 149. At that point, RONWIN volunteered that as far as he was concerned, it was agreeable for opposing counsel to continue the deposition beyond the seven (7) hour limit, which was done. RONWIN's view is that each side should have the opportunity to discover, sharpen and present their case to the jury that RONWIN originally demanded. PILKINGTON appears devoted to the opposite view and has acted accordingly in the majority of the MDs' depositions.

Of the seven (7) MDs deposed, the depositions of Drs. PRINCE, WOLFEL and DEANE were conducted in a reasonably proper manner. The depositions of Drs. HIATT, TORKELSON, SERVI and KNAUER were definitely not.

<u>COMMENTS ON HIATT'S DEPOSITION:</u>

RONWIN was not informed in advance of the contact(s) between PILKINGTON, or his office aides, with HIATT. It appears that HIATT and PILKINGTON had agreed that the total time for

SCANNED
JUL 10 2006
U.S. DISTRICT COURT MPLS

HIATT's deposition would be two (2) hours. The deposition commenced slightly after eight (8) a.m., and PILKINGTON took about 1 hour and 40 minutes for his interrogation. Then, he turned it over to RONWIN. There were changes of seats and position of papers, and an off-the-record discussion; p. 67, l. 23 to p. 68, l. 11, HIATT Depo. By the time that RONWIN began his interrogation, it was approximately 9:45 a.m. At 10:00 a.m., an office aide to HIATT entered the room and "reminded" HIATT that he had a ten o'clock appointment.

RONWIN protested, but all RONWIN could get was a hurried ten (10) minutes. During the entire interrogation by RONWIN, HIATT claimed "confusion," inability to understand questions, dodging answers to questions he should well have been able to answer and, in effect, making a virtual sham of the process.

PTO 149 allows four (4) hours of deposition of non-plaintiff witnesses. HIATT is a non-plaintiff witness. PILKINGTON should not have given HIATT the idea that HIATT could bring the deposition to a close at the two hour mark or slightly thereafter.

On RONWIN's question as to how "CK", (Creatine Phosphokinase), gets out of the cells when high concentration of statins causes CK to move out of cells, HIATT dodged a direct answer, p. 68, l. 23 to p. 70, l. 7, HIATT Depo. In that sequence, there is a classic dodge:

p. 68, l. 23, Question: "Well, don't statins attack muscles, muscle tissue?"

p. 68, l. 25 to p. 69, l. 1, Answer: "Statins primarily block an enzyme that makes LDL cholesterol."

The answer is absurd for two reasons: (1) statins, particularly including Baycol, attack muscle cell membranes and destroy portions thereof so that entities the size of CK, which is both a protein and enzyme, (the vast majority of enzymes are proteins; however, some enzymes are

not, e.g., some Ribose Nucleic Acids, "RNA", have been shown to possess enzyme action in living entities), and Myoglobin, which is a protein, can exit from the muscle cell, (as well as other cells such as nerve cells, chondrocytes (tendon cells), etc.); and (2) statins do not "primarily block an enzyme that makes 'LDL cholesterol', rather, statins block an enzyme known as 3-hydroxy, 3-methyl glutaryl Co.A Reductase, ("HMG Reductase"), which inhibits HMG Reductase from "reducing" 3-hydroxy, 3-methyl glutaryl Co.A to a compound known as mevalonate. The reason why HIATT's statement is appallingly false is that he has done more than 20 years of research and has published numerous scientific papers on the results of that research which included work with statins. He can be held to have well known the true answer to RONWIN's question. He dodged the true answer to that question and to the subsequent ones on that subject for a purpose not consistent with his oath to tell "the truth, the whole truth and nothing but the truth."

From p. 86, l. 11 to p. 87, l. 22, HIATT Depo., he claims "confusion" on "incidence" reports. He most certainly knows that incidence reports are reports of adverse reactions revealed in clinical trials of drugs.

From p. 87, l. 23 to p. 88, 25, HIATT Depo., he dodges questions on the ethics governing the publication of scientific reports in scientific journals. Since he has published numerous scientific reports, he can be held to well know the ethics involved. In fact, WOLFEL, who has published numerous scientific reports, (some which included HIATT as a co-author, among others), had no hesitancy to answer the same questions.

p. 89, ls. 1-15, HIATT Depo. dodges another question on publication ethics.

On brief subsequent recross examination by RONWIN, p. 96, l. 18 to p. 98, l. 4, HIATT



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 10 2006 09:53AM P4

Depo., he dodges a question on whether the chemical structure of Baycol is such that it can cause negative interactions with various tissues in the body.

