# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

---

DEPOSITION OF: WILLIAM R. HIATT, M.D.
June 5, 2006

---

| | |
|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : |
| | : MDL No. 1431 |
| This Document Relates to: | : (MJD) |
| | : |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : Case No. 02-0200 |
| | : |

---

TAKEN PURSUANT TO NOTICE on behalf of the Defendant at 789 Sherman Street, Suite 200, Denver, Colorado 80203 at 8:05 a.m. before Lisa B. Kelly, Registered Professional Reporter and Notary Public within Colorado.

APPEARANCES

For the Plaintiff Ronwin (pro se): EDWARD RONWIN, Ph.D., ESQ.
945 Rolland Moore Drive L-2
Fort Collins, Colorado 80526

For the Defendant: JEFFREY PILKINGTON, ESQ.
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, Colorado 80202

Also Present: None



INDEX

EXAMINATION OF WILLIAM R. HIATT, M.D.: PAGE
June 5, 2006

By Mr. Pilkington: 5, 90

By Mr. Ronwin: 68

| DEPOSITION EXHIBITS: | INITIAL REFERENCE |
|---|---|
| 1 Subpoena | 11 |
| 2 Medical records | 14 |
| 3 Outpatient Consultation | 54 |
| 4 Document Entitled "Is Alternate Daily Dose of Atorvastatin Effective in Treating Patients with Hyperlipidemia? The Alternate Day Versus Daily Dosing of Atorvastatin Study (ADDAS)" | 75 |
| 5 Document Entitled "ACCP 1999 Annual Meeting Abstracts" | 75 |
| 6 Document Entitled "Effect of Lovastatin Administered Every Other Day on Serum Low-Density Lipoprotein Cholesterol >160 mg/dl" | 75 |
| 7 Document Entitled "A Comparison of Fluvastatin 40 mg Every Other Day versus 20 mg Every Day in Patients with Hypercholesterolemia" | 75 |
| 8 Chart | 77 |
| 9 Letter to Dear Health Care Professional from Bayer, 12/15/99 | 81 |
| 10 Letter to Dear Health Care Professional from Bayer, 5/21/01 | 81 |
| 11 Letter to Dear Health Care Professional from Bayer, 6/17/01 | 81 |
| 12 Letter to Healthcare Professional from Bayer, 8/8/01 | 81 |
| 13 Curriculum Vitae of William R. Hiatt, M.D. | 91 |
| 14 Phone Log Report, 5/13/04 | 94 |



(Attached to original and Mr. Pilkington's copy transcript.)

REQUESTED PORTIONS OF TESTIMONY: PAGE
(None.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
Exhibit Page Exhibit Page
(None.)



WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:

WILLIAM R. HIATT, M.D.,

having been first duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MR. PILKINGTON:
Q. Good morning, Doctor. We met for the first time this morning; is that correct?
A. Correct.
Q. My name is Jeff Pilkington. I'm with the law firm of Davis Graham & Stubbs here in Denver, and I represent Bayer in this litigation. Do you understand that?
A. Yes.
Q. Have you ever had your deposition taken before?
A. Yes.
Q. I want to go through some basic ground rules to make sure that the three of us are on the same page today. You understand the court reporter is taking down everything that is said, so she can't take down a nonverbal response. Do you understand that?
A. I do.
Q. My role here is to ask you questions about your care and treatment of Mr. Ronwin. Do you understand that?

Page 6

A. I do.
Q. This is my only opportunity to ask you any questions about your care and treatment of him. Do you understand that as well?
A. I do.
Q. If you don't understand any of my questions, please let me know and I'll restate it. Fair enough?
A. Yes.
Q. If you don't hear a question, please ask me to repeat it as well, okay?
A. Okay.
Q. If you need a break at any time, please ask us and we'll accommodate you, okay? Finally, you've taken an oath to tell the truth, correct?
A. I have.
Q. And that's the same oath that you would take if you were to testify in person before the judge and jury in this case. Do you understand that?
A. I do.
Q. Do you have any questions before we get started today?
A. No.
Q. Doctor, we are here in your practice, clinical practice here in Denver, Colorado?
A. Correct.

Page 7

Q. Let me better understand your background. You're an M.D.?
A. That's correct.
Q. Where did you go to school?
A. University of Colorado School of Medicine.
Q. When did you graduate?
A. 1976.
Q. Before that, you went to undergrad somewhere?
A. Correct.
Q. Where did you go?
A. Knox College, Galesburg, Illinois.
Q. So you graduated from the University of Colorado School of Medicine in '76?
A. Correct.
Q. Did you focus on any particular area of specialty?
A. I became a resident in internal medicine at Boston University. I returned to Colorado, completed my residency in internal medicine and then did a two-year fellowship in general internal medicine with an additional emphasis on vascular medicine.
Q. What is vascular medicine?
A. It's the practice of cardiovascular medicine in blood vessels outside the heart.
Q. And if it was vascular medicine within the

Page 8

heart, that would be cardiology?
A. Correct.
Q. So vascular medicine deals with the vessels and the vascular beyond the heart; is that correct?
A. Correct.
Q. When did you complete your residency in Boston?
A. '78.
Q. You came back and completed your fellowship in 1980?
A. No. I had one more year of residency in internal medicine in '79, and I completed my fellowship in '81.
Q. Have you had any schooling since that fellowship?
A. No.
Q. Are you affiliated with the University of Colorado Health Sciences Center?
A. Yes.
Q. How are you affiliated?
A. I'm on the faculty. Regular faculty.
Q. What position do you have on the faculty?
A. Professor of medicine, Department Of medicine.
Q. And do you have a specialty at the university?
A. Vascular medicine.
Q. How long have you been on the faculty?

Page 9

A. Since 1981.
Q. 25 years?
A. Indeed.
Q. And as part of your role -- what do you do as a professor at the university?
A. I see patients a little over one full day a week. I have some modest teaching responsibilities. And then I am president of this organization, The Colorado Prevention Center, which occupies the majority of my time, which is a cardiovascular clinical trials research organization and is an affiliated institution with the university.
Q. Doctor, do you see patients beyond that one day when you're at the university?
A. I see patients all day Thursday and Friday morning.
Q. Here at the --
A. At the university. Not here at the Colorado Prevention Center.
Q. Okay. So you see patients two days a week?
A. A day and a half.
Q. Okay.
A. And then I do inpatient attending two weeks a year.
Q. You mentioned The Colorado Prevention Center.

Page 10

What is that again?
A. It's an independent but affiliated institution, nonprofit 501(c)(3) corporation that is a clinical trials research organization and a prevention center in focusing on prevention of cardiovascular disease in the citizens of Colorado.
Q. What are some of the examples of the clinical trials that you do?
A. We have, in 2005, $4.8 million in research grants, specializing in clinical trials to develop new therapies to treat cardiovascular disease. And we have 35 contracts, roughly.
Q. You mentioned to treat cardiovascular disease. What diseases are you focusing on?
A. Primarily peripheral arterial disease.
Q. In lay terms, what is peripheral arterial disease?
A. It's atherosclerosis in the arteries of the peripheral circulation.
Q. Meaning the extremities?
A. Correct.
Q. Legs, your arms?
A. Carotids. Renals. Mesenteric. Other vessels.
Q. Anything but the heart?
A. Anything but the heart.

Page 11

Q. And in your practice as a vascular specialist, do you see those sorts of diseases more frequently in the legs or arms or --
A. Most of the peripheral arterial disease is seen in the legs.
Q. Why is that?
A. No one knows, but it has a predilection for the lower extremity over the upper extremity, though you do see patients with disease in the aortic arch and major vessels to the arms. They're much less common.
Q. What are the classic symptoms of peripheral vascular diseases?
A. About half the patients have no leg symptoms. About a third have what's called intermittent claudication, which is an exercise-induced pain in the calf. It's relieved by rest. And a very small percent have what's called critical leg ischemia, which is pain at rest in the foot, ischemic ulceration and gangrene.
Q. Doctor, I know that you kindly accepted notice of this subpoena. We'll mark that as Exhibit Number 1.
MR. PILKINGTON: Can you mark some stickers?
THE DEPONENT: This one says to Eugene Wolfel.
MR. PILKINGTON: Sorry about that.
(Deposition Exhibit 1 was marked.)
(Discussion off the record.)

Page 12

Q. (BY MR. PILKINGTON) Dr. Hiatt, I've handed you what I've marked as Exhibit Number 1, correct?
A. Correct.
Q. Exhibit Number 1 is a notice of your deposition as well as a subpoena. It asks you to bring your complete file with respect to Mr. Ronwin. Do you have that?
A. No.
Q. Is that file located at the university?
A. Correct.
Q. Have you ever treated Mr. Ronwin here at The Colorado Prevention Center?
A. No.
Q. Has Mr. Ronwin ever participated in any sort of study here at The Colorado Prevention Center?
A. Yes.
Q. What study is that?
A. It was a muscle biopsy study, looking at the effects of peripheral arterial disease on gene expression and skeletal muscle.
Q. I'm sorry. Would you say that again?
A. It was a study looking at the effects of peripheral arterial disease on gene expression in peripheral arterial disease.
Q. Did it have anything to do with statins?
A. Yes.

Page 13

Q. What role did statins have in that study?
A. Some patients were taking statins. Some were not.
Q. Was the group who was not taking the statins considered the control group?
A. No. We had a healthy age-match control.
Q. What was the purpose of the study?
A. To better understand the effects of muscle ischemia on skeletal muscle gene expression, with a secondary question on the effects of statins on the same.
Q. And what did -- have you answered that secondary question of the effects of statins?
A. We've not completed the study. The analyses are ongoing.
Q. And was Mr. Ronwin's role in that study to simply give a muscle biopsy?
A. Correct.
Q. Has he had any other involvement in that study?
A. No.
Q. What records would reflect his role in that study?
A. We keep case report forms here.
Q. Would you have a file on Mr. Ronwin for that study?
A. Yes.

Q. Is that located here?
A. Correct.
Q. Do you know when Mr. Ronwin participated in that study?
A. I don't remember the date.
MR. RONWIN: It was summertime.
Q. (BY MR. PILKINGTON) Dr. Hiatt, do you have a CV?
A. I do.
Q. At a break, perhaps could you print that out for us?
A. I could.
Q. Okay. Would that better give me a better understanding about your background and your research background?
A. I would think so.
Q. Okay. Doctor, let me hand you what I will mark as Exhibit Number 2.
(Deposition Exhibit 2 were marked.)
MR. RONWIN: Can I interrupt you for a minute? This one says to Dr. Wolfel and this one says to Dr. Hiatt.
MR. PILKINGTON: We have changed that on the record, so Exhibit Number 1 is the one to Dr. Hiatt.
MR. RONWIN: Okay. I just want to make sure



which one you've got.
Q. (BY MR. PILKINGTON) Dr. Hiatt, I've handed you a compilation of medical reports authored by you that were produced by the University of Colorado Hospital. Would you just take a moment to flip through those and confirm that those are your reports.
A. That is correct.
MR. RONWIN: Is this Exhibit 2?
MR. PILKINGTON: Yes, it is.
Q. (BY MR. PILKINGTON) Doctor, before we go to the specifics of your care and treatment of Mr. Ronwin, do you treat patients for hypercholesterolemia?
A. Correct.
Q. What is that disease?
A. It's a disorder of lipid metabolism.
Q. And what are the primary types of lipoproteins which transport cholesterol in the blood plasma?
A. HDL cholesterol and LDL cholesterol.
Q. What is HDL cholesterol?
A. High-density lipoprotein.
Q. Is that the good cholesterol, as it's commonly known?
A. Correct.
Q. And LDL is what?
A. Low density.



