# Exhibit B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

---

In re BAYCOL PRODUCTS LITIGATION

This Document Relates to: MDL No. 1431

Edward Ronwin, et al.

v. Case No. 02-0200

Bayer Corp., et al.

---

DEPOSITION OF RICHARD TORKELSON, M.D.
Taken in behalf of Defendant Bayer Corp.

1:10 p.m., Monday
June 19, 2006

PURSUANT TO NOTICE, the deposition of RICHARD TORKELSON, M.D. was taken in accordance with the applicable Wyoming Rules of Civil Procedure at the offices of Cheyenne Orthopaedics, 2301 House Avenue, Suite 505, Cheyenne, Wyoming, before Kathy J. Mullivan, a Registered Professional Reporter, and a Notary Public in and for the State of Wyoming.



6e06858b-6434-4d16-a2a6-a7248af267db

APPEARANCES

For the Plaintiff: Pro Se

For the Defendant Bayer Corp.: MR. JEFFREY PILKINGTON
Attorney at Law
DAVIS, GRAHAM & STUBBS, LLP
1550 Seventeenth Street
Suite 500
Denver Colorado 80202

INDEX


| DEPOSITION OF RICHARD TORKELSON, M.D.: | PAGE |
|---|---|
| Direct - Mr. Pilkington | 3 |
| Cross - Mr. Ronwin | 51 |
| Redirect - Mr. Pilkington | 100 |
| Recross - Mr. Ronwin | 103 |


EXHIBITS

| No. | Description | Identified |
|---|---|---|
| 1 | Subpoena | 5 |
| 2 | Curriculum Vitae | 6 |
| 3 | Medical Record | 23 |
| 4 | X-ray Report | 30 |
| 5 | February 17, 2004 Letter | -- |
| 6 | Patient Personal History Form | -- |



PROCEEDINGS

(Deposition proceedings commenced
1:10 p.m., June 19, 2006.)

RICHARD TORKELSON,
called as a witness on behalf of the Defendant, being first duly sworn, testified as follows:

DIRECT EXAMINATION

Q. (BY MR. PILKINGTON) Good afternoon, Doctor. We met before the deposition. My name is Jeff Pilkington. I'm with the law firm of Davis, Graham & Stubbs out of Denver and I represent Bayer Corporation. Do you understand that?
A. Yes. I guess I didn't, but I do now.
Q. I don't know if you know this or not, but Mr. Ronwin has filed a lawsuit against my client, Bayer. Were you aware of that before today?
A. No.
Q. And in this lawsuit he claims that certain of his injuries, including his rotator cuff injury, was caused by his injection of Bacal. Do you have any idea of the nature of his lawsuit before this?
A. No.
Q. I assume you've been deposed in the past?
A. Yes.
Q. Just so we're on the same page, I want to go



through some basic ground rules of the deposition. Okay?
A. All right.
Q. First of all, I'm going to ask you a series of questions to better understand your brief care and treatment of Mr. Ronwin. Okay?
A. Yes.
Q. I am ethically precluded from talking to you outside of Mr. Ronwin's presence, so this will be the only opportunity I get to discuss the care and treatment of Mr. Ronwin before the trial on this case. Do you understand that?
A. Yes.
Q. If you don't understand a question that I ask you, please ask me to restate or rephrase it and I'll be happy to do so.
A. Okay.
Q. This deposition may be used at trial and so it might be very important for you to explain some of your care and treatment in very elementary lay terms. Would you be glad to do that?
A. Yes.
Q. Finally, you understand that you've taken an oath to tell the truth?
A. Yes.
Q. And that's the same oath you would take if you



were to testify live in person before the judge and jury in this case?
A. That's correct.
Q. Do you have any questions before we go any further?
A. No.

(Deposition Exhibit No. 1
marked for identification.)

Q. First of all, Doctor, I will hand you what I've marked as Deposition Exhibit Number 1. Doctor, this is a subpoena that was served upon you and you kindly accepted service, correct?
A. That's correct.
Q. And Exhibit A to the subpoena asked to you bring certain information to your deposition today; is that correct?
A. Yes.
Q. What did you bring to your deposition?
A. I brought the hospital chart. Actually, I have the X rays next door.
Q. Okay. And you also brought a CV?
A. And a CV, yes.
Q. Do you have any other records relating to your care and treatment of Mr. Ronwin?
A. No.

Q. Doctor, let's turn to your background. And before the deposition, you produced -- your office produced your curriculum vitae.
(Deposition Exhibit No. 2 marked for identification.)
Q. Is your curriculum vitae what has been marked Exhibit Number 2?
A. Yes.
Q. Is your curriculum vitae accurate as of today's date?
A. Yes.
Q. Would your curriculum vitae assist the jury in understanding better your background and credentials?
A. Yes.
Q. Doctor, where did you go to medical school?
A. University of Colorado.
Q. In Denver at the Health Sciences Center?
A. That's correct.
Q. When did you go there?
A. 1967 to '71.
Q. What did you do -- what did you do after you graduated from the Health Sciences Center?
A. I served a rotating internship at San Bernardino County hospital in San Bernardino, California in '71 to '72.



Q. What was the internship in?
A. Rotating. They don't do it anymore. It would be what's called a family practice internship now.
Q. So it rotated among various subject matters of medicine?
A. That's correct.
Q. What did you do after you completed your internship?
A. I did a residency in orthopedic surgery at the University of Colorado Medical Center in 1972 to 1976.
Q. You completed that orthopedic residency in 1976?
A. That's correct.
Q. What did you do after that?
A. I spent a brief period of time, approximately seven months, in Glendive, Montana with the Public Health Service in a National Healthcorp position. And then following that, moved to Cheyenne. I've been here ever since.
Q. Have you practiced orthopedic medicine in Cheyenne since about 1977?
A. That's correct.
Q. Did you grow up in Wyoming?
A. Yes.
Q. Where at?
A. Lusk.



Q. Where did you earn your undergraduate?
A. University of Wyoming.
Q. You completed that in 1971? I'm sorry, 1967?
A. Right. I went three years.
Q. So you completed that in 19 --
A. '67.
Q. So you practiced orthopedic medicine in the Cheyenne metropolitan area since '77, correct?
A. That's correct. I've never heard it called the metropolitan area, but I like it.
Q. It's a big city, right, for Wyoming?
A. For Wyoming.
Q. But in any event, you practice here since 1977?
A. That's correct.
Q. And have you practiced here at Cheyenne Orthopaedics since that time?
A. I have -- not in this building. I've had several different partners, as partners retire or leave, but, yes, I've been the same practice since then.
Q. And so your practice has always been called Cheyenne Orthopaedics?
A. No. When I started, we were Drs. Kline & Torkelson, PC. That was my partner who's since retired. And then when Dr. Rangitsch joined me, we changed the name to Associates in Orthopaedics, PC. And then about four



years ago, one of the other orthopedic surgeons in town had a partner retire and he joined our practice, and so the practice name is actually Cheyenne Orthopaedics. That's a partnership.
Q. Let me go back to your residency in orthopedics. Did you focus on any particular aspect of orthopedics in your residency?
A. No.
Q. How do you define orthopedics?
A. Orthopedics is the medical and surgical care of illness and injury relating to the spine and extremities.
Q. Okay. Are you board certified?
A. Yes.
Q. When were you first board certified?
A. 1978.
Q. And is your certification current?
A. Yes.
Q. Do you have any hospital affiliations?
A. Yes.
Q. What are those?
A. On the active staff, United Medical Center, which is the community hospital in Cheyenne. I think that's -- I don't think I'm affiliated any longer with the VA.
Q. Were you once affiliated with the VA?





6e06858b-6434-4d16-a2a6-a7248af267db

Page 10

A. I believe I was. For years here for the VA Hospital here.
Q. You're licensed here in the state of Wyoming?
A. Yes.
Q. Are you licensed elsewhere?
A. Colorado.
Q. Let's turn to your practice as it exists today. Is your practice a general orthopedic practice?
A. Yes.
Q. What does that mean?
A. It means that I've not completed a fellowship in subspecialty, for instance, a hand or a spine fellowship or pediatric fellowship. It is a practice where I see the entire range of orthopedic surgery with certain exceptions, those being complex trauma, spine, complex hand injuries.
Q. And with those more complex injuries, do you refer those on to the special -- subspecialists?
A. Yes.
Q. What are some of the typical injuries that you see here in your practice?
A. It's a very broad question. Injurywise, we're at the intersection of two major hospitals, so we see a lot of fractions. We see lots of sprains and strains, knee injuries, shoulder injuries, common -- treat a lot of

Page 11

patients with arthritis, reconstructive surgery.
Q. And do you do surgeries?
A. Yes.
Q. What types of injuries do you do?
A. Basically the range of orthopedic surgery with the exceptions that I've already given. In other words, I don't do spine surgery no more. Complex hand surgery, complex pediatric surgery, complex trauma.
Q. For example, do you do shoulder surgeries?
A. Yes.
Q. Knee surgeries?
A. Yes.
Q. Do you do rotator cuff tear surgeries?
A. Yes.
Q. Is that a fairly common surgery you do in your practice?
A. Yes.
Q. Let me focus on the way you treat your patients here at the clinic. When your patients arrive at the clinic, they're taken to an examination room?
A. That's correct.
Q. By a nurse?
A. We now have a nurse. Back several years ago we employed a medical assistant, not a registered nurse.
Q. So that medical assistant would take the patient

Page 12

back to the patient room?
A. That's correct.
Q. What would the physicians -- medical assistant do at that point?
A. Generally take vital signs, pulse, blood pressure. Usually, particularly on the first visit, actually probably most visits, ask what the primary complaint is, why they're here today.
Q. Before you went into the patient room to see the visit (sic), would you review the chart?
A. Yes.
Q. When you went in to meet with the patient, then did you take notes?
A. Yes.
Q. And would those notes be set forth in the patient chart?
A. Yes.
Q. What would you do with those notes after you saw the patient?
A. These are handwritten notes. And then depending on how busy the clinic, either would immediately dictate a typed note, transcribed note, or often on a busy day, I will take the charts back to my office and dictate it into the morning or into the afternoon.
Q. But regardless, you dictated your typewritten

Page 13

notes, generally speaking, within 24 hours after you saw patient?
A. Yes, generally, within three or four hours.
Q. And the reason that you did so is to make sure that your typewritten notes were as accurate as possible?
A. That's correct.
Q. And do your -- both your handwritten notes, as well as your typewritten notes set forth the most important information relating to your care and treatment of your patients?
A. That's correct.
Q. And with your handwritten notes, as well as your typewritten notes, did you take down whatever complaints the patient had?
A. Yes.
Q. And did you do so in a way -- let me back up. And did you take those patient complaints down as accurate as you could?
A. Yes.
Q. You did so to better able you to provide the care and treatment to your patient, such as Mr. Ronwin?
A. That's correct.
Q. Before we go to the specifics of Mr. Ronwin, I want to focus on shoulder injuries. And you told me before that you see quite a few shoulder injuries in your





6e06858b-6434-4d16-a2a6-a7248af267db

Page 14

practice; is that fair to say?
A. That's correct.
Q. And what type of shoulder injuries do you see?
A. Well, again, the whole broad range of shoulder injuries. I would say the most common shoulder problem that I treat is what we call a subacromial impingement syndrome, which is a bursitis, tendinitis of the shoulder region. Probably the second most common would be a similar type of problem, which would be repair of a torn rotator cuff tendon. And then we -- because we're a relatively small town, we see a fair number of shoulder strains, we often act as a primary care physician. City like Denver, a lot of times orthopedic surgeons will require referral from a primary care physician first. We don't do that. So we see a fair number of acute injuries.
Q. Doctor, to make your care and treatment of Mr. Ronwin more understandable, would you basically -- would you go through the basic anatomy of the shoulder as it relates to your care and treatment of Mr. Ronwin.
A. Sure. The shoulder joint area is actually two joints. There's the ball and socket joint between the arm and the shoulder blade, the ball being the upper end of the arm and the socket being a portion of the shoulder blade. It's a relatively shallow socket. It's not a contained ball and socket like the hip.

