# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

---

DEPOSITION OF: JANE SERVI, M.D.
June 20, 2006

---

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : | Case No. 02-0200 |

TAKEN PURSUANT TO NOTICE AND SUBPOENA on behalf of the Defendant Bayer Corporation at 419 Canyon Avenue, Suite 300, Fort Collins, Colorado 80521 at 9:08 a.m. before Sylvia E. Noneff, Registered Professional Reporter and Notary Public within Colorado.

APPEARANCES

For the Plaintiff Ronwin (pro se): EDWARD RONWIN, Ph.D., ESQ.
945 Rolland Moore Drive L-2
Fort Collins, Colorado 80526

For the Defendant: JEFFREY PILKINGTON, ESQ.
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, Colorado 80202

Also Present: None



INDEX

EXAMINATION OF JANE SERVI, M.D.: PAGE
June 20, 2006

By Mr. Ronwin 74, 122

By Mr. Pilkington 4, 120

DEPOSITION EXHIBITS: INITIAL REFERENCE

1 Subpoena, 5/31/06 6

2 Curriculum vitae of Jane (Niki) Servi, M.D., not dated 9

3 Northern Colorado Orthopedic Associates chart notes re Ronwin, various dates 31

4 Handwritten letter from Drs. Knauer and Servi to Ronwin, 1/6/04; explanations of chart abbreviations 72

5 Letter from Ronwin to Knauer, 11/5/03; request for explanations of chart abbreviations 72

6 Patient intake form re Ronwin, 8/28/01, updated 10/27/03 73

7 Anatomical illustration of the shoulder, not dated 81

(Attached to original and Mr. Pilkington's copy transcript.)

REQUESTED PORTIONS OF TESTIMONY: PAGE

(None.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

(None.)



WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:
(Deposition Exhibits 1 and 2 were marked.)
JANE SERVI, M.D.,
having been first duly sworn to state the whole truth, was examined and testified as follows:
EXAMINATION
BY MR. PILKINGTON:
Q. Good morning, Doctor.
A. Good morning.
Q. My name is Jeff Pilkington, and I'm an attorney out of Denver, Colorado with the law firm of Davis Graham & Stubbs. I represent Baycol -- Bayer. Do you understand that?
A. Yes, thank you.
Q. Bayer made Baycol, which was voluntarily removed from the market back in 2001. Okay?
A. Okay.
Q. Have you ever had your deposition taken before?
A. Yes.
Q. About how many times?
A. Probably five.
Q. I want to make sure that we're on the same page this morning, so I'll lay out some basic ground



rules that we need to follow. First of all, I'm going to ask you a series of questions to better understand your care and treatment of Mr. Ronwin. Do you understand that?
A. Yes.
Q. This is my only opportunity to talk to you about your care and treatment of him. Do you understand that as well?
A. I do.
Q. The next time I'll talk to you is probably at the trial of this case. Okay?
A. Okay.
Q. Many of the questions that I ask you will relate to medical terms and medical terminology, so would you kindly explain in lay terms what some of the more complicated medical terms and concepts are?
A. I would be happy to do so.
Q. If you don't understand a question that I ask you, please ask me to restate or rephrase it.
A. Okay.
Q. I'll be happy to do so. Similarly, you understand you've taken an oath to tell the truth?
A. I do.
Q. That's the same oath that you would take if you were to testify live in person before the judge and



04611547-742a-4e96-903b-ddf0b207a131

jury in this case, correct?
A. I understand.
Q. Do you have any questions before we keep going?
A. I have no questions.
Q. Doctor, I've handed you what I've marked as Exhibit Number 1. And I'll represent to you that that is the subpoena that was served upon your office and that you kindly accepted service. Do you agree with that?
A. I agree.
Q. This subpoena asked you to bring certain things to your deposition. What did you bring to your deposition today?
A. I brought along the original chart.
Q. Did you also bring a CV?
A. I brought a CV.
Q. And by the "original chart," that's the entire chart relating to your clinic's care and treatment --
A. It is.
Q. -- of Mr. Ronwin? When I talk about your clinic's care and treatment of Mr. Ronwin, who in your clinic cared for Mr. Ronwin?
A. I cared for Mr. Ronwin; and my partner, Dr. Knauer, cared for Mr. Ronwin.



Q. Before receiving the subpoena for your deposition testimony in this litigation, did you know that Mr. Ronwin had sued my client, Bayer?
A. I believe Dr. Knauer had mentioned it at one point and had discussed the fact that she was meeting with him and was requested to write a letter for him. But that was my extent. I was not involved in that.
Q. What, if anything, did you prepare for your -- do to prepare for your deposition today?
A. Well, I attempted to look in the PDR, the Physician's Desk Reference. And of course, since it was taken off the market, that's not in the current literature. So I did do a quick search on Google and reviewed some of the literature that's on Pubmed, P-u-b-m-e-d.
Q. Are you talking about the Baycol drug?
A. I'm talking about -- well, I actually looked up Baycol and rhabdomyolysis.
Q. And what is rhabdomyolysis?
A. Basically, in laymen's terms, it's destruction of the muscle with release of the enzymes and proteins. What ends up with Baycol and rhabdomyolysis is that myoglobin, which is an iron-containing protein, is released. It is -- myoglobin is actually what carries oxygen to the muscle. And as a result of its release, it



can effect damage to the kidneys.
Q. In your clinical practice, have you seen any cases of rhabdomyolysis?
A. In my practice up here in orthopedics, I have not. I have seen rhabdomyolysis in my training when I was a family practice resident working on the emergency rotations in Scottsdale, Arizona. We would see it in association with alcohol intoxication and dehydration, heat illness.
Q. In any of your training or your practice, have you seen rhabdomyolysis in conjunction with statin use?
A. I have not. We do not prescribe that medication, so in general, the patient would probably present to their primary physician who was prescribing that.
Q. Did you do anything else to prepare for your deposition?
A. I reviewed the chart.
Q. Anything else?
A. That's it.
Q. Let's now better understand your background as a doctor. First of all, where did you go to college?
A. I went to college at the University of Wisconsin, Madison. And I finished my final two years at



the University of Lowell, which is now termed U-Mass -- Lowell.
Q. In Massachusetts?
A. In Massachusetts.
Q. What did you do after you graduated from the University of Lowell?
A. I went to medical school at the University of Wisconsin Medical School.
Q. And did you graduate from that medical school?
A. I did, and I followed that with a family practice residency in Scottsdale, Arizona.
Q. When did you graduate from medical school?
A. 1995.
Q. Actually, 1992, and then you --
A. That would be it. Thanks.
Q. And to better assist the jury in better understanding your background as a doctor, you brought your CV to the deposition?
A. I did.
Q. Is your CV been -- has your CV been marked as Exhibit Number 2?
A. It is Exhibit Number 2.
Q. Is Exhibit Number 2 a true and accurate copy of your curriculum vitae?

Page 10

A. Yes, it is.
Q. Is it current as of today's date?
A. It is current.
Q. Would that curriculum vitae better understand -- better assist the jury in better understanding your background and qualifications?
A. It would.
Q. So in 1992, you graduated from University of Wisconsin, Madison Medical School?
A. Correct.
Q. You then went to Arizona to complete a family practice residency?
A. That's correct.
Q. What is family practice medicine?
A. It's primary care medicine, so essentially it would be your gatekeeper. They evaluate patients who would initially present with almost any problem, and then do an evaluation, formulate a treatment program. If it was something that was out of their realm of expertise and required a specialist referral, then typically they would be the referring physician to the specialist.
Q. What did you do after you completed your residency?
A. I did a primary care sports medicine fellowship up in Hennepin County, Minneapolis, Minnesota.

Page 11

Q. And what did that focus on?
A. Sports medicine. It's a bridge in between primary care physicians and orthopedists. So we would continue to maintain our family practice status and training, but then go on in and train in a special level of sports medicine, whether that be from a primary care aspect, treating athletes with medical illnesses such as diabetes or any female athlete triad, all the way to bridging the gap to orthopedics, as the majority of sports medicine problems do not go on to require orthopedic surgery.
So we treat them in a nonsurgical manner. We also train side by side with the orthopedists so that we're able to, first, assist in surgery and care postoperatively, evaluate preoperatively, and again, make appropriate referrals to the orthopedist.
Q. What did you do after you completed that fellowship?
A. I started to work with Northern Colorado Orthopedic Associates.
Q. Is that the clinic in which you practice today?
A. It is.
Q. Who -- so you've been at Northern Colorado Orthopedics --

Page 12

A. Since November of 1996.
Q. -- almost 10 years?
A. Um-hum.
Q. You have to say "yes."
A. Yes. I'm sorry.
Q. Let's turn to your practice. Do you practice with other doctors?
A. I practice with two orthopedists currently.
Q. Who are those persons?
A. Dr. Knauer and Dr. Cohen, C-o-h-e-n.
Q. Since you've been there and since 1996, have both doctors been at that clinic?
A. No, sir. Dr. Cohen joined us in June of 2005, so he's been there just a little over a year now.
Q. But Dr. Knauer has been there throughout your 10-year tenure --
A. Yes.
Q. -- at the group, correct?
A. Yes.
Q. You're licensed to practice here in the state of Colorado?
A. Yes, I am.
Q. Are you licensed anywhere else?
A. No, sir.
Q. Are you -- are you a member of any

Page 13

professional organizations?
A. I am. I'm a member of the Annual Medical Society for Sports Medicine, Family Practice, as well as the American College of Sports Medicine. Up until about a month ago, I was also a member of the Wilderness Medicine Society.
Q. Are you board certified in any area?
A. I'm board certified in family practice, and I hold a CAQ in sports medicine.
Q. What is a CAQ?
A. A certificate of added qualification.
Q. Do you have any hospital appointments?
A. I have hospital privileges.
Q. Privileges, thank you.
A. And they are not full-status privileges. I simply admit and assist in surgery at the hospital, so I have special privileges there.
Q. Let's turn to your practice at Northern -- Northern Colorado Orthopedics. How would you describe the practice in which you've been a part of for 10 years?
A. It's an orthopedic practice. We will see anything from pediatric patients through geriatric patients. Again, my focus is more on conservative management without surgical intervention. We may see anything from sports injuries to work injuries to overuse

injuries to pain that results from the aging process.
Q. Would those be described as degenerative injuries?
A. Yes, they would.
Q. So you see a spectrum of patients ranging from the very young to the very old?
A. A wide spectrum, yes.
Q. And do you also see a spectrum of different types of injuries in your practice?
A. Yes, we do.
Q. What types of injuries do you see?
A. I would see acute injuries, such as sprained knees, sprained ankles, people coming off the ski hill or the athletic field; I will see overuse injuries, so repetitive, cumulative trauma; and again, degenerative injuries that happen over time.
Q. And those degenerative injuries that you see in your practice, is that just part of the aging process?
A. Yes, it is.
Q. Our bodies just wear out over time?
A. In a general sense, yes.
Q. In terms of the types of injuries do you see -- that you see as an orthopedic doctor, or a doctor who sees orthopedic injuries, what joints are involved?
A. We, again, are a general orthopedic clinic,



so we will see foot and ankle, knee, hip, spine, shoulder, wrist, neck. And again, we don't do a full spectrum of surgery on all of those, but we will refer out appropriately for the surgical care that we don't cover in our office.
Q. And is it my understanding that your role in the clinic is -- is primarily to assist the two orthopedic doctors in the more conservative management of orthopedic injuries?
A. I'm not entirely what you mean by "assist."
Q. Sure.
A. I'm sorry.
Q. No, that's -- that's fair enough. And as I said at the beginning, if you don't understand my question, please ask me to restate --
A. Yes.
Q. -- or rephrase it. How --
A. I'm a full-functioning doctor, so I'm not there to assist. I'm there to actually evaluate and treat the patients.
Q. And I -- and I apologize. A better question would be this: What is your role in that clinic with the two orthopedic doctors?
A. I'm an employee, and I see my function as decompressing their nonsurgical load and assisting in



surgery as needed.
Q. Okay. So is it fair to say that you are caring and treating for those patients who at that point in time do not need surgical intervention?
A. That's correct.
Q. And at some point in time, when those patients need surgery, you will then pass those patients on to one of the two orthopedic physicians?
A. Yes, again, as well -- as long as it's in their spectrum. And if it's in the spectrum of care, such as spine surgery or, you know, hand and wrist intricate surgeries, then we pass them along to the appropriate specialist.
Q. I understand. When you examine your patients, do you have a specific procedure or protocol that you go through?
A. Yes, I do. I try and have standard protocol for all my patients.
Q. What -- what is that protocol?
A. Again, it's based on what the presenting complaint is, because you're going to focus your exam and your questions sometimes in a different manner regarding what that is. But you start out with the presenting complaint and launch into a history of that complaint. Do you want me to kind of go through --



