answer?
MR. PILKINGTON: (Shook his head.)
THE DEPONENT: Thank you.
Q. (BY MR. RONWIN) Now, you said you took chemistry, right?
A. I took chemistry.
Q. And what is fluorene?
A. Fluorene is one of the chemical elements on the periodical chart.
Q. I see. Do you know -- let's see. I want to phrase it this way: Is fluorene the most active element known to man?
A. I could not answer that question. It might be a more appropriate question for a chemist.
Q. I see. Well, do you know how glass is etched?
A. I do not know how glass is etched.
Q. I see. Okay. Did you know that there's a fluorene atom in the Baycol molecule?
A. I don't prescribe Baycol. I don't know the chemical makeup of Baycol. I couldn't even start to answer that question.
Q. I see. You agree that it -- Baycol tears up muscle cells in various degrees?
MR. PILKINGTON: Objection, form and



foundation.
A. Baycol has been, from my knowledge -- again, I don't prescribe it. From my knowledge, it has been associated in some people with rhabdomyolysis.
Q. (BY MR. RONWIN) Well, to get the -- in rhabdomyolysis, to get the proteins and enzymes pouring into the bloodstream from the -- from the muscle cells, then the muscle cells must have been torn open; is that right?
MR. PILKINGTON: Same objections.
A. To my understanding, there is destruction of the cell. How that occurs is beyond my medical expertise.
Q. (BY MR. RONWIN) All right. So if Baycol can -- can -- but you don't know how it does that, it tears up the cells, is what you're saying?
A. No. Again, that may be a better question asked to a chemist, a pharmaceutical, a research person.
Q. Okay.
A. That's not the type of medicine that we practice from day to day in our office.
Q. Okay. So it's not within your knowledge?
A. It is not within my expertise.
Q. But you do know -- do you know whether the composition of a cell is basically an organization of



molecules?
A. That is beyond my --
MR. PILKINGTON: Same objections.
A. -- ability to answer.
MR. PILKINGTON: Same objections.
Q. (BY MR. RONWIN) Well, the cell has an outer cover in the animal kingdom, all right? It's not a wall, like in the plant kingdom, but it's a cover, right, a membrane. Is the membrane made up of chemicals?
A. That's --
MR. PILKINGTON: Same objections, form and foundation.
A. That's beyond my medical expertise.
Q. (BY MR. RONWIN) I see. All right. What else is a tendon made up of, in addition to cells?
MR. PILKINGTON: Form and foundation.
A. I think that perhaps Dr. Knauer might be able to better explain that than myself.
Q. (BY MR. RONWIN) I see.
A. Again, in our area of medicine, we don't always go down to the molecular level. That portion of our training occurred way beyond before we became clinicians and were actually dealing with evaluation and treatment and -- of our patients. So for me to go back to that cellular level, I would be grasping and may give



you inaccurate information.
Q. Okay. But would you agree that the entire human body, as any other living entity, consists of chemicals?
MR. PILKINGTON: Same objections.
A. Do I need to answer that? Can I defer that question? It -- we are organic.
Q. (BY MR. RONWIN) Well, organic is a special type of chemical, meaning it has carbon atoms in it, which, of course, there are lots of them in the body. But just chemicals in general put together into various molecules, and they in turn form the cells, and that -- they in turn form the various anatomical parts, and they in turn form the body --
MR. PILKINGTON: Objection --
Q. (BY MR. RONWIN) -- is that right?
MR. PILKINGTON: Objection, form and foundation.
A. I'm going to defer on that.
Q. (BY MR. RONWIN) You're going to what?
A. I'm not going to answer that question. That's beyond my -- my medical expertise to answer that within correct reason. I'm -- I'm not sure, in terms of chemicals and the -- the way that you are using that term, as if that's what we were made up of. So I would



04611547-742a-4e96-903b-ddf0b207a131

defer that to an organic chemist.
Q. I see. Well, even -- even if you're not an organic chemist or a biochemist, you've taking chemistry, and you've certainly taken biochemistry, didn't you, in the -- in medical school?
A. Yes, I have. Actually, it's in undergrad that you take your inorganic and organic chemistry. It's before you get to medical school.
Q. Right. And then in medical school you took biochemistry; is that right?
A. No.
Q. You didn't?
A. In undergrad I took physical chemistry, P. chem.
Q. Oh, physical.
A. You don't take biochemistry.
Q. You never took biochemistry?
A. I took P. chem., which I believe would be an analogy to biochemistry.
Q. Well, there's --
A. But that is all done as undergrad. It's not done in medical school. Then your area of expertise will then branch. If you become a chemist, you will take other types of chemistry and go down to the cellular level.



When you go to medical school, then you start to develop into organ, organ systems, and then we develop into how we are going to look for medical conditions and treatments for them. So many times at -- at our level of being a physician, we are no longer dealing with chemicals and cellular membranes and all of the carbons that make up a body.
Q. You're dealing --
A. That goes into our research branch of medicine.
Q. Your overall work deals with -- with organs and functional anatomical parts of a body; is that right?
A. We deal with evaluation of patient complaints and treatment. I am a specialist who deals with sports medicine problems --
Q. Yeah.
A. -- and musculoskeletal problems --
Q. Yes.
A. -- on a macrolevel as a person presenting to me with a complaint.
Q. But that doesn't prevent those muscles that you just spoke about, muscular problems, it doesn't prevent that from being basically chemical in nature.
A. I'm not sure how that relates to my area of medicine.



Q. I see.
MR. RONWIN: Well, okay. You want to go see your patients, then?
THE DEPONENT: Thank you.

EXAMINATION

BY MR. PILKINGTON:
Q. Doctor, I just have a couple of follow-up questions.
A. Absolutely.
Q. One, a point of clarification. I believe you testified about your October 31st office note. And it reads here, "He states that his pain nearly resolved with this injection, but over the past month he has had increased symptomology." By "this injection," are you referring to your injection of September 4th of 2001?
A. It's referring to September 4th of 2001. His pain nearly went away, didn't completely go away, and has since increased again.
Q. And the reason I ask that question, I think you testified that it referred to an injection that he'd had before he visited your office, so --
A. Yes, there were -- well, there were two questions, I think. I think you asked the same question about the injection that was incurred before he saw me, and it sounds like a very similar thing happened, where



he had resolution and then recurrence, or near-resolution and reoccurrence.
Q. But your October 31st note about "his pain nearly resolved" was in reference to your injection in September of '01, correct?
A. That's correct.
Q. And finally, Doctor, there was a long line of questioning about an MRI and a closed MRI and an open MRI. Do you remember that questioning?
A. I do.
Q. Regardless of whether an MRI was ordered or not, did you continually offer to Mr. Ronwin an arthrogram?
A. I believe that we -- in the first line of offering of an MRI, he reflected the fact that he had a bad experience with closed areas, and we offered an arthrogram at that point. I believe in subsequent visits an MRI was offered.
And so it would be inferred, again, that if he said, "I don't want an MRI, but an arthrogram would be okay," that that was an option. But it was not specifically stated until, again, my last visit with him prior to his being referred over to Dr. Knauer.
Again, he brought up the fact, I believe, that he wasn't -- he wasn't happy with going through a



04611547-742a-4e96-903b-ddf0b207a131

closed situation, but that perhaps, if things persisted, that he would pursue an arthrogram. So again, even if it wasn't reflected in each visit, he knew that was an option.

Q. So in other words, if he had a problem with claustrophobia with an MRI, an arthrogram was an option?

A. Was an option. He was aware of that.

Q. And you presented that option to him at the very first visit?

A. At the very first visit.

MR. PILKINGTON: Doctor, I thank you for your time and your patience today.

MR. RONWIN: Now, wait a minute.

EXAMINATION

BY MR. RONWIN:

Q. I was just going to ask, did I actually undergo an arthrogram, however?

A. Again, that was when care was transferred over to Dr. Knauer. It's my belief that you may have, but I would have to defer to Dr. Knauer or to the chart notes.

Q. Huh?

A. Or to the chart notes.

Q. Yes. Well, do the chart notes indicate that I had an arthrogram? I think you made a statement to



that effect.

A. There is a radiographic report dated May 28, 2003 of a left shoulder arthrogram with "Findings consistent of a rotator cuff tear" --

Q. Right.

A. -- "most likely involving supraspinatus tendon with degenerative changes present as described in the body."

MR. RONWIN: Okay.

MR. PILKINGTON: Doctor, for the record, you have the opportunity to read and review your transcript. I can represent to you some doctors choose to do so. Others do not. I have confidence that the court reporter has taken down this deposition very accurately. But again, it is up to you. If you'd like to read and review it, you can do so. If you'd like to waive that, you can do so as well.

THE DEPONENT: I will waive that.

MR. PILKINGTON: Thank you again for your time.

THE DEPONENT: Thank you.

MR. RONWIN: Thank you.

IT WAS STIPULATED AND AGREED between counsel, with the consent of the deponent, that the reading and signing of the within deposition is waived.



WHEREUPON, the within proceedings were concluded at the approximate hour of 11:44 a.m. this 20th day of June, 2006.

* * *



CERTIFICATION

SYLVIA E. NONEFF, Registered Professional Reporter, appointed to take the deposition of JANE SERVI, M.D., certify that prior to the deposition the individual was duly sworn by me to testify to the truth; that the deposition was taken by me at 419 Canyon Avenue, Suite 300, Fort Collins, Colorado 80521 on June 20, 2006; that the proceedings were then reduced to typewritten form by means of computer-aided transcription, consisting of 126 pages herein; that the foregoing is an accurate transcript of the proceedings at that time.

I do hereby certify review of transcript was not requested on the record.

I further certify that I am not related to any party herein or their counsel and have no interest in the result of this litigation.

IN WITNESS WHEREOF, I have hereunto set my hand this 29th day of June, 2006.

____________________________

SYLVIA E. NONEFF

Registered Professional Reporter



04611547-742a-4e96-903b-ddf0b207a131

COFFMAN REPORTING & LITIGATION SUPPORT, INC.
1440 Blake Street, Suite 320
Denver, Colorado 80202
303.893.0202

JEFFREY PILKINGTON, ESQ.
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, Colorado 80202

Re: Ronwin v. Bayer Corp.
Deposition of: JANE SERVI, M.D.
Date of Deposition: June 20, 2006
Trial Date: None set

Enclosed is:

(XX) ORIGINAL TRANSCRIPT. Please retain unopened original until it is required by any party in a trial or hearing in the above matter.

( ) ORIGINAL SIGNATURE PAGE ___with ___without corrections; copies provided to attending counsel. Please append these sealed originals to original transcript in your possession.

( ) Signature/correction sheets not received prior to filing.

(XX) Review of transcript not requested.

( ) 30-day review unavailable. Signature and correction pages forwarded to counsel agreeing to obtain signature. Original filed in anticipation of trial date. See letter within deposition.

( ) Copy of deposition, signature and correction pages sent to deponent. See letter within deposition.

( ) Signature not applicable.

Original transcript filed on_______________via_______________

Follow-up documentation filed on____________via_____________

cc: Attending counsel

# Exhibit D

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

---

DEPOSITION OF: SALLY A. KNAUER, M.D.
June 23, 2006

---

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : | Case No. 02-0200 |

TAKEN PURSUANT TO NOTICE AND SUBPOENA on behalf of the Defendant Bayer Corporation at 2121 East Harmony Road, Boardroom, Fort Collins, Colorado 80528 at 1:30 p.m. before Sylvia E. Noneff, Registered Professional Reporter and Notary Public within Colorado.

