Page 98

Do you understand that?
A. I do.
MR. PILKINGTON: Thank you again.
THE DEPONENT: Thanks.
(Discussion off the record.)
EXAMINATION
BY MR. RONWIN:
Q. I was going to ask you first, in your training for -- for your M.D. -- and not just in medical school, but even prior to that -- did you take chemistry?
A. Yes.
Q. What courses in chemistry did you take, and for how long? In other words, how many semesters of each?
A. Oh, let's see. I graduated from college in 1976. And I took inorganic chemistry, organic chemistry --
Q. Biochem --
A. -- physical chemistry and biochemistry in medical school.
Q. I see. That about sums it up.
A. Okay.
Q. Is that a -- well, it would have been about a year of inorganic and organic?
A. I think two semesters of each of those.

Page 99

Q. Yeah, a year. In other words, yeah, a college year. And physical chemistry, probably a half, one semester?
A. I think -- I can't remember.
Q. And biochemistry, was that a semester?
A. I think so.
Q. Okay. Thank you. And, let's see. Now, he's gone through a number of these reports, and I just wanted to ask you first in general on those reports, before I go into -- just -- I won't go into all of them, then. You see, I was all prepared to go into every one of them, but there's no -- I want to save some time.
Is it true that in the course of my visits to your firm, your medical firm, from the start, which was on September 4, 2001, until the last time, which was somewhere in 2000 -- well, March of 2004, did I receive about -- oh, six to seven injections of cortisone?
A. You did receive them. I'd have to go through here to count up. But that sounds --
Q. Well, you don't have to count the exact number. Is that about approximately correct?
A. Probably so.
Q. Because there were four from Dr. Servi, one each time --
A. Okay.

Page 100

Q. -- on each of the visits to her. There were at least two, I think, from you, you see?
A. Okay.
Q. So that will take care of that. Now, as to those -- the effect of that, was it the net result that -- that I'd get temporary relief from pain, but that I always found I had to come back?
A. Yes, um-hum.
Q. Okay. I just wanted to check that matter. Now, I thought I'd like to do this: Take a look at those X-rays to where these are.
MR. RONWIN: And I think -- if you want to go -- we could just stand by the doctor, and -- and she could show us -- you know, point. You know what I'm saying?
MR. PILKINGTON: Doctor, could I ask you, these are the only X-rays, correct? Are these the originals?
THE DEPONENT: This one from my office, yes.
MR. PILKINGTON: Okay.
THE DEPONENT: This is a copy of the MRI -- or not -- of the arthrogram.
MR. RONWIN: Yeah, right.
MR. PILKINGTON: So you have a copy of the arthrogram and only one of the X-rays?

Page 101

THE DEPONENT: Yes.
MR. RONWIN: I see.
MR. PILKINGTON: Go ahead with your questions, Mr. Ronwin.
MR. RONWIN: I just wanted the two of us to get up and take a look, and I'll ask her where are these spurs, so we get an idea of where these spurs are and how -- and I'm interested in how close they are to the rotator cuff, and whether they're cutting into the rotator cuff, or maybe just cutting into the subacromial bursa area, that sort of thing.
A. You actually can't tell that from the X-ray, because you can't -- it's unlike an MRI that shows the soft tissue.
Q. (BY MR. RONWIN) Yes, I realize --
A. So what you see is just a space.
Q. I realize that you don't get soft tissue with MRI --
A. Right.
Q. -- with X-rays. You do with MRIs.
A. So we really can't tell if it's cutting into the bursa or to the rotator cuff.
Q. Okay.
A. But I'd be happy to look.
Q. Yeah, if you'd look at it.

MR. PILKINGTON: Doctor, when do you so, would you please to -- please state for the record what you're reviewing and what you are -- what you are finding?
A. Okay. What we're looking at is the arthrogram from the Harmony Imaging Center.
Q. (BY MR. RONWIN) Right.
A. And this particular views show the acromion and the clavicle.
Q. Right.
A. And the undersurface shows a spur here --
Q. Yes.
A. -- on the undersurface of the distal clavicle and the acromion --
Q. Acromion, um-hum.
A. -- at the AC joint.
Q. I see, okay. And the -- we don't see the tissue, of course, the soft tissue, which would be the tendon, the rotator cuff tendon. But it sits right underneath that?
A. That's correct.
Q. I see. And in your experience, the height of that spur, which is this here, is that right --
A. Yes.
Q. -- that I'm pointing to?



A. Yes.
Q. And that one there (indicated)?
A. Yes.
Q. Is that -- is the length of those spurs sufficient to be touching or even entering the rotator cuff tendon?
A. With activity of the shoulder, the humeral head actually raises up.
Q. I see.
A. And so yes, it can impinge, or pinch, on those soft tissue structures.
Q. I see. And if it does -- and when the rotator cuff tear rises up toward the spurs, would that make a total tear of a -- could that make a total tear of a rotator cuff?
A. It could, or it could make a partial tear.
Q. Partial, a partial tear. But you found a total --
A. A total tear.
Q. -- tear?
A. Right.
Q. Thank you. I just wanted to get an idea of where we were at on this thing anatomically. Okay. Now -- now, do X-rays pick out inflammation of tissues?
A. No.



Q. No? Inflammation of tendons?
A. No.
Q. Litigants -- ligaments?
A. No.
Q. I was thinking of litigants, got them confused. Cartilage, of course?
A. You don't see the actual cartilage, but you see the cartilage -- the space that the cartilage occupies. And so if the cartilage is thin, such as in knee arthritis, then the bone edges gets closer together.
Q. I see. But that's all it shows you on cartilage? It doesn't actually show you the cartilage itself?
A. Yes.
Q. Okay. And -- and let's see what I want to ask you. Now, the -- I had it here. Oh, the composition of cartilage, what is that, in your -- in your knowledge?
MR. PILKINGTON: Objection, foundation, form. You can answer, if you can.
A. Oh, okay. Again, I don't consider -- even though I'm an orthopedic surgeon, I don't consider myself an expert on this. But there are cartilage cells.
Q. (BY MR. RONWIN) Yes.
A. There's water, and then there's also, I believe proteoglycans in a cartilage matrix.



Q. Yes, there are. I forgot the name of what some of those proteins are. There's saccharide.
A. I can't remember.
Q. Yes. I can't remember.
A. Even -- okay.
Q. And the -- do you have collagen in the cartilage -- in the cartilage?
MR. PILKINGTON: Same objections.
A. I don't know.
Q. (BY MR. RONWIN) I see. Okay. Do you have a great many cells?
MR. PILKINGTON: Same objections.
A. You have cells in cartilage, um-hum.
Q. (BY MR. RONWIN) And what are those cells called?
A. Chondrocytes.
Q. Chondro?
A. Chondrocytes.
Q. Yeah, chondrocytes, right. Okay. And let me move on here. All right. And I just want to get myself a little more organized. I have a lot of other things to ask you.
Now, let's just digress on that situation where we had the back pain. That was something like 5 -- we'll find it in Exhibit 7. And it was the report of --

Page 106

hum, which report was that? It could be -- oh, it must have been this one here. Yes, it was 5/2/03. That's where the back pain was.
Well, on -- as regards to that hospitalization, did you at first, when I first reported to your firm -- and to you, therefore -- that I was having back pain and suggested that I should go into the hospital and get traction, did you at first not agree with that?
A. Yes.
Q. And is it the -- you're a member -- you're a member of the Board of -- American Board of Osteopathic Surgeons; is that right?
A. No. American Board of Orthopedic Surgeons.
Q. Oh, I mean Orthopedic Surgeons, right. Excuse me. Is it the theme of that board that traction is not useful?
A. I don't know.
Q. I see. Okay. It is, by the way. I'll tell you how later on. At any rate, ultimately did I come up there, and I was pointing out that it was so bad I couldn't walk upright?
A. I can't remember everything about that, I'm afraid.
Q. Oh, I see.

Page 107

A. Okay?
Q. Okay.
A. I know -- I remember you were hurting.
Q. Right. And then -- so I was put into traction, right -- in the hospital, and then immediately put into traction; is that right?
A. Yes.
Q. And it was sometime midday, perhaps; is that right?
A. I can't remember.
Q. Oh, okay. But I did stay overnight?
A. I think you did.
Q. Right. And then the next morning, did you send in two physical therapists to check out my legs --
A. I don't remember --
Q. -- and my back?
A. -- but let me see if it's in your chart.
Q. I don't think you have it in here on that.
A. Okay. Yeah, it looks like I just have the history and physical exam when you were admitted and -- oh, and I do. I have a discharge diagnosis, and it doesn't indicate that.
Q. No?
A. But I just don't have that information.
Q. Right. I see. Well, do you recall that

Page 108

they reported to you that I was in fine fettle?
A. I can't remember.
Q. I see. Did you come in that morning and -- rather excited and say, Guess what, or something to that effect, meaning that I had had a complete recovery?
A. I remember that you did well and went home.
Q. Yeah.
A. Okay?
Q. And did they inform you that I was -- the next morning, after being out of traction, I was walking up and down the ward?
A. I can't remember someone talking to me about that.
Q. Yes. And prior to the admission to the hospital, did I indicate that on my left buttock area (indicated), that if you touched the area, you would feel the spasm of the muscle in that region?
A. I can't remember.
Q. I see. Let's see, here. So did it prove that traction actually does have a -- a salutatory effect on some types of back pain? Did it prove that traction does have a salutatory effect on some types of back pain?
A. Well, you were admitted, and you were put at bed rest, and so I think it's hard to say exactly what helped, but you did get better.

Page 109

Q. Yes. And a complete -- a complete recovery, actually.
A. And that's great, yes, yes.
Q. Yes. All right. And if orthopedic surgeons are of the view that -- generally of the view that traction isn't any -- isn't worth anything, would they be -- could they be considered to be somewhat in error?
MR. PILKINGTON: Objection, form and foundation.
A. And say that again, Ed -- Mr. Ronwin?
Q. (BY MR. RONWIN) If orthopedic surgeons were generally of the view that traction was not very useful for back pain, would they be somewhat in error?
MR. PILKINGTON: Same objection.
A. I think we use it in outpatient treatment at times, and in some people they have found benefit from that. But we don't use it in inpatient treatment anymore.
Q. (BY MR. RONWIN) Right, right. It isn't normally suggested as a treatment these days; is that right?
A. As an inpatient; that's right.
Q. Right. All right. Okay. Now, let's see what else I want to do. I should get my things in order here by number, and then I can go down the line. One,

Page 110

and two --
THE REPORTER: I can't hear you. I hope you're not --
MR. RONWIN: I'm just muttering to myself.
THE REPORTER: Okay.
MR. RONWIN: I forgot you take down even the mutterings.
THE REPORTER: If I hear them.
Q. (BY MR. RONWIN) Okay. Oh, there has been some question raised about, your notes indicate that I refused to take -- get an MRI; is that right? Your notes address that. Let's see if we can pick one of them up. We just had one that he mentioned, yes. Well, for example, on 5/12/03 you have this statement near the bottom. It's the next-to-the-last sentence. Do you see that? "He states that" --
A. Oh.
Q. -- "he does not desire" --
A. I do.
Q. Right -- "to proceed with an MRI scan." Yes.
A. And it said that, "having had one in the past, which was troublesome for him."
Q. Yes.
A. And that you had stated you had some

Page 111

claustrophobia --
Q. Right.
A. -- so that you didn't desire to have another one.
Q. Right. And the claustrophobia, would that come from a closed MRI?
A. It could. Some people get them in open, closed, some people, but more so in a closed.
Q. More so in a closed, yeah.
A. Yes.
Q. You really feel surrounded, don't you, in a closed?
A. You do.
Q. And the Poudre Valley Hospital, at least at that time, had a closed one only; isn't that right?
A. I'll have to defer to you, but I think you're right.
Q. Yes. But there are open MRIs in Fort Collins, too --
A. Yes.
Q. -- individual organizations? And for an open MRI or any MRI, wouldn't your office make the arrangements?
A. We would order that or schedule that --
Q. Yes.

