IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : MDL No. 1431 (MJD) |
| This document relates to: | : |
| Ronwin v. Bayer Corp. | : Case No. 02-0200 |

REPLY TO DEFENDANT, BAYER CORP.'S RESPONSE TO PLAINTIFF'S EMERGENCY MOTION TO ORDER CERTAIN DEPONENTS TO RETURN FOR FURTHER DEPOSITION; TO TO ORDER THE RETURN OF EXTORTED FUNDS AND TO ORDER OPPOSING COUNSEL TO CEASE CERTAIN ACTIVITIES

As indicated in the above title, this is Plaintiff's, ("RONWIN"), Reply to Defendant's, ("BAYER"), Response to RONWIN's Motion seeking an Order for certain deponents to return for further deposition; to return extorted funds and to Order opposing counsel to cease certain activities.

The details of this Reply are found in the Memorandum which follows.

A certificate of service appears at the end of the Memorandum.

DATED: July 18, 2006

Edward Ronwin
945 Rolland Moore Dr., L-2
Fort Collins, CO 80526
970-221-3837
Plaintiff pro se

SCANNED
JUL 19 2006
U.S. DISTRICT COURT MPLS

## MEMORANDUM IN SUPPORT OF THE ATTACHED REPLY

As to the "Background" in BAYER's Response, the DAVIS GRAHAM & STUBBS law firm, ("DGS"), acting through its attorney, JEFFREY R. PILKINGTON, ("PILKINGTON"), did not allow RONWIN any input on the total deposition time for each of the eight (8) MD depositions taken to date, (actually a ninth MD deposition was taken on Friday, July 14, 2006), including the four (4) depositions at issue in this motion matter, see 3rd ¶, p. 2, Response.

In the first half of the text on p. 3, Response, BAYER writes that RONWIN understood the time constraints. False! RONWIN was informed that DGS had arranged for duration times, again without prior consultation with RONWIN; however, the procedure used by PILKINGTON, as exemplified in the first MD deposition, (that of Dr. Hiatt), was that we began at slightly after 8:00 a.m., but PILKINGTON's interrogation carried on until 9:40 a.m. leaving RONWIN no more than 20 minutes, which was further cut because of changing positions and papers around the conference table with the result that RONWIN had only 15 minutes. Then, at 10:00 a.m., Dr. Hiatt's employee opened the room door to announce that Dr. Hiatt had a "meeting" at 10:00 a.m. When RONWIN disputed the procedure, he was able to get another 10 minutes with Dr. Hiatt acting like he was sitting on needles. Thus, RONWIN had to rush and did not get to examine all the matters he originally intended to touch upon. Hardly the fair play that BAYER falsely purveys to this Court.

BAYER's asserts that each of the three (3) orthopedic specialists alleged that the cause of RONWIN's rotator cuff tear was "degenerative changes," last line, p. 3 to 4th line, p. 4, Response. That is not an issue in this motion. That only gives one side of the matter. The fact is that based on excellent medical authority, and physical analysis of the X-rays and arthrogram

involved, it is not possible for "degenerative changes," (i.e., two arthritic spurs in RONWIN's left shoulder area), to have caused the rotator cuff tear. Furthermore, there exists significant and scientifically supported evidence to uphold RONWIN's expert analysis of the real basis for Baycol's dangerous and murderous action on human body tissues. This is not the place to try the case--the trial before the jury is the proper venue.

As to each of the three (3) orthopedic physicians testifying that, "Baycol was not the cause of [RONWIN's] rotator cuff," lines 4-6, p. 4, Response, each showed that they were not competent professionally to make that statement. The comments in the preceding sentence applies with equal force to the assertion of each of the three (3) orthopedic MD's that there is no valid evidence to support RONWIN's views on how Baycol injures, lines 6-8, p. 4, Response. Thus, each of the orthopedic MD's admit that they know nothing about Baycol, (Dr. Knauer didn't even know that Baycol was a molecule, p. 121, ls. 21-22, Dr. Knauer's Depo.:

Q. (by RONWIN): And so -- and Baycol, is that a molecule?
A. (by Dr. Knauer): I don't know.

Dr. Knauer did not know that there was a fluorine atom in the Baycol molecule, but accepted RONWIN's word upon being shown the Baycol insert which, as all drug inserts, carried a diagram of the Baycol molecule, p. 125, l. 3 to l. 11, Dr. Knauer Depo.:

Q. (by RONWIN): Okay, fine. So all I want to get across right now is that, do you agree Baycol is a molecule, and it has a fluorene [sic] atom in it?
A. (by Dr. Knauer): From what you just explained to me--
MR. PILKINGTON: Objection, form and foundation.
Q. (BY MR. RONWIN): Yes.
A. (by Dr. Knauer): --not based on any knowledge I have, I will have to accept that.
(emphasis added).

The testimony of Dr. Knauer applies with equal force to the other two orthopedic physicians and clearly shows that the testimony of all three MD's purporting to provide "expert" opinion



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 18 2006 12:59PM P4

about RONWIN's expert theme on how Baycol destroys tissues and kills is false; and further supports RONWIN's contention that PILKINGTON did interact with each MD prior to the deposition. If one admits lack of biochemical and molecular biology knowledge of the nature and action of a drug, which in all cases without exception is a biochemical capable of biomolecular action, one cannot assert truthfully that the drug is or is not a cause of any result on the level of its fundamental action.[1] The same applies to Dr. Hiatt who testified that he was not aware of any of his patients who has a rotator cuff problem that he believed was attributed to use of a statin, p. 66, ls. 14-17, Dr. Hiatt's Depo. and Dr. Hiatt further testified that he had not in his "clinical experience seen any evidence to suggest that a rotator cuff injury could be related to the use of statin," p. 92, ls. 22-25, Dr. Hiatt's Depo. However, Dr. Hiatt admitted that the fact that he was not aware that statin action could cause rotator cuff tears does not "exclude" the possibility, p. 72, l. 25 to p. 73, l. 18, Dr. Hiatt's Depo.[2]

In fact, toward the end of this Reply, those who read will find that there is evidence that Baycol definitely causes rotator cuff problems.

As to the behavior of BAYER's parent and sole owner's conduct in Nazi Germany, last ¶, p. 4, Response, the matter has relevance. Notably, BAYER avoids mention of the fact that BAYER and its German parent, BAYER A.G., pleaded guilty to three, separate charges of criminal price

---

[1]RONWIN is a member of the American Society of Biochemistry and Molecular Biology. There is no difference between a Molecular Biologist and a Biochemist. If one is a Molecular Biologist, one must be a Biochemist and vice versa. The Molecular Biologists tend to concentrate their study on the structure of large molecules and how that affects the actions of those molecules; whereas the Biochemist tends to concentrate more on the chemical reactions of biochemicals and their metabolism. But, the lines are not firmly drawn and very, very frequently intertwine.

[2]RONWIN attempted to explain Baycol's biochemical and biomolecular action but it proved beyond the understanding of the three (3) orthopedic physicians who, despite some chemistry and biochemistry courses, lacked adequate understanding, due to an extent of the long interval between the time they underwent the chemical training and the present as exemplified by Dr. Knauer, p. 118, ls. 15-16, Dr. Knauer's Depo.



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 18 2006 01:08PM P5

fixing and these acts occurred while and after Baycol was being marketed. The relevance is that the record as illustrated by Exhibit 1 to the motion, which is one example of BAYER's deceit and lie to the public and the FDA, and a number of examples in the record of similar conduct vis a vis the public and the FDA accumulated to date, is shown to be matched at and after the time Baycol was being marketed by BAYER's similar conduct as regards price fixing behavior for which it pleaded guilty on three, separate criminal charges. Exhibits 2-4 to the motion; and that BAYER was taken to task for the price fixing by the European Union authorities, Exh. 5 to the motion and that the Swiss authorities were also examining criminal behavior by BAYER, Exh. 6 to the motion and that this criminal conduct is traceable back to World War II, Exhs. 7-8 to the motion.

The failure of RONWIN to "challenge the physician's conclusions," was not a failure of the propriety of RONWIN's position on Baycol action; rather, it was a failure to get the MD's to begin to see the scientific facts of Baycol action because each MD essentially pleaded lack of adequate chemical knowledge as exemplified by Dr. Knauer, p. 118, ls 15-16, Dr. Knauer's Depo.

The alleged "bizarre and confusing questions" posed by RONWIN, last line, p. 4 to all of p. 5, Response, are "bizarre and confusing" to those without sufficient biochemical background, which all of the MD's, except Dr. Hiatt pleaded, e.g., p. 118, ls. 15-16, Dr. Knauer Depo. Dr. Hiatt could have understood if he wanted to but he was quite annoyed because his deposition was taken even though RONWIN made it clear that the taking of his deposition was <u>not</u> RONWIN's idea.

It is also notable that Dr. Servi and Dr. Knauer work together in the same medical firm. As

to this matter Dr. Knauer was the "lead" physician. The deposition of Dr. Servi revolved around four (4) short reports on RONWIN's visits to her in which she did no more than give RONWIN a cortisone injection in each instance. Dr. Knauer was fully competent to discourse on those four (4) reports along with her own. In brief, the deposition of Dr. Servi was totally superfluous and need not have been taken.

AS TO THE TIMES OF THE DEPOSITIONS

The times set forth in the table on p. 6 for Dr. Knauer's deposition are false. The table alleges that the total time for Dr. Knauer's deposition was 3 hours and 57 minutes. RONWIN has disputed the fact that the times taken by recesses or breaks in the depositions have rarely been reported in the transcripts. There have been two different reporters from the same reporting firm on three (3) of the four depositions in contention herein; while a reporter from a Cheyenne, WY firm handled the task in the deposition of Dr. Torkelson. The firm from which the two reporters in the depositions taken in Colorado, offices in Denver, CO, and does a significant amount of business with DGS as indicated to RONWIN by PILKINGTON. RONWIN contends that the recess and break times in each deposition should be reported in each instance. Thus, in Dr. Knauer's deposition one break of four (4) minutes is reported on p. 122, l. 8, but two interruptions which led to breaks on p. 133 and p. 171 are noted without the break times given.

In connection with that problem, and after RONWIN's supplemental deposition, (taken under Court Order concerning RONWIN's right shoulder rotator cuff tear in 1994), the reporter, who did Dr. Knauer's deposition transcript worked out the total time of the deposition and the break times. The reporter noted her data on two separate pieces of paper. One is from a yellow, lined pad in common use by attorneys; the other is a small piece of a purple colored paper. The copy

of these two items is attached hereto has Exhibit R1.

Under the heading "Knauer breaks," the reporter tallied the question and answer times which added up to 216 minutes which she divided by 60 to obtain a total time of 3.6 hours for the actual interrogation time in Dr. Knauer's deposition. 3.6 hours is 3 hours and 36 minutes, NOT the 3 hours and 57 minutes that BAYER represents to this Court in the table on p. 6, Response. Furthermore, all breaks and recesses occurred during RONWIN's interrogation time; hence RONWIN was shorted 24 minutes. Additionally, the reporter listed on the "yellow" sheet three break times of which only the first one is noted in the deposition and agreed with RONWIN that the second break given as 7 minutes was more like 20 minutes. That would bring the total break time closer to the 24 minutes that were denied to RONWIN.

In the bottom half of p. 6, Response, BAYER sets out RONWIN's answers to PILKINGTON's questions about whether RONWIN thought the depositions of the three (3) MD's noted had ended. What the sheer verbiage on white paper does not convey was RONWIN's disgust with the way PILKINGTON engineered his full and uninterrupted interrogations whereas RONWIN lost 24 minutes with Dr. Knauer and had only 25 rushed minutes with Dr. Hiatt as compared to PILKINGTON's 1 hour and 40 minutes; and that, with deponents whose antagonism to RONWIN was amply demonstrated as exemplified by Dr. Torkelson's threatening conduct, see p. 6, motion, which BAYER totally ignores. Those threats were disturbing, flustering, improperly interfering and outrageous and would not have been tolerated by any judge presiding at any trial of this matter.

As to Dr. Servi's deposition, RONWIN challenges the representation on the table on p. 6, Response to the effect that Dr. Servi's deposition ran to 11:44 a.m. It was already over by 11:30

a.m. Furthermore, during a break between PILKINGTON's interrogation and RONWIN's, RONWIN headed for the men's room. Dr. Servi and the reporter also left the room. PILKINGTON ran out of the room in the direction of Dr. Servi. In the men's room, RONWIN had to use the commode. That took about 10+ minutes. After successfully performing that function, RONWIN left the stall and went to the sink. At that point, PILKINGTON entered the men's room. It is RONWIN's view that PILKINGTON talked with Dr. Servi during that 10+ minutes. At the end of Dr. Servi's deposition, PILKINGTON also ran out of the room and definitely talked with Dr. Servi. Can one imagine what the good doctor and the good attorney were talking about? Not how to make moonshine, for sure!

On p. 6, Response, just below the table, BAYER boasts that it has paid for the depositions and states that RONWIN has refused to pay anything. Then on p. 7, top, Response, BAYER states that RONWIN "knew and understood" that each deposition could be continued if necessary. First, what BAYER deliberately fails to tell the Court is that PILKINGTON was insisting that on any continuance RONWIN had to pay the total tab. Second, RONWIN lives on $1,025 per month social security. At this time, that's it--there ain't no more dollars coming in! Would the Court tell RONWIN from what he can pull out the sums noted in the table on p. 3, Response, and still pay rent, utilities, telephone, gasoline, etc, etc., and, oh, the food? If PILKINGTON had not demanded that RONWIN pay the tab for continuing the depositions, RONWIN would have demanded their continuance.

The idea that justice is to be obtained if you can pay for it is foreign to the U.S. Constitution, (although not unknown in this nation), and no judge of the United States should ever range him or her self in favor of that outrageous concept which is all one can expect from a foreign

company that worships a culture of crime.

From p. 7 to p. 9, Response, BAYER presents part of its argument on why the motion should be denied, claiming that RONWIN's being flustered or failure to ask questions, 8th full line, p. 8, Response, doesn't justify the motion prayer. RONWIN was not flustered on his own, it was deliberately stimulated by the conduct of the deponents in question in this motion and by their dodging of direct answers to questions, as exemplified by Dr. Torkelson's conduct related from the last ¶, p. 6 to the fifth line, p. 8, in the motion.

At the bottom of p. 8, Response, BAYER <u>admits</u> that RONWIN's interrogation time covered 40% of the transcript pages[3] and that 60% of the "page time" was "at least 60% of the questions," which BAYER says is "neither unfair nor unreasonable." All RONWIN can say is that such sense of "fairness" and "reasonableness" is typical of those devoted to crime--a sort of heads I win, tails you lose philosophy. And, if BAYER needed more time to achieve a fair distribution of time between the parties, why didn't BAYER continue the depositions rather than cheat RONWIN?

The allegation at lines 7-9, p. 9, Response, that RONWIN "went through his questions and exhibits in great detail...", and had, "...ample opportunity to ask all questions..", is simply false. Had that been the case, the motion would not have been filed.

The prognostication of the course of additional deposition time, ls. 6-7, p. 10, Response, is nonsense. Dr. Torkelson for one will be chary to not threaten to leave and to fail to give simple yes or not answers when due and not to attempt to dodge questions with vague and immaterial

---

[3] Had to be less since, as in the matter of Dr. Knauer's deposition time, RONWIN's time was cut by at least 24 minutes.



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 18 2006 01:02PM P10

answers.

The prayer's request for a mechanism to contact the Court to settle any disputes arising during the depositions is preeminently sensible and should go a long way to make the atmosphere and conduct of all in the deposition equivalent to what it would be in an actual trial of the case.

ON THE TAKING OF THE X-RAY FILMS AND THE EXTORTION BY DR. KNAUER, bottom p. 10 to 12, Response.

The problem is largely solved but not fully so. The X-ray film are referred to in the text of both Dr. Torkelson's and Dr. Knauer's depositions. Each MD, without asking and before the X-ray films were marked, simply walked off with the films. The films belong with the deposition transcripts for numbering as exhibits and filing with the Court. Thus far, RONWIN has a copy of the films from Dr. Knauer, but is out $10.00, which is an outrage. PILKINGTON has a copy of Dr. Torkelson's X-ray films. If these two MD's wanted to keep records of the films, they should have made copies for themselves. Each MD brought the films to their depositions pursuant to the summons and, the films having been used in the depositions should have been left with the reporter in each case.

As to BAYER's contentions on RONWIN's request concerning PILKINGTON's conduct, pp. 13-14, Response, RONWIN will stick by his assertions backed by the facts that RONWIN has presented to the Court herein and in the motion and does not have to resort to outrageous characterization of his opponents. While there is no evidence of record that RONWIN suffers from "blind paranoia," as alleged by BAYER, end of 1st ¶, p. 13, Response, BAYER can hardly deny its utterly despicable conduct in lying to the FDA and to the public (worldwide), to cheating the public worldwide by its unlawful price fixing schemes and cabals, not once but



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 18 2006 01:03PM P11

on at least three occasions and by buying hapless human beings and using them as laboratory, experimental animals.

Before concluding, RONWIN extends the following observations:

This MDL has gone on for over 4½ years. In RONWIN case, it is about 6 weeks short of the fifth anniversary of the filing of the Complaint. RONWIN believes that most of the thousands of remaining plaintiffs are in similar time status. Justice delayed has long been held to be justice denied. No judge of the United States, (or any particular state), should ever deny justice. It is time to force BAYER to cease the practice of inundating its opponents with paper, with false charges, with dodging uncomfortable facts and with refusal to simply play fair.

A second point is that BAYER, through its huge stable of attorneys, has managed to bamboozle the Plaintiff's Steering Committee ("PSC"), and its sub-divisions, and this Court with the notion that all Baycol did was cause Rhabdomyolysis, ("Rhabdo"). The rest, as one of their Philadelphia lawyers, Mr. Beck, said, were just "aches and pains." That exemplifies the rot in BAYER's position in this Court.

Appended hereto as Exhibit R2, is a copy of 6 pages of an FOI report obtained from the FDA by RONWIN. In addition, the exhibit contains a title page for the report and the last page of the report. The full report is 48 pages, but the point is well made with just the first 6 pages of data. Therefore, the rest of the data pages are not included in the exhibit. Additionally, there is a copy of a letter of transmittal included in the exhibit from the FDA employee who handled the matter.

As to the disclaimer on the title page, the FDA employee explained that the information "has not been scientifically or otherwise verified" means that the Adverse Event Reports ("AERs") contained in the document are not obtained from formal clinical studies. But, Lt. Comdr. Robert



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 18 2006 01:03PM P12

Macky,[4] informed RONWIN that on average for all drugs, 10% of the adverse reports emanate from the public and that 90% emanate from medical practitioners who provide the pharmaceutical companies with the data. The medical practitioners are eligible to observe and diagnose the reported adverse events. Notably, Dr. Hiatt testified as to AER's that he used AER data in considering whether or not to prescribe a statin, p. 84, ls. 21-25, Dr. Hiatt's Depo., and later added that "Adverse event information is part of decision making," p. 86, ls. 1-2 and finally stated that, "Let me try to respond by saying adverse event information is used for every drug decision across every drug class," p. 86, ls. 8-10, Dr. Hiatt's Depo. Dr. Wolfel, whose deposition performance is <u>not</u> in contention stated a similar concept. Of course, unless we are willing to charge that FDA is spending a great many federal dollars collecting useless information, AERs must be taken to be reliable. In fact, even BAYER used AERs when falsely comparing Baycol's propensity to cause Rhado compared to Lipitor's propensity. Whereas, BAYER claimed equal propensities, the fact is that Lipitor has ten (10) times less capacity to cause Rhabdo.

The end comment in the disclaimer on the title page concerning estimate of the incidence of adverse drug reaction means, according to the FDA employee, that the reported AERs in the FOI report, Exh. R2, are certain but that an unknown number of AERs have never been reported and may not ever be reported.

To assist the points being made as to the data in Exh. R2, RONWIN has put a hyphen next to each item on each of the six (6) pages to highlight particular matter of concern herein.

---

[4] A member of the U.S. Public Health Service who are commissioned officers with naval ranks, but who works for FDA.

Notably, BAYER causes more than Rhabdo or myolysis or myositis, p. 1, Exh. R2. It causes considerable nerve injury, p. 1, item 14; p. 2, item 39; p. 3, item 6; p. 5, item 44; p. 6, item 45 and tendon injury, (tendons consist of cartilage which in turns consists of cells known as chondrocytes and about 50% of cartilage is collagen, a structural support protein, and other ingredients); p. 5, item 33; p. 6, items 15 and 16. The rotator cuff is the tendon consisting of cartilage that can be torn as in RONWIN's case. Also injured or caused by Baycol is bursitis; p. 6, item 6. The shoulder anatomy includes a bursa sack. And, lo and behold, Baycol causes a ROTATOR CUFF SYNDROME!; p. 6, item 15.

To the four (4) deponents who testified, without expertise, that Baycol couldn't cause a rotator cuff tear, and that they never heard of it, doesn't mean that Baycol cannot so act. As claimed by RONWIN, Baycol can cause tendon problems and a rotator cuff tear.

As for RONWIN's view of Baycol's pernicious action which is strictly based on expert, scientific knowledge within RONWIN's mental province, the characterization of same by BAYER as "bizarre and confusing," last line, p. 4 to lines 1 and 2, p. 5, Response, is typical of the scientific ignorance of BAYER's attorneys, proves nothing about RONWIN's views and is to be expected from a company with a culture of crime. Some of RONWIN's views are already of record in this case in RONWIN's Expert Report submitted to the Court per PTO 114. At this time additional materials need not be presented, but it is time for this Court to come to realize that the "aches and pains" of the thousands of remaining plaintiffs, including RONWIN, are real and can be and were caused by Baycol whether or not muscle pathology was involved in any particular case.

CONCLUSION



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 18 2006 01:04PM P14

For the foregoing reasons, Plaintiff asks this Court to approve the essence of the prayer in the motion.

DATED: July 18, 2006

Edward Ronwin, Plaintiff pro se

CERTIFICATE OF SERVICE

I, hereby certify that I served the foregoing Reply to Defendant's Response to Plaintiff's Motion upon the following persons by FAX, this 18th day of July, 2006:

The Court Clerk's Office at FAX No. 612-664-5044
Defendant's counsel, Sidley Austin, LLP, Chicago, IL at FAX No. 312-853-7036
Defendant's counsel, Jeffrey Pilkington, at DGS at FAX No. 303-893-1379
Plaintiff's Liaison Counsel, Deanna Dailey at Larson-King, St. Paul, MN, at FAX No. 651-312-6618
Dr. Sally A. Knauer, Fort Collins, CO at FAX No. 224-9800
Dr. Jane Servi, Fort Collins, CO at FAX No. 224-9800
Dr. William Hiatt, Denver, CO at FAX No. 303-860-1288
Dr. Richard Torkelson, Cheyenne, WY at FAX No. 307-634-9170

Edward Ronwin

Ronwin 2 - 2:47 - 3:35

Keller = total testimony Time = 4.03 hrs

Knauer = total testimony time = 3.6 hrs

P 122 - times are listed
P 133 4:16 - 4:23 break = 7 minutes
P 171 5:13 - 5:16 break - 3 minutes

The Reporter's numbers on the purple sheet do not copy but give the dark blank on the following sheet. However, the Reporter's numbers were:

1:30 - 2:39 = 69
2:44 - 3:59 = 75
4:02 - 4:16 = 13
4:23 - 5:13 = 50
5:16 - 5:27 = 9

216 ÷ 60
3.6 hrs

EXH. R1

Ronwin 2 - 2:47 - 3:35

Keller = total testimony time = 4.03 hrs

Knauer = total testimony time = 3.6 hrs

P 122 - times are listed
P 133 4:16 - 4:23 break = 7 minutes
P 171 5:13 - 5:16 break - 3 minutes

[redacted]

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Public Health Service**
Center for Drug Evaluation and Research
Office of Regulatory Policy
Division of Information Disclosure Policy
5600 Fishers Lane, HFD-13
Rockville, Maryland 20857

June 27, 2006

In Response Refer to File: 2006-10197

Dr. Edward Ronwin
945 Rolland Moore Dr., L-2
Fort Collins,CO 80526

Dear Mr. Ronwin,

This is in response to your request for adverse events associated with the use of Baycol drugs. Your request was received in the Center for Drug Evaluation and Research on June 26, 2006.

I have attached a summary of all adverse events that have been reported since November 1, 1997 to CDER's Office of Drug Safety for this/these drugs. The number following each listed adverse event represents the number of such events reported to CDER for the specified drug. Also, following each listed adverse event is the percentage of the total reported adverse events that a specific adverse event represents. This summary may include duplicate reports (e.g., more than one report submitted) and/or multiple adverse events for the same individual.

A more detailed report for these adverse events is available at a charge of approximately $55.00 per drug. In addition to the listing of the adverse event(s), the detailed report include the age and sex of the patient, other medications taken by the patient, the form and dose taken, and the date the FDA received the report. We are unable to customize searches for specific adverse events.

To obtain a more detailed report, we will need to receive a letter declaring your commitment to pay a $55.00 per drug fee by July 27, 2006. If we do not receive a written payment commitment within the specified time frame, your entire request will be closed to CDER.

Your letter committing to pay the fee must include the File Number located at the top of this letter and sent to:

Food and Drug Administration
Office of Management Programs
Division of Freedom of Information (HFI-35)
5600 Fishers Lane
Rockville, MD 20857

EXH, R2

Requests may also be sent via fax to (301) 443-1726. If there are problems with sending a fax, call (301) 827-6567. **Please do not submit any payment with your letter. You will be billed for the detailed report at a later date.**

**If you have any questions regarding this response, please notify us in writing, citing the above file number.**

Sincerely,

*Andrea Glover*

Regulatory Counsel
Office of Regulatory Policy
Division of Information Disclosure Policy, HFD-13

# Adverse Event Reporting System (AERS)

# Freedom Of Information (FOI) Report

**Selections for:** CERIVASTATIN
BAYCOL

**From:** 01-NOV-1997 **To:** Present

Disclaimer: The information contained in these reports has not been scientifically or otherwise verified as to a cause and effect relationship and cannot be used to estimate the incidence of adverse drug reactions.

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms in Cases**

| MedDRA Preferred Term Reaction | Count | %Rpts |
|---|---|---|
| RHABDOMYOLYSIS | 8121 | 38.6% |
| PAIN | 4501 | 21.4% |
| ANXIETY | 4054 | 19.3% |
| RENAL DISORDER | 3603 | 17.1% |
| MYALGIA | 3471 | 16.5% |
| RENAL FAILURE | 3180 | 15.1% |
| ASTHENIA | 2917 | 13.9% |
| HEPATOCELLULAR DAMAGE | 2278 | 10.8% |
| RENAL IMPAIRMENT | 1839 | 8.7% |
| INJURY | 1795 | 8.5% |
| DEPRESSION | 1710 | 8.1% |
| PAIN IN EXTREMITY | 1485 | 7.1% |
| BLOOD CREATINE PHOSPHOKINASE INCREASED | 1262 | 6.0% |
| NERVOUS SYSTEM DISORDER | 1207 | 5.7% |
| FATIGUE | 1192 | 5.7% |
| BACK PAIN | 1188 | 5.6% |
| DIFFICULTY IN WALKING | 1123 | 5.3% |
| OBSTRUCTIVE UROPATHY | 1114 | 5.3% |
| ARTHRALGIA | 1097 | 5.2% |
| MUSCLE INJURY | 1046 | 5.0% |
| NAUSEA | 994 | 4.7% |
| MUSCLE SPASMS | 993 | 4.7% |
| MUSCULAR WEAKNESS | 961 | 4.6% |
| CONDUCTION DISORDER | 938 | 4.5% |
| MALAISE | 906 | 4.3% |
| HEPATIC FUNCTION ABNORMAL | 883 | 4.2% |
| RENAL TUBULAR NECROSIS | 815 | 3.9% |
| CONVULSION | 806 | 3.8% |
| MUSCLE DISORDER | 797 | 3.8% |
| ORGAN FAILURE | 788 | 3.7% |
| RENAL FAILURE ACUTE | 716 | 3.4% |
| CHROMATURIA | 691 | 3.3% |
| VOMITING | 668 | 3.2% |
| POLYTRAUMATISM | 667 | 3.2% |
| MYOPATHY | 665 | 3.2% |
| LIVER FUNCTION TEST ABNORMAL | 635 | 3.0% |
| CHEST PAIN | 604 | 2.9% |
| DYSPNOEA | 604 | 2.9% |
| PYREXIA | 539 | 2.6% |
| EMOTIONAL DISTRESS | 531 | 2.5% |
| DIZZINESS | 522 | 2.5% |
| HEADACHE | 476 | 2.3% |
| FALL | 418 | 2.0% |
| MYOCARDIAL INFARCTION | 415 | 2.0% |
| DIALYSIS | 376 | 1.8% |
| MUSCLE ATROPHY | 372 | 1.8% |
| DEHYDRATION | 363 | 1.7% |
| HYPOAESTHESIA | 358 | 1.7% |
| MYOSITIS | 336 | 1.6% |
| DRUG INTERACTION | 324 | 1.5% |
| DIARRHOEA | 313 | 1.5% |
| WEIGHT DECREASED | 301 | 1.4% |
| LIVER DISORDER | 287 | 1.4% |



06-Jul-2006 10:29 AM

FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 18 2006 01:07PM P6

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms in Cases**

| MedDRA Preferred Term Reaction | Count | %Rpts |
|---|---|---|
| OEDEMA PERIPHERAL | 286 | 1.4% |
| ABDOMINAL PAIN | 279 | 1.3% |
| INSOMNIA | 271 | 1.3% |
| MYASTHENIC SYNDROME | 263 | 1.2% |
| CARDIAC DISORDER | 262 | 1.2% |
| ASPARTATE AMINOTRANSFERASE INCREASED | 258 | 1.2% |
| PARAESTHESIA | 251 | 1.2% |
| CONDITION AGGRAVATED | 247 | 1.2% |
| HEPATITIS | 245 | 1.2% |
| ALANINE AMINOTRANSFERASE INCREASED | 239 | 1.1% |
| RENAL INJURY | 232 | 1.1% |
| TENDERNESS | 230 | 1.1% |
| ELECTROMECHANICAL DISSOCIATION | 220 | 1.0% |
| GAIT DISTURBANCE | 218 | 1.0% |
| HYPERTENSION | 209 | 1.0% |
| CEREBROVASCULAR ACCIDENT | 208 | 1.0% |
| URINARY TRACT INFECTION | 194 | 0.9% |
| ABDOMINAL PAIN UPPER | 193 | 0.9% |
| HAEMATURIA | 193 | 0.9% |
| VISION BLURRED | 190 | 0.9% |
| NECK PAIN | 188 | 0.9% |
| SYNCOPE | 183 | 0.9% |
| BALANCE DISORDER | 179 | 0.9% |
| MOVEMENT DISORDER | 174 | 0.8% |
| PNEUMONIA | 164 | 0.8% |
| BLOOD CREATININE INCREASED | 160 | 0.8% |
| HAEMODIALYSIS | 160 | 0.8% |
| CARDIAC FAILURE CONGESTIVE | 156 | 0.7% |
| WEIGHT INCREASED | 156 | 0.7% |
| CONSTIPATION | 140 | 0.7% |
| DEATH | 134 | 0.6% |
| PRURITUS | 134 | 0.6% |
| ATROPHY | 131 | 0.6% |
| HYPERHIDROSIS | 131 | 0.6% |
| TREMOR | 129 | 0.6% |
| BLOOD URINE PRESENT | 128 | 0.6% |
| RESPIRATORY FAILURE | 128 | 0.6% |
| MENTAL DISORDER | 127 | 0.6% |
| NEUROPATHY PERIPHERAL | 125 | 0.6% |
| OSTEOARTHRITIS | 123 | 0.6% |
| VISUAL DISTURBANCE | 122 | 0.6% |
| CARDIAC FAILURE | 121 | 0.6% |
| JAUNDICE | 121 | 0.6% |
| DECREASED ACTIVITY | 120 | 0.6% |
| JOINT STIFFNESS | 120 | 0.6% |
| HEPATIC FAILURE | 120 | 0.6% |
| COUGH | 117 | 0.6% |
| PALPITATIONS | 114 | 0.5% |
| BLOOD PRESSURE INCREASED | 113 | 0.5% |
| BLOOD UREA INCREASED | 112 | 0.5% |
| VERTIGO | 112 | 0.5% |
| DERMATITIS | 112 | 0.5% |
| ARTHRITIS | 111 | 0.5% |



06-Jul-2006 10:29 AM

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms in Cases**

| MedDRA Preferred Term Reaction | Count | %Rpts |
|---|---|---|
| FEELING ABNORMAL | 111 | 0.5% |
| CARDIAC ARREST | 108 | 0.5% |
| DIABETES MELLITUS | 108 | 0.5% |
| DECREASED APPETITE | 108 | 0.5% |
| HEPATIC ATROPHY | 108 | 0.5% |
| —NERVE INJURY | 108 | 0.5% |
| ANAEMIA | 107 | 0.5% |
| URINE ABNORMALITY | 107 | 0.5% |
| PERIPHERAL VASCULAR DISORDER | 106 | 0.5% |
| — ARTHROPATHY | 105 | 0.5% |
| INFLUENZA LIKE ILLNESS | 105 | 0.5% |
| ARRHYTHMIA | 104 | 0.5% |
| DYSPEPSIA | 103 | 0.5% |
| ANGINA PECTORIS | 102 | 0.5% |
| SEPSIS | 102 | 0.5% |
| RASH | 98 | 0.5% |
| DYSURIA | 97 | 0.5% |
| DYSPHAGIA | 96 | 0.5% |
| SINUSITIS | 96 | 0.5% |
| HEART RATE INCREASED | 95 | 0.5% |
| MEMORY IMPAIRMENT | 95 | 0.5% |
| HYPERKALAEMIA | 94 | 0.4% |
| TRANSIENT ISCHAEMIC ATTACK | 94 | 0.4% |
| CORONARY ARTERY DISEASE | 92 | 0.4% |
| PANCREATITIS | 92 | 0.4% |
| RENAL PAIN | 89 | 0.4% |
| HYPOTENSION | 88 | 0.4% |
| SLEEP DISORDER | 88 | 0.4% |
| BLOOD GLUCOSE INCREASED | 87 | 0.4% |
| PARALYSIS | 87 | 0.4% |
| LOSS OF CONSCIOUSNESS | 87 | 0.4% |
| SWELLING | 87 | 0.4% |
| ANOREXIA | 86 | 0.4% |
| HEPATIC TRAUMA | 86 | 0.4% |
| ATRIAL FIBRILLATION | 86 | 0.4% |
| KIDNEY INFECTION | 85 | 0.4% |
| BURNING SENSATION | 84 | 0.4% |
| BLOOD LACTATE DEHYDROGENASE INCREASED | 83 | 0.4% |
| PHARYNGOLARYNGEAL PAIN | 83 | 0.4% |
| PULMONARY OEDEMA | 82 | 0.4% |
| SPINAL OSTEOARTHRITIS | 82 | 0.4% |
| DRUG INEFFECTIVE | 81 | 0.4% |
| JOINT SWELLING | 81 | 0.4% |
| FLATULENCE | 80 | 0.4% |
| BLOOD CHOLESTEROL INCREASED | 77 | 0.4% |
| CIRCULATORY COLLAPSE | 76 | 0.4% |
| CONTUSION | 74 | 0.4% |
| GASTROINTESTINAL DISORDER | 74 | 0.4% |
| POLLAKIURIA | 74 | 0.4% |
| OEDEMA | 74 | 0.4% |
| MYOGLOBINURIA | 73 | 0.3% |
| BLOOD TRIGLYCERIDES INCREASED | 72 | 0.3% |
| BONE PAIN | 72 | 0.3% |



06-Jul-2006 10:29 AM

FROM : EDWARD RONWIN FAX NO. : 970-224-3838 Jul. 18 2006 01:08PM P8

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms in Cases**

| MedDRA Preferred Term Reaction | Count | %Rpts |
|---|---|---|
| CARDIOMYOPATHY | 72 | 0.3% |
| CONFUSIONAL STATE | 71 | 0.3% |
| ERECTILE DYSFUNCTION | 71 | 0.3% |
| OLIGURIA | 71 | 0.3% |
| HEPATIC ENZYME INCREASED | 68 | 0.3% |
| CHOLELITHIASIS | 66 | 0.3% |
| RED BLOOD CELL SEDIMENTATION RATE INCREASED | 66 | 0.3% |
| SUDDEN DEATH | 66 | 0.3% |
| BLOOD BILIRUBIN INCREASED | 65 | 0.3% |
| HYPERTONIA | 65 | 0.3% |
| URINARY TRACT OBSTRUCTION | 65 | 0.3% |
| EMOTIONAL DISORDER | 64 | 0.3% |
| WHITE BLOOD CELL COUNT INCREASED | 64 | 0.3% |
| STRESS | 64 | 0.3% |
| HAEMORRHAGE | 64 | 0.3% |
| VISUAL ACUITY REDUCED | 63 | 0.3% |
| CARDIOMEGALY | 62 | 0.3% |
| CHRONIC OBSTRUCTIVE PULMONARY DISEASE | 62 | 0.3% |
| HEPATOMEGALY | 62 | 0.3% |
| GASTROINTESTINAL HAEMORRHAGE | 62 | 0.3% |
| NEPHROLITHIASIS | 62 | 0.3% |
| RENAL FAILURE CHRONIC | 62 | 0.3% |
| DYSSTASIA | 61 | 0.3% |
| HYPERLIPIDAEMIA | 61 | 0.3% |
| POLYMYOSITIS | 61 | 0.3% |
| TACHYCARDIA | 60 | 0.3% |
| THROMBOCYTOPENIA | 60 | 0.3% |
| FLUSHING | 59 | 0.3% |
| INTERVERTEBRAL DISC PROTRUSION | 59 | 0.3% |
| PLEURAL EFFUSION | 59 | 0.3% |
| ABDOMINAL DISTENSION | 58 | 0.3% |
| URINARY INCONTINENCE | 58 | 0.3% |
| MYOGLOBIN BLOOD INCREASED | 58 | 0.3% |
| GASTRITIS | 58 | 0.3% |
| LABORATORY TEST ABNORMAL | 57 | 0.3% |
| ANGINA UNSTABLE | 56 | 0.3% |
| RECTAL HAEMORRHAGE | 56 | 0.3% |
| TINNITUS | 56 | 0.3% |
| LETHARGY | 56 | 0.3% |
| CHILLS | 56 | 0.3% |
| CARDIOVASCULAR DISORDER | 55 | 0.3% |
| CHEST DISCOMFORT | 55 | 0.3% |
| COMA | 55 | 0.3% |
| ILL-DEFINED DISORDER | 55 | 0.3% |
| ALOPECIA | 54 | 0.3% |
| BRADYCARDIA | 54 | 0.3% |
| MUSCULOSKELETAL STIFFNESS | 53 | 0.3% |
| BLOOD POTASSIUM INCREASED | 52 | 0.2% |
| HAEMATOCRIT DECREASED | 52 | 0.2% |
| MUSCLE RIGIDITY | 52 | 0.2% |
| HAEMOGLOBIN DECREASED | 52 | 0.2% |
| CARPAL TUNNEL SYNDROME | 51 | 0.2% |
| ANURIA | 50 | 0.2% |

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms in Cases**

| MedDRA Preferred Term Reaction | Count | %Rpts |
|---|---|---|
| FACE OEDEMA | 50 | 0.2% |
| INFLAMMATION | 50 | 0.2% |
| HEPATIC STEATOSIS | 49 | 0.2% |
| PHARYNGITIS | 49 | 0.2% |
| TENDONITIS | 49 | 0.2% |
| RENAL CYST | 49 | 0.2% |
| OBSTRUCTION | 48 | 0.2% |
| BRONCHITIS | 47 | 0.2% |
| PANCREATITIS ACUTE | 47 | 0.2% |
| MULTI-ORGAN FAILURE | 47 | 0.2% |
| DYSPHONIA | 47 | 0.2% |
| CHRONIC FATIGUE SYNDROME | 47 | 0.2% |
| ANGIOPATHY | 46 | 0.2% |
| CYSTITIS | 46 | 0.2% |
| GASTROOESOPHAGEAL REFLUX DISEASE | 46 | 0.2% |
| VENTRICULAR EXTRASYSTOLES | 46 | 0.2% |
| NIGHT SWEATS | 46 | 0.2% |
| NERVOUSNESS | 46 | 0.2% |
| ARTERIOSCLEROSIS | 45 | 0.2% |
| DYSPNOEA EXERTIONAL | 45 | 0.2% |
| NASOPHARYNGITIS | 45 | 0.2% |
| INFECTION | 45 | 0.2% |
| HYPERCHOLESTEROLAEMIA | 45 | 0.2% |
| CARDIO-RESPIRATORY ARREST | 44 | 0.2% |
| ERYTHEMA | 44 | 0.2% |
| FIBROMYALGIA | 44 | 0.2% |
| BLOOD CREATINE PHOSPHOKINASE MB INCREASED | 43 | 0.2% |
| RHINITIS | 43 | 0.2% |
| MYOCARDIAL ISCHAEMIA | 42 | 0.2% |
| COORDINATION ABNORMAL | 41 | 0.2% |
| BENIGN PROSTATIC HYPERPLASIA | 40 | 0.2% |
| UPPER RESPIRATORY TRACT INFECTION | 40 | 0.2% |
| TENDON DISORDER | 40 | 0.2% |
| STAPHYLOCOCCAL INFECTION | 40 | 0.2% |
| SOMNOLENCE | 40 | 0.2% |
| SLEEP APNOEA SYNDROME | 40 | 0.2% |
| MOBILITY DECREASED | 40 | 0.2% |
| MITRAL VALVE INCOMPETENCE | 40 | 0.2% |
| MEDICATION ERROR | 40 | 0.2% |
| GAMMA-GLUTAMYLTRANSFERASE INCREASED | 40 | 0.2% |
| CATARACT | 39 | 0.2% |
| AMYOTROPHIC LATERAL SCLEROSIS | 39 | 0.2% |
| FLUID RETENTION | 39 | 0.2% |
| POLYNEUROPATHY | 39 | 0.2% |
| PULMONARY EMBOLISM | 39 | 0.2% |
| HEART RATE IRREGULAR | 38 | 0.2% |
| BLOOD ALKALINE PHOSPHATASE INCREASED | 37 | 0.2% |
| ACCIDENT | 37 | 0.2% |
| ELECTROCARDIOGRAM ABNORMAL | 37 | 0.2% |
| HYPOKALAEMIA | 37 | 0.2% |
| C-REACTIVE PROTEIN INCREASED | 37 | 0.2% |
| POST PROCEDURAL COMPLICATION | 37 | 0.2% |
| URINARY TRACT DISORDER | | |



06-Jul-2006 10:29 AM

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms in Cases**

| MedDRA Preferred Term Reaction | Count | %Rpts |
|---|---|---|
| HYPERSENSITIVITY | 36 | 0.2% |
| SCIATICA | 36 | 0.2% |
| SPINAL COLUMN STENOSIS | 36 | 0.2% |
| URTICARIA | 36 | 0.2% |
| ASTHMA | 35 | 0.2% |
| BURSITIS | 35 | 0.2% |
| DYSGEUSIA | 35 | 0.2% |
| RESPIRATORY DISORDER | 35 | 0.2% |
| RENAL COLIC | 35 | 0.2% |
| BLOOD PRESSURE DECREASED | 35 | 0.2% |
| DIVERTICULUM | 34 | 0.2% |
| HIATUS HERNIA | 34 | 0.2% |
| ECCHYMOSIS | 34 | 0.2% |
| MUSCLE TWITCHING | 34 | 0.2% |
| ROTATOR CUFF SYNDROME | 34 | 0.2% |
| TENDON RUPTURE | 34 | 0.2% |
| PROTEINURIA | 34 | 0.2% |
| DIVERTICULITIS | 33 | 0.2% |
| EYE DISORDER | 33 | 0.2% |
| RASH ERYTHEMATOUS | 33 | 0.2% |
| SPEECH DISORDER | 33 | 0.2% |
| EAR PAIN | 33 | 0.2% |
| LUNG DISORDER | 32 | 0.2% |
| THROMBOSIS | 32 | 0.2% |
| SENSATION OF HEAVINESS | 32 | 0.2% |
| HYPOTHYROIDISM | 31 | 0.1% |
| RED BLOOD CELL COUNT DECREASED | 31 | 0.1% |
| OSTEOPOROSIS | 31 | 0.1% |
| LEUKOCYTOSIS | 31 | 0.1% |
| HYPOTONIA | 31 | 0.1% |
| ABASIA | 30 | 0.1% |
| HYPERGLYCAEMIA | 30 | 0.1% |
| SENSORY LOSS | 30 | 0.1% |
| URINARY RETENTION | 30 | 0.1% |
| POLYMYALGIA RHEUMATICA | 30 | 0.1% |
| OESOPHAGITIS | 30 | 0.1% |
| INTERVERTEBRAL DISC DEGENERATION | 30 | 0.1% |
| INFLUENZA | 30 | 0.1% |
| ATELECTASIS | 30 | 0.1% |
| DRUG EFFECT DECREASED | 30 | 0.1% |
| ABDOMINAL DISCOMFORT | 29 | 0.1% |
| LYMPHADENOPATHY | 29 | 0.1% |
| GROIN PAIN | 29 | 0.1% |
| GOUT | 29 | 0.1% |
| DIABETIC NEUROPATHY | 29 | 0.1% |
| DIABETES MELLITUS INADEQUATE CONTROL | 29 | 0.1% |
| DEEP VEIN THROMBOSIS | 29 | 0.1% |
| CYST | 29 | 0.1% |
| CORONARY ARTERY OCCLUSION | 29 | 0.1% |
| CARDIAC MURMUR | 29 | 0.1% |
| BLOOD AMYLASE INCREASED | 28 | 0.1% |
| CHOLESTASIS | 28 | 0.1% |
| FAECES DISCOLOURED | | |





FROM :EDWARD RONWIN FAX NO. :970-224-3838 Jul. 18 2006 01:09PM P11

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms in Cases**

**Summary Report for FOI Selections:**

**From:** 01-NOV-1997 **To:** Present

Selection by inexact search of active ingredient:
CERIVASTATIN%

Selection by inexact search of Tradename/Verbatim:
BAYCOL%

Total Individual Safety Reports: 21,048

From: Dr. Edward Ronwin

To: The persons who will be receiving this FAX

Date: July 18, 2006

It appears that my fax machine will only allow faxing of no more than 20 pages on a dialed number. In order to send this Reply to a Response to a Motion, I shall be doing so in two stages of approximately 14 pages each.

The caption should alert all who receive this fax to its purpose.

The last page of the text of the Reply contains a Certificate of Service and lists those who will be receiving this fax.