Swiss law enforcement authorities were investigating BAYER with regard to its activities as respects its dangerous drug, Baycol. In 1994, BAYER BOUGHT 150 inmates from the notorious Auschwitz concentration camp used them as laboratory animals to test a drug and killed them

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re BAYCOL LITIGATION | ) | MDL No. 1431 (MJD) |
| This document relates to: | ) | Case No. 02-0200 |
| RONWIN v. BAYER CORP. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO COMPEL**

Plaintiff, Edward Ronwin, (RONWIN), hereby responds to Defendant's, (BAYER), Motion to Compel, dated December 4, 2006.

BAYER seeks to take RONWIN's expert deposition without payment of an expert fee. RONWIN refuses to have his expert deposition taken unless an expert fee is paid. In addition, the time for BAYER to have approached this court on this matter and the time to take case-specific depositions, whether fact or expert, has passed.

In BAYER's usual manner, repeatedly displayed in numerous motions, responses, replies, etc., in this MDL and in this specific case, BAYER throws out falsehood and nonsense with great alacrity in alleged support of its views. But, what else can be expected from a company that in the period from late 2004 to early 2005, (a time during which this MDL was in force), pleaded guilty to three (3) separate, criminal actions brought against it by the U.S. District Attorney for the Northern Dist. of Calif, and paid a total fine for all three cases of $104 million dollars. Attached hereto as Exh. 1 are copies of the first two pages of the three (3), separate judgments of the U.S.Dist.Ct. for the No. Dist. of Calif., showing the certification of the judgment by the clerk of said court and the amount of the judgment against BAYER. Attached hereto as Exh. 2 is a copy of a news article appearing in Chem. & Eng. News, a publication of the American Chemical Society announcing that the EU fined BAYER $70 million for price-fixing violations. Attached hereto as Exh. 3 is a report in the BMJ, (British Medical Journal), reporting that the

SCANNED
DEC 11 2006
U.S. DISTRICT COURT MPLS

Swiss law enforcement authorities were investigating BAYER with regard to its activities as respects its dangerous drug, Baycol. In 1994, BAYER BOUGHT 150 inmates from the notorious Auschwitz concentration camp used them as laboratory animals to test a drug and killed them all. BAYER indicated to the camp commander that they would be buying more inmates; see the testimony of French interpreter for the Russians at the Nuremberg, Germany, trial of 23 (I.G.)Farben directors on Nov. 14, 1947. BAYER was a part of I.G.Farben prior to and during World War II. The testimony is reported in the book entitled, $E=MC^2$ by David Bodanis, Berkeley Publication Group, N.Y. 2001 and p. 275 thereof is attached hereto as Exhibit 4. Included in Exh. 4 is RONWIN's request for a copy of the original New York Herald Tribune article made to the N.Y. Public Library; the note of transmittal of the requested copy and a copy of the copy of the original N.Y. Herald Tribune news report. But more. As to BAYER's deadly drug, Baycol, which eventually killed about 152 people world-wide, including at least 42 Americans, the U.S. Food & Drug Administration, (FDA), ordered BAYER to cease using false and deceptive advertising and to cease making false claims of Baycol's alleged superiority as a statin, (statins are anti-cholesterol drugs). A copy of the letter from the FDA to BAYER, which consists of said order, is attached hereto as Exh. 5. To make a buck, BAYER ignored its own toxicologists' warnings that the doses which BAYER promoted for Baycol caused deaths among dogs. Some dogs can reach weights of 120 lbs, which is more than RONWIN, and other people, weigh. BAYER also removed data from its clinical reports to FDA when such data was believed by BAYER to have potential to promote a negative view of Baycol by the FDA. And, the preceding recitation does not end the outrageous activity of this despicable defendant.

BAYER alleges that it is, p. I, Memorandum to BAYER's Motion, (MEMO):

> ...unaware of any authority to support Ronwin's position that a party, who designates and and declares himself an expert witness, is entitled to payment for his deposition time from the party he sues.

RONWIN had told Jeffrey Pilkington, (PILKINGTON), BAYER's Denver, CO attorney that RONWIN had a case indicating that a party can also be an expert witness. BAYER has paid no attention to the matter and PILKINGTON never asked for the citation to the case. The case is Keystone Mfg. Inc. v. Jaccard Corp. et al, 394 F.Supp.2d 543 (W.D.N.Y.2005). In Keystone, the company's expert witness was Mr. Leonard A. Deni, (DENI), The defendants sought to exclude DENI's expert witness report; not because DENI was not an expert but because Keystone's attorney assisted DENI in the preparation of DENI's expert report. Since DENI was actively and substantially involved in the preparation of the report and signed it, the court allowed the report, 394 F.Supp.2d @ 567-568.

The significance of Keystone follows:

Corporations can only appear through natural persons. The shareholders of a corporation are effectively the corporation. In a lawsuit, a corporations gains and losses are the shareholder's gains and losses. If Keystone won the case, DENI would win, since he was a 40% shareholder in Keystone and a Vice President, 394 F.Supp.2d @ 567, (emphasis added). If Keystone lost the case, DENI would lose. Hence, shareholders are parties in a corporate action since their economic and other welfare is inseparable from the corporation.

On Jaccard's part of the case, the Defendant, Mr. Eric J. Wangler is a named party. As to Mr. Wangler, the court said, 394 F.Supp.@ 567:

> Jaccard argues that Mr. Wangler should be dismissed from this case because he did not act in his individual capacity as to any of the acts alleged by Keystone, but rather, acted in his capacity as an officer of Jaccard Corporation. Keystone argues that Mr. Wangler should remain in this action because he is the president and sole stockholder

> in Jaccard Corporation and is personally responsible for many of the acts complained of in the Complaint.
>
> Corporate officers may be held personally liable for tortious acts committed in connection with their corporate duties. See Insituform Techs., Inc. v. Cat Contr., Inc., 385 F.3d 1360, 1375 (Fed.Cir. 2004). Here, given the numerous unresolved issues of material fact, this Court finds that the evidence weighs in favor of keeping Mr. Wangler in the case since he is repeatedly personally named in the actions of which Keystone complains. He is also, moreover, the president and sole shareholder of Jaccard Corporation. (emphasis supplied).

Even though not named specifically as a party, DENI was a party-expert witness. If shareholder, Mr. Wangler, were an expert, his expert status would have been accepted by the court in Jaccard same as DENI's expert status. DENI was not an "outside" expert hired for the purpose by Keystone; rather, DENI was an "inside" expert or effectively a "party-expert" for Keystone.

BAYER also questions RONWIN's expert status because RONWIN is "retired" and because BAYER promises to "challenge RONWIN's qualifications." last ¶, p. 1, MEMO.

RONWIN may be "retired" in that he doesn't get into the laboratory and perform experiments as he once did, but RONWIN continues his membership in three, major scientific societies, to-wit: The American Association for the Advancement of Science, (AAAS); the American Chemical Society, (ACS) and the American Society for Biochemistry and Molecular Biology,[1] (ASBMB). Furthermore, in 2001, RONWIN taught a course which was an overview of

[1] As the name of the society indicates, its members are either biochemists or molecular biologists. There is however no difference between the two. A biochemist is a molecular biologist and vice versa. That is why the two "different" types can exist in a single society. The "difference" such as may be alleged is that most scientists who consider themselves molecular biologists concentrate on biochemical molecules found in living entities and less on biochemical reactions in the abstract. However to be a molecular biologist one must know biochemistry, organic chemistry, inorganic chemistry, physical chemistry and materials chemistry (at least). Likewise to be a biochemist on must know the same. Of course, one cannot know all of the aspects of these various areas of concentration, but all or virtually all biochemists and molecular biologists are familiar with the basics of these various areas of concentration and study.

chemistry that included biochemistry, physical chemistry, organic chemistry, etc. to airman posted at the E.F. Warren Air Force Base in Cheyenne, WY. Evidently, RONWIN's "retired" status did not affect his grasp of chemical studies. RONWIN continues to receive the scientific publications of the above mentioned societies and reads other scientific publications in the Colorado State University, situated about 1½ miles from RONWIN's residence. This activity enables RONWIN to keep abreast of the latest trends and developments in biochemistry, molecular biology, organic chemistry, astrophysics, energy matters and other areas of scientific investigation.

Additionally, the atoms which make up molecules, did not change their chemical characteristics because RONWIN retired. Carbon, Hydrogen, Oxygen, Nitrogen, Fluorine, Sodium, Chlorine, and all other chemical elements act today in their chemical reactions as they did when RONWIN first took chemistry in High School (of Science, that was its name), in 1938 and afterward in his formal educational pursuits for the BS, MS and PhD degrees and in subsequent teaching and research in biochemical and related matters. In fact, the chemical properties known today of the approximately 116 chemical elements had the same chemical properties when the earth was created, when the sun was created and when the universe was created. The chemical elements were created from the lightest element known, Hydrogen, by nuclear fusions in the bowels of stars which threw them off into their surrounding media when these stars underwent supernova explosions. We may rest assured that the chemical elements will continue to show the same chemical properties that they do today, did when they were created and will do in the near future unless some extraordinary universal event occurs.

Furthermore, when RONWIN "retired," RONWIN's knowledge of biochemistry and of related

as well as of distant scientific studies, did not immediately leave RONWIN's brain. For BAYER any absurdity is okay.

BAYER's game in this case has been to argue that BAYCOL only causes Rhabdomyolysis (RHABDO), a severe muscle injury and myopathy (less severe muscle injuries which include myolysis, less severe tearing up of muscle cells than RHABDO, and myositis which is inflammation of muscle tissue). There are two aspects to BAYER's position:

(i) That only physicians can determine if Baycol causes the above muscle actions and (ii) that only muscle tissue and cells are injured by Baycol.

Both propositions are nonsense!

Dr. Jane Servi, (SERVI), who is an associate of Dr. Knauer, (who, in turn, performed the operation on RONWIN's left shoulder rotator cuff), testified in deposition, copies of pages 1-5, 114-121, are attached hereto as Exhibit 6. Excepts from SERVI's deposition found in Exh. 6 follow:

P. 114, line 18 to p. 115, line 18: (Questions by RONWIN; Answers by SERVI),

Q. I see, Okay. Did you know that there's a fluorene, (misspelled by Reporter), atom in the Baycol molecule?

A. I don't prescribe Baycol. I don't know the chemical makeup of Baycol. I couldn't even start to answer that question.

Q. I see. You agree that it -- Baycol tears up muscle cells in various degrees?

Mr. PILKINGTON: Objection, form and foundation.

A. Baycol has been, from my knowledge -- again, I don't prescribe it. From my knowledge, it has been associated with people with rhabdomyolysis.

Q. Well, to get the -- in rhabdomyolysis, to get the proteins and enzymes pouring into the bloodstream from the -- from the muscle cells, then the muscle cells must have been torn open; is that right?

MR. PILKINGTON: Same objections.

A. To my understanding, there is destruction of the cell. How that occurs is beyond my medical expertise.

Q. All right. So if Baycol can -- can -- but you don't know how it does that, it tears up the cells, is what you're saying?

A. No. Again, that may be a better question asked to a chemist, a pharmaceutical, a research person.

P. 115, line 22 to p. 116, line 13:

Q. Okay. So it's not within your knowledge?

A. It is not within my expertise.

Q. But you do know -- do you know whether the composition of a cell is basically an organization of molecules?

A. That is beyond my --

MR. PILKINGTON: Same objections.

A. -- ability to answer.

MR. PILKINGTON: Same Objections.

Q. Well, the cell has an outer cover in the animal kingdom, all right? It's not a wall, like in the plant kingdom, but it's a cover, right, a membrane. Is the membrane made up of chemicals?

A. That's --

MR. PILKINGTON: Same objections, form and foundation.

A. That's beyond my expertise.

P. 116, lines 20-21:

A. Again, in our area of medicine, we don't always go down to the molecular level...

P. 117, line 22 to p. 118, line 1:



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:17AM P7

A. That's beyond my -- my medical expertise to answer that within correct reason. I'm -- I'm not sure, in terms of chemicals and the -- the way you are using that term, as if that's what we were made up of. So I would defer to an organic chemist.

P. 119, lines 1 to 7:

A. When you go to medical school, then you start to develop into organ, organ systems, and then we develop into how we are going to look for medical conditions and treatments for them. So many times at -- at our level of being a physician, we are no longer dealing with chemicals and cellular membranes and all of the carbons that make up the body.

P. 119, lines 11 to 14:

Q. Your overall work deals with -- with organs and functional anatomical parts of the body; is that right?

A. We deal with evaluation of a patient complaints and treatment...

P. 119, lines 19 to 25:

A. -- on a macrolevel as a person presenting to me with a complaint.

Q. But that doesn't prevent those muscles that you spoke about, muscular problems, it doesn't prevent that from being basically chemical in nature.

A. I'm not sure how that relates to my area of medicine.

SERVI clearly recognized that MD's, (she is one), concentrate on an overall clinical level; i.e., they see a patient; the patient explains: I took drug X; a part of my anatomy hurts; the anatomical part did not hurt before I took drug X; I did not experience any other trauma to the hurting anatomical part such as a fall, being hit by a brick or vehicle, etc. Hence, MD concludes: Drug X is causing the patients pain at the patient's anatomical site.

But, as SERVI states, MD's don't get more fundamental; i.e., they do not venture into the basic chemical essence of tissues and cells.

RONWIN's expert view of Baycol action is far more fundamental than espoused by the Plaintiff's Steering Committee, (PSC), and BAYER medical experts. Molecules, without



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:17AM P8

exception, are built from atoms. Baycol is a specific molecule. When Baycol enters the body it works its way into liver cells and inhibits the enzyme, HMG Reductase, which, in turn, reduces the amount of cholesterol released into the bloodstream. That cholesterol can travel in the bloodstream free, or as esters, or attach to lipoproteins and form, among other things, "LDL" and "HDL." However, Baycol action does not stop there. Baycol attacks cell membranes, (the walls of animal cells), which themselves consist of molecules; some of which are proteins, some are phospholipids, some are saccharides (sugars - not "table sugar" known as sucrose). Also found in cell membranes are various ions such as $Na^+$ and $Cl^-$, etc. Baycol's attacks on cell membranes, whether muscle cells, nerve cells or other types of cells, can cause openings in the cell membranes. These openings can be large enough so that some of the intracellular contents can work there way out of the cells, which can effectively kill the cells. Even if Baycol does not cause a wide gap in cell membranes, it can still enter the cells and cause disruption of normal cellular activity.

Baycol can also attack non-cellular entities in the body such as the major structural protein known as Collagen. The attack here results from Baycol's interference with the hydrogen bonding that gives Collagen its structure. When the natural structure of Collagen, which makes up a significant amount of any tendon, ligament, bone, etc., is deformed, the structure of these anatomical parts lose their normal form and structure which, in turn, reveals itself as weakness and pain.

In distinction to the foregoing, all the PSC and BAYER medical experts have been saying is that Baycol was ingested and muscle cells and tissue destruction, as in RHABDO or weakening of muscle tissue and cells, (myopathy), has occurred. But no statement issues from these experts

to show just how and why the muscle cells and tissue were destroyed and/or weakened.

However, RONWIN has offered the basic biochemical reasons for Baycol's destructive tissue and cell action based on Baycol's molecular structure and the chemical propensities of the atoms in the Baycol molecule; which is partly set forth in RONWIN's expert report filed in this specific case, see Exh. B, MEMO.

It is the biochemists/molecular biologists who are far more capable than MD's (or OD's) to state with expert competence whether or not a drug is the cause of anatomical injury. In fact, every drug case is really a biochemical case and not the superficial, clinical level case that BAYER has promoted in this MDL.

As to the second point above at p. 6; i.e., that, according to BAYER, (and the PSC), only muscle cells and tissue are injured by Baycol action:

The position of BAYER, (and the PSC), is nonsense. Proof follows:

The FDA reports adverse events on each and every drug marketed in the U.S.A. FDA receives the notices of adverse events from (i) consumers (about 10%); (2) MD's and DO's and (3) from the drug manufacturers who report the greater bulk of adverse events to FDA. Reporting of adverse events is required by law and FDA regulation. Attached hereto as Exh. 7 is a copy of 6 pages out of 47 pages containing adverse events reported on Baycol and compiled by FDA. Exh. 7 also contains a front page and a back page. On each page showing adverse events, RONWIN has placed an hyphen next to one or more adverse events for convenience of argument. The court can note that Baycol not only causes muscle injuries, BUT ALSO CAUSES nerve injury and disorders, tendon injuries, rotator cuff injury, vision problems, walking disturbances, etc.



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:18AM P10

Furthermore, BAYER having had a duty at law and regulation to report adverse events on Baycol and who had undoubtedly reported the major share of those events as presented in Exh. 7, must be held to have well known that Baycol caused more than muscle injuries and thereby, having promoted the notion that only muscle tissues and cells are injured by Baycol, perpetrated a hoax on this court and on the plaintiffs. And, in line with BAYER's criminal tendencies for over 50 years has allowed its attorneys in this MDL and specific case to continue to perpetrate the fraud that Baycol only causes muscle injuries.

In one of the depositions taken in this specific case, BAYER attempted to belittle the value of FDA's adverse events reports. Attached hereto as Exhibit 8 is a copy of a fax to RONWIN from the Ombudsman's office of the FDA. The second page contains the function of adverse events reports in the FDA scheme of operations. The 3rd ¶ explains the value of the reports. FDA relies on the reports to "detect safety signals and to monitor drug safety." The reports "form the basis for further epidemiological studies when appropriate. As a result, the FDA may take regulatory actions to improve product safety and protect the public health, such as updating a product's labeling information, sending out a 'Dear Health Care Professional' letter, or re-evaluating an approval decision." No small amount of important FDA work is supported by FDA's adverse events reports!

In the second ¶, Background Section of MEMO, p. 2, BAYER repeats its assertion that RONWIN is not a physician. Yes, RONWIN is not a physician. But, as all manifestations of life are based on biochemical reactions, (biochemical because the chemical reactions occur in living entities), it is the biochemists/molecular biologists who are, by training and experience, far more suited to deliver expert opinions on any chemical reaction in living things than any MD.

As can be seen from RONWIN's Curriculum Vitae in Exh. A to MEMO, RONWIN taught biochemistry in medical schools or in university departments which served medical schools associated with the universities. MD's generally receive a single course in biochemistry[2] and are ill-equipped to hold forth expertly on the fundamental, molecular level of drug action on the molecular composition of living tissue cells and on other anatomical features such as tendons.

Attached hereto as Exh. 9 is a copy of a recent editorial from Chemical and Engineering News published by the ACS which discusses the fact that "medicine" is now biochemical in nature and moving more and more intensely in that direction.

BAYER's only offering against RONWIN's expert opinion is to speculate that RONWIN will opine that, last sentence, p. 2 to top of p. 3, MEMO:

> ...the injuries and damages that [RONWIN] suffered, and still suffer, are related to and caused by [RONWIN's] ingestion of Baycol whose chemical structure can give rise to fluorine ion which can, in turn, cause injury to numerous body components, proteins and tissues including the protein collagen in tendons and rotator cuff tendons.

The speculation about what RONWIN will hold forth as an expert is partially true. There is much more behind that offering such as proof, based on sound chemical principles, as to why the fluorine ion can cause the injuries RONWIN asserts. But, simply by making the above, quoted statement, how does BAYER show that it is wrong or impossible, and thereby that RONWIN could not possibly be an expert witness? The answer is that BAYER follows its usual pattern in this entire MDL. Again and again it makes statements, providing no proofs, and then asserts a non sequitur conclusion.

Furthermore, RONWIN filed an expert report or opinion in this specific case pursuant to

---

[2]Some medical schools/universities now have a combined program wherein the student spends about six (6) years and is graduated with both an MD and PhD degree. The latter degree is in biochemistry.



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:19AM P12

Fed.R.Civ.P. 26(a)(2)(B). BAYER was served with a copy, Exh. B, MEMO. BAYER made no effort at the time said report was filed, nor since, to refute any part of the report or to challenge RONWIN's expert status. And in MEMO, as above at p.12, offers nonsense as its alleged refutation of RONWIN's expert status.

Also notable, as to RONWIN's expertise, is RONWIN's list of scientific publications, see Exh. A to MEMO. As of this time, no person has refuted RONWIN's "Dipositive-Bond Theory of Hydrolytic Enzyme Action" (item no. 4) on the list. As to the structure of Nucleic Acids, (DNA), which was a major question when RONWIN was a graduate student at the Univ. of Calif, Berkeley in 1950-1952, there is an intriguing story presented in the footnote below[3]. The Direct Acylation of Amino Acids, etc., items 2 and 6 on said list, were also done while RONWIN was a graduate student and were original works which provided a basis upon which two Rockefeller Center scientists based their approach to their synthesis of the protein Insulin,

---

[3]RONWIN prepared for publication items 1 and 5 on his list of publications, see Exh. A to MEMO. These publications deal with the structure of Nucleic Acids. RONWIN's basis for proposing the structure was that the proposed structure fit the X-ray patterns of Nucleic Acids. Dr. Watson, of the Crick and Watson team, stated somewhere that when RONWIN's formula was published they thought that RONWIN had "beat them to the punch." Also, at the behest of the Chairman of the Biochemistry Dept. at Univ. of Calif., RONWIN visited with Dr. Linus Pauling. Dr. Pauling was very annoyed with RONWIN, which RONWIN found perplexing. However, the Nobel Prize for the determination of the structure of Nucleic Acids (at least to that point in time) was given, not only to Drs. Crick and Watson, but also to a Dr. Maurice Wilkins, who was at Cambridge Univ. in England at the same time as Drs. Crick and Watson. Somewhat over a year ago, Dr. Wilkins published a book entitled, <u>The Third Man on the Double Helix</u>. In the book, Dr. Wilkins notes that Dr. Pauling had also come up with a Nucleic Acid formula which entailed a structure that was like RONWIN's. Dr. Wilkins does not mention that it was like RONWIN's but his description of Dr. Pauling structure makes it clear that it was. Evidently, Dr. Pauling was a bit miffed that I beat him to publication and exhibited his annoyance at my meeting with him. But more, the structure of Nucleic Acids, as Dr. Wilkins admits, was really discovered by Dr. Rosalind Franklin at Cambridge Univ. at the same time. She isolated strands of Nucleic Acids and noted the double helix structure. Dr. Wilkins relates that Dr. Watson was present when she was apparently describing her results to Dr. Wilkins. Dr. Watson immediately saw relationship and hastened to Dr. Crick's office. Thereafter they made a model of the double helix structure and published a paper (a scientific report) on the subject. Few in the field dispute that Dr. Franklin, who died not many years after her discovery, really deserved the Nobel Prize which she did not get or even share.

which in turn, was the first protein synthesized by mankind.

The statement in the 2nd ¶, Background Section, p. 2, MEMO, on when RONWIN received his PhD and stopped doing research is misleading. RONWIN started chemistry training in High School in 1938 and graduated in 1941. Then RONWIN did some college work in chemistry until early 1943 when he went into the Army. Back from war in early 1946, RONWIN again began college chemistry training in 1947. The work at the Univ. of Illinois in 1949-1950 included research in polymer chemistry under Dr. Marvel, who, at the time, was considered a foremost authority on polymer chemistry. That work was important even though more in organic than in biochemistry as such because much of life's chemistry depends upon proteins, (and enzymes which are almost all, but not all proteins), polymeric saccharides, DNA, etc., all of which are polymers. In essence, RONWIN's formal learning, teaching and research experience covers some 24 years. And, RONWIN has continued throughout the time since he formally left teaching and research in biochemistry and related areas to keep abreast of developments in the field. Part of that process is that RONWIN receives as a life subscription a weekly issue of Science which is a world-wide respected publication of the AAAS and on par with Nature, its British equivalent. The journal reports new developments in science, publishes series on discussion in specific areas of science and publishes original reports of current researches. It covers many areas of science, but a good deal of its coverage is on biochemical, organic chemical, physical chemical, materials chemistry, physics and astrophysics. In addition, RONWIN gets the periodic publication of the ASBMB which reports on current biochemical and medical advances. And RONWIN reads various articles in the Journal of Biological Chemistry and other journals which are available at the Colo.State Univ. library.

As above at p. 13, BAYER failed to challenge RONWIN's expert report when it was filed nor since. Hence, BAYER must be held to have admitted that RONWIN is an expert.

When RONWIN filed his expert report on or about June 26, 2004, BAYER was fully informed that RONWIN was advancing in this specific case as both a fact witness and an expert witness. BAYER admits, 1st full ¶, p. 3. MEMO, that BAYER has taken RONWIN's fact deposition and agreed to take RONWIN's expert deposition, "later in a separate deposition." As to that matter, BAYER appended a copy of pp. 1-4 and 173-180 of RONWIN's deposition as Exh. C, MEMO.

The following can be noted from Exh. C, p. 176, lines 5-16:

(Questioning by PILKINGTON; Answers by RONWIN)

Q. How -- what -- on what basis have you concluded that Baycol can cause blurred vision?

A. Right. We've got to get into that chemistry that I talked to you about the other time. You want to get into all that?

Q. Well, let's do this: We have agreed before this deposition that we will return to take your expert witness deposition, correct?

A. You want to do that?

Q. At a later point, correct?

A. Then, that would be fine with me. Yeah, otherwise, we've got a whole lot to go into. (emphasis added).

Clearly, BAYER was (i) recognizing RONWIN as an expert and (ii) an agreement was made to take RONWIN's deposition as an expert. The deposition continued, pp. 176, line 17 to p. 177, line 16:



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:20AM P15

Q. And, Mr. Ronwin, do you recall us having a telephone conversation during which you told me that you're going to testify as an expert at trial?

A. What? As an expert, yes.

Q. And when you told me that -

A. And you want to take my deposition.

Q. – I said, Let's take your plaintiff's deposition first, and then take your expert deposition.

A. I don't believe you told me that. What I think you told me was that you didn't -- you weren't going to agree that I was an expert. That's the idea.

Q. Well, let's see if we can make sure we agree now.

A. Let's agree now.

Q. You've designated yourself as an expert, right?

A. Yes.

Q. And I was not planning on getting into any of your expert opinions today.

A. That will be fine.

Q. Okay. Provided, however, I have the opportunity to come back and ask you about your expert opinions.

A. You can always come back at a suitable, mutual time.

As can be seen, BAYER's attorney insisted that he said, "let's take your plaintiff's deposition first and then your expert deposition." Being honest, RONWIN noted that PILKINGTON, (in the telephone conversation) said that he "wasn't going to agree that [RONWIN] was an expert." Then the deposition continued and BAYER makes a definite agreement with RONWIN to take



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:21AM P16

RONWIN's expert deposition.

If BAYER believed that RONWIN was not an expert then BAYER was obligated to (i) approach the court and formally challenge RONWIN's status as an expert, or (ii) be satisfied with RONWIN's fact deposition, (a second portion of which was taken in late July, 2006).

BAYER cannot have it two (2) ways. If BAYER wants an expert deposition from RONWIN, BAYER cannot at the same time maintain that RONWIN is not an expert!

Furthermore, per PTO 149, the time to take a fact deposition for Phase I specific cases, which this case is, was no later than July 31, 2006, (p. 4, PTO 149); and the time to take an expert deposition has also long run, Sept. 29, 2006, (p. 4, PTO 149) and all depositions of BAYER's experts had to be completed by November 29, 2006 (p. 4, PTO 149).

As noted in the 1st full ¶, p. 3, MEMO, RONWIN's expert deposition was set for Sept. 28, "by mutual agreement." However, on the morning of Sept. 13, 2006, the day after RONWIN attended the deposition of his medical expert, Dr. Raul G. Reyes in Louisiana, RONWIN was taken with a serious, flu-like ailment and actually saw an MD twice during an approximately two (2) week period that the illness persisted. It was then intended to reset the deposition for sometime during the week of Oct. 2-6, 2006. On Sept. 6, 2006, RONWIN faxed a letter to PILKINGTON asking for a $3,000 fee; however, later in the day, RONWIN learned from Dr. Reyes' business manager of Dr. Reyes' medical activities that BAYER had agreed to pay Dr. Reyes a $5,000 fee. Therefore, RONWIN faxed a second letter to PILKINGTON indicating that RONWIN's fee for an expert deposition would be $5,000 since RONWIN was going to discourse expertly on more than Dr. Reyes would be able to.

After attending Dr. Reyes' deposition on Sept. 12, 2006, RONWIN felt that the $5,000 fee

would be too much and sent another fax to PILKINGTON setting his fee at $1,000 for whatever time the expert deposition required; the fee to be paid at the start of the deposition, Exh. H to MEMO.

Pursuant to RONWIN's request, PILKINGTON notified RONWIN by letter, copy of which is appended hereto as Exh. 10, of the fees that BAYER paid to seven (7) MD's who had provided medical services of sorts to RONWIN within the time parameters apropos to this case. The letter notes that the fees paid were those demanded (by the deponents). The deposition time is not given. However, the depositions of Drs. Keller, Knauer and Wolfel took approximately 4 hours with interruptions in the first two depositions especially when RONWIN was interrogating. Dr. Hiatt's deposition took about 2¼ hours, with RONWIN getting very little interrogation time. Dr. Deane's deposition took about 1 hour. Dr. Torkelson's deposition took about 2 hours. Dr. Servi's deposition took about 2.5 hours.

A $1,000 fee for what will be an illuminating expert deposition for 5-6 hours, possibly more, is reasonable.

During telephone conversation with PILKINGTON in Sept., 2006 on the resetting of RONWIN's expert deposition during the week of Oct. 2-6, 2006, PILKINGTON said that BAYER would not pay an expert fee for RONWIN's expert deposition and would file a motion challenging a deposition fee to RONWIN, "within two (2) weeks." BAYER's motion to which this Response is addressed was filed on December 4, 2006. That's more like two months. Moreover, the time for all depositions under PTO 149, p. 4, for Phase I specific cases ran on November 29, 2006.

It is submitted that all the arguments put forth in MEMO have been fully refuted herein; and

it is notable that BAYER cites Fed.R.Civ.P. 26(b)(4)(C) which provides that a party seeking discovery "must pay the expert a reasonable fee <u>for the time spent</u> in responding to any discovery demands, including time spent on depositions." p. 4, MEMO.

**WHEREFORE,** Plaintiff asks that the court deny BAYER's motion and let the parties decide between themselves whether or not they wish to proceed with an expert deposition from RONWIN.

DATED: December 11, 2006

Edward Ronwin, pro se
945 Rolland Moore Dr., L-2
Fort Collins, CO 80526
970-221-3837

CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Response upon the following by FAX, this 11th day of December, 2006:

The Court's Clerk's Office at FAX No. 612-664-5044; Defendant's counsel at FAX No. 312-853-7036; Jeffrey Pilkington, Defendant's Denver, CO counsel at FAX No. 303-893-1379; Plaintiff's Liaison Counsel, Deanna Dailey at Larson-King at FAX No. 651-312-6618.

Edward Ronwin



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:23AM P2

From: Dr. Edward Ronwin, 945 Rolland Moore Dr., L-2, Fort Collins, CO 80526
Telephone: 970-221-3837; FAX: 970-224-3838

To the following parties by FAX:
The Clerk's Office, U.S. Dist.Ct., Dist. of Minnesota
Sidley Austin, Defendant's attorneys in Chicago, IL.
Courtesy copy: Jeff Pilkington, Denver, CO att'y for Def't.
Plaintiff's Liaison Counsel, Deanna Dailey at Larson-King

Re: Plaintiff's Response to Defendant's Motion to Compel

Date: December 11, 2006

My fax machine handles only 18-20 pages at a time. I will be faxing herewith, including this page, a total of 52 pages. The exhibits constitute the majority of the pages.

I will have to fax about 18-19 pages at a time. After I'm done with one set of pages, I will immediately set the next set for faxing and will have to redial. There are 10 exhibits which, in turn, have several pages in most cases. The text of the Response has 19 pages.

If there is any problem, please call me at 970-221-3837.

Edward Ronwin, PhD, JD