RONWIN was fed up and disgusted with the outrage perpetrated by the concerted action of PILKINGTON and HIATT and could really do nothing, in the circumstances, but give way. PILKINGTON knew that the Court has allowed depositions such as that of HIATT to proceed for at least four (4) hours and he should have so informed HIATT; instead, he gave HIATT the idea that HIATT can decide to leave after two hours, during which PILKINGTON had the lion's share of the interrogation time; and HIATT aided him with false assertions that he was confused, the question is too broad, he can't answer the question, all of which are sheer falsehoods.

PILKINGTON started his interrogation on p. 5 and went to p. 68, when RONWIN's cross examination began. Yet, by p. 89, ls. 16 to 18, HIATT's office aide entered to announce 10:00 a.m.

**COMMENTS ON TORKELSON'S DEPOSITION:**

On June 19, 2006 at 1:00 p.m., the Court Reporter, PILKINGTON and RONWIN assembled at TORKELSON's office in Cheyenne, Wyoming. Prior to this deposition, PILKINGTON, or his office aides, told TORKELSON or his office personnel that the deposition would take 2 hours. PILKINGTON started the interrogation and took at least an hour before RONWIN could start his cross examination.

On FIVE occasions, TORKELSON gave RONWIN 5 or 10 more minutes and threatened to leave the deposition at the end of those time limits:

p. 72, l. 25 to p. 73, l. 5: TORKELSON: "I ought to tell you, this is scheduled for two hours and I have another appointment in 10 minutes. I don't mean to rush you, if we're going to have to do much longer than that, we're going to have to reschedule."
RONWIN: "We're going to have to, because I've got questions here."



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 10 2006 09:53AM P5

PILKINGTON had started his interrogation on p. 5; RONWIN started on the bottom of p. 51. Yet, by p. 72, TORKELSON starts to threaten to end the deposition by walking out. Judge DAVIS can he do that in a courtroom trial?

p. 78, ls. 21-22: TORKELSON: "I'm just telling you my time constraints." Let's move it along, please."

p. 88, ls. 18-19: TORKELSON: "I don't know. I've got - I'm going to give you about 10 minutes and then I'm out of here."

p. 89, l. 24 to p. 90, l. 5: TORKELSON: "It's made of many different types. Now if you want to go through the pathophysiology, the anatomy, the microanatomy of a tendon, we could sure as hell do it, but I don't have the time, and it doesn't appear to me to be relevant and you're making me a little angry, to tell the truth. You got 10 minutes and then I'm out of here."

p. 98, ls. 12: TORKELSON: "I'll give you five minutes."

p. 99, ls 4-6: TORKELSON: "And within the five minutes, I'm happy to do that."

Fed.R.Civ.P. 26 does not give the deponent the right to decide when a deposition is over or how long it can run. This Court announced that depositions, such as TORKELSON's can run up to four (4) hours, and that more time can be had if the court approves. TORKELSON's continued threats to leave the deposition before it was finished interfered with proper interrogation because it caused unnecessary annoyance, argument and flustered RONWIN unnecessarily interrupting his chains of thought and objectives in his interrogation of TORKELSON. Meanwhile, PILKINGTON, who was not continually badgered and threatened as to time by TORKELSON, made no effort to stop TORKELSON's abuse and outrage.

But that is not all. Like HIATT, TORKELSON frequently dodged questions and never provided answer for some. To keep this motion as short as possible, one example is presented below:



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 10 2006 09:54AM P6

p. 96, l. 2-3: RONWIN: "Yeah, but can you rule out other possible causes?"
p. 96, ls. 4-6: TORKELSON: "I can't think of any other possible cause. Yes, I would rule out Bacal, (the reporter kept misspelling Baycol), as a cause, if that's your question.
p. 96, l. 7: RONWIN: "You would?"
p. 96, l. 8: TORKELSON: "Yes."
p. 96, l. 9: RONWIN: "On what grounds?"
p. 96, l. 10: TORKELSON: "Because Bacal doesn't cause this."
p. 96, l. 11: RONWIN: "How do you know?"
p. 96, ls. 12-13: TORKELSON: "Based on my experience as an orthopedic surgeon."
p. 96, ls. 14-17: RONWIN: "Uh-huh. And have you had -- how many patients have you had that had taken Bacal for sure and then you had to do a rotate -- you found a rotator cuff tear for sure?"
p. 96, ls. 18-19: TORKELSON: "As I'm standing here -- as I'm sitting here now, I can't give you any example one way or another."
p. 96, ls. 20-21: RONWIN: "Okay. Then how do you know Bacal wasn't the cause?"
p. 96, ls. 22-24: TORKELSON: "I've answered the question. My opinion is this is a degenerative tear based on experience of 30 years training as an orthopedic surgeon."
p.96, l. 25: RONWIN: "That's fine."
p.97, l. 1-2: TORKELSON: "And based on literature with regard to Bacal, but I'm not going to argue with you about it."
p.97, ls. 3-4: RONWIN: "I'm not asking you to argue. I'm asking [how - left out by reporter] you can you rule out any other cause?"
p.97, ls. 5-7: PILKINGTON: Objection. Asked and answered. He said he ruled out other -- in his opinion, the most probable cause is degenerative change."
p.97, l. 8: RONWIN: "That's his opinion."
p.97, l. 9: PILKINGTON: "That's what your asking."
p.97, ls. 1--14: RONWIN: "Yeah, but I asked how did he rule out other causes? And then he says, well, there was no physical injury. And then he says he rules out Bacal, so I asked him how he can rule out Bacal, and he doesn't give us an answer."
p.97, l. 15: PILKINGTON: "Oh, he did."
p.97, ls. 16-17: RONWIN: "No, he didn't. This is more like what he would like --"
p.97, ls. 18-19: TORKELSON: "Mr. -- we are pretty much done."
p.97, ls. 20-21: RONWIN: "Yeah, this is more like what he would like to rule out."
p.97, l. 22: PILKINGTON: "Are you done?"
p.97, ls. 23-24: RONWIN: "Well, I suppose, but I'd really like to go into that Bacal thing."

RONWIN, speaking now as an expert in Biochemistry and Molecular Biology (the latter being merely biochemistry concentrated on chemical reactions and related matters in living things), Baycol is a chemical with great propensity to react with cell membranes of all sorts of cells, e.g., muscle, nerve, chondrocytes (tendon cells), etc., and can tear up non-cellular components



FROM : EDWARD RONWIN FAX NO. : 970-224-3838 Jul. 10 2006 09:54AM P7

of body tissues such as cartilage and the protein collagen which gives much of cartilage its form and strength. It is that subject that RONWIN was trying to get at, but was thwarted by TORKELSON's dodge. That he has been an orthopedic surgeon for 30 years, does not answer the questions on whether or not Baycol can cause cartilage and collagen destruction and hence rotator cuff tears, as well as other body tissue damages.

But TORKELSON's offenses went further. At the "end" of the deposition, TORKELSON left the room and took with him X-ray film that he was subpoenaed to bring and which was used in the deposition but had not yet been marked. It is now exhibit 4 to the deposition. That occurred only after considerable argument with TORKELSON's office.

Before leaving the deposition room, it became obvious that TORKELSON took the X-ray film. Brief search in his office area was not successful. The next day, Tues., June 20, 2006, RONWIN called TORKELSON's office and spoke to the manager. She said she would talk with TORKELSON and get back to RONWIN. If she did, she did not leave a message on RONWIN's telephone line. RONWIN contacted the manager again on Wed., June 21, 2006. The manager said that TORKELSON would not release the X-ray film. RONWIN explained that the X-ray film was part of a court record, and that it was unlawful to take any part of a court record without court knowledge and permission. The manager said she would talk to TORKELSON again and latter that day informed RONWIN that RONWIN could have copies of the X-ray film if RONWIN paid for the copies. RONWIN would not pay for copies of what was part of a court record unlawfully taken by TORKELSON and which RONWIN wanted to use on Fri., June 23, 2006 in the scheduled deposition of KNAUER and then return same to the court reporter. RONWIN asked PILKINGTON, who clearly had a good rapport with TORKELSON, to call



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 10 2006 09:54AM P8

TORKELSON's office and to inform them that they had to release the X-ray film to the court reporter. PILKINGTON refused. The next day, Thurs., June 22, 2006, RONWIN again asked PILKINGTON to intervene. This time PILKINGTON said he had intervened <u>successfully</u> because he decided that he would like to use the X-ray film with an expert for BAYER. Regardless of whether or not he had use for the X-ray film, PILKINGTON had a duty to demand the return of the X-ray film to the court reporter from whom RONWIN wished to borrow the film for KNAUER's deposition, but refused to do his duty.

<u>COMMENTS ON THE SERVI DEPOSITION:</u>

At the time of preparation of this motion, the SERVI deposition transcript has not been made available. On June 20, 2006 at 9:00 a.m., the court reporter, PILKINGTON, RONWIN and SERVI convened for the purpose of taking SERVI's deposition. PILKINGTON went on for about an hour, then it was RONWIN's turn. Shortly after RONWIN started, SERVI explained that she had a patient appointment at 11:00 a.m., and clearly was playing the same game as TORKELSON, but without threats to get up and leave or "giving us 10 minutes." PILKINGTON, or his office staff, has told SERVI that the deposition would take no more than two (2) hours. RONWIN was not privy to the original arrangements. SERVI also dodged questions particularly on the action of Baycol similar to TORKELSON's dodge.

<u>COMMENTS ON THE KNAUER DEPOSITION:</u>

At 1:30 p.m., June 23, 2006, the court reporter, PILKINGTON and RONWIN assembled in a "Board Room" of the large Poudre Valley Harmony Medical facility in Fort Collins, Colorado. KNAUER entered the room slightly after 1:30 p.m. To start the deposition and with PILKINGTON's acquiescence, RONWIN read some preliminary information to KNAUER to



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 10 2006 09:55AM P9

apprise her of her function and of some things she could not do such as just get up and walk out before agreement to conclude the deposition. She was further informed that her appearance at the deposition was essentially her appearance at trial and that she had to conduct herself as though the judge and jury were sitting in the room. Thereafter, PILKINGTON commenced his interrogation. During the proceedings, KNAUER asked for a recess due, RONWIN believes, to a call of nature, which in a civilized society cannot be ignored.

After PILKINGTON completed his questioning for approximately two (2) hours, RONWIN started his cross examination. After a while, KNAUER received a phone call on her cell phone and announced that she had an "emergency." With that she left the room for about twenty (20) minutes. (For some reason, the court reporter failed to note the recess, but only notes that a telephone call interrupted the proceedings). When KNAUER returned to the room, the deposition began again. After a while, KNAUER got another cell phone call. This time she announced something about having to attend a "50 year anniversary," and that her husband was waiting for her. The time shown by the wall clock which faced RONWIN throughout the deposition showed 5:10 p.m. After making her announcement pursuant to her last cell phone call, KNAUER got up to leave. RONWIN had less time than PILKINGTON and is flustered by the interruptions. It tends to disorganize RONWIN's approach to his interrogations. Where they did not occur, the depositions went well and fair, as noted above.

On leaving the room, it wasn't noticed that KNAUER did the same thing that TORKELSON did. She walked off with the X-ray film. Briefly, after RONWIN attempted to get the film without success and after writing a letter to KNAUER about the unlawfulness of taking court records without court permission, KNAUER finally allowed all of the X-ray films to be given



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 10 2006 09:55AM P10

to RONWIN, except one, for which it was claimed that she had to pay $10.00 to the Poudre Valley Hospital to have a copy made. No amount of argument would shake that stance. Since RONWIN already had all of the films, except that one item. RONWIN paid the $10.00; however, no one has the obligation to pay those who take court records without court permission for the return of court records. RONWIN is holding the court records until he is able at KELLER's deposition on July 14, 2006, to transmit same to the court reporter company for inclusion in KNAUER's deposition transcript. (The same court reporter company will take KELLER's deposition as took all the others, except TORKELSON's)[1]. PILKINGTON made no effort to advance the return of the X-ray film by KNAUER.

KNAUER, too, dodged questions such as on Baycol and other matters.

**<u>ON THE DEFENDANT, BAYER:</u>**

The net effect is that PILKINGTON, on behalf of BAYER, has successfully succeeded in making four (4) out of seven (7) MD depositions taken thus far, a one-way street where BAYER gets its whole effort met by use of deceit and essentially unlawful behavior, while RONWIN is continuously denied equal opportunity. Furthermore, observation of the rapport between the four (4) deponents, HIATT, TORKELSON, SERVI and KNAUER, with PILKINGTON was such that the denials by these deponents of prior interaction with PILKINGTON appears to RONWIN to be questionable. That BAYER's agents would act unlawfully and unethically is well-established by the trail of written record discussed below:

To get a fuller picture of BAYER which explains what it approves in this MDL and case-

---

[1]In all depositions, the court reporter was chosen by BAYER's attorney and in each case, except in TORKELSON's deposition, the reporter firm is one that does substantial business with the law firm acting for BAYER in this case-specific action.

specific activity on its behalf, RONWIN submits the following information:

1. BAYER deceived the public and health care professionals by its advertising on Baycol which raised the ire of the U.S. Food and Drug Administration, ("FDA"), as shown in Exh. 1 attached hereto. In reading some of the depositions of BAYER officers and scientists, it is quite clear that BAYER kept information from the FDA and also discarded results from clinical trials which would reflect adversely on Baycol and, in turn, possibly cause the FDA not to approve a higher dosage of Baycol which BAYER was seeking. Other unethical action is also revealed in those depositions. Time constraint has prevented RONWIN from providing citation and/or exhibit to support the above contentions, other than Exh. 1. But, deceiving the American and world public, and drug approval agencies of various countries is not the only unlawful actions that BAYER has taken.

2. Attached hereto, as Exhs. 2, 3 and 4, respectively, are copies of three (3) certified judgments from the U.S. District Court for the Northern District of California. In each of these three judgments, BAYER is noted as pleading guilty to price-fixing and is ordered to pay substantial sums. The total sum for all three judgments is approximately $104,000,000.00. In addition, the European Commission, an arm of the European Union, fined BAYER 70 million Euros, (approximately $100,000,000.00 at today's exchange rates), see Exh. 5 attached hereto; and the Swiss law enforcement authorities were pursuing a criminal action against BAYER with respect to Baycol, see Exh. 6, attached hereto.

3. During World War II, when BAYER was a part of the I.G. FARBEN chemical giant, BAYER BOUGHT 150 female inmates from the Auschwitz concentration camp administration and bargained over the price for each, (paying 170 marks rather than the 200 marks demanded

by the camp administration). BAYER then used the victims as guinea pigs in an experiment, (we and the civilized world use mice, rats, etc.) to test a drug which killed all of the women. They also told the camp commander that they wanted to BUY more inmates; see Exh. 7 attached hereto which is an excerpt from a recently published book and Exh. 8 which is a copy of the original report found in the New York Herald Tribune of November 15, 1947 of testimony at the Nuremburg War Crimes Trials on November 14, 1947. The Herald Tribune ceased publication in 1966, but its production over the years of its existence is preserved in the N.Y. Public Library on film from whence Exh. 8 is made.

**WHEREFORE**, Plaintiff asks this Court for an Order as follows:

1. Directed to Drs. Hiatt, Torkelson, Servi and Knauer to attend an extension of their depositions in the City of Fort Collins, Colorado, at their cost for the court reporter and transcripts of deposition, and, where necessary for the cost of the premises,[2] for a period of up to three (3) hours to allow Plaintiff to fully interrogate each of said doctors; and, further, to order said doctors to avoid any effort to dodge answers to questions; and further to not complain that they have patient visits that allegedly interfere with their depositions or other obligations; and that they should arrange for suitable substitute(s) in case any of their patients experience a medical emergency; and that they should disable their cell telephones throughout the deposition proceedings; and that Plaintiff exert best efforts to keep that depositions as short as possible; and,

2. An Order to Dr. Knauer to repay $10.00 to Plaintiff; and,

---

[2] Drs. Servi and Knauer both live and work in Fort Collins and are believed to have access to a meeting room at their medical office facility.



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 10 2006 09:56AM P13

3. An Order cautioning Drs. Hiatt, Torkelson, Servi and Knauer that any violation of the Order by these deponents will subject them to contempt of Court with action by the Court as appropriate; and,

4. An Order directing the Defendant's counsel and Plaintiff on the mechanism whereby the Judge can be contacted, or a substitute contacted, in cases where it is deemed necessary to draw the Court's attention to any dispute arising at any deposition; and that any time necessitated by such contact(s) be considered as not applicable to the talley of deposition time; and,

5. An Order to Defendant's attorney, Mr. Jeffrey Pilkington, that his advocatory activities must be reoriented toward a proper ethical approach in the course of his work on behalf of the Defendant.

DATED: July 10, 2006.

Edward Ronwin, Plaintiff pro se

CERTIFICATE OF SERVICE

I, hereby certify that I served the foregoing Motion and Memorandum upon the following persons or entities by FAX, this 10th day of July, 2006:

The Court's Clerk Office at FAX No. 612-664-5044
Defendant's counsel. Sidley Austin, LLP, Chicago, Illinois at their FAX No. 312-853-7036;
Defendant's counsel. Jeffrey Pilkington, at Davis, Graham & Stubbs at their FAX No. 303-893-1379
Plaintiff's Liaison counsel. Deanna Dailey, at Larson-King, St. Paul, MN at their FAX No. 651-312-6618
Dr. Sally A. Knauer, Fort Collins, CO at FAX No. 224-9800
Dr. Jane Servi, Fort Collins, CO at FAX No. 224-9800
Dr. William Hiatt, Denver, CO at FAX No. 303-860-1288
Dr. Richard Torkelson, Cheyenne, WY at FAX No. 307-634-9170

Edward Ronwin



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 10 2006 09:56AM P14