Q. And is that the bad cholesterol?
A. Correct.
Q. And what are the risks of having high cholesterol?
A. The risk of increased LDL cholesterol levels is acceleration of cardiovascular disease.
Q. Meaning coronary heart disease?
A. Coronary and peripheral.
Q. And what are the risks of both coronary and peripheral diseases?
A. The common risk is that of myocardial infarction, stroke and death.
Q. Serious conditions?
A. Correct.
Q. Potentially fatal conditions?
A. Correct.
Q. Do you treat patients for coronary heart disease?
A. I do.
Q. As well as peripheral vascular disease?
A. Correct.
Q. What are some of the risk factors that you consider to be -- let me rephrase the question. What are some of the risk factors for coronary heart disease?
A. High cholesterol, specifically LDL cholesterol,



low HDL cholesterol, hypertension, diabetes and cigarette smoking.
Q. Increased age?
A. Correct.
Q. Sex?
A. Correct. Gender would be male gender.
Q. Male gender. Diabetes?
A. Correct.
Q. And by risk factors, those factors increase the risk of a person developing coronary artery or coronary heart disease?
A. That's correct.
Q. Let me now focus on peripheral vascular diseases. What are some of the risk factors for peripheral vascular diseases?
A. The same as for coronary artery disease.
Q. And is it fair to say the greater number of risk factors that a patient has, the greater the risk that patient faces?
A. That's correct.
Q. And what is the -- is there a primary or a heightened risk factor of those that you've identified for both coronary artery disease as well as peripheral vascular disease?
A. For peripheral arterial disease, diabetes and

Page 18

cigarette smoking are the most predominant risk factors.
Q. And for coronary heart disease?
A. The same, plus LDL cholesterol.
Q. And is a pre-existing history of coronary artery disease considered a risk factor as well?
A. The term would not be exactly a risk factor, but the association between coronary artery disease and peripheral arterial disease is quite high. But they are both manifestations of the same disease process --
Q. Meaning --
A. -- which is atherosclerosis --
Q. -- atherosclerosis of the vascular --
A. -- of the arterial circulation, so . . .
Q. Doctor, let's turn to your reports which we've identified as Exhibit Number 2. Doctor, you've had the opportunity to review Exhibit 2?
A. Yes.
Q. Are you aware of any other reports for Dr. Ronwin?
A. Not unless I went through the medical record and discovered something that's not shown here.
Q. Doctor, do you dictate a report after you see a patient at the university?
A. Correct.
Q. Is that your standard practice?

Page 19

A. Correct.
Q. Are these reports that you dictated following an office visit with Mr. Ronwin?
A. Correct.
Q. And were these reports prepared by you with personal knowledge of the information set forth therein?
A. Correct.
Q. And Doctor, are these reports maintained at the University of Colorado Health Sciences Center?
A. Correct.
Q. Are these reports true and accurate copies of the reports that you dictated?
A. Yes.
Q. Doctor, it appears that you first saw Mr. Ronwin in July of 2002?
A. Correct.
Q. Specifically July 26 of 2002, correct?
A. Correct.
Q. And the last report that I have is in November of 2005, correct?
A. Correct.
Q. Do you have a recollection of seeing Mr. Ronwin after that date?
THE DEPONENT: Did you come to see me in 2006?
MR. RONWIN: Yeah. In March, when I saw

Page 20

Dr. Wolfel. I see you the same day.
Q. (BY MR. PILKINGTON) So you've seen him one time --
A. That's presumably correct.
Q. -- in March of 2006?
A. Yes.
Q. Tell me, Dr. Hiatt, how did you -- do you consider Mr. Ronwin a patient of yours?
A. Yes.
Q. And what -- what are you seeing Mr. Ronwin for?
A. Primarily for his peripheral arterial disease and associated risk factors.
Q. Is Dr. Wolfel treating Mr. Ronwin for his coronary artery disease?
A. Correct.
Q. In fact, Mr. Ronwin was referred to you by Dr. Kumpe?
A. Kumpe.
Q. And what was the purpose of the referral?
A. The purpose was to assume medical care for his vascular disease.
Q. Who was providing that care before?
A. I'm not aware. It may have been provided by a physician in Fort Collins.
Q. Is that something that's common at the

Page 21

university, to split the care of a patient who has both coronary and peripheral vascular diseases?
A. Well, I don't know if it's common or not.
Q. It was done with Mr. Ronwin?
A. In general?
Q. Well, maybe you don't understand my question and that's probably my fault. But my understanding is that Dr. Wolfel is caring for his coronary artery disease and associated risk factors.
A. Correct.
Q. And you're caring for his peripheral arterial disease and associated risk factors.
A. Correct.
Q. Is that something that is commonly done at the University of Colorado Health Sciences Center?
A. I would say it's not common because I'm the only vascular medicine specialist. So that most cardiologists would care perhaps for both. But because I'm available, when available, I'll focus on the peripheral arterial problems.
Q. Has your focus with Mr. Ronwin been on his peripheral vascular issues and associated risk factors?
A. Correct.
Q. When Mr. Ronwin came to you, what was your understanding of his medical history?

A. He had a history of claudication. He had a history of revascularization procedures most recently by Dr. Kumpe. And he still had limitations from his claudication. And he was taking medical therapies for his vascular disease.
Q. If you look at the first paragraph of your July 26th, 2002 office notes, Mr. Ronwin reported to you that he had a coronary artery bypass in 1996.
A. Correct.
Q. Following that, he had problems with claudication?
A. Correct.
Q. And because of that claudication, he had numerous revascularization procedures, correct?
A. Correct.
Q. And here you note that he had those sorts of procedures in 1997?
A. Correct.
Q. 1998?
A. Correct.
Q. 2000?
A. Correct.
Q. And I believe 2001, correct?
A. I don't see the 2001 reference here.
Q. But he had numerous -- I'm sorry. At the end of



the paragraph, you reference, and in January this year, he had his second procedure which has now been successful, correct?
A. Correct.
Q. So he had that procedure in 2002 as opposed to '01?
A. Correct.
Q. So he had numerous revascularization procedures?
A. Correct.
Q. What is that type of procedure?
A. Those were predominantly done by balloon angioplasty to open up occluded blood vessels.
Q. What is claudication?
A. Claudication means to limp. It's the symptom of peripheral arterial disease.
Q. Was it your understanding that Mr. Ronwin had that symptom since 1997 at least?
A. Correct.
Q. What symptoms did he present at this first office visit?
A. He continued to have claudication symptoms at presentation to me.
Q. And did he also, in this second paragraph, Doctor, report to you a pain in his buttocks bilaterally that radiated down through his leg into his thigh?



A. Correct.
Q. Doctor, what medications was he on at the time?
A. His medications, when he presented to me, included Simvastatin, Atenolol, aspirin and vitamins.
Q. This statin he was taking, was Zocor --
A. Correct.
Q. -- the brand name?
A. Yes.
Q. And he was taking 40 milligrams each day?
A. Yes.
Q. What was your understanding as to why he was taking the Atenolol?
A. That has a dual purpose, controlling blood pressure and it's part of the treatment for coronary artery disease.
MR. RONWIN: Excuse me. Let's go off the record for a second.
MR. PILKINGTON: I'm going to stay on the record. Go ahead.
MR. RONWIN: It says here I took Zocor 40 milligrams per day. I took it every other day.
MR. PILKINGTON: We'll get to that. We'll get to that in a minute. You can ask him questions.
Q. (BY MR. PILKINGTON) The aspirin, he reportedly was taking three -- let me ask you that. Was it your



understanding that Mr. Ronwin was taking the Zocor 40 milligrams each day?
A. Well, according to this note, that's what I put down.
Q. Is that something that would have been reported to you by Mr. Ronwin?
A. Correct.
Q. And according to this note, he was taking the Atenolol, 25 milligrams each day?
A. Correct.
Q. The aspirin, 325 milligrams each day?
A. Correct.
Q. What was the purpose of the aspirin?
A. It's an anti-thrombotic medication commonly given to people with cardiovascular disease.
Q. To further reduce the risk of both coronary and peripheral diseases?
A. Primarily to reduce the risk of myocardial infarction, stroke and death.
Q. Doctor, did you do a complete examination of Mr. Ronwin on that day?
A. Yes.
Q. Did you form any conclusions or make an assessment as to his current condition?
A. Yes.

Q. And Doctor, was it your conclusion that Mr. Ronwin has systemic cardiovascular disease?
A. Yes.
Q. Was it your conclusion that that cardiovascular disease was manifested primarily as both coronary artery disease as well as peripheral arterial disease?
A. Correct.
Q. Was it your understanding that the coronary artery disease was being primarily cared for by Dr. Wolfel?
A. I don't recall when he first saw Dr. Wolfel.
Q. I'll represent to you that it was before you first saw him.
A. All right.
Q. Do you have any reason to disagree with that?
A. No.
Q. And what was your approach of how to best manage these systemic cardiovascular diseases?
A. Well, the discussion here, which is consistent with usual cardiovascular care, is to focus on each risk factor and anti-platelet therapy.
Q. What risk factors were you focusing on?
A. Management of his LDL cholesterol, which as noted here would have a goal of less than 100 milligrams per deciliter.



Q. Okay.
A. Control of his blood pressure, which at the time was well controlled. He did not smoke or have diabetes. And use of anti-platelet therapies.
Q. So your focus in terms of Mr. Ronwin was to better control his cholesterol?
A. Correct.
Q. To control or maintain control of his hypertension?
A. Correct.
Q. And the use of anti-platelet therapy?
A. Correct.
Q. What does anti-platelet therapy mean, refer to?
A. It refers to drugs that block platelet function.
Q. Such as --
A. Aspirin and Clopidogrel.
Q. So in terms of managing his cholesterol, you understood that he was taking Zocor, 40 milligrams each day?
A. Correct.
Q. And at least according to your notes here, that that Zocor at that dose was managing his cholesterol adequately?
A. The report in the record says that his LDL cholesterol was 70 milligrams per deciliter, which would



be adequate.
Q. And is it fair to say that the 70 LDL is a better target for Mr. Ronwin than 100?
A. Today it's fair to say that. Back in 2002, that wasn't the guideline.
Q. What is the guideline today?
A. The guideline today is that patients who are high risk -- and one definition would be the combination of peripheral arterial disease and coronary disease -- should maintain an LDL cholesterol less than 70 milligrams per deciliter. And that's an American Heart Association guideline.
Q. Do you know when that became the American Heart Association guideline?
A. In the last year. I actually have a copy of the article in my office.
Q. So would you agree that Mr. Ronwin is a high-risk patient?
A. Yes.
Q. And he's a high-risk patient given the established diseases of both coronary artery disease as well as peripheral vascular disease?
A. Correct.
Q. Because of his high-risk categorization, Mr. Ronwin's target for LDL should be 70 or less?



A. That's true today.
Q. In 2002, when you first saw him, was the target less than 100?
A. Correct.
Q. Do you have an understanding as to why the current guideline is a reduction by almost 30 percent of LDL?
A. Newer information has indicated that lower levels are associated with improved benefit, specifically the Heart Protection Study that Med Analysis published in Lancet 2005.
Q. Have you adopted this new guideline in your practice?
A. Yes.
Q. And is it your advice to your patients to -- who are of a high-risk category, such as Mr. Ronwin, to get that LDL down to 70 or below?
A. Yes, it is.
Q. Are there any -- what are the guidelines with respect to HDL?
A. They are not as well developed as those for LDL cholesterol. They do indicate that patients with cardiovascular disease should have an HDL cholesterol -- and I believe that in men it's greater that 40 and women greater than 50, but I would have to look that up.

Q. And what guidelines, if any, relate to the triglycerides?
A. The level of evidence there is not as good there either. And so in general, patients that have very high levels of triglycerides are treated for that. But the guidelines on triglycerides are less established.
Q. So in terms of treating his peripheral vascular disease in May -- I'm sorry, in July of 2002, your focus was on managing his cholesterol, controlling his hypertension, and the use of the anti-platelet therapy aspirin, fair to say?
A. In terms of his systemic disease, that's correct.
Q. Doctor, I want to now focus on the two types of symptoms that he presented in July of 2002, okay?
A. Okay.
Q. And I'm focusing on the last paragraph of your report. Do you have that in front of you?
A. On page 3?
Q. Yes.
A. Okay.
Q. Doctor, he was complaining to you about some pain that was focused in his buttocks that radiated down into his legs, correct?
A. Correct.



Q. What was your conclusion about that type of pain?
A. That he might have had two kinds of pain, one was claudication, the other was consistent with neuromuscular etiology of pain.
Q. What is the classical symptoms of claudication?
A. Muscle cramping or discomfort on exertion that's relieved by rest.
Q. As opposed to the neuromuscular type of pain that you were suspecting, what is that? What is the symptom of that?
A. Those symptoms often radiate from the buttocks or low back down into the legs. May have more of a positional component, but can mimic claudication.
Q. So was it your conclusion that he may be having symptoms of both claudication as well as neuromuscular pain?
A. Correct.
Q. Doctor, the next time you saw Mr. Ronwin was in August of 2002?
A. Correct.
Q. Doctor, rather than going through this for each office visit, is it fair to say that Mr. Ronwin's coronary artery disease and peripheral vascular disease has remained constant during that time?



A. During what time?
Q. During your entire care and treatment of him.
A. It has remained fairly stable.
Q. And by stable, he still has coronary artery disease, correct?
A. Correct.
Q. And he still has peripheral vascular disease, correct?
A. Correct.
Q. But through your care and treatment, along with others at the university, those conditions have been stable over the last four years?
A. Define stable.
Q. You used the word "stable". What did you mean by stable?
A. Stable meant that his level of claudication symptoms, specifically when walking uphill, remained relatively constant over that interval.
Q. And Doctor, I apologize. Your care and treatment of him really didn't focus on the coronary aspect. It's on the peripheral aspect?
A. Correct. But because they're all cardiovascular diseases, I wouldn't ignore a change in coronary symptoms, either.
Q. So by stable, you mean that the symptoms



relating to both his coronary disease, as well as vascular disease, have remained fairly constant during the last four years?
A. Correct. And by stable, I mean he did not have another cardiovascular event during that time.
Q. A good thing.
A. That's a good thing.
Q. Okay. In any event, he came back to you in August of 2002 with the same complaint of pain radiating down into his buttocks, correct?
A. Correct.
Q. And to make this move faster, Doctor, you note that this pain was radiating into his buttocks and thigh upon walking that is relieved by rest. Do you see that?
A. Yes.
Q. However, it is a rather persistent pain and does not seem to be aggravated by further exertion. He clearly distinguishes this from his claudication pain, which is mostly calf induced and does limit his exercise.
A. Yes.
Q. Did I state that correctly?
A. Yes.
Q. You had some tests done on his spine?
A. Correct.
Q. And what did those tests reveal?

Page 34

A. Degenerative disk disease in his lower spine.
Q. What conclusions, if any, were you making with respect to this pain in his buttocks and into his legs?
A. The conclusion from that visit was that his pain, on exertion, was primarily musculoskeletal.
Q. As opposed to claudication?
A. Correct.
Q. Doctor, focusing on this middle paragraph where you talk about Mr. Ronwin's most recent lipid profile, do you see that?
A. Yes.
Q. What did you report with respect to his profile and the dosage of Zocor that he was taking?
A. The note begins with, taking Simvastatin, 40 milligrams per day, his LDL cholesterol was 70, his HDL was 36, triglycerides were 80.
Q. So Mr. Ronwin reported to you that he was taking the Zocor, 40 milligrams per day, correct?
A. According to this note, that is correct.
Q. And based on that dosage of Zocor, his LDL was down to 70, which would be ideal according to today's guidelines.
A. Correct.
Q. Did you also have a discussion with Mr. Ronwin about his desire to reduce his dose of Zocor to

Page 35

40 milligrams every other day?
A. I did.
Q. And what do you recall about that discussion?
A. As I recall, that was a discussion that began at that visit and continued through many visits, that based on Mr. Ronwin's review of the biochemistry of this class of medicine, he could take it less frequently.
Q. Did Mr. Ronwin approach you and explain to you that he wanted to reduce Zocor to every other day?
A. Yes.
Q. Would you turn to your last paragraph of your August note? In this you note that in terms of the patient's lipid disorder, I was concerned about cutting back on his statin dose on his own. Did you have that concern?
A. Yes.
Q. Why did you have that concern?
A. I was afraid he would lose control of his LDL cholesterol.
Q. That is, it would go up?
A. Correct.
Q. And did you try to dissuade him of moving to Zocor every other day?
A. I did.
Q. What did you tell him?

Page 36

A. I did not recommend that.
Q. Despite that recommendation, do you have an understanding as to what Mr. Ronwin did?
A. I believe he reduced it to every other day.
Q. Against your advice?
A. Yes.
Q. Doctor, have you prescribed statins over the years?
A. Yes.
Q. Is that a -- are statins a tool that you use to control one's cholesterol?
A. Yes.
Q. And do statins have an important role in controlling both coronary artery disease as well as peripheral vascular disease?
A. Yes.
Q. Doctor, one of the recognized side effects of these medications is rhabdomyolysis?
A. Correct.
Q. What are some of the symptoms of rhabdomyolysis?
A. Extreme muscle tenderness, often associated with kidney failure. Muscle weakness.
Q. And --
A. Very high CK levels in the blood.
Q. CK meaning --

Page 37

A. Creatine kinase. C-r-e-a-t-i-n-e, k-i-n-a-s-e.
Q. Have you had any of your patients who have taken statins report muscle tenderness, weakness, those sorts of symptoms?
A. Be careful not to make the association between muscle weakness or tenderness and rhabdomyolysis.
Q. Okay.
A. Those are often two distinct things.
Q. Okay. And thank you for that distinction. Have patients of yours reported the symptoms of muscle tenderness and weakness associated with the use of statins?
A. Not muscle tenderness, but muscle aches.
Q. And after they've reported muscle aches, do you do a CK analysis?
A. I often do.
Q. And if the CK analysis is elevated, what do you do?
A. It never has been. Because the risk of true rhabdomyolysis as extremely low.
Q. Have you ever had a case of rhabdomyolysis associated with statin use?
A. I have not personally.
Q. Okay. Is it your understanding that in cases of rhabdomyolysis, as soon as the statin is removed, the --

that assuming no renal failure or problems, the symptoms, the tenderness and the weakness of muscles resolve?
A. It should be, but I would have to review the literature to confirm that every case where statins were discontinued resolved.
Q. But it's your understanding that that usually happens?
A. Yes.
Q. So Doctor, at this point in time, at least in August of 2002, Mr. Ronwin told you he was going to use Zocor every other day, correct?
A. He indicated at the end of that visit that he wanted to take it every other day.
Q. Okay. Well, let's go to your next visit in August of 2002. Do you have that in front of you?
A. Do you mean September?
Q. Thank you very much. Do you have that in front of you?
A. Yes.
Q. What were his complaints on this visit?
A. At that visit, he had an angina complaint and a new symptom, which is orthopnea, which is shortness of breath when lying down.
Q. What is angina?
A. That's the symptom of coronary artery disease.



It's chest discomfort on exertion. It's relieved by rest.
Q. And is both angina and orthopnea symptoms associated with coronary artery disease?
A. Angina is associated with coronary artery disease. Orthopnea is associated with congestive heart failure.
Q. Okay. And indeed, your assessment on that date, if you turn the page, was that Mr. Ronwin had significant obstructive coronary disease, correct?
A. Yes.
Q. And that that coronary disease resulted in occasional symptoms?
A. Yes.
Q. Including angina?
A. Yes.
Q. Including the claudication-type symptoms?
A. Well, the coronary disease wouldn't cause claudication.
Q. The vascular disease would, correct?
A. Yes.
Q. And you also were -- you were also concerned about Mr. Ronwin developing some mild congestive heart failure?
A. Correct.
Q. What is that?



A. That's when the heart pump does not work properly.
Q. What was your recommendation at that time?
A. His blood pressure was a little higher than previously, 140 over 70. And because of this blood pressure and symptoms, I put him on an ace inhibitor, which would treat both.
Q. And if you go to the top paragraph on the first -- second page, it says, review of his medication today reveals he is taking Zocor, but on his own accord 40 milligrams every other day?
A. Correct.
Q. Do you see that? Did Mr. Ronwin report to you that he had, in fact, changed his dosage to Zocor every other day?
A. Based on this record, yes.
Q. And did he explain that he wanted to -- he did so to limit his exposure to statins?
A. Yes.
Q. He also reported reducing his aspirin intake as well to 81 milligrams.
A. Yes.
Q. Was that at your recommendation?
A. I don't recall, but that's a typical dose.
Q. Doctor, did Mr. Ronwin explain to you in



September of 2002 why he wanted to limit his exposure to statins?
A. I don't make a specific mention of it in this visit.
Q. Do you have a recollection of him doing so?
A. Yes.
Q. And what is your recollection?
A. My recollection is that he wanted to take as little statin as necessary.
Q. Did he explain why?
A. It was not clear to me why reducing the frequency of dosing was necessary, except that he felt that based on the way the drug was handled by the body, that it might -- you might be able to take less and continue at the same level of LDL cholesterol control.
Q. Doctor, you then saw Mr. Ronwin in November of 2002?
A. Yes.
Q. This time he really didn't have any primary complaints. You say he didn't have any chief complaints.
A. Uh-huh.
Q. Is that correct?
A. That's correct.
Q. But he still had some angina, correct?
A. Yes.


535c79c7-92f2-46d7-a7dc-a76bb554b50f

Q. I'm focusing on the third paragraph and I'll read it. The patient had a prior history of hypertension with systolic blood pressures in the 130 to 140 range. I had put him on an ace inhibitor, but he decided not to take his medication. He went to see Dr. Wolfel today. His blood pressure was low and Dr. Wolfel commented he saw no reason to take this drug; is that correct?
A. Correct.
Q. But was it your understanding that Mr. Ronwin did not take any of the ace inhibitor that you prescribed?
A. Correct.
Q. And on this note, his -- he was taking Zocor every other day and his LDLs stayed at around 70, correct?
A. Yes.
Q. So because of his most recent lipid profile, you agreed to keep that dosage?
A. Correct.
Q. But let's go to the next page, your assessment. What is your -- what was your assessment at this time?
A. The assessment at that time was to continue to evaluate his coronary circulation, to continue to treat his lipids aggressively, to continue the beta blocker and aspirin. And his peripheral arterial disease was stable.
Q. Did you still have concern about Mr. Ronwin taking Zocor only 40 milligrams every other day?



A. To some degree.
Q. Let's go to April of 2004, which is about five months after you last saw Mr. Ronwin. I'm sorry. It appears almost a year and a half after you last saw Mr. Ronwin, correct?
A. Yes.
Q. Do you know why there was a gap, such a large gap in time?
A. I don't. There may be some missing records.
MR. RONWIN: I don't believe there was a gap. I see you every time I see Dr. Wolfel.
Q. (BY MR. PILKINGTON) Well, this is -- this is all the records that we have. But do you have a recollection of seeing Mr. Ronwin between November of 2002 and April of 2004?
A. I can't specifically recall, but it's likely I would have seen him.
Q. Do you have a specific recollection of what happened, if you did, in fact, see him during that time?
A. Based on the note from April 2004, I would speculate that his clinical situation had not changed much. I would need to confirm that speculation with notes, if they were available.
Q. And Doctor, would those notes be at the University of Colorado Health Sciences Center?



A. Yes.
Q. And if those notes did not reveal an office visit before -- between November of '02 and April of '04, would you have -- would you have any reason to disagree with that?
A. There's a shadow chart in the senior's clinic that would be another potential source of records that --
Q. And if I wanted to get that chart, who would I approach?
A. The medical records department would be the primary source. And whether they would then, you know, approach the seniors clinic or whether you could do that directly, I couldn't say. But just to make you aware, there is a shadow chart available.
Q. So there may be additional records in the shadow chart?
A. Correct. There may be.
Q. Okay. And to conclude this gap of time or to conclude this questioning about this gap of time, you don't have a specific recollection of seeing Mr. Ronwin between November of '02 and April of '04; is that correct?
A. That's correct.
Q. But you may have, you just don't know?
A. That's correct.
Q. And if there is no record of any office visit,



whether it be in the university files or in that shadow file, would you agree that you did not actually see him during that time period?
A. Unless the case of the low probability something was lost or misplaced.
Q. Regardless, Doctor, is it fair to say that Mr. Ronwin would call your clinic often?
A. That's correct.
Q. And more often than most of your patients?
A. To some degree.
Q. Who was the primary contact that he had when he called and wanted to talk to you?
A. My nurse, Nancy Montgomery.
Q. In fact, did you assign Nurse Montgomery the role of talking to Mr. Ronwin when he called?
A. Well, she is in that role for all of my patients.
Q. Okay. And the ace inhibitor that you prescribed, was that Lisinopril?
A. It was Enalapril.
Q. Doctor, I'm not going to mark this as an exhibit, but I'll refer to it on the record as UCHC000490ER. And this is a phone log report, correct?
A. Correct.
Q. The date is September 26, '03, correct?

A. Correct.
Q. And is that your nurse's signature?
A. I'm not sure.
Q. Is this your handwriting in the middle of the page?
A. Correct.
Q. It says here, patient called to inform Dr. Hiatt that the results of his Zocor tests are in the computer. Do you see that?
A. I do.
Q. Do you know what, quote, Zocor tests, unquote, refers to?
A. Not specifically.
Q. Was he -- to your knowledge, he wasn't a part of any sort of statin test or any Zocor test? Is that correct?
MR. RONWIN: I would like to -- I would like to interject. I think that's just the lipid panel.
MR. PILKINGTON: Okay. Go ahead.
THE DEPONENT: Restate the question.
Q. (BY MR. PILKINGTON) Sure. Are you aware -- are you aware as to whether Mr. Ronwin was in any sort of statin study or test?
A. On a drug specifically?
Q. Yes.



A. No.
Q. But are you trying to differentiate a specific clinical test or trial as opposed to following his progress while taking Zocor?
A. Typically, I would review the lipid profile.
Q. And that may be what the test is referring to?
A. May be.
Q. Let's move on, Dr. Hiatt, to April of 2004. Do you have that note in front of you?
A. I do.
Q. What was Mr. Ronwin's chief complaint at this time?
A. It was claudication.
Q. The same type of symptom that he first presented to your office?
A. Correct.
Q. Doctor, I want to refer you to another phone log report, which is UCHC000021ER. This is dated 10/4/02.
A. Okay.
Q. And is that your nurse's signature?
A. I believe so.
Q. Do you review phone log reports --
A. I do.
Q. -- taken down by your nurse?
A. I do.



Q. And it says here, patient called and informed that he obtained the Lisinopril from the VA in Cheyenne. Did I read that correctly?
A. You did.
Q. Okay. And that's shortly after -- what is Lisinopril?
A. That's an ace inhibitor.
Q. And in fact, you prescribed an ace inhibitor on September 26 of '02, correct?
A. Correct.
Q. And you prescribed Vasotec?
A. Correct.
Q. Is that different than Lisinopril?
A. That's Enalapril.
Q. But in any event, he apparently was getting the Lisinopril from the VA clinic, according to this note?
A. According to that note.
Q. And according to this note, Mr. Ronwin read the insert and is not sure he should be taking the medication. Did I read that correctly?
A. You did.
Q. Was it your understanding from Nurse Montgomery that after reading the package insert for the ace inhibitor, Mr. Ronwin was not sure whether he should take the medication?



A. According to that note.
Q. And is this note something that you would have reviewed during the ordinary course of your medical and clinical practice at the university?
A. Yes.
Q. Doctor, let's now go back to April of 2004. You told me that his primary complaint in April of 2004 was this claudication?
A. Correct.
Q. Let me focus you on the middle paragraph. It says, the patient has had rotator cuff problems in both shoulders with arthroscopic correction in the left shoulder in June of 2003. He is trying to relate his muscle tear to his prior use of Baycol which he took for seven months. Evidently he is in litigation over this issue. Did I read that correctly?
A. You did.
Q. Is this the first time Mr. Ronwin ever advised you he was in litigation over this injury?
A. I believe so.
Q. Is that something that if a patient reports to you litigation about an injury, you'll usually include in a medical record?
A. Yes.
Q. Doctor, Mr. Ronwin reported to you that he had



535c79c7-92f2-46d7-a7dc-a76bb554b50f

Page 50

rotator cuff problems in both shoulders, correct?
A. Correct.
Q. Meaning his left shoulder, as well as his right shoulder?
A. Yes.
Q. And you noted here that he had correction of the left shoulder in June of 2003?
A. Correct.
Q. Did Mr. Ronwin also explain to you that he believed that this rotator cuff injury to his left shoulder was caused by his use of Baycol?
A. Well, I say here this muscle tear, so whether that relationship was to one or both shoulders, I can't recall.
Q. What did he tell you about the rotator cuff problem in his right shoulder?
A. Well, this was the first I noted it. And I wasn't treating him for that condition. So about all the history I obtained is shown here.
Q. Had Mr. Ronwin ever complained to you about any type of shoulder problem before April of 2004?
A. Not that I'm aware.
Q. Let's go to the next paragraph. And it reads, the patient's current lipid management is Simvastatin, which he takes 40 milligrams every other day. He failed

Page 51

when he took it every third day, his LDL crept up to 117, but on every other day it is 103, with an HDL of 48 and triglycerides of 91. He seems fairly wedded to this dosing. Did I read that correctly?
A. Yes, except wedded misspelled.
Q. Did Mr. Ronwin report to you that he was now taking Zocor every other day?
A. It appears he was taking the statin every other day.
Q. But somewhere between November of '02 and April of '04, he decided to take it every third day?
A. Correct.
Q. He reported that to you?
A. That's correct.
Q. He also reported to you when he took it every third day, that his LDL crept up to above 100?
A. Up to 117 by report.
Q. And would 117 be unacceptable, given Mr. Ronwin's risk level?
A. Yes.
Q. Did you advise Mr. Ronwin to take the Zocor every third day?
A. No.
Q. Would that be against your recommendation?
A. Correct.

Page 52

Q. Just like taking it every other day was against your recommendation?
A. Correct.
Q. And here he reported to you that when he took it every other day, it was 103, still above 100?
A. Correct.
Q. Let's go to the next paragraph. The patient has also been prescribed aspirin for his coronary artery disease, but he stopped this on his own because of reports from friends that there might have been some serious side effects and, therefore, he is not interested in restarting this. Did Mr. Ronwin report to you that he had stopped taking aspirin?
A. According to this note, that's correct.
Q. And is it your understanding that he is no longer taking aspirin?
A. Based on this record. I would have to go through the other notes to confirm that he's remained off aspirin.
Q. But at least in April of 2004, he reported to you that he's no longer taking aspirin?
A. Correct.
Q. And the reason that he reported to you that he was no longer taking this aspirin was what?
A. Concern about side effects.

Page 53

Q. Doctor, would you go to the last page of this report. And you reported that after much discussion, trying to modify his statin dose any higher would not be well received. I also tried to get him to restart aspirin but with no effect. Did I read that correctly?
A. Correct.
Q. Did you recommend that Mr. Ronwin start taking aspirin again?
A. Yes.
Q. Why?
A. Because it's part of standard therapy to reduce the risk of cardiovascular events in patients with peripheral arterial disease.
Q. Did you also recommend to Mr. Ronwin that he take Zocor every day?
A. I don't see the note here. I do note that at 103, he's very close to target goal, and so -- but it says, I did discuss trying to modify his statin dose, which would have meant I would have articulated the need to go to once-a-day dosing.
Q. And that discussion you note was not well received, correct?
A. Right.
Q. Doctor, the next note that I have been able to locate from the university's file is May 26 of 2005.

A. Okay.
Q. Again, do you have a specific recollection of seeing Mr. Ronwin between April of '04 and May of '05?
A. Not specific, but I would check the shadow chart to see if that's true.
MR. RONWIN: Must have been at least one visit.
MR. PILKINGTON: And Mr. Ronwin, that's the problem with the hospitals and the large hospitals of the importance to try to get all the records. And we'll follow up and try to get the shadow chart from Dr. Hiatt, okay? I apologize. This is everything I have.
Dr. Hiatt, let me mark as Exhibit Number 3 --
MR. RONWIN: Do you have much more to do?
MR. PILKINGTON: I have 20 minutes or so.
MR. RONWIN: Too bad. I've got several questions to ask.
THE DEPONENT: Could I take a two-minute break?
MR. PILKINGTON: Yes, you may.
(Recess taken.)
(Deposition Exhibit 3 was marked.)
Q. (BY MR. PILKINGTON) Dr. Hiatt, at the break, I found what I would like to mark as Exhibit Number 3. This is an outpatient consultation; is that correct?
A. Correct.
Q. With your requesting physician name at the



bottom?
A. Correct.
Q. Is this the referral to --
MR. RONWIN: Can I have a copy of that, please?
MR. PILKINGTON: I'll get you one.
Q. (BY MR. PILKINGTON) This is dated May 20th, 2004.
A. Yeah. Correct.
Q. And what is that for?
A. Referral to orthopedic surgeon.
Q. Who did you refer him to?
A. Just to the clinic. No one specifically.
Q. And why were you referring him to --
A. History of the left rotator cuff tear, prior surgery with current complaints of decreased range of motion and increased pain. Needs evaluation and expert opinion regarding information.
Q. Was Mr. --
A. Patient will bring.
Q. Was --
A. He was going to bring information to the orthopedic surgeon.
Q. And did this relate back to the April 2004 visit during which time Mr. Ronwin discussed for the first time his prior rotator cuff problems?



A. I believe that's correct.
Q. And was it your understanding that when he was saying he needed evaluation and expert opinion, that he was seeking an expert opinion regarding the possible association between his shoulder injury and his use of Baycol?
A. That was my understanding.
Q. Doctor, again, we're moving forward to May of 2005. You have a note of that clinic visit?
A. May 26.
Q. May 26 of 2005. Do you have that?
A. Yes.
Q. And, again, in this note, it was a follow-up for his chief complaint of claudication?
A. Correct.
Q. And how did you describe his claudication in these records or the symptoms associated with it?
A. It was stable.
Q. And what symptoms did Mr. Ronwin report that he was having?
A. He was not very limited on walking on the level, but walking up a hill near his house would bring on claudication and force him to stop walking.
Q. Is that a classic symptom of claudication?
A. It is.



Q. And the next-to-the-last paragraph on the first page, you noted that his risk factors have been managed with Simvastatin, 40 milligrams every other day at his insistence?
A. Correct.
Q. And that has resulted in an LDL of 88, HDL of 38, and triglycerides of 124 --
A. Correct.
Q. -- correct? Again, this every-other-day use may have been meeting the guidelines before, but not meeting the current guidelines, correct?
A. The level of ADA?
Q. The level of LDL.
A. The current guideline would be 70.
Q. And it appears that he had a CK test.
A. Correct.
Q. What was the purpose of the CK test?
A. To monitor for statin side effects.
Q. And what side effects were you looking for?
A. For the CK muscle in the liver would be the low but potential risk of causing muscle and liver damage.
Q. You also note here that the patient was on the Atenolol, 25 milligrams a day, to control his blood pressure and for his cardioprotective effects, correct?
A. Correct.

Q. You also note, he has been placed on anti-thrombotic therapies, but stopped Plavix because of bruising and stopped aspirin because he believes it can be associated with side effects, though it is unclear he has personally had any of those side effects, correct?
A. Correct.
Q. Did Mr. Ronwin report to you that he was not taking aspirin at this time?
A. Yes.
Q. Was it your continued recommendation that he take the aspirin?
A. Correct.
Q. Under assessment, you were planning to do some further vascular studies --
A. Correct.
Q. -- to understand whether his claudication had -- or his vascular problems had worsened?
A. Correct. His complaints were stable, but the question being posed was whether his vascular disease had also remained stable.
Q. Doctor, I'm turning to the last page. It appears that the patient's risk factors are in good control. His lipids are at target level, correct?
A. Correct.
Q. Meaning target for the guildlines as they



existed in May of 2005?
A. Well, the change from an LDL of 100 to 70 occurred about a year ago. So this would have been around that transition time.
Q. I understand. But at that time, the LDL seemed to have been met at every other day.
A. Correct.
Q. But now, again, we need to get that LDL down to 70 or below?
A. Today, that's true.
Q. You noticed his blood pressure is at target goal. But I note, did you try to convince him to go back on his anti-thrombotic therapies?
A. I did.
Q. What were those therapies?
A. That would be either aspirin or Plavix.
Q. What was his response?
A. He didn't want to do that.
Q. Doctor, you conclude this note by saying you would like to see him every four to six months.
A. Yes.
Q. It appears that you saw him within a month, if you turn the page to June 30 of 2005.
A. Yes.
Q. And it appears that this office note was



following some cardiac workup that you had -- you or Dr. Wolfel had scheduled.
A. Correct.
Q. And was it your conclusion that after this cardiac workup, no further revascularization was required?
A. That was true for both his coronary and his peripheral arteries.
Q. And you say, despite your assessment, Mr. Ronwin had been bothered by several things. First, he feels that a blood draw done in May caused an injury to his right arm?
A. Correct.
Q. Do you recall what Mr. Ronwin said about that?
A. He felt that the phlebotomist had somehow bruised him and that affected his ability to use his arm, so we sent him to orthopedic surgery.
Q. And do you understand he was also referred to a rheumatologist?
A. That I don't recall.
Q. And what was his second complaint?
A. He felt that when he had the peripheral vascular evaluation duplex ultrasound, that when they pressed the ultrasound probe on his left thigh, he had some pain from that.
Q. Mr. Ronwin reported that to you?



A. Yes.
Q. Finally, the other complaint that you note is discomfort in his buttocks down the posterior aspects of both thighs.
A. Correct.
Q. Is that similar to the discomfort that he reported to you early in your care and treatment of --
A. Correct.
Q. -- Mr. Ronwin? Let me ask you the question again. Is this complaint of discomfort in his buttocks down in his thighs and legs similar to that that he reported to you early in your care and treatment of him?
A. Correct.
Q. What was your assessment, Doctor, with respect to the complaint of his arm?
A. I couldn't find an abnormality on examination.
Q. But regardless, you referred him to further workup with a neurologist?
A. Yes.
Q. Was that Dr. Neville?
A. I would have to check the record to see.
Q. Doctor, the last note that I have is one of November -- specifically November 11, 2005.
A. Okay.
Q. Do you have that in front of you?

A. I do.
Q. Mr. Ronwin came to you for follow-up for his claudication?
A. Correct.
Q. And symptomatically apparently he had improved; is that fair to say?
A. Yes.
Q. And in November, was it your conclusion to continue to monitor his vascular health and to control the risk factors associated with that?
A. Correct.
Q. Doctor, if Mr. Ronwin's most recent lipid profiles reveal an LDL of above 70, would you recommend that he take Zocor every day?
A. I would recommend that he lower the LDL less than 70 by whatever means.
Q. And would taking Zocor, 40 milligrams each day, be the first step in trying to reduce his LDL below 70?
A. Correct.
Q. Is that the first step that you would recommend?
A. To take it, yeah, daily, as recommended, yes.
Q. Has it always been your recommendation to Mr. Ronwin to take Zocor each and every day?
A. Correct.
Q. 40 milligrams?



A. Correct.
Q. And has it always been your recommendation to Mr. Ronwin that he take aspirin each and every day?
A. Correct.
Q. 81 milligrams each and every day?
A. At a minimum.
Q. At some point in time, was it also your recommendation to Mr. Ronwin that he take an ace inhibitor?
A. That was a recommendation at one time, but that might have changed if his blood pressure was low. So it would be partly dependent upon his blood pressure.
Q. Dr. Hiatt, has Mr. Ronwin ever complained to you about having pain or discomfort in his shoulder?
A. He did on the occasion that I saw him and we made the referral to orthopedic surgery.
Q. Was that -- is that the only --
MR. RONWIN: What's that?
THE DEPONENT: That's the intercom.
Q. (BY MR. PILKINGTON) Is that the only time that he complained to you about having pain in his shoulder?
A. Complaints of shoulder discomfort were not commonly discussed at any of my visits.
Q. And in fact, your only recollection is that he complained to you about it that one occasion?



A. That's all that's documented in the record.
Q. Did Mr. Ronwin ever complain to you about having blurred vision?
A. Not that I recall.
Q. Did Mr. Ronwin ever complain to you about having problems walking, for example, his left foot landing in front of his right foot or any problems with his gait?
A. Well, I would be hesitant to speculate because if the notes indicated that we were dealing with a vascular problem and potentially a neuromuscular problem, there may have been some discussion around gait that I can't recall.
Q. Did Mr. Ronwin ever complain to you about cataracts or any problems with his eyes?
A. Well, I would have to go through all of my notes, particularly a review of systems, which I'm not seeing here. But I don't recall a discussion around problems with his vision.
Q. I have reviewed Mr. Ronwin's pleadings in this case, as well as Dr. Wolfel's records. Is it your understanding -- is it consistent with your understanding that Dr. Wolfel is the doctor who actually prescribes the Zocor?
A. No. I believe I do. And it would be common in this situation where the cardiologist and myself would be



both co-prescribing something. Typically, I try to coordinate that through one doctor writing the prescription.
Q. So it's you and Dr. Wolfel working together to manage his cholesterol levels?
A. I think I was serving more as a primary care physician for Mr. Ronwin and in that context I would be the primary prescribing physician, but Dr. Wolfel would have notified me had he had a different recommendation.
Q. Is it your understanding that Dr. Wolfel's recommendation is similar to that that you've expressed today?
A. I don't remember specific conversations with Dr. Wolfel regarding the frequency of his taking the statin.
Q. Has Mr. Ronwin ever asked you for opinions as to whether Baycol caused any of his alleged injuries?
A. He has.
Q. What have you told him?
A. Could you be more specific?
Q. Sure. What did Mr. Ronwin ask you?
A. This is from my recollection. But that he would bring in articles and discuss the association of statins with musculoskeletal problems, and ask me to look at those things. In fact, I think there was one time when he asked

Page 66

me to write an opinion about that and I refused.
Q. Why did you refuse to do so?
A. I was uncomfortable making the association around the statins and his particular musculoskeletal complaints, so I didn't want to commit myself to that.
Q. When you say you were uncomfortable about making those associations between his particular symptoms and the drug, meaning that it was your preliminary opinion that you didn't think that his symptoms were caused by his ingestion of Baycol?
A. I'd be careful about the broad term "symptom". But in terms of the rotator cuff, I could not make that association.
Q. In your experience in prescribing statins, have you ever had a patient have a rotator cuff problem that you believe was attributed to use of a statin?
A. No.
Q. Have you heard or are you aware of any case reports that make such an association?
A. I'm not.
Q. And is it fair to say that Mr. Ronwin approached you and asked you to offer on opinion that his symptoms, his neuromuscular symptoms were the result of taking Baycol?
A. My recollection was that he was asking my

Page 67

opinion about the association of Baycol with his rotator cuff injury.
Q. That only?
A. That's my recollection.
Q. Okay. So stated differently, Mr. Ronwin approached you and asked you whether you would offer an opinion that his rotator cuff injury was associated with his use of Baycol, correct?
A. I believe that's correct.
Q. And you were uncomfortable doing so?
A. That's correct.
Q. Have you ever stated or suggested to Mr. Ronwin that any symptoms that he may be having are in any way associated with his use of Baycol?
A. I could not associate his use of any statin with the specific symptoms he was having.
MR. PILKINGTON: Doctor, I may have a couple more questions, but I do know that in courtesy to Mr. Ronwin, he may have a couple of questions.
MR. RONWIN: I got a few questions, yeah.
MR. PILKINGTON: I might have some questions, but I thank you for your time.
MR. RONWIN: I'll just go over to the other side. You want me to switch sides?
MR. PILKINGTON: Why don't we have the doctor

Page 68

switch sides and I'll move this out of the way.
THE DEPONENT: What do I do with these exhibits?
MR. PILKINGTON: Just keep them right there.
THE DEPONENT: Keep them here?
MR. PILKINGTON: Yes.
THE DEPONENT: Do you want me over there as well?
MR. PILKINGTON: You can stay right there.
MR. RONWIN: Off the record for a second.
(Discussion off the record.)
MR. PILKINGTON: We're on the record now.

EXAMINATION

BY MR. RONWIN:
Q. You've indicated that you're familiar with statins.
A. Correct.
Q. And some of their negative effects; is that right?
A. Correct.
Q. And would a neuromuscular disease be a potential evidence of statin action?
A. Not that I'm aware of.
Q. Well, don't statins attack muscles, muscle tissue?
A. Statins primarily block an enzyme that makes LDL

Page 69

cholesterol.
Q. But don't they attack the muscle cells and actually tear up the muscle cell wall and that's how the CK gets out of the muscle, out of the muscle cells?
MR. PILKINGTON: Form. Foundation.
A. Not exactly.
Q. (BY MR. RONWIN) Well, how does the CK arise then in the blood in extremely high concentrations when statins are taken in some cases?
MR. PILKINGTON: Same objections.
A. It's a fairly broad question.
Q. (BY MR. RONWIN) Uh-huh.
A. The vast majority of patients that take statins don't have elevations in CK.
Q. I'm just talking about the ones that do. How does that CK get out of the cells as a result of the statin action?
A. In the cases of elevations in CK?
Q. Yes.
A. It's felt to be due to inflammation.
Q. Well, but that's -- but doesn't that inflammation make the cell wall subject to more easy rupture?
A. Not necessarily.
Q. Well, then, how does the CK get out of the cell?

Page 70

A. It can leak out without changing the integrity of the cell wall.
Q. Well, that's almost like tearing the wall open, though, if it can leak out. It normally doesn't leak out; isn't that right?
A. Normally CK does not leak out of the muscle, that's correct.
Q. On the 40 milligrams every other day, are you aware that in my connection of getting my cardio -- cardiology treatment at UC, at the University of Colorado Hospital, that I have -- I had it with Dr. Hergott for just a very short time, maybe a week or two at the most, something like that, and then the rest of the time has been with Dr. Wolfel; is that right?
A. My understanding is you've primarily seen Dr. Wolfel.
Q. Yes. And do you know whether or not Dr. Wolfel has acquiesced in my using statin every other day throughout the time that I have seen him?
A. I would hate to speak for him.
Q. Huh?
A. I would hate to speak for Dr. Wolfel.
Q. You don't know, then, the answer to that question though, do you? Or do you?
A. I know Dr. Wolfel and I both felt that taking it

Page 71

every other day was not the appropriate way to take a medicine. We both agreed to that.
Q. I see. Do you know if he ever -- if Dr. Wolfel ever told me to take it every other day?
A. I'm not aware of that conversation.
Q. Okay. On the May 26, '05 report that you made, your comment was something to the effect that the Plavix -- I stopped taking Plavix because it caused bruising. What did you mean by bruising?
A. Common side effects of Plavix is bruising. And you must have complained of that because I made a note of that.
Q. But what do you mean by bruising medically?
A. Bruising would be bleeding under the skin after trauma.
Q. Okay. So are you aware that one of the contraindications of Plavix is that it causes bleeding?
A. Well, that's a -- I would characterize that as a side effect --
Q. But it's --
A. -- not necessarily a contraindication.
Q. I see. One of its side effects then.
A. Correct.
Q. In other words, if you take Plavix, you could experience bleeding?

Page 72

A. That is correct.
Q. Yes. Could the bleeding be -- show up as fresh blood in the stool?
A. It could.
Q. Okay. Were you aware that in 2001, that would have been April of 2001 -- you won't have that in your record -- Dr. Kumpe did an angioplasty on my left leg?
A. I was aware of that.
Q. Were you aware that Dr. Kumpe, well, prescribed Plavix for me in connection with that and asked me to take it for a 30-day period at 75 milligrams per day?
A. I'm not aware of that recommendation, but it would be consistent with what he would recommend.
Q. Right. Were you aware that after 13 consecutive days of taking Plavix for 75 milligrams, fresh blood appeared in my stools?
A. I was not aware of that.
Q. Would that have been a reason -- if that were the case, would that have been the reason to stop taking Plavix?
A. Not necessarily.
Q. Would you be aware that Dr. Kumpe agreed with me to stop taking it?
A. I'm not aware of that interaction.
Q. Okay. Thank you. Now, you indicated something

Page 73

to the effect that statins, as far as you knew, didn't cause rotator cuff tears; is that right?
A. Correct.
Q. Are you -- do you have any medical reason to indicate why that's the case?
A. Why there's not an association?
Q. Yes.
A. It's just not been a reported side effect of statins that I'm aware of.
Q. Okay. Does that exclude the possibility that rotator cuff tears can occur in the use of certain statins?
A. Does that exclude that possibility?
Q. Yes.
A. It does not exclude it, but it makes it extremely unlikely.
Q. But it doesn't exclude it?
A. It does not exclude it.
Q. Yes. Right. That's all I wanted to ask you. Let me get to this point here. There was a question presented to you by my opponent here which seemed to indicate that taking statins every other day was not a very good -- very good process.
Do you believe that taking statins every other day is not a good idea if someone is being treated for



535c79c7-92f2-46d7-a7dc-a76bb554b50f

cardiovascular disease?
A. That would be considered an off-label use of a statin. And because we try to practice medicine according to evidence, that's not part of the evidence that would be considered off label.
Q. Yes. Let me show you several research papers and the only thing I'm going to ask you to do here, Doctor, is to simply read the title of the study, indicate the journal in which it was published, the volume, and the year in which it was published, and then read the brief conclusion for the benefit of the jury on each of these items. There are four of them.
MR. PILKINGTON: Let's mark each one as an exhibit. Do you want to do that?
MR. RONWIN: These are the only ones I have available of these. We made no arrangement to get copies of these things here.
THE DEPONENT: We have a Xerox, if you want.
MR. PILKINGTON: Let's mark them and then we can get copies.
MR. RONWIN: Then we can make arrangements.
THE DEPONENT: Is that appropriate, to read this information?
MR. PILKINGTON: Well, I mean, I would object to this line of questioning to the extent -- I mean, you can



ask -- you can certainly -- he can ask you, Doctor, what these articles say, but any conclusions or opinions from these articles, you know, if you've never seen them before, I'll object.
MR. RONWIN: I have --
MR. PILKINGTON: Do you want me to mark these for you?
MR. RONWIN: Yes.
THE REPORTER: Are we off the record here for a second?
MR. PILKINGTON: Sure.
(Discussion off the record.)
(Deposition Exhibits 4 through 7 were marked.)
Q. (BY MR. RONWIN) And let me hand you what's been marked Exhibits 4, 5, 6 and 7, inclusive. And could you do for them what I just asked you to do, please.
A. Exhibit 4, Is Alternate Daily Dose of Atorvastatin Effective in Treating Patients with Hyperlipidemia? The Alternate Day Versus Daily Dosing of Atorvastatin Study, which is from American Heart Journal, 2002, Volume 144, pages 674 through 7. You want me to read the conclusion?
Q. Just the simple conclusion right up there, yes, sir.
A. Although higher doses of Atorvastatin were used



on alternate days, these results suggest that the alternate-day administration of Atorvastatin can produce a reduction in LDL-C comparable to that of daily administrative in patients with hypercholesterolemia, and yet provide some cost savings.
Exhibit 5, ACCP 1999 Annual Meetings Abstracts.
Q. And could you look where the line is on the bottom? There's a --
A. Yes.
Q. I put a line. There's a short --
A. 32. Efficacy of alternate day dosing versus every-day dosing with Atorvastatin.
Q. Yes.
A. Conclusion. Based on our preliminary results, the percent reduction in LDL is similar in every day and every-other-day dosing with Atorvastatin. Every-other-day dosing should result in significant drug cost savings without compromising the therapeutic effects.
Exhibit 6. Effect of Lovastatin Administered Every Other Day on Serum Low-Density Lipoprotein Cholesterol Greater Than 160 Per Deciliter. The American Journal of Cardiology, Volume 76, 1975, page 312 through 313.
There is no -- oh. Excuse me. In conclusion, Lovastatin administered as 20 milligrams every other day



is effective in lowering LDL levels in patients with serum LDL greater than 160 milligrams per deciliter.
Exhibit 7, A Comparison of Fluvastatin 40 Milligrams Every Other Day Versus 20 Milligrams Every Day in Patients with Hypercholesterolemia, Pharmacotherapy, 1998, Volume 18, pages 836 to 839.
Conclusion, Fluvastatin 40 milligrams every other day is effective in lowering total cholesterol and LDL in patients with hypercholesterolemia.
Q. As to these research reports, are they in journals which are considered respectable scientific journals in the medical community?
A. American Heart Journal is. Abstracts are not. American Journal of Cardiology is a lower tiered journal. Pharmacotherapy, I would say, lower-tiered journal.
MR. RONWIN: Okay. Thank you. These go to the reporter, but we need to get copies of those. I would like to show you what we'll mark as Exhibit 8.
(Deposition Exhibit 8 was marked.)
Q. (BY MR. RONWIN) Could you look that over, please, and tell us what that appears to be? I would like to help you by indicating that that happens to be a history of Ronwin's lipid panel since 1984.
A. Okay.
Q. And that I started Baycol, which was the first



535c79c7-92f2-46d7-a7dc-a76bb554b50f

statin I ever took, on January 10th, 2001. So you can compare that cholesterol level and LDL level, et cetera, before and after starting statins in Ronwin's case.
A. Where did these data come from?
Q. They came from the -- from the laboratories which reported the lipid panels.
MR. PILKINGTON: To clarify, this is something you prepared, correct, Mr. Ronwin?
MR. RONWIN: Yes, that's true. I prepared it from the lipid panel reports of various diagnostic laboratories.
A. So you're asking me to accept the fact that these have been transcribed properly and these are accredited laboratories?
Q. (BY MR. RONWIN) Yes.
A. And that you note here a possible error, but that you're asking me to believe this is accurate information?
Q. Well, there's one where the doctor himself admitted it was an error, with an unusually high cholesterol of 315. That was Dr. Lukeson. And that was done with a finger stick deal in his own office.
And first he tried to tell me it was the true value. But I insisted it couldn't possibly be. And so ultimately he said, yeah, it isn't. It isn't correct.



MR. PILKINGTON: What is your question?
Q. (BY MR. RONWIN) Well, the question is, in looking it over, this reflects from January 10th, 2001, down to the last data given there, on March 2006, it reflects my history of -- lipid panel history.
And it's done basically -- except for the first two or three items in 2001 -- with every-other-day dosing, primarily Zocor.
MR. PILKINGTON: What is your question? Are you just commenting?
Q. (BY MR. RONWIN) I would like him to take a look at it and indicate whether or not the every-day dosing has been reasonably effective in my case.
A. Every-day dosing?
Q. Every other day. Excuse me.
A. I can't --
MR. PILKINGTON: Objection.
A. I can't conclude that.
Q. (BY MR. RONWIN) I see. Okay. If you can't conclude it, you can't conclude it.
MR. PILKINGTON: Is that marked as Exhibit 9?
THE DEPONENT: Exhibit 8.
MR. PILKINGTON: Exhibit 8. Okay. Thank you.
MR. RONWIN: All right.
THE REPORTER: Can we go off for just a second?



(Discussion off the record.)
Q. (BY MR. RONWIN) All right. Now, I want to ask you, in your practice, you have -- have you prescribed statins for any of your patients?
A. Yes.
Q. And have you ever prescribed Baycol?
A. I do not recall, though at the time it was available, I might have.
Q. Do you know if you're listed in any way with the Bayer Company or have been listed in any way with the Bayer Company as a cardiologist or cardiovascular specialist?
A. I'm not aware. I don't do any work with Bayer.
Q. I see.
A. This organization received grant support back in the 1990s to study a blood pressure medicine that Bayer sponsored. But that support ended in 1998.
Q. I see. Okay.
A. I don't have an ongoing relationship with Bayer.
Q. All right. Well, I want to show you --
MR. RONWIN: We'll have these marked also, one, two, three --
THE DEPONENT: I can go another five or ten minutes.
MR. RONWIN: -- four items. And these will be 9



to 12, inclusive, 9, 10, 11, 12. Just a brief question on this.
MR. PILKINGTON: These are Dear Doctor letters, Mr. Ronwin?
MR. RONWIN: What?
MR. PILKINGTON: These are Dear Doctors letters?
MR. RONWIN: Yeah. That's all they are, really. Just one question on it.
MR. PILKINGTON: Take your time, Doctor.
MR. RONWIN: Two questions, actually.
(Deposition Exhibit 9 through 12 were marked.)
Q. (BY MR. RONWIN) Are those documents basically, quote, Dear Doctor letters?
A. I'm just seeing them for the first time. They have the Bayer logo on each of them. And they appear to be information to health care professionals, but I haven't read them.
Q. Huh?
A. They appear to be information to health care professionals, but I've not read these letters.
Q. All right. Would you accept that they're generally considered to be Dear Doctor letters warning of aspects concerning their drug?
A. I have to read them to conclude that.
Q. Well, just briefly. I'm sure you'll get the

gist of it.
A. This first letter dated December 15, 1999 describes the risk of rhabdomyolysis with combination lipid therapy.
Q. Let me put it this way: Is it basically a letter giving warnings to doctors concerning their drug for the purposes of helping doctors consider prescribing a drug?
MR. PILKINGTON: Form. Foundation.
A. The first letter describes the risk of combination therapy. The second letter is May 21, 2001. This one refers to reports of muscle weakness and rhabdomyolysis during the postmarketing period. Substantial number of these cases occurred in patients receiving Baycol.
June 17, 2001, information on the prescribing of Baycol without Bayer making voluntary changes. Again, references that it would be contraindicated to take in combination with Gemfibrozil, G-e-m-f-i-b-r-o-z-i-l.
And the last letter is August 8, 2001, again, about rhabdomyolysis is a serious side effect of statins. And it talks about reports on the rate of rhabdomyolysis with Baycol relative to other statins, especially when Gemfibrozil is co-administered.
And then it says, effective immediately, Bayer



has discontinued the marketing and distribution of all dosage strengths of Baycol.
Q. (BY MR. RONWIN) Did you ever receive any of those letters?
A. I probably would have.
Q. You probably would have?
A. Yes.
Q. Are you sure that you received them?
A. I can't document I personally received these, but the probability is quite high I would have as a prescribing physician.
Q. Do you have colleagues in your work in cardiology?
A. Yes.
Q. Do you know if any of them received Dear Doctor letters?
A. Do you mean specifically these Dear Doctor letters?
Q. These or any other from Bayer.
A. I can't speak for them.
Q. Okay. All right.
MR. RONWIN: We're going to need copies of all of those, okay?
Q. (BY MR. RONWIN) Now, let's see. I want to ask you, in connection with your work with statins, have you



ever come across data that's based on adverse events reports? AERs is the acronym.
A. Yes.
Q. Have you used such data in your research?
A. That's kind of a broad question. I'm not sure what you mean.
MR. PILKINGTON: Form.
Q. (BY MR. RONWIN) Well --
THE DEPONENT: Pardon?
MR. PILKINGTON: I have to object to form and foundation. You highlighted my objection to form.
THE DEPONENT: Okay.
Q. (BY MR. RONWIN) Well, in your research, do you look at AERs to get a grasp of the actions of a statin?
A. My research?
Q. Yes. Or in your treatment of patients. Either way. I'm just mixing the two together.
A. Well, those are two different things.
Q. I know they are.
A. So specifically what would you ask?
Q. Well, have you ever used AER data in considering whether or not you should prescribe a statin?
A. Yes.
Q. You have?
A. Yes.



Q. Which statins have you used it on, have you used AER data on?
A. Essentially all of them would influence your decision making.
Q. I see. Has that included Baycol?
A. Well, since Baycol has been off the market and I've not used it very much, that information would have been more relevant to other statin classes.
Q. I see. Okay. Do you believe that AER data on statins are reliable indicators of statin contraindications?
MR. PILKINGTON: Objection. Form. Foundation.
Q. (BY MR. RONWIN) All right. Do statins have contraindications?
A. They do.
Q. And do you believe that AER information concerning these contraindications is generally reliable information?
MR. PILKINGTON: Same objections.
A. That's too broad a question about reliability in particular. I'm not sure what you're driving at.
Q. (BY MR. RONWIN) Well, do you think that AER information should not even be considered when you're considering the utility of a statin for purposes of prescription?


535c79c7-92f2-46d7-a7dc-a76bb554b50f

A. You're still confusing me. Adverse event information is part of decision making.
Q. So you would rely on AER information then?
A. For what purpose?
Q. For the purpose of whether you wanted to prescribe a statin or have confidence that it would be effective in treating your patients.
A. Let me try to respond by saying adverse event information is used for every drug decision across every drug class.
Q. Okay. Are you familiar with the term "incidence reports"?
A. Yes.
Q. And what are incidence reports?
A. Incidence refers to the rate of an event over time.
Q. Do incidence reports give you similar information to what AERs give you?
MR. PILKINGTON: Same objections.
A. You're being fairly vague. Incidence reports of what?
Q. (BY MR. RONWIN) Of contraindications or negative effects.
MR. PILKINGTON: Form.
A. Incidence reports don't describe



contraindications.
Q. (BY MR. RONWIN) Do they describe negative effects of a statin?
A. I'm just struggling with the words. I'm struggling with the words. Incidence report is a very generic term referring to the report of an event over time. It doesn't have anything to do with anything other than that's a very generic term. I mean, I don't know how to answer your question.
Q. Would it be correct that incidence reports are essentially the data obtained from actual clinical studies, as compared to AERs, where they are reports, random reports from people who are using the drug that's under study, but not part of a specific, set up clinical study?
MR. PILKINGTON: Form. Foundation.
A. I'm not sure I agree with your terms.
MR. RONWIN: Huh?
MR. PILKINGTON: I just said, form. Foundation.
Q. (BY MR. RONWIN) All right. You what?
A. I don't -- I'm not sure I agree with your terminology.
Q. Okay. Now, you've published papers, right, in your biomedical research?
A. Correct.



Q. And how many years have you been doing that, just roughly?
A. Approximately 30 years.
Q. I see. And --
A. Exactly 30 years.
Q. Would a pharmaceutical company's conduct be unethical if it promoted and sold a drug while aware that the drug had dangerous propensities to the health of the ultimate drug users?
MR. PILKINGTON: Objection. Form and foundation.
MR. RONWIN: All right.
MR. PILKINGTON: You can answer, if you can.
A. I can't answer that question.
Q. (BY MR. RONWIN) Can't answer that?
A. I really can't. It's too broad.
Q. Well, if a drug had dangerous propensities, and a pharmaceutical company was aware of it, would it be unethical for the pharmaceutical company to promote and sell it?
MR. PILKINGTON: Same objections.
A. I can't make that -- I just can't draw that conclusion without a lot more information. And then the determination of what is ethical or not is another layer of decision making.



Q. (BY MR. RONWIN) Yes. Let's see. I'm on the wrong page here. All right. Oh, is there an ethical obligation for authors -- an author or authors of research reports published in scientific journals based on research that's supported in whole or in part by pharmaceutical companies to reveal in the published report any monetary or professional relationship that the author or authors have with the pharmaceutical company?
MR. PILKINGTON: Same objections.
(Interruption in the proceedings.)
(Discussion off the record.)
A. I won't answer the question on ethical grounds, but I will say it's common for authors to report associations with pharmaceutical companies. Do you have any final questions?
MR. PILKINGTON: Doctor, I notice that your staff just came in and said your 10:00 is here. Do you have a 10:00?
THE DEPONENT: I do.
MR. PILKINGTON: Okay. Do you need to stop now?
THE DEPONENT: As soon as possible. Yeah. I have another meeting that I'm ten minutes late to.
MR. RONWIN: What do you want to do? We stop and then what happens? That's the end of this deposition?
MR. PILKINGTON: As far as I'm concerned. I

Page 90

mean, how much more do you have? Maybe the doctor could give us five more minutes and get this done.

MR. RONWIN: Well, it isn't critical. The questions I was asking him, these last questions, are not absolutely critical. I think they're interesting. I think he would -- he could have an answer. But I can ask them -- I could ask them of someone else perhaps.

MR. PILKINGTON: Okay.

MR. RONWIN: And we'll leave it go.

MR. PILKINGTON: Okay. I have a couple of follow-up, Doctor, and I'll be very, very short.

EXAMINATION

BY MR. PILKINGTON:

Q. Doctor, you testified before that you had a grant from Bayer to do some clinical testing on a blood pressure medication in the early to mid-1990s.

A. Actually, I was not the principal investigator, Dr. Robert Schier was. But that was a study conducted at this institution.

Q. Does that grant in any way affect your testimony about your care and treatment of Mr. Ronwin?

A. It does not.

Q. Doctor, could we mark a copy of your CV at the end of this deposition as Exhibit Number -- the next number?

Page 91

MR. RONWIN: It would be 13.

MR. PILKINGTON: 13.

A. Yes.

Q. (BY MR. PILKINGTON) Doctor, would Exhibit 13 be a true and accurate copy of your CV as of this date?

A. Correct.

Q. Doctor, I notice in your records that there were some testing, CK testing of Mr. Ronwin along with his lipid panel. Do you recall that?

A. The notes in the record note that they were normal.

Q. Okay. Mr. Ronwin asked you about Dr. Wolfel and his belief as to whether Mr. Ronwin should take the Zocor every day as opposed to every other day. Do you recall that testimony?

A. I do.

Q. And is it your recollection that both you and Dr. Wolfel believed that Mr. Ronwin should take the Zocor every single day?

A. Correct.

Q. 40 milligrams each day?

A. Correct.

Q. Dr. Hiatt, Mr. Ronwin asked you a question about whether there was a possibility that a statin could cause a rotator cuff injury. Do you recall that testimony?

Page 92

A. I do.

Q. And it was your testimony that it was extremely -- an extremely unlikely possibility?

A. Correct.

Q. Have you in your -- you've been working with statins for how many years?

A. Since they came out.

Q. And when was that?

A. Oh --

MR. RONWIN: About 1980.

A. Yeah.

Q. (BY MR. PILKINGTON) For nearly all of your clinical practice?

A. Correct.

Q. 20-plus years?

A. Correct.

Q. You've been doing research relating to statins?

A. More recently I have.

Q. And you've been treating patients, prescribing patients statins over those years, correct?

A. Correct.

Q. In your clinical experience, have you seen any evidence to suggest that a rotator cuff injury could be related to the use of statins?

A. I have not personally nor have my colleagues.

Page 93

Q. Doctor, you were given some articles, specifically articles marked as Exhibits 4, 5, 6, and 7, correct?

A. Correct.

Q. Did you read those articles?

A. No, I did not.

Q. Have you ever seen those articles before today's deposition?

A. Mr. Ronwin may have shown me one or two of those previously. I can't recall.

Q. But you would not be able to opine as to whether the conclusions set forth in those articles which you read on the record were, in fact, consistent with your clinical experience without reading the entire articles?

A. Correct.

Q. In other words, you would like to read them before you offer any opinions as to whether the conclusions are correct?

A. That's correct.

Q. And finally, two more points, Doctor. You were given Exhibit Number 8, I believe, which was a chart prepared by Mr. Ronwin.

A. Correct.

Q. And if you look at his most recent entry on March 13 of '06, his LDL was reportedly 94, his HDL was

Page 94

43, correct?
A. Correct.
Q. According to today's guidelines, is his LDL elevated?
A. Yes.
Q. What should it be?
A. 70.
Q. Would that also support your conclusion that Mr. Ronwin should take Zocor every single day?
A. Correct.
Q. Is it your recommendation today that he take Zocor every single day?
A. That's one possible recommendation.
Q. And finally, Doctor, I'll mark as Exhibit Number 14 --
MR. PILKINGTON: Mr. Ronwin, let me give you a copy of that as well, okay?
Q. (BY MR. PILKINGTON) Exhibit Number 14 is a, again, telephone note dated May 13 of '04. Do you see that?
A. That's not this.
MR. PILKINGTON: That's the wrong one, Mr. Ronwin. I'm sorry. I gave you the wrong exhibit. I'll give it to you in a minute. But just to expedite this, you can look at mine as well, okay?

Page 95

Q. (BY MR. PILKINGTON) This will be marked as Exhibit Number 14.
A. Okay.
Q. This is a telephone note of May 13, 2004, correct?
A. Okay.
Q. That's your nurse's signature?
A. Correct.
Q. This is your signature?
A. Correct.
Q. This is something you would review in your care and treatment of Mr. Ronwin?
A. Correct.
Q. And this is referencing you were asked for a referral to an orthopedic surgeon?
A. Correct.
Q. Ultimately, did you refer him to Dr. Eckhoff?
A. Yes.
Q. Did you ever talk to Dr. Eckhoff about his findings?
A. I would have looked at his note.
Q. Do you know what his findings were?
A. I would have to read the note to refresh my memory.
MR. PILKINGTON: And Mr. Ronwin, did you ever

Page 96

see Dr. Eckhoff?
MR. RONWIN: Not on that. I saw him recently on the fact that I began getting some rheumatism in my knees, but nothing like that.
THE DEPONENT: So remind me. Did you follow through with that appointment?
MR. RONWIN: I never saw Dr. Eckhoff until about a month or so ago.
THE DEPONENT: Okay. That's why I don't have a recollection.
MR. RONWIN: And I saw him on rheumatism.
THE DEPONENT: Okay.
MR. PILKINGTON: Doctor, I am done. I thank you for your time. Do you have a follow-up?
MR. RONWIN: I wanted to ask him just a couple of questions.

EXAMINATION

BY MR. RONWIN:
Q. You had indicated that it's not very likely that a statin would cause rotator cuff tears.
A. I'm not aware of that in the literature or in my personal experience.
Q. Right. But would you agree with me that a statin is basically a biochemical, meaning a chemical -- a molecule, chemical molecule that has action in the body,

Page 97

in the living body?
A. I agree with that.
Q. All right. And do you know how statin -- other than it being an inhibitor of 3-hydroxy-3-methylglutaryl coenzyme A reductase, other than it being an inhibitor of that enzyme, which resides in liver cells, do you know whether various statins can have other kinds of biochemical action on various organs and tissues of the human body?
MR. PILKINGTON: Foundation.
A. That's a broad question.
Q. (BY MR. RONWIN) Huh?
A. That's a broad question. It's hard to focus a specific answer.
Q. Well, I'm just asking you if you know if it could have.
MR. PILKINGTON: Same objections.
A. I really am uncomfortable answering questions that are very broad sweeping in nature. If you have a specific question about a specific drug effect, please ask that.
Q. (BY MR. RONWIN) All right. Do you know if the structure, the chemical structure of Baycol is such that it could cause negative interactions with various tissues in the body?

Page 98

A. I'm not aware of that.
Q. Okay.
THE DEPONENT: Is it okay if we wrap up now?
MR. RONWIN: Yeah. Let's wrap up.
MR. PILKINGTON: Doctor, just for the record, you have the right to review and sign your transcript, if you would like.
THE DEPONENT: Okay.
MR. PILKINGTON: You have that option. If you choose not to do so, the record will stand as it exists as reported by the court reporter.
THE DEPONENT: All right. I'm fine with that.
MR. PILKINGTON: Okay. Mr. Ronwin, one final question on the record. Will you give us access to your file here that is a part of this research program? I'll make you a copy as well.
MR. RONWIN: Oh, yeah. You're asking him of his file?
MR. PILKINGTON: I need your permission.
MR. RONWIN: Sure.
MR. PILKINGTON: Okay.
MR. RONWIN: Get whatever you want.
MR. PILKINGTON: Would you like written authorization from him?
THE DEPONENT: Probably should.

Page 99

MR. PILKINGTON: Okay. Thank you very much, Doctor.
THE DEPONENT: Okay.
(Discussion off the record.)
(Deposition Exhibits 13 and 14 were marked.)
BY STIPULATION OF THE PARTIES AND THE DEPONENT, by and through their respective counsel, the reading and signing of the within deposition is waived.
WHEREUPON, the within proceedings were concluded at the approximate hour of 10:20 a.m. this 5th day of June, 2006.

* * *

Page 100

CERTIFICATION

I, Lisa B. Kelly, RPR, appointed to take the deposition of

WILLIAM R. HIATT, M.D.,

certify that prior to the deposition the witness was sworn by me to tell to the truth; that the deposition was taken by me at 789 Sherman Street, Suite 200, Denver, Colorado 80203 on June 5, 2006; that the proceedings were reduced to typewritten form by computer-aided transcription consisting of 101 pages herein; that the foregoing is an accurate transcript of the proceedings.

I further certify that I am not related to any party herein or their counsel and have no interest in the result of this litigation.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of June, 2006.

____________________________
Lisa B. Kelly
Registered Professional Reporter

Re: Ronwin v. Bayer
Date of Deposition: June 5, 2006
Trial Date: None
Volume: --
Reporter: LBK
Proofer: SF
Audio: SC

Page 101

COFFMAN REPORTING & LITIGATION SUPPORT, INC.
1440 Blake Street, Suite 320
Denver, Colorado 80202
303.893.0202

JEFFREY PILKINGTON, ESQ.
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, Colorado 80202

Re: Ronwin v. Bayer
Deposition of: William R. Hiatt, M.D.
Date of Deposition: June 5, 2006
Trial Date: None
Enclosed is:

(XX) ORIGINAL TRANSCRIPT. Please retain unopened original until it is required by any party in a trial or hearing in the above matter.

( ) ORIGINAL SIGNATURE PAGE _____with _____without corrections; copies provided to attending counsel. Please append these sealed originals to original transcript in your possession.

( ) Signature/correction sheets not received prior to filing.

(XX) Review of transcript not requested.

( ) 30-day review unavailable. Signature and correction pages forwarded to counsel agreeing to obtain signature. Original filed in anticipation of trial date. See letter within deposition.

( ) Copy of deposition, signature and correction pages sent to deponent. See letter within deposition.

( ) Signature not applicable

Original transcript filed on___________via________
Followup documentation filed on_________via________
cc: Attending counsel



535c79c7-92f2-46d7-a7dc-a76bb554b50f