Page 15

MR. RONWIN: Excuse me, is he -- is he testifying now concerning his notes on me?
MR. PILKINGTON: No, let me rephrase the question, okay?
MR. RONWIN: I'm not sure I understood you.
Q. (BY MR. PILKINGTON) Doctor, what I'd like you to do is explain to the jury the basic anatomy of the shoulder so that when we get to Mr. Ronwin, we can understand better your care and treatment. Okay?
A. Right, I understood that.
Q. Would you start over -- and let me --
MR. RONWIN: Let me interrupt you again. Would you want to use this as an exhibit?
MR. PILKINGTON: Let me see.
MR. RONWIN: It's kind of a side view.
Q. (BY MR. PILKINGTON) Doctor, would this help explain to the jury the basic anatomy of the shoulder?
MR. RONWIN: You want to mark it?
A. You know, I'm not particularly wild about it, truthfully. I think I can explain it better without it.
Q. (BY MR. PILKINGTON) Let me do this. I'm not going to use it, but the question that I have is this, and I've asked it, you started to explain it to me. Would you explain to the jury the basic anatomy of the shoulder, including the bony structures, the muscles and the tendons

Page 16

involved in the shoulder.
A. Yes. I won't repeat what I was talking about. What I started was there are two joints, basically, in the shoulder region, one being the ball and socket joint. I explained what's called the glenohumeral joint. In addition, there's a joint between the collarbone, which is called the clavicle and the acromion, which is a portion of the shoulder blade that really forms a part of the roof of the shoulder joints, serves as attachment of muscles. That joint being between the acromion and the clavicle as the acromioclavicular joint.
The shoulder itself, the ball and socket joint, its stability's maintained by a capsule, which holds the fluid in. It's thickened in certain areas to provide stability. There's a similar capsular structure, but mainly strong ligaments in the acromioclavicular joint, which is a true joint, as well, and those hold that joint together.
There are a number of muscles around the shoulder joint area, and one of the things that makes the shoulder unique, among the joints of the body, is that most of those muscles do not have a firm bony attachment to the skeleton. In other words, the hip joint, for instance, the socket part is part of the pelvis. On the shoulder, though, the shoulder blade itself doesn't attach

Page 17

by any muscular -- I mean, by any ligament attachment to the torso, but it's really held in place by the enveloping muscles on both sides of the shoulder blade so that the muscles on the under side of the shoulder blade serve to hold the shoulder blade against the body and the muscles generally on the more superficial side of the shoulder blade provide the motor power to elevate and rotate the shoulder. And those are attached all the way, really, on all sides of the shoulder blade, which we call the scapula.
There are obviously nerves and muscles that pass through the area, nerves that innervate the muscle and arteries that provide blood supply to the muscles of the area and the bones and the joints. And then those nerves and blood vessels, of course, in the region down into the extremity into the hand.
Q. You talked about muscles in the formation in the acromioclavicular joint. What muscles are involved in that joint?
A. Well, the joint itself has -- really doesn't have any stabilizing muscles. That's a very small joint and it's stabilized by ligament. The muscles -- the primary muscle of concern that attaches in the area is the deltoids muscle, which is the muscle -- one of the muscles that elevates your shoulder in forward position.





6e06858b-6434-4d16-a2a6-a7248af267db

Q. Now, which of those joints is generally construed, in lay terms, as the rotator cuff?
A. What the rotator cuff is is a blended tendon from several of the muscles of the -- that originate from the scapula, shoulder blade. Those include the supraspinatus and infraspinatus, teres major, minor. The major portion of the rotator cuff tendons generally that are involved are the supraspinatus and infraspinatus muscles. Those muscles blend together in a really broad tendon that comes underneath the AC joint, acromioclavicular joint, and then attach in the upper part of the humerus, the arm bone. And they then blend with the capsule of the joint that holds the joint fluid in.
Q. And the supraspinatus tendon, is that the top portion of the rotator cuff?
A. Yes.
Q. And that holds that supraspinatus muscle to that bony area?
A. Right, attaches to the arm. That's correct.
Q. Okay. Which of the tendons do you see in your practice -- I'm sorry, which of those four tendons, in your clinical practice, do you most often see partially torn or completely torn?
A. Generally we see the supraspinatus.
Q. When that is torn or partially torn, what sort



of symptoms, if any, do you usually see?
A. It causes pain, it can cause weakness. It depends on whether or not this is an acute tear. As a result -- as a result of an injury or a chronic attritional tear, this is an area that is prone to attritional degeneration of the tendon and a tear.
Q. And in the latter case, is that a degenerative sort of process?
A. That's correct.
Q. Let me now focus on what are some of the recognized causes of what we refer to as torn rotator cuffs.
A. Okay.
Q. What are the primary causes of torn rotator cuffs?
A. The primary cause of an acute tear is injury. And we will see that the most common two ways in which that occurs is a fall on an outstretched arm. Basically jams the arm, cat -- jams the arm upward, catches the rotator cuff and in between the humerus, the arm bone, and the undersurface of the scapula, the acromion or acromioclavicular joint.
The other way that can be torn acutely is a person that falls, for instance, from a ladder and catches a wrung of the ladder and then is drawn upward, their arm



is basically, lay term, hyperextended, and it catches the same way.
The chronic tears we see as a result either of an abnormality or an abnormality that is present from birth in the way that the acromion turns, it may tend to dip down more and be more likely to pinch that tendon, or with arthritis of the acromioclavicular joint and resulting spurring of the bone, and those spurs then narrow that space where the tendon travels, so then over time, that tendon is just worn down, if you will, until finally it can tear and retract.
Q. And do you see the latter point of the arthritis in the spurring with the supraspinatus tears?
A. Yes.
Q. You mentioned impingement syndrome before. What is that?
A. That is a broad term that refers to the process I just explained, that is, pinching or impingement of the rotator cuff tendon between the arm and the shelf of bone, either at the acromion itself or a portion of the acromioclavicular joint or often both.
Q. And this impingement syndrome you just described, is that a common cause of rotator cuff tears, whether it be partial or complete?
A. Yes.



Q. Is impingement syndrome generally regarded as a degenerative process?
A. Yes, we can see it on occasion in patients that may have predisposing factors, say acromioclavicular arthritis, who have been asymptomatic. They then may have an injury as I described or a lot of repetitive activity overhead and develop inflammation in the area so it may become symptomatic as the result of either overuse or injury, but quite commonly we see it probably most commonly just as a gradual wear and tear process.
Q. So to have a rotator cuff tear, it's not necessary that the person have extensive activity or extensive repetitive shoulder movements; is that correct?
A. That's correct. In fact, I would say it's at least 50-50, 50 percent of them don't.
Q. Doctor, do you see rotator cuff tears in the elderly population?
A. Yes.
Q. Are rotator cuff tears a common occurrence in the elderly population?
A. Yes.
Q. And is that because of the degenerative process that you described earlier?
A. Yes.
Q. Our bodies just wear out?





6e06858b-6434-4d16-a2a6-a7248af267db

A. Yes.
Q. Doctor, do you keep up on the published literature as it relates to rotator cuff injuries?
A. Yes.
Q. And have you seen studies that show that in many cases rotator cuff tears may be asymptomatic?
A. Yes, they often are.
Q. And would you better explain that to the jury?
A. Well, a chronic rotator cuff tear is, as I've explained, it's an attritional process, so that over time the tendon becomes thinner and thinner, we think may be contributed by impingement, but it also may just be a lack of blood supply, microscopic blood supply, especially with aging and the tendon thins and gradually tears, may even retract. And in the absence of an injury, often they're not symptomatic.
I guess the other reason that that occurs is that being 59 myself, I can tell you, as you get a little older, you develop aches and pains in multiple joints and most of us ignore them. They come and go and thought of just as, you know, this joint hurts or that joint aches.
Q. But is it generally regarded in the field of orthopedic medicine that rotator cuff tears can be asymptomatic, that is, the patient can have a rotator cuff tear but not experience any symptoms?



A. Yes.
Q. Doctor, let's now turn to Mr. Ronwin.
(Deposition Exhibit No. 3 marked for identification.)
Q. And I will mark as Exhibit Number 3 a copy of your office notes, okay?
Doctor, do you recognize Exhibit Number 3?
A. Yes.
Q. What is Exhibit Number 3?
A. Exhibit Number 3 is a copy of my office notes, clinic notes, March 16, March 21, August 8, all 2001.
Q. And is that a true and accurate copy of your office notes?
A. Yes.
Q. Were those office notes prepared in a course of you providing care and treatment for Mr. Ronwin?
A. Yes.
Q. Were those office notes prepared based on the information that you gathered during the course of your care and treatment of Mr. Ronwin?
A. Yes.
Q. Are those office notes maintained in the chart that you brought to your deposition today?
A. Yes.
Q. Is that chart maintained here at the clinic in



Cheyenne?
A. Yes.
Q. Finally, is there someone at your office whose responsibility it is to maintain that office chart in a true and accurate way?
A. Yes.
Q. You first saw Mr. Ronwin on March 16th of 2001?
A. That's correct.
Q. Is the first page of Exhibit Number 3 the office notes that relate to that visit?
A. Yes.
Q. Doctor, why don't you explain to the jury what Mr. Ronwin came in complaining about.
A. He complained of left shoulder pain, which he stated had been present approximately two to three months.
Q. Had you met Mr. Ronwin before?
A. No.
Q. Do you know how he came to your clinic?
A. No.
Q. And so when -- if we look at the handwritten notes on Exhibit Number 3, which of those handwritten notes are your notes?
A. Everything except the first line, which reflects BPPRT, that's blood pressure, pulse, temperature and the then the signature.



Q. So from really the first line -- second line of handwritten notes down to the typewritten -- handwritten notes those are your own notes?
A. That's correct.
Q. And, in fact, if you look at the original, those are in a blue colored pen; is that correct?
A. That's correct.
Q. Doctor, Mr. Ronwin told you that he had left shoulder pain?
A. That's correct.
Q. And how long did he tell you that he had this shoulder pain?
A. Two to three months.
Q. What did you write down with respect to that?
A. I wrote, "Patient complains of left shoulder pain present for approximately two to three months."
Q. Did you then dictate that note later that day or the next day?
A. Yes.
Q. And how did you dictate the duration of this left shoulder pain?
A. I dictated it the same, present for approximately two to three months. I will notice that the handwritten portion there's a two and a dash three, which indicates to me -- I don't have any -- it's been five



WYOMING REPORTING SERVICE, INC.
1-800-444-2826

6e06858b-6434-4d16-a2a6-a7248af267db

years, so I don't have any direct memory of any of that, but generally when I do that, the patient will tell me something, and then as we're discussing it may become apparent that it's changed somewhat, so that it -- my guess is initially told me about two months and then as we talked more about it, it was obviously there had been two to three months, a little longer.

Q. But in any event, Doctor, based on your notes, Mr. Ronwin told you he had this left shoulder pain for two to three months, correct?

A. That's correct.

Q. What did -- what else did he describe about this injury that he came to see you about?

A. He indicated that he had not had any injury or any unusual activity. I'll ask to see if they've done something unusual; throwing, for instance, or a lot of fishing, those sorts of things. He indicated he was a right-handed individual, indicated that the character was such that it was worse with elevation, putting his hand over his head, particularly if he tried to elevate it by lifting objects overhead. He had taken some -- well, my typewritten notes indicates he had taken some nonsteroidal medication, but as a -- look at the written note it says "no NSAIDs," so I would say that's probably a typographical error. My guess is -- in fact, I would say



probability is he had not taken any anti-inflammatory medication.

Indicated there was no crepitus. That's medical term for a grinding sensation or popping. He did feel as though he had some weakness in the shoulder. He denied any previous shoulder symptoms and denied any shoulder symptoms on the right side.

Q. Based on that history, did you then do a physical examination?

A. Yes.

Q. Describe your examination to the jury.

A. He indicate -- he was a healthy-appearing individual. Did not appear to have any acute pain or distress. Was comfortable. He was thin. Examination of the left shoulder, examination of the nerves, the vascular supply was normal. There was no deformity in about the shoulder region. There was no warmth in the joint or redness. No fluid in the joint. No detectable soft tissue swelling. Flexion, which is the forward motion --

Q. Doctor, could I stop you at that point? What is the significance of your findings of the absence of warmth, swelling, that sort of thing?

A. With warmth and erythema or redness, you're looking for acute, very active inflammation, something you might see with an over -- acute overuse or injury, looking



for the possibility of an inflammatory arthritis that would produce that or infection.

The same with an effusion. Effusion is fluid in the joint. Swelling, again, you're really looking for more inflammatory condition rather than a chronic condition.

Q. You were about to describe the level of motion that he had in his shoulder. Would you do that?

A. Yes. For instance, which is forward movement, such as a Nazi salute, was to 170 degrees, that being from the side of the body to near straight overhead. 180 is normal.

Q. You said 170, I think.

A. 160, I'm sorry.

Q. So he had 170 degrees?

A. No. I'm sorry. He did have 160. Sorry.

Q. So flexion was 160?

A. That's correct.

Q. Mr. Ronwin was how old at the time -- at this time?

MR. RONWIN: How old?

Q. (BY MR. PILKINGTON) In 2001?

A. He was --

MR. RONWIN: 77.

Q. (BY MR. PILKINGTON) So Mr. Ronwin was 77 at the



time of this visit.

How do you characterize the flexion of 160 degrees in a 77-year-old man?

A. It would be within normal range.

Q. What else did you see in terms of his movement?

A. Abduction, which is elevation away from the side of his body, was 110 degrees actively, that's something he could do under his own power. 125 degrees, passively. In other words, he could go to 20 degrees beyond a right angle parallel to the floor. He could go 20 degrees past that, and then if I helped him he could get another 15 degrees beyond that.

Q. What are the normal range of abduction?

A. Patient 77, I'd expect 160 to 180 degrees, so this was decreased.

Q. What else did you find?

A. I found internal rotation described to L1 or first lumbar vertebra. Basically that indicates when he he's putting his hand behind his back he can bring it to the mid-back region. That's a normal -- external rotation, that is with his arm at the side, rotating his hand away from the body, was 40 degrees, which is within normal limits. Extension, that is elevation behind his back, was 50 degrees, which is basically within normal limits as well.





6e06858b-6434-4d16-a2a6-a7248af267db

Page 30

I felt the strength was excellent. There was no tenderness. There was some prominence of the acromioclavicular joint, both shoulders.
Q. Where's that joint again?
A. It's up on top of the shoulder.
Q. So if I reach up and touch the top my shoulder, the bony structure I'm feeling is the acromioclavicular joint?
A. Acromioclavicular joint, AC joint, that's correct.
Q. AC joint would be easier to use.
Did you take any X rays?
A. Yes, I did.
Q. Let me mark as Exhibit Number --
THE REPORTER: 4.
Q. (BY MR. PILKINGTON) -- 4 the X ray your office took.
(Deposition Exhibit No. 4 marked for identification.)
MR. RONWIN: I have a copy, if you don't.
MR. PILKINGTON: I have one for you.
MR. RONWIN: Did you bring the X rays in?
THE DEPONENT: Yes.
Q. (BY MR. PILKINGTON) Doctor, I've handed you what I've marked as Deposition Exhibit Number 4. Is that

Page 31

the x-ray report that was completed by your office on March 16 of 2001?
A. That's correct.
Q. Did you read the X ray?
A. Yes.
Q. Did you dictate this report?
A. Yes.
Q. Doctor, if you recall, I asked you a series of questions about the accuracy of how the office notes were maintained by your office.
A. That's correct.
Q. Is this a report maintained and kept by your office in the same way?
A. Yes.
Q. Doctor, is this a true and accurate copy of the X ray -- an x-ray report for Plaintiff Ronwin on March 16 of '01?
A. Yes.
Q. What did you see when you visualized and read Mr. Ronwin's X ray?
A. There was a moderate degenerative arthritis of acromioclavicular joint, the AC joint. I described it as subchondral sclerosis, which that indicates the bone adjacent to the cartilage, glidingness of the joint was more dense, radiodense, and was somewhat irregular. It's

Page 32

characteristic of what's called degenerative arthritis, osteoarthritis, wear and tear. Also described interior osteophyte formation that refers to bone spurring. Interior referring to the bone spurring is projecting down word towards the rotator cuff tendon area.
Q. Before you go any further, let me make sure I understand what you just said, that you found a moderate degree of degenerative arthritis of his AC joint, correct?
A. That's correct.
Q. And, in particular, you found inferior bone spurring?
A. That's correct.
Q. By bone spurring, what does that refer to?
A. Osteoarthritis, wear and tear. Arthritis is a bone forming arthritis. In other words, where the ligament or the muscles attach in and around the joint, the body, over time, forms bone at the marks of the joint, which appears by X ray and clinically is the spur.
Q. If this is on the inferior side of the AC joint, that would be down into the tendon area?
A. That's correct.
Q. Would that be this supraspinatus tendon area?
A. Well, depends. The supraspinatus, if there's no rotation, it involves entire rotator cuff, depending on

Page 33

the position of the arm, rotational position of the arm, but with the arm at the side, that's primarily supraspinatus is what's involved.
Q. And your next finding was a finding of minimal glenohumeral narrowing?
A. That's correct.
Q. What does that refer to?
A. Glenohumeral joint is the shoulder joint proper that is between -- it's the ball and socket joint. The gleno being the socket, the humerus being the arm. And narrowing I'm referring there to is the cartilage, that is, the gliding surface of the joint. Osteoarthritis of that joint, osteoarthritis manifests itself by X ray as a narrowing of the distance between the bones.
What causes that distance by X ray is the cartilage itself, which is radiolucent. It doesn't show up on X ray. So as the cartilage wears thinner and thinner, then the bones come closer and closer together and you get severe arthritis. And by X ray, the bones appear to be touching each other, which, in fact, they are. It is indicative of some early arthritis of that joint as well.
Q. Finally, you noted some mild subacromial narrowing?
A. That's correct.





6e06858b-6434-4d16-a2a6-a7248af267db

Q. Would you explain what that finding relates to?
A. The subacromial space is the space beneath the shelf of the bone you feel on top of shoulder and the humerus. That's the arm bone. And what fills that space is the rotator cuff tendon and a bursa, which is a sac that is a friction-reducing structure between the tendon and the acromion. That is the bone.
And what I'm indicating is that on the anterior-posterior view is the X ray taken straight front to back of the patient, that space appeared to be more narrow than I would expect to be normal.
Q. Okay. Doctor, is it fair to say that you found three abnormal findings with respect to his X ray on March 16 of '01?
A. Yes.
Q. The first would be you found moderate degenerative arthritis of the AC joint?
A. That's correct.
Q. Second you found some narrowing of the glenohumeral joint?
A. That's correct.
Q. And finally you found mild subacromial narrowing; is that correct?
A. That's correct.
Q. Although these findings are abnormal, are these



findings common in a man of 77 years old?
A. Yes.
Q. You would expect these sort of degenerative processes in a 77-year-old man?
A. Yes, particularly the acromioclavicular arthritis. In other words, not everybody that's 77 has early arthritis, the glenohumeral joint. Acromioclavicular arthritis is much more common.
Q. Based on your examination, your history, as well as your review of the X ray, what was your impression?
A. My impression was the subacromial impingement syndrome we talked about earlier with osteoarthritis of the acromioclavicular joint.
Q. Once again, for the benefit of the jury, would you explain what type of subacromial impingement syndrome you're talking about?
A. Yes. In this case I felt that the arthritis of the acromioclavicular joint was producing bone spurring and enlargement of that AC joint was narrowing space and pinching or impinging on the rotator cuff tendon and the bursa between the tendon and the bone, producing an inflammation of the tendon, what we call tendinitis, inflammation of the bursa, we call it bursitis.
Q. So it was rubbing on the tendon -- tendons involved in the rotator cuff, correct?



A. That's correct.
Q. Which created inflammation and pain, correct?
A. That's correct.
Q. And it was also rubbing or pushing down on the bursa sac, correct?
A. That's correct.
Q. Which also produce inflammation and pain, correct?
A. That's correct.
Q. What was your plan, Doctor?
A. Pardon?
Q. What was your plan?
A. The plan was to start him on an anti-inflammatory medication, arthritis medicine. And I chose naproxen, 500 milligrams twice a day. I talked to him about physical therapy. Very often, in fact routinely, a patient like this we would start at a physical therapy program to improve mechanics of the shoulder. He did not wish to go to physical therapy. I told him that he if he wasn't better, he should come back for a cortisone injection.
Q. Doctor, is the type of impingement syndrome that you described in your office notes the type of process that can lead to a rotator cuff tear?
A. Yes.



Q. And in particular, the supraspinatus tendon?
A. Yes.
Q. Doctor, you told Mr. Ronwin to come back for an injection of a steroid if his symptoms did not improve?
A. That's correct.
Q. Did Mr. Ronwin return to your office for such an injection?
A. Yes, he did.
Q. When did he return?
A. He returned March 21st of 2001.
Q. Did he see you at this time?
A. He did not.
Q. Who did he see?
A. He saw my partner, Dr. Rangitsch.
Q. Is Dr. Rangitsch still a partner of yours?
A. Yes, he is.
Q. Do you see each other's patients on an as-needed basis?
A. Yes.
Q. Do you rely on Dr. Rangitsch's note in the course of your care and treatment of your patients?
A. Yes.
Q. Did he dictate a note of the March 21st office visit?
A. Yes, he did.





6e06858b-6434-4d16-a2a6-a7248af267db

Q. And in the course of your care and treatment of Mr. Ronwin, did you review Dr. Rangitsch's note of March 21, 2001?
A. Yes, I did.
Q. And what did Mr. Rangitsch -- I'm sorry, Dr. --
A. Rangitsch.
Q. -- Rangitsch. Let me start over.
What was the care and treatment provided by Dr. Rangitsch on March 21, 2001?
A. Dr. Rangitsch saw him because I was called away on an emergency, so I was out of the office. We will often see patients for each other if the patient's here and the other physician has to leave. Mr. Ronwin indicated at that time that the naproxen was a waste of his time and made him sick, which is one of the side effects of that medication, can cause some nausea or heartburn, and didn't really help the pain.
He indicated he wanted a cortisone injection. And Dr. Rangitsch proceeded to administer cortisone injection into the subacromial space, the bursa.
Q. Doctor, if you go back to your note on August -- I'm sorry, March 16, 2001. You noted, "I have started him on naproxen 500 milligrams b.i.d. with usual admonitions." What do you mean by "usual admonitions"?
A. Tell a patient that can, in rare instances,



cause kidney problems, liver problems. Make sure they have not had abnormal kidney function. I tell them most common side effect is it interferes the protective lining of the stomach against acid, so they can get heartburn, can cause ulcers and/or bleeding. And I tell them if they get any stomach symptoms, heartburn or pain or nausea, change in their bowel movement, they should stop the medication, call me.
Q. What was Dr. Rangitsch's assessment of March 2001?
A. His assessment was subacromial impingement, left shoulder.
Q. You testified that Dr. Rangitsch administered a steroid injection?
A. That's correct.
Q. What was the purpose of that injection?
A. Steroid cortisone is a powerful anti-inflammatory, and if we inject it into an area of inflammation, tendinitis or bursitis or arthritis, often will stop the inflammation and improve the inflammation. It's done for pain relief and to lessen the amount of inflammatory symptoms.
Q. In general terms, when you see a patient who has subacromial impingement syndrome, such as Mr. Ronwin, do you first begin the patient on some sort of pain relief



and physical therapy?
A. Yes.
Q. If that --
A. Anti-inflammatory medications.
Q. And if that doesn't work, then do you go to the next level of steroid injections?
A. Yes.
Q. How long do you expect the steroid injection to provide relief?
A. I tell patients it can be anywhere from four or five hours to six months to forever. And it's just that variable patient, such as this, this age, these physical findings and radiographic findings, I would ordinarily expect and hope the first injection would last three to six months.
Q. Doctor, I'm going back to your first office visit with Mr. Ronwin. You told him that if his symptoms didn't subside, that he should return to you or your office for a steroid injection, correct?
A. That's correct.
Q. And within five days of that first office visit he returned to your clinic?
A. That's correct.
Q. And asked for an injection, correct?
A. That's correct.



Q. Now, on March 21, Dr. Rangitsch advised Mr. Ronwin to follow up in a few days if Mr. Ronwin was not significantly improved, correct?
A. That's correct.
Q. Is that something you would advise your patients as well?
A. Yes.
Q. So, in other words, is it your clinic standard practice that following an injection, you will advise the patient that if you don't have significant improvement in a few days, to return to the clinic?
A. That's correct.
Q. When is the next time you saw Mr. Ronwin?
A. August 8, 2001.
Q. That's the next time he came to the clinic, correct?
A. That's correct.
Q. Did you have any communications with Mr. Ronwin between March 21 and August 8th?
A. No.
Q. If you or your clinic did have any such communications, would those be found in the office notes?
A. Yes.
Q. What were his complaints in August of 2001?
A. Complained of left shoulder pain, present for





6e06858b-6434-4d16-a2a6-a7248af267db

approximately one month.
Q. And how did you describe that pain?
A. It was pain that was worse with elevation, the arm above the head that's what he was talking about there. Indicated that -- I indicated in my note he had not been on an exercise program. The injection that Dr. Rangitsch performed in March had given him complete relief of symptoms up until about a month before I saw him.
Q. So was it your understanding that sometime in early July the shoulder pain returned to Mr. Ronwin's left shoulder?
A. That's correct.
Q. And was it your understanding, based on what Mr. Ronwin told you, that from March 21 to early July the cortisone injection gave him complete relief of his symptoms?
A. That's correct.
Q. And that understanding is based on what Mr. Ronwin told you, correct?
A. That's correct.
Q. Did you do a physical examination?
A. Yes, I did.
Q. What did that examination show?
A. Examination of the shoulder indicated that his motion was essentially normal. He lacked the last 15 to



20 degrees of elevation, so whereas when I'd seen him six months before -- five, six months before, he was able to elevate to 160 degrees forward elevation or flexion. He was only able to get to about 110 degrees in abduction, whereas in August he could get to 1six0, 165 degrees.
Elevation did cause pain and pain with resisted elevation. In other words, I asked him to elevate his arm, hold against it and that increased his pain.
Q. What was your impression?
A. Subacromial impingement.
Q. The same impression you had before?
A. Yes.
Q. By impression, that's your diagnosis, correct?
A. That's correct.
Q. What plan or action did you take in August of 2001?
A. I injected the shoulder joint area, the bursa, really the subacromial bursa, with Depo-Medrol, and that's cortisone and Xylocaine, which is local anesthetic, and asked him to return in a month.
Q. So you directed Mr. Ronwin to return to your clinic in a month?
A. Yes.
Q. Is that the last time you saw Mr. Ronwin?
A. Yes.



Q. Have you spoken to Mr. Ronwin since that office visit?
A. Not to my recollection.
Q. You diagnosed Mr. Ronwin as having subacromial impingement syndrome with osteoarthritis of the AC joint, correct?
A. That's correct.
Q. I'll represent to you that in 2003, Mr. Ronwin was diagnosed with a full tear of the supraspinatus tendon. Okay?
A. Uh-huh.
Q. In your clinical judgment, could the subacromial impingement syndrome and osteoarthritis you saw lead to a complete tear of the supraspinatus tendon?
A. Yes.
Q. Doctor, did Mr. Ronwin ever advise you that he was taking Bacal?
A. Yes.
Q. And how did he --
MR. RONWIN: Wait a minute, wait a minute. Do you have notes in addition to what you put here in this exhibit? He's reading from the back of the page now.
MR. PILKINGTON: I'll ask him to look at that.
MR. RONWIN: That should be an exhibit.



MR. PILKINGTON: We'll get there. Hold on.
MR. RONWIN: Okay.
Q. (BY MR. PILKINGTON) What are you looking at?
A. I'm looking at -- what we do is we have a -- we have patients fill out two forms before we see them. Generally the first is a patient information form, name, address, birth date, that sort of thing, and insurance information, a copy of their insurance card. So that's the relevant patient information for business office.
And in addition, we ask them to fill out a personal history form.
Q. Okay.
A. And then generally what I'll do after that is after that's been filled out, generally I will review that before I see the patient or when I -- at the time of the visit, and then I may or may not ask questions to --
Q. So, Doctor, in this --
A. -- supplement.
Q. -- patient information form, he told you that he was on Bacal, correct?
A. That's correct.
Q. At any point in time during your care and treatment of Mr. Ronwin, did he attribute any of these complaints or symptoms to his use of Bacal?
A. No.





6e06858b-6434-4d16-a2a6-a7248af267db

Page 46

MR. RONWIN: Wait a minute.
MR. PILKINGTON: You can ask questions.
MR. RONWIN: No, it's not a matter of asking questions, it's a matter of -- you gave him a subpoena, which also requested production of documents.
MR. PILKINGTON: Right.
MR. RONWIN: Why weren't these -- my personal history forms produced along with your -- with your notes? These were produced, the notes here, which is Exhibit 3, that you can look at, but then what you're reading from was not produced at any time. Why is that?
MR. PILKINGTON: Mr. Ronwin, you can ask him those questions. I'm about done so you can ask him those questions. Okay?
MR. RONWIN: I don't think you should ask him questions until he produces that stuff.
Q. (BY MR. PILKINGTON) Doctor, let's go back to where I was. Okay?
A. Uh-huh.
Q. Doctor, have you practiced orthopedics here in the Cheyenne area since 1977?
A. Correct.
Q. And have you had patients in your office who have been on statins before?
A. Yes.

Page 47

Q. Have you ever had a patient who had a torn rotator cuff tear -- let me start over. In your clinical experience, have you ever seen a torn rotator cuff tendon caused by the use of a statin?
A. No.
Q. And in your clinical experience, have you ever seen in any of the published literature, anything to suggest that a torn rotator cuff tendon can be caused by the use of a statin?
A. No.
Q. Including Bacal?
A. That's correct.
Q. Doctor, just a couple of final questions, I'll let Mr. Ronwin ask you some questions.
I just want to make sure that on March 16, 2001, Mr. Ronwin told you that he had this left shoulder pain for two to three months; is that correct?
A. That is correct.
Q. And finally, in August of 2001 he told you that the injection in March had given him complete relief of his symptoms up until sometime in July?
A. That's correct.
Q. At any point during your care and treatment of Mr. Ronwin, did he complain of blurred vision?
A. No.

Page 48

Q. At any point in time during your care and treatment of Mr. Ronwin, did he complain of pain in his back?
A. No.
Q. At any point in time during your care and treatment of Mr. Ronwin, did he complain of any sort of pain down the back of his legs?
A. No.
Q. Any sort of leg pain?
A. No.
Q. At any point during your care and treatment of Mr. Ronwin, did he complain about his gait or inability to walk?
A. No.
Q. At any point during your care and treatment of Mr. Ronwin, did he complain to you about right elbow pain?
A. No.
Q. And finally, at any point during your care and treatment of Mr. Ronwin, did he complain about cataracts?
A. No.
Q. And I understand that you weren't treating him for his cataracts or vision, I understand that. Fair to say?
A. That's fair to say.
Q. But if -- as an orthopedic doctor who was seeing

Page 49

Mr. Ronwin, if he had problems with his gait or his legs, is that some -- is that a complaint you would expect him to make at the time of his office visit?
A. If he were experiencing those types of musculoskeletal complaints, yes, I would expect that he would.
MR. PILKINGTON: Doctor, that's all I have right now. Mr. Ronwin may have some questions now. Thank you for your time.
MR. RONWIN: First, I think we should get a -- a production of the personal record that he referred to.
MR. PILKINGTON: Do you want a copy of it?
MR. RONWIN: Yes, we should make it an exhibit and make a copy -- you asked for everything, that -- that subpoena produces extremely extensive -- you have Exhibit A here and you can go through all the things that are required. Enormous number of things are required.
MR. PILKINGTON: Well, it's here, Mr. Ronwin, and we can make a copy of it, if you'd like to. I'm sure the doctor would be glad to make a copy for you.
THE DEPONENT: Sure.
MR. RONWIN: All right. And any other item he might have on me.
THE DEPONENT: I can copy -- you want





6e06858b-6434-4d16-a2a6-a7248af267db

personal information sheet, too?
MR. RONWIN: Yeah, personal information. What do you mean by personal information?
THE DEPONENT: Would be what you filled out, insurance --
MR. RONWIN: Yes. Oh, Medicare and that kind of thing?
THE DEPONENT: Uh-huh.
MR. RONWIN: I don't think that's necessary. Neither is --
THE DEPONENT: You want a copy of the --
MR. RONWIN: Neither are these things necessary.
THE DEPONENT: You want a copy of the letters --
MR. RONWIN: Here's a blank sheet.
THE DEPONENT: -- authorization to disclose medical information?
MR. RONWIN: No, that wouldn't be necessary for what we're doing.
THE DEPONENT: You want a copy of your letter?
MR. RONWIN: Yes. Do you have a copy of a letter in there that I sent you?
THE DEPONENT: Uh-huh.



MR. RONWIN: Sure. We should have that.
THE DEPONENT: MCS -- request from MCS for copy, do you want that?
MR. RONWIN: What -- can I look at that, see if it says --
THE DEPONENT: Maybe what you should do is look through that and tell me what you want copied and I'll do it.
MR. RONWIN: All right. This is just a copy for request -- okay. This we don't need. They just don't turn easy. Of course these records, don't -- okay. I don't think we need that. Seems like a repeat of what has come before in some of these. Okay. No, none of the rest of these. These are all right.
THE DEPONENT: Just these two, then?
MR. PILKINGTON: Take a break and get those copies. Let's go off the record.
(Deposition proceedings recessed 2:15 p.m. to 2:18 p.m.)
(Deposition Exhibit Nos. 5 and 6 marked for identification.)
CROSS-EXAMINATION
Q. (BY MR. RONWIN) First I want to ask you about making up the notes. As I understand it -- part of these written notes are written by other persons, right?



A. Just the first line is written by the --
Q. Other persons. And you wrote everything else here?
A. That's correct.
Q. Okay. And then you saw me on that date, March 16, '01, and how long thereafter did you actually write this -- these handwritten notes?
A. I wrote them at the time of the visit, as we were talking.
Q. As we were talking?
A. Yes.
Q. And when did the typing get done?
A. Generally I will do one of two things, depending if the office is particularly busy and I'm running behind, and I'll dictate that portion -- typed portion at the end of the day, the end of the morning, the end of the afternoon. If it's sufficiently slow day or I have a chance to do it and I'm not running behind, I'll dictate it immediately after the visit. I can't tell you which it was in this instance.
Q. Now, in regard to this particular note of March 16, '01, do you recall exactly when the typed part came out?
A. Nope.
Q. Okay. And were you referring, unless I didn't



hear you quite right -- in fact, I was having a little trouble hearing you people, I really was -- were you referring to an additional copying of the notes somewhere?
A. No.
Q. In other words, there wasn't any tape made of it or something of that sort?
A. Well, there's a -- this is a trans -- the typed portion is the transcribed note, so we transcribe that, the service that we used for transcribing it over the phone. And it's either stored electronically on a disk, I think is what they do. I don't know. I can't tell you.
Q. So there is another record, then, of the typed portion here?
A. No, I doubt -- I don't know. I doubt that.
Q. Oh, I see. Well, then --
A. It's just something you transcribe it. Obviously, the transcriber is not going to be available. I don't -- it's not like she's taking my dictation.
Q. Yes.
A. It occurs, I'm sure, on some type of computer retaining device.
Q. Yes.
A. I'd be surprised if she keeps it.
Q. So then in between this handwritten -- these handwritten notes and the typed portion here, there's some





6e06858b-6434-4d16-a2a6-a7248af267db

sort of transcription made that then goes to some other party, who then makes this typewritten portion; is that right?
A. That's correct.
Q. Okay. I didn't understand that when you first explained it. I thought it was typed here on -- physically on the typewriter or computer.
A. No.
Q. In composing this particular sheet, did you actually put your handwritten notes on this -- on the original of this very sheet?
A. Yes.
Q. So how did the transcript -- the typed transcribed portion get on there?
A. It's on a -- they type it on a -- on paper that has an adhesive backing.
Q. I see. And then you have --
A. So when they send it back and then one of my -- one of my employees then takes the adhesive backing and places it in the chart.
Q. I see. So it really -- the way these are here, it's as though it's one thing done at one time, but it isn't actually. It's someone then comes along and puts on the typed part and then you present it as a whole?
A. That's correct.



Q. Okay. And in between there, is there room for error between what you've written here and what is on the typed part?
A. You mean could the -- could the transcriptionist type a word erroneously? Sure.
Q. And this transcription, is it strictly taken from the handwritten notes only or do you somehow voice what is actually typed out here?
A. I dictate it. That's my --
Q. Oh, you do?
A. Those are my words. I dictate it --
Q. All right.
A. -- and it is transcribed exactly word for word.
Q. So every word here, for example, in this March 16, '01 typed portion of the notes, every word under history was something that you dictated?
A. That's correct.
Q. Even though you had written handwritten notes?
A. That's correct.
Q. Okay. Let's see. What sort of percentage of your practice would you say -- and it doesn't have to be exact, requires you to do rotator cuff tear surgery?
A. Oh, I haven't any idea.
Q. Well, if you don't have an idea --
A. I probably would say either rotator cuff --



either repair of rotator cuff or depression surgically of subacromial impingement, probably do between 50 and a hundred a year.
Q. And what percentage of the surgeries would that be? Do you have any idea how many surgeries occur then?
A. I generally do about average six a week.
Q. How many a week?
A. Six.
Q. Six?
A. Probably.
Q. So six times 50 is 300; is that right?
A. Six times 50 is 300.
Q. Huh?
A. Yes, that's correct.
Q. Good at mathematics, too, aren't I?
A. You are.
Q. All right. All righty. Now -- now, in -- you just said you do subacromial decompression. Is that what you called it?
A. Yes.
Q. That's not really a rotator cuff tear surgery, is it?
A. Well, no. The rotator cuff tendon is torn, generally we will perform a subacromial decompression and then repair --



Q. And repair it at this time?
A. That's correct.
Q. But you could just have arthritis in the subacromial area that's causing pain without a tear?
A. That's correct.
Q. Is that right? All right. And -- okay. Take that up.
All right. I think you said you can have a rotator cuff tear, but not the symptoms; is that correct?
A. That's correct.
Q. Well, if you had a -- a -- if you had a full tear, wouldn't you always have pain, if you, for instance, wanted to lift your hand up to push something up -- let's say push something up on a shelf in a closet or maybe you like to press weights in a gym, or something, wouldn't you always have pain?
A. No.
Q. You wouldn't?
A. No.
Q. Hmm. That's surprising. Hmm.
All right. Now, you said you wrote on your notes shoulder pain -- left shoulder pain, by -- well, X, which I guess means for --
A. Yes.
Q. -- in that sense, two, and then you put a dash,





6e06858b-6434-4d16-a2a6-a7248af267db

upwards three months; is that right?
A. That's correct.
Q. Now, do I indicate when I started taking Bacal on these notes that have been marked as Exhibit 6?
A. No.
Q. Did I -- does it indicate that I took Bacal?
A. Pardon?
Q. Does it indicate that I took --
A. In your personal history, yes.
Q. Oh, yes, it does. What medicines you regularly take, Bacal. All right. You wrote statin underneath. All right.
But there isn't any request for how long you took it, is there?
A. No.
Q. Okay. Let's -- let's ask this. If I started in January and I saw you in March, would that certainly encompass the two months?
A. If you started what in January?
Q. Taking Bacal.
A. Yes.
Q. And I saw you in March?
A. Correct.
Q. Would that encompass at least the two months?
A. Yes.



Q. Why did you write that three with that --
A. Well, as I said before, generally when I -- when I see -- it's been five years. I have no -- I have no actual memory of the encounter, but generally when that occurs, it occurs because the patient will tell me two months, for instance. And then as we talk, it may become -- it will become apparent to me perhaps as long as three months, so then I just add it to the note.
Q. Okay. So -- but are you writing these handwritten notes exactly as the patient is speaking?
A. Yes.
Q. I see. Well, then, you must have come back and put that three in there.
A. I did it at the time of the exam, yes. These notes are -- I don't write notes on this except when I'm in the room with the patient. So whatever is handwritten there is written at the time of the patient exam.
Q. But if I said -- if I -- by the way, I'm going to use third person, okay? I'll probably forget at times in the heat of battle. But if I told you -- if Ronwin told two months, you would have written two months; is that right?
A. Yes.
Q. Then would you have come back with three months afterward?



A. Well, I would have come back with three months after I wrote the two, otherwise I would have put two to three months. It would have been on the same line.
Q. Yes. In other words, you had to come back --
A. So what this implies to me is that originally, when I talked with the patient, the patient would say two months, and then as we continue the history process, something the patient has said is indicated as to two to three months, so it's approximate.
Q. So that three is actually after --
A. If the patient --
Q. Pardon. Go ahead. You want --
A. The three is what?
Q. An afterthought, isn't it?
A. What do you mean an afterthought?
Q. At the time I said two months, if I said two months --
A. Well, I would not have put three months had you not said three months.
Q. Why would I -- why would Ronwin tell you two months and then later on in the meeting tell you three months?
A. Because generally this is an approximation, in other words, if a patient has a specific date of injury, they may say -- I'll say how long have you been having



symptoms, and they'll say since December 23. I know the date because it was two days before Christmas. Ordinarily with the degenerative process, something that has become symptomatic over a more gradual period of time, it is an approximation, and so generally they will say about two months, and then it would become apparent at some point that it was longer than that. If it wasn't, I wouldn't have put it down.
Q. What -- what in that interview caused you to be -- make it appear to you apparent that it was three months?
A. Well, as I've stated, I have no actual memory of that --
Q. I see.
A. -- but what is in that portion of the written exam is the patient's words.
Q. Yeah.
A. So what it would have been would have been a statement from you that it was at one point a statement from you two months. And then later, during that interview process, three months. I don't put it in there unless it comes -- this history portion is what the patient tells me. I don't put it in there if the patient hasn't told me that, so I don't recall what it was specifically why that was two and then three. I can't





6e06858b-6434-4d16-a2a6-a7248af267db

tell you, but I can tell you that it is my habit, over 30-plus years of practice, that what I write down is what the patient tells me.
Q. But wouldn't it be more -- more logical to have instead of have the two months, if you were subsequently told three months by Ronwin, to have simply crossed the out the two months and put three months?
A. I have no exact memory. If a patient generally -- you're talking about you specifically or you talking about --
Q. I'm talking about me, this note.
A. So you want to talk about this time specifically?
Q. Yes. I'm not talking about anybody else.
A. I don't have any specific memory of the event.
Q. Okay.
A. But in general, if the patient tells me a time period and later tells me a different time period, then I will list both, because this is the patient's own words.
Q. All right. Again, if -- if Ronwin --
A. My guess is that it was something that was less specific. My guess is it was about two months it's been bothering me and later, you know, as I think about it, it may have been as long as three months. If it was something specific where a person would say it started two



months ago exactly, and then said, you know, as I think about it, it wasn't two months ago, I know it was three months ago, then I would change it to say patient indicates it was three months.
Q. Did Ronwin --
A. It was said in such a way that it was more generalized that I added that.
Q. Did Ronwin tell you the exact date he started Bacal?
A. No.
Q. Do you think Ronwin knows the exact date he started Bacal and has evidence of it?
A. I have no -- I have no way of knowing.
Q. I may have it with me somewhere. I think I do. That's 24 -- hmm.
MR. RONWIN: Are you looking for anything in particular?
MR. PILKINGTON: What are you looking for, the date you claim you started taking Bacal?
MR. RONWIN: Yes. I know the date was January 10, 2001. Have you got the lipid sheets -- my lipid panel sheets? No?
Q. (BY MR. RONWIN) All right. Will you accept the fact that Ronwin started Bacal -- taking Bacal on January 10, 2001?



A. I have no way of knowing whether Ronwin did or did not. If you tell me that's when you started, then I accept that. I have no reason not to.
Q. You have no reason to not believe that; is that right?
A. That's correct.
Q. All right. Well, you can certainly believe it.
And if we look at two months, January and February, would be roughly two months; is that right?
A. That's correct.
Q. And if we added March, we went out three months; is that right?
MR. PILKINGTON: Object to form.
A. January 10 to February 10 would be one, and February 10 to March would be two months. So if you're asking me the time frame between January 10 and March 16, would be two months and six days.
Q. (BY MR. RONWIN) Yeah, but when you write down the word -- wrote down the word months, were you thinking months from the day one to the last day of the month and then from the day one of the next month and the last day of the month?
A. I was thinking two months, generally, as a person would in conversation, i.e., 30-day months, but this is not in any means meant to be an exact date. If I



had known an exact date, I'd have stated an exact date. So that meant if you're asking me if I would put it another way, I would have put it 60 to 90 days.
Q. All right. Let's see. All right. I'll go with the -- into these notes themselves.
Is this note formation and preservation procedure that you've described here, both to my colleague and to myself, done for all patients in your office?
A. Yes.
Q. And all of your -- of your associates, colleagues, also do it that way?
A. I have three partners. Two partners, Rangitsch and Basta do it this way. We use the same transcription service. Dr. Winter, who actually was not in our practice March of 2001, uses a handheld dict -- cassette recorder.
Q. Okay. So Dr. Rangitsch's report was prepared in a similar -- or identical way in which yours was?
A. That's correct.
Q. And it was he who did the dictation on his report?
A. That's correct.
Q. Now, the next sentence in the first paragraph of the March 16th report, the -- let's see, first paragraph, rather, and you wrote that sentence, "He has taken nonsteroidal medication."





6e06858b-6434-4d16-a2a6-a7248af267db

Page 66

A. Right.
Q. And what was the medication that I supposedly had taken?
A. Well, I think I've explained that earlier. Obviously that's a typographical error in transcription. In other words, when there's a difference between my handwritten note and the -- and the transcribed note, then I always rely on my handwritten note, because it's contemporaneous with the exam. So the handwritten note says no NSAIDs, indicating there was no nonsteroidal medication.
Q. First, N-S-A-I-D stands for a non -- does it stand for nonsteroidal anti-inflammatory drug?
A. Yes.
Q. Okay. And when you do this dictation, do you have these handwritten notes in front of you?
A. Yes.
Q. And you've written in the handwritten notes having not -- no NSAID?
A. That's correct.
Q. So how could they dictate that he has taken nonsteroidal medication?
A. Well, as I've explained, my guess is -- my guess is that I did not dictate it that way, but that's how it was transcribed.

Page 67

Q. So errors can come into your notes; is that right?
A. You mean the -- there could be a transcription error? Sure.
Q. Transcription error. Possibly an error in your own handwriting -- handwritten notes, too?
A. Well --
Q. Are you --
A. -- there's no error in my handwritten notes with regard to what I put on the paper. I mean, what I write down is what the patient tells me.
Q. Well, did I tell you that -- did Ronwin tell you that the flexion was 160 degrees?
A. Under the exam, that is, first two sentences on that wrote are what the patient states. That's the history part of an exam. Where it says "exam," that is objective exam. That is what I find objectively on my physical exam. That has nothing to do with what you tell me. It's what I observe on physical exam.
Q. Let's take your handwritten statement in the second line, on that March 16, 2001 note, where it says "no crepitus."
A. That's correct.
Q. Did Ronwin tell you -- did Ronwin say to you "no crepitus"?

Page 68

A. No, what you-- what Ronwin probably told me was no grinding or popping. This is a -- that's the medical term for that.
Q. Yes. Crepitus. All right.
What is the next one that follows that? What is that, don't P -- oh?
A. It says, "Doesn't PT." These are notes that I can recall for a dictation. What that indicates is that Ronwin doesn't want physical therapy.
Q. Okay. Uh-huh. I have a hard time reading your handwriting.
Could you just recite what you've written on the -- after you -- you have your flexion, abduction data, you have the XL stands for the left shoulder, I assume, but could you read what -- the rest of what you've written on that line?
A. You want me to read it exactly or you want me to use the abbreviations? What I've written is mod DJD AC joint, the symbol would be with, Nth spur, minimal G/N narrowing, mild subacromial narrowing.
Q. Okay. I see. I just wanted to find out what you were -- what you were saying there. See if it had any importance.
Now, this no SNAID -- no NSAID versus the statement has taken nonsteroidal medication -- first let

Page 69

me back that up and ask you, did you claim that you did not have a telephone conversation with me after the last time I had seen you in August of 2001?
A. I think what I said is I don't recall any other communication after the last visit.
Q. Would you accept the fact that you did have a conversation with me?
A. If you tell me that --
MR. PILKINGTON: Objection. Asked and answered.
A. -- we did, I have no reason to disbelieve it. I just don't recall it.
Q. (BY MR. RONWIN) And in that conversation, since you don't seem to recall it, but would you try hard to recall that you admitted that there was that error between your written notes on the NSAID matter and the typed portion?
A. I have absolutely no recollection of any telephone call with you.
Q. All right. Now --
A. I can tell you generally if a patient phones in about a medical problem, I generally dictate it at that time, but obviously not always if you called me in this instance.
Q. Did Ronwin ask for a cortisone injection to





6e06858b-6434-4d16-a2a6-a7248af267db

relieve his left shoulder pain at the March 16, 2001 visit?
A. The note does not indicate so.
Q. Well --
A. Generally if a patient specifically requests an injection, I may suggest what I think is appropriate medical treatment, and between me and the patient, may not give an injection. Ordinarily if the parent insists they want an injection, then it's indicated, I would give it at that time.
Q. You would give the injection if the patient insisted; is that right?
A. That's correct. If I thought it were medically indicated.
Q. Yes.
Now, also, did you get a -- any sort of history of Ronwin's educational background and experience? Your -- in the patient's personal history form Exhibit 6?
A. No, but we don't ask for it, either.
Q. Doesn't appear that you asked for it.
If Ronwin told you that he had been a professor of biochemistry for about 20 years, would you think he would know -- he would know what cortisone is?
MR. PILKINGTON: Objection. Foundation.
A. Well, I would -- professor of bio -- sure. I



would think so.
Q. (BY MR. RONWIN) All right. And so if he knew what cortisone was, is there a possibility that he would have asked for a cortisone injection when he visited you on March 16, 2001?
MR. PILKINGTON: Objection. Form, foundation.
Doctor, I may have to object to the form or foundation of certain questions to preserve those objections for trial, and that's all I'm doing.
Q. (BY MR. RONWIN) Perfectly natural legal procedure.
A. Right. Now, I've forgotten the question.
Q. The question was, if -- if you had that knowledge of Ronwin's background and he asked for a cortisone injection, would you think he -- he knew what he was asking for, in effect?
MR. PILKINGTON: Same objections.
A. I would assume -- I would assume so.
Q. (BY MR. RONWIN) All right.
A. Are you assuming medical knowledge? I'm not -- I'm not quite sure I know what you're asking, to tell you the truth.
Q. Well, you know what biochemistry is, don't you?
A. Yes.



Q. Did you take some when you went to medical school?
A. Yes.
Q. And did they take up the topic of steroids?
A. You know, I recall very little of biochemistry in medical school.
Q. I see. By the way, did you have any other chemistry in medical school besides biochemistry?
A. In medical school?
Q. Uh-huh.
A. Man, I haven't thought about medical school in years. Not that I recall.
Q. Did you have chemistry before you went to medical school?
A. Yes.
Q. What chemistry did you have?
A. I had -- I took organic chemistry and quantitative analysis and qualitative analysis, as I recall.
Q. Okay. That's good.
Did you -- by the way, did you have inorganic chemistry? I would think it likely, in order for you to have taken analytical chemistry.
A. I don't recall what I took in high school.
I ought to tell you, this is scheduled for two



hours and I have another appointment in 10 minutes. I don't mean to rush you, if we're going to have to do much longer than that, we're going to have to reschedule.
Q. We're going to have to, because I've got questions here.
Did Ronwin get a cortisone injection on March 16, 2001?
A. No.
Q. Do you recall if Ronwin made the request that for the cortisone injection it be given in the following manner, first an injection of lidocaine or could have been Xylocaine, which is essentially the same -- well, they're not identical, but very similar molecules, followed by the injection of the cortisone?
A. I have no independent recollection of this visit.
Q. Do you recall that you refused to do that -- to give me -- to give Ronwin an injection by that procedure?
A. I have no independent recollection of that visit.
Q. If you had used that procedure, would that have caused you any loss?
A. I'm sorry. Any loss?
Q. Well, suppose you gave Ronwin a cortisone injection the way in which he asked, first the -- the

analgesic and then the cortisone --
A. Yes.
Q. -- two separate shots. Would that have caused you any loss?
A. I still -- any loss of what?
Q. I don't care. Any loss at all, whether it would have taken any salary or -- or compensation from you.
A. No.
Q. Would it cause you great chagrin?
A. No.
Q. All right. That's what I mean.
Would such a procedure for giving a cortisone injection, that is, first the analgesic and then the cortisone, be any worse than giving the combined analgesic and cortisone injection?
A. Any worse how?
Q. That's what I'm wondering. Would it be any worse? Do you know if it would be any worse? That's what I'm asking you.
A. Any worse in what way?
Q. Well, if getting it all at one time, would that be -- getting it in two injections, would that be any worse?
A. You mean is there reason to do it one way versus another, is that the question you're asking?



Q. That's another way you could phrase the question, yes.
A. Is that the way you're asking the question?
Q. Yes, that would be all right.
A. Generally, routinely, in fact, I give that as a combined injection. The reason being that the pain experienced by the injection of the local anesthetic is going to be equivalent to the pain experienced by placing the needle into the subdeltoid -- subacromial bursa without anesthetizing the skin, so generally I do not.
Q. I see. But it could be given that way, couldn't it?
A. Yes.
Q. All right. Well, let's take up this little point from Dr. Rangitsch's report. Now, again, Dr. Rangitsch -- did that -- did Dr. Rangitsch prepare that report of the March 21, 2001?
A. Yes.
Q. Did you have a hand in the preparation of it in any way?
A. No.
Q. All right. Did you -- when did you become aware that Ronwin visited Dr. Rangitsch on March 21, 2001?
A. I don't recall.
Q. Huh? Don't recall?



A. I don't recall.
Q. Okay. Are you aware that prior to making the appointment with your office for March 21, 2001, Ronwin told one of your staff persons that he wanted a cortisone injection in two steps, such as we had described?
A. No.
Q. Are you aware that Dr. Rangitsch gave Ronwin a choice to have a cortisone injection either in two steps or one step?
A. No.
Q. Did Dr. Rangitsch state in his report of March 21 visit that Ronwin, quote, rotator cuff strength appears intact; is that right?
A. Yes, he indicates under physical exam rotator cuff strength appears intact.
Q. Yes. What allowed Dr. Rangitsch to use the word appears in that phrase?
MR. PILKINGTON: Objection. Form. Foundation.
A. You're asking me to speculate about what Dr. Rangitsch is thinking.
Q. (BY MR. RONWIN) Well, if you know.
A. I don't know.
Q. Okay. Why are there no range-of-motion data in Dr. Rangitsch's report?



MR. PILKINGTON: Same objections.
A. I don't know. I assume he elected not to put them there.
Q. (BY MR. RONWIN) I see. Okay. Would the termination of the various range of motion -- range-of-motion data on Ronwin's left shoulder have had any bearing on whether or not Ronwin's left shoulder rotator cuff was torn or frayed --
A. No.
Q. -- or partially torn?
A. No.
Q. Did you -- let's see. Is there a lack of proof in Dr. Rangitsch's report to support the statement that "Ronwin's rotator cuff strength appears intact"?
MR. PILKINGTON: Objection. Form and foundation.
A. I'm not sure I understand the question. Dr. Rangitsch is an excellent orthopedic surgeon, and if his judgment on physical exam is that the rotator cuff strength appeared intact, then that would be his judgment.
Q. (BY MR. RONWIN) Well --
A. It's based on his examination.
Q. Yes, but based on his examination is there enough in there to warrant that -- that conclusion, that, quote, the rotator cuff strength appears intact?

MR. PILKINGTON: Same objections.
A. Well, the -- what that statement is is a statement of his physical examination of you. In other words, after examining you, it's his opinion that the rotator cuff strength was intact.
MR. RONWIN: I see. All right. Now -- now I'm pressed. Once again, I'm pressed.
MR. PILKINGTON: I bet I took less than an hour. When did we start this deposition?
MR. RONWIN: No, you took more than an hour.
MR. PILKINGTON: Rather than do this on the record, let's keep going and perhaps we can get done with the doctor.
THE DEPONENT: That's fine.
MR. PILKINGTON: He's being very hospitable.
MR. RONWIN: Can we keep going? I'd like to get --
THE DEPONENT: Fine, let's go through it. I'm just telling you my time constraints. Let's move it along, please.
Q. (BY MR. RONWIN) Let's go to that report of 8 -- August 8, 2001. When did you get the comment in the first paragraph of, quote, pain for about one month.



A. That's what the patient told me.
Q. All right. Where did you get the notion that Dr. -- "Dr. Rangitsch's injection of cortisone gave Ronwin complete relief of his symptoms"?
A. That's what the patient told me.
Q. What symptoms?
A. Symptoms of pain.
Q. Where did you get the description mild pain?
A. That's what the patient indicates. That may not --
Q. Well, now --
A. If a patient tells me something and I -- and I want it as an exact quote, I will put it in quotation marks. So some things like that would be characterization.
Q. But in your -- in your written -- handwritten notes, do you have anything about mild pain?
A. No.
Q. And haven't you told us that you report what the patient says there in your handwritten notes?
A. My handwritten notes are not an exact -- it's not like I'm taking a transcription, so my handwritten notes are not an exact statement of everything the patient says. What they are -- what -- they're used to assist me in dictation of the note. That's why the dictated note is



almost always much more detailed.
Q. How much pain do I have in my thumb?
MR. PILKINGTON: Objection. Form and foundation.
A. I have no idea.
Q. (BY MR. RONWIN) That's right. And if -- if the patient doesn't tell you the degree of pain that the patient feels, what means do you have to know whether the pain is horrendous, almost unbearable, nearly unbearable, mild or virtually nonexistent?
MR. PILKINGTON: Same objections.
A. I have no way of knowing the amount of pain the patient has unless they tell me.
Q. (BY MR. RONWIN) In that telephone conversation that I assured you we had after the last time I saw you, after this August 8 meeting, did you admit to Ronwin that the idea that the pain was mild was your idea?
A. I have no recollection of any telephone conversation.
Q. Oh, so this is a -- a variance, though, between your handwritten notes and, again, the -- the typed portion of your notes; is that right?
MR. PILKINGTON: Objection. Form, foundation. Are you talking August 8?
MR. RONWIN: What?



MR. PILKINGTON: You talking August 8.
A. I'm not seeing anywhere -- I guess I'm confused, because I don't see anywhere in here --.
Q. (BY MR. RONWIN) About mild --
A. Mild.
Q. It's on the second page of the 8/8/2001 note.
MR. PILKINGTON: Doctor under physical examination?
Q. (BY MR. RONWIN) Yeah, last --
MR. PILKINGTON: Mild pain with elevation.
A. Okay. So the question is, I'm sorry, what?
Q. (BY MR. RONWIN) I just said -- so there is a discrepancy between your handwritten notes where you don't refer to mild pain at all, but there in the physical examination you're assuring whoever reads these reports that Ronwin has mild pain with elevation and mild pain with resisted depression and reflection.
MR. PILKINGTON: Same objections.
A. Okay. Well, the reason I would say mild pain is that would be the patient's characterization during the exam. So I wouldn't -- I wouldn't put mild pain if the patient exhibited significant pain. So I -- it's a judgment based on what the patient says. If the patient moves the shoulder without any pain at all, I would say shoulder motion does not produce pain. If the patient





6e06858b-6434-4d16-a2a6-a7248af267db

can't get it up at all and says this is severe or killing me, then I would say it's severe. If it's mild, I indicate it's mild, it's a subjective term.
Q. (BY MR. RONWIN) The patient says there's no grinding sounds and that sort of thing. You're right, no crepitus. How come you didn't write something about pain in your handwritten notes for August 8, 2001?
MR. PILKINGTON: Objection. Asked and answered. Same objections as before.
A. As I explained to you, the handwritten notes are not an absolute transcription. It's not like dictation. I put down sufficient amount so I can recall the exam, physical exam, and the history prior to dictation. I dictate at the same time.
Q. (BY MR. RONWIN) What would give you -- from the handwritten notes, give you an adequate -- an adequate ability to state that the pain was mild?
MR. PILKINGTON: He's answered that question. Asked and answered objection.
A. The handwritten -- handwritten notes and the typed notes are not exactly the same. The handwritten notes are used to help me recall physical exam or the -- but I don't know who.
Q. (BY MR. RONWIN) You're not answering the question. You're not answering the question. The



question is what in the handwritten notes would even give you the idea to write mild pain?
A. There is nothing in the handwritten note to indicate that.
Q. Okay. That's what I wanted to get at. There is nothing.
All right. Now, let's see. Did we argue at that August 8th, 2001 visit -- well, let's turn the reel back. Did you charge for the visit on March 16, 2001?
A. I'm sure I did.
Q. And did we argue at the August 8th, 2001 visit because Ronwin contended that he came to get a cortisone injection and received none, yet he had to come back five days later to get a cortisone injection?
A. I have no independent recollection of this.
Q. All right. Let's see, put that down.
Has anybody redacted your notes since these were put together originally?
A. I guess I should know redacted, but I don't.
Q. Huh?
A. No, I'm not familiar with the term redacted.
Q. Well, altered them, changed them?
A. Has anyone altered the notes?
Q. Changed them, rewritten the terms for some reason or other?



A. No.
Q. Used different words instead of words there to perhaps enhance the -- the quality of the expression?
A. Since the records were requested?
Q. Yes.
A. No.
Q. Well, since you -- they were actually first put together in this form.
A. No.
Q. Now, do your reports bear any indication of a left shoulder rotator cuff tendinitis or tear in Ronwin's left shoulder?
MR. PILKINGTON: Objection. Form.
A. They do not indicate a tear, subacromial impingement implies a tendinitis.
Q. (BY MR. RONWIN) Yeah.
A. Tendinitis and bursitis.
Q. Do you -- do you list the tendinitis as a -- as an assessment or a impression?
A. No.
Q. Why not?
A. Well, because the subacromion impingement encompasses tendinitis and bursitis, as I explained about an hour ago.
Q. But that wouldn't be a rotator cuff tendinitis,



would it, necessarily?
A. Yes, it would be a rotator cuff tendinitis.
Q. Well, all right. But you don't list the tear --
A. No.
Q. -- possibility of a tear?
And was that a possible diagnosis?
A. Sure.
Q. Why wasn't it stated?
A. Subacromial impingement can produce a tear, a small tear.
Q. All right. Now, I've got -- I wanted to view those X rays. I had some questions on the X rays.
A. All right.
(Off-the-record discussion.)
MR. PILKINGTON: Doctor, for the record, you brought three separate films into the room?
THE DEPONENT: That's correct.
MR. PILKINGTON: Thank you.
Q. (BY MR. RONWIN) Yes. Okay. Now, first I wanted to ask you, the views, is this a front view? In other words, a view this way, or is it a back view?
A. It's what's called anter/post review. It's taken -- the patient's back to the film, the beam coming from front to back.
Q. Front to back, so it's sort of a -- what view --

the X rays are hitting the front first of the body; is that right?
A. Well, radiographs produce a two-dimensional reproduction of three-dimensional objects, so it's neither front nor back.
Q. Well, I asked you which way the X ray come. They're coming from the camera -- from the x-ray device, the catho tube, straight at the body this way and you're taking a picture in the back?
A. That's correct.
Q. Okay. That's what I wanted to know.
Now, this one here, which -- which way were the X rays coming and which way --
A. With the patient partially oblique to the film, again coming -- the film is at the back, the beam is coming from the front.
Q. So this way and at an odd angle?
A. That's correct.
Q. Okay. Just to be sure we're talking about the same things -- and this one here, would that be with the -- the X rays coming this way?
MR. PILKINGTON: Would you describe where you --
MR. RONWIN: Huh?
MR. PILKINGTON: Would you describe where



you pointed?
MR. RONWIN: I'm pointing to the front of my shoulder. In other words, being encompassing both the area of the -- you see the arm first.
Q. (BY MR. RONWIN) In other words, is that the way it's coming, the X rays?
A. It's taken over a curved cassette, that is a cassette that is a half moon shape. Patient -- cassette is placed in the armpit, the film comes from the top of the shoulder through the armpit to the film.
Q. So it's -- the X rays are coming down this way?
A. From the top of the shoulder through the shoulder and the film.
Q. And the camera's down somehow; is that right?
A. No, the camera is at the top. The film is in the armpit.
Q. I see. Okay. All right. I got the idea.
Are those the X rays of Ronwin's left shoulder --
A. Yes.
Q. -- at the time he visited on 3/16/01?
A. Yes.
Q. And were they taken in your offices?
A. Yes.
Q. Okay. Now, do X rays pick out bone?



A. Do they pick out bone?
Q. In other words, they show bone?
A. Yes.
Q. Do they pick out cartilage?
A. Do they show cartilage? No.
Q. Do they show collagen?
A. No.
Q. Do they show tendons?
A. No.
Q. What are tendons -- what are tendons constructed?
A. What are tendons constructed of?
Q. Of what, yes.
A. They're protein.
Q. Protein?
A. Uh-huh.
Q. What protein?
A. I don't know. I've got -- I'm going to give you about 10 minutes and then I'm out of here.
Q. Yeah.
A. I don't mean to be disrespectful, but that's the time I have scheduled.
Q. I'd like to do something if I wanted more, but we'll see what we can do. If I get through this, we may leave it at that.



MR. PILKINGTON: I'm sure you can get through this.
MR. RONWIN: What?
MR. PILKINGTON: I'm sure you can get through this.
MR. RONWIN: I can't hear you.
MR. PILKINGTON: I'm sure you can get through your questioning in 10 minutes.
MR. RONWIN: I think so. I'll give it a try.
Q. (BY MR. RONWIN) You're saying they're proteins. Are there cells in tendons?
A. Yes.
Q. What kind of cells?
MR. PILKINGTON: Objection. Foundation.
A. Oh, my gosh. Tendons cells.
Q. (BY MR. RONWIN) You just call them tendon cells?
A. Yes.
Q. Okay.
A. There are many types of cells. Tendon is a very complex structure.
Q. Yes, I understand that.
A. It's made of many different types. Now, if you want to go through the pathophysiology, the anatomy,





6e06858b-6434-4d16-a2a6-a7248af267db

the microanatomy of a tendon, we could sure as hell do it, but I don't have time, and it doesn't appear to me to be relevant and you're making me a little angry, to tell you the truth. You've got 10 minutes and then I'm out of here.
Q. All right. Are there nerve cells in tendons?
A. There are nerve cell endings in tendons, yes.
Q. Are there muscle cells in tendons?
A. At the tendinous -- musculotendinous junction, yes.
Q. Is the -- is the tend --
A. Tendon by definition is tendon cells, not muscle cells. Muscle cells are in muscle.
Q. All right.
A. So nerve cells are in nerve. Bone cells are in bone.
Q. All right. So there's a variation between the --
A. Right.
Q. -- the tendon cells?
A. That's correct.
Q. Okay. Fine. Don't get excited about it, you know.
I think you said there are blood vessels in tendons; is that right?



A. Yes. Well there are blood vessels in some tendons.
Q. All right. Do X rays of the sort we have -- you have taken here on March 16, 2001 reveal a rotator cuff tear in a supraspinatus tendon?
A. No.
Q. Okay. And any other portion of the left shoulder area?
A. In any other portion of the left shoulder area what?
Q. Are there any tears or -- or frays shown by the X rays in Ronwin's left shoulder?
A. No, X rays don't -- don't reveal that kind of detail in soft tissue.
Q. Right. Is an arthrogram used to spot a shoulder rotator cuff tear?
A. Can be.
Q. Is an arthrogram basically an X ray procedure?
A. Arthrogram is an X ray procedure, yes.
Q. Yes.
A. It's an enhanced X ray procedure.
Q. Yes, and how did the arthrogram show the rotator cuff tear, then?
A. Arthrogram -- during an arthrogram, a liquid medium, which is opaque to the X ray beam, is injected



into the joint. It escapes through the tear and the tendon, then that can be seen.
Q. Okay. All right. So there was no way from those X rays that you saw, that on March 16, 2001, that you could have concluded that Ronwin had a left shoulder rotator cuff tear?
A. They're not designed -- well, there are rotator cuff tears that can be seen by --
Q. By X rays?
A. -- plain X ray. A tear can't be seen, but can be inferred by a loss of the space. That was not present in this film.
Q. I see. And do you consider the -- you spoke of the arthritic nature, the -- the acromioclavicular spurs and the osteophytes, which are just spurs basically, as being present. And you implied that they could cause the rotator cuff tear. Now, can you see a tear in those X rays from the -- the spurs and arthritis conditions?
MR. PILKINGTON: Form and foundation.
A. As I said, those are not designed to produce -- to show tears in the rotator cuff tendon.
Q. (BY MR. RONWIN) Either way. In other words, whether it was due to a tear of the tendon?
A. That's correct.
Q. Okay. That's -- that's what I want to know.



And, now, in describing the -- the impressions that you had, would you consider them to be mild, more than mild, so to speak, or very -- very severe, the condition that you described, the -- I believe you described the condition here, subacromial impingement?
MR. PILKINGTON: Objection. Form and foundation.
A. I didn't characterize it in my note.
Q. (BY MR. RONWIN) Huh?
A. I said it wasn't characterized in the note.
Q. In your note?
A. As mild.
MR. PILKINGTON: Are you referring to the x-ray report right here?
MR. RONWIN: No, I'm referring to the impression in the March 16, 2001 report.
A. Right. It wasn't -- I didn't characterize it one way or another.
Q. (BY MR. RONWIN) Right. So you -- at this time, are you able to say whether it was mild, severe or in between?
A. Well, based on my note, I would probably have classified that as mild to moderate.
Q. Mild?
A. Mild to moderate.





6e06858b-6434-4d16-a2a6-a7248af267db

Page 94

MR. PILKINGTON: Moderate.
Q. (BY MR. RONWIN) Okay. Let's see. I have a couple of things here I might want to ask you about, and I better come back -- impression -- all right.
Oh, do you have any evidence that Ronwin's left shoulder rotator cuff tear was essentially due to age, rather than to any other -- any other possible cause?
A. No, I wouldn't say it's due to age, specifically. I would say it's --
Q. It's --
A. In my opinion, it's a degenerative condition.
Q. Yes, but you have no proof that it was due to age, degeneration as a result of age?
A. We see -- we see this type of degenerative condition more commonly as a patient gets older, but we can see it in younger ages, too.
MR. PILKINGTON: Form and foundation objection.
Q. (BY MR. RONWIN) Specifically as to me, are you able to say that it was age degeneration that caused the rotator cuff tear?
A. It's a --
Q. If you can't say it, then you can't say it.
A. It is a degenerative condition that is the result of, in my opinion, osteoarthritis or degenerative

Page 95

arthritis, acromioclavicular joint and impingement.
Q. Yeah. Yeah. All right.
A. The arthritis is much more common as a person gets older.
Q. Yes.
A. At age 77, and I'm sure that played a part, yes.
Q. Would your analysis in this situation exclude other possible causes?
A. Such as injury?
Q. Such as injury or such as --
A. It excludes injury, as you gave no indication there had been an injury.
Q. Yeah, right, but such as a tearing of bodily tissues by the Bacal molecule or by the fluorine atom in the Bacal molecule coming off that molecule and then acting in the body?
A. Are you asking me my opinion as to whether or not this is related to Bacal?
Q. No, I'm just saying can you rule out no other causes other than that -- that -- than that the injury -- I mean, the physical injury type -- you've ruled out physical injury type in your opinion just now.
A. I don't think.
Q. Can you rule out other things --
A. I don't think this is an acute injury. This is

Page 96

a degenerative process, secondary to bony impingement.
Q. Yeah, but can you rule out other possible causes?
A. I can't think of any other possible cause. Yes, I would rule out Bacal as a cause, if that's your question.
Q. You would?
A. Yes.
Q. On what grounds?
A. Because Bacal doesn't cause this.
Q. How do you know?
A. Based on my experiences as an orthopedic surgeon.
Q. Uh-huh. And have you had -- how many patients have you had that had taken Bacal for sure and then you had to do a rotate -- you found a rotator cuff tear for sure?
A. As I'm standing here -- as I'm sitting here now, I can't give you any example one way or another.
Q. Okay. Then how do you know Bacal wasn't the cause?
A. I've answered that question. My opinion is this is a degenerative tear based on experience of 30 years training as an orthopedic surgeon.
Q. That's fine.

Page 97

A. And based on literature with regard to Bacal, but I'm not going to argue with you about it.
Q. I'm not asking you to argue. I'm asking you can you rule out any other cause?
MR. PILKINGTON: Objection. Asked and answered. He said he ruled out other -- in his opinion, the most probable cause is degenerative change.
MR. RONWIN: That's his opinion.
MR. PILKINGTON: That's what you're asking.
MR. RONWIN: Yeah, but I asked how did he rule out other causes? And then he says, well, there was no physical injury. And then he says he rules out Bacal, so I asked him how he can rule out Bacal, and he doesn't give us an answer.
MR. PILKINGTON: Oh, he did.
MR. RONWIN: No, he didn't. This is more like what he would like --
THE DEPONENT: Mr. -- we are pretty much done.
MR. RONWIN: Yeah, this is more like what he would like to rule out.
MR. PILKINGTON: Are you done?
MR. RONWIN: Well, I suppose, but I'd really like to go into that Bacal thing.
THE DEPONENT: We can reschedule if you'd





6e06858b-6434-4d16-a2a6-a7248af267db

like. I'm perfectly happy to do that.
MR. PILKINGTON: I'm not paying for the doctor's time. If you want –
MR. RONWIN: We'll discuss that afterwards.
MR. PILKINGTON: Are you done?
MR. RONWIN: Well, I think that we haven't -- I got to go to this cause thing. I'd like to get this cause bit out, because there are a couple of things I could explain to him and see if he can explain --
MR. PILKINGTON: Doctor, would you give us five minutes and I think this will be done.
THE DEPONENT: I'll give you five minutes.
MR. PILKINGTON: I think it can be done. That will save us having to come back again.
Q. (BY MR. RONWIN) Okay. The Bacal molecule has a fluorine atom in it, do you know that?
A. No, I'm not an expert in Bacal.
Q. Okay. Will you accept that it has a fluorine atom in it?
A. I have no idea. I'm not an expert in Bacal.
Q. I didn't ask you that. I just said will you accept it.
A. I'm not going to accept anything that I have no knowledge of. I'm not an expert in Bacal. I can't talk about the chemistry of Bacal.



Q. Right. Well, do you know?
A. I'm an orthopedic surgeon. I can answer those questions.
Q. That's fine.
A. And within the five minutes, I'm happy to do that.
Q. That's fine.
And therefore, do you know if Bacal tears up tissues, cells and other tissues in the body?
MR. PILKINGTON: Objection. Form and foundation.
A. I've just told you I'm an expert in orthopedic surgery.
Q. (BY MR. RONWIN) So, therefore, the answer is really no, you don't know?
A. Right, I don't know.
Q. That's all you need --
A. I don't know the chemistry of Bacal, no.
Q. Right. And you don't know, therefore, whether a it tears up cells or other body tissues?
MR. PILKINGTON: Same objections.
A. Same answer.
Q. (BY MR. RONWIN) Okay. And, therefore, you don't know whether it tears up muscle cells or -- and nerve cells?



MR. PILKINGTON: Same objections.
A. I know in general the questions and the allegations with regard to statins and muscle damage.
Q. (BY MR. RONWIN) Yes. Do you know about statins and nerve cell damage?
A. Yes.
Q. You do?
A. I've read in general, yes.
Q. Yes. But now do you know --?
A. But I'm not an expert in that area. I'm an expert in orthopedic surgery. I've testified with regard to my opinion as to what caused your injury.
MR. RONWIN: Well, I don't think we're going to get a better answer be than that.
THE DEPONENT: No, you're not.
MR. RONWIN: He's simply no willing to answer.
MR. PILKINGTON: I think he's answered, but do you have any more questions?
MR. RONWIN: I think call it a night.
MR. PILKINGTON: Doctor, just a couple follow-up questions.
THE DEPONENT: Fine.
REDIRECT EXAMINATION
Q. (BY MR. PILKINGTON) Doctor, there's been a lot



of testimony about your handwritten two to three months. Do you recall that testimony?
A. Yes.
Q. Is it my understanding you wrote two to three months based on what Mr. Ronwin told you?
A. That's correct.
Q. To the best of your knowledge, is that a true and accurate note of what he told you?
A. Yes.
Q. Doctor, let me show you a reference to a document Mr. Ronwin filed in court. It's a letter pursuant to PTO114, Section 1B1 and on page 4. Mr. Ronwin said, "I began to experience left shoulder pain and restriction -- restriction of the range of motion in my left arm on or about February 15, 2001." Do you see that.
A. Yes.
Q. That's about one month before he saw you, correct?
A. That's correct.
Q. Did Mr. Ronwin ever tell you that he began to experience his pain one month before he saw you?
A. No.
Q. Instead he told you it was two to three months before, correct?
A. That's correct.





6e06858b-6434-4d16-a2a6-a7248af267db

Q. Mr. Ronwin asked you some questions about whether he asked for an injection on March 16, do you recall that testimony?
A. Yes.
Q. Would it have been your standard of practice to make a note if a patient asked you for cortisone injection and you refused?
A. Yes.
Q. Did you make such a note in your record of March 16?
A. No.
Q. What conclusion does that lead you to?
A. That he did not request that.
Q. There was some discussion about the mild pain -- your description of his pain in his left shoulder in August as mild, do you recall that?
A. Yes.
Q. Would you explain to the jury how you arrived at that descriptive term?
A. Well, the physical examination of a patient assess the amount of apparent discomfort or pain during the range of motion. I'll ask a patient, in fact, is that painful, and they'll indicate to me, yes, a little or yes a lot.
Q. Okay. And it was your conclusion, based on his



description, that it was mild, correct?
A. That's correct.
Q. One final question, Doctor. Based on your care and treatment -- let me back up, we -- both Mr. Ronwin and I represented to you that he ultimately had a full tear of the supraspinatus tendon. Okay?
A. Yes.
Q. And that he had rotator cuff surgery sometime in 2003 to correct that tear. Okay?
A. Yes.
Q. Based on your clinical experience in years as orthopedic surgeon, what do you believe led to that rotator cuff tear?
A. Chronic impingement, bony impingement between the acromioclavicular joint, the acromion and rotator cuff tendon and the humeral head.
MR. PILKINGTON: Doctor, I thank you for your time and patience today.
MR. RONWIN: Wait a minute. I just want to ask him on that.

RECROSS-EXAMINATION

Q. (BY MR. RONWIN) Now, you -- we talked about two to three-month and one month, okay, and there is in your -- in your notes that first you put down no NSAID, and then you put it into your typed material, which



indicates that wouldn't you agree that there is inaccuracies treatment to your notes?
MR. PILKINGTON: Objection. Asked and answered.
Q. (BY MR. RONWIN) Is that right?
A. What I've stated is that what I've written is what the patient tells me in the history portion. That is not inaccurate. I have agreed with you several times that in the transcription, the transcriptionist may make an error either based on what she hears or simply typing it wrong. What is in the written portion of the note I have confidence --
Q. When --
A. -- when there's a difference in between the written note and transcribed note, I go with the written note, because it's written at the time I see the patient.
Q. Wouldn't you have an obligation to correct your transcribed notes, then, before you passed them out?
A. If I notice it.
Q. Did you make an effort to -- to do that on this -- on the March 16, 2001 note?
A. If you're asking me that before I sent a copy of my records somewhere, specifically to an attorney, will I make a change on the note? The answer to that is no, I do not.



Q. All right. And then the word "mild," now -- you indicated here now, you didn't previously when you were asked the question, you said that I indicated that my -- my pain was mild?
A. What I've stated --
MR. PILKINGTON: Objection. Asked and answered.
A. What I've stated, that is a portion of my physical exam based on either the patient's direct -- direct statement that it's mild, moderate or severe or my assessment based on the exam, as to whether the patient is exhibiting severe, mild or moderate pain.
Q. (BY MR. RONWIN) Well, did -- did -- are you saying that I told you that it was mild?
MR. PILKINGTON: Same objections.
A. What I'm saying is I have no independent recollection of that exam.
Q. (BY MR. RONWIN) Yeah, yeah, but it shows up and it doesn't show up in your handwritten part.
MR. PILKINGTON: Same objections.
A. That's correct.
Q. (BY MR. RONWIN) All right. And lastly, you -- you -- you write chronic impingement or impingement, and you -- you characterize it here in your testimony as mild to moderate. And are you saying that a mild to moderate





6e06858b-6434-4d16-a2a6-a7248af267db

impingement is the cause of the rotator cuff tear?
A. Yes.
MR. RONWIN: Okay.
MR. PILKINGTON: Doctor, on the record, you have the opportunity to read and review your transcript. You probably been through this before. You can waive that right.
THE DEPONENT: I'll waive the right. Thank you.
MR. PILKINGTON: Doctor, appreciate it. Thank you for your time.
(Signature waived.)
(Deposition proceedings concluded 3:30 p.m., June 19, 2006.)



CERTIFICATE

I, KATHY J. MULLIVAN, a Registered Professional Reporter and a Notary Public of the State of Wyoming, do hereby certify that the aforementioned witness was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That the foregoing transcript is a true record of the testimony given by the said deponent, together with all other proceedings herein contained.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Notarial Seal this _____ day of __________, 200_.

KATHY J. MULLIVAN
Registered Professional Reporter

My commission expires April 5, 2007.





6e06858b-6434-4d16-a2a6-a7248af267db