Q. Please.
A. -- my thought process on that? So some of the things that I look at are injured part: When did it start? What started it? What is the intensity, the location, the radiation of the pain? Is there any numbness or tingling associated with it?
When does it hurt? Is there things that makes it worse? Are there things that make it better? What kind of treatment have you had on your own or with other doctors before you got to me? Did it help you? Did it make it worse?
Have you gone to physical therapy? Have you had any X-rays or other imaging yet? Previous problems or injuries with that area? What's the worst pain you get?
Q. So a pretty comprehensive --
A. At least at first --
THE REPORTER: Wait. Sorry. "Pretty comprehensive"?
Q. (BY MR. PILKINGTON) -- questioning of the injury at issue?
A. At least on, you know, the first presentation of the patient. And then as they come in as an established patient, you can focus in a little bit without having to do as elaborate of a question with your



04611547-742a-4e96-903b-ddf0b207a131

Page 18

history or your exam.
Q. Do you do a physical examination?
A. Yes, I do.
Q. What else do you do in that office visit?
A. Again, it's patient-dependent. So along with the physical exam, you are going to be palpating or touching areas of the body. You're going to do a general observation. You're going to look at strength, at motion, at neurologic function.
And then, if appropriate, you may be doing some imaging. We do have X-ray in our house, so we're able to obtain X-rays that day, if needed. Formulate an assessment, a treatment plan, initiate that treatment plan, and then request the patient -- if, again, appropriate -- to return for follow-up care.
Q. Doctor, in your clinical practice, do you keep notes of your office visits with your patients?
A. Yes, we do.
Q. Do you dictate those notes?
A. We dictate them, and then they get transcribed.
Q. And after they're transcribed, do you review those?
A. We review them, yes.
Q. And make any corrections, if necessary?

Page 19

A. Yes.
Q. Doctor, before the deposition we briefly discussed in Mr. Ronwin's presence that you saw Mr. Ronwin, I believe, four different times; is that correct?
A. I haven't counted the times, but somewhere around that area, yes.
Q. And we'll get to the specific number. But is it your understanding that Mr. Ronwin's injury that -- for which you provided care and treatment was his left shoulder?
A. That's correct.
Q. Before we go to the specifics of your care and treatment of Mr. Ronwin, would you explain to the jury the basic anatomy of the shoulder?
A. The shoulder is a ball-and-socket joint, so the shoulder ball will fit into the socket, which is made up of part of the shoulder blade. There's also a joint that sits above that called your AC joint where your acromion, which comes off the back side of your shoulder blade, will make a joint with the collarbone, or clavicle.
Underneath that bony roof of the AC joint lies a bursa. A bursa is a fluid-filled sac so that you don't have tendon rubbing on bone. Underneath the bursa lies the rotator cuff muscles. They're made up of a

Page 20

group of four muscle-tendon units that help to move the arm in various directions.
They also help to provide stability to that joint so that the ball is staying in the socket, as opposed to falling out. There are also ligaments that will keep that ball in the socket. That becomes difficult, because it blends -- those ligaments blend into a capsule.
The capsule encompasses the joint – again, to provide stability to the joint, to keep it in -- as well as to provide a close space so that there's lubrication within the joint so that the bones are not rubbing over each other, but there's a fluid layer in there that provides a shock-absorbing, lubricating-type atmosphere for those bones.
There is a labrum. And a labrum is a cuff of tissue that surrounds that socket to make it a little bit deeper so that the ball of the arm bone will not fall out of the socket. And then we have the two bones.
Q. Okay. You mentioned the -- what laypersons might call the ball-and-socket joint.
A. Um-hum.
Q. Is there a medical term for that joint?
A. I just call it a ball-and-socket joint.
Q. Okay.

Page 21

A. I'm sure there is one.
MR. RONWIN: Let me interrupt for a moment.
MR. PILKINGTON: Sure.
MR. RONWIN: Do you think we ought to use this?
MR. PILKINGTON: You can use it --
MR. RONWIN: Do you think this would be helpful?
MR. PILKINGTON: You can use it with your questioning, but I'm okay with -- I'm okay to keep going. Okay, Doctor?
MR. RONWIN: All right.
Q. (BY MR. PILKINGTON) The -- you also mentioned the AC joint.
A. Yes.
Q. And you said that under the acromion --
A. Um-hum.
Q. -- bone lies four tendons, correct?
A. Right.
Q. Where is the acromion bone?
A. If you were to go to the front of your shoulder and follow the collarbone towards the outside of your shoulder, you're eventually going to come to a gap, and then the next bone. That next bone more towards your outside of your shoulder is the acromion. And again, it

comes from the back side of your shoulder, from that scapular shoulder blade.
Q. And underneath that acromion bone is the -- are the rotator cuff tendons?
A. There's a bursa, and then some of the rotator cuff tendons. Remember, it's a blend of four of those muscle-tendon units, so two of them will be lying underneath that bone.
Q. So you have the bone, and underneath the bone you have the bursa sac --
A. Correct.
Q. -- correct? And underneath that bursa sac are some of the four rotator cuff --
A. Correct.
Q. -- tendons, correct?
A. Correct.
Q. And is it fair to say that the top rotator cuff tendon underneath that bursa sac and that bony area is the supraspinatus tendon?
A. Yes, that's fair to say.
Q. And is the supraspinatus tendon the top, or uppermost, tendon of the rotator cuff tendons?
A. Yes, it is.
Q. And the supraspinatus tendon holds the supraspinatus muscle to the acromion?



A. Correct. The tendon is an attachment from bone to muscle.
Q. Doctor, in your clinical practice, which of the four tendons do you most often see as a partial or complete tear?
A. The supraspinatus.
Q. Based on your clinical experience, why is that the most common of the four tendons to be torn, either partially or completely, if you know?
A. Again, this is probably hypothesis, but for many of our patients, we will see that there may be some impingement that goes on. The impingement can come from that tendon rubbing along the bony surface of the acromion. That creates some scar tissue to form in there, and that creates a degenerative state that at some point for some patients later on may result in tendinitises, partial tears, full tears.
Again, medicine is not an exact science, so we can't say that is the one and only factor. Certainly just with overrepetitive overuse, you can also have some degeneration with time in that tendon itself that may not come from impingement, and just comes with the natural process of injury and -- and aging.
Q. Let me focus on a few things of what you've said and ask a more general question, some of which you



already answered. But what are some of the causes of torn rotator cuff tendons?
A. Again, in medical science we're not perfect, but we have two general classifications: acute, which would be traumatic injuries. Somebody fell. It could be skiing, could be, you know, an elderly patient who slipped on the ice and grabbed onto something. But there is an injury that directly results in a tear. And the second class would be one of degeneration, which is a slower process and may not be related to any injury.
Q. And the degenerative process could be the result of repetitive or overuse, correct?
A. Yes, it could.
Q. Or the degenerative process could be just the normal aging process?
A. Absolutely.
Q. Arthritis, bone spurring, that sort of thing?
A. I'm not exactly sure what you mean by "arthritis," because arthritis does not affect the tendons or the muscle. It affects the -- the joint surfaces.
Q. I understand. But the -- the degeneration from the aging process, do you have any understanding as to why that will cause a tear or ruptured tendon?



A. What we speak of in the degeneration process is that when we're young, that tendon is healthy. It has properties of elasticity and stretch. It's able to recover from, you know, the stretch that we may do with it from day to day.
In the aging process, that tendon loses some of that elasticity and, again, you know, may even develop some scar tissue within it. It loses that capability of stretch and the capability to come back to the natural state or, you know, be the healthy state. And that's what we talk about when we talk about degeneration.
Q. Would you also agree -- you mentioned impingement syndrome before?
A. Um-hum, yes, I did.
Q. And you described that process as well, correct?
A. Yes.
Q. Do you also recognize that impingement syndrome is a cause of rotator cuff tears?
A. Again, medicine is not exact. And we have recognized that in the past. There is some question at this point whether that may be true or not. That's recent literature in sports medicine right now. And unfortunately, you can find literature to support either side.



04611547-742a-4e96-903b-ddf0b207a131

Q. But --
A. But in general, in the -- in the past we have definitely thought of that as an etiology.
Q. Meaning impingement syndrome can result in rotator cuff tears?
A. Chronic impingement syndrome could result in partial or full tears of the supraspinatus tendon.
Q. Doctor, do you see rotator cuff tears in the elderly population?
A. Yes.
Q. And, Doctor, when you diagnose those rotator cuff tears in the elderly population, is your diagnosis mainly of a degenerative origin?
A. Not necessarily. Some, again, of our patients will have that traumatic presentation. A perfect example is wintertime here and slipping on ice and grabbing onto something to support them. So it's not fair to say that that's the only source.
Q. But absent an acute injury, with the elderly population who present with a torn rotator cuff tendon, is it primarily the result of the degenerative, or the aging, process?
A. I can't say that it's primarily. In the patients that come in without an acute injury, yes. But, again, in the patients that come in with an acute injury,



there's no way of us -- for us to know that.
Q. Do you keep up on the published literature as it relates to rotator cuff injuries?
A. I've recently attended the annual American College of Sports Medicine where, again, we did, you know, have some current literature presented to us. I from time to time will read my journal articles on sports medicine. It just happens -- it just depends on what happens to be published that -- that month.
Q. Doctor, have you seen any scientific studies that show that in some cases rotator cuff tears may be asymptomatic?
A. Yes.
Q. Would you better explain those studies to the jury?
A. I think that's easier to better explain if you happen to have those studies available, because again, there are -- you are able to pull up literature on either side. I guess what you're asking me is, how can that be possible?
Q. No, no. What I'm -- what I'm asking you is this: Do you recognize that the scientific community -- let me start over. Do you recognize that partial rotator cuff tears can be asymptomatic?
A. Yes, I do.



Q. And do you also recognize that complete rotator cuff tears can be asymptomatic?
A. Yes, I do.
Q. And by "asymptomatic," the patient is not complaining of symptoms or problems that would be suggestive of a partial or a whole tear, correct?
A. That's correct. Again, that's my area of sports medicine, is to conservatively treat patients. And so in the past -- and again, medicine changes and evolves. But in the past, before we had arthroscopic intervention, many times I would look at my patients who were elderly -- and again, "elderly" is a definition that varies from doctor to doctor. So I might look at my patients who were maybe 75, 80 and older and discuss with them a conservative approach even if I had MRI documentation of a torn rotator cuff.
There's a high probability in our elderly patients that if we do do rotator cuff repairs, they're immobilized for a period of time. And after mobilization, they can present with a frozen shoulder, and it makes it very difficult for them to get that full range of motion back.
So I, in my elderly patients, would treat them conservatively if I could obtain pain control or an asymptomatic nature in them. So I have that option. Not



everybody needs to have surgery for rotator cuff tears, dependent on their age.
Q. So the first line of treatment in a symptomatic rotator cuff problem would be medication, physical therapy, exercises, that sort of thing?
A. It's age-dependent. In a younger person -- and again, you know, that's from doctor to doctor, but I would classify a younger patient even 75 and younger -- you would probably want to do surgical intervention on those patients, because over time if you did not, again, part of the function of the tendon is not just to help move the arm, but to hold the arm or that bone in place.
So if you had a younger person who had torn that particular tendon and was going to live with that tear for the next -- and again, medicine isn't exact, so we don't have an exact time frame. Could be 10 years; could be 15 years; could be 20 years -- the shoulder bone could start to move up until it sits underneath that bony roof of the AC joint, and then you lose mobility there.
So in a younger person, you would approach them surgically. In an elderly patient, you would have the opportunity to either treat them conservatively or surgically. And in the past, before the advent of arthroscopic repairs, we treated most of our patients who were in the elderly category conservatively.

Q. But am I correct, Doctor, that a patient can have a rotator cuff tear, a partial tear, but not experience any symptoms?
A. Yes, they can.
Q. And a patient can have a complete rotator cuff tear and not experience any symptoms?
A. Yes, they can.
Q. And once the symptoms arise, or once they present you with the symptoms, you then determine what type of treatment you will employ?
A. Correct.
Q. Doctor, are you aware of any epidemiological studies that show that the ingestion of statins can cause rotator cuff tears?
A. I am not.
Q. Rotator cuff injuries of any kind?
A. I am not.
Q. Are you aware of any epidemiological studies that show that Baycol in particular can cause rotator cuff tears?
A. I am not aware of any.
Q. That -- any epidemiological studies that establish that Baycol can establish -- that can cause any type of rotator cuff injuries?
A. No, I'm not.



Q. Doctor, a more general question: Are you aware of any published studies, epidemiological studies down to --
A. Evidence-based medicine?
Q. Yes. Are you aware of any studies that in any way establish that statins can cause rotator cuff tears?
A. I am not.
Q. That statins can cause rotator cuff injuries?
A. I am not.
Q. Doctor, are you aware of any studies that establish that Baycol in particular can cause rotator cuff tears?
A. I am not.
Q. That Baycol can cause rotator cuff injuries?
A. I am not.
Q. Let's turn to your care and treatment of Mr. Ronwin.
A. Okay.
(Deposition Exhibit 3 was marked.)
Q. Doctor, I have marked as Exhibit Number 3 a compilation of your off -- your clinic's office notes. And would you just take a moment to confirm that those are, in fact, your office notes?



A. Yes, they are.
Q. Doctor, I have put those in chronological order. You are certainly free to refer to your chart or the exhibit. I'd suggest the exhibit might be easier to follow. But when was the first time you saw Mr. Ronwin?
A. September 4, 2001.
Q. Do you know how he came to your clinic?
A. He presented to our clinic with left shoulder pain.
Q. But do you know how he was referred to your clinic?
A. If you give me a sec --
Q. Sure.
A. -- I can refer to our chart. It's been a while.
Q. That's fine.
MR. RONWIN: What exhibit number did you make that?
MR. PILKINGTON: 3.
MR. RONWIN: 3?
MR. PILKINGTON: Yes.
MR. RONWIN: And that's all of the four times she saw me?
MR. PILKINGTON: Exhibit 3 is the entire office notes for the Northern Colorado Orthopedic



Associates.
MR. RONWIN: Including Dr. Knauer's?
MR. PILKINGTON: Yes.
MR. RONWIN: Oh, I see. I don't have that part with me.
MR. PILKINGTON: Well, I gave it -- didn't I give that to you? There you go.
MR. RONWIN: Oh, you gave it to me. All right.
A. We have an intake form, and on that form it was marked that he presented to our office from the Yellow Pages.
Q. (BY MR. PILKINGTON) Okay. In any event, he came to your office and you saw him on September 4th of 2001?
A. Correct.
Q. What were his complaints?
A. Left shoulder pain.
Q. How did he describe that pain?
A. His pain came on of insidious onset, which means there was not a traumatic injury or something that he could pinpoint as the onset of his pain. He first noticed it in February or March and was diagnosed via another physician as having bursitis and received a cortisone injection for that.

Q. Is this what he told you?
A. Yes, it is.
Q. What -- how did he describe his pain?
A. His pain was described, again, as insidious onset over the top surface of the shoulder. It would travel down the shoulder, the arm bone. It became worse with movement, such as raising the arm to the side in -- in a fashion that you might raise it over your head. Also, going behind the back would be something that made it worse.
It was a 10 out of 10 on a scale of 10. That's a rating of pain, so it was severe in nature. It could vary in quality from dull to sharp. It did not keep him up at night unless he got into a certain position that would aggravate it. He denied any numbness or tingling going down the arm.
Q. Was it your understanding that the treatment to date was simply cortisone injections?
A. That's correct.
Q. Doctor, I want to go back to the first cortisone injection. He was first diagnosed in February or March as having bursitis, correct?
A. Correct.
Q. Did he tell you that that pain had resolved with that cortisone injection?



A. He said initially that it did, and later on, in my summary, it appears that it didn't -- it may have helped, but it didn't make it go away, which was why he was presenting. So that can happen many times where you'll get a temporary response.
Q. Indeed, you state in your notes, "He states that two months ago he had the insidious onset of pain," correct?
A. Um-hum -- yes. I'm sorry.
Q. And was it your understanding that from the time that he got his first injection to about two months before your office visit that the pain had resolved because of the cortisone injection?
A. Yes.
Q. So, Doctor, I'll represent to you that he had his first injection in March. Would it be your understanding, based on what he told you, that from March to sometime in July the cortisone injection had resolved his pain?
A. To my best understanding, yes.
Q. Did you take a history, Doctor, of his other orthopedic history?
A. Yes, I did.
Q. What -- what did -- what history did Mr. Ronwin provide to you?



A. In terms of surgical orthopedic care, anyways, we obtained that. In terms of, you know, what he may have seen an orthopedist for that did not require surgery, we did not. But his surgical presentations included a left shoulder transplantation of the ulnar and radial nerve, a left elbow surgery for a fracture, and a right rotator cuff repair.
Q. Did he also explain to you that he had a history of cervical degenerative joint disease?
A. Yes, he did.
Q. And let me jump down to the -- your notes about prior surgical history, correct?
A. Correct.
Q. Mr. Ronwin told you that he had left shoulder transplantation of ulnar and radial nerve?
A. Yes.
Q. What was your understanding of that surgery?
A. I didn't really think about it at the time --
Q. He also --
A. -- nor do I really now. It's --
Q. He also told you that he left elbow surgery for a fracture?
A. Yes, he did.
Q. And he also told you that he had a right



rotator cuff repair?
A. Correct.
Q. A surgical repair, right?
A. Yes.
Q. Did he explain the -- anything more about that right rotator cuff repair?
A. No, sir, and I didn't further ask.
Q. Did you conduct a physical examination?
A. Yes, I did.
Q. What did that physical examination show?
A. It showed -- again, I start with just a general observation, and he didn't appear to be in any acute distress. He was very cooperative with what I asked him. His left shoulder didn't seem to have any swelling about it, any muscular wasting. He had some tenderness over his AC joint and his corticoid process. So again, those are areas in the shoulder that we will specifically push on to see if they reproduce pain.
We looked at his motion in his shoulder, both actively, meaning what he could do on his own, which was somewhat restricted, as well as passively. So I will also, without him having to activate his muscles, move his shoulder through motion. And again, that was slightly restricted.
Q. Doctor, let me go through his range of

motion.
A. Yes.
Q. First, you described it in your notes as flexion.
A. Yes.
Q. What is flexion?
A. Forward flexion means that you raise the arm in front of your body.
Q. So I'd just be raising it in front of my face, so to speak (indicated)?
A. That is correct.
Q. His was 120 active and 160 passive; is that correct?
A. That's correct.
Q. Mr. Ronwin, I believe, was 77 years old at the time of this office visit, correct?
A. That's correct.
Q. Is 120 degrees active flection normal for a man of his age?
A. No.
Q. What would be normal?
A. Normal will be probably somewhere between 160 to 180. And again, there's a wide, you know, variety of normal, depending on what conditions may be. So that would be a normal person who does not have restrictions



secondary to degenerative joint disease.
Q. If a person had restriction due to degenerative joint disease, would 120 degrees flexion be considered normal, or within normal range?
A. For that person, yes. And again, if, you know, we're looking at a healthy person, then I would say we were looking at a range between 160 to 180.
Q. And now -- and we're talking about a person his age?
A. Correct.
Q. Abduction, what is that?
A. Abduction means you're rising -- you're raising your arm to the side, so coming away from your body up over your head.
Q. And that was 160 active and 180 passive?
A. Correct.
Q. For a man of his age, would that be normal?
A. Yes.
Q. The next level was IR. What does that refer to?
A. Internal rotation. And to test that, you are asking the patient to raise their arm up their back, so up their back, reaching up their spine as far as they can go (indicated).
Q. And how far did Mr. Ronwin reach?



A. He went to T8. And T refers to the rib, the thoracic rib, so Number 8 refers to eight out of 12 of those ribs.
Q. For a man of his age, would that be within the normal range?
A. That varies greatly. In general, that would probably be less than a man of his age.
Q. And -- but I did note that you have, "This is equal to the collateral side."
A. "Contralateral," meaning the opposite side, so that was equal to his right arm.
Q. So his left arm, for which he was -- left shoulder, for which he was complaining, he could reach behind his back the same as he did with his right?
A. Right. And that's, you know, always something that you can compare to for an individual. If they have two healthy sides, then you can compare. Now, I can't tell you whether his right side is healthy or not healthy --
Q. Sure.
A. -- without having X-rays and doing an evaluation on that.
Q. But in any event, the internal rotation for his left side was the same as his right?
A. Correct.



Q. And the ER, what does that refer to?
A. External rotation. So holding -- can I just demonstrate? Holding your arms, your elbows, next to your body, you rotate out like a gate or a door (indicated).
Q. And what did you find?
A. His external rotation was 45 degrees. And again, that was equal to his opposite side. And one thing that I would probably mention is, again, I'm not -- I didn't mention in here when he had his rotator cuff repair.
Sometimes with a rotator cuff repair to the opposite side, you may have some reduced motion. So again, I can't tell you whether that's normal for his other side or -- or not normal, but it is a comparison to his other side.
Q. Would 45 degrees be normal for a man of his age?
A. It can be.
Q. But in any event, his external rotation was the same for his left as his right?
A. Correct.
Q. Did Mr. Ronwin ever tell you why he had right rotator cuff surgery?
A. No. We didn't discuss that.

Q. Or when?
A. That may be on our intake form, again. I can refer back there, if you'd like, and see.
Q. Sure.
A. No. I have listed quite a few with no dates, and that was not something I asked.
Q. Now, the next entry of "Strength abduction, ER, IR, biceps, triceps, 5/5, no pain," what does that mean?
A. We're looking at the different muscle groups around the shoulder. So again, we already discussed what the motion of abduction, external rotation and internal rotation are. So you have the patient hold that, that end point of motion, and see what their strength is at that point. 5 is full strength.
And bicep and tricep would include the front of the arm muscle and the back of the arm muscle. So not only did he have full strength of those muscle-tendon groups, but there was no pain when we were resisting that testing.
Q. But you did find the supraspinatus 4 on a scale of 5 and painful?
A. 4 minus over 5.
Q. Okay. What does that refer to?
A. That refers -- and again, it's a little bit



subjective. But 5 is full strength. 3 would be the ability just to hold up an arm against gravity, without any resistance on it whatsoever. So it's a measure from full strength to not being able to move the arm at all, with 3 kind of being your middle ground.
Q. And what would 4 minus refer to?
A. 4 minus would refer that he was weak and that he was able to withstand a little bit of resistance to pushing an arm down from the abducted position (indicated).
Q. What you're doing is, you're holding your arm away from your side in the abduction position?
A. Correct (indicated). And honestly, for supraspinatus you bring it in at a 45-degree angle, so it's not all the way out to the side. And that isolates strictly the supraspinatus, instead of bringing the deltoid muscle into play also.
Q. Now, what does that tell you? What did that tell you, as a clinician?
A. It tells me that he has a supraspinatus, or what we would term a rotator cuff problem, perhaps a bursitis. Again, you know, it's very difficult to separate what a tendinitis, a bursitis might be, so you're looking at things that may cause weakness in that particular group.



And it could be anything from arthritis at the AC joint, that acromioclavicular joint. It could be from arthritis in the glenohumeral joint, which is the true shoulder joint. It could be coming from a bursitis. It could be coming from a tendinitis, a partial tear, a rotator cuff tear. Unfortunately, sometimes it can even come from a nerve impingement, or a nerve being trapped in the neck.
So it's not specific to one thing. But it gears -- when you look collaboratively at the whole history and physical exam, it helps you to start to figure out in your whole entire differential diagnosis what specifically you may be looking at.
Q. Now, the next entry in your notes -- and I'll quote -- "Impingement test positive in forward flexion IR with a mildly positive cross-arm test."
A. Um-hum.
Q. What does that mean as a clinician -- to you, as a clinician?
A. It's a term -- again, in orthopedic sports medicine, there's names associated to many of these tests. And it was a description of what is called a Hawkins test. And a Hawkins test is to look to see, when you put the bone of the shoulder in a certain position, it will bring bony prominences, it will bring tendon, it



will bring bursa all together and potentially cause a pinching sensation in somebody who may have impingement syndrome.
So it was a test to look for that. They're not 100 percent sensitive or specific, but they can, again, when you put the whole picture together, be helpful in determining your diagnosis.
Q. But this impingement test was a test to look for an impingement in the acromion area?
A. In that whole general area: the acromion, the bursa, the tendon that lies underneath it.
Q. The tendon you're referring to is the supraspinatus tendon?
A. Correct.
Q. Okay. And what was the result of your impingement test?
A. That that did indeed reproduce his pain.
Q. That is, it was positive for some degree of impingement?
A. It was positive for reproducing pain, which may go along with impingement.
Q. Now, you have an entry for radiographs. Were any X-rays taken at this time?
A. There was a review of radiographs, which means that they came from the outside and that we did not

take them ourselves.
Q. Who brought those?
A. Mr. Ronwin brought those in.
Q. Do you know which radiographs you reviewed?
A. I reviewed radiographs of his shoulder.
Q. Do you know the source of those radiographs? In other words, where were those radiographs taken?
A. I don't have that information available to me at the moment.
Q. Do you know how many you reviewed?
A. I don't have that information available to me at the moment either.
Q. Did you review the radiographs or the X-rays that Mr. Ronwin provided you?
A. At that time, yes.
Q. And what were your findings?
A. That there was a mild amount of arthritis in the true shoulder joint.
Q. Is that the ball and socket?
A. That's the ball-and-socket joint. There was no migration of that arm bone up. Again, as we discussed previously, with tears that are older, you can actually see the bone start to migrate up underneath that AC joint, so that was not occurring. He had a little bit of spurring, or extra bony formation, at the end of his AC



joint.
And then we -- we look with a specific view called, many times, a scapular wide view -- and I can't tell you if that's what this was because I didn't delineate it -- but at the end of that acromion itself. And we will type that. And that's what's reflected here, is a Type II acromion.
If the acromion goes straight across, it's a Type I, so it's less likely that that's going to cause any impingement. With a Type II acromion, there may be a slight curve or hook to the end, so it may or may not contribute to impingement of the bursa and the tendon underneath. And then with a Type III, there's a much larger hook. So again, many times, there is that contribution of impingement.
Q. So is this your only documented findings or readings of those X-rays?
A. That's true.
Q. Did you keep the X-rays in your office?
A. I honestly can't tell you that because, again, I transferred cared to (sic) Mr. Ronwin, and I'm not sure what happened, if he took his X-rays home, or if they stayed in our clinic.
Q. Let me better understand your three basic findings with respect to your X-ray review. First, you



found some mild degenerative change of the ball and socket, correct?
A. Correct.
Q. And is it correct to describe that as a degenerative change?
A. Yes.
Q. Is it an arthritic change?
A. Yes.
Q. Is that sort of change, that degenerative change, what you would expect in a 77-year-old man?
A. It's within the normal limits of that. We run a wide range of people who have severe arthritis in that joint at that age to patients that have no arthritis on X-ray documentation of that joint, so . . .
Q. You also found mild spurring at the distal AC joint?
A. That's correct.
Q. And when you say "mild spurring at the distal AC joint," the distal meaning the closest to the ball and socket?
A. Correct.
Q. And is that spurring -- is that the spurring that would go downward (indicated)?
A. Correct.
Q. And by "downward," I'm pointing down into



the bursa, as well as the tendon area --
A. Correct.
Q. -- correct?
A. Correct.
Q. And is that the type of spurring that is commonly referred to as impingement?
A. It can be, yes.
Q. Doctor, you also -- the third major finding that you found was a Type II acromion?
A. Correct.
Q. And I believe you described a Type II as a mild curve or a mild hook at the end of the distal acromion?
A. That's correct.
Q. And this slight curving or hooking may contribute to some bursitis or tendinitis?
A. It might. There are, again, many patients who have it who don't. There are patients who have it that do. And sometimes MRIs can further delineate that. But it is something that could contribute, or with other factors along with it, could contribute to impingement syndrome.
Q. But, Doctor, would you agree that these three findings are consistent with a finding of impingement syndrome?

A. They could be consistent with that, yes.
Q. And indeed, Doctor, impingement syndrome can lead to tendinitis?
A. It can.
Q. It can lead to tendon tears, correct?
A. It can. And again, medicine isn't exact, so there is many people who have these same findings who it doesn't. But in his particular case, it seemed at that point like it probably was.
Q. And indeed, your impression, Doctor, at the time was "left rotator cuff tendinitis versus tear," correct?
A. That's correct.
Q. And what -- explain to the jury your thought process for that impression or diagnosis.
A. The history, the complaints, the physical exam all coincided with a differential diagnosis, meaning that many times you can't just say that there's one thing that could cause this, because there may be two or three, and you're left to prove or disprove which one may be the true cause.
Without having a way to look at that tendon, because X-rays do not show tendon, my conclusion was that this was either a tendinitis versus a tear. How do you diagnose a tear? You either obtain an MRI, which is



probably 90 percent sensitive, or you go in arthroscopically and look, which, again, you're not going to be doing on every patient.
So without the availability to see the integrity of that tendon that's lying inside the shoulder, you make a presumption that it's either a tendinitis, and if it's not resolving with treatment, then there's a chance that it may be a tear.
Q. Doctor, at this time -- let me back up.
A. Yes.
Q. In that answer, Doctor, you talked about cause, and you talked about your diagnosis of either a tendinitis or a tear, correct?
A. Yes.
Q. Mr. Ronwin did not present to you any acute injury, correct?
A. No, there was no acute injury.
Q. At this time, meaning in September of 2001, Doctor, did you form any conclusions as to what the cause of his tendinitis or possible rotator cuff tear was?
A. At that point -- and again, that's not reflected in my notes. But looking back, if I had to answer that question, I would have probably said it was a result of a tendinitis or a tear that would have been lying more in the second type of category of injury that



we talked about, degenerative in nature, impingement-type, as opposed to an acute injury.
Q. Your plan, Doctor, was to discuss -- well, let me back up. You discussed the implications of your diagnosis with Mr. Ronwin in some detail, correct?
A. That's correct.
Q. What was your suggestion to Mr. Ronwin as to the plan?
A. Mr. Ronwin had already had an idea about what the treatment he would like to receive would be. Again, in my area of medicine, I try to present options and have the patient make an educated decision about how they would like to pursue.
Mr. Ronwin had already suggested he was not particularly interested in receiving an anti-inflammatory-type medication for this. He had had a good result with the cortisone injection previously and was in favor of pursuing another injection.
Q. And did you provide him with that injection?
A. Yes, I did.
Q. Doctor, you also explained to him that he was candidate for an MRI?
A. Yes.
Q. What did you tell him?
A. Well, after the injection, I will always



retest that -- that strength in the supraspinatus tendon. Again, this is not 100 percent sensitive, meaning it can't tell you for sure what is going on.
But when you put the cortisone injection into the area of the shoulder, which we term the subacromial space, there's a numbing medicine in there. The numbing medicine can be something that blocks the pain.
So when you retest strength, if there's good strength there, and you have a return to maybe a 5, 5 minus strength, with 5 being complete strength, it may be an indication that there is integrity of the supraspinatus tendon, meaning that there's no tears.
If you're able to still demonstrate weakness in that, it could still be the result of a tendinitis, but it also leads you to have some suspicion that there may be a tear in there. So I counseled him on the fact that we did have an MRI that would assess the integrity of that tendon, if he desired.
Q. Or an arthrogram?
A. Or an arthrogram, which Mr. Ronwin had expressed that he had a bad experience in an MRI because of the claustrophobia that can be associated with it or just the closed, you know, tube that you need to go into. So an arthrogram is an option to look at the integrity of

the tendon without having to do an MRI and having to lie in a closed space.
Q. So you offered to Mr. Ronwin the options of an MRI or an arthrogram to better understand the nature of his rotator cuff injury, correct?
A. That's correct.
Q. And at this time he declined --
A. That's --
Q. -- either procedure?
A. That's correct.
Q. Doctor, to summarize your first visit of September 4 of 2001, you took a history, correct?
A. Correct.
Q. You did an examination?
A. Correct.
Q. You reviewed the X-rays that Mr. Ronwin brought to you, correct?
A. Correct.
Q. And based on your -- based on all of those things and your clinical judgment, it was your impression that he had a rotator cuff tendinitis or a possible tear, correct?
A. Correct.
Q. And the rotator cuff tendon that you were most concerned about was the supraspinatus tendon,



correct?
A. Correct.
Q. And based on all of this information that you had at the time, it was your conclusion and it's still your conclusion that the probable cause was a degenerative cause?
A. Correct.
Q. Doctor, you then told Mr. Ronwin in September to return to the clinic in about three weeks?
A. Correct.
Q. He did return in the end of -- at the end of October?
A. Correct.
Q. Specifically, October 31st?
A. Correct.
Q. Is this the next time that you saw him?
A. Yes, it is.
Q. What did he present to you on Halloween of 2001?
A. That his pain had nearly resolved with his second injection, but over the month of October his symptoms had again increased, meaning pain.
Q. So he told you that for about a month it went away, but now it's coming back?
A. Correct.



Q. And how did he rate his pain in October?
A. At that point -- and I usually ask, What is the most severe pain? -- his most severe pain that he would have would be a 6 out of that scale of 10.
Q. Did you talk to him about possible medications, possible procedures and further testing?
A. Again, he had no desire to take medication. He found the cortisone to be very helpful. He did not want to obtain an MRI. But -- but he states if his pain didn't resolve, perhaps he would like to pursue the arthrogram.
Q. Did you conduct a physical examination?
A. Yes.
Q. Was the physical examination similar to what you conducted in September?
A. Similar.
Q. And were the findings of this physical examination consistent with your findings in September?
A. Yes, they were.
Q. And it appears that his flexion improved significantly.
A. Correct, it did. Unfortunately, his abduction got a little bit worse.
Q. Okay.
MR. RONWIN: I'm not healthy, much to my



chagrin.
Q. (BY MR. PILKINGTON) But you still had the impingement issues as well, correct?
A. Correct.
Q. And your assessment in October was what, Doctor?
A. Again, he had the mild arthritis to both his true shoulder joint and the AC joint, that he had a tendinitis versus a tear, and that he was developing some restriction to motion, or a frozen shoulder.
Q. What was your plan?
A. Again, involving the patient, his desire was to pursue another cortisone injection.
Q. He declined any further testing, however, correct?
A. At that point, again, I believe that his thought process was, Let me see if my shoulder gets better, and if not, then maybe I would like to pursue the arthrogram.
Q. You offered him physical therapy?
A. Yes, I did.
Q. And physical therapy is an important treatment option for adhesive capsulitis?
A. It can be. One can also, you know, in a patient who is compliant, can treat it without. But it

Page 58

is -- can be something that's very beneficial.
Q. Is that one of the reasons you suggested to him that he pursue physical therapy?
A. Both for the fact that he was continuing to have recurrence of his painful condition, as well as the fact that I thought he was developing a frozen shoulder, those two.
Q. Did he decline the physical therapy?
A. Yes, he did.
Q. I noticed a telephone call of December 21, 2001 for a referral to a podiatrist.
A. That's correct.
Q. The next time you saw Mr. Ronwin was in February of 2002?
A. That's correct.
Q. What did he present to you in February of 2002?
A. Again, with shoulder pain. His third injection, which was the second one given by myself, did not seem to offer him any relief.
Q. Now, I'll read this to you, Doctor. "He states that the onset used [sic] to be at the same time that he was utilizing Baycol. He has discontinued that since but has not had a resolution of his pain." Did I read that correctly?

Page 59

A. Yes. We're not perfect at reviewing our chart notes. I'm sorry.
Q. That's okay, Doctor. I'm not perfect when I speak, either. So, Doctor, in any event, he told you that -- in February of 2002 that this pain, the shoulder pain, began about the same time he was using Baycol?
A. That's correct.
Q. And that he had stopped using Baycol?
A. Correct.
Q. Did he ever tell you that he had used Baycol before?
A. I can again refer back to his initial intake and see if it was listed on that. And it appears that when he came in in September of 2001, his medications, as dictated on that note, were Zocor and aspirin. So that was the first statement of Baycol that I was aware of.
Q. I'll represent to you that he filed a lawsuit against my client in September of 2001. Did he tell you -- at any time before February -- or let me start over. At any time February 12th or before, had he told you that he'd filed a lawsuit against my client?
A. I do not recall any statements of filing a -- a lawsuit.
Q. But in any event, he said to you in February that this pain began about the same time he was taking

Page 60

Baycol?
A. That's correct.
Q. Now, how did he describe his pain in February of 2002?
A. In February he described his pain as noticed in the upper portion of the arm. It occurred with movement, putting on his clothes, reaching forward, reaching behind his back. It was a short, sharp pain, with the worst at that time being a 5 on that scale of 10.
Q. 4 to 5?
A. 4 to 5 out of 10. It was not causing him any symptoms at night; i.e., that would not wake him up at night with pain. And he was not using any analgesic pain medication for this.
Q. Now, if I compare his symptomology in February of '02 to September of '01, which was six months before --
A. Correct.
Q. -- thereabouts, how would you compare the two?
A. That his pain had improved from a severe nature of 10 out of 10 to a moderate nature. At times initially at night, if he got in certain positions, it was waking him up. Now it was not. Otherwise, the pain

Page 61

was still present with the same types of movement, was perhaps maybe a little more localized to just the arm, as opposed to the top of the shoulder and the upper arm.
Q. But in your clinical judgment, had his shoulder improved?
A. Improved in terms of pain, yes.
Q. Did you conduct a physical examination as well?
A. Yes.
Q. Is your physical examination similar to that that you described before?
A. Similar.
Q. And it appears that his flexion and abduction was very -- was normal.
A. Yeah. His abduction was equal to the other side. So again, that indicates that that mild frozen shoulder was resolving. Strength testing was a little bit improved, but still caused him pain, was getting closer to a true normal 5 over 5, but wasn't quite there.
Q. And you note, "The Hawkins test is positive," correct?
A. Right.
Q. That's the impingement test?
A. Correct. That's the one we discussed earlier.

Page 62

Q. Again, a positive impingement test is consistent with some sort of impingement syndrome?
A. It can be. They're not 100 percent sensitive.
Q. But you use that test in diagnosing one with impingement syndrome, correct?
A. In assisting us in making that diagnosis.
Q. Now, your assessment was really the same as it was in October of 2001 --
A. Yes.
Q. -- with the exception of the frozen shoulder had resolved?
A. Correct.
Q. What was your plan?
A. Plan. Again, I encouraged him to obtain an MRI or -- I didn't put it there -- or the arthrogram, obviously, if he was not amenable to the MRI. It would allow us to fully evaluate the extent of his arthritis, the extent of the integrity of his tendon, to find out if he was having ongoing, you know, problems, whether he was a surgical candidate.
Q. Did he decline those?
A. He did.
Q. The last time you saw Mr. Ronwin was on May 16th of 2002?

Page 63

A. That's correct, I believe. I'd have to look through our --
Q. Just take a moment.
A. -- chart. Okay. Because I know he was seen by Dr. Knauer for a few times, and then I had seen him again. That appears to be true.
Q. So to better state the question, May 16, 2002 was the last time that you personally provided any sort of care and treatment for Mr. Ronwin?
A. That's correct.
Q. After May 16th of 2002, your colleague, Dr. Knauer, picked up the care and treatment?
A. That's correct.
Q. Do you have an understanding as to why she picked up his care and treatment in August of 2002?
A. Yes. When I am unable to conservatively manage a problem and it continues to be a problem for my patient, then it can be very helpful to pursue a second opinion. It could be very helpful to potentially pursue the possibility of surgical intervention. So when people aren't resolving, I refer them on to the next tier of care.
Q. Now, in May of 2002 Mr. Ronwin presented, again, left shoulder pain, correct?
A. Correct.

Page 64

Q. He was -- did you recommend that he take some sort of anti-inflammatory medication?
A. It is something that I always provided as an option for pain control --
Q. And --
A. -- so I -- I presented that as an option.
Q. And by presenting it to them as an option, is it your recommendation that your patients take that medication?
A. It's presented as an option. Again, when somebody continues to return with pain, it is one way to manage that pain. I don't force my patients to do anything that they're uncomfortable with, but it was presented as an option.
Q. I understand. So you presented this non -- or this anti-inflammatory medication to Mr. Ronwin repeatedly?
A. Correct.
Q. He declined taking that medication, correct?
A. Correct.
Q. He -- you also presented to him the option of an MRI or an arthrogram to better understand the nature of his injury, correct?
A. Correct.
Q. You presented that at each and every one of

Page 65

your four office visits?
A. Correct.
Q. And in each of these office visits, he declined either the arthrogram or the MRI to better understand the nature of his injury?
A. Correct.
Q. You conducted a physical examination, correct?
A. Correct.
Q. And what were the results of that examination?
A. The results were that there were no tenderness over the corticoid process where I palpated, or felt, that there continued to be some over the AC joint on that visit. His motion in regards to forward flexion, again, was essentially normal and equal to his right shoulder, as were internal rotation and external rotation.
In regards to strength, his supraspinatus continued to be slightly weak, while the remainder of the muscles seemed to have full strength. His impingement test continued to be positive, and everything else was essentially normal.
Q. And, Doctor, your assessment, though, was, again, the degenerative joint disease, as well as the AC

degenerative disease, correct?
A. Correct, as well as the tendinitis versus a partial tear.
Q. So since -- I'm sorry. Your plan at this time was to have another cortisone injection?
A. Per patient request, yes.
Q. And did you comply with his request?
A. Yes, I did.
Q. And what was the plan in terms of when he should return to the clinic?
A. That he would return as needed.
Q. Doctor, am I correct that you did not provide any care and treatment for Mr. Ronwin after May of 2002?
A. That's correct.
Q. That all of the care and treatment was handled by Dr. Knauer?
A. That's correct.
Q. And, Doctor, would you be in any position to comment on the care and treatment provided by Dr. Knauer after May of 2002?
A. No.
Q. You would defer to her?
A. I would defer to her.
Q. So when I get to trial, and if you're called



to testify at trial, you'll talk about your care and treatment from September of '01 to May of 2002, correct?
A. That's correct.
Q. But you will not be testifying about what happened after that?
A. No, I won't.
Q. Doctor, let me see if I can summarize your care and treatment during those nine months. Doctor, your initial di -- diagnosis was a left rotator cuff tendinitis versus tear?
A. Correct, along with a mild arthritis in the shoulder joint and the AC joint.
Q. And those continued to be your working diagnoses, correct?
A. That's correct, with the exception of that frozen shoulder that then seemed to resolve.
Q. Okay. So to summarize, during your nine months your working diagnosis was, one, a left rotator cuff tendinitis versus tear?
A. Correct.
Q. And your focus there was on the supraspinatus tendon?
A. Correct.
Q. And two, your working diagnosis was mild left glenohumeral degenerative joint disease and AC



degenerative joint disease, correct?
A. Correct.
Q. And, Doctor, no time during this nine-month period did Mr. Ronwin present to you with any sort of acute injury, correct?
A. No, he did not.
Q. And was it your working diagnosis that these -- this injury was the result of a degenerative process?
A. Yes.
Q. I'm about done, Doctor, and I know Mr. Ronwin will have some questions. Did Mr. Ronwin -- let me start over. Have you spoken to Mr. Ronwin since May of 2002?
A. I may have spoken to him postoperatively over the telephone, if I recall. And I think -- I would believe that would be the only time.
Q. Just to see how he was doing?
A. No. I believe I was on call one day when he called in in regards to -- I'm grasping now, because it's not documented anywhere -- but I believe pain management or -- or an update after surgery.
Q. At any point during your care and treatment of Mr. Ronwin, did he attribute any of his shoulder complaints to his use of Baycol?



A. He noted in the one visit on February 12, 2002, that at that point he noted his pain onset seemed to coincide with his Baycol use onset.
Q. But did he ever tell you, Doctor, at any point during your care and treatment of him that he believed Baycol caused his shoulder injury?
A. It's not documented here, but I believe at that visit he asked me if there was a potential that Baycol could have contributed to it. And we had, obviously, an off-record discussion about whether that was a potential or not.
Q. What did you tell him?
A. Again, this is completely from recall, but that as far as I knew from my opinion that it was not a direct link to a rotator cuff tear.
Q. You had never seen it in your practice, correct?
A. Correct.
Q. You had never seen it in the published literature, correct?
A. Correct.
Q. And you'd never seen it presented at any conferences, correct?
A. Correct.
Q. Doctor, during your care and treatment of


04611547-742a-4e96-903b-ddf0b207a131

Mr. Ronwin, did he ever complain to you about having blurred vision?
A. Not that I recall.
Q. Did he ever complain to you about having pain in the back of his legs?
A. Not that I recall.
Q. Did he complain to you about having any sort of leg pain?
A. Not that I recall.
Q. Did he complain to you about having any sort of back pain?
A. Not to myself.
Q. Did he complain to you about having any back pain that radiated down his legs?
A. Not that I recall.
Q. Did he complain to you about having any problems with his walk or his gait?
A. Not that I recall.
Q. Did he complain to you about having any right elbow pain?
A. Not that I recall.
Q. Did he complain to you about having cataracts?
A. Not that I recall.
Q. Doctor, are the only X-rays that you



reviewed the X-rays that Mr. Ronwin provided to you?
A. Yes.
MR. RONWIN: They were Torkelson's.
MR. PILKINGTON: They were Torkelson's?
MR. RONWIN: Um-hum. He's the only guy that ever took left shoulder --
MR. PILKINGTON: Okay.
MR. RONWIN: -- X-rays.
Q. (BY MR. PILKINGTON) Doctor, let me look at your file one more time. I may see something. Let's go off the record. I'm basically done. Let's take a quick break. But I might have a -- want to pull something out of your file, if that's okay?
A. Now, can I correct myself?
Q. Yes, you may.
A. On my first visit, I -- we developed an intake form after Mr. Ronwin was in our clinic. So if you do go back to that first visit on him, I was still asking review-of-symptoms questions, and he did describe blurry vision in his review of symptoms.
Q. Okay. I appreciate that, Doctor. And you understand that throughout this deposition that if you feel a previous answer needs to be corrected, you have that right?
A. Thank you.



(Discussion off the record.)
MR. PILKINGTON: Let's go back on the record.
Q. (BY MR. PILKINGTON) Doctor, in your file I note there's a report of September 4, 2001 by Dr. Survey -- Servi. And it looks like there are three pages -- actually, six pages with some handwriting there, correct? Do you have an understanding of what that -- this is?
A. Yes. And it looks like not all six of those are mine, because the handwriting changes.
Q. Okay.
A. But it was a request from Mr. Ronwin to define our acronyms that we use in our dictation.
Q. Okay. And let's have a copy made of this and marked as Exhibit Number 4. And is Exhibit Number 4 in response to this November 5, 2003 letter from Mr. Ronwin?
A. Yes.
Q. And we'll mark that as Exhibit Number 5. Can I take it this out?
A. You may, especially if you put it back together again.
Q. Doctor, I'm also looking at your file now. It looks like the last three pages in this file are some



documents completed by Mr. Ronwin.
A. Yes.
Q. I notice that there are -- this says pages 3 and 4. What does this go to?
A. I would assume that it came with the patient information form. This is a -- this stands alone by itself and is our general health history form. And again, it was developed after we initially saw Mr. Ronwin, and that's why my initial evaluation, it was all dictated in. And then we went to a form where the patient checked boxes and provided their own information if it needed to be listed. So I'm sorry it says 3 and 4. It stands by itself.
Q. Okay. And let's mark that health history form as Exhibit Number 6. And that's a health history form completed by Mr. Ronwin?
A. Correct, dated 8/28. And I think you might have to find which clinic note, because I can't quite read the year on there. And then reviewed October of 2003.
MR. PILKINGTON: Doctor, I thank you for your time. I know Mr. Ronwin has some questions. Let's take a break now and get these exhibits copied. Okay?
(Break taken from 10:33 a.m. until 10:43 a.m.)



04611547-742a-4e96-903b-ddf0b207a131

(Deposition Exhibits 4 through 6 were marked.)

EXAMINATION

BY MR. RONWIN:

Q. I'm going to try to refer to myself in the third person, with my last name, so as to dissociate myself from the two hats I'm sort of wearing, but I might miss. A lot of times I do miss, especially when I get excited about something. I wanted to ask you, in your education toward an M.D. degree, did you take chemistry?

A. Yes, I did.

Q. Do you recall what courses and how long each course lasted; in other words, a semester or two?

A. Correct. I believe there were two semesters of chemistry, two semesters of organic chemistry, and one semester of P. chem, physical chemistry.

Q. I see. And the first chemistry, was that inorganic chemistry?

A. The first chemistry was actually undergraduate chemistry, just a simple introduction chemistry course.

Q. I see. So that would have, then, certainly included inorganic chemistry, then; is that right? You --

A. Actually, it's before you would even get



into organic chemistry. It's --

Q. No, not organic. Inorganic.

A. Right, it would be inorganic chemistry, correct.

Q. That's what I'm saying.

A. Sorry.

Q. Okay. Thank you. And I wanted to ask you, you represented an opinion here about degenerative condition, or whatever, was actually a cause of the rotator cuff tear?

A. There -- are you speaking of degenerative -- a degenerative tendon or a degenerative joint disease?

Q. I don't know what you were referring to at the time. I didn't really quite hear it, and I was wondering --

A. Okay.

Q. I wanted to just rectify that.

A. I think that I was asked if there were -- there was an etiology of degeneration that could lead to a rotator cuff care that's separate from degenerative joint disease, which I think I tried to make clear when you were questioning me that they are two separate issues.

Q. Yeah.

A. Degenerative joint disease refers to the



wear and tear on the cartilaginous surface on the ends of the two bones where they come together to make a joint, whereas the degenerative tendon has nothing to do with bone. It has to do with losing the normal integrity and makeup of a tendon.

Q. Yeah. I see. Okay. And did you actually ascribe a -- a cause for Ronwin's rotator cuff tear?

A. No, I did not.

Q. Okay.

A. I did not have the capacity to obtain an MRI or arthrogram, which would actually look at the integrity of that tendon to see whether it was torn or not.

Q. No. I mean a cause of the -- of the --

A. A cause? If I had to give my best impression of a cause, I would -- I would have said at that time, as I would now, that it was most likely consistent with a degenerative tendon and a degenerative tear.

Q. Are you certain of that, though?

A. Am I certain?

MR. PILKINGTON: Objection, form and foundation.

THE DEPONENT: Does that mean I stop?

MR. RONWIN: Oh, no.

MR. PILKINGTON: Doctor -- Doctor, during



the course of questions I may have to object to the form of the question or the foundation of a question.

THE DEPONENT: So he needs to reformulate his --

MR. PILKINGTON: No, no. The purpose of that is for when that question may be presented at trial, I preserve my objections for the judge to rule on. You're still required to answer the question if you can.

THE DEPONENT: Thank you.

MR. PILKINGTON: Okay. I apologize. Would you like the question read back?

THE DEPONENT: Yes, please.

MR. PILKINGTON: Why don't you read back her answer before, too?

(Page 76, lines 14 through 20 were read back.)

A. So my answer to that would be, medicine is not an exact science, but to my best ability, I would -- I would say yes, that would be --

Q. (BY MR. RONWIN) I see.

A. -- my diagnosis and etiology of that problem.

Q. Okay. Um-hum. The next question I wanted to ask you is that --

THE REPORTER: Doctor, could you please

speak up?
MR. RONWIN: Oh.
Q. (BY MR. RONWIN) The next question I wanted to ask you, because of your association, if you don't feel that you want to answer the question, it would be all right with me.
A. Thank you.
Q. Do you consider Dr. Knauer a specialist?
A. She is a general orthopedist in the realms of primary care medicine. And specialties, yes, she has a specialization in orthopedic medicine.
Q. I see. Is she board certified for that purpose; do you know?
A. She is board certified in general orthopedics.
Q. I see. You had mentioned different -- that you shunt your patients off to specialists, and I just wanted to know if --
A. Yes, she would be considered one of my specialists that I would refer or ask a second opinion or a consult of.
Q. All right. Now, in the drafting of your report, first I'd like to ask you, do you have a day or days of the week when the only medical treatments you -- or -- or advice you offer is in the form of seeing



individual patients all day or part of the day?
A. Most of the day I see individual patients. I'm assuming you mean as opposed to doing surgery or assisting in surgery?
Q. Exactly, right.
A. I assist in surgery. And my -- the majority of care that I give is going to be patient-directed care in the office, evaluating patients, as opposed to doing surgery --
Q. Okay.
A. -- or assisting in surgery.
Q. All right. So we take an average day, you're likely to just see patients, then?
A. That's correct.
Q. And do you see them pretty much all day, let's say 8:00 to 5:00 or 9:00 to 4:00, or something?
A. No. I work part-time. I essentially put in 20 hours a week.
Q. Oh, I see. And so any -- during any one of those days, you'd only work for about half the day, or something like that?
A. I work three half days and one full day.
Q. One full day?
A. Correct.
Q. And on a full day, do you see patients all



day?
A. Yes.
Q. I see. And the other days you generally see patients all the half day?
A. The complete half day, yes.
Q. I see. Now, when you make your reports up, are you writing up the notes as people -- as patients give you answers to the questions?
A. Yes, I do.
Q. As -- as you're --
A. Yes, I do.
Q. I see. And then what do you do with those -- are they handwritten?
A. They're notes that I jot down on a scrap piece of paper, answers to my questions, and then from there I formulate my dictation.
Q. I see. And how far -- how -- how long after you've written your notes do you do the dictation?
A. It varies. If I have an opportunity, I will dictate immediately after seeing the patient. If I already have patients in the room, then that's where the notes become helpful, because I may be dictating them, in general, at the end of that half day.
Q. I see.
A. Very rarely I may end up dictating them the



next day.
Q. I see.
A. But my dictations are all in within one day after our office visit --
Q. I see.
A. -- with the majority being dictated either after the patient or at the end of that day of my work.
Q. Yes. Do you have occasion or have you experienced occasion where your notes are later questioned because the -- you've indicated that the patient has said X, but later the patient may say, It wasn't quite X; it was Y?
A. Very rarely. I can recall one patient who may have done that, absolutely.
Q. Yeah. They --
A. You never say "never." You never say "always."
Q. Right. Okay. Let's see. Oh, I think we'll get this marked as Exhibit 7.
MR. RONWIN: Is that right?
(Deposition Exhibit 7 was marked.)
MR. RONWIN: I've got copies for everybody. You can -- you can look at that, and there's your copy, and there's my copy and an extra one.
Q. (BY MR. RONWIN) You described various



04611547-742a-4e96-903b-ddf0b207a131

anatomical aspects of a shoulder. And I was wondering, is this a reasonable representation of much of what you described?
A. This is a reasonable non-3-D representation of a shoulder.
Q. I see. And I think you said that when the -- the acromion showed a sharp bend on the end --
A. It was a Type II acromion, which means that there was a mild to moderate curve of the end of that bone.
Q. Yeah. Or it could even be more serious, you said, like a Type III is what you pronounced it?
A. Some people's can be a Type III.
Q. Yes. Now, if you had a Type II --
A. Um-hum.
Q. -- is that acromion hinged to this white area coming off the deltoid muscle?
A. Is the acromion within that tendon; is that the understanding of my question?
Q. No. Is it -- a tendon hinges to a bone, doesn't it?
A. A tendon is an attachment to a bone --
Q. Right.
A. -- so bone is connected to muscle via tendon.



Q. Right. And the acromion is a bone, is it not?
A. The acromion is a bone.
Q. Right. And on this chart it shows a white area, which I assume coming out of the deltoid; is that right?
A. It's encompassed within the blend of that tendon, yes.
Q. Yes. And so what I'm trying to get at is, when the acromion has that sharp curve at the end that you referred to, which you used as a distinction between the various types of acromion situations, is that the tendon that's torn?
A. No. The -- the bend in that acromion points downward, down towards the floor. So what it's going to poke into is that bursa, which you have reflected underneath that acromion on your picture --
Q. Right.
A. -- and then the supraspinatus tendon underneath that.
Q. I see. So it could actually go through the bursa --
A. Yes, it could.
Q. -- and then hit the supraspinatus tendon?
A. It could, yes.



Q. I see. Did you have any reason to believe that in Ronwin's case it was actually doing that?
A. Based on X-ray, I cannot tell you conclusively that it is pinching down into that tendon. MRIs can be helpful in demonstrating that. Based on the tests that we do on physical exam, there was a suggestion that it could. Again, those tests are not 100 percent sensitive.
Q. I see. Now, you're aware that there was -- I underwent -- Ronwin underwent an arthrogram for --
A. I understand. I did not review that, as it was in care that was incurred after my release of you to -- release of Ronwin to Dr. Knauer's care.
Q. Okay. All right. Now, you also mentioned four tendons that came out of the supraspinatus muscle.
A. No. I referred to four tendons that made up the rotator cuff group, not that came out of the supraspinatus tendon.
Q. Oh, I see. There's just one tendon that comes out of the supraspinatus --
A. That's correct.
Q. -- muscle? All right. There's another tendon shown here just beneath that supraspinatus tendon. What is that tendon?
A. It is not labeled on your diagram. I can



tell you the four tendons that make up the rotator cuff group. I can't tell you what they're trying to depict in that picture.
Q. I see.
A. They could potentially be trying to depict the infraspinatus tendon --
Q. Um-hum.
A. -- but without having that labeled, I can't tell you.
Q. All right. And it looks in the diagram it comes out of the scapula, but it doesn't, does it?
A. It's very difficult to tell on this diagram.
Q. Okay.
A. And again, if that were the truth, it may be reflective of that infraspinatus, but it's difficult to tell. Again, it's -- when things aren't in three-dimensional, it's hard to tell where things may come from. And that's -- when we perform radiography, many times we get multiple views to try and pinpoint and localize things. So it's -- on a flat copy it's hard to tell.
Q. All right. Now, this glenoid that you -- that you see over there, is that a -- almost like a sac, like the bursa is?
A. No. The glenoid refers to the cup of that

shoulder joint, so it's a ball and a socket.
Q. Yeah.
A. That's the socket. The glenoid refers to the socket itself.
Q. Yes. So the glenoid is actually on both sides of that synovial membrane; is that right?
A. No.
Q. It's not?
A. It is only on the shoulder-blade side. It's the -- it's the cup that the ball fits into. It's called the glenoid fossa.
Q. Yes.
A. So it's only on the one -- it's that cup surface only.
Q. I see. So -- but the humerus seems to be coming into this one over here.
A. I believe -- again, it's not labeled. I would believe that that picture is trying to demonstrate the articular cartilage that lines the end of the bone and makes up that joint --
Q. Oh.
A. -- surface.
Q. I see.
A. And that's why you see it on the both sides of the picture.



Q. All right. So is the glenoid bone, or is it cartilage?
A. The glenoid fossa refers to the socket. The socket is made up of the bony portion, as well as the articular cartilage that lines the end of the bone.
Q. Oh, I see.
A. And I believe -- I believe that what they're showing in this picture is the articular cartilage surface.
Q. I see. Okay. All right. Now, I want to get -- what did you mean by the expression "asymptomatic rotator cuff tears, full or partial, asymptomatic"?
A. Asymptomatic means that it is not causing a symptom. There is no complaints of pain, numbness or tingling, loss of motion. You can have a tear without having it manifest symptoms.
Q. I see. Okay. All right. Now, I'll just go through something here. Mr. Pilkington had gone through your -- your various notes of my visits, and I just wanted to check on one or two things. You have in the September 4, 2001 visit, under Objective --
A. Yes.
Q. -- and then -- let's see -- one, two, three -- six, seven -- eight lines down, I believe it is, you see, "No subacromial crepitation." Then you have a



statement, "UENVI." What was that, again? What does that --
A. Upper extremity neurovascularly intact.
Q. I see.
A. So in my evaluation of that, I check a radial pulse, I check sensation to light touch of the fingertips, and I will do reflexes of the bicep, tricep and brachioradialis.
Q. Oh. So this really deals with the arm itself?
A. Correct.
Q. Okay. And then you have "Neck." Was that mean -- did that mean you examined the neck?
A. Correct.
Q. And what does the "FROM" stand for again?
A. Full range of motion, with the exception of the extension, or bending the neck backwards to, say, look up towards the ceiling --
Q. Um-hum.
A. -- only went to 5 degrees.
Q. I see. Is that normal or abnormal?
A. That is abnormal.
Q. Um-hum. What would normal be?
A. It varies from patient to patient and from, obviously, an age standpoint --



Q. Yeah.
A. -- because, again, many times as people are getting older, they have the development of some arthritic condition.
Q. Okay.
A. So a normal neck might bend back -- there you go. It depends on the person. You -- you could probably say 45 degrees or more.
Q. Yes. You pointed to my colleague?
A. To your colleague.
Q. But he might not be normal.
A. He may not. And unfortunately, we don't have two necks to compare to, like we have two arms.
Q. Okay. Great. Now, let's see --
MR. PILKINGTON: What's your opinion of me, Mr. Ronwin?
MR. RONWIN: What's my opinion of you?
THE DEPONENT: That's off the record, right?
MR. PILKINGTON: I'm sorry.
MR. RONWIN: The expression is not suitable for -- for general company.
Q. (BY MR. RONWIN) Okay. All right. Now, how did we reach the conclusion that -- I want to get in there. And then -- now, did you -- in the same note of September 4, 2001, I have here, under the Conclusions --



04611547-742a-4e96-903b-ddf0b207a131

let's see. You don't have a conclusion, do you?
A. Impression is a --
Q. Huh?
A. Impression on page 2 would be my conclusion.
Q. Oh, okay. Yeah. Well, that was an impression. I'm trying to get at a thing where you asked -- you -- you say that "He," meaning Ronwin, "is very adamant about not receiving medication secondary to their side effect profile."
A. Correct.
Q. Where is that? I just can't -- I'm having trouble finding it.
A. All medications have the potential for side effects.
Q. Oh, there it is. Right.
A. With anti -- and I obviously don't know what side effect profile Ronwin may have been referring to at that point --
Q. Yes.
A. -- but all medications have the potential for side effects.
Q. Right.
A. So, for instance, if we were talking about nonsteroidal anti-inflammatory medication --
Q. Yeah.



A. -- that we might frequently use for this type of condition, you could develop heartburn, you could develop ulcers --
Q. Right. Have all kinds of --
A. -- among other -- among other things.
Q. Yes. So if a patient said to you that they -- he didn't or she didn't care to take NSAIDs --
A. Correct.
Q. -- would you think that's -- badly of the patient, or that, Well, that's what the patient feels like?
A. I feel like that's what my patient feels like --
Q. All right.
A. -- and I will attempt to find alternative ways to manage the problem.
Q. Are you aware that Dr. Knauer, your associate or colleague, had prescribed Bextra for Ronwin at one time?
A. I did not really become aware of that until I was reviewing this last night, and I did see that reflected in one of her notes.
Q. Yes. And are you aware that Bextra was taken off the market by the Food and Drug Administration's order --



A. I'm aware of that.
Q. -- in 2004?
A. Yes, I am aware of that.
MR. PILKINGTON: Objection, form and foundation.
Q. (BY MR. RONWIN) All right. Now, let's see. Hum. Okay. Now, let's see. Here are a list of drugs -- oh, darn it, I didn't that bring that with me. All right. Okay. Now, let's see. I have an expression here that there's no improvement -- quote, No improvement in postinjection resisted supraspinatus testing.
A. Correct.
Q. Do you know where that is on that chart? I'm --
A. It's on page 2 of September 4 --
Q. Oh, yes; that's right.
A. -- 2001.
Q. Yes, that's right. What did you mean by that expression?
A. I'm looking at the fact whether pain may have been improved or whether strength may have been improved. And when there is no improvement, it can potentially indicate to me -- and again, it's not 100 percent sensitive, because it could still be pain as a result of tendinitis -- but it makes me more aware that



there could potentially be a partial or a full tear associated with the injury or the condition.
Q. All right. Okay.
A. It just heightens my awareness of what I continue to look at in follow-up visits.
Q. Right. Okay. Then we have the October -- I just want to run through that quick. Let's see. This would be -- you -- you indicate in the History portion of the October 31, 2001 note that, quote, He, meaning Ronwin, has received two corticosteroid injections into the subacromial space thus far, with the last one being 9/4/2001.
A. Correct.
Q. Now, the 9/4/2001, was that one that you gave me?
A. That's correct.
Q. What was the other one, then? Where was that?
A. I didn't enclose that, but it was outside of our office.
Q. Outside, um-hum.
A. I didn't ask who had performed it, or if I did ask, I did not dictate it. So I'm not sure, other than it wasn't performed by me or in my office.
Q. Do your records reflect -- your -- your

company's records reflect whether or not Ronwin indicated that he had gone to some other orthopedic surgeons prior to coming to your firm?
A. They do not reflect that. But quite obviously, with receiving a cortisone injection prior to presentation with me, Ronwin had seen somebody. I didn't reflect whether -- whether it was an orthopedist or a primary care doc, but obviously had been to somebody prior to me.
Q. Or even the location, or anything of that --
A. Not reflected.
Q. Okay. I see. Now, then you say -- now, where is that? -- Pain -- oh, that would be the third sentence in that History. "He," Ronwin, "states that his pain nearly resolved with this injection." And are you referring to the September 4, 2001 that you gave me?
A. No. This was the cortisone injection that was received prior to presentation in my office.
Q. I see. All right. And then you also say again -- let's see -- you also say, quote, He, meaning Ronwin, is also against undergoing MRI. Which MRI are you referring to?
A. An MRI of the shoulder was offered, the left shoulder.
Q. Yes. Now, what I want to get at is, at the



Poudre Valley Hospital, do they have an MRI machine?
A. Yes, they do.
Q. Is that a closed MRI machine?
A. At that time, there was the capacity only for closed at PVH.
Q. Yes. And is a closed MRI machine basically a tube?
A. Yes, it is.
Q. And if you were getting your shoulder examined, you'd be shoved all the way into the tube; isn't that right?
A. You would be in the tube.
Q. And the tube surrounds you very closely; isn't that right?
A. Yes, it does.
Q. About the only thing you can do in there while you're waiting is -- for the magnetic field to work its effects is to count sheep; is that right?
A. Well, with any MRI the only thing you can do is lie still. Otherwise, there's motion artifact.
Q. Yes.
A. So it doesn't matter if it's shoulder, knee.
Q. Yes.
A. You have to lie still.
Q. And it can go on for maybe a half hour?



A. Yes, even longer.
Q. Even longer, right. And if you had claustrophobia -- if a person had claustrophobia, would that be conducive to entering that machine?
A. Many people feel uncomfortable doing that. We do have medications, again, to help counteract that. But there are patients who just feel uncomfortable enough that they don't want to be put into a tube.
Q. Yes. Now, are there MRIs such as open MRIs?
A. There are now open MRIs. I can't tell you back then there was an open MRI facility. I can't tell you if it was operating then or not. I can tell you that we don't always like those open MRIs because their resolution is not as good as the closed. But for people who have a very claustrophobic history, it's an option, as are arthrograms.
Q. Yes. Now, if -- if one of your patients -- meaning your firm, your medical firm's patients -- was going to undergo, let's say, X-ray analysis or get X-rays made of some portion of their anatomy, would your firm make the arrangements to get the X-ray?
A. We have X-ray capacity in our office, so we would take --
Q. So you would take them right there?
A. -- that X-ray right in our office.



Q. Okay. Well, if you were going to have the person get his or her blood analyzed, would you make the arrangements for that?
A. We will write a request for that, and the patient then takes the request to the lab.
Q. I see. How about for an MRI? Would you write directions?
A. For an MRI, our office actually calls and sets up the appointment while the patient is either in our office or on the phone where they're accessible to times.
Q. Do your records -- do you have all your records on Ronwin with you?
A. I do.
Q. Do they reflect that Ronwin -- that your firm made an arrangement for Ronwin to have an MRI, an open MRI?
A. I would have to look and review that, because while I was seeing Ronwin as a patient, he declined the desire to undergo an MRI --
Q. That's right.
A. -- with a bad experience of being in a closed situation previously.
Q. Yes.
A. So I would have to review the chart to look


04611547-742a-4e96-903b-ddf0b207a131

for that answer.
Q. I see. Well, I'll indicate to you that you did make an open MRI arrangement for me at the -- called the Poudre Valley Open MRI, located roughly on the corner -- the northeast corner of Timberline and Prospect Avenue; that I went for the appointment; and that I was undressed to the point where I just had my shorts on and I believe my pants; and the -- the attendant, or the person who was going to run it -- I don't know which she was -- came over and asked me if I had stents in me. And I have about three or four stents in me, so she said, We can't do an MRI. And I went back and I told your firm about it, either by phone or actually went to your offices.
MR. PILKINGTON: Objection --
Q. (BY MR. RONWIN) Is that reflected anywhere in your --
A. I would have to review the chart and look for that. I don't recall it. I would have to defer and say I'd have to look at the chart.
MR. PILKINGTON: Objection, form and foundation to the last question.
Q. (BY MR. RONWIN) The date of that appointment, by the way, was May 6th of 2004.
A. It appears that the referring physician in



that case was my partner. So again --
Q. Oh.
A. -- I haven't reviewed --
Q. All right.
A. Again, I recall offering MRIs multiple times, and saying, No. If it -- I might at some point be interested in an arthrogram, but not an MRI.
Q. Could you indicate to your colleague, Dr. Knauer, to check that point for -- for her deposition?
A. And I was going to say, in fact, it looks like this request may actually be for an arthrogram. So again, I'd have to defer to her.
Q. Yes.
A. I know I -- here's another one. And again, it's -- Dr. Knauer is the referring physician, so --
Q. Okay. Why don't you just ask her to check on that MRI?
A. I will.
Q. And she could call them. And the fellow who was in charge is named John -- that's all I got, was his first name -- at the Poudre Valley Open MRI. And that's different from the Fort Collins Open MRI, which is in the same building. All right.
A. I can't even tell you for sure if this is an MRI request, but I am pretty sure that it is not



something that I requested.
Q. All right. Now, if there's no -- in your September 4th report, you had that there was no subacromial crepitation, I believe.
A. Correct.
Q. Does that indicate that it's mild, and possibly not involved in a rotator cuff tear?
MR. PILKINGTON: Objection, form.
A. It simply reflects that there's no crepitation.
Q. (BY MR. RONWIN) I see. Okay. What causes crepitation?
A. Inflammation can. Scar tissue can. It doesn't mean that it's present in all patients. It's, again, just a sign that I look for on physical exam.
Q. I see.
A. If I do find it, it indicates to me that there may be inflammation or scar tissue present.
Q. Yeah. If you have crepitation, is there a noise that emanates from the area?
A. A noise or a sensation that an examiner may feel as they put the shoulder through range of motion.
Q. Okay. Let me just get rid of this one. Let's see. Do you -- did you find, in regard to the February 12, 2002 note, that Ronwin's pain never was



completely resolved? Now, let's see --
A. "He states that his first two injections were helpful," so -- and, "However, this past one did seem to offer him some relief, but it has never completely resolved."
Q. Okay. And the first two that you're referring to, are they the ones in your office, the September 4th, and the -- the next one was February -- no, October 31st?
A. No. They would be the first one, which was given outside of the office, which was either February or March, and then the one that I gave in September. The February note reflects that the October injection didn't seem to be helpful --
Q. I see. Okay.
A. -- or it offered some relief, but didn't resolve the problem.
Q. I see.
A. Can I go back and ask a question --
Q. Sure.
A. -- from what I thought I just heard was that I should go back and discuss something with Dr. Knauer?
Q. No. I was only going to ask you to suggest to Dr. Knauer that he -- that she might like to look into this question of whether your firm had made an

appointment for Ronwin at this Poudre Valley Open MRI.
A. Okay. I'm just questioning that, because typically we don't discuss with each other what happens at depositions because we don't want to skew anything.
Q. Yeah.
A. I mean --
Q. I didn't -- I don't believe --
A. -- am I missing something?
MR. PILKINGTON: Doctor, you can use your best judgment.
THE DEPONENT: Okay.
MR. RONWIN: Yeah.
MR. PILKINGTON: If you would prefer not to do so, you're certainly entitled to do so.
MR. RONWIN: Yeah. You don't have to, right. I just --
MR. PILKINGTON: If you'd like to, that's fine.
THE DEPONENT: Okay. Thank you.
MR. RONWIN: It's just a suggestion --
THE DEPONENT: I just wanted to clarify. Thank you.
MR. RONWIN: It's just a suggestion, because it's a point --
THE DEPONENT: Okay.



MR. RONWIN: -- that will be raised, I'm sure, with Dr. Knauer too.
THE DEPONENT: Okay.
MR. PILKINGTON: But certainly you're correct at trials that, generally speaking, the witnesses are not to talk to each other before testifying.
THE DEPONENT: Thank you.
MR. PILKINGTON: You're welcome.
Q. (BY MR. RONWIN) Okay. All right. Now -- oh, what was this Near test that you referred to?
A. It's another one of the impingement tests. There's Hawkins and Near, with the Hawkins being the one that was described earlier where the arm is brought in forward flexion in front of the body, and then internally rotated in front of the body.
Q. Oh, this way (indicated)?
A. Correct. With the Near's, the arm is brought up above --
Q. Oh, above.
A. -- and rotated to, again, attempt to re-create any pain that might be associated with an impingement. So it's one of those impinge -- one of the two impingement signs.
Q. Yes. When you have a rotator cuff tear, there's a most usual area that you'll get pain is when



you elevate the arm up above a head, so to speak?
A. It can be. There's a painful arc that's described on abduction. So abduction is bringing the arm from the side up towards the ear level. And many patients -- again, it's not 100 percent sensitive -- but many patients may go through a painful arc in between 90 to 100 degrees of abduction, and then as they go beyond 120 degrees their pain may resolve. So again, it's one of the -- the clinical signs that we will look for as we're examining a patient.
Q. So if you had a rotator cuff tear, and you were relatively sedentary in terms of physical exercise, and you were, let's say, sitting at a desk or in a chair reading or writing and whatever like that, and you didn't have a rotator cuff tear -- I mean, rotator cuff pain, see --
A. Meaning also we're including in there tendinitis.
Q. Yeah -- is it possible you go through quite a long while before you really feel the rotator cuff tear is giving you pain that causes you to go get medical attention?
A. I'm not sure I understand.
MR. PILKINGTON: Objection, form and foundation.



A. I'm not sure I understand. Could you --
Q. (BY MR. RONWIN) All right.
A. -- ask that question again?
Q. What I'm trying to get at is, with a rotator cuff tear, even if you have one, is it possible to so conduct your daily living by -- by the activities that you engage in that you never really feel the tear, unless perhaps you raise your arm well above the head level or try to lift weights, that sort of thing?
A. We have asymptomatic tears, so there are patients who may raise their arm and not have any pain. Tendinitises, people can raise -- or impingement syndrome, people can raise their arms and get pain. So again, just by basis of pain on raising an arm, it doesn't necessarily mean that you have a tear.
Q. Yeah. But you could go a long time, even with the tear, and it not affect your daily life very much?
A. It depends on the patient.
Q. I see.
A. We have some patients who are asymptomatic and don't have symptoms. So you're right. It can be a while from the time that they may have torn to the point that we diagnose them. We have other people who have pain right away.

Page 106

Q. I see.
A. Their -- each patient is evaluated as a separate entity, as opposed to having everybody present or be treated in the same fashion.
Q. Okay. Now -- let's see. In your experience, you've given a lot of -- have you given a great many cortisone injections --
A. Yes, I have.
Q. -- into your patients? And in your experience, what sort of range of time do you find that the cortisone injections are reported to -- to effect a reduction in pain?
A. You will have a large range, from people not experiencing any relief in terms of their pain from a cortisone injection to, again, if it's a tendinitis, people having one injection and having resolution of their problems.
I find it a more aggressive maneuver, but still conservative, meaning that we're not doing surgery, to do a cortisone injection over prescribing medication orally, because we are using a more potent form and putting it right where the problem is. So I do consider it a more aggressive step.
How many people get better from or feel some symptom relief from a cortisone injection? Again,

Page 107

there's not any great studies out there in literature which will give you a number. My general experience, I would probably say between 50 to 80 percent of people may experience some pain relief or resolution of their symptoms with a cortisone injection.
Q. I see. But what about a time period for the lasting effect of the cortisone?
A. It varies from person to person.
Q. I see.
A. And again, it depends on whether you're doing it for a chronic condition, like a rotator cuff tear or arthritis, versus doing it for a tendinitis. So we may have patients experience relief for maybe 24 hours, some zero, some 24 hours because of the numbing medicine that's put in there. We have some patients who we will give it to, and they'll never have an injection or pain again if we're treating a tendinitis.
Q. I see.
A. So it can be anywhere from zero to never having a problem again --
Q. Out into the future?
A. -- and everything in between.
Q. Okay. Thank you. All right. Let me see.
A. I don't know if it's helpful to let you know that in general -- in general, we will give three to four

Page 108

injections in a year. So again, as we start to surpass that and I cannot obtain resolution of my problem, that's when I start to say, Maybe it's time to see another physician and get another opinion.
Q. Right. And that's what happened in Ronwin's case; is that right?
A. That's correct.
Q. Okay. Let me just go into some other little things here.
MR. PILKINGTON: Mr. Ronwin, can I interrupt? How much longer do you think you'll be?
MR. RONWIN: I wouldn't -- I would judge no more than about a half hour at most.
THE DEPONENT: Am I able to at least give my office a call?
MR. PILKINGTON: Yes.
MR. RONWIN: Sure. Why don't you go right ahead and do that.
THE DEPONENT: Thank you.
MR. PILKINGTON: Let's take a break.
(Break taken from 11:21 a.m. until 11:27 a.m.)
Q. (BY MR. RONWIN) Now, we were talking about the -- your awareness of Baycol causing -- whether it caused rotator cuff tears or injuries, right? And I

Page 109

think you indicated that you knew of nothing, no literature or studies, showing that Baycol caused rotator cuff tears.
A. I'm unaware of any.
Q. Right. Are you aware that Baycol tends to destroy -- disrupt and destroy muscle cells?
MR. PILKINGTON: Objection, form and foundation.
A. I'm aware that Baycol has been associated with rhabdomyolysis.
Q. (BY MR. RONWIN) Yes.
A. Rhabdomyolysis does cause destruction of the muscle cell in a striated muscle.
Q. Right. Are you aware that -- of -- as to whether Baycol causes destruction of nerve cells?
MR. PILKINGTON: Same objection.
A. I am not aware of that. Again, I don't use Baycol, so it's one of those things that I have not looked into. I'm not a neurologist, so I'm not familiar with that. I'm sorry.
Q. (BY MR. RONWIN) Okay. Are there cells in the tendons?
A. Are there cells in the tendon? There are cells in the tendon.
Q. Yes.

A. Are they similar cells to a muscle? Not -- not the same cells.
Q. I see. But they are -- there are cells in the tendon?
A. There are cells in the tendon.
Q. Right. And there are cells -- then, are there cells in the supraspinatus tendon?
A. Yes.
Q. Okay. And would you know of any reason why Baycol would attack muscle cells, as gives rise to myositis and rhabdomyolysis, yet wouldn't have the ability to attack the cells in the tendons?
MR. PILKINGTON: Objection, form and foundation.
THE REPORTER: I'm sorry, Doctor. Wait.
MR. PILKINGTON: Just one short pause between some of your questions.
THE DEPONENT: Sorry.
MR. PILKINGTON: That's okay.
THE REPORTER: I have, "Objection, form and foundation." I don't have an answer.
A. They are different types of cells. A muscle cell is different than a tendon cell.
Q. (BY MR. RONWIN) Yes. But would that automatically mean Baycol couldn't attack a muscle



cell --
A. I can't comment on --
MR. PILKINGTON: Same objection.
A. Sorry.
Q. (BY MR. RONWIN) -- the -- the tendon cell?
MR. PILKINGTON: Same objection.
A. I can't comment on that.
Q. (BY MR. RONWIN) Okay. But, now, you did say that you didn't -- you believe that -- you made it a positive statement that Baycol did not cause the rotator cuff tear.
A. We have no literature that I'm aware of that Baycol has caused tendon ruptures.
Q. Well, I'm talking about Ronwin's rotator cuff tear. Do you know whether -- whether or not with certainty that Baycol did not cause it?
A. I have no information that leads me to believe that Baycol has a causative factor in causing anybody's rotator cuff tendon ruptures, whether it be Ronwin's or somebody else in the general population.
Q. But that isn't quite the answer to the question.
A. That's the best answer I can give you.
Q. No. I mean, the -- the answer -- I don't want to give you the answer. That's for you to give.



But the question is, do you know whether Baycol did not -- did not cause Ronwin's rotator cuff tear?
MR. PILKINGTON: Same objection, asked and answered.
A. I can tell you, again, based in the literature that I'm aware of, the meetings that I have gone to, that there has been no causative -- evidence-based medicine is very big right now in medicine in general -- that there has been no causative association between Baycol and rotator cuff tears, whether it be Ronwin's tear or whether it be anybody in the general population, I'm aware of any link to causation between Baycol and tendon ruptures.
Q. (BY MR. RONWIN) That's within what you've seen in -- in literature or lectures, et cetera; is that the idea?
A. That's correct.
Q. But does that absolutely exclude the converse; that it can cause rotator cuff tears?
A. I'm unaware that it can cause rotator cuff tendon tears.
Q. It's not a matter of whether you're aware of it. It's whether -- whether what you know necessarily excludes that it can do it.
A. I cannot imply --



MR. PILKINGTON: Objection, asked and answered, form and foundation. You can answer again.
A. I cannot --
Q. (BY MR. RONWIN) All right. Let's try to take an example. Have you ever seen an eclipse of the sun?
A. I have seen an eclipse of the sun.
Q. Oh, you have? Darn it.
A. Or the moon, or something.
Q. I see.
A. I've seen an eclipse.
Q. Have you ever seen a three-car collision; in other words, three cars colliding at the same time?
A. I have not witnessed that in action, no.
Q. Ever in your life?
A. Ever in my life.
Q. Does that exclude the possibility that three cars could collide at the same time?
A. I don't see the connection, but it's possible, I'm sure, that three cars could.
Q. But you don't know that for sure, do you?
MR. PILKINGTON: Objection, form and foundation.
MR. RONWIN: All right. Okay.
THE DEPONENT: So do I need to give an