Ex. D

831d373c-d877-4400-9353-010c1c445990

APPEARANCES

For the Plaintiff Ronwin (pro se): EDWARD RONWIN, Ph.D., ESQ.
945 Rolland Moore Drive L-2
Fort Collins, Colorado 80526

For the Defendant: JEFFREY PILKINGTON, ESQ.
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, Colorado 80202

Also Present: None



INDEX

EXAMINATION OF SALLY A. KNAUER, M.D.: PAGE
June 23, 2006

By Mr. Ronwin 98

By Mr. Pilkington 5, 176

| DEPOSITION EXHIBITS: | INITIAL REFERENCE |
|---|---|
| 1 Subpoena, 5/31/06 | 14 |
| 2 Curriculum Vitae of Sally Ann Knauer, M.D., not dated | 15 |
| 3 Poudre Valley Hospital Operation Report re Ronwin, 6/28/03 | 32 |
| 4 Report of left shoulder arthrogram of Ronwin by Singer, 5/28/03 | 38 |
| 5 Poudre Valley Hospital admission note re Ronwin, 6/25/03 | 51 |
| 6 Poudre Valley Hospital discharge summary re Ronwin, 6/29/03 | 52 |
| 7 Northern Colorado Orthopedic Associates chart notes re Ronwin, various dates | 53 |
| 8 Letter from Knauer To Whom It May Concern, 5/5/03 | 66 |
| 9 X-ray report of left shoulder of Ronwin by Pacini, 9/11/02 | 79 |
| 10 X-ray report of left shoulder of Ronwin, 3/16/01 | 95 |
| 11 Product information insert re Baycol, 12/9 | 122 |
| 12 Article, "Statins and risk of polyneuropathy, A case-control study," by Gaist, et al., Neurology, May 2002 | 128 |



INDEX (Continued)

| DEPOSITION EXHIBITS: | INITIAL REFERENCE |
|---|---|
| 13 Article, "Scientific Facts on the Biological Effects of Fluorides," Natural Health and Longevity Resource Center website, printed 6/16/06 | 134 |
| 14 Article, "The Basis for the Pernicious Action of Baycol (=Cerivastatin), by Ronwin | 152 |
| 15 The Back and Limbs, Anatomy for Surgeons, by Hollinshead, et al, reprinted 1964, pages 323-324 | 152 |
| 16 Fax cover sheet from Powers to Ronwin, 6/23/06; letter from Misocky to Sever, 10/25/99 | 156 |
| 17 Amended Judgment in a Criminal Case, 1/19/05 | 159 |
| 18 Judgment in a Criminal Case, 6/6/05 | 162 |
| 19 Judgment in a Criminal Case, 12/10/04 | 167 |
| 20 Article, "Bayer faces Swiss criminal probe over cerivastatin," by Fleck, BMJ, Volume 324, January 2002, page 130 | 168 |
| 21 Business Concentrates Article, "EC imposes pricing fines," C&EN, 1/2/06 | 169 |
| 22 E = Mc2, by Bodanis, 2001, page 275 | 170 |

(Attached to original and Mr. Pilkington's copy transcript.)

REQUESTED PORTIONS OF TESTIMONY: PAGE

(None.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
(None.)



WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:

MR. PILKINGTON: Doctor, we'll go on the record. Mr. Ronwin has a couple of comments, and I'll let him do --

MR. RONWIN: Yeah, before she's sworn in. That's fine.

MR. PILKINGTON: Well, we'll swear her in first, and then you can make --

MR. RONWIN: You want to swear her in?

MR. PILKINGTON: Yeah.

MR. RONWIN: Go ahead.

MR. PILKINGTON: But again, thank you. And swear her in.

SALLY A. KNAUER, M.D.,

having been first duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MR. PILKINGTON:

Q. Good afternoon, Dr. Knauer.

A. Good afternoon.

Q. My name is Jeff Pilkington. I'm with the law firm of Davis, Graham & Stubbs in Denver. I represent Bayer in this litigation which Mr. Ronwin has filed against my client, Bayer. Do you understand that?

A. Yes.

MR. PILKINGTON: Before we go any further, Mr. Ronwin wants to make several comments on the record. And I've allowed -- if he'd like to do so, I'll allow him to do so at this time. Okay?

THE DEPONENT: Okay.

MR. RONWIN: Right. Well, some of these comments my opposite number would probably make also, but I'll make them anyhow. This proceeding is the same as being at trial, because professionals and experts usually don't appear at trial. It's a convenience for them in many ways. And it's just as though the judge and the jury are sitting in this room with us, you see.

Now, as to time considerations, he will be asking his major questions first, and then I'll have my opportunity. There may be a question or two afterwards by either of us. I'll act as promptly as possible, consistent where I believe I need to elicit in the way of testimony from you. But I won't be rushed, as has happened on a couple of previous depositions in this case, and I'm not looking at the clock.

I'm not here as your enemy or your friend. I'm here to advocate for somebody I think I know well: myself. And I'll act herein as if I were advocating for someone else, the same -- the same idea. If you don't



understand a question or a point in the question, let me know. I'll rephrase and/or explain your lack of understanding -- until your lack of understanding is erased, and you're then able to hopefully answer the question. All right?

THE DEPONENT: (Nodded head.)

MR. RONWIN: I'll try to refer to myself in the third person, using my last name, but at times I will forget. That's because I'm wearing two hats, and I'm trying to separate the hats.

When I talk about the composition of the human body, I'm only referring to the physical body, not to the metaphysical body. The soul, or any other ideas like that, are -- are of no concern in this litigation, okay?

Now, at times I'll ask you to read portions of documents which will be marked as exhibits, and that's not because I can't read them myself. Rather, it's so that the jury will know the pertinent contents of exhibits by hearing you, when and if any portion or portions of the transcript of this deposition is read at trial.

Also, some of my questions may have no obvious purpose, but I assure you all of them do have a purpose. They may not be phrased correctly, or whatever,



but there's a purpose. It's not madness run wild.

Now, this is a touchy little subject. Your colleague Dr. Servi was very specific in her deposition about what she thought caused the rotator cuff tear. Now, she did claim that she never saw anything about Baycol causing rotator cuff tears. But to my mind, that doesn't mean that Baycol doesn't or couldn't cause rotator cuff tears.

Now, her answer only means that she doesn't know whether or not Baycol causes rotator cuff tears. And therefore, the certainty of her stance, in my mind, as to the cause of rotator cuff tears becomes questionable. Simply put, what Dr. Servi doesn't know cannot be grounds for ruling out Baycol as the cause, you see, and that goes for anybody else. And when I attempted to get --

MR. PILKINGTON: Let me interrupt you for a moment. Dr. Servi (sic), it probably goes without saying there are disagreements with what -- I disagree with many of his statements. But I have graciously allowed him to state this on the record, so I'll let him do so. But as he's going through this, I want you to understand that I disagree with much of what he's saying.

But go ahead, Mr. Ronwin.

MR. RONWIN: Oh, thank you. When I



attempted to get her to admit that her absolute stance on the cause of my rotator cuff tear was invalid and began to move to explanation as to why Baycol could cause rotator cuff tears, your colleague responded to questions with dodges that failed to answer my questions; for example, responses to biochemical matter with quotes -- with, quote, something like, I'm an orthopedic doctor, you see.

Well, that's not my problem if she doesn't understand biochemical matters, you see. That still doesn't justify her position, in my opinion, or similar comments. And so it amounted to a dodge of answers. Most of these answers are capable of a yes or a no, but if you feel you want to amplify, go right ahead and do so. There's no problems there.

Now, dodging answers to questions with spurious comments and irrelevancies, in my opinion, I'm not going to tolerate it today. I'm going to continue to insist on getting an answer, because we're not engaged in a sham. We're in a legal contest designed to elicit the truth, the whole truth, and nothing but the truth, to which you will be swearing -- or you already have -- as to the quality of the answers you give.

And I have only two other -- three other things. And one of the things, I'll be taking up


831d373c-d877-4400-9353-010c1c445990

biochemical and biomolecular concepts, which underlies just about all of medical practice today.

THE DEPONENT: Um-hum.

MR. RONWIN: It didn't in the 1950s, but it does today. People look for what chemicals cause cancer. We already know there is the identity of some. We know that enzymes create chemicals in cells that in turn cause cancer action and cause these cells to go into angiogenesis, et cetera, et cetera. And then we look for molecules also that will prevent these enzymes from doing that and prevent these molecular agents from doing what they're doing, you see. So medicine has changed considerably, particularly in the last 30 years or so.

And in any deposition, it's incumbent upon all involved to conduct themselves as though the judge was physically present. This deposition, as in others in the case, is convened essentially by order of the court. Now, the litigants had a right to choose whom they wished to depose and when, but within limits set by the court order, you see. So in a sense, we're here by court order, to an extent.

And lastly, dodging answers of -- answers to questions with spurious and irrelevant statements will cause me to seek from the court a citation against you for contempt of court. I've just got to get the answers.



I can't allow to happen what happened on Tuesday, and then on Monday with some other M.D., and then last week, too -- no, two weeks before in some other depositions. It's just got to end.

MR. PILKINGTON: Are you done, Mr. Ronwin?

MR. RONWIN: That's it.

MR. PILKINGTON: Okay.

Q. (BY MR. PILKINGTON) Doctor, again, I'm Jeff Pilkington, and I represent Bayer. Let me -- I've told you on the record that I disagree with much of what Mr. Ronwin has said. The deponents, including your colleague Dr. Knauer (sic), truthfully answered the questions. Let me go over some basic grounds rules, however. First of all, I'm here because Mr. Ronwin has sued my client, Bayer. You understand that?

A. (Deponent nodded.)

Q. "Yes"?

A. Yes.

Q. And that brings us to the next rule. It's very important that you give verbal responses to my answers, because the court reporter can not only take -- cannot take down a shake or a nod of the head.

A. Yes.

Q. Do you understand that?

A. Yes.



Q. You've been deposed before, probably.

A. Yes.

Q. You know some of the basic ground rules, but let me go over a couple of others. This is my only opportunity to talk to you. I am ethically precluded from discussing any care and treatment of Mr. Ronwin by you, and this is my only opportunity to talk to you before we go to trial. Do you understand that?

A. I do.

Q. This is the first time that we have talked, correct?

A. Correct.

Q. We've never met before this deposition?

A. Correct.

Q. We have never talked before this deposition, correct?

A. No, that's correct.

Q. If you don't understand a question that I ask you, please ask me to restate or rephrase it. Okay?

A. I will.

Q. The same with Mr. Ronwin. If you don't understand a question that he asks you, please ask him to restate or rephrase it. Okay?

A. I will.

Q. Throughout this deposition, some objections



may be made, and those objections are made to preserve the objection for trial. Do you understand that?

A. I do.

Q. It is also very important that I explain this to you, Doctor. If you don't have the knowledge or the expertise to answer my questions or Mr. Ronwin's question, you don't have to answer that question, okay?

A. Yes.

Q. If you don't know the answer, an "I don't know" is a perfectly okay answer, and I want to make sure that that is clear to you, Doctor. Do you understand that?

A. That is clear.

Q. For example, if there are cardiology issues in this case that you feel uncomfortable answering, tell us that. Okay?

A. Yes.

Q. If there are biochemical or biochemistry questions that you don't know the answer to, please tell us that. Okay?

A. Yes.

Q. The worst thing that we could have you do today is guess or speculate about what the answer could or should be. Okay?

A. Yes.

Q. Finally, Doctor, you understand you've taken an oath to tell the truth?
A. I do.
Q. And that oath is the same oath that you would take if you were to testify in person before the judge and jury, correct?
A. Correct.
Q. With those preliminaries out of the way, let's move forward, Doctor.
A. Okay.
Q. First of all, Doctor, you're kindly appearing today pursuant to a subpoena that I issued, correct?
A. Yes, I am.
Q. And you accepted that subpoena, correct?
A. I did, um-hum.
(Deposition Exhibit 1 was marked.)
Q. I have marked as Exhibit 1 the subpoena that was -- that you accepted. Will you take a look at that? Is that the subpoena that you accepted?
A. Yes.
Q. Doctor, that subpoena asked you to bring certain information to your deposition today. What did you bring to your deposition?
A. I brought my CV.



Q. Okay. What else did you bring?
A. And I brought the patient chart.
Q. Okay.
A. And I brought X-ray studies.
Q. Is the patient chart the same chart that Dr. Knauer (sic) brought to her deposition?
MR. RONWIN: You mean Dr. Servi.
A. Dr. Servi.
Q. (BY MR. PILKINGTON) Thank you. I might do that again.
A. It is.
Q. Okay. And let me rephrase the question. Is the patient chart you brought today the same chart that Dr. Servi brought at her deposition earlier this week?
A. Yes.
Q. And you were talking you brought some X-rays as well?
A. I did. I brought some X-rays from our office, Northern Colorado Orthopedics, and then I also brought X-rays from Harmony Imaging Center.
Q. Thank you very much, and we'll get to those a little later in the deposition.
(Deposition Exhibit 2 was marked.)
Q. Doctor, I have marked as Exhibit Number 2 your curriculum vitae. Is Exhibit Number 2 a true and



accurate copy of your CV?
A. It is.
Q. Would Exhibit Number 2 assist the jury in better understanding your background and qualifications in this case?
A. It would.
Q. Doctor, what, if anything, did you do to prepare for your deposition?
A. I reviewed the chart and reviewed the X-rays.
Q. Have you spoken to Mr. Ronwin about this deposition at all?
A. I have not.
Q. Did you do any research or other investigation for this deposition?
A. I did one thing that -- briefly that cross-referenced two orthopedics journals with the topic of rhabdomyolysis and rotator cuff tears.
Q. And what did that show to you?
A. I wasn't able to find anything in the literature about those two things occurring together.
Q. So in other words, before your deposition you did a search of the medical literature for a possible association between rotator cuff tears and rhabdomyolysis?



A. And, again, it was two orthopedic journals, yes.
Q. Okay. And you were not able to find any publications about that association?
A. I was unable to find that.
Q. Doctor, let's turn to your background. First of all, where did you go to college?
A. Baylor University.
Q. That's in Waco?
A. Waco, Texas.
Q. When did you graduate?
A. I graduated in 1976.
Q. What did you do after you graduated?
A. I went to medical school in San Antonio from 1976 to 1980.
Q. What was the school that you went to?
A. University of Texas Health Science Center in San Antonio.
Q. How long were you at that medical school?
A. Four years.
Q. Until 1980?
A. Yes.
Q. What did you do after that?
A. I did my orthopedic surgery residency, and that was five years at the University of Oklahoma Health

Page 18

Science Center in Oklahoma City.
Q. And what is involved in an orthopedic surgery residence?
A. It's a comprehensive training program that involves both evaluating patients, learning diagnostic skills, and also learning surgical skills.
Q. But it was focusing on orthopedics?
A. Yes, um-hum.
Q. And what is orthopedics?
A. It's the study and practice of, primarily, musculoskeletal problems and treatment of such.
Q. You completed that residency in 1985?
A. I did.
Q. What did you do after that?
A. I started my private practice in Fort Collins, Colorado.
Q. What is your private practice called?
A. Currently it's called Northern Colorado Orthopedic Associates.
Q. So you started this in 1986?
A. '86.
Q. So you've been practicing here in the Fort Collins area for 20 years?
A. Yes.
Q. At the same practice?

Page 19

A. I started with another practice and was with -- and was there for a year, and then went out on my own in '86.
Q. So from '85 to '86, you were with another clinic?
A. Yes.
Q. And then you started your own in '86?
A. Correct.
Q. Doctor, do you have any hospital affiliations?
A. I do: Poudre Valley Hospital in Fort Collins, Colorado.
Q. And by "affiliations," what does that mean?
A. That means I'm on the active staff of that hospital.
Q. Where else do you -- does that mean you perform surgeries at that hospital?
A. Yes.
Q. And what -- do you have any other affiliations with any other surgical centers?
A. Harmony Ambulatory Surgery Center --
Q. Is that --
A. -- also in Fort Collins.
Q. Is that an outpatient sort of clinic?
A. It is an outpatient surgery center.

Page 20

Q. Okay. You're board certified?
A. Yes.
Q. In what area?
A. Orthopedic surgery.
Q. When were you first board certified?
A. 1987.
Q. And since then, did you need to be recertified?
A. Yes. That's a 10-year requirement, and so I've recertified one time and am up for recertifying again next year.
Q. Looking forward to it?
A. (Deponent nodded.)
Q. Doctor, briefly explain, what does recertification involve?
A. For orthopedic surgery, you can do different pathways. There can be an oral recertification, where the examiners actually come and evaluate charts in your office. But most people choose the written pathway, which is a computer-based test.
Q. So you have to study and be up on all areas of orthopedics, correct?
A. Yes. And most people, you know, go to review courses and that type of thing.
Q. But in any event, you're currently board

Page 21

certified in orthopedics?
A. Yes.
Q. You're also licensed to practice here in the state of Colorado?
A. Yes.
Q. Anywhere else?
A. No.
Q. Let's focus for a moment on your clinical practice, Doctor. You practice with Dr. Servi?
A. I do.
Q. And who else do you practice with?
A. Dr. Nathaniel Cohen.
Q. How would you describe your practice?
A. My practice is primarily a knee practice and shoulder practice. I do a lot of knee arthroscopy, ACL reconstructions, total knee replacements. That's the biggest part of my practice now.
Dr. Cohen is a shoulder specialist, and so as he joined the practice, to allow him to get busy, my shoulder practice has decreased a little bit as I've tried to allow him to build up cases.
Q. When did he join your practice?
A. One year ago.
Q. So that was in 2005?
A. Yes.


831d373c-d877-4400-9353-010c1c445990

Q. Before 2005, how would you describe the breakdown of your practice as between knees and shoulders?
A. Oh, probably -- probably 60 percent knee, 30 percent shoulder, and then 10 percent other -- other things.
Q. And now you're focusing more on knees than shoulders?
A. I am. It's probably more like 70 percent knees now, um-hum.
Q. And let's focus for a minute on your shoulder practice. In terms of your shoulder practice, what sort of injuries are you seeing?
A. Rotator cuff disease, primarily rotator cuff tendinitis, rotator cuff tears, occasionally people who have dislocated their shoulders. And I don't do ER trauma call anymore, so I'm really not doing fractures.
Q. So would it be fair to say that over the last -- since 2000, at least, your shoulder practice has focused on rotator cuff injuries --
A. Yes.
Q. -- or diseases?
A. Or diseases, yes, um-hum.
Q. Okay. And that would include diseases, tendinitis, tears, those sorts of things?



A. Yes, it would.
Q. Do you do shoulder surgeries?
A. Yes, um-hum.
Q. What type of surgeries do you do?
A. Rotator cuff repairs, surgery for impingement, such as acromioplasties. Those are the primary ones that I do.
Q. And about how many surgeries do you do a week?
A. Oh, I usually do probably seven surgeries a week.
Q. Seven shoulder surgeries?
A. No, seven surgeries.
Q. All right. And of those seven surgeries, on average a week, how many are shoulder surgeries?
A. Again, with the addition of the new partner, I don't do a lot of shoulder surgery anymore.
Q. But let's say before --
A. Before the partner arrived, oh, goodness. Hum. You know, I'm not certain. That's something I didn't look at. But I would fairly commonly do rotator cuff repairs, you know, a number a month in the past.
Q. Okay.
A. And the same thing with the shoulder arthroscopies: quite a few a month.



Q. Okay. Fair to say you're a seasoned orthopedic surgeon, correct?
A. Fair to say, yes.
Q. And you're also a seasoned orthopedic surgeon for shoulder injuries, as you've described?
A. Yes, um-hum.
Q. Doctor, when you first meet a patient, what do you do during your office examinations? Take me through your general practice of your office examinations.
A. Well, it would consist of just taking the history from the patient initially and having them describe their symptoms and when things began to be a problem. Then there would be a physical examination. Then there would be imaging studies, such as X-rays, if necessary. Then I would discuss with them what my findings were, and we would form a plan.
Q. And that plan would be your recommended treatment, correct?
A. Yes, um-hum.
Q. Doctor, do you memorialize your office visits in office notes?
A. Yes.
Q. Do you dictate those notes?
A. I do.



Q. Are those dictations then transcribed?
A. Yes.
Q. Do you review those transcriptions after they are transcribed?
A. I do.
Q. Do you dictate your notes shortly after you see the patient?
A. Yes.
Q. And do you correct any mistakes, in your mind, in those notes if you find them?
A. Yes.
Q. Doctor, now let's turn -- since this case largely involves Mr. Ronwin's shoulder, let's turn to basic anatomy of the shoulder, if we could. And it would help me and perhaps Mr. Ronwin if you would basically explain the anatomy of the shoulder. And my question is this: Could you, in general terms, in lay terms if you would, describe the basic anatomy of the shoulder as it relates to Mr. Ronwin's injury?
A. Yes. The rotator cuff is composed of four tendons and muscles, and the tendons actually attach to the upper portion of the humerus. And one of those tendons is an internal rotator, and three of those tendons are external rotators, hence the name "rotator cuff."

The tendon that is most commonly involved with rotator cuff disease and tears is the supraspinatus, primarily because of its location, which is underneath the acromion. It's in a location underneath the acromion, between the humeral head, so that it's in a location that can be pinched. Also, in a fall, something such as that. Again, it's between two bony structures, so it's in a vulnerable position.
MR. RONWIN: Would it be helpful to have that lovely diagram in here?
THE DEPONENT: I think I'm fine without it, but thanks.
MR. RONWIN: Well, okay.
Q. (BY MR. PILKINGTON) You can keep going.
A. And then also in the shoulder there's a bursa that's underlying the acromion. And that kind of sits on top of the rotator cuff. It can also sometimes become inflamed and can cause shoulder problems as well, so . . .
Q. Is that what we call bursitis?
A. Yes.
Q. Doctor, can you describe the joint? The joint is formed with several bones and tendons; is that correct?
A. Certainly. It's a ball-and-socket joint.



But again, the socket, I tell patients, is very shallow, and so the ball nestles up against that shallow socket, which means that the muscles surrounding it are very important as far as holding it into that socket.
I tell people they have to work hard, you know, to keep the ball in the socket appropriately. The anatomy of the shoulder allows the shoulder, however, to have excellent range of motion, and that's one of the reasons that it's not a very constrained kind of socket.
The bones involved are the glenoid, which is the socket; the humeral head, which is the ball; and then the acromion, which I mentioned before is -- what I tell patients, kind of in lay terms, is the point of the shoulder. That connects to your clavicle through the acromioclavicular joint. And also, the acromion is attached to the scapula.
Q. So would be fair to say, in the overall anatomy of the shoulder, we're dealing with two joints: the ball-and-socket joint, as well as the AC joint?
A. Yes, um-hum.
Q. Doctor, I'd like to go back with -- to what you said about the supraspinatus tendon. Is that an external tendon or an internal tendon?
A. It's an externally -- it -- I think I'm understanding you correctly. It's an external rotator.



Q. Okay. Thank you for that clarification. So in terms of the supraspinatus tendon, could you describe the location of that tendon as it relates to the ball and socket in the AC joint?
A. The muscle itself starts in a little grove that's above the spine of the scapula. And then the muscle blends into the tendon.
Q. And the scapula is where?
A. The shoulder blade.
Q. Okay.
A. Okay? And then the muscle blends into the tendon that then enters into the shoulder itself and attaches to the humeral head.
Q. And, Doctor, your shoulder blade is on the back side of your body, your back, correct?
A. Yes.
Q. And does the scapula come up over the top of your shoulder?
A. It does. That's -- the acromion is the projection of the scapula that then comes forward and forms the point of the shoulder.
Q. And how would you describe -- if you would, since we're on the record, how would you describe the point that you just suggested locationwise?
A. Let's see. I would say it's the superior



aspect of the shoulder and lateral aspect.
Q. So I'm reaching to my shoulder, my left shoulder. The scapula comes up -- starts in my back and comes up over -- curves over the top of my shoulder; is that correct?
A. It -- the acromion is the portion of the scapula that kind of thins down and projects forward and lateral.
Q. And the AC -- I'm sorry. The supraspinatus tendon is found where in relation to the AC joint?
A. It lies underneath that joint and underneath the acromion.
Q. You suggested before that the tendons that you see most often that are damaged are the supra -- is the supraspinatus tendon; is that correct?
A. That's correct.
Q. Why is that?
A. Primarily because of its location.
Q. And what about its location creates the injuries that you see?
A. It is located between the ball, which is a bony structure, and the acromion, which is a bony structure. And when we lift our arm, then the space that it is traveling in can become smaller, and it can become pinched.

Q. And is that pinching referred to as impingement syndrome?
A. Impingement syndrome is when the rotator cuff gets inflamed, and people have symptoms because of that inflammation.
Q. Let's turn to symptoms and rotator cuff tears. You -- you keep up on the literature as it relates to rotator cuff tears?
A. I -- I try to, yes.
Q. When we deposed Dr. Servi, she was asked questions about asymptomatic rotator cuff tears. Do you agree that rotator cuff tears are sometimes asymptomatic?
A. Oh, yes, um-hum.
Q. And do you agree that partial rotator cuff tears are sometimes asymptomatic?
A. Yes.
Q. Do you also agree that complete rotator cuff tears are asymptomatic?
A. They can be.
Q. And what do you mean by "asymptomatic"?
A. People don't have symptoms and don't realize they have them.
Q. Stated differently, a person may have a partial or a complete tear of a rotator cuff tendon but not present with classic symptoms, correct?



A. Yes.
Q. And those symptoms would be pain or limited range of motion?
A. Yes, or weakness.
Q. Put it this way, Doctor: If I don't have any pain, weakness or decreased range of motion, I could still have a partial or complete rotator cuff tear?
A. Yes, you could, um-hum.
Q. And those opinions are supported and well-documented in the scientific literature?
A. Yes.
Q. Doctor, you may have explained this, but could you do it once again? What is shoulder impingement syndrome?
A. It's a -- it's a diagnosis that consists of, primarily, inflammation of the rotator cuff that is felt to be caused by either repetitive trauma causing inflammation or an injury causing inflammation. So that when the arm is moved in certain ways -- and that would be abduction and internal rotation -- that causes pain in the shoulder.
Q. Can that also be caused by degenerative changes as well?
A. It can.
Q. And by "degenerative changes," would you



describe that to the jury?
A. That could be degenerative changes such as in the acromioclavicular joint. You can form -- as a result of degenerative changes, you can have spurs. And those spurs can project inferiorly, downward. And then that can irritate the rotator cuff, which is lying right underneath that area.
Q. Doctor, let's now turn to your care and treatment of Mr. Ronwin. I want to begin in perhaps a nonobvious fashion, but I want to begin with the surgery.
A. Okay.
Q. Okay? I want to jump all the way ahead. We may come back, we may not, but I want to jump to your surgery. I have marked as Exhibit Number 3 your surgical report. Give me one moment.
(Deposition Exhibit 3 was marked.)
Q. Doctor, I've handed you what I've marked as Exhibit Number 3. What is Exhibit 3?
A. Exhibit 3 is the operation summary from 6/28/03 of the left shoulder surgery for Mr. Ronwin.
Q. Did you do his left shoulder surgery?
A. I did.
Q. Is this a report that you dictated?
A. Yes, it is.
Q. And did you review this report after it was



dictated?
A. Yes, I did.
Q. Is this a true and accurate report of your operation?
A. Yes.
Q. Doctor, what is the purpose of an operative report or an operation report?
A. It's -- it accurately depicts what was done surgically so that historically you have something to refer back to.
Q. So it's a very important medical record?
A. Yes.
Q. Doctor, what was your preoperative diagnosis?
A. Left shoulder adhesive capsulitis and left shoulder full-thickness rotator cuff tear.
Q. Was your postoperative diagnosis the same?
A. It was.
Q. Explain those two diagnoses.
A. The full-thickness rotator cuff tear is when the rotator cuff is completely torn through the entire substance of the tendon. And again, it can be one of those four tendons of the rotator cuff, or more.
The adhesive capsulitis is more commonly known as a frozen shoulder. And that sometimes occurs



831d373c-d877-4400-9353-010c1c445990

when the capsule gets inflamed or people are hurting and not using the shoulder, and then there are actually adhesions that develop in the shoulder that prevent it from moving.
Q. So it's a -- you described it as a "frozen shoulder." It just doesn't move like it should?
A. Correct.
Q. Doctor, let's now focus on the rotator cuff tear. Mr. Ronwin's rotator cuff tear involved only one tendon, correct?
A. That's right.
Q. What tendon was that?
A. The supraspinatus.
Q. Is that the same tendon that you just described to me as the most frequently torn of the four rotator cuff tendons?
A. Yes.
Q. We'll get to the specifics of that, but would you -- what I'd like you to do now is turn to what types of operation that you did. Under Operation Performed, you wrote, "Number 1. Left shoulder manipulation under general anesthesia." What is that?
A. After the patient has been placed under anesthesia, you check the range of motion of the shoulder, and in his case I did so. He had limited range



of motion, just like a mechanical block. And so what you do is, you actually physically manipulate that shoulder, and you can actually hear and feel release of adhesions. It's noisy. And take the shoulder through a range of motion to break up those adhesions, and that will then allow the patient hopefully to get better range of motion after surgery quicker.
Q. So the purpose of that manipulation is to break those adhesions so that the patient can obtain greater range of motion?
A. Yes.
Q. And you do that under anesthesia, obviously?
A. Yes.
Q. Doctor, the second portion of your surgery that you described is, quote, Left shoulder rotator cuff repair with acromioplasty, correct?
A. Yes.
Q. Are those two different or -- two different surgeries?
A. They're done through the same incision, but they are two different and distinct procedures. The acromioplasty is making more space for the rotator cuff. So on the undersurface of the acromion, you actually shave off the bone, so that you have made that space bigger where the supraspinatus tendon is traveling. And



then, of course, then the rotator cuff repair is exactly that. You're repairing the tear in the rotator cuff, in this case the supraspinatus.
Q. Doctor, would you describe the acromioplasty that you did for Mr. Ronwin?
A. Sure. I did that in -- with an arthroplasty burr and with rongeurs. What an arthroplasty burr is is a high-speed burr. And then rongeurs are little bone-cutting tools, so if you have any sharp places remaining, you can remove them. And then I indicated that I took the acromioplasty all the way over to the acromioclavicular joint. And so, again, that's from lateral to medial all the way over to the AC joint.
Q. How far would that be distancewise?
A. Oh, it would be a matter of just -- depending on people's size, it's probably 3 centimeters at most.
Q. So you took -- what you did is, you used these tools to increase the space in the AC joint area?
A. Increase the space in the subacromial space --
Q. Okay.
A. -- so the space below the acromion.
Q. And what you were doing is, you were taking away some of the bony area of the bottom side of the



acromion?
A. Yes, any bone spurs that were there that were encroaching onto or pushing on the supraspinatus. You would then basically kind of lift -- kind of raise the roof of that space, so to speak.
Q. And, Doctor, did you do that procedure, the acromioplasty, because the radiograph showed advanced narrowing of the AC joint?
A. Partly so. But most shoulder surgeons do typically do an acromioplasty fairly routinely with rotator cuff repairs just to give the cuff more room in the future.
Q. So it was a combination of both?
A. Yes, it was.
Q. Doctor, the second portion -- or second procedure that you did was the repair of the supraspinatus tendon?
A. Yes.
Q. How did you do that?
A. I did a soft-tissue repair and a tendon-to-tendon repair with suture.
Q. So you effectively reconnected the tendon to the -- the tendon together?
A. Yes. And it was a tear through the tendon, and there was good tissue on either side of the tear,

Page 38

which enabled the repair to be done with multiple sutures.
Q. When you say "there was good tendon on each side of the repair," that's a positive thing to allow you to -- to allow a successful surgery?
A. Yes. And -- yes, um-hum.
Q. Doctor, so is it fair to say that in this surgery you, one, manipulated the shoulder to improve the capsulitis that you found?
A. Yes.
Q. Two, you did an acromioplasty to give greater space below the acromion?
A. Yes, um-hum.
Q. And finally, you reattached or tied together the ruptured supraspinatus tendon, correct?
A. Yes, um-hum.
Q. Doctor, let me step back for a moment. Is it fair to say that the surgery was done because of the results of the left shoulder arthrogram done in late May?
A. That, and the ongoing symptoms.
Q. Okay. Let's -- I'll mark as Exhibit Number 4 the arthrogram.
(Deposition Exhibit 4 was marked.)
Q. Doctor, do you have Exhibit Number 4 in front of you?

Page 39

A. I do.
Q. What is Exhibit Number 4?
A. That is the left shoulder arthrogram dictated report summary.
Q. This was prepared by Dr. Singer?
A. Yes.
Q. Is he a local radiologist?
A. He is.
Q. Do you rely on Dr. Singer in your practice?
A. Yes.
Q. And have you -- do you have a great deal of confidence in Dr. Singer's findings?
A. I respect him a lot.
Q. What was the purpose of this arthrogram?
A. This was to help us determine if there was a tear in the rotator cuff.
Q. What is an arthrogram?
A. An arthrogram is a procedure where dye is instilled into the glenohumeral joint, and then X-rays are taken. And you're looking to see, also with a little exercise of the shoulder, if that dye extravasates, or travels, anywhere it shouldn't go. It should be self-contained in that joint if the rotator cuff is intact. If the rotator cuff has a full-thickness tear into it, then it will escape into areas it shouldn't go.

Page 40

Q. And indeed, that was the finding of Dr. Singer in this arthrogram, correct?
A. Yes, yes.
Q. That Mr. Ronwin had a full rotator cuff tear?
A. Yes.
Q. Doctor, did you review the report before your surgery?
A. Yes.
Q. Did you review the actual film before your surgery?
A. Absolutely.
Q. And is that a common practice to do so?
A. Yes.
Q. After reviewing the film, did you agree with his findings?
A. I did.
Q. Doctor, let's turn to the -- his findings in Exhibit Number 4. And I'd like you to focus on the first full paragraph. The first sentence says, "Preliminary films of the shoulder demonstrate smoothing marginated sclerotic densities in the glenoid process of the scapula and in the humeral head consistent with bone islands." What does that refer to?
A. That means that what was seen in the regular

Page 41

X-rays were some areas of sclerosis, or increased density. And they're fairly commonly seen. They're just benign findings.
Q. And when you -- where were they found?
A. Let's see. In the glenoid.
Q. So actually in the bone itself?
A. Yes.
Q. Okay. So that is -- those findings are increased areas of densities in the bone itself, not on the exterior, or outside, of the bone; is that correct?
A. Correct.
Q. And when you say "benign," clinically insignificant for your -- for your purposes?
A. Yes.
Q. Doctor, the next finding is, quote, There are degenerative changes in the AC joint. The joint space is narrowed, and there are small, marginal osteophytes, correct?
A. Yes.
Q. What do you -- what is meant by "degenerative changes in the AC joint"?
A. Well, typically what that means is that the joint is narrower than you'd expect it to be, which would indicate that there's some wear or thinning of the cartilage in the joint. He goes on to say that the joint

space is narrowed. And then "marginal osteophytes" means that along the borders of the two bones that are joining, there are bone spurs. And those bone spurs form in response to the arthritis, increased stress on the bone.
Q. So, really, there are two findings there. One is that the AC joint was narrow than -- narrower than expected, correct?
A. Right.
Q. And two, there was a finding of bone spurs in that joint area, correct?
A. Yes.
Q. Doctor, in your clinical judgment, do you see -- let me back up. In your clinical experience, do you see narrowing of the AC joint in older patients?
A. Yes, you certainly can, um-hum.
Q. Is narrowing of that joint more frequently found in older patients?
A. It is.
Q. In other words, the narrowing of the AC joint is a degenerative process?
A. Yes.
Q. It happens as we get older?
A. Not in everybody, but certainly it does happen -- you see it definitely more frequently in people who are older.



Q. Stated differently, the prevalence of AC joint narrowing is greater as you get older, as opposed to as -- when you were younger?
A. Yes, um-hum.
Q. And, Doctor, what causes these bone spurs to develop?
A. Typically it's thought that because the cartilage acts as a cushion, if there is thinning of that joint, then there is a little bit more stress on the bone, since it doesn't have the cushion, and the body responds to that stress by forming bone spurs. A similar thing happens in the knee with knee arthritis.
Q. So these bone spurs are an arthritic result?
A. Kind of a secondary sign of what's going on with the arthritis.
Q. Okay. So you found this AC joint narrowing as well as bone spurs in that area, correct?
A. Correct.
Q. You also found "small subchondral cysts at the tip of the clavicle and in the adjacent acromion process"?
A. Yes.
Q. Would you explain that?
A. That can also be associated with arthritis. It's just a radiographic finding.



Q. And the acromion process is where?
A. The superolateral aspect of the shoulder.
Q. Is that near the rotator cuff area?
A. That's above the rotator cuff.
Q. So with the -- the AC joint narrowing, as well as these bone spurs, that would be in the area of the supraspinatus tendon, correct?
A. Yes, um-hum.
Q. Whereas the cysts, that would be above the acromion bone; is that correct?
A. Yes. Well, the cysts are in the -- the cysts are actually in the tip of the clavicle.
Q. Okay.
A. So the clavicle joins the acromion through this joint that has the bone spurs in it, and then the cysts are actually in that bone in the end of the clavicle. And then, also, apparently there was some in the acromion itself.
Q. And finally, Doctor, you note that "Bone spurs project from the greater tuberosity of the humeral head," correct?
A. Yes.
Q. What does that refer to?
A. Well, the greater tuberosity is the portion of the humeral head where three of the rotator cuff



muscles attach -- or tendons attach.
Q. Is one of those tendons the supraspinatus?
A. Yes, um-hum.
Q. So what you found were bone spurs in that area where those three tendons attached?
A. Yes, per this X-ray report.
Q. Including the supraspinatus tendon?
A. Yes.
Q. And when I say "you," you saw -- you reviewed the X-ray, correct?
A. I did.
Q. I'm sorry. The arthrogram, correct?
A. I did.
Q. And you agreed with these findings, correct?
A. I did.
Q. So, Doctor, would you explain to the jury what this arthrogram showed as it related to a possible rotator cuff tear?
A. Initially dye was placed into the glenohumeral joint, and then the -- then they ask the patient to move his arm. And there was reported to be, per this report, immediate extravasation of the contrast media through the superior aspect of the joint space, into the subacromial bursa. And again, that's consistent with a tear of the rotator cuff, because normally the

fluid should stay in the glenohumeral joint.
Q. And specifically, this was consistent with a finding of a supraspinatus tendon tear, correct?
A. You can't, with an arthrogram, be that specific. All you know is there's a hole, and it's getting from one place to the other when it shouldn't.
Q. But the conclusion of this report, that it was most probably a supraspinatus tendon tear, correct?
A. Yes. And sometimes I think the radiologists, they -- as they're seeing it happen in realtime, they get a little more of a sense of where is that dye traveling.
Q. Regardless of whether you can tell or not with an arthrogram, your operation told you it was a complete tear of the supraspinatus tendon, correct?
A. Yes, it did.
Q. Doctor, the final sentence of this report says, "Degenerative changes are present, as described above." Do you see that?
A. I do.
Q. Do you agree that degenerative changes were found in this arthrogram?
A. I do.
Q. And the degenerative changes that you're referring -- that this refers to -- let me back up. You



agree that there were degenerative changes, correct?
A. I do.
Q. And the degenerative changes that you saw were those four changes that were set forth in the first paragraph, correct?
A. I do.
Q. Doctor, I may have asked this, but I apologize if I did. Do you see -- are bone spurs, as -- as you found in this arthrogram, more common in the elderly population?
A. Yes.
Q. And why is that?
A. I think, again, it's -- you know, we've used the joint more. It's similar in other joints in the body. There's a higher prevalence of arthritis and wear-and-tear-type phenomenon as we age in all of our joints.
Q. Doctor, before this arthrogram, did your office do an X-ray of Mr. Ronwin?
A. We did a left shoulder X-ray that appears to be dated 5/12/03.
Q. Doctor, I was not able to find a report of that. Perhaps it's just contained in your office notes; is that correct?
A. That's correct.



Q. And you pulled out one of the -- the 5/12 X-ray, or you're trying to?
A. I'm trying to. Okay. Yes, 5/12/03.
Q. Doctor, what were your conclusions after you reviewed the 5/12 X-ray?
MR. RONWIN: Excuse me. Was that done at your office or in the Harmony -- the other part of the Harmony Center here?
THE DEPONENT: This was done -- the X-ray was done in our office.
MR. RONWIN: It was in your office?
THE DEPONENT: Um-hum, yeah, um-hum.
Q. (BY MR. PILKINGTON) Doctor, you reviewed that May 12 of 2003 X-ray?
A. Yes. And --
Q. What did you -- what did your review of that X-ray show?
A. I described "Degenerative changes of the AC joint," and then I said, "with perhaps some inferior osteophyte formation of the glenoid," but described that finding as "mild."
Q. When you said "degenerative changes of the AC joint," what do you mean by that?
A. I mean narrowing of the joint space.
Q. And did you also find bone spurs in that



area?
A. Yes. It looks like there is a bone spur, too.
Q. Doctor, this X-ray -- Mr. -- let me back up. Mr. Ronwin continued to have symptoms of -- chronic symptoms relating to his left shoulder, correct?
A. Yes, um-hum.
Q. And we'll get to those symptoms in a moment. But because of those symptoms, you did an X-ray on May 12 of 2003, correct?
A. Yes.
Q. You then did an arthrogram in late May 2003, correct?
A. Yes.
Q. The -- the findings of the X-ray and the arthrogram, as well as the symptoms, led you to recommend surgery for Mr. Ronwin, correct?
A. Yes.
Q. And that surgery was completed, I believe, on June 26th?
MR. RONWIN: 28th.
A. June 26th.
MR. RONWIN: 26th?
Q. (BY MR. PILKINGTON) According to your report?



831d373c-d877-4400-9353-010c1c445990

A. According to my report.
Q. And we've gone through that -- that surgery in some detail, correct?
A. Yes.
Q. During the course of your surgery, did your surgery confirm the radiological findings of both the X-ray, as well as the arthrogram?
A. It did.
Q. Stated differently, your surgery confirmed that there was narrowing of the AC joint, correct?
A. Actually, I did not enter the AC joint. You're looking kind of at the underside of it during surgery.
Q. But what you did as part of your surgery was to widen the space of that AC joint, correct?
A. The subacromial space.
Q. I'm sorry. Okay. And the reason you did that was what?
A. To decompress the rotator cuff and give it more room.
Q. To give it more room?
A. (Deponent nodded.)
Q. And you also removed bone spurs, correct?
A. Yes.
Q. On the inferior side of the acromion?



A. Yes, um-hum.
Q. Doctor, did you follow Mr. Ronwin following his surgery?
A. I did.
Q. When was -- how long was he hospitalized; do you know?
MR. RONWIN: Three days.
A. I do. He was hospitalized from 6/26 to 6/29/03.
Q. (BY MR. PILKINGTON) And are you looking at your discharge report?
A. I am.
Q. And, Doctor, I'll mark a couple more exhibits for you to review.
(Discussion off the record.)
(Deposition Exhibit 5 was marked.)
Q. Doctor, I've handed you what I've marked as Exhibit Number 5. And I'm looking for a copy for Mr. Ronwin. Just one moment.
MR. RONWIN: Well, I've got them here. I can take my own.
Q. (BY MR. PILKINGTON) Doctor, is Exhibit Number 5 an accurate copy of the history and physical that you prepared for this surgery?
A. Yes.



Q. Doctor, for the record, I'll mark your discharge summary as Exhibit Number 6.
(Deposition Exhibit 6 was marked.)
Q. Is Exhibit Number 6 a true and accurate copy of the discharge summary that you prepared for Mr. Ronwin's shoulder surgery?
A. Yes, um-hum.
Q. And once again, those documents are prepared in large part to document the care and treatment that was provided to him; is that correct?
A. Oh, I'm sorry. Yes, yes.
MR. PILKINGTON: Let's go off the record for a minute.
(Discussion off the record.)
Q. (BY MR. PILKINGTON) Doctor, I want to pick up with your care and treatment of Mr. Ronwin following the surgery. He was discharged on June 29th of 2003?
A. Yes.
Q. Was he discharged to his home?
A. He was.
Q. Did he drive himself home?
A. No.
MR. RONWIN: No.
Q. (BY MR. PILKINGTON) And do you know how he got home?



A. I do.
Q. Okay. How would he get home?
A. My husband and I drove him home.
Q. That was very kind of you.
A. Well, he's --
Q. Do you do that for your patients often?
A. I think that was a first.
Q. To make sure he got home and was okay?
A. Yes.
Q. Doctor, I want to focus now on your postsurgery care. And we will mark as Exhibit Number 7 your clinic notes. These have been -- already been authenticated by Dr. Servi --
A. Oh, great.
Q. -- but we'll use these with you as well.
A. Sure.
(Deposition Exhibit 7 was marked.)
Q. Doctor, is Exhibit Number 7 a true and accurate copy of your clinic notes?
A. It appears to be, yes, um-hum.
Q. And if you need to refer to this, you certainly can do so. Following the surgery, however, you followed Mr. Ronwin?
A. Yes.
Q. It appears that he came in just a few days



831d373c-d877-4400-9353-010c1c445990

Page 54

after his surgery, correct?
A. Yes.
Q. What was the first day that he came back?
A. 7/2/03.
Q. There's 7.
A. Thanks.
Q. How was he doing when he returned?
A. The record states he was "doing quite well." I said, "He was diligent with his HEP" -- that stands for home exercise program -- "and his incision was benign." We took out his stitches, and I asked him to return in two weeks.
Q. Did he return?
A. He did, on 7/14/03.
Q. How was he doing at that point in time, about two weeks after the surgery?
A. Yes. And the records state that "He states he is feeling much better and is gaining with regard to range of motion."
Q. And is that what you expect following a surgery of the rotator cuff about two weeks postop?
A. Yes. And especially with a manipulation, too, because sometimes that's even harder to get your range of motion back.
Q. So -- so two weeks after surgery he was

Page 55

doing -- progressing quite well?
A. Yes, um-hum.
Q. He returned in August, correct?
A. August 25, '03.
Q. How did Mr. Ronwin tell you how he was feeling?
A. The record states that "He stated overall he is doing well. He felt his physical therapy had been helpful, and we reviewed that report. He said he had a concern about a click that he occasionally felt with flexion."
Q. Were you able to duplicate the click?
A. And he -- well, the record says, "He was able to demonstrate that today."
Q. How did he -- had his range of motion improved over the two months following the surgery?
A. Let's see. He had flexion to 150 degrees and abduction to 90 degrees. Prior to surgery --
Q. No, I'm sorry.
A. Or --
Q. Postsurgery, had his -- had his range of motion improved?
A. Oh, yes, it had.
Q. Okay.
A. Yes, it had. It was progressively

Page 56

improving.
Q. What is flexion, Doctor?
A. Flexion is bringing the arm forward in front of the body.
Q. So moving it straight in front of your body?
A. Lifting it up, yes.
Q. What is normal for an 80-year-old man?
A. 180 is bringing it all the way up overhead.
Q. Is that common in 80-year-old men, or --
A. People -- people -- we're all different, but many people can do it.
Q. Many people can do it?
A. You bet, yes.
Q. Do you often see 80-year-old men who can't do that?
A. I do, um-hum.
Q. How about abduction? What is that?
A. Abduction is bringing the arm out to the side laterally.
Q. What is normal?
A. And, again, 180 degrees.
Q. Okay. And at least two months after surgery, Mr. Ronwin had 150 degrees of flexion?
A. Yes.
Q. Were you pleased with that progress?

Page 57

A. Yes.
Q. And his abduction was what?
A. 90 degrees.
Q. Were you pleased with that progress as well?
A. I was. We actually limit some of these things to protect the rotator cuff repair for a time.
Q. But two months postsurgery he was doing very well, in your opinion?
A. Yes, it appears so from my note.
Q. Indeed, he was -- you prescribed physical therapy for Mr. Ronwin, correct?
A. I did.
Q. And who did you prescribe for physical therapy? I'll represent to you that it was Adams & Giddings.
A. Adams & Giddings PT.
Q. Do you frequently refer your patients to that clinic?
A. I do.
Q. And how long was Mr. Ronwin in physical therapy?
A. Hum.
MR. RONWIN: About five to six weeks.
A. It looks like the first note was -- well, let's see here. I see an August 4th note, and an August


831d373c-d877-4400-9353-010c1c445990

Page 58

22nd note, a September 19th, and that looks like all the PT.
Q. (BY MR. PILKINGTON) So it looks like about the beginning of August through mid-September, correct?
A. Yes.
Q. And what was the purpose of the physical therapy?
A. To assist him in his recovery with both passive range of motion, active assisted range of motion, primarily both of those.
Q. Doctor, was the -- in your opinion, was the physical therapy helpful in improving Mr. Ronwin's condition?
A. Yes.
Q. Indeed, in September of '03, about three months postsurgery, Mr. Ronwin was doing well, correct?
A. Yes, he was.
Q. That's -- that's what he told you, correct?
A. Yes, um-hum.
Q. What did he tell you about physical therapy?
A. What date?
Q. September 22nd of '03.
A. "He states overall he is doing well. He felt the physical therapy had been helpful, but also felt he had some increased soreness after therapy and thought

Page 59

he was at the point where he could do his home exercise program well."
Q. So that's the point in time where he stopped the physical therapy and continued his home exercise program?
A. Yes.
Q. I note in there that his flexion was now 160 degrees without discomfort, correct?
A. Yes.
Q. Again, how would you describe the level of achievement in terms of postsurgery flexion?
A. I would describe that as good.
Q. And indeed, only 20 degrees short of normal?
A. Yes.
Q. Doctor, you then saw Mr. Ronwin four months after the surgery, in late October of '03?
A. Yes.
Q. What did Mr. Ronwin tell you about how he felt in his -- about his progress?
A. My note indicates, "He returned stating he was actually feeling well and encouraged by his progress. He states he has better range of motion and less discomfort of the shoulder all of the time."
Q. Now, based on those comments, did you believe that he was progressing -- that is, improving --

Page 60

following the surgery?
A. I did.
Q. And Mr. Ronwin told you that he is feeling better, correct?
A. Yes.
Q. That he thought he was progressing -- that is, improving -- correct?
A. Yes.
Q. That his range of motion was improving, correct?
A. Yes.
Q. And that he has less and less discomfort of his shoulder --
A. Yes.
Q. -- as time passes, correct?
A. Yes.
Q. All very positive signs?
A. Yes.
Q. He did describe one limitation to you, correct?
A. Yes, he did.
Q. And what did he describe to you?
A. He said that he couldn't get used to putting his jacket on utilizing the left arm first, and so he preferred to put the right arm in first, even though it

Page 61

was a little uncomfortable, than putting the left arm in.
Q. And do you recommend that many of your patients try to make adaptions following a rotator cuff surgery?
A. Yes. It's oftentimes just more comfortable.
Q. Doctor, would you read the last sentence of your October note to the jury?
A. "He seems to actually be doing quite well at this time functionally and will return in approximately three months for reassessment."
Q. Was your conclusion three months postop that he was doing quite well functionally?
A. Yes.
Q. The last time -- I'm sorry. You then saw Mr. Ronwin in February of '04?
A. Yes, um-hum.
Q. And was this a routine follow-up?
A. I did ask him in October to return in three months. It looks like it would be that follow-up.
Q. So this would have been about a little over six months postsurgery, correct?
A. Yes. Let's see.
Q. I want to go through your discussion of Baycol, but I also want to go through your examination of Mr. Ronwin. What did your physical examination reveal?

A. On the February 2, '04 visit I said, "Today reveals he has excellent range of motion of the right shoulder. He can abduct fully with a 2-pound weight." Wait a minute. Let me -- let me stop. "Today reveals he has excellent range of motion of the right shoulder. He can abduct fully with a 2-pound weight. On the left he will abduct to 90 degrees, and then does complain of some pain, causing him to stop. He has 145 degrees of flexion left, 180 degrees flexion right. He states the left shoulder is still not normal." And then I just said, "He has undergone a rotator cuff repair as well as manipulation for adhesive capsulitis."

Q. So at this point in time, he was still a little short in terms of flexion, as well as abduction, correct?

A. Yes.

Q. And based on your experience, six months following a rotator cuff surgery, would you expect someone to be still short of normal flexion and abduction?

A. I think some people definitely will still be short of that, and especially if they're also fighting a frozen shoulder.

Q. So these findings were not unexpected, correct?



A. Correct.

Q. But is it your opinion that he was still progressing well?

A. I would say so. I think from the previous note, he had -- he had lost a few degrees in the flexion range, but still was -- was progressing reasonably.

Q. Now, you saw Mr. Ronwin about a month later, correct?

A. Yes.

Q. Why did he come to see you at that point in time?

A. My report states, "Returns at this time to discuss his concerns with his case against the manufacturers of Baycol."

Q. And did you write a letter for him?

A. I had.

Q. Doctor, I want to go back to February. Is --

THE DEPONENT: Could we go off the record for a minute?

MR. PILKINGTON: Yes, you may.

(Break taken from 2:39 p.m. until 2:44 p.m.)

(The last question was read back)

MR. PILKINGTON: I will start over.

MR. RONWIN: You're on the note 3 -- March



22, '04.

Q. (BY MR. PILKINGTON) Doctor, we're back on the record. And again, if you ever need to take a break, just do exactly what you did. Okay?

A. Thank you.

Q. Doctor, we are on the office note of February 2nd of '04. Okay? Do you have that in front of you?

A. I do.

Q. And he told you that he was still proceeding with his case against my client, Bayer, correct?

A. Yes.

Q. Who manufactured Baycol, correct?

A. Yes.

Q. In your practice, do you ever prescribe statins?

A. No.

Q. Have you ever prescribed Baycol?

A. No, huh-uh.

Q. Doctor, what did Mr. Ronwin tell you at this visit about his case against my client?

A. Let's see. He had asked both Dr. Servi and myself to just assist him in some clarification of some abbreviations that were in the chart which we had provided him copies of, and we reviewed some of that. He



did tell me he had some difficulties with the left shoulder.

Let's see. Specific to your client, my note says, "We did discuss the rhabdomyolysis problem with the Baycol and also the myositis symptoms." And I said, "He notes in June apparently they are going to trial."

Q. Do you recall your discussion about rhabdomyolysis as well as the myositis symptoms?

A. I don't.

Q. Was it your -- did Mr. Ronwin tell you that he believed that Baycol caused his rotator cuff tear?

A. He did.

Q. Did he also ask you for a letter that set forth an opinion that Baycol caused his rotator cuff tear?

A. Well, he did -- he asked me for a letter. And I told him I would -- I think that I would provide a summary letter of -- of care.

Q. Did he ask you for a letter that set forth the cause of his rotator cuff tear, or do you recall?

A. I can't remember.

Q. You wrote a letter, correct?

A. I did.

(Deposition Exhibit 8 was marked.)

Q. Let me hand you what I've marked as Exhibit

Page 66

Number 8. Doctor, would you explain to the jury what Exhibit Number 8 is?
A. This is a letter to Edward Ronwin dated March 5, 2003, a To-Whom-It-May-Concern letter, and summarizing his care in the office of Northern Colorado Orthopedic Associates.
Q. And is this a letter that you wrote pursuant to his request?
A. Yes.
Q. Doctor, is it fair to say that this letter is simply a summary of the care and treatment that you provided?
A. Yes, it is.
Q. And I note it's dated March 5, 2003. Should that be 2004?
A. I don't know. I don't think so.
Q. Well, your office note is March 22nd of '04.
A. Let's see here.
Q. And you note in that office note, "I had written a letter for him dated March 5, 2004."
MR. RONWIN: It's probably an error.
A. Oh, you know --
Q. (BY MR. PILKINGTON) It's just a typo.
A. Oh, I see. It probably is. Yes, yes, I see what you're saying.

Page 67

Q. So again, my question, Doctor, should the -- should the letter be 2004, as opposed to March 5, 2003?
A. It must be, yeah. I apologize.
Q. We all do that, Doctor.
A. Okay.
Q. No problem, nothing -- I just wanted to make sure I was right on that.
A. Yeah.
Q. So, Doctor, in March of '04 he returned to you to discuss his concerns about his case against my client, Bayer, correct?
A. He did.
Q. And you document that in your note?
A. I did.
Q. What else did he want to make certain and make clear to you?
A. He -- he made it clear that he did not start this action against Bayer because of the announcement that Baycol was a destructive agent, noting that his pain started about six months before Bayer's notice was made public. He also wanted it to be clear and in the medical record that he stated there had been no other known trauma to his shoulder during that period of time in which he ingested the Baycol. He emphasized -- again, just reading from the chart -- that in his research he

Page 68

had found that Baycol causes degeneration of tissue in muscle, and that it had also been shown to do this about the shoulder.
Q. Did he share any of that research with you?
A. I can't remember.
Q. But he told you that he had found research that showed that this Baycol had caused degenerative -- degeneration of tissue in the shoulder? Is that what he told you?
A. He said "about" the shoulder.
MR. RONWIN: You want to go off the record on that for a moment?
MR. PILKINGTON: No.
MR. RONWIN: Oh, okay.
Q. (BY MR. PILKINGTON) Doctor, you did -- did you do a physical examination of him at that time, or not?
A. I did not.
Q. And did he also come to you and explain some issues that he had with Dr. Torkelson, of Cheyenne Orthopedics?
A. Yes.
Q. Do you recall what you discussed about that?
A. He just said that Dr. Torkelson -- there had been some either inconsistencies or some things that he

Page 69

didn't agree with in the medical record, and that he had mentioned those concerns with Dr. Torkelson.
Q. At this time -- this was the last time you saw Mr. Ronwin, correct?
A. Yes.
Q. And you note at this time, "He did have some limited range of motion and function," correct?
A. Yes, yes.
Q. And you note that, "as described before," meaning as described at the previous visit?
A. Yes.
Q. But, Doctor, in March of '04, were you -- describe for the jury your satisfaction with the results of your arthro -- with your rotator cuff surgery and acromioplasty.
A. I think I felt that the results were – were satisfactory. You always hope that people will get full range of motion after a frozen shoulder, but that does not always happen. And likewise, with the rotator cuff repair, I think they were satisfactory.
Q. Meaning it could have been worse, it could have been better; fair to say?
A. Fair to say.
Q. Doctor, under your Recommendation, you told him to continue his home exercise program, correct?

A. I did.
Q. And then I'm going to read this for the benefit of the jury. "I indicated to the patient that" --
THE REPORTER: Wait. "I indicated to the patient that"?
Q. (BY MR. PILKINGTON) -- "that I would plan to review the material which he brought with him today. I have again reiterated that in my discussions with other doctors, Baycol has affected muscle tissue, but there has been no reported incident of rotator cuff tear being linked to this to my knowledge." Did I read that correctly?
A. Yes.
Q. And did you explain that to Dr. Ronwin that day?
A. I did.
Q. Doctor, as of March of 2004, were you aware of any scientific evidence that rotator cuff tears were in any way associated with Baycol?
A. I was not.
Q. With a statin?
A. I was not.
Q. Doctor, as we sit here today, are you aware of any scientific evidence that associates Baycol with a



rotator cuff tear?
A. I am not.
Q. Doctor, sitting here today, are you aware of any scientific evidence that in any way associates a rotator cuff tear with statins in general?
A. I am not.
Q. Doctor, you have talked to other doctors about this as well, correct?
A. I have.
Q. And what have your colleagues told you?
A. That -- the same answer.
Q. That they're not aware of any association?
A. Yes, to their knowledge.
Q. Doctor, when you're caring for and treating a patient -- for a patient -- let me start over. In the course of your care and treatment of a patient such as Mr. Ronwin, you diagnose his condition, correct?
A. Yes.
Q. As part of your diagnosis, you are considering the possible causes of that diagnosis, correct?
A. Yes.
Q. Doctor, have you -- do you use the term "differential diagnosis" in your practice?
A. Yes.



Q. What does differential diagnosis refer to?
A. It refers to -- as you're trying to figure out what the diagnosis is, it refers to what are all the different considerations that you might have for that problem.
Q. And when considering a diagnosis for a condition, do you consider possible causes for that condition?
A. Yes.
Q. Doctor, what are possible causes of a tear of the supraspinatus tendon?
A. Possible causes would be trauma and impingement syndrome, aging, acromioclavicular degenerative joint disease, shoulder dislocation. That's fairly inclusive.
Q. And, Doctor, are those possible causes all causes that you consider in making a diagnosis and caring and treating for your patients?
A. Yes.
Q. Doctor, are -- on this differential diagnosis chart, are you aware of any evidence that supports Baycol as being a possible cause of supra -- of a supraspinatus tendon tear?
A. I'm not aware of any.
Q. Doctor, in your clinical judgment, would you



place Baycol on your list of differential diagnoses or causes of a supraspinatus tendon tear?
A. I would not.
Q. Doctor, we've gone through some of your notes, and we'll go through others. Doctor, based on your expertise as an orthopedic surgeon, a doctor who is board certified in orthopedics, as well as your clinical judgment, do you have an opinion as to the cause of Mr. Ronwin's rotator cuff tear?
A. I would state that the most likely cause would be that of a combination of factors, including the impingement, bone spurs, age of the patient.
Q. Doctor, that opinion is based on your clinical care and treatment of Mr. Ronwin?
A. Yes.
Q. As well as your background, education and professional experience?
A. Yes.
Q. Doctor, let's turn for a moment to the first time you saw Mr. Ronwin. We deposed Dr. Servi last week -- I'm sorry, Tuesday of this week, and Dr. Servi was the first doctor in your clinic to see Mr. Ronwin.
A. Yes.
Q. How would you describe your professional relationship with Dr. Servi? How do the two of you

operate in your clinic?
A. Well, her specialty is as a primary care sports medicine physician and also outpatient kind of orthopedic physician. And although her training is not in orthopedic surgery -- it's in family practice and sports medicine -- she does essentially what I do in the office. So she does not do surgery, but she does assist in surgery.
And so she will do an assessment. She'll go through the differential diagnosis. She'll do appropriate testing, just as I would do. And then if a patient reaches a point where she feels that there is a surgical indication or a need for them to see me, then she refers them on to me.
Q. And -- and is it your understanding that that point came in mid-2002?
A. Yes.
Q. And for that reason, she referred the care and treatment of Mr. Ronwin to you, correct?
A. That would be my understanding.
Q. Doctor, do you rely on Dr. Servi's notes and care and treatment in your care and treatment of patients?
A. I do.
Q. For example, in your care and treatment of



Mr. Ronwin, did you rely on her findings as well?
A. I would certainly -- yes, I would certainly have reviewed the history and had that accessible to me.
Q. Doctor, if you would turn to the first page of Exhibit Number 7, her first office note of September 4, 2004. Do you have that in front of you?
A. I do.
Q. Dr. Servi testified that she reviewed the radiographs, or the X-rays, that Mr. Ronwin brought to his (sic) office, okay?
A. Yes.
Q. Would you read what her findings were into the record?
A. "Radiographs: Review of radiography demonstrating mild degenerative changes of glenoid fossa, no proximal migration of the humerus, mild spurring at the distal AC joint with a Type II acromion."
Q. Doctor, are those findings consistent with the findings that you made later in 2003?
A. Yes.
Q. Are those findings indicative of a degenerative change in the rotator cuff region?
A. They're indicative of distal AC joint arthritis, yeah.
Q. And what is a Type II acromion?



A. There are three types. I is a flat surface. And the second one, Type II, has a little curve to it. And the third one has had a sharper hook to it.
Q. What is the significance of the classifications?
A. It's been found that people who have, particularly a Type III acromion, may have a slightly higher incidence of developing rotator cuff tears or injury in the future.
Q. And is it – do Type II acromion also have a higher prevalence of rotator cuff injury than Type I?
A. There's debate, and you can find data supporting both sides.
Q. On both sides?
A. Yeah.
Q. Doctor, in any event, Dr. Servi cared for him up through May of 2002, correct?
A. She did.
Q. And in August of 2002, his care and treatment was handed to you?
A. Yes.
Q. The first time you saw Mr. Ronwin was on August 30, 2002?
A. Yes.
Q. I want to be as brief as I can, Doctor, in



going through many of these notes. But had Dr. -- had Mr. Ronwin been offered X-rays, arthrograms and MRIs in the past to better understand his shoulder injury?
A. Yes.
Q. He was offered those by your clinic?
A. Yes.
Q. And what -- did he decline each of those treatment options?
A. Apparently, yes.
Q. Doctor, you discussed your findings of this date with Mr. Ronwin, correct?
A. I did.
Q. Did you recommend any further sort of diagnostic care and treatment, such as X-rays, an arthrogram, or an MRI?
A. We did discuss X-rays, and he stated that he did not desire further X-rays at this time. He stated he did not want to pursue any further intervention, including arthrogram or MRI, and did not desire to proceed with further injection. But he did elect to utilize a trial of medication.
Q. What was that medication?
A. That medicine was Bextra.
Q. What is Bextra?
A. It's an anti-inflammatory.



831d373c-d877-4400-9353-010c1c445990

Page 78

Q. So in August of 2002 he declined an X-ray, an MRI, an arthrogram and a further injection, correct?
A. Correct.
Q. And he decided to try the Bextra instead?
A. Correct.
Q. Apparently, he called back just two weeks later, in early September?
A. Yes.
Q. And is that depicted in your office note of September 10th of '02?
A. It is.
Q. And what was that call about?
A. He had called and actually spoke with staff, and he had requested a CT scan. When I was told that, I called him back and recommended -- actually, and then I put, "Leaving two messages." And I recommended that he have X-rays done first, and that the CT scan was not indicated. I said in my message to him to call, and we would order the X-rays, and that I would review them and call him back with further recommendations.
Q. Doctor, was an X-ray completed on September 11, 2002?
A. There -- yes, there's an X-ray dated September 11, 2002.
MR. RONWIN: What number, 8, 9?

Page 79

Q. (BY MR. PILKINGTON) This will be Exhibit Number 9, Doctor.
(Deposition Exhibit 9 was marked.)
Q. I've handed you Exhibit Number 9, Doctor, which is an imaging report dated September 11, 2002, correct?
A. I'm sorry. I was reading.
Q. That's okay. Doctor, I've handed you Exhibit Number 9, which is an X-ray report dated September 11, 2002.
A. Yes.
Q. This report was issued by Dr. Pacini?
A. Pacini, yes.
Q. Do you rely on Dr. Pacini's reading of X-rays in your practice?
A. I do.
Q. Do you have a great deal of confidence in his findings?
A. I do.
Q. Doctor, before your surgery of Mr. Ronwin, did you review the X-ray dated September 11, 2002?
A. Hum. I -- I would have. That would have been available to me on our system, yes.
Q. Is it fair to say that you review any X-rays or radiology before going into a surgery?

Page 80

A. Yes.
Q. And it would have been your practice to do so?
A. Yes.
Q. After your review of this report, as well as the film, did you agree with Dr. Pacini's findings?
A. Yes.
Q. And, Doctor, I want to bring your attention to the specific findings. The first finding is a finding relating to the sclerotic densities; is that right?
A. Yes.
Q. Is this the same finding that you found in the arthrogram in May of 2003?
A. Yes, it would appear to be.
Q. Again, would you explain that to the jury?
A. Sclerotic densities just look more white on the X-ray, more dense. And they are just benign findings that we can see in bone sometimes.
Q. So the finding of -- on -- on the -- of the sclerotic densities is similar to that finding on the May of 2003 arthrogram, correct? I stated that rather poorly.
A. It look -- well, it does look like that Dr. Pacini made that comparison and said it looked very similar and unchanged.

Page 81

Q. And let me rephrase my question.
A. Okay.
Q. In -- in September of '02, there was a finding of some sclerotic densities in the glenoid portion, correct?
A. Yes.
Q. You also found those same sort of sclerotic densities a few months later, in May of 2003, correct?
A. Yes, um-hum.
Q. The second finding is, quote, There is mild narrowing of the glenohumeral joint, correct?
A. Yes.
Q. Did you find that in this X-ray as well?
A. I can't remember. I did note in my X-ray that he had a very mild spur in the glenohumeral joint, which would be consistent with this, too.
Q. There's also a note 3 -- I'm sorry. The next finding says, "The AC joint demonstrates advanced narrowing, and there is prominent superior bowing of the distal clavicle." My first question to you, Doctor, did you also -- after your review of the September '02 X-ray, did you also find narrowing of the AC joint?
A. Yes. It would have been consistent with our previous film.
Q. You mean your later film?

A. The later film, yes.
Q. Okay. Let me back up so we're -- I'm not -- I don't mean to confuse you. Okay?
A. Okay.
Q. In September of 2002, Dr. Pacini found that the AC joint demonstrated advanced narrowing, correct?
A. Yes, um-hum.
Q. In the arthrogram, which you reviewed as well --
A. Yes.
Q. -- you found advanced narrowing of the AC joint, correct?
A. Yes.
Q. So those two findings are consistent?
A. Yes.
Q. Doctor, there's also a finding of "prominent superior bowing of the distal clavicle." What does that mean?
A. You know, I don't remember seeing that. And it just means that the bone is bowed, but I don't recall seeing that.
Q. But in any event -- meaning you don't recall seeing that now, or you don't recall making that finding?
A. I don't remember anything about bowing of the clavicle.



Q. Okay. But in any event, Dr. Pacini found that there was prominent superior bowing of the distal clavicle, correct?
A. Correct.
Q. And what was his -- what did he think this related to?
A. He said, "bowing of the distal clavicle probably related to an old injury or developmental in origin."
Q. What -- in your clinical experience, when a radiologist refers to "bowing of the distal clavicle," what does that mean?
A. I don't know.
Q. But in any event, his conclusion was that it was probably related to an old injury or developmental in origin, correct?
A. Correct.
Q. Doctor, did you share these results with Mr. Ronwin? If you'd turn to the next page of Exhibit Number 7, there's an entry 9/16 of '02.
MR. RONWIN: Yeah, a phone call.
A. Okay. 9/16/02. Yes.
Q. (BY MR. PILKINGTON) Do you have that?
A. "Phone call to patient."
Q. Okay.



A. "He feels the Bextra is helping his shoulder. Discussed X-ray of 9/11/02. He will return or call as needed."
Q. Doctor, you next saw him in October of 2002?
A. Yes.
Q. And under Physical Examination, you noted that he continued with his left shoulder pain, correct?
A. Yes. I described "a mildly positive impingement sign and near full range of motion of the shoulder."
Q. And you note the findings of the X-ray, correct?
A. Yes.
Q. And what were your findings with respect to the X-ray?
A. Mild narrowing of the glenohumeral joint with AC joint advanced narrowing.
Q. What was your plan of action at that time?
A. To do an injection in the subacromial space, and also change his medication.
Q. What was the medication changed to?
A. Celebrex.
Q. When did you next see Mr. Ronwin?
A. December 4, '02.
Q. Did you conduct a physical examination at



that time?
A. I did.
Q. And he had somewhat limited range of motion?
A. He did.
Q. What was his range of motion at that time?
A. Flexion 160 degrees, abduction 120 degrees, with discomfort.
Q. How did Mr. Ronwin describe the pain in terms of how much pain there was, as well as how it affected his daily life?
A. On 12/4 he described the pain as "not bad. He feels functional. He does note some difficulties with internally rotating his shoulder to put it into a coat jacket, but compensates."
Q. What was your plan of treatment at this time?
A. The plan was, he was satisfied with his course at this time. He was going to utilize Tylenol. We discussed the maximum safe doses of Tylenol, and he was going to return or call as needed.
Q. Did he return to you in February of '03?
A. Yes.
Q. You said -- this note says that "He returned for persistent left shoulder pain," correct?
A. Yes.

Page 86

Q. How did he describe the pain to you?
A. A short, sharp pain, which he rates as 4 to 5 out of 10. And actually, this is Dr. Servi's note.
Q. I'm sorry. February of '03, Doctor.
A. Oh, wait. We're out of order. I take that back. February 21 of '03, he described "soreness with reaching activities, but otherwise stated he was quite functional."
Q. And did he also explain to you that his shoulder doesn't hurt all the time? It only hurts in specific instances?
A. He did.
Q. And those instances would be when he puts his arm in a sleeve?
A. Yes, um-hum. And he noted it was sore getting things out of his left back pocket.
Q. Doctor, are those sort of symptoms consistent with an impingement syndrome?
A. Yes.
Q. Doctor, are those symptoms consistent with degenerative changes in the shoulder?
A. Yes.
Q. Regardless of those instances of pain, he described himself as quite functional?
A. Yes.

Page 87

Q. He also told you that he had no pain with his activities of daily living, correct?
A. Yes.
Q. Now, he didn't use those words, correct?
A. That's right.
Q. But did he express to you that he was able to do the things in his day without problems?
A. He did, and that driving was not a problem.
Q. Did he explain to you that he functions, quote, very well?
A. Yes.
Q. Doctor, what was your finding under Recommendation in terms of his function, as well as further testing and treatment?
A. I stated, "He is actually quite functional at this time and does not desire further testing or surgical intervention in the future. I have suggested certain ways to minimize his pain with regard to dressing and carrying things, and he agrees to try to do this. He will return on an as-needed basis."
Q. Doctor, he returned in May of 2003, correct?
A. Yes.
Q. And he complained -- he returned to you at that time complaining of severe low back and buttock pain?

Page 88

A. Yes, and actually had been hospitalized for that.
Q. Did you place him in the hospital for that?
A. Yes.
Q. What sort of treatment was provided to him in the hospital?
A. Traction.
Q. What was your impression of this -- these symptoms, this low back pain and buttock pain?
A. My impression when I admitted him to the hospital?
Q. No. When you treated him on May 2nd.
A. He was greatly improved. He was more functional, but he was still having some muscle spasm. And I just stated in my Impression, "Recent improvement of low back pain after hospitalization for traction."
Q. Where are you reading from? I'm sorry.
A. 5/12/03.
Q. I'm sorry. You're one ahead of me. I'm on 5/2/03.
A. Okay.
Q. That's when he complained to you about having the severe low back pain and buttock pain, correct?
A. Let me see if we're out of order.

Page 89

Q. There it is.
A. Oh, thank you.
Q. Do you have May 5 -- I'm sorry, May 2nd?
A. May 2nd, I do. I do.
Q. You have that in front of you?
A. I do.
Q. And is that -- when were Mr. Ronwin's complaints at that time?
A. Let's see. He was in the office for the onset of severe left low back and buttock pain with a sudden onset after his daily walk.
Q. So was it your understanding, based on what he told you, that this low back pain and buttock pain came on all at once?
A. Yes, it was sudden, um-hum.
Q. Doctor, had -- at any point in time prior to this office visit in May of '03, had he complained to you about any sort of back pain?
A. I don't believe so.
Q. Did he complain to you about any sort of buttock pain?
A. I don't think so.
Q. Did he complain to you about any sort of leg pain?
A. No.

Page 90

Q. What was your plan of course with respect to this back and buttock pain?
A. He had -- he very strongly desired to be put in the hospital because traction had helped him many years ago. And I talked to him about options of care and ultimately admitted him for traction.
Q. Did you follow him in the hospital for that?
A. I did.
Q. Do you know the outcome of that care and treatment?
A. I think he was just briefly hospitalized and went home feeling better.
MR. RONWIN: Almost -- almost a miraculous cure, wasn't it?
Q. (BY MR. PILKINGTON) But in any event, you -- you obtained some X-rays of his lower back, correct?
A. I did.
Q. And what did those X-rays show?
A. They showed some diminished joint space at L4-5 and L5-S1 with osteophyte formation, and I also stated, "There was a type of mesh-appearing graft on the radiograph."
Q. Your Impression was that this was "Low back and left buttock pain of unknown etiology," correct?

Page 91

A. Yes.
Q. But what did you think that it may be stemming from or originating from?
A. Degenerative disk disease of the low back.
Q. Doctor, that brings us to May 12th of 2003, when he returned to your clinic, correct?
A. Yes.
Q. And at that time he noted that -- you noted that his back was -- was greatly improved, correct?
A. Yes.
Q. And at this point in time, you had another X-ray of -- you had an X-ray of his left shoulder, correct?
A. Yes.
Q. And I think we've already been through those findings, correct?
A. Yes.
Q. Do you agree that the X-ray of May 12, 2003 is consistent with the arthrogram that was done just a few weeks later; specifically, on May 28, 2003?
A. I do, um-hum.
Q. Doctor, do you also agree that the findings of the May 12, 2003 X-ray were consistent with the September 11, 2002 X-ray?
A. I do.

Page 92

Q. Doctor, to simplify this, during your care and treatment of Mr. Ronwin, there were three different X-rays done, correct?
A. Yes.
Q. There was an X-ray done on September 11, 2002 --
A. Yes.
Q. -- which we've marked as Exhibit Number 9, correct?
A. Yes.
Q. There was an X-ray done on May 12, 2003, which has not been marked, but has been described in your office notes, correct?
A. Yes.
Q. And there was an X-ray -- specifically, an arthrogram -- done on May 28, 2003, correct?
A. Correct.
Q. And that has been marked as Exhibit Number 4, correct?
A. Correct.
Q. Doctor, you have reviewed all of those X-rays or arthrograms, correct?
A. Yes.
Q. Would you agree that the findings with respect to each of those X-rays or arthrograms are

Page 93

consistent with each other?
A. I do.
Q. Doctor, I'm about done, if you'd just give me a moment.
(Discussion off the record.)
Q. Doctor, we have gone through your office notes in some detail during this deposition, correct?
A. We have.
Q. Doctor, at any point in time during your care and treatment of Mr. Ronwin, did he complain about having problems with his vision?
A. I don't remember seeing that in any of my notes.
Q. Doctor, at any point in time during your care and treatment of Mr. Ronwin, did he complain to you about cataract problems?
A. I don't remember.
Q. Doctor, at any point in time during your care and treatment of Mr. Ronwin, did he complain to you about having right elbow pain?
A. I don't remember.
Q. Doctor, at any point in time during your care and treatment of Mr. Ronwin, did he complain about having a problem with walking, or a gait problem?
A. It just was associated with his severe back

pain episode.
Q. On that singular episode?
A. Yes.
Q. And at any point in time did Mr. Ronwin complain to you about having pain in the back of his legs?
A. Again, associated with his hospitalization for the back pain. But other than that, I don't recall other episodes.
Q. And, Doctor, when you say you don't recall, had Mr. Ronwin made these complaints to you, are those the sorts of complaints that you would have put down in your notes?
A. I try to be complete in my notes, yes.
Q. Okay. And let me ask you again.
A. Okay.
Q. Doctor, I've asked you a series of questions about whether or not Mr. Ronwin complained to you about certain things, correct?
A. Yes.
Q. And you've told me that you don't recall whether -- that he made those complaints, correct?
A. Correct.
Q. Doctor, are those the types of complaints that you would put down in your office notes had he made



them?
A. I would.
Q. And, Doctor, if those complaints are not found in the office notes, does that lead you to believe that he did not make them to you at the time of your office visit?
A. That would lead me to believe that.
Q. And of the complaints that I went through, the back pain and the buttock pain, he made that complaint only one time, in early May of 2003, correct?
A. Correct.
Q. And that led to a hospitalization relating to traction?
A. Yes.
(Deposition Exhibit 10 was marked.)
Q. Doctor, I will hand you what I've marked as Exhibit Number 10. Would you take a moment to look at that? Doctor, have you had the opportunity to review Exhibit 10?
A. Yes.
Q. I'll represent to you that this is an X-ray report completed by Dr. Torkelson, from Cheyenne Orthopedics. Do you know Dr. Torkelson?
A. I think I've met him once.
Q. Doctor, do you agree that the findings of



Exhibit 10 are consistent with the findings that are set forth in the X-rays of September '02, May of '03, and the arthrogram of May of '03?
A. Yes.
Q. Doctor, do you know why Mr. Ronwin kept coming to you -- stopped coming to your clinic?
A. I believe it may be related to the fact that we had a difference of opinion with regard to the origin of the rotator cuff tear.
Q. Explain to the jury what that difference of opinion is.
A. He felt that it was due to the Baycol, and I had discussed with him that I had no knowledge of the connection of Baycol with rotator cuff tears, and our opinions differed. And I can't speak to what he was feeling at the time, but I think that was frustrating, and he felt that he had completed his care.
Q. Doctor, once again, is it your opinion to a reasonable degree of medical probability that the cause of his rotator cuff tear was not the Baycol?
A. Yes.
Q. Doctor, would you state again for the record your opinion to a reasonable degree of medical probability as to what you believe the cause of his supraspinatus rotator cuff tear was? Let me rephrase the



question, okay?
A. Yes.
Q. It was a poor question. Doctor, in your opinion to a reasonable degree of medical probability, what is the cause -- what was the cause of his rotator cuff tear?
A. I believe the likely cause would be the age of the patient, the degenerative changes that have already been noted on the X-ray, associated with some impingement.
Q. Doctor, I appreciate your time and your patience this afternoon. I may want to look into your file, but I do want to give Mr. Ronwin the opportunity to ask you questions.
A. Okay. Thank you.
Q. Before turning you over to Mr. Ronwin, I want to repeat to you and to Mr. Ronwin that it is very important that you provide answers to his questions, just as you have my questions.
A. Yes.
Q. If you do not know the answer to a question, or if a question is beyond your area of expertise, you certainly have the right to explain that to Mr. Ronwin, and you are under no obligation to answer a question that you do not understand or do not feel qualified to answer.