Page 112

A. -- for our patients typically.
Q. Yes. And do you -- did you -- Dr. Servi didn't have knowledge or any indication in your records that you had done -- your firm had done that. But did you find that? The date of May 6, 2003 --
A. I saw --
Q. -- would be -- was the day of the --
A. I saw a prescription for Poudre Valley Open MRI --
Q. Oh, you did?
A. -- that was dated 5/6/03 --
Q. Yes.
A. -- for lumbar MRI.
Q. Yes. And I -- I can assure you I showed up for that. Do you know why the MRI was not conducted?
A. I don't, huh-uh.
Q. I see. Well, do you have -- in one of these reports, you have a notice of a -- hum, he hit on it, and I don't know if I can get that report. It was a -- a report where you indicated something that concerns my iliac. Do you remember that?
A. A mesh --
Q. Oh, here it is. Let's see. Here it is. It's right in that 5/2/03. It's -- it's -- let's see, line 1, 2, 3, 4, 5 -- 6. Look at line 6, about the

Page 113

center of the page -- of the note, where it says "with" osteopath -- "osteophyte formation," and, "He also appears to be status postiliac type of mesh-looking graft on the radiograph."
A. What date are you looking at?
Q. Oh, 5/2/03, the one we were just talking about, actually.
A. Yes, I see.
Q. Yes. Now, does that indicate to you a stent?
A. I don't know.
Q. Well, a mesh is -- a stent is like a mesh, isn't it?
A. I think some of them are, yes.
Q. Yes. They're little things, and they've got a lot of lines of --
A. Um-hum.
Q. -- of iron or steel and that kind of thing.
A. Um-hum.
Q. So it's really a mesh, in a way.
A. Um-hum.
Q. Well, I have a mesh in my iliac. I've got two -- two or three in my coronary arteries.
A. Um-hum.
Q. And so are you aware that if you have

stents, the magnetic force of the -- of the MRI is such that it can tear those stents out of their position, and if it's in an artery, it could kill you?
A. What the radiologists say is that if a stent has been placed recently, as in, like, a month or two, that there's some possibility. They don't want to MRI people then.
Q. Yes.
A. But after the stent has incorporated, after that, then they can MRI. And we MRI people with stents frequently.
Q. Well, the technician told me, when I told her I had -- asked if I had stent, and I said yes, she said, I can't do it. And that's why it wasn't done.
A. Oh.
Q. So these -- you know, these refusals to take MRI were basically, one, wanted an open MRI, and not a closed, didn't know if they had it here in town at all; and two, couldn't take it when I did show up because of the stents.
Now, actually, this rule of the month or two, that's new. John, who is the manager of the -- of this Poudre Valley Open MRI at Prospect and Timberline, just said -- didn't put any time limit, just that they would like to check on where you got it and what sort of



stent and that kind of thing.
A. I think it's good to be careful. But I am not -- again, the radiology side of this --
Q. Yes.
A. -- and cardiology side of this are not my fields.
Q. That's fine.
A. But that's what I've been told by radiology.
Q. Well, that's what caused that MRI stuff and -- you know, and not wanting to take it. I just wanted to clarify that for the record.
A. Okay.
Q. It's not really important, and it has nothing to do with Baycol. Okay. And then -- so we'll turn that over. Well, do you -- do you know -- oh, let's go to your letter. That was Exhibit 8, I believe; is that right? Yes, the To-Whom-It-Concerns letter.
A. Okay.
Q. First of all, you indicate that I asked for a letter; is that correct?
A. Yes.
Q. Did you misunderstand that the -- what I asked for was a medical expert report, and that's quite different from a letter?
A. You know, I -- I don't remember.



Q. Oh, I see. And do you recall that I -- when I visited you on March 22nd, I believe, of that year -- that's the last report you've made --
A. Yes.
Q. -- that I indicated to you that the letter did not -- was insufficient as an expert medical report under the Federal Rules of Civil Procedure?
A. I don't recall that.
Q. I see. All right. I'll just digress for a second and tell you that the rules -- there are specific rules, as you know, for doing things in court, and we call them Rules of Procedure. And there's several in there for criminal.
And medical expert reports are defined in the rules -- the specific rule being, I believe, 26(a) -- small a, that is -- (2) -- these are in parentheses -- and then a capital (B). And the rule sets out just what an expert has to put in the report in order for it to satisfy the rule. And a letter just does not do the job, you see. So that's why this letter was totally rejected, you see. It just didn't do the job.
No matter what you would say in there, the letter form just wouldn't do it. So that's the reason why the letter wasn't adequate and wasn't used. And that's why I came back and talked to you about it on the



22nd of March, you see. Did that explain it?
A. Okay.
Q. That's all I -- that's all I wanted to do, was clarify these little things. Now, you do know that Baycol is a -- is a drug; is that right?
A. Yes.
Q. And it's in the family known as statins; is that right?
A. Yes.
Q. And in the fam -- as far as Baycol, it has adverse events -- it causes adverse events; is that right?
A. I have read about that.
Q. Huh?
A. I have read about that.
Q. You have read it. And you know that, therefore, that part of the adverse events are that it tears up nerve -- muscle tissue?
MR. PILKINGTON: Objection, form and foundation.
A. Well, what I have read is that there's some damage to the cell membrane of muscle tissue.
Q. (BY MR. RONWIN) Cell -- cell membrane, right, of muscle tissue, yes. And then out pour contents from the menu -- from the -- from the cell?

A. Yes.
Q. And these are contents like creatinine, phosphokinase, an enzyme. Are you aware of that?
MR. PILKINGTON: Objection, form and foundation.
A. I have read that, yes.
Q. (BY MR. RONWIN) Yes. And myoglobin?
A. I've read that.
Q. Right, and these -- these sort of things. Now, would you anticipate -- well, first let's -- let's back up the reel just a little bit. The body is made up of atoms; is that right? I mean, basically, if you tore the body apart piece by little million, million piece, it would be an atom, right?
A. I -- I think so. It's been a long time since I have done any kind of chemistry or biology --
Q. Right.
A. -- but certainly.
MR. PILKINGTON: Objection, form and foundation to that last question.
Q. (BY MR. RONWIN) Would it be made up of the four elements that the Greeks knew: fire, water --
A. Water.
Q. Water, yes. Oops -- oops, water. But even the water is made up of atoms --



A. Certainly.
Q. -- isn't it?
A. Certainly.
Q. Okay. So ultimately, the body is atoms?
A. Okay.
Q. And then, are these atoms arranged into molecules?
MR. PILKINGTON: Same objections.
A. It has been so long since I have done anything with chemistry and biology that, you know -- I don't know where this line is going, but I'm not sure I'll be very helpful.
Q. (BY MR. RONWIN) Well, that's all right. You -- you don't have to be helpful to me at all.
A. Okay.
Q. I'm indifferent to the whole thing.
A. Okay.
Q. See, as I told you --
MR. PILKINGTON: Doctor, as we've -- we said before, if you don't -- cannot answer the question --
MR. RONWIN: That's right.
MR. PILKINGTON: -- you can tell Mr. Ronwin.
MR. RONWIN: That's right.
MR. PILKINGTON: And I think Mr. Ronwin agrees with me.



MR. RONWIN: Right.
Q. (BY MR. RONWIN) And don't feel worried about it at all.
A. Oh, okay.
Q. Okay? I'm just trying to get a point.
A. Okay.
Q. But -- well, as we take it, the body is often spoken -- the human body is often spoken of, is it not, of as having about 75 percent water?
A. I can't remember.
Q. But some high percentage; is that right?
A. I think so.
Q. Mostly water?
A. I think so.
Q. And then there are other -- and water is a molecule, is it not?
A. Yes.
Q. Yes. And then there are other molecules in the body?
A. Yes.
Q. Like amino acids?
A. Like what?
Q. Amino acids?
A. Yes, amino acids.
Q. Right. And these molecules might join together and get strings or -- or rings, or whatever; is that right?



A. I suppose.
Q. And they could then form proteins?
A. I suppose.
Q. Right. And they could form sugars?
A. I suppose.
Q. And -- and strings then would be known as saccharides; is that right?
A. I can't remember.
MR. PILKINGTON: Objection to this whole line of questioning, form and foundation.
MR. RONWIN: Oh, okay.
Q. (BY MR. RONWIN) He likes to do that, you see. At any rate, so basically, the human body is made up of molecules; is that correct?
A. I think so.
Q. And so the membranes of cells would be made up of molecules, would they not?
A. I think so.
Q. And so -- and Baycol, is that a molecule?
A. I don't know.
MR. PILKINGTON: Same objections.
Q. (BY MR. RONWIN) You don't know?
A. I don't know.

Page 122

Q. Okay. Let's take a look at this thing. This is the Baycol insert that, you know, the drug companies provide -- provide when you buy the stuff for it sometimes.
MR. RONWIN: Why don't we have it just marked, okay. I believe there are three here, yes.
(Deposition Exhibit 11 was marked.)
(Break taken from 3:59 p.m. until 4:03 p.m.)
Q. (BY MR. RONWIN) Would you look at that document for a moment and please tell us --
MR. RONWIN: You're on?
THE REPORTER: (Nodded head.)
Q. (BY MR. RONWIN) -- and please tell us what it is.
A. It has "Baycol" at the top, and it looks like it describes the clinical pharmacology, and then it goes through indications, contraindications, warnings, precautions.
Q. Oh, that's all right. It's just an insert, right?
A. There you go, yes.
Q. Okay. That's fine. And do you notice on the very top, at the left-hand column, there's a diagram of a molecule; is that right?
A. Yes, it looks like that.

Page 123

Q. Right. So Baycol is a molecule; is that right?
A. It looks like it is on this page.
Q. Right. And I'd like to focus your attention on the central area there. Do you see the two 6-membered rings? One of them has a nitrogen in place of a carbon atom; is that right?
A. You know, I am --
Q. You don't remember?
A. -- an expert in orthopedic surgery, and I am not an expert in chemistry or biochemistry.
Q. Oh, that's all right. That's okay.
A. It was 30 years ago --
Q. Right. Okay.
A. -- and I don't really feel I can answer questions regarding this, because it's not in my field of expertise.
Q. That's all right. But -- but the questions that I'm asking don't require a -- a chemical expert, or even -- even someone that's worked in a chemical lab who may not have an Ph.D. or -- or an M.S. or something like that. Just if you've taken chemistry -- I'm not going to be asking you about how this is put together, or things like that. I just want to point something out to you. That's all.

Page 124

A. Okay.
Q. So if you look at where that N is, you see the N in the center, in part of a ring?
A. I see the N.
Q. Okay. And you can accept my word that -- if you like -- that that ring has five carbons, one at each point.
A. I will accept your word.
Q. Huh?
A. I will accept your word.
Q. Good. And then it's -- from that carbon that is -- we call that the paraposition to the end. There's a link there -- do you see that? -- to another ring, is that right --
A. I see --
MR. PILKINGTON: Objection to form.
Q. (BY MR. RONWIN) -- just below it? Right. That -- that line, by the way, represents a bond --
A. Okay.
Q. -- between that carbon atom at one end -- and the end of one of the rings and the other carbon atom. Okay? And then at the bottom of that second ring, you notice there is a line, and then an F?
A. Yes.
Q. Okay. Now, will you accept my statement

Page 125

that that F stands for a fluorene atom?
A. I will accept that.
Q. Okay, fine. So all I want to get across right now is that, do you agree that Baycol is a molecule, and it has a fluorene atom in it?
A. From what you just explained to me --
MR. PILKINGTON: Objection, form and foundation.
Q. (BY MR. RONWIN) Yes.
A. -- not based on any knowledge I have, I will have to accept that.
Q. (BY MR. RONWIN) Okay. That's fine. That's all I wanted to do at this point. Okay? Now, we spoke just briefly about the fact that you knew that, from your experience or your readings, that Baycol -- that, rather -- that -- yes, that Baycol had a tendency to tear up muscle membranes, right?
MR. PILKINGTON: Objection, form and foundation.
A. That it injured cellular membranes.
Q. (BY MR. RONWIN) Huh?
A. That it injured cellular membranes in muscles.
Q. Yes, cellular, right, cellular membranes.
A. That's all I know --

Page 126

Q. I see.
A. -- about Baycol.
Q. Oh. Did you know that they were muscle?
A. Yes. It did indicate that it was cellular membranes in muscle tissue.
Q. Muscle, right. That's how you would get rhabdomyolysis --
A. Yes.
Q. -- is that right?
A. Yes, to my knowledge.
Q. And you know what rhabdomyolysis is?
A. I have -- I have limited knowledge of that in the orthopedic field from compartment syndromes, things such as that.
Q. Yes, all right. Now, did you know -- would it be reasonable, then, since all cells -- muscle cells, nerve cells, chondrocytes or other cells -- all have membranes, is that right, in the animal kingdom?
MR. PILKINGTON: Objection, form and foundation.
A. I don't know.
Q. (BY MR. RONWIN) You don't know that all cells in the animal kingdom have just membranes?
A. I don't know.
Q. Oh. Do you know the difference between the

Page 127

cells in the plant kingdom and the animal kingdom?
MR. PILKINGTON: Same objections.
A. I can't remember. I probably did at some point in time.
Q. (BY MR. RONWIN) Will you accept that the animal kingdom is characterized by just membranes on their -- as their outer cover of the cell, and the plant kingdom has walls?
A. I can't remember those things --
Q. You can't remember that distinction?
A. -- from my -- it's been too long.
Q. I see. But you did take biology, though, at one time?
A. About 35 years ago.
Q. Oh, I see. Well, that part of biology hasn't changed for over 100 years, believe me. Okay. At any rate, you can expect, could you not, that if it tears up muscle cells, which are membranes, and the membranes are made up of molecules, as we've agreed everything is made up of molecules in the human body, that nerve cells would -- would have membranes made of molecules; is that right?
MR. PILKINGTON: Objection, form and foundation.
A. I don't know.

Page 128

Q. (BY MR. RONWIN) You don't know? I see. Well, let's take a look at a paper here. Even if you're not an expert, you can certainly read this stuff.
MR. RONWIN: One, two, three, four. One I always keep to the side, and we can mark these, please, okay? And that would be Exhibit 12; is that right?
(Deposition Exhibit 12 was marked.)
Q. (BY MR. RONWIN) And you -- what is the -- that item you have in front of you, please, that's been marked Exhibit 12?
A. You've given me something that's titled "Statins and risk of polyneuropathy."
Q. Right. I just want to mark down "Knauer depo." Okay. And I wonder if you would read -- you've read the title. I wonder if you'd read the -- the -- oh, here it is, the journal out of which it comes. I'll show you where it is, if you'd like. I'll point that out to you, here (indicated). The journal in which it comes, please?
A. The journal is Neurology, 2002.
Q. '2. And that 58 --
A. 58.
Q. -- do you know what that is? That's the volume number.
A. Sure.

Page 129

Q. Right. And then --
A. And then the pages are 1333 to 1337.
Q. Right.
MR. RONWIN: You got that?
THE REPORTER: (Nodded head.)
MR. RONWIN: Okay. Good.
Q. (BY MR. RONWIN) And right above that, there is the word "Conclusions"; is that correct?
A. Yes.
Q. Could you read that conclusion?
A. "Long-term exposure to statins may substantially increase the risk of polyneuropathy."
Q. Right. And polyneuropathy, what does that mean in medical language -- well, I mean in English, what does it mean to a medical --
MR. PILKINGTON: Objection, foundation.
A. That's outside my area.
Q. (BY MR. RONWIN) Well, would neuropathy mean a disease of the -- of the nerves --
MR. PILKINGTON: Same --
Q. (BY MR. RONWIN) -- or -- yes, a disease of the nerves?
MR. PILKINGTON: Same objection.
A. Again, it's outside my area.
Q. (BY MR. RONWIN) Oh, that's all right. I'm

not asking you to identify any kind of neuropathy. Just if you hear the word "neuropathy," particularly as an M.D., doesn't it mean that something is wrong with the nerves?
A. I would say so.
Q. Yes. And that would be the nerve cells, right?
MR. PILKINGTON: Same objections.
A. I -- I don't know.
Q. (BY MR. RONWIN) Well, if you have a nerve, it's nothing more than a cell; isn't that right? You may have a tissue of nerves, but they're all -- it's made up of cells; isn't that true?
MR. PILKINGTON: Same objection.
A. There are cells.
Q. (BY MR. RONWIN) Yeah. So it would be nerve cells, ultimately?
A. And I don't know, really, anything about polyneuropathy.
Q. Oh, that's okay. That's okay. And the word "poly" would mean not just one type of nerve disease, but possibly several, right?
MR. PILKINGTON: Same objections.
A. Poly does mean more than one.
Q. (BY MR. RONWIN) More than one, right.



Okay. So -- now, it says "statins." Now, if you look at the page 2, on your right-hand column near the bottom, it says, "Drug Exposure." Do you see that?
A. I do.
Q. And then if you go down one, two, three, four, five, six -- on the sixth line of that Drug Exposure paragraph --
A. Yes.
Q. -- it starts at the very right-hand side -- the sentence starts with the word "The."
A. Yes.
Q. Okay. Could you read that sentence, and then the next sentence after that?
A. Certainly. "The total package content of the drug is recorded as the number of defined daily doses," in parentheses, capital "DDD."
Q. Right.
A. "The DDD is established by an expert panel as the typical adult daily maintenance dose," in parentheses, "15 milligrams simvastatin, 30 milligrams lovastatin, 20 milligrams pravastatin, 40 milligrams fluvastatin, 10 milligrams atorvastatin" --
Q. You skipped -- you went from fluvastatin to cerivastatin, but --
A. -- "or 0.2 milligrams cerivastatin."



Q. Okay. Now, do you know if the -- the pharmaceutical name, I'll call it, for Baycol is cerivastatin? Are you aware of that?
A. I wasn't aware of that.
Q. It is. Will you accept that it is?
A. I wasn't aware of that, and I'll take your word for it.
Q. Okay. It is. So therefore, without going through this entire paper -- by the way, in the scientific area, you're aware that research reports are referred to as "paper, papers"?
A. All right.
Q. They are. I mean, a scientist usually talks about the papers he's published, see. You've heard that, right?
A. (Deponent nodded.)
Q. Good. So without going through this paper, would you agree that at least some -- some researchers, if you look at the authors with M.D.s and Ph.D.s liberally sprinkled after their names, is that right? No, up above, you see the authors?
A. Um-hum, yes.
Q. Yes. They're all M.D.s or Ph.D.s, and some have two -- two degrees --
A. Yes.



Q. -- in the doctorate area, et cetera. That -- to -- to get back to the question, would you agree that, as to persons of professional standing, there is evidence presented that cerivastatin, or Baycol, can cause -- in addition to the known muscle problem, can cause nerve damage?
MR. PILKINGTON: Objection, form and foundation.
(Interruption by a knock at the door.)
THE DEPONENT: Excuse me just a moment.
MR. PILKINGTON: That's fine. We can go off the record.
(Discussion off the record.)
Q. (BY MR. RONWIN) Will you accept, then, as a result of this paper, which is not the only sort of -- you know, the "it" of the world, so to speak, that it appears that Baycol can also cause nerve damage, nerve cell damage?
MR. PILKINGTON: Objection, form and foundation.
A. I think what I can state is that you've given me an article that was from 2002 Neurology that had as its conclusion that "Long-term exposure to statins may substantially increase the risk of polyneuropathy."
Q. (BY MR. RONWIN) Right. And among those

Page 134

statins was named Baycol.
A. And I will accept that you told me --
Q. Yeah. The second --
A. -- that was the same as Baycol.
Q. The second page. Right. That -- that's all I was trying to get at at that point.
A. Okay.
Q. Now, let's take a look at this interesting thing. These are mine. I always keep a fourth one separate, so I don't mark on that one, you see. That's the reason. And here are three.
MR. RONWIN: Would you mark this as Exhibit 13, please.
(Deposition Exhibit 13 was marked.)
Q. (BY MR. RONWIN) What is the title of that document, please?
A. This is from the Natural Health and Longevity Resource Center, titled "Scientific Facts on the Biological Effects of Fluorides."
Q. Right. And you notice, for example, on the first one we -- you have in bold type certain representations there. And underneath there are a whole bunch of citations to publications; is that right?
A. Yes.
Q. Which support -- which are alleged to

Page 135

support the statement in Item 1; is that right?
A. And I would just have to say I'm unaware of this -- is this from the Internet? I'm unaware of any origin of this, but it does look like there is a statement, followed by a grouping of citations. And that's all I can state.
Q. Right. And would you do us -- please read for us just those -- that Number 1, and then -- just without the citations, just what it says in Number 1?
A. "Number 1. Fluoride exposure disrupts the synthesis of collagen and leads to the breakdown of collagen in bone, tendon, muscle, skin, cartilage, lungs, kidney and trachea."
Q. Right. And then let's take Number 2, please. Could you read that also?
A. Again, from this same source, Natural Health and Longevity Resource Center.
Q. Yes.
A. "Number 2. Fluoride stimulates granule formation and oxygen consumption in white blood cells, but inhibits these processes when the white blood cell is challenged by a foreign agent in the blood."
Q. Right. And let's take Number 5, just to make this short.
A. "Number 5. Fluoride inhibits antibody

Page 136

formation in the blood."
Q. Right. And Number 6?
A. "Number 6. Fluoride depresses thyroid activity."
Q. Right. And 7, please?
A. "Number 7. Fluorides have a disruptive effect on various tissues in the body."
Q. And Number 8?
A. "Number 8. Fluoride promotes development of bone cancer."
Q. Right. And 9, that would be the one --
A. "Number 9. Fluorides cause premature aging of the human body."
Q. Right. And you noticed when we looked at the structure of Baycol, the chemical structure of Baycol, it had a fluorene atom in it?
A. You told me that that's what that F stands -- stood for.
Q. Yes, that's what it stood for.
MR. PILKINGTON: Fluorene, or fluoride?
MR. RONWIN: What?
MR. PILKINGTON: Fluorene, or fluoride?
MR. RONWIN: Well, the atom itself is fluorene. Fluoride is when you add an electron to it, and so you have the ion, i-o-n. Do you see the

Page 137

difference?
MR. PILKINGTON: Thank you.
Q. (BY MR. RONWIN) Okay. So if you have hydrogen fluoride, you have now a molecule where the hydrogen atom separates in water, for example, becomes just a proton, and the fluoride ion has an extra electron from when it's an atom. Do you see what I'm saying? But that's not the important thing at this point. But again, you did notice that there was a fluoride atom in Baycol?
A. A fluoride atom --
Q. Right, in Baycol.
A. -- in Baycol is what you're saying?
Q. That was what that F stood for in that formula.
A. And again, I know nothing about this, and I'll just have to accept that.
Q. No, that's okay. But do you notice it had it?
A. You told me that's what the F stood for.
Q. Right. And from this item that we have just read, Exhibit Number 13, we -- we noticed that fluoride has some deleterious effects on the human body; is that right?
MR. PILKINGTON: Objection, form and foundation.

Page 138

A. I can't -- I can't agree to that, because I'm unaware of the sources of information. And I was just shown this today, so I can't comment on that.
Q. (BY MR. RONWIN) Well, I'm not asking you to accept it as a belief. I'm just saying that there are reports from scientific sources that these are effects that fluorene exerts on the human body.
MR. PILKINGTON: Same objections.
A. I don't know.
Q. (BY MR. RONWIN) Well, you may not know that, but they're telling you. These scientific researchers have reported that these are the effects.
A. And I don't know that these are valid sources. I can't accept things that are just from the Internet, so --
Q. Well --
A. -- that's -- that's the best I can answer that question.
Q. Yes. Well, look at the -- at the papers; for instance, in the first one. Well, Toxicological Letters, that's undoubtedly a publication, meaning a scientific journal.
A. And again, I'm just unaware of these scientific journals --
Q. I see.

Page 139

A. -- so I can't speak to that.
Q. Then there's one there, Biochimica et Biophysica Acta, that's a well-known one that goes back many, many, many years.
A. And I'm just saying, I'm not aware of these.
Q. As a matter of fact, you can tell it's well-known -- that it must be many years old because the volume on that -- the volume number is 715. That's a long -- that means a long time ago, you see?
A. I think I've answered as best I can with regard to this document that you've given me.
Q. Okay. It -- you don't have to believe this is what I'm trying to tell you. But it is telling -- it is an announcement to the world, in effect, that fluorene has many deleterious actions on the human body.
A. There --
MR. PILKINGTON: Objection, form, foundation. She's asked and answered the question.
Q. (BY MR. RONWIN) Okay. Now, among those negative actions, in the first item that they had was that it leads to a breakdown of collagen in tendon; is that right?
A. And again, I don't know where this came from. But as you know, in scientific literature there's a lot of differences of opinion where you can find things

Page 140

to support --
Q. Oh, sure.
A. -- just about everything you want to report.
Q. Yes, that's right, right.
A. So I can't comment on this particular document here.
Q. I'm just saying that at least some people have found, and their researchers, and have therefore reported, that a fluoride ion or atom breaks up collagen, and among the tissues it breaks it up in is tendon.
MR. PILKINGTON: Same objections, asked and answered.
A. Again, I just -- I just can't say anything more than I've already said.
Q. (BY MR. RONWIN) I see. Well, the rotator cuff tear occurs in a tendon; is that right?
A. That's correct.
Q. Right. And if you took Baycol into your body, you'd be taking in fluoride atoms for sure; isn't that right?
MR. PILKINGTON: Foundation.
A. And again, I am unaware of the mechanics of Baycol and how it is absorbed and what it is taken into in the body.
Q. (BY MR. RONWIN) No, I'm not asking you to

Page 141

be aware. I'm just saying, if you took the Baycol into the body, wouldn't you be taking in a fluoride ion? You'd absolutely have to, wouldn't you?
MR. PILKINGTON: Objection, asked and answered.
A. All I'm saying is that, again, I am unaware of the action of Baycol in the body or how it is absorbed and to what tissues it enters.
Q. (BY MR. RONWIN) But you would be taking in fluoride ion -- or atoms into the body?
A. I -- I think I've answered that already.
Q. And you also have collagen in the body; is that right?
A. You do have collagen in the body.
Q. And the collagen is in tendons; is that right?
A. Pardon me?
Q. Collagen is in tendons?
A. Yes.
Q. And one of those tendons is the rotator cuff tendon?
A. Yes.
Q. Right. So would there be a possibility, then, that the Baycol fluoride atom, either while still on the Baycol molecule, or after having been removed by

some biochemical process from the Baycol molecule in the body, could tear up the collagen in the rotator cuff tendon?
MR. PILKINGTON: Objection, form and foundation.
A. And I don't have any knowledge of that --
Q. (BY MR. RONWIN) Well --
A. -- as far as what I stated before.
Q. -- you may not know that it occurs. I just asked if it's a possibility that that could occur.
A. And I answered that I do not know.
Q. You do not know. Well --
MR. PILKINGTON: Same objections.
Q. (BY MR. RONWIN) -- is it illogical?
MR. PILKINGTON: Same objections, asked and answered.
A. I just -- I've answered as best I can.
Q. (BY MR. RONWIN) Yeah. But, I mean, is there such a thing as -- there's such a thing as logic and illogical. And if you've got this molecule in the body with fluoride atoms, and it had at least one fluoride atom in it -- and you've got, by the way, millions of -- of molecules in the -- in the average dose of this thing, and I'll show you how much in a moment -- if you have that situation, and you have collagen in the



body, and there are researchers who report collagen is torn up by fluoride, and this is undoubtedly done by them taking collagen, putting it in a solution with fluoride, and noting that the collagen is torn up, you see. By "torn up," I mean collagen has a certain structure when it's -- when it's in the body.
A. Um-hum.
Q. But they take it out of the body, which would be the best source for it -- usually some animal, like a cow or a pig. They probably get it from a slaughterhouse -- and then put it into a solution that has fluoride, either ion or the atom in it. And they find after a while that the collagen is -- has distorted -- the structure is distorted. That's why they're reporting that.
Otherwise, you've got to say, Well, jeez, these are a bunch of liars. Well, maybe one of them is a liar, maybe two of them are, but they're not all liars. I mean, we've got to be practical today, or any day in the -- in the year.
So therefore, is it not logical that with fluoride being carried into the body by the ingestion of Baycol, and there being collagen in the tendons of the body, as well as in bones, muscle, skin, cartilage, as they have down here, that the fluoride could possibly



distort the collagen in the tendons?
MR. PILKINGTON: Objection, form, foundation. The doctor has repeatedly answered your question, Mr. Ronwin. You've asked this several different ways. She's repeatedly told you she doesn't know.
MR. RONWIN: Well, let me tell you, this "doesn't know" isn't justified in terms of logic, in my opinion, really, quite honestly.
MR. PILKINGTON: I understand your argument. But the doctor is here to answer your question, and I think she's answered your question, so --
MR. RONWIN: Well, that's -- that's from your point of view, because you would be happy to not have it answered.
MR. PILKINGTON: I think she's answered.
THE DEPONENT: I think I have answered it.
Q. (BY MR. RONWIN) I really don't think you have. It's an -- it's an illogical answer, quite honestly. I'm not trying to be nasty, or anything. It -- it just doesn't -- it just doesn't comport with -- with logic, you see, and that's why I feel it should -- it should be answered.
The real answer is that, yes, Baycol has a -- taken into the body could result in collagen



destruction, in cartilage destruction, in a tendon destruction, in bone destruction, you see.
And what I'm getting at is -- because the Bayer Corporation played a little game. Bayer Corporation got the so-called plaintiff's steering committee in this multidistrict litigation, which you may not know all about.
It's where all the plaintiffs from the district courts in the United States that filed -- that filed suits against the Bayer Corporation in the district courts in the United States were all thrown into one district court in the District of Minnesota, in Minneapolis.
And there they played the theme that the only thing that -- that Baycol tears up is muscle, mainly -- and it's a very -- if it's a very severe tear-up of the muscle, they called it by the cute name of rhabdomyolysis, which, if you look at the roots of it, you're a little puzzled where they got the rhabdo from, because rhabdo, in Greek, means wand, you see.
MR. PILKINGTON: Mr. Ronwin, let me interrupt. I can't dictate how you answer -- ask questions or what you do during your time.
MR. RONWIN: That's right.
MR. PILKINGTON: But we do have a limited


831d373c-d877-4400-9353-010c1c445990

amount of time with the doctor.
MR. RONWIN: Well, we do. But we're running into something that I think she ought to understand, because -- so --
Q. (BY MR. RONWIN) Or it had a myositis or a myolysis, you see. And that's what the company would like everybody to think: That's the only thing it breaks up. But now here come people who say, Oh, no, it breaks up nerves. And here comes Ronwin, who says, Oh, no, it breaks up collagen, it breaks up cartilage, and it breaks up tendons.
And when it breaks up cartilage and tendons, which tendons are made up of cartilage and collagen, then it could break up a rotator cuff tear -- a rotator cuff, you see? It could start by slowly destroying some of the collagen unity, the natural unity in the -- in the tendon of the rotator cuff, see, and then gradually enlarge that one and start on other chains of collagen.
And it can also tear up those cell membranes of the cells that are in the tendons, you see, just as it tears up muscle ones. So if you look at it logically, the conclusion is that yes, you could have aging, you could have degeneration, you could have impingement, all these causes that you mentioned, which I don't disagree with, but you can also have Baycol tearing it up, you



see.
MR. PILKINGTON: We understand your argument.
Q. (BY MR. RONWIN) And that's what I was getting to, and that's a logical argument. Now, my own testimony will do it as an expert. But I feel that a medical doctor ought to be able to do it.
And the reason for it is this: that medicine 50 years ago was taking a look at a tissue and saying, Well, it's a diseased tissue, and maybe we can get a drug to undisease it, so to speak, get rid of the disease.
But today it's different, isn't it? When they talk about a disease -- let's say some -- some unusual disease. I was thinking of Tay-Sachs, but actually, Tay-Sachs -- you know what that is, don't you? It's a deficiency of a fat metabolism.
A. I vaguely remember it.
Q. Yes. That's more -- that's an older one. That's more norm, but it's along the same lines. Because today what we're doing is matching up the disease with genetics, right, particularly --
MR. PILKINGTON: Objection, form and foundation.
Q. (BY MR. RONWIN) -- some DNA portion of a



gene; isn't that right?
MR. PILKINGTON: Objection --
Q. (BY MR. RONWIN) And what is the gene? It's made up DNA, and the DNA is made up of molecules, you see?
A. Sure. And if we could get back maybe to more question forms --
Q. Yeah.
A. -- that would be good.
Q. Okay. I'm going to -- I'm going to try to do that.
A. Okay.
Q. But you've got the point that I've made here. And the reason I've had to make it is this utter dismissal of Baycol by some of the M.D.s that have come into this situation in my particular case, but they're doing it in -- they're doing it in other plaintiffs' cases. And Bayer loves it, because they just like to get it down to where it's just muscle damage, you see?
MR. PILKINGTON: Well, our characterization of the truth differs, Mr. Ronwin. But I agree --
MR. RONWIN: Well --
MR. PILKINGTON: I agree with the doctor's --
MR. RONWIN: We're going to take a look now



at Bayer.
MR. PILKINGTON: Go ahead.
Q. (BY MR. RONWIN) I'm going to skip one deal here, which is an interesting deal. It's how you compare the -- the capacity or the propensity of one drug to cause adverse events with another drug. The comparisons are false. But it will take time to go through it, and so I'm not going to do that with you. All right?
I do have something here that we sort of talked about. And this -- I said the number of molecules in the sample. I just wanted to tell you what the number of molecules are in a 4/10ths-milligram sample of Baycol, which was the usual -- the usual dose.
A. Okay.
Q. It would be five times 10 to the 17 molecules. Do you how big a number that is written out? It's a lot of molecules. That's probably more molecules than there are cells in the human body, though there are trillions of cells in the human body; isn't that right?
MR. PILKINGTON: Objection, form and foundation.
A. I don't know.
Q. (BY MR. RONWIN) You don't know that?
A. I don't know.
Q. That surprises me. It really surprises me.

Page 150

MR. PILKINGTON: Objection to your comments.
MR. RONWIN: What did you say?
MR. PILKINGTON: I said I object to your comments, Mr. Ronwin.
MR. RONWIN: Okay. You can object to whatever you want to.
MR. PILKINGTON: I understand.
Q. (BY MR. RONWIN) Let me see. I just want to get at what -- the rest of what I want to get at here. Good. Now, I was wondering, did -- you mentioned in the letter that I showed you some materials; is that right?
A. There was something mentioned in --
Q. That letter --
A. -- a note or letter.
Q. That's the letter you wrote, you know, To Whom It May Concern.
A. Let's look.
Q. Did he have it with 7? Yes, he has it with Exhibit 7, yes. No, he doesn't have it with Exhibit 7. It's Exhibit 8. Here it is, right here. No, I guess you don't mention it in there. I'm sorry. I think -- oh, I know where you mention it, in the -- in the last note you have on -- on March 24 -- 22, you mention that I had given you material; is that right?
A. I did mention something in my March 22 note.

Page 151

Q. Yes. Let's see. Anyway, was this the thing that I gave you? Before we -- before we even mark it as an exhibit, because if it isn't the thing, then it wouldn't be -- does this recall your memory? Is this the thing that I gave you?
MR. PILKINGTON: Can I look at that, Mr. Ronwin?
A. That does not look familiar to me.
MR. RONWIN: Huh?
MR. PILKINGTON: What are you showing her?
MR. RONWIN: I gave her something before, when I asked her to write a medical expert opinion. And I think I gave her this, which discusses the basis for the action of Baycol, see.
MR. PILKINGTON: Can we mark it, since you're showing it to her?
MR. RONWIN: Well, I just want to --
THE DEPONENT: I don't think I've ever seen that.
MR. RONWIN: Okay. If she didn't, then there's no sense in --
MR. PILKINGTON: Can I have a copy of it?
MR. RONWIN: Yeah.
MR. PILKINGTON: Thank you.
MR. RONWIN: It's very similar to what I've

Page 152

gotten. Remember that report I gave you? Okay. We'll give you a copy.
MR. PILKINGTON: Thank you.
MR. RONWIN: Do you want it marked now?
MR. PILKINGTON: Let's just mark it as Exhibit 14.
MR. RONWIN: 14.
(Deposition Exhibit 14 was marked.)
MR. PILKINGTON: And, Doctor, is it your testimony that you've never -- you don't recall ever seeing Exhibit 14?
THE DEPONENT: That doesn't look familiar, and I don't believe there's a copy of that in my chart.
Q. (BY MR. RONWIN) Okay. All right. Fine. No problem. Now, I think we'll take one other thing here. I'm going to make one further digression before we go to there. Before we get on this last matter, I'll make one further digression. Okay?
MR. RONWIN: Let's mark this thing, please. That would be Exhibit 15.
(Deposition Exhibit 15 was marked.)
Q. (BY MR. RONWIN) Well, that's all right. You've said you didn't get it, so we can put it aside.
A. No. Okay.
Q. Oh, she put 15 under there. Okay. What did

Page 153

I -- what have you been presented with?
A. Well, let's see. It's page 323 and 324.
Q. Yes.
A. And it looks like it's from Anatomy for Surgeons, Back and Limbs.
Q. Yes, right. And starting on -- on page 323, right underneath the Figure 223, there's a sentence that begins on the right-hand column, right? And it starts with "In their series" --
A. Okay.
Q. -- right? Could you read that up to page 324, to the line 1, 2, 3, 4 -- to the -- where the sentence ends on line 4, where it says "50 percent"? Do you see that?
A. Certainly.
Q. Okay. Please.
A. All right. "In their series, there were tears of the cuff in 4 of 12 shoulders representing the fifth decade, in 4 of 18 of the sixth decade, in 30 of 30 of the seventh decade, and in 23 of 24 of the eighth and ninth decades."
Q. Yes.
A. "Grant and Smith, confining their observations to rupture of the supraspinatus tendon, found 11 individuals with bilaterally ruptured tendons, 8

Page 154

with rupture on the right side only, and 6 with rupture on the left side only, among 95 dissecting room subjects. Further, among 18 subjects aged 17 to 46 years, they found no incidence of rupture; among 12 subjects, 47 to 56 years, they found rupture of at least one tendon in 25 percent; among 22 subjects, 57 to 66 years, they found 18 percent with a rupture; among 31 subjects, 67 to 77 years, 39 percent; and among 12 subjects, 77 to 86 years, 50 percent."
Q. Right. And will you accept that in 2001, when I first came to your offices -- and that was during which I had taken Baycol for seven months, a period of approximately seven months almost to the day -- I was 77 years old?
A. All right.
Q. Okay. So under this finding by Grant and Smith reported here in the Anatomy For Surgeons -- and you're a surgeon, right?
A. Yes.
Q. Out of the 31 subjects in that age category, which includes the 77 -- people 77, 39 percent were found with rotator cuff tears, is that right, of the supraspinatus tendon?
A. From 77 to 86 years, it was 50 percent among 12 subjects.

Page 155

Q. No, 67 to 77.
A. Okay. And then it said "and among 12 subjects" --
Q. Yeah.
A. -- "77 to 86," so there's a little overlap there, and that was 50 percent.
Q. Yeah. So I might be -- there might have been 45 percent in that 77 category, then?
A. Okay.
Q. Okay. So therefore, is -- is it the -- is it the case that just being old would absolutely cause a -- a rotator cuff tear?
A. It's not absolutely. There are lots of studies out there that do show -- and there's varying percents, depending on which study you read -- but there's an increasing incidence of rotator cuff tears as we age.
Q. With age?
A. Yes.
Q. But it would not necessarily be the cause of -- of the rotator cuff tear?
A. It increases with age, and that's all we can say.
Q. Yes, yes. So in my case, could one say it's absolutely the age?

Page 156

A. We could just say that it's a higher incidence in that age group, and that's all we can say.
Q. And that's all you can say, right. Now, let's go to a little bit about the good -- the good defendant in this case. I'll just show you what the FDA had to say.
MR. RONWIN: Please mark that as Exhibit -- what is that, 16? Is that not right? Is that right, 16?
THE REPORTER: (Nodded head.)
(Deposition Exhibit 16 was marked.)
Q. (BY MR. RONWIN) Now, you have Number 16; is that right?
A. I do.
Q. What does that appear to be, please?
A. Let's see. The first page says "Division of Drug Information FDA," slash, a number of other letters.
Q. Yes.
A. Okay. Dated 6/22/06. It's a fax to Edward Ronwin from Joan Powers. "Message: Baycol letters."
Q. Yes, right. And then on the next page, what sort of a document do we have?
A. It looks like a fax, and it is to a Ms. Sever, S-e-v-e-r, who's of Bayer Corporation.
Q. October -- do you have the date on that?
A. October 25, 1999.

Page 157

Q. All right. And it is from the Food and Drug Administration, is it not? If you look at the top, under the line --
A. Oh, yes, "Food and Drug Administration, Rockville, Maryland."
Q. Yes. Even though it's Department of Health and Human Services, that's -- FDA is part of that.
A. All right.
Q. And, let's see. Would you read the -- the first paragraph, please?
A. On page 1?
Q. Yes.
A. Okay. "Dear Ms. Sever: As part of its routine monitoring program, the Division of Drug Marketing, Advertising, and Communications has become aware of promotional material for Baycol that is false, lacking in fair balance, or otherwise misleading. Reference is made to a Sales Ad submitted under cover of Form FDA 2253. The dissemination of this material by Bayer Corporation and/or their agents, violates the Federal Food, Drug, and Cosmetic Act and its implementing regulations. DDMAC requests that the use of the above referenced material and those containing the same or similar violations cease immediately."
Q. All right.

Page 158

A. "Specifically, DDMAC has the following objections."
Q. Right. And then the next paragraph, let's see. You start with the -- let's see. "More specifically" -- the sentence right at the last line, starting "More specifically," could you read --
A. "The statement, 'Baycol is a fully synthetic inhibitor of the HMG CoA reductase enzyme' in juxtaposition with a chart comparing the 'Synthetic Pure Enantiomers'" -- let me spell that.
Q. Enantiomers.
A. E-n-a-n-t-i-o-m-e-r-s -- and then in parentheses, "(Baycol and Lipitor) versus 'Other Statins,' and then in parentheses, "(Pravachol, Zocor, Mevacor, and Lescol)," L-e-s-c-o-l, "that are 'fungally derived' implies a clinical advantage for Baycol versus 'other statins' that is unsubstantiated."
Q. Right. Okay. Then, let's see. Under the next one, they have "More specifically" again right after the second sentence. That would be the third line.
A. "More specifically, the statement, 'Baycol inhibits cholesterol-producing enzymes in vitro more completely at lower concentrations than any other statin' in juxtaposition with a graph titled, 'Statin inhibition of membrane-bound HMG CoA reductase in animal hepatic

Page 159

tissue' uses non-clinical data to imply clinical significance and the superiority of Baycol versus the other HMGs."
Q. Right. Well, then, the next sentence is what, "The disclaimer"? The next sentence was what? The last sentence was --
A. It says, "'in vitro data do not imply clinical significance' -- excuse me -- "that is presented in smaller type underneath the graph does not adequately correct the misleading implication."
Q. Right. We don't have to read the rest of those because we'll be putting them in -- in evidence. But the point is that the other objections are in similar vein.
A. Okay.
Q. In other words, misleading the public --
A. Okay.
Q. -- is the basic idea.
MR. PILKINGTON: Objection. Was that a -- form and foundation.
MR. RONWIN: Okay. Go ahead. You object. Let me get this now. And here I want to be careful, because I don't want to give away the original. Okay. I'll put it in that pile, because it won't matter. This will be Exhibit 17, I believe. Could you mark that?

Page 160

(Deposition Exhibit 17 was marked.)
Q. (BY MR. RONWIN) You have a document in front of you. What is the -- is that document, at least from the top?
A. At the top it says, "United States District Court, Northern District of California, Filed January 18, 2005."
Q. Right.
A. "United States of America versus Bayer."
Q. Yes. Now, what does it say this -- the title of it is? That's on the right-hand side, "Amended" --
A. "Amended Judgment in a Criminal Case."
Q. Right. And then underneath, on the left-hand side, it says --
(Interruption by a telephone call.)
Q. -- it says "The Defendant," and then there's a little box checked with a X -- with a cross. Do you see it on your right-hand side, the upper right-hand side, it says "The Defendant," right?
A. On the left-hand side?
Q. I mean the left-hand side, excuse me. I'm sorry.
A. That's okay.
Q. And then there's a little cross in the box,

Page 161

right?
A. Um-hum.
Q. And what does that box says?
A. "Pleaded guilty to Count 1 of the information."
Q. Right. Okay. So they pleaded guilty; is that right?
MR. PILKINGTON: Objection, form and foundation.
Q. (BY MR. RONWIN) And then you have underneath "Title & Section," right?
A. Yes.
Q. And could you read the "Nature of Offense"?
A. "Conspiracy to Maintain & Increase Prices of Certain Rubber Chemicals."
Q. Right. And the -- and then underneath on the first page, there's apparently a stamp thing. And that -- what does that say?
A. "I hereby certify that the annexed instrument is a true and correct copy of the original on file in my office."
Q. Right. Okay. Now, if you look at the next page, on the top it's headed what?
A. "Criminal Monetary Penalties."
Q. Okay. And then could you give the totals,

giving what the total -- what each item is? "Assessment"?

A. "Assessment"?

Q. Yes.

A. "$400. Fine: $66 million."

Q. Right.

A. "Restitution: Not applicable."

Q. Okay. So this is a -- this is a plead of guilty and a willingness to pay $66 million for price-fixing on rubber chemicals.

MR. PILKINGTON: Objection, form and foundation.

A. And I have no idea. You just had me read some things here that I really don't know anything about.

Q. (BY MR. RONWIN) Well, you're not -- you just learned it for the first time.

MR. PILKINGTON: Objection, form and foundation, asked and answered.

MR. RONWIN: Now, let's mark this as Exhibit 18.

(Discussion off the record.)

MR. PILKINGTON: Will you ask that again, Doctor?

THE DEPONENT: I asked the question that I'm here, as I understand it, as an expert witness in



orthopedic surgery and as your treating physician. And I'm being asked to read documents that I've never seen before, that I don't know what they're about --

Q. (BY MR. RONWIN) Right.

A. -- and I'm just questioning why that that is occurring?

Q. Right. And the reason is this: that this company promoted a drug that was highly dangerous, killed about 152 people worldwide, about 40 or so in the United States, possibly more; persisted in it -- in marketing the drug, and even applying to get increased -- the right to market increased dosages than the ones they had initially in this country.

And then they have kept from the FDA -- I didn't present that evidence. It's there, and I have it. I didn't bring it here. They presented to the FDA false clinical information and kept clinical information, statistics and such, or observations that they found in their clinical studies, kept it from the FDA.

They paid journals to publish this stuff. They paid researchers to write the articles for this stuff, and the researchers failed to notify the journals in the paper -- in their scientific reports that they were working for Bayer and were being paid by Bayer. Instead, they just simply made it look like they were



independent researchers doing research on -- on this Baycol independently, you see?

A. My point is that I'm an orthopedic surgeon --

Q. That's right.

A. -- and that's what I do, and that's what I'm an expert at.

Q. Yes.

A. And this does not have any -- I --

Q. You don't see the immediate bearing.

A. Well, my --

Q. But the bearing --

A. Let me finish, please. But my point is that, I think what I see as my part here is, with your particular situation, what is my opinion with regard to the origin or cause of what's happened to you, not negating and not -- I agree you have a right to your opinion, certainly, and I respect that. But I just wanted to put that on the record.

MR. RONWIN: Oh, okay.

MR. PILKINGTON: And let me -- let me answer your question, Doctor. I share your concern about where this deposition is going, and I disagree with much of what Mr. Ronwin has said.

MR. RONWIN: It will --



MR. PILKINGTON: Just bear -- bear with me. I have the right to answer her question, too. I share your concern, Doctor. We're trying to get this deposition over with, and I think it will happen.

THE DEPONENT: Okay.

MR. PILKINGTON: So I share your concern. I have many disagreements with Mr. Ronwin. But fortunately, we have been able to get depositions done, haven't we, Mr. Ronwin?

THE DEPONENT: And I'm happy to stay here as long as we need to.

MR. RONWIN: We're almost there. We're almost to the end.

MR. PILKINGTON: Let's go.

Q. (BY MR. RONWIN) But here's the point.

A. Okay.

Q. We're going to still have to go through this, but I want to add this other part about why. And I want you to understand this, you see. Because they have promoted, as I just explained previously, that the only thing that Baycol did was tear up muscle tissue, you see.

And they promoted it when they should well have known two things: That it could tear up -- if it can tear up muscle tissue, it can tear up just about any cell in the body, not necessarily every one, but just

about every one. And it could tear up collagen, and it could tear up other things.
Because their scientists know as much as I do that fluoride is an awfully dangerous agent. It is the most -- it is the most active element known to man. The way you etch glass is by taking a piece of glass, putting a wax top on it, cutting the symbols that you want on the glass, and filling it with none other than hydrogen fluoride, which is hydrofluoric acid. Okay? It's that strong. It will chop up --
A. Well, I'm happy to continue.
Q. Now, so what -- and that has affected the thinking of many people.
A. Yes.
Q. And most M.D.s have not even bothered to even look at this kind of thing. And that's why most of you, quite honestly -- and this is not -- not casting an aspersion on the medical profession -- is most of you are really unfit to give an expert opinion on the cause of -- of these adverse events by Baycol. It's a biomolecular problem. Biochemists, pharmaceutical chemists, which is analogous to a biochemist. It's just a special branch of it --
A. Well, let's go ahead and move on.
Q. And that's the reason, you see. And so I'm



trying to show you that this is not an angel defendant. This is a very nasty defendant.
MR. PILKINGTON: Mr. Ronwin, we have many disagreements.
MR. RONWIN: Okay. So give her Exhibit -- did you mark that as Exhibit 18?
(Deposition Exhibit 18 was marked.)
Q. (BY MR. RONWIN) Let's just do the same thing again, just giving the "United States of America" title -- you know, the litigants, in other words.
A. Okay. "United States of America versus Bayer." The defendant pleaded guilty to Count 1 of the information.
Q. Yes. And is that --
A. And that was --
Q. -- a judgment --
A. -- a judgment in a criminal case.
Q. Yes.
A. "Criminal monetary penalties. Assessment: $400. Fine: $33 million. Restitution," it just has a dollar sign.
Q. Okay. That will be good enough on that one. And then we'll just do the last one on that.
(Deposition Exhibit 19 was marked.)
Q. Okay. You have Number 19?



A. I do.
Q. Let's go through that routine again.
A. Okay. "United States District Court, Northern District of California, United States of America versus Bayer. The defendant organization pleaded guilty to Count 1 of the Information. Judgment in a criminal case." I don't see what it was about.
Q. Oh, this is a schedule of payment -- well, let's see. They had a sheet before that. Yeah, they have criminal monetary penalties, right. That's on page 2.
A. Okay. "Assessment: $400. Fine: $4.0 million."
Q. Right. Okay. Good. I've got just a couple more of these little items.
MR. RONWIN: And let's -- let's mark this one, please, as Exhibit 20.
(Deposition Exhibit 20 was marked.)
Q. (BY MR. RONWIN) Could you just read the title of that article, without reading the article itself?
A. "Bayer faces Swiss criminal probe over cerivastatin."
Q. Yes. And underneath, on the left hand on the bottom, it has a -- it starts with a "BJM." Do you



see that? That's the journal.
A. Oh, "Told the BJM on Friday that he had opened the investigation after" --
Q. No, no. I mean this -- this thing here (indicated).
A. "BJM Volume 324, January 19, 2002."
Q. Right.
A. "BJM.com."
Q. Yes. And the page is on this side, is it not?
A. Page 130.
Q. Right. And do you know what "BJM" stands for?
A. I don't.
Q. British Medical Journal.
A. Okay.
Q. It used to be actually written out, but then they decided to use just the letters.
A. I see.
Q. Okay. Thank you.
MR. RONWIN: Now let's take another one here, and we'll mark this as -- as Exhibit 21, please.
(Deposition Exhibit 21 was marked.)
Q. (BY MR. RONWIN) And you'll notice on the bottom, on the left hand, boxed in on the first page, on

the bottom left-hand column, left-hand-most -- right-hand-most column, excuse me.
A. It says, "EC imposes pricing fines. The European Commission has imposed a total of $90 million in fines on three firms for fixing the price of rubber chemicals between 1996 and 2001. The commission imposed fines of $70 million on Bayer, $16 million on Chemtura, and $4 million on General Quirnica."
Q. That's good enough, good enough.
A. And that's from www.cen-online.org.
Q. Right.
A. January 2, 2006.
Q. Yes. And do you know what C&EN stands for?
A. I don't.
Q. Chemical and Engineering News.
A. Okay.
Q. It's a publication in our chemical society.
A. I see.
Q. Okay. And this one is an interesting one.
MR. RONWIN: Would you mark that as Exhibit Number 22?
(Deposition Exhibit 22 was marked.)
Q. (BY MR. RONWIN) And you have that exhibit, okay. Exhibit 22, Dr. Knauer deposition. Would you tell us where that's from?



A. I don't see where that's from.
Q. Handwritten on the top.
A. E = MC2, by David Bodanis, B-o-d-a-n-i-s.
Q. Right.
A. Berkeley Publishing Group, New York, 2001.
Q. Right.
A. Excuse me.
(Interruption by a telephone call.)
Q. This is the last thing I'll ask you to read.
A. Okay.
Q. Starting below the -- the second paragraph, so to speak, it starts at "129."
A. Yes.
Q. Could you read that, that whole thing down there?
A. Starting with "female 'slaves'"?
Q. Yes.
THE REPORTER: Could you slow down just a little when you read?
THE DEPONENT: Sure.
A. "129 . . . "female 'slaves': With the passage of time, it is easy to forget what attitudes the individuals who worked in Germany during the war were accepting; what words like bought and slave actually meant. There are tens of thousands of pages in the



Nuremberg Trial documentation; on November 15, 1947, the New York Herald Tribune reported the firsthand testimony behind just one:
"Nuremberg, November 14, 1947 (A.P.) A French witness testified today that the I.G. Farben," F-a-r-b-e-n, "combine purchased 150 women from the Oswiecim (Auschwitz) concentration camp, after complaining about a price of 200 marks (then $80.00) each, and killed all of them in experiments with a soporific drug."
Q. (BY MR. RONWIN) That's right. Continue.
A. "The witness was" -- let me spell this -- G-r-e-g-o-i-r-e, M, last name A-f-r-i-n-e. "He told the American military tribunal trying 23 Farben directors on war crime charges that he was employed as an interpreter by the Russians after they overran the O-s-w-i-e-c-i-m camp in January 1945 and found a number of letters there. Among the letters, he said, were some addressed from Farben's 'Bayer'" -- that's in quotes -- "plant to the Nazi commandant of the camp. These excerpts were offered in evidence:
"1. In contemplation of experiments with a new soporific drug, we would appreciate your procuring for us a number of women.
"2. We received your answer but consider



the price of 200 marks a woman excessive. We propose to pay not more than 170 marks a head. If agreeable, we will take possession of the women. We need approximately 150.
"3. We acknowledge your accord. Prepare for us 150 women in the best possible condition, and as soon as you advise us you are ready we will take charge of them.
"4. Received the order of 150 women. Despite their emaciated condition, they were found satisfactory. We shall keep you posted on developments concerning the experiment.
"5. The tests were made. All subjects died. We shall contact you shortly on the subject of a new load."
Q. Thank you. I want to explain that IG Farben was probably the biggest chemical corporation or body in the world at that time. And it was made up of -- at the end of the war, they broke it up into four different companies. One of them was Bayer, and that's why they have that Bayer in quotes. It was a branch of IG Farben then in LeverKusen, Germany, which is not far from the Swiss border.
And the other two companies that I can remember is BASF. That's what it was known as, and is


831d373c-d877-4400-9353-010c1c445990

known today by that name, just as Bayer is known. And the third one was called Degussa, which is also an active chemical firm today, growing. And I don't remember the name of the fourth.

But the point is that here were human beings that were treated like -- when we do experiments with drugs, we use mice and rats and guinea pegs, and here they use human beings.

MR. PILKINGTON: Objection to form and foundation.

Q. (BY MR. RONWIN) And here a company -- here is a company that steals from all of us by price-fixing, not just once, but three different times, and has to come up with 104 million to the US government and 70 million to the EC, which is the European Commission, which is part of the European Union, the EU.

And -- and then they come into this country, and they form Bayer Corp., which is a wholly owned corporation of Bayer A.G., the German firm. And then, when they go for -- put out their literature, they're lying like thieves, misrepresenting all over the place. The FDA didn't hesitate to use the word "false," you see, et cetera and et cetera. You read it.

And this is the kind of company that put out Baycol, and they had clear information that it was a



dangerous drug. As a matter of fact, I haven't gone into the comparison for you, but it is about 620 times more dangerous than Zocor, which is one of these statins, and that's not a very dangerous one. But 620 times more dangerous if they use the proper biochemical comparison for danger.

The one they have already is about five -- 5.4 times more dangerous. That's bad enough, you see. But if you do it properly on a molecular basis, you find out it's about 620 times more dangerous, see. And so we have a product that can kill. It did kill. It can injure. It did injure. And not only people with -- with muscle injuries, like back problems, et cetera, but also injuries to tendons, ligaments, bone, that sort of thing.

And it's all due to that fluorene atom. And if you want to take a second -- and we don't have to have it on this. We can call it cut -- I can show you something that's quite interesting. Would you want to take a second and look?

MR. PILKINGTON: Are you done with your questions?

MR. RONWIN: Huh?

MR. PILKINGTON: Are you done with your questions?

MR. RONWIN: Yeah. Do you have any others?



MR. PILKINGTON: Just very quickly, I have a couple follow-up questions. I promise to get back on track.

MR. RONWIN: Okay.

MR. PILKINGTON: Just -- just for the record, I strongly object to Mr. Ronwin's closing arguments, which is -- is not true, and the jury will decide this case.

EXAMINATION

BY MR. PILKINGTON:

Q. But I want to get back, Doctor, to why we're here. And I truly appreciate your patience in getting this done today.

A. That's okay.

Q. First of all, Doctor, when you looked at that X-ray, Mr. Ronwin asked you about a partial tear and a total tear. Do you recall that?

A. I do.

Q. Can partial tears lead to total tears?

A. Yes.

Q. And do you commonly see that in the elderly population, where a tear begins as a partial tear, eventually go into a total tear?

A. Yes.

Q. Doctor, to clarify the record, Mr. Ronwin's



lower back pain and buttock pain, his only complaint was in May of 2003, correct?

A. Yes.

Q. And no other point in time during your care and treatment of him did he make those sorts of complaints, correct?

A. Yes, that's correct.

Q. Doctor, I have to ask you some basic questions to make sure that I get your medical records into evidence. And by these I'm going to ask you questions as to Exhibit Numbers 3, 5, 6, 7 and 8. Okay, Doctor?

A. Yes.

Q. Those are all your records. Doctor, are those exhibits all true and correct copies of the actual documents?

A. I lost Number 7. Just a second.

Q. Those are your office notes.

A. Oh, thank you very much.

Q. You're welcome.

A. Yes, they all are.

Q. And, Doctor, were they prepared by you or your colleague, Dr. Servi?

A. Yes, or the radiology report by the radiologist.

Q. And I -- let me -- let me start over. I want to do this with respect to Exhibit Numbers 3, 4, 5, 6, 7, 8 and 9. Okay, Doctor?
A. Yes.
Q. Those were all documents that you reviewed in the course of your care and treatment of Mr. Ronwin, correct?
A. Yes, they are.
Q. And, Doctor, were these documents prepared at or about the time by clinicians who had firsthand knowledge about the treatment provided by Mr. -- to Mr. Ronwin?
A. Yes.
Q. And those clinicians were either you, your colleague Dr. Servi, or a radiologist with whom you worked?
A. Yes.
Q. And those radiologists are doctors to whom you referred Dr. Ronwin -- Mr. Ronwin?
A. They would have read the X-rays. He might not have met them, but yes.
Q. And you relied on those documents, correct?
A. Absolutely, yes.
Q. Doctor, are those true and correct copies of the medical records pertaining to Mr. Ronwin?



A. Yes.
Q. And, Doctor, are those medical records maintained in your office chart?
A. Yes.
Q. And do you have a person in your office whose responsibility it is to maintain the accuracy of that chart?
A. Yes.
Q. And, Doctor, is it the ordinary course of your clinic -- ordinary practice of your clinic to maintain records such as I've described in the patient's chart?
A. Yes.
Q. Finally, Doctor, Mr. Ronwin asked you to read statements from Exhibits 12 through 22, correct?
A. Yes.
Q. Had you ever, before this deposition, seen any of those exhibits?
A. No.
Q. And I know that during the deposition you questioned the relevance of many of these exhibits, correct?
A. Yes.
Q. And, Doctor, were you given the opportunity to read these exhibits in their entirety?



A. No.
Q. Doctor, would you like to read these exhibits before -- before offering any opinions as to the conclusions found in those exhibits?
A. Yes. I can't conclude anything from what I've seen today.
Q. And, Doctor, the mere reading of those exhibits, as you did at Mr. Ronwin's request, does not mean that you agree with what you read, correct?
A. Yes, that's correct.

MR. PILKINGTON: Doctor, I thank you for your patience. You have the opportunity to read and review your transcript, if you so desire. I can represent to you that the court reporter has done an excellent job transcribing everything that has taken place, but you have the opportunity to read and review, or you can waive that right, too.

THE DEPONENT: I can waive that.

MR. PILKINGTON: Thank you for your time.

IT WAS STIPULATED AND AGREED between counsel, with the consent of the deponent, that the reading and signing of the within deposition is waived.

WHEREUPON, the within proceedings were concluded at the approximate hour of 5:27 p.m. this 23rd day of June, 2006.



CERTIFICATION

SYLVIA E. NONEFF, Registered Professional Reporter, appointed to take the deposition of

SALLY A. KNAUER, M.D.,

certify that prior to the deposition the individual was duly sworn by me to testify to the truth; that the deposition was taken by me at 2121 East Harmony Road, Boardroom, Fort Collins, Colorado 80528 on June 23, 2006; that the proceedings were then reduced to typewritten form by means of computer-aided transcription, consisting of 182 pages herein; that the foregoing is an accurate transcript of the proceedings at that time.

I do hereby certify review of transcript was not requested on the record.

I further certify that I am not related to any party herein or their counsel and have no interest in the result of this litigation.

IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of June, 2006.

SYLVIA E. NONEFF
Registered Professional Reporter

COFFMAN REPORTING & LITIGATION SUPPORT, INC.
1440 Blake Street, Suite 320
Denver, Colorado 80202
303.893.0202

JEFFREY PILKINGTON, ESQ.
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, Colorado 80202

Re: Ronwin v. Bayer Corp., et al
Deposition of: SALLY A. KNAUER, M.D.
Date of Deposition: June 23, 2006
Trial Date: None set

Enclosed is:

(XX) ORIGINAL TRANSCRIPT. Please retain unopened original until it is required by any party in a trial or hearing in the above matter.

( ) ORIGINAL SIGNATURE PAGE __with ___without corrections; copies provided to attending counsel. Please append these sealed originals to original transcript in your possession.

( ) Signature/correction sheets not received prior to filing.

(XX) Review of transcript not requested.

( ) 30-day review unavailable. Signature and correction pages forwarded to counsel agreeing to obtain signature. Original filed in anticipation of trial date. See letter within deposition.

( ) Copy of deposition, signature and correction pages sent to deponent. See letter within deposition.

( ) Signature not applicable.

Original transcript filed on______________via_____________

Follow-up documentation filed on____________via_____________

cc: Attending counsel



831d373c-d877-4400-9353-010c1c445990

# Exhibit E

To: Jeff Pilkington

From: Edward Ronwin

Date: July 5, 2006

Faxed herewith is a copy of Attorney's Statement of Changes to the Depositions of Drs. Hiatt, Deane & Wolfel.

FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 05 2006 07:46AM P1
RCV BY:D.G.&S. : 7- 5- 6 : 8:44AM : 970 224 3838→ D.G.&S.:# 1

Coffman REPORTING & LITIGATION SUPPORT, INC.
1440 BLAKE STREET, SUITE 320
DENVER, COLORADO 80202
303.893.0202

## ATTORNEY'S STATEMENT OF CHANGES

I, Dr. Edward Bozzuoli, state I wish to make the following changes in the transcript of DR. KEVIN DEANE given on JUNE 5, 2006:

| Page | Line | Should Read | Reason |
|---|---|---|---|
| 62 | 25 | Dr. Wolfel should read Dr. Wolff. | Original incorrect |
| 62 | 18-20 | Wolfel should read Wolff | original incorrect |

Edward Bozzuoli
Signature

# ATTORNEY'S STATEMENT OF CHANGES

I, Edward Ronwin state I wish to make the following changes in the transcript of Dr. Eugene Wolfel given on June 8, 2006.

Page 105, ls. 8-11: Asked by Dr. Ronwin if Dr. Ronwin told Dr. Wolfel that "his friends gave Ronwin suggestions to cease aspirin," Dr. Wolfel's recorded response is: "I can't recall if that was mentioned or not." That report is incorrect. Dr. Wolfel actually answered, "No."

Page 118, l. 9: The 0.04 mg. should read 0.4 mg. (of Baycol).

Page 134, l. 11: The person talking was Dr. Ronwin, not Mr. Pilkington.

Page 140, ls 8-24: Dr. Ronwin asked if AERs are reliable. Dr. Wolfel answered, "yes." That is not what is reported. What is reported was Dr. Wolfel's amplification implying that AERs are used by FDA and therefore are "reliable" but the positive single, "yes," was not included even though it was said by Dr. Wolfel. Throughout Dr. Wolfel's deposition, it is notable that Dr. Wolfel frequently supplemented his initial responses with amplifications.

Edward Ronwin

Dr. Edward Ronwin

## ATTORNEY'S STATEMENT OF CHANGES

I, Edward Ronwin state I wish to make the following changes in the transcript of Dr. William R. Hiatt on June 5, 2006.

Reading to the question from p. 22, l. 25 to p. 23, l. 3, there is discussion to the effect that Dr. Ronwin had "numerous revascularization procedures." In the cited question on p. 23, ls. 1-2, the question suggests that Dr. Ronwin had a "second procedure" in "January of this year," which means January, 2006). That suggestion is utterly untrue which makes the answer, p. 23, l. 4, "correct," to also be untrue. Dr. Ronwin had no revascularization procedure in January, 2006. In fact, Dr. Ronwin's last such procedure occurred in June or July, 2001.

P. 24, ls. 9, 20-21: The allegation that Dr. Ronwin was taking "40 milligrams, (of Zocor), each day" is false. From and after, May 20-25, 2001, Dr. Ronwin took Baycol every other day, and when same was removed from the market on Aug. 8, 2001, Dr. Ronwin took 40 mg. Zocor every other day, and never reported otherwise to anyone including Dr. Hiatt; except when Dr. Ronwin told Dr. Wolfel that he was taking 40 mg. Zocor every third day, which was done for about three months.

P. 24, l. 25 to p. 25, l. 7: The allegation that Dr. Hiatt got the notion that Dr. Ronwin, allegedly, took Zocor at 40 mg. each day is false.

P. 27, ls. 8-10: The allegation that Dr. Ronwin suffered from "hypertension" that Dr. Hiatt was allegedly seeking "to control or maintain control" is false. Dr. Ronwin has never suffered from or been diagnosed by anyone to have "hypertension."

P, 30, ls. 9-10: The allegation that Dr. Ronwin had or has "hypertension," is, as just above, false.

P. 40, ls. 20-21: The allegation that Dr. Ronwin reported to Dr. Hiatt that Dr. Ronwin was taking an 81 milligram dose of aspirin daily is false. At all times when Dr. Ronwin took a daily dose of aspirin, the dose size was 325 milligrams, though that dose was taken daily.

P. 42, l. 24 to p. 43, l. 1: If Dr. Hiatt ever had a concern about Dr. Ronwin taking Zocor every other day, Dr. Hiatt never expressed that concern to Dr. Ronwin. In fact, on Dr. Ronwin's last visit to Dr. Hiatt on March 13, 2006, Dr. Hiatt told Dr. Ronwin as both left the examination room that the every other day statin dosing procedure was becoming popular.

P. 50, ls. 20-22: Dr. Ronwin did not "complain" to Dr. Hiatt about his left shoulder rotator cuff tear; rather, Dr. Ronwin spoke to Dr. Hiatt in an effort to get an expert medical report on his left shoulder as required by the Court. Dr. Ronwin was not seeking the report from Dr. Hiatt, but from an orthopedic surgeon who Dr. Hiatt might suggest.

P. 50, l. 23 to p. 52, l. 3, especially p. 51, l. 21 to p. 52, l. 3: The claim that Dr. Ronwin's taking Zocor every third day was "against [Dr. Hiatt's] recommendation" is false. Dr. Ronwin never asked for Dr. Hiatt's recommendation!

P. 52, ls. 7-14: The allegation that Dr. Ronwin stopped taking aspirin "because of reports from friends" is absolutely false. The dosing with aspirin was dropped by Dr. Ronwin, on Dr. Ronwin's own decision, based on scientific reports of the various adverse reactions and effects on numerous body organs and functions caused by aspirin. Dr. Eugene Wolfel, who is Dr. Ronwin's "primary care physician" as to cardiological and vascular concerns, agrees with Dr. Ronwin's reasons for stopping aspirin ingestion. In

FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 05 2006 07:47AM P4
RCV BY:D.G.&S. : 7- 5- 6 : 8:44AM : 970 224 3838→ D.G.&S.:# 4

fact, p. 52, ls. 23-25, Dr. Hiatt reports that Dr. Ronwin stopped aspirin dosing because of "concern about side effects," and did not add anything about Dr. Ronwin's "friends" making any contribution to Dr. Ronwin's decision to cease taking aspirin.

P. 53, ls 14-23: Dr. Hiatt's claims that he urged every day use of Zocor are false. Dr. Hiatt was never asked by Dr. Ronwin to urge or not to urge, or otherwise, as to Dr. Ronwin's taking of Zocor. Dr. Ronwin took Zocor because of Dr. Ronwin's knowledge of the enzyme inhibition backed by scientific reports which supported every other day dosing regimen

P. 60, ls. 8-16: The allegation that Dr. Hiatt "sent [Dr. Ronwin] to orthopedic surgery" is false for two reasons: (i) Dr. Hiatt has nothing to do with the matter, and (ii) Dr. Ronwin was sent to see Dr. Neville, a neurologist at the Univ. of Colorado Hospital by arrangements made by Ms. Sue West, Risk Manager at the hospital.

P. 62, l. 22 to p. 63, l. 6: The allegation that Dr. Hiatt continued to make recommendations to take Zocor every day and aspirin at 81 mg. dose per day, are absolutely false. Dr. Hiatt was never asked by Dr. Ronwin for any recommendation on these drugs.

P. 64, l. 19 to p. 65, l.15: The notion that Dr. Hiatt was Dr. Ronwin's "primary care physician" is bunk. Whenever Dr. Ronwin has been asked, as in the application Dr. Ronwin executed for the different clinics at the Univ. of Colo. Hosp., who is "primary care physician" was, Dr. Ronwin always answered that he had none. Dr. Ronwin never appointed Dr. Hiatt as his "primary care physician," nor any other medical doctor. Furthermore, it was Dr. Wolfel, or his nurse practitioner, who have always written Dr. Ronwin's prescriptions for statins, and they have never varied from what Dr. Ronwin requested; nor was Dr. Hiatt consulted or asked about those prescriptions.

P. 66, l. 6 to p. 67, l. 16: Dr. Hiatt's alleged inability to associate Dr. Ronwin's symptoms with Baycol action have no scientific bases; nor did Dr. Hiatt ever review the evidence that supports the contrary.

P. 68, l. 25 to p. 69: Dr. Hiatt's statement that "statins primarily block an enzyme that makes LDL Cholesterol" is false. The well-established fact is that the enzyme inhibits 3-hydroxy,3-methyl glutaryl Co.A Reductase. That enzyme blocks the conversion of 3-hydroxy, 3-methyl glutaryl Co.A to mevalonate. The end effect of that inhibitory action is to prevent the formation of Cholesterol in liver cells, not LDL Cholesterol. The enzyme has no direct action on LDL-Cholesterol formation as stated by Dr. Hiatt.

P. 70, l. 25 to p 71, l. 2: If, as Dr. Hiatt alleges both Dr. Wolfel and Dr. Hiatt both felt that taking statin (Zocor implied) every other day was not appropriate, that attitude was not ever communicated to Dr. Ronwin by Dr. Wolfel nor by Dr. Hiatt.

P. 85, l. 9 to p. 86, l. 10: Dr. Hiatt did say "yes" to the question that AER information is "reliable." While, the "yes" is not recorded, Dr. Hiatt's answers do indicate a reliable use for AER data.

P. 86, l. 11 to p. 87, l. 22: Dr. Hiatt's claims that he's "confused" about "incidence reports," which are reports of adverse reaction data obtained from clinical studies. Since, Dr. Hiatt has engaged in clinical studies for many years, (he alleges 30 at another portion of the transcript), Dr. Hiatt's reply to Dr.



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 05 2006 07:48AM P5
RCV BY:D.G.&S. : 7- 5- 6 : 8:45AM : 970 224 3838→ D.G.&S.:# 5

## DEPOSITION OF DR. HIATT

Ronwin's questions on "incidence reports" are not credible.

P. 87, l. 23 to p. 88, l. 25: Dr. Hiatt has deliberately dodged questions on the ethics of scientific report publication. The questions were clear and Dr. Hiatt either knows or should be held to know the proper ethics involved.

P. 91, ls. 12-22: Dr. Hiatt's allegation that Dr. Ronwin asked Dr. Hiatt about Dr. Wolfel's belief as to whether Dr. Ronwin should take Zocor every day as opposed to every other day, is false. For one thing if Dr. Ronwin's wanted to know Dr. Wolfel's position, Dr. Ronwin would ask Dr. Wolfel directly! The fact is that Dr. Ronwin never asked Dr. Hiatt any such question. As to the subsequent question and answer, p. 91, ls. 17-22, the question and answer relate a fiction never communicated to Dr. Ronwin, who, based on scientific evidence, would have ignored the views stated. In fact, Dr. Ronwin never asked either Dr. Wolfel or Dr. Hiatt if every other day dosing with Zocor was okay; rather, Dr. Ronwin simply used that dosing regimen at all times after Dr. Ronwin ceased taking Baycol.

P. 93, l. 24 to p. 94, l. 13: Dr. Hiatt's allegation that Dr. Ronwin's LDL value should be "70" is false. Dr. Wolfel, who has been the primary physician concerned with Dr. Ronwin's lipid profile has testified in his deposition that the "70" goal is more flexible than the former "100" goal. The "70" goal is a recommendation rather than a fixed objective. Also, the data in Exh. 8 to Dr. Hiatt's deposition shows a variance in the level of the different lipids gauged on Dr. Ronwin over the years from 1984 to the present and include the time that Dr. Ronwin has taken statins. In fact, the LDL Cholesterol level last observed on June 8, 2006 (3 days after Dr. Hiatt's deposition) was 67, well within the "70" goal. That value was obtained by every other day dosing with Lipitor, the most popular statin on the market.

P. 96, l. 18 to p. 98, l. 4: Dr. Hiatt dodges questions on Baycol as a chemical that can act on other chemicals in the human body other than on 3-hydroxy, 3-methyl glutaryl Co.A Reductase.

Edward Ronwin