AO 245B (Rev. 12/03 - Judgment in a Criminal Case

FILED
JUN 7 2005
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# United States District Court
## Northern District of California

UNITED STATES OF AMERICA
v.
BAYER CORPORATION

JUDGMENT IN A CRIMINAL CASE

Case Number: CR 04-0318 VRW

USM Number:

Phillip A Proger, Jones Day, 51LouisianaAve,N.W., Washington, DC 20001-2113
Defendant's Attorney

I hereby certify that the annexed instrument is a true and correct copy of the original on file in my office.
ATTEST:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California
By ________ Deputy Clerk
Date 3/13/06

THE DEFENDANT:

[x] pleaded guilty to count : One of the Information .
[ ] pleaded nolo contendere to count(s) ___ which was accepted by the court.
[ ] was found guilty on count(s) ___ after a plea of not guilty.

ACCORDINGLY, the defendant is adjudicated guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 15 U.S.C. § 1 | PRICE FIXING | | One |

The defendant is sentenced as provided in pages 2 through 3 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ] The defendant has been found not guilty on count(s) ___.

[ ] Count(s) ___ (is)(are) dismissed on the motion of the United States.

IT IS ORDERED that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of any material changes in economic circumstances.

May 24, 2005
Date of Imposition of Judgment

Signature of Judicial Officer

Honorable Vaughn R. Walker, Chief U. S. District Judge
Name & Title of Judicial Officer

6 June 2005
Date

... IN CRIMINAL DOCKET 12/8/05

ENTERED IN CRIMINAL DOCKET

SCANNED
DEC 11 2006
U.S. DISTRICT COURT MPLS

EXH. 1

FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:24AM P3

DEFENDANT: BAYER CORPORATION
CASE NUMBER: CR 04-0318 VRW



## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $ 400 | $ 33 million | $ |

[ ] The determination of restitution is deferred until _. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

[ ] The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | *Total Loss | Restitution Ordered | Priority or Percentage of Payment |
|---|---|---|---|
| Totals: | $_ | $_ | |

[ ] Restitution amount ordered pursuant to plea agreement $ _

[ ] The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6, may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

[ ] The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

[ ] the interest requirement is waived for the [ ] fine and/or [ ] restitution.

[ ] the interest requirement for the [ ] fine and/or [ ] restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (Rev. 9/00) - Judgment in a Criminal Case

# United States District Court
## Northern District of California

**FILED**
JAN 1 8 2005
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES OF AMERICA**
**v.**
**BAYER AG**

**AMENDED**
**JUDGMENT IN A CRIMINAL CASE**
(For Offenses Committed On or After November 1, 1987)

Case Number: CR04-~~0234~~ 235 MJJ

James Walden
Defendant's Attorney

**THE DEFENDANT:**

ENTERED IN CRIMINAL DOCKET 1-19-05

[x] pleaded guilty to count(s): 1 of the Information.
[ ] pleaded nolo contendere to count(s) ___ which was accepted by the court.
[ ] was found guilty on count(s) ___ after a plea of not guilty.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 15 U.S.C. 1 Sherman Act | Conspiracy to Maintain & Increase Prices of Certain Rubber Chemicals. | **12/2001** | 1 |

The defendant is sentenced as provided in pages 2 through 4 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ] The defendant has been found not guilty on count(s) ___.

[ ] Count(s) ___ (is)(are) dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.:

Defendant's Date of Birth:

Defendant's USM No.:

Defendant's Residence Address:

Defendant's Mailing Address:

12/9/2004
Date of Imposition of Judgment

[signature]
Signature of Judicial Officer

Honorable Martin J. Jenkins, U. S. District Judge
Name & Title of Judicial Officer

1/18/2005
Date

I hereby certify that the annexed instrument is a true and correct copy of the original on file in my office.
ATTEST:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California
By ___ Deputy Clerk
Date ___

258

DEFENDANT: BAYER AG
CASE NUMBER: CR04-0235 MJJ

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments directly following the Monetary Penalties section.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $ 400.00 | $ 66,000,000.00 | $ N/A |

[ ] The determination of restitution is deferred until _. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

[ ] The defendant shall make restitution (including community restitution) to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid in full prior to the United States receiving payment.

| Name of Payee | *Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| Totals: | $ _ | $_ | |

[ ] If applicable, restitution amount ordered pursuant to plea agreement $ _

[ ] The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 5, Part B may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

[ ] The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

[ ] the interest requirement is waived for the [ ] fine and/or [ ] restitution.

[ ] the interest requirement for the [ ] fine and/or [ ] restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245E (Rev. 9/00) - Judgment in a Criminal Case for Organizational Defendants

# United States District Court
## Northern District of California

FILED
2004 DEC 10 PM 6:47
RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA
v.
BAYER AG

**JUDGMENT IN A CRIMINAL CASE**
(For Organizational Defendants)

Case Number: CR-04-0331 PJH

Phillip Proger
Defendant Organization's Attorney

I hereby certify that the annexed instrument is a true and correct copy of the original on file in my office.
ATTEST:
RICHARD W. WIEKING
Clerk, U.S. District Court
Northern District of California
By ____ Deputy Clerk
Date 3/15/06

**THE DEFENDANT ORGANIZATION:**

[x] pleaded guilty to count(s): one of the Information.
[ ] pleaded nolo contendere to count(s) ___ which was accepted by the court.
[ ] was found guilty on count(s) ___ after a plea of not guilty.

**ACCORDINGLY,** the court has adjudicated that the defendant is guilty of the following offense(s).

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 15 USC 1 | Price Fixing | | One |

The defendant organization is sentenced as provided in pages 2 through 4 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ] The defendant organization has been found not guilty on count(s) ___.

[ ] Count(s) ___ (is)(are) dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant organization shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant organization shall notify the court and United States attorney of any material change in the organization's economic circumstances.

Defendant Organization's Federal Employer I.D.:

Defendant Organization's Principal Business Address:
BAYER AG
Corporate Center
D-51368
Leverkusen, GERMANY

Defendant Organization's Mailing Address:
BAYER AG
Corporate Center
D-51368
Leverkusen, GERMANY

December 8, 2004
Date of Imposition of Judgment

Signature of Judicial Officer

Honorable Phyllis J. Hamilton, U. S. District Judge
Name & Title of Judicial Officer

DEC 10 2004
Date

ENTERED IN CRIMINAL DOCKET 12/21/04

DEFENDANT: BAYER AG



CASE NUMBER: CR-04-0331 PJH

# CRIMINAL MONETARY PENALTIES

The defendant organization shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth in this judgment.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $ 400.00 | $ 4.7 million | $ |

[ ] The determination of restitution is deferred until _. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

[ ] The defendant shall make restitution (including community restitution) to the following payees in the amounts listed below.

If the defendant organization makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid in full prior to the United States receiving payment.

| Name of Payee | *Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| Totals: | $ _ | $_ | |

[ ] If applicable, restitution amount ordered pursuant to plea agreement $ _

[ ] The defendant organization shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on the Schedule of Payment Page, Part B may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

[ ] The court determined that the defendant organization does not have the ability to pay interest, and it is ordered that:

[ ] the interest requirement is waived for the [ ] fine and/or [ ] restitution.

[ ] the interest requirement for the [ ] fine and/or [ ] restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 United States Code for offenses committed on or after September 13, 1994, but before April 23, 1996.

[redacted]



## AstraZeneca in two small-molecule drug agreements

**AstraZeneca is advancing small-molecule drugs for cancer** and heart disease with an acquisition and a licensing deal, respectively. The British drug firm has agreed to acquire KuDOS Pharmaceuticals, also of the U.K., for $210 million in cash. AstraZeneca is particularly interested in a KuDOS drug, KU 59436, that stops tumor cells from repairing damaged DNA by inhibiting an enzyme involved in the process. AstraZeneca says KuDOS will become a hub for DNA repair discovery within its cancer and infection research area. Meanwhile, AstraZeneca has signed a deal to develop AtheroGenics' anti-inflammatory cardiovascular drug candidate, AGI-1067, now in Phase III trials. AtheroGenics will receive an up-front fee of $50 million and up to $300 million in development and regulatory milestones. It could reap further sales-related milestones of up to $650 million, for total payments of $1 billion.

## Fuji acquires Avecia's inks

**Fuji Photo Film has agreed to** buy Avecia's ink-jet inks business for $260 million. Under the deal, due to be completed next month, Fuji acquires a plant and a research center in the U.K. and a plant in the U.S. Fuji sees the business, which employs 340 people, as a good fit with its existing specialty films and liquid-crystal display components businesses. The move also strengthens Fuji's know-how in technologies related to home printing of digital photographs. The acquisition will reportedly make Fuji the leading player in the ink-jet inks business, with a 45% share.

## Kemira boosts paper chemicals

**Kemira will buy Lanxess'** paper chemicals business for slightly more than $100 million. The unit had sales last year of approximately $290 million, primarily in colorants, optical brighteners, and sizing. Plants are in the U.S. and Germany, with a total of 375 employees. The acquisition will increase Kemira's pulp and paper chemicals sales to about $1.3 billion per year. "This agreement will raise Kemira to be the biggest supplier in pulp and paper chemicals globally," says Lauri Junnila, president of the Kemira business. According to Lanxess, the unit had losses in 2003 and 2004 but performed better in 2005.

## Ciba in silver marketing pact

**Ciba Specialty Chemicals** will market Bio-Gate Bioinnovative Materials' high-porosity elemental silver antimicrobial products and efficacy testing technology. The worldwide agreement covers use in polymers as well as in medical devices. In September, BASF and H.B. Fuller each invested $1.5 million in AgION Technologies, a maker of silver zeolite antimicrobial compounds.



**TINY SHINY** Scanning electron microscopy image of Biogate's high-porosity antimicrobial silver.

## Lonza makes omega-3 buy

**Lonza has acquired the docosahexaenoic acid (DHA) business** of Celanese's Nutrinova unit. The deal includes Nutrinova's DHA know-how, patents, and registrations in major global markets. DHA, a fermentation-based ingredient derived from microalgae, is considered one of the most important omega-3 polyunsaturated fatty acids. Lonza says the buy expands its nutrition portfolio and brings it proprietary fermentation technology.

## DSM to expand fibers again

**DSM plans to spend more** than $20 million to build yet another high-performance polyethylene fiber line in Greenville, N.C. Production is expected to begin in mid-2007. At Greenville, over the past year, the firm committed to two other new fiber lines and a facility to make bullet-resistant fabric to satisfy demand from military and law enforcement agencies. DSM says the newest line will help it satisfy industrial customer demand for the fiber, also used in ropes, sports applications, and cut-resistant garments.

## A PEEK at Victrex plans

**Victrex plans to invest $1[illegible]0** million over the next three years to expand its polyether ether ketone (PEEK) specialty polymers business. Some $[illegible]0 million will go to a second plant for PEEK powders at the company's headquarters site in England. The new plant will have capacity of 1,450 metric tons per year and open in late 2007. The existing plant will also be upgraded to help boost supplies for Asia. Victrex is investing in a new technology center in Shanghai, scheduled to open later this year.

## BMS and Merck part over drug

**Bristol-Myers Squibb and** Merck have agreed to end a pact to develop the diabetes drug Pargluva following an October request by FDA for additional information on the drug's cardiovascular profile. Under the agreement, all rights to the drug revert to BMS, which says it is considering a range of options, including conducting additional studies or ending development of the drug. BMS told analysts last month that a delay in approval for Pargluva is among the factors that will defer growth at the company until 2007 (C&EN, Dec. 19, 2005, page 12).

## Shell, Basell agree on sale

**Basell and Shell Chemicals** are advancing plans for a Basell buyout of Shell's interest in their 50-50 ethylene joint venture—Société du Craqueur de l'Aubette—in Berre, France. As part of the deal, Basell will purchase Shell's butadiene business in Berre and take over logistics operations in Aubette, Berre, and Fos. Basell says the deal allows it to fully back-integrate its polyethylene and polypropylene plants in Berre and a polyethylene plant in Fos.

EXH. 2

## EC imposes pricing fines

**The European Commission** has imposed a total of $90 million in fines on three firms

for fixing the price of rubber chemicals between 1996 and 2001. The commission imposed fines of $70 million on Bayer, $16 million on Chemtura, and $4 million on General Química. They had fines reduced 20%, 50%, and 10%, respectively, for cooperating with the investigation. Flexsys, a joint venture of Akzo Nobel and Solutia, received immunity as the first to cooperate with the probe. Separately, Chemtura says it paid $50 million to settle the antitrust claims of customers representing more than half of its U.S. rubber chemical sales.

## Ranbaxy loses Lipitor dispute

**The U.S. District Court in** Delaware has ruled against Ranbaxy Laboratories in its challenge of Pfizer's Lipitor, a cholesterol-lowering agent that is the world's biggest selling drug. The court placed an injunction blocking Ranbaxy from marketing Lipitor in the U.S. before 2011, when Pfizer's patent expires. Ranbaxy vowed to appeal, but Pfizer shares still soared 9% on the news. Separately, a court in Spain also enforced Pfizer's patent. In October, Ranbaxy lost against Pfizer in the U.K.

## Wyeth signs with Progenics and Exelixis

**Wyeth has agreed to jointly** develop Progenics Pharmaceuticals' methylnaltrexone for the treatment of opioid-induced side effects. In exchange for worldwide rights to the drug, Wyeth is paying Progenics $60 million up front and as much as $356.5 million in additional milestone payments. Separately, Wyeth has signed a licensing agreement with Exelixis under which it will assume responsibility for Exelixis compounds targeting the farnesoid X receptor, a nuclear hormone receptor implicated in metabolic and liver disorders. Exelixis will get $10 million up front and may receive up to $147.5 million more in milestone payments.

## Chemical recovery is slow

**U.S. chemical production** continued its post-hurricane recovery in November, but has




yet to get back to levels seen prior to the storms or to those of November 2004, according to seasonally adjusted data from the Federal Reserve Board. The production index for all chemicals for November was 101.3, up 2.0% from the previous month but still down 1.4% from August before the hurricanes struck and off 2.7% from November 2004. Output of the important basic chemicals sector rose 12.2% from October to an index of 91.4 as plants came back onstream but was still down 6.0% from August and 14.3% from November a year earlier.

## India's Tata buys British soda ash firm

**Tata Chemicals has acquired** a 63.5% stake in Brunner Mond, the former ICI soda ash business, for about $110 million. Tata is India's largest soda ash producer, while Brunner Mond is Europe's second largest producer and has operations in Kenya. The companies say the combined entity will be the world's third largest soda ash maker and the only producer of the alkali with plants on three continents.

## Tripos plans U.K. job cuts

**Tripos says it will stream**line its discovery research business, based in Bude, England, resulting in a loss of anywhere from 20 to 99 jobs. The business currently employs 164 people. Tripos follows Discovery Partners International in downsizing at the end of a long-term contract to make small-molecule compounds for Pfizer (C&EN, Dec. 5, 2005, page 36).

## Roche licenses bird flu drug to Indian firm

**Roche has agreed to license** India's Hetero Drugs for the production of the flu drug oseltamivir, better known as Tamiflu. Roche says Mumbai-based Hetero "is the first company that was identified to be able to speed up agreed delivery timelines in the first half of 2006." Until now, Roche has insisted that it was best able to supply all Tamiflu orders because it has been rapidly increasing production capacity for the difficult-to-make drug.

## Genzyme moves in gene therapy

**Genzyme has acquired gene** therapy assets from Avigen, including intellectual property related to treatments for Parkinson's disease and hemophilia. Genzyme made an up-front payment of $12 million and may make later milestone and royalty payments. Rich Gregory, Genzyme's head of research, says the purchase "reflects our commitment to achieve the medical advances that we believe are possible with this technology. Avigen says it is moving out of gene therapy into small-molecule therapeutics "that have a more established and predictable development process."

## BUSINESS ROUNDUP

- **Honeywell Electronic Ma**terials and Cabot Corp. have signed a global patent cross-license agreement regarding tantalum materials for the semiconductor industry. Tantalum is used as a barrier layer to prevent unwanted diffusion of copper.

- **ChemDiv has agreed to** deliver a small-molecule compound library to ChemBioNet, a network of German research institutes. ChemDiv says the library will represent about 80% of the compounds in ChemBioNet.

- **J.M. Huber's CP Kelco unit** has agreed to acquire Shandong Gold Millet Biological Products, a Chinese maker of the food thickener xanthan gum. Huber says the buy enlarges its xanthan gum capacity and allows it to better serve customers in Asia.

- **Henkel has opened a** 65,000-sq-ft Adhesives & Sealants Technology Center in Madison Heights, Mich., at a cost of $8 million. It will serve automotive industry customers.

- **Bridgestone plans to build** a 50,000-metric-ton-per-year styrene-butadiene plant in Guangdong province, China, for completion in 2008. The $100 million facility will supply rubber to satisfy an expected surge in demand for tires in China.



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:28AM P10

## In brief

**Children with cancer denied care:** An estimated 250 000 children develop cancer each year worldwide, yet four out of five either are not diagnosed or are denied essential life saving treatment, says the Cancer Research Fund and Imperial Cancer Research Fund (soon to merge as Cancer Research UK).

**Dutch children may receive meningitis C vaccine:** The Health Council of the Netherlands has recommended vaccination against group C meningococcus for all those aged under 18 years, after a sharp increase in the incidence of the disease. Reported cases have risen from 80 in 1999 to 222 in the first 10 months of 2001.

**Fraudster struck off medical register:** London GP Dimitrios Padelis, aged 46, who defrauded the NHS of £348 000 ($487 000; €564 000), was last week struck off the medical register. He had submitted false invoices through his company Allcare Agency, which provided locum services to hospitals. He is currently serving a four year sentence at Ford Open Prison in West Sussex.

**Malaysian wins discrimination case:** In the first racial discrimination case in the Republic of Ireland to be brought successfully by an employee, a Malaysian doctor working at St James's Hospital, Dublin, has won £23 490 ($33 892; €58 000) in back pay, overtime, and allowances. The ruling said that it was unlawful for him to work as an intern without a basic salary when Irish intern colleagues doing similar work were on salaried positions.

**Embryologist faces court hearing:** An embryologist and a hospital consultant face a court hearing next week after complaints about the way cryopreserved genetic material was stored at the Hampshire Clinic and North Hampshire Hospital's fertility centre in Basingstoke. Thirty nine couples had to have their eggs destroyed because record keeping was so poor, and one couple lost their eggs completely.

## Doctors worried about threat to supplies of animal insulin

Mark Hunter *Leeds*

Fears that worldwide production of animal insulin could be put at risk by the proposed takeover of Brazilian manufacturer Biobras have been dismissed by the multinational pharmaceutical company involved in the buy-out.

Novo Nordisk has "no plans for the discontinuation of production of animal insulin." Nor will it halt Biobras's supply of source material to other companies that manufacture insulin, claimed Novo's executive vice president, Lars Jorgensen.

Concerns over the bid, which has been accepted by the Biobras board and is currently under consideration by shareholders and the Brazilian competition authorities, have centred on Novo's recent policy of scaling down its production of animal insulins. Its mixed porcine and bovine product Lentard was withdrawn from the UK market in July last year.

In contrast, Biobras is one of the world's major manufacturers of animal insulin and, significantly, one of the few remaining producers of the insulin crystals used by other companies as source material for their own animal insulins.

This has led some diabetic patient groups to fear a hidden agenda in Novo's bid for the Brazilian company.

"Novo have already stated their intention of global withdrawal of all animal insulins," said Jenny Hirst, joint chair of the Insulin Dependent Diabetes Trust. "My concern is that if Novo withdraw completely from the animal insulin market, they are not going to be interested in supplying anyone else with the source material."

This would be of serious concern to the significant minority of patients with type 1 diabetes who had been unable to switch to synthetic human insulin because of problems with intolerance or increased risk of hypoglycaemia, she said. Around 25 000 patients in the United Kingdom still use animal insulin.

Ms Hirst also pointed out that many developing countries were unable to afford the higher priced synthetic insulin and would suffer greatly if Biobras ceased production of source material.

At CP Pharmaceuticals, the United Kingdom based company that is currently the only manufacturer still to produce both porcine and bovine insulins, the Novo bid for Biobras is being observed with great interest.

However, the chief executive, Charles Savage, is keen to emphasise that although the company does have a "relationship with Biobras for the supply of crystals, there are other reliable sources."

Indeed the company has recently increased its production capabilities to step into the breach left by Novo Nordisk and Eli Lilly's gradual global withdrawal of animal insulins.

"We are committed to the long term supply of animal insulins to the world's diabetics," said Mr Savage. □

## Bayer faces Swiss criminal probe over cerivastatin

Fiona Fleck *Geneva*

Prosecutors in the Swiss canton of Ticino have opened a criminal inquiry into Bayer AG on suspicion of fraud and grievous bodily damage following the German pharmaceutical giant's controversial recall of its cholesterol drug cerivastatin sodium in August last year.

Cantonal prosecutor Nicola Respini told the *BMJ* on Friday that he had opened the investigation on 4 December after a patient taking cerivastatin (marketed as Lipobay in Europe and Baycol in the United States) allegedly experienced serious side effects. The cantonal government accused Bayer of suppressing vital information about the drug's potentially fatal interaction with another drug.

Mr Respini said the inquiry would look into whether doctors in Ticino prescribed the drug knowing it could have harmful consequences and, also, whether Bayer's managers and researchers failed to inform doctors about known potentially harmful side effects.

He said the case could result in charges of fraud and grievous bodily harm, for which the maximum penalty for the charges of fraud is 20 years in prison and a fine.

"A Swiss patient was prescribed Lipobay because he had health problems. But after he started taking it his condition worsened. He developed muscular problems and had to be hospitalised first in Locarno then in western Switzerland," Mr Respini said.

"The cantonal health authorities carried out an inquiry into Lipobay and concluded that Bayer had suppressed information on dangerous side effects during drugs tests from 1998 to 1999. We now have experts examining the documentation to establish whether this is true," he said.

Bayer recalled cerivastatin after 52 deaths occurred in patients taking the drug—31 of those in the United States (2001;323:359)—and the German federal health ministry accused Bayer of withholding vital information from the German federal drug agency.

The drug's recall has led to a series of lawsuits filed by patients in the United States and Germany against Bayer and has prompted speculation that the company, which invented aspirin a century ago, could face substantial compensation claims. □




How Bayer advertised Lipobay before it was withdrawn



EXH, 3

FROM: E = MC² by DAVID BODANIS, BERKLEY PUB. GROUP, NY 2001 NOTES

Kaiser Wilhelm Institute for Physics was being relocated to the Hechingen area, Heisenberg was informed that Polish slave labor would be available.

129 ... female "slaves": With the passage of time, it is easy to forget what attitudes the individuals who worked in Germany during the war were accepting; what words like *bought* and *slave* actually meant. There are tens of thousands of pages in the Nuremberg Trial documentation; on November 15, 1947, the New York *Herald Tribune* reported the firsthand testimony behind just one:

> *Nuremberg, November 14, 1947 (A.P.) A French witness testified today that the I. G. Farben combine purchased 150 women from the Oswiecim [Auschwitz] concentration camp, after complaining about a price of 200 marks (then $80.00) each, and killed all of them in experiments with a soporific drug.*
>
> *The witness was Gregoire M. Afrine. He told the American military tribunal trying 23 Farben directors on war crimes charges that he was employed as an interpreter by the Russians after they overran the Oswiecim camp in January 1945 and found a number of letters there. Among the letters, he said, were some addressed from Farben's "Bayer" plant to the Nazi commandant of the camp. These excerpts were offered in evidence:*
>
> *1. In contemplation of experiments with a new soporific drug, we would appreciate your procuring for us a number of women.*
>
> *2. We received your answer but consider the price of 200 marks a woman excessive. We propose to pay not more than 170 marks a head. If agreeable, we will take possession of the women. We need approximately 150.*
>
> *3. We acknowledge your accord. Prepare for us 150 women in the best possible condition, and as soon as you advise us you are ready we will take charge of them.*
>
> *4. Received the order of 150 women. Despite their emaciated condition, they were found satisfactory. We shall keep you posted on developments concerning the experiment.*
>
> *5. The tests were made. All subjects died. We shall contact you shortly on the subject of a new load.*



FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:29AM P12

4-C Service
212-592-7201

212-930-0831
212-930-0800(?)

Elizabeth Diefendorf
Chief 212 930-0770

945 Rolland Moore Dr., L-2
Fort Collins, CO 80526
970-221-3837

January 31, 2006

The General Research Division
New York Public Library
42nd St./Fifth Ave.,
N.Y., N.Y. 10018

Att'n: Reference Library

To Whom It May Concern:

I would appreciate a copy of a report that appeared in the New York Herald Tribune on November 15, 1947. I realize that the newspaper went out of business in 1966. I understand that you have it on film, but I cannot come to New York City to view it there or to get a copy.

I have enclosed a copy of p. 275 from a published book entitled, E=MC(Square), by David Bodanis, Berkley Publishing Group, New York, paperback printed 2001. The publishing Group is currently a division of Penquin Putnam, Inc.

The article is under the dateline Nov. 14, 1947 and deals with testimony before the Nuremberg Trial court by a Russian interpreter. Again, it appeared on Nov. 15, 1947 in the Herald Tribune.

Please forward a copy as soon as possible. Thank you.

Sincerely

/S/ER

Edward Ronwin, PhD,JD

Feb 16, 2006

The New York Public Library
Fifth Avenue & 42nd Street, New York, New York 10018-2788

To Mr Ronwin —

As requested . . .

Beth Diefendorf
NYPL

[illegible]

Dr. Schmidt did rocket-missile research at Kiel for Germany during the war. He was credited with being mainly responsible for the engine of the first rocket fighter plane—the Messerschmidt 163. He headed a team of German scientists brought to Britain to continue rocket research, including the German V-2 and V-3 projects.

The explosion, which was felt seven miles away and sent up a column of smoke a mile high, occurred in a testing hut 150 yards from the administrative building of the station, which employs 400 scientists and laborers.

The Ministry of Supply, in [illegible], said that the blast took place during the testing of a rocket motor—presumably to aid in airplane take-offs—and that all staff members at the time were "under cover."

The British Press Association said it understood research men had been watching the test of a motor through slits in a [illegible] blast wall. [illegible] one worker [illegible] arrangement had been made to fire two rockets, and that when one was fired the discharge apparently set off the other prematurely.

The station, once a R. A. F. field, was surrounded after the mishap by a guard of Air Ministry police patroling a wire fence eight feet tall while scientists went on to investigate.

Later two photographers and a newsman, finding an unguarded entrance, went inside. They saw a buckled roof on one of a cluster of huts, but no other sign of damage. An unofficial report had said the whole station had been destroyed.

## 2 Thugs Rob Contractor Of $5,000 Pay Roll, Flee

A $5,000 pay roll for plasterers working on the Fresh Meadow Housing Project of the New York Life Insurance Company, Horace Harding Boulevard and 187th Street, Bayside, Queens, was stolen yesterday afternoon by two gunmen who escaped with their loot through the partly finished eight-and-ten-story apartment buildings.

Pasquale Grassi, president of the P. Grassi Contracting Co., Inc., 302 Park Avenue, New York, and his paymaster, Peter Reed, of 155-15 Riverside Drive West, were packaging the money in Mr. Grassi's car, in front of building No. 6 of the project. As they left the car two men approached with drawn revolvers and demanded the money, which Mr. Grassi handed over.

## Wilbur L. Cross Parkway Opens New 9½-Mile Link

*Special to the Herald Tribune*

NORTH HAVEN, Conn., Nov. 14.—A nine-and-a-half-mile link in the Wilbur L. Cross Parkway was opened here today at a ceremony at which Mr. Cross, Governor of Connecticut from 1931 to 1939, cut the ribbon permitting the flow of traffic to begin. Governor James [illegible]

will be entering the industry at the rate of 850 a week it was said. Plan [illegible] figures for the coal industry show that although the number of workers increased this year from [illegible] to 715,301 on Nov. 1, the present total is below that for May. The high point was reached on May 23, when the number of pit workers reached [illegible] with the present high "wastage" rate it will be necessary to recruit 2,000 men a week until the end of the year if the goal of 730,000 is to be reached.

## Trial Hears Farben Killed 150 Women

### Were Used in Testing of New Soporific Drug

NUERNBERG, Nov. 14 (AP).—A French witness testified today that the I. G. Farben combine purchased 150 women from the Oswiecim concentration camp, after complaining about a price of 200 reichsmarks (than $80) each, and killed all of them in experiments with a soporific drug.

The witness was Gregoire M. Afrine. He told the American military tribunal trying twenty-three Farben directors on war crimes charges that he was employed as an interpreter by the Russians after they overran the Oswiecim camp in January, 1945, and found a number of letters there. Among the letters, he said, were some addressed from Farben's "Bayer" plant to the Nazi commandant of the camp.

These excerpts were offered in evidence:

1. "In contemplation of experiments of a new soporific drug, we would appreciate your procuring for us a number of women."

2. "We received your answer but consider the price of 200 marks a woman excessive. We propose to pay not more than 170 marks a head. If agreeable, we will take possession of the women. We need approximately 150."

4. "We acknowledge your accord. Prepare for us 150 women in the best possible health conditions, and as soon as you advise us you are ready, we will take charge of them."

4. "Received the order of 150 women. Despite their emaciated condition, they were found satisfactory. We shall keep you posted on developments concerning this experiment."

5. "The tests were made. All subjects died. We shall contact you shortly on the subject of a new load."

## British Loan Accord

### Agreement With Belgium Signed to Thaw Funds in U. S.

*From the Herald Tribune Bureau*
*Copyright, 1947, New York Herald Tribune, Inc.*

LONDON, Nov. 14.—A new agreement expected to set the pattern by which the British can obtain the unfreezing of the remainder of the American loan was [illegible]


Public Sale Today at 2 [illegible]
AMERICAN AND ENGLISH FURNITURE
Early American and Georgian Silver
Oriental Rugs · Decorations
LEARNED, MORRIS AND OTHER OWNERS

Now On Exhibition
WEEKDAYS 9:30 TO 5 · CLOSED SUNDAY

AMERICAN PORTRAI[TS]
GILBERT STUART · REMBRANDT PEA[LE]
JOHN WESLEY JARVIS · JANE STUART · C[…]
BARBIZON AND GENRE WO[RKS]
COROT · JONGKIND · DIAZ · BOUGUE[REAU]
VIBERT · SCHREYER · OTHERS
AMERICAN PORTRAIT SCULPTU[RE]
AND OTHER BUSTS
HOUDON · CAFFIERI · CERRACC[HI]
From the Estate of the Late
PERCY A. ROCKEFELL[ER]
BY ORDER OF AVERY ROCKEFELLER
AND FREDERIC W. LINCOLN
And Property of the Estates of the Late
HENRY KENDALL THAW · MARY HIL[L]
AND FROM OTHER OWNERS
Illustrated Catalogue 50¢
Public Sale November 20 at 8

FRENCH PROVINCIAL FURNI[TURE]
AND DECORATIVE OBJECT[S]
Comprising Property Removed from [the]
CHÂTEAU DE SAINT FÉLIX
NEAR AVIGNON, PROVENCE
By Direction of the Heirs of the
Comte de Morigny de la Chelle and from
PAUL GUIBAL DE VALLON
WITH OTHER PROPERTY
BY ORDER OF MME ANNA GUE[…]
Illustrated Catalogue 50¢
Public Sale November 21-22 [at …]

IMPORTANT MODERN [FREN]CH
ILLUSTRATED BOOK[S]


page 7 of 13

Herald Tribune 11/15/47

DEPARTMENT OF HEALTH & HUMAN SERVICES

Food and Drug Administration
Rockville MD 20857

OCT 2 5 1999

**TRANSMITTED VIA FACSIMILE**

Ms. Carol Sever
Deputy Director
Regulatory Affairs
Bayer Corporation
400 Morgan Lane
West Haven, CT 06516

**RE: NDA 20-740**
**Baycol (cerivastatin sodium)**
**MACMIS ID# 8238**

Dear Ms. Sever:

As part of its routine monitoring program, the Division of Drug Marketing, Advertising, and Communications (DDMAC) has become aware of promotional material for Baycol (cerivastatin sodium) that is false, lacking in fair balance, or otherwise misleading. Reference is made to a Sales Aid (QO 1068), submitted under cover of Form FDA 2253. The dissemination of this material by Bayer Corporation (Bayer) and/or their agents, violates the Federal Food, Drug, and Cosmetic Act and its implementing regulations. DDMAC requests that the use of the above referenced material and those containing the same or similar violations cease immediately. Specifically, DDMAC has the following objections:

**Sales Aid**

__Baycol –the science for success__

The presentation under this header is misleading because it implies, without substantial evidence, that Baycol is superior to other HMG CoA reductase inhibitors ("HMGs") because of its synthetic properties. More specifically, the statement, "Baycol is a fully

EXH. 5

synthetic inhibitor of the HMG CoA reductase enzyme" in juxtaposition with a chart comparing the "Synthetic Pure Enantiomers" (Baycol and Lipitor) versus "Other Statins" (Pravachol, Zocor, Mevacor, and Lescol) that are "fungally derived" implies a clinical advantage for Baycol versus "other statins" that is unsubstantiated. The disclaimer, "comparisons do not imply clinical significance" that is presented in small type does not adequately correct the misleading implication.

**Powerful enzyme inhibition**

Again, the presentation under this header is misleading because it implies that Baycol is superior to other HMGs based on non-clinical (*in vitro*) data about the enzymatic properties of the HMGs. More specifically, the statement, "Baycol inhibits cholesterol-producing enzymes *in vitro* more completely at lower concentrations than any other statin" in juxtaposition with a graph titled, "Statin inhibition of membrane-bound HMG CoA reductase in animal hepatic tissue" uses non-clinical data to imply clinical significance and the superiority of Baycol versus the other HMGs. The disclaimer, "In vitro data do not imply clinical significance" that is presented in smaller type underneath the graph does not adequately correct the misleading implication.

**Dramatic results across key lipid parameters**

The presentation of HDL-C efficacy information under this header is misleading because it overstates the efficacy of Baycol. More specifically, the statement, "Baycol delivers outstanding mean increases of 10% in HDL-C" in conjunction with the statement, "Epidemiological research has shown that each 1 mg/dl increase in HDL-C is associated with a 4.4% decrease in the risk of coronary heart disease" suggests an effect of Baycol that is unsubstantiated. This presentation suggests that drug intervention with Baycol and corresponding increase in HDL-C levels will have a positive effect on cardiovascular morbidity and mortality. This effect on morbidity and mortality has not been demonstrated, however, as described in Baycol's approved product labeling which states, "The independent effect of raising HDL-C or lowering triglycerides on the risk of coronary and cardiovascular morbidity and mortality has not been determined." The disclaimer that follows the misleading HDL-C claims, "The effect of Baycol on cardiovascular morbidity and mortality" that appears in very tiny font, in a footnote, does not adequately correct the misleading implication.

**Baycol proven significantly better than Pravachol**

The presentation under this header is misleading because it implies that Baycol is superior to Pravachol without substantial evidence. More specifically, the presentation of LDL-C reductions for Baycol .3 mg (31%) versus Pravachol 20 mg (26%) in conjunction

Carol Sever
Bayer Corporation
NDA 20-740

with the misleading claim of "19% better efficacy...P<.0001" implies superiority without adequate substantiation. The studies utilized by Bayer to substantiate the superiority of Baycol versus Pravachol are inadequate. For example, the first study compares Baycol .3 mg (at that time—the highest labeled dose) to Pravachol 20 mg (the mid-range dose). Furthermore, the second study yielded no difference (both achieved 30% LDL-C reduction) between Baycol .3 mg and Pravachol 40 mg (the highest labeled dose). Therefore, the presentation of superiority is misleading for the aforementioned reasons. The disclaimer, "The clinical outcomes resulting from differences in LDL-C reductions between Baycol and Pravachol have not been determined" does not adequately correct the unsubstantiated implication of superiority.

**Lack of Fair Balance**

The presentation of risk information in this promotional piece lacks fair balance. Promotional materials may be lacking in fair balance, or otherwise misleading if they fail to present information relating to side effects and contraindications, with a prominence and readability reasonably comparable to the presentation of efficacy information. In the Sales Aid, Bayer uses several pages, various color patterns, charts, graphs, and the like, to provide emphasis for efficacy information. However, the page seemingly devoted to the presentation of risk information titled, "Baycol offers a proven record of safety" contains mostly additional benefit (safety) claims for Baycol and very little risk information. In fact, Bayer presents the most important risk information (risk of myopathy, rhabdomyolysis, etc...) with much less emphasis, in the middle of the Sales Aid.

Bayer should immediately cease using this, and all other promotional materials for Baycol that contain the same or similar violations. Bayer should submit a written response to DDMAC, on or before November 8, 1999, describing its intent and plans to comply with the above. In its letter to DDMAC, Bayer should include a list of all promotional materials that were discontinued, and the discontinuation date.

Bayer should direct its response to the undersigned by facsimile (301) 594-6771, or by written communication at the Division of Drug Marketing, Advertising, and Communications; HFD-42; Room 17B-20; 5600 Fishers Lane; Rockville, MD 20857. DDMAC reminds Bayer that only written communications are considered official.

Carol Sever
Bayer Corporation
NDA 20-740

In all future correspondence regarding this matter, please refer to MACMIS # 8238 and NDA 20-740.

Sincerely,

/S/

Michael A. Misocky R.Ph., J.D.
Regulatory Review Officer
Division of Drug Marketing,
Advertising and Communications

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

---

DEPOSITION OF: JANE SERVI, M.D.
June 20, 2006

---

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : | Case No. 02-0200 |

TAKEN PURSUANT TO NOTICE AND SUBPOENA on behalf of the Defendant Bayer Corporation at 419 Canyon Avenue, Suite 300, Fort Collins, Colorado 80521 at 9:08 a.m. before Sylvia E. Noneff, Registered Professional Reporter and Notary Public within Colorado.

EXH. 6

04611547-742a-4e98-803b-ddf0b207a131

APPEARANCES

For the Plaintiff Ronwin (pro se): EDWARD RONWIN, Ph.D., ESQ.
945 Rolland Moore Drive L-2
Fort Collins, Colorado 80526

For the Defendant: JEFFREY PILKINGTON, ESQ.
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, Colorado 80202

Also Present: None



INDEX


EXAMINATION OF JANE SERVI, M.D.: PAGE
June 20, 2006

By Mr. Ronwin 74, 122

By Mr. Pilkington 4, 120

| DEPOSITION EXHIBITS: | INITIAL REFERENCE |
|---|---|
| 1 Subpoena, 5/31/06 | 6 |
| 2 Curriculum vitae of Jane (Niki) Servi, M.D., not dated | 9 |
| 3 Northern Colorado Orthopedic Associates chart notes re Ronwin, various dates | 31 |
| 4 Handwritten letter from Drs. Knauer and Servi to Ronwin, 1/6/04; explanations of chart abbreviations | 72 |
| 5 Letter from Ronwin to Knauer, 11/5/03; request for explanations of chart abbreviations | 72 |
| 6 Patient intake form re Ronwin, 8/28/01, updated 10/27/03 | 73 |
| 7 Anatomical illustration of the shoulder, not dated | 81 |

(Attached to original and Mr. Pilkington's copy transcript.)

REQUESTED PORTIONS OF TESTIMONY: PAGE

(None.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:

(None.)




WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:

(Deposition Exhibits 1 and 2 were marked.)

JANE SERVI, M.D.,

having been first duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MR. PILKINGTON:

Q. Good morning, Doctor.
A. Good morning.
Q. My name is Jeff Pilkington, and I'm an attorney out of Denver, Colorado with the law firm of Davis Graham & Stubbs. I represent Baycol -- Bayer. Do you understand that?
A. Yes, thank you.
Q. Bayer made Baycol, which was voluntarily removed from the market back in 2001. Okay?
A. Okay.
Q. Have you ever had your deposition taken before?
A. Yes.
Q. About how many times?
A. Probably five.
Q. I want to make sure that we're on the same page this morning, so I'll lay out some basic ground



rules that we need to follow. First of all, I'm going to ask you a series of questions to better understand your care and treatment of Mr. Ronwin. Do you understand that?
A. Yes.
Q. This is my only opportunity to talk to you about your care and treatment of him. Do you understand that as well?
A. I do.
Q. The next time I'll talk to you is probably at the trial of this case. Okay?
A. Okay.
Q. Many of the questions that I ask you will relate to medical terms and medical terminology, so would you kindly explain in lay terms what some of the more complicated medical terms and concepts are?
A. I would be happy to do so.
Q. If you don't understand a question that I ask you, please ask me to restate or rephrase it.
A. Okay.
Q. I'll be happy to do so. Similarly, you understand you've taken an oath to tell the truth?
A. I do.
Q. That's the same oath that you would take if you were to testify live in person before the judge and



04611547-742a-4e96-903b-ddf0b207a131

FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:42AM P2

answer?
MR. PILKINGTON: (Shook his head.)
THE DEPONENT: Thank you.
Q. (BY MR. RONWIN) Now, you said you took chemistry, right?
A. I took chemistry.
Q. And what is fluorene?
A. Fluorene is one of the chemical elements on the periodical chart.
Q. I see. Do you know -- let's see. I want to phrase it this way: Is fluorene the most active element known to man?
A. I could not answer that question. It might be a more appropriate question for a chemist.
Q. I see. Well, do you know how glass is etched?
A. I do not know how glass is etched.
Q. I see. Okay. Did you know that there's a fluorene atom in the Baycol molecule?
A. I don't prescribe Baycol. I don't know the chemical makeup of Baycol. I couldn't even start to answer that question.
Q. I see. You agree that it -- Baycol tears up muscle cells in various degrees?
MR. PILKINGTON: Objection, form and



foundation.
A. Baycol has been, from my knowledge -- again, I don't prescribe it. From my knowledge, it has been associated in some people with rhabdomyolysis.
Q. (BY MR. RONWIN) Well, to get the -- in rhabdomyolysis, to get the proteins and enzymes pouring into the bloodstream from the -- from the muscle cells, then the muscle cells must have been torn open; is that right?
MR. PILKINGTON: Same objections.
A. To my understanding, there is destruction of the cell. How that occurs is beyond my medical expertise.
Q. (BY MR. RONWIN) All right. So if Baycol can -- can -- but you don't know how it does that, it tears up the cells, is what you're saying?
A. No. Again, that may be a better question asked to a chemist, a pharmaceutical, a research person.
Q. Okay.
A. That's not the type of medicine that we practice from day to day in our office.
Q. Okay. So it's not within your knowledge?
A. It is not within my expertise.
Q. But you do know -- do you know whether the composition of a cell is basically an organization of



molecules?
A. That is beyond my --
MR. PILKINGTON: Same objections.
A. -- ability to answer.
MR. PILKINGTON: Same objections.
Q. (BY MR. RONWIN) Well, the cell has an outer cover in the animal kingdom, all right? It's not a wall, like in the plant kingdom, but it's a cover, right, a membrane. Is the membrane made up of chemicals?
A. That's --
MR. PILKINGTON: Same objections, form and foundation.
A. That's beyond my medical expertise.
Q. (BY MR. RONWIN) I see. All right. What else is a tendon made up of, in addition to cells?
MR. PILKINGTON: Form and foundation.
A. I think that perhaps Dr. Knauer might be able to better explain that than myself.
Q. (BY MR. RONWIN) I see.
A. Again, in our area of medicine, we don't always go down to the molecular level. That portion of our training occurred way beyond before we became clinicians and were actually dealing with evaluation and treatment and -- of our patients. So for me to go back to that cellular level, I would be grasping and may give



you inaccurate information.
Q. Okay. But would you agree that the entire human body, as any other living entity, consists of chemicals?
MR. PILKINGTON: Same objections.
A. Do I need to answer that? Can I defer that question? It -- we are organic.
Q. (BY MR. RONWIN) Well, organic is a special type of chemical, meaning it has carbon atoms in it, which, of course, there are lots of them in the body. But just chemicals in general put together into various molecules, and they in turn form the cells, and that -- they in turn form the various anatomical parts, and they in turn form the body --
MR. PILKINGTON: Objection --
Q. (BY MR. RONWIN) -- is that right?
MR. PILKINGTON: Objection, form and foundation.
A. I'm going to defer on that.
Q. (BY MR. RONWIN) You're going to what?
A. I'm not going to answer that question. That's beyond my -- my medical expertise to answer that within correct reason. I'm -- I'm not sure, in terms of chemicals and the -- the way that you are using that term, as if that's what we were made up of. So I would



04611547-742a-4e96-903b-ddf0b207a131

defer that to an organic chemist.
Q. I see. Well, even -- even if you're not an organic chemist or a biochemist, you've taking chemistry, and you've certainly taken biochemistry, didn't you, in the -- in medical school?
A. Yes, I have. Actually, it's in undergrad that you take your inorganic and organic chemistry. It's before you get to medical school.
Q. Right. And then in medical school you took biochemistry; is that right?
A. No.
Q. You didn't?
A. In undergrad I took physical chemistry, P. chem.
Q. Oh, physical.
A. You don't take biochemistry.
Q. You never took biochemistry?
A. I took P. chem., which I believe would be an analogy to biochemistry.
Q. Well, there's --
A. But that is all done as undergrad. It's not done in medical school. Then your area of expertise will then branch. If you become a chemist, you will take other types of chemistry and go down to the cellular level.



When you go to medical school, then you start to develop into organ, organ systems, and then we develop into how we are going to look for medical conditions and treatments for them. So many times at -- at our level of being a physician, we are no longer dealing with chemicals and cellular membranes and all of the carbons that make up a body.
Q. You're dealing --
A. That goes into our research branch of medicine.
Q. Your overall work deals with -- with organs and functional anatomical parts of a body; is that right?
A. We deal with evaluation of patient complaints and treatment. I am a specialist who deals with sports medicine problems --
Q. Yeah.
A. -- and musculoskeletal problems --
Q. Yes.
A. -- on a macrolevel as a person presenting to me with a complaint.
Q. But that doesn't prevent those muscles that you just spoke about, muscular problems, it doesn't prevent that from being basically chemical in nature.
A. I'm not sure how that relates to my area of medicine.



Q. I see.
MR. RONWIN: Well, okay. You want to go see your patients, then?
THE DEPONENT: Thank you.

EXAMINATION

BY MR. PILKINGTON:
Q. Doctor, I just have a couple of follow-up questions.
A. Absolutely.
Q. One, a point of clarification. I believe you testified about your October 31st office note. And it reads here, "He states that his pain nearly resolved with this injection, but over the past month he has had increased symptomology." By "this injection," are you referring to your injection of September 4th of 2001?
A. It's referring to September 4th of 2001. His pain nearly went away, didn't completely go away, and has since increased again.
Q. And the reason I ask that question, I think you testified that it referred to an injection that he'd had before he visited your office, so --
A. Yes, there were -- well, there were two questions, I think. I think you asked the same question about the injection that was incurred before he saw me, and it sounds like a very similar thing happened, where



he had resolution and then recurrence, or near-resolution and reoccurrence.
Q. But your October 31st note about "his pain nearly resolved" was in reference to your injection in September of '01, correct?
A. That's correct.
Q. And finally, Doctor, there was a long line of questioning about an MRI and a closed MRI and an open MRI. Do you remember that questioning?
A. I do.
Q. Regardless of whether an MRI was ordered or not, did you continually offer to Mr. Ronwin an arthrogram?
A. I believe that we -- in the first line of offering of an MRI, he reflected the fact that he had a bad experience with closed areas, and we offered an arthrogram at that point. I believe in subsequent visits an MRI was offered.
And so it would be inferred, again, that if he said, "I don't want an MRI, but an arthrogram would be okay," that that was an option. But it was not specifically stated until, again, my last visit with him prior to his being referred over to Dr. Knauer.
Again, he brought up the fact, I believe, that he wasn't -- he wasn't happy with going through a



04611547-742a-4e96-903b-ddf0b207a131

# Adverse Event Reporting System (AERS)

# Freedom Of Information (FOI) Report

**Selections for:** CERIVASTATIN
BAYCOL

**From:** 01-NOV-1997 **To:** Present

Disclaimer: The information contained in these reports has not been scientifically or otherwise verified as to a cause and effect relationship and cannot be used to estimate the incidence of adverse drug reactions.

EXH. 7

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms in Cases**

| MedDRA Preferred Term Reaction | Count | %Rpts |
|---|---|---|
| RHABDOMYOLYSIS | 8121 | 38.6% |
| PAIN | 4501 | 21.4% |
| ANXIETY | 4054 | 19.3% |
| RENAL DISORDER | 3603 | 17.1% |
| MYALGIA | 3471 | 16.5% |
| RENAL FAILURE | 3180 | 15.1% |
| ASTHENIA | 2917 | 13.9% |
| HEPATOCELLULAR DAMAGE | 2278 | 10.8% |
| RENAL IMPAIRMENT | 1839 | 8.7% |
| INJURY | 1795 | 8.5% |
| DEPRESSION | 1710 | 8.1% |
| PAIN IN EXTREMITY | 1485 | 7.1% |
| BLOOD CREATINE PHOSPHOKINASE INCREASED | 1262 | 6.0% |
| NERVOUS SYSTEM DISORDER | 1207 | 5.7% |
| FATIGUE | 1192 | 5.7% |
| BACK PAIN | 1188 | 5.6% |
| DIFFICULTY IN WALKING | 1123 | 5.3% |
| OBSTRUCTIVE UROPATHY | 1114 | 5.3% |
| ARTHRALGIA | 1097 | 5.2% |
| MUSCLE INJURY | 1046 | 5.0% |
| NAUSEA | 994 | 4.7% |
| MUSCLE SPASMS | 993 | 4.7% |
| MUSCULAR WEAKNESS | 961 | 4.6% |
| CONDUCTION DISORDER | 938 | 4.5% |
| MALAISE | 906 | 4.3% |
| HEPATIC FUNCTION ABNORMAL | 883 | 4.2% |
| RENAL TUBULAR NECROSIS | 815 | 3.9% |
| CONVULSION | 806 | 3.8% |
| MUSCLE DISORDER | 797 | 3.8% |
| ORGAN FAILURE | 788 | 3.7% |
| RENAL FAILURE ACUTE | 716 | 3.4% |
| CHROMATURIA | 691 | 3.3% |
| VOMITING | 668 | 3.2% |
| POLYTRAUMATISM | 667 | 3.2% |
| MYOPATHY | 665 | 3.2% |
| LIVER FUNCTION TEST ABNORMAL | 635 | 3.0% |
| CHEST PAIN | 604 | 2.9% |
| DYSPNOEA | 604 | 2.9% |
| PYREXIA | 539 | 2.6% |
| EMOTIONAL DISTRESS | 531 | 2.5% |
| DIZZINESS | 522 | 2.5% |
| HEADACHE | 476 | 2.3% |
| FALL | 418 | 2.0% |
| MYOCARDIAL INFARCTION | 415 | 2.0% |
| DIALYSIS | 376 | 1.8% |
| MUSCLE ATROPHY | 372 | 1.8% |
| DEHYDRATION | 363 | 1.7% |
| HYPOAESTHESIA | 358 | 1.7% |
| MYOSITIS | 336 | 1.6% |
| DRUG INTERACTION | 324 | 1.5% |
| DIARRHOEA | 313 | 1.5% |
| WEIGHT DECREASED | 301 | 1.4% |
| LIVER DISORDER | 287 | 1.4% |

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms In Cases**

| MedDRA Preferred Term Reaction | Count | %Rpts |
|---|---|---|
| OEDEMA PERIPHERAL | 286 | 1.4% |
| ABDOMINAL PAIN | 279 | 1.3% |
| INSOMNIA | 271 | 1.3% |
| MYASTHENIC SYNDROME | 263 | 1.2% |
| CARDIAC DISORDER | 262 | 1.2% |
| ASPARTATE AMINOTRANSFERASE INCREASED | 258 | 1.2% |
| PARAESTHESIA | 251 | 1.2% |
| CONDITION AGGRAVATED | 247 | 1.2% |
| HEPATITIS | 245 | 1.2% |
| ALANINE AMINOTRANSFERASE INCREASED | 239 | 1.1% |
| RENAL INJURY | 232 | 1.1% |
| TENDERNESS | 230 | 1.1% |
| ELECTROMECHANICAL DISSOCIATION | 220 | 1.0% |
| GAIT DISTURBANCE | 218 | 1.0% |
| HYPERTENSION | 209 | 1.0% |
| CEREBROVASCULAR ACCIDENT | 208 | 1.0% |
| URINARY TRACT INFECTION | 194 | 0.9% |
| ABDOMINAL PAIN UPPER | 193 | 0.9% |
| HAEMATURIA | 193 | 0.9% |
| — VISION BLURRED | 190 | 0.9% |
| NECK PAIN | 188 | 0.9% |
| SYNCOPE | 183 | 0.9% |
| — BALANCE DISORDER | 179 | 0.9% |
| MOVEMENT DISORDER | 174 | 0.8% |
| PNEUMONIA | 164 | 0.8% |
| BLOOD CREATININE INCREASED | 160 | 0.8% |
| HAEMODIALYSIS | 160 | 0.8% |
| CARDIAC FAILURE CONGESTIVE | 156 | 0.7% |
| WEIGHT INCREASED | 156 | 0.7% |
| CONSTIPATION | 140 | 0.7% |
| DEATH | 134 | 0.6% |
| PRURITUS | 134 | 0.6% |
| ATROPHY | 131 | 0.6% |
| HYPERHIDROSIS | 131 | 0.6% |
| TREMOR | 129 | 0.6% |
| BLOOD URINE PRESENT | 128 | 0.6% |
| RESPIRATORY FAILURE | 128 | 0.6% |
| MENTAL DISORDER | 127 | 0.6% |
| — NEUROPATHY PERIPHERAL | 125 | 0.6% |
| OSTEOARTHRITIS | 123 | 0.6% |
| — VISUAL DISTURBANCE | 122 | 0.6% |
| CARDIAC FAILURE | 121 | 0.6% |
| JAUNDICE | 121 | 0.6% |
| DECREASED ACTIVITY | 120 | 0.6% |
| JOINT STIFFNESS | 120 | 0.6% |
| HEPATIC FAILURE | 120 | 0.6% |
| COUGH | 117 | 0.6% |
| PALPITATIONS | 114 | 0.5% |
| BLOOD PRESSURE INCREASED | 113 | 0.5% |
| BLOOD UREA INCREASED | 112 | 0.5% |
| VERTIGO | 112 | 0.5% |
| DERMATITIS | 112 | 0.5% |
| ARTHRITIS | 111 | 0.5% |

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms in Cases**

| MedDRA Preferred Term Reaction | Count | %Rpts |
|---|---|---|
| FEELING ABNORMAL | 111 | 0.5% |
| CARDIAC ARREST | 108 | 0.5% |
| DIABETES MELLITUS | 108 | 0.5% |
| DECREASED APPETITE | 108 | 0.5% |
| HEPATIC ATROPHY | 108 | 0.5% |
| NERVE INJURY | 108 | 0.5% |
| ANAEMIA | 107 | 0.5% |
| URINE ABNORMALITY | 107 | 0.5% |
| PERIPHERAL VASCULAR DISORDER | 106 | 0.5% |
| ARTHROPATHY | 105 | 0.5% |
| INFLUENZA LIKE ILLNESS | 105 | 0.5% |
| ARRHYTHMIA | 104 | 0.5% |
| DYSPEPSIA | 103 | 0.5% |
| ANGINA PECTORIS | 102 | 0.5% |
| SEPSIS | 102 | 0.5% |
| RASH | 98 | 0.5% |
| DYSURIA | 97 | 0.5% |
| DYSPHAGIA | 96 | 0.5% |
| SINUSITIS | 96 | 0.5% |
| HEART RATE INCREASED | 95 | 0.5% |
| MEMORY IMPAIRMENT | 95 | 0.5% |
| HYPERKALAEMIA | 94 | 0.4% |
| TRANSIENT ISCHAEMIC ATTACK | 94 | 0.4% |
| CORONARY ARTERY DISEASE | 92 | 0.4% |
| PANCREATITIS | 92 | 0.4% |
| RENAL PAIN | 89 | 0.4% |
| HYPOTENSION | 88 | 0.4% |
| SLEEP DISORDER | 88 | 0.4% |
| BLOOD GLUCOSE INCREASED | 87 | 0.4% |
| PARALYSIS | 87 | 0.4% |
| LOSS OF CONSCIOUSNESS | 87 | 0.4% |
| SWELLING | 87 | 0.4% |
| ANOREXIA | 86 | 0.4% |
| HEPATIC TRAUMA | 86 | 0.4% |
| ATRIAL FIBRILLATION | 86 | 0.4% |
| KIDNEY INFECTION | 85 | 0.4% |
| BURNING SENSATION | 84 | 0.4% |
| BLOOD LACTATE DEHYDROGENASE INCREASED | 83 | 0.4% |
| PHARYNGOLARYNGEAL PAIN | 83 | 0.4% |
| PULMONARY OEDEMA | 82 | 0.4% |
| SPINAL OSTEOARTHRITIS | 82 | 0.4% |
| DRUG INEFFECTIVE | 81 | 0.4% |
| JOINT SWELLING | 81 | 0.4% |
| FLATULENCE | 80 | 0.4% |
| BLOOD CHOLESTEROL INCREASED | 77 | 0.4% |
| CIRCULATORY COLLAPSE | 76 | 0.4% |
| CONTUSION | 74 | 0.4% |
| GASTROINTESTINAL DISORDER | 74 | 0.4% |
| POLLAKIURIA | 74 | 0.4% |
| OEDEMA | 74 | 0.4% |
| MYOGLOBINURIA | 73 | 0.3% |
| BLOOD TRIGLYCERIDES INCREASED | 72 | 0.3% |
| BONE PAIN | 72 | 0.3% |



06-Jul-2006 10:29 AM

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms in Cases**

| MedDRA Preferred Term Reaction | Count | %Rpts |
|---|---|---|
| CARDIOMYOPATHY | 72 | 0.3% |
| CONFUSIONAL STATE | 71 | 0.3% |
| ERECTILE DYSFUNCTION | 71 | 0.3% |
| OLIGURIA | 71 | 0.3% |
| HEPATIC ENZYME INCREASED | 68 | 0.3% |
| CHOLELITHIASIS | 66 | 0.3% |
| RED BLOOD CELL SEDIMENTATION RATE INCREASED | 66 | 0.3% |
| SUDDEN DEATH | 66 | 0.3% |
| BLOOD BILIRUBIN INCREASED | 65 | 0.3% |
| HYPERTONIA | 65 | 0.3% |
| URINARY TRACT OBSTRUCTION | 65 | 0.3% |
| EMOTIONAL DISORDER | 64 | 0.3% |
| WHITE BLOOD CELL COUNT INCREASED | 64 | 0.3% |
| STRESS | 64 | 0.3% |
| HAEMORRHAGE | 64 | 0.3% |
| — VISUAL ACUITY REDUCED | 63 | 0.3% |
| CARDIOMEGALY | 62 | 0.3% |
| CHRONIC OBSTRUCTIVE PULMONARY DISEASE | 62 | 0.3% |
| HEPATOMEGALY | 62 | 0.3% |
| GASTROINTESTINAL HAEMORRHAGE | 62 | 0.3% |
| NEPHROLITHIASIS | 62 | 0.3% |
| RENAL FAILURE CHRONIC | 62 | 0.3% |
| DYSSTASIA | 61 | 0.3% |
| HYPERLIPIDAEMIA | 61 | 0.3% |
| POLYMYOSITIS | 61 | 0.3% |
| TACHYCARDIA | 60 | 0.3% |
| THROMBOCYTOPENIA | 60 | 0.3% |
| FLUSHING | 59 | 0.3% |
| INTERVERTEBRAL DISC PROTRUSION | 59 | 0.3% |
| PLEURAL EFFUSION | 59 | 0.3% |
| ABDOMINAL DISTENSION | 58 | 0.3% |
| URINARY INCONTINENCE | 58 | 0.3% |
| MYOGLOBIN BLOOD INCREASED | 58 | 0.3% |
| GASTRITIS | 58 | 0.3% |
| LABORATORY TEST ABNORMAL | 57 | 0.3% |
| ANGINA UNSTABLE | 56 | 0.3% |
| RECTAL HAEMORRHAGE | 56 | 0.3% |
| TINNITUS | 56 | 0.3% |
| LETHARGY | 56 | 0.3% |
| CHILLS | 56 | 0.3% |
| CARDIOVASCULAR DISORDER | 55 | 0.3% |
| CHEST DISCOMFORT | 55 | 0.3% |
| COMA | 55 | 0.3% |
| ILL-DEFINED DISORDER | 55 | 0.3% |
| ALOPECIA | 54 | 0.3% |
| BRADYCARDIA | 54 | 0.3% |
| MUSCULOSKELETAL STIFFNESS | 53 | 0.3% |
| BLOOD POTASSIUM INCREASED | 52 | 0.2% |
| HAEMATOCRIT DECREASED | 52 | 0.2% |
| MUSCLE RIGIDITY | 52 | 0.2% |
| HAEMOGLOBIN DECREASED | 52 | 0.2% |
| CARPAL TUNNEL SYNDROME | 51 | 0.2% |
| ANURIA | 50 | 0.2% |

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms in Cases**

| MedDRA Preferred Term Reaction | Count | %Rpts |
|---|---|---|
| FACE OEDEMA | 50 | 0.2% |
| INFLAMMATION | 50 | 0.2% |
| HEPATIC STEATOSIS | 49 | 0.2% |
| PHARYNGITIS | 49 | 0.2% |
| TENDONITIS | 49 | 0.2% |
| RENAL CYST | 49 | 0.2% |
| OBSTRUCTION | 48 | 0.2% |
| BRONCHITIS | 47 | 0.2% |
| PANCREATITIS ACUTE | 47 | 0.2% |
| MULTI-ORGAN FAILURE | 47 | 0.2% |
| DYSPHONIA | 47 | 0.2% |
| CHRONIC FATIGUE SYNDROME | 47 | 0.2% |
| ANGIOPATHY | 46 | 0.2% |
| CYSTITIS | 46 | 0.2% |
| GASTROOESOPHAGEAL REFLUX DISEASE | 46 | 0.2% |
| VENTRICULAR EXTRASYSTOLES | 46 | 0.2% |
| NIGHT SWEATS | 46 | 0.2% |
| NERVOUSNESS | 46 | 0.2% |
| ARTERIOSCLEROSIS | 45 | 0.2% |
| DYSPNOEA EXERTIONAL | 45 | 0.2% |
| NASOPHARYNGITIS | 45 | 0.2% |
| INFECTION | 45 | 0.2% |
| HYPERCHOLESTEROLAEMIA | 45 | 0.2% |
| CARDIO-RESPIRATORY ARREST | 44 | 0.2% |
| ERYTHEMA | 44 | 0.2% |
| FIBROMYALGIA | 44 | 0.2% |
| BLOOD CREATINE PHOSPHOKINASE MB INCREASED | 43 | 0.2% |
| RHINITIS | 43 | 0.2% |
| MYOCARDIAL ISCHAEMIA | 42 | 0.2% |
| COORDINATION ABNORMAL | 41 | 0.2% |
| BENIGN PROSTATIC HYPERPLASIA | 40 | 0.2% |
| UPPER RESPIRATORY TRACT INFECTION | 40 | 0.2% |
| — TENDON DISORDER | 40 | 0.2% |
| STAPHYLOCOCCAL INFECTION | 40 | 0.2% |
| SOMNOLENCE | 40 | 0.2% |
| SLEEP APNOEA SYNDROME | 40 | 0.2% |
| MOBILITY DECREASED | 40 | 0.2% |
| MITRAL VALVE INCOMPETENCE | 40 | 0.2% |
| MEDICATION ERROR | 40 | 0.2% |
| GAMMA-GLUTAMYLTRANSFERASE INCREASED | 40 | 0.2% |
| CATARACT | 40 | 0.2% |
| AMYOTROPHIC LATERAL SCLEROSIS | 39 | 0.2% |
| FLUID RETENTION | 39 | 0.2% |
| — POLYNEUROPATHY | 39 | 0.2% |
| PULMONARY EMBOLISM | 39 | 0.2% |
| HEART RATE IRREGULAR | 39 | 0.2% |
| BLOOD ALKALINE PHOSPHATASE INCREASED | 38 | 0.2% |
| ACCIDENT | 37 | 0.2% |
| ELECTROCARDIOGRAM ABNORMAL | 37 | 0.2% |
| HYPOKALAEMIA | 37 | 0.2% |
| C-REACTIVE PROTEIN INCREASED | 37 | 0.2% |
| POST PROCEDURAL COMPLICATION | 37 | 0.2% |
| URINARY TRACT DISORDER | 37 | 0.2% |



06-Jul-2006 10:29 AM

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms In Cases**

| MedDRA Preferred Term Reaction | Count | % Rpts |
|---|---|---|
| HYPERSENSITIVITY | 36 | 0.2% |
| SCIATICA | 36 | 0.2% |
| SPINAL COLUMN STENOSIS | 36 | 0.2% |
| URTICARIA | 36 | 0.2% |
| ASTHMA | 35 | 0.2% |
| BURSITIS | 35 | 0.2% |
| DYSGEUSIA | 35 | 0.2% |
| RESPIRATORY DISORDER | 35 | 0.2% |
| RENAL COLIC | 35 | 0.2% |
| BLOOD PRESSURE DECREASED | 35 | 0.2% |
| DIVERTICULUM | 34 | 0.2% |
| HIATUS HERNIA | 34 | 0.2% |
| ECCHYMOSIS | 34 | 0.2% |
| MUSCLE TWITCHING | 34 | 0.2% |
| ROTATOR CUFF SYNDROME | 34 | 0.2% |
| TENDON RUPTURE | 34 | 0.2% |
| PROTEINURIA | 34 | 0.2% |
| DIVERTICULITIS | 33 | 0.2% |
| EYE DISORDER | 33 | 0.2% |
| RASH ERYTHEMATOUS | 33 | 0.2% |
| SPEECH DISORDER | 33 | 0.2% |
| EAR PAIN | 33 | 0.2% |
| LUNG DISORDER | 32 | 0.2% |
| THROMBOSIS | 32 | 0.2% |
| SENSATION OF HEAVINESS | 32 | 0.2% |
| HYPOTHYROIDISM | 31 | 0.1% |
| RED BLOOD CELL COUNT DECREASED | 31 | 0.1% |
| OSTEOPOROSIS | 31 | 0.1% |
| LEUKOCYTOSIS | 31 | 0.1% |
| HYPOTONIA | 31 | 0.1% |
| ABASIA | 30 | 0.1% |
| HYPERGLYCAEMIA | 30 | 0.1% |
| SENSORY LOSS | 30 | 0.1% |
| URINARY RETENTION | 30 | 0.1% |
| POLYMYALGIA RHEUMATICA | 30 | 0.1% |
| OESOPHAGITIS | 30 | 0.1% |
| INTERVERTEBRAL DISC DEGENERATION | 30 | 0.1% |
| INFLUENZA | 30 | 0.1% |
| ATELECTASIS | 30 | 0.1% |
| DRUG EFFECT DECREASED | 30 | 0.1% |
| ABDOMINAL DISCOMFORT | 29 | 0.1% |
| LYMPHADENOPATHY | 29 | 0.1% |
| GROIN PAIN | 29 | 0.1% |
| GOUT | 29 | 0.1% |
| DIABETIC NEUROPATHY | 29 | 0.1% |
| DIABETES MELLITUS INADEQUATE CONTROL | 29 | 0.1% |
| DEEP VEIN THROMBOSIS | 29 | 0.1% |
| CYST | 29 | 0.1% |
| CORONARY ARTERY OCCLUSION | 29 | 0.1% |
| CARDIAC MURMUR | 29 | 0.1% |
| BLOOD AMYLASE INCREASED | 29 | 0.1% |
| CHOLESTASIS | 28 | 0.1% |
| FAECES DISCOLOURED | 28 | 0.1% |





FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:51AM P11

**FDA - Adverse Event Reporting System (AERS)**
**Freedom Of Information (FOI) Report**
**Standard Report - All Preferred Terms in Cases**

**Summary Report for FOI Selections:**

**From:** 01-NOV-1997 **To:** Present

Selection by inexact search of active ingredient:
CERIVASTATIN%

Selection by inexact search of Tradename/Verbatim:
BAYCOL%

Total Individual Safety Reports: 21,048

FROM :Office Of The Ombudsman FAX NO. :3014808039 Oct. 16 2006 04:56PM P1

OFFICE OF THE OMBUDSMAN
OFFICE OF THE COMMISSIONER
FOOD AND DRUG ADMINISTRATION
U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES
5600 FISHERS LANE, HF-7
ROCKVILLE, MD 20857

## FACSIMILE TRANSMISSION RECORD

8 Number of Pages (Including Coversheet)

To: Dr. Ronwin

FAX: 970-224-3838 Voice: 970-221-3837

THIS DOCUMENT IS INTENDED ONLY FOR THE USE OF THE PARTY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND PROTECTED FROM DISCLOSURE UNDER APPLICABLE LAW. If you are not the addressee, or a person authorized to deliver the document to the addressee, you are hereby notified that any review, disclosure, dissemination, copying, or other action based on the content of this communication is not authorized. If you have received this document in error, please immediately notify us by telephone and return it to us at the above address by mail. Thank you.

FROM: Laurie Lenkel
Office of the Ombudsman Voice: (301) 827-3390
FAX: (301) 480-8039

DATE: October 16, 2006

MESSAGE:

I printed off just one of the links. If you see another link that looks interesting I will print that off as well.
I hope this information is useful.

LL

EXH. 8

NOTE: If you do not receive a legible document, or do not receive all of the pages, please telephone us immediately at the voice number above.

FROM :EDWARD RONWIN FAX NO. :970-224-3838 Dec. 11 2006 10:53AM P13

U.S. Food and Drug Administration



# Adverse Event Reporting System (AERS)

The Adverse Event Reporting System (AERS) is a computerized information database designed to support the FDA's post-marketing safety surveillance program for all approved drug and therapeutic biologic products. The ultimate goal of AERS is to improve the public health by providing the best available tools for storing and analyzing safety reports.

The FDA receives adverse drug reaction reports from manufacturers as required by regulation. Health care professionals and consumers send reports voluntarily through the MedWatch program. These reports become part of a database. The structure of this database is in compliance with the international safety reporting guidance (ICH E2B) issued by the International Conference on Harmonisation. The guidance describes the content and format for the electronic submission of reports from manufacturers. FDA codes all reported adverse events using a standardized international terminology, MedDRA (the Medical Dictionary for Regulatory Activities). Among AERS system features are: the on-screen review of reports; searching tools; and various output reports. FDA staff use reports from AERS in conducting postmarketing drug surveillance and compliance activities and in responding to outside requests for information.

The reports in AERS are evaluated by clinical reviewers in the Center for Drug Evaluation and Research (CDER) and the Center for Biologics Evaluation and Research (CBER) to detect safety signals and to monitor drug safety. They form the basis for further epidemiological studies when appropriate. As a result, the FDA may take regulatory actions to improve product safety and protect the public health, such as updating a product's labeling information, sending out a "Dear Health Care Professional" letter, or re-evaluating an approval decision.

- **Latest Quarterly Data Files from the AERS Database** (last four quarters)
- **Older Quarterly Data Files from the AERS Database**
- **MedWatch**: The FDA Safety Information and Adverse Event Reporting Program
  The MedWatch page Mandatory Reporting by Drug/Biologics Manufacturers, Distributors, and Packers contains information about the following:
  - Mandatory Reporting Form and Instructions (FDA 3500A)
  - International Conference on Harmonisation of Technical Requirements for Registration of Pharmaceuticals for Human Use (ICH)
  - Regulations Related to Postmarketing Safety Reporting
  - Guidance for Industry
  - Guidance for FDA Field Staff
  - MedWatch to Manufacturer Program (MMP)

Adverse Event Reporting System

- Electronic Submission Postmarketing Safety Reports - Pilot Program
- Federal Register Publications Related to Postmarketing Reporting

Back to Top Back to Drug Information

Date created: August 7, 2002; Updated: July 29, 2005



FDA/Center for Drug Evaluation and Research

CHEMICAL & ENGINEERING NEWS
1155—16th St., N.W., Washington, DC 20036
(202) 872-4600 or (800) 227-5558

EDITOR-IN-CHIEF: Rudy M. Baum
DEPUTY EDITOR-IN-CHIEF: Pamela S. Zurer
MANAGING EDITOR: A. Maureen Rouhi

ART DIRECTORS: Nathan Becker, Robin L. Braverman
ASSOCIATE DESIGNER: Yang H. Ku
STAFF ARTIST: Monica C. Gilbert
SENIOR CORRESPONDENT: Lois R. Ember
NEWS EDITOR: William G. Schulz
EDITOR-AT-LARGE: Michael Heylin
SENIOR ADMINISTRATIVE OFFICER: Marvel A. Wills
ADMINISTRATIVE ASSISTANT: Marilyn Caracciolo

BUSINESS
Michael McCoy, Assistant Managing Editor. NORTHEAST: (732) 906-8300. Lisa M. Jarvis (Associate Editor), Rick Mullin (Senior Editor), Marc S. Reisch (Senior Correspondent), William J. Storck (Senior Correspondent), Alexander H. Tullo (Associate Editor), Rachel [illegible] (Administrative Assistant). HONG KONG: 852 2984 9072. Jean-François Tremblay (Bureau Head). LONDON: 44 20 8870 4884. Patricia L. Short (Senior Correspondent)

GOVERNMENT & POLICY
David J. Hanson, Assistant Managing Editor. WASHINGTON: (202) 872-4495. Glenn Hess (Senior Editor), Bette Hileman (Senior Editor), Cheryl Hogue (Senior Editor), Jeffrey W. Johnson (Senior Editor), Susan R. Morrissey (Associate Editor)

SCIENCE/TECHNOLOGY/EDUCATION
Duren Dagani, Assistant Managing Editor (Washington). BOSTON: (617) 395-4163. Amanda T. Yarnell, Deputy Assistant Managing Editor. WASHINGTON: (202) 872-6214. Ivan Amato (Senior Editor), Celia Henry Arnaud (Senior Editor), Stuart A. Borman (Senior Correspondent), Rebecca [illegible] (Intern), Sarah Everts (Associate Editor), Bethany Halford (Associate Editor), Stephen K. Ritter (Senior Editor), Sophie L. Rovner (Senior Editor). CHICAGO: (847) 679-1156. Mitch Jacoby (Senior Editor). HOUSTON: (281) 486-3900. Ann M. Thayer (Senior Correspondent). WEST COAST: (510) [illegible]. Elizabeth K. Wilson (Senior Editor). LONDON: [illegible] 81 082. Michael Freemantle (Senior Correspondent)

ACS NEWS & SPECIAL FEATURES
Linda Raber, Assistant Managing Editor. Corinne A. Marasco (Associate Editor), Rachel A. [illegible] (Assistant Editor), Linda Wang (Assistant Editor)

EDITING & PRODUCTION
Robin M. Giroux, Assistant Managing Editor. Janet S. Dodd (Senior Editor), Kimberly R. [illegible] (Assistant Editor), Arlene Goldberg-Gist (Senior Editor), Melissa A. Kunnell (Assistant Editor), Stephen [illegible] Trzaska (Associate Editor)

C&EN ONLINE
Melody Voith, Editor. Tchad K. Blair (Visual Designer), Luis A. Carrillo (Production Manager), Rachel Sheremeta Pepling (Associate Editor), William B. Shepherd (Manager, [illegible])

PRODUCTION & IMAGING
Renee L. Schlottman, Lead Digital Production Specialist. Krystal E. King (Senior Digital Production Associate)

SALES & MARKETING
Elise Swinehart, Manager. Claire Pacciolli Jarrett (Marketing Manager)

ADVISORY BOARD: Magid Abou-Gharbia, Kim Baldridge, Lukas Braunschweiler, Gary Calabrese, [illegible] J. Carey, F. Fleming Crim, Martin E. [illegible] Doyle, Robin L. Garrell, Richard M. Gross, Rudolf [illegible] L. Louis Hegedus, Nancy B. Jackson, [illegible] Kumar, Robert L. Lichter, Charles M. Lieber, [illegible] A. Loo, Eli Pearce, Peter Pollak, Marquita [illegible] Paul J. Reider, Sara J. Risch, Gregory H. [illegible] Alan Shaw, Kevan M. Shokat, [illegible] Wilhelm Stahl, Joel Tickner, Guy Villax, Frank Wicks

Published by the AMERICAN CHEMICAL SOCIETY
Madeleine Jacobs, Executive Director & CEO
Robert D. Bovenschulte, President, Publications Division

EDITORIAL BOARD: Gregg Baysinger (Chair); ACS Board of Directors Chair: James D. Burke; ACS President: E. Ann Nalley; Ned D. Heindel, Madeleine M. Joullie, Leah Solla, Peter J. Stang

Copyright 2006, American Chemical Society
Canadian GST Reg. No. R127571347

WWW.CEN-ONLINE.ORG

EDITOR'S PAGE

# The Future Of Medicine

THIS WEEK'S COVER STORY ON SYSTEMS biology provides a fascinating glimpse into the future of medicine (see page 17). It is a future of personalized medicine, with drugs tailored to treat specific populations of patients. It is a future in which medicine's focus will shift from disease treatment to health maintenance and disease prevention.

The cover story was written by Senior Editor Celia Henry Arnaud. In her lead, she writes: "Imagine going to a doctor's office. Your complete genome sequence, which provides a probabilistic prediction of your future health, is part of your medical file. To see how that genetic component is playing out and to obtain a snapshot of your current health status, your doctor orders a standard test of more than 2,000 proteins and metabolites. According to the results of those tests, your doctor recommends ways for you to maintain or improve your health through either medication or behavior modification.

"Sounds futuristic? Perhaps, but it's not as far off as it seems, and systems biology will help make it a reality."

At its core, systems biology represents a shift from a reductionist approach to biology—studying genes and proteins one at a time to understand their function—to an embrace of the elemental complexity of biological systems. As Arnaud writes, "The goal of systems biology is to combine molecular information of various types in models that describe and predict function at the cellular, tissue, organ, and even whole-organism levels."

Many diseases, such as obesity, diabetes, and many heart diseases, will only be successfully treated with a systems approach, a number of researchers Arnaud interviewed point out. Joseph H. Nadeau, chairman of the genetics department at Case Western Reserve University School of Medicine, told Arnaud, "Look at all the things that are problematic, compromised, or dysfunctional in an obese individual. To think that we can go into a laboratory and synthesize some drug that will fix all the problems and not cause any adverse side effects, the premise is goofy."

But Nadeau also noted that even diseases viewed as relatively simple, like cystic fibrosis or sickle cell anemia, both of which are caused by a single gene defect, are not as straightforward as once thought. "Other genes in the genome influence the age of onset, the severity, and the clinical associations," Nadeau said. "The biology of individuals with cystic fibrosis is telling us that it may be a simple genetic cause, but there are many systems properties that confound it."

Huge challenges remain before systems biology has a major impact on clinical practice, of course, and chemistry will play a major role in overcoming them. Currently, data are not being collected from enough patients to be able to determine the extent to which changes in genes, proteins, and other pathway components will actually be predictive of health and disease, Arnaud writes.

Another roadblock to advancing systems biology into the clinic is the lack of analytical technologies to make a broad range of measurements of biological molecules with high sensitivity at a low enough cost. H. Steven Wiley, director of the biomolecular systems initiative at Pacific Northwest National Laboratory, told Arnaud, "What you really want to do is take a drop of blood from a patient and look at every protein, every metabolite, everything that's in the blood."

Arnaud interviewed a number of scientists at universities, national labs, and companies who are working to develop just such analytical systems and the bioinformatics tools that will be able to handle the avalanche of data they will produce. One such scientist is James R. Heath, a chemistry professor at California Institute of Technology, who told Arnaud, "Finding molecules that have the same specificity for proteins that antibodies do, that can distinguish between slightly modified proteins versus unmodified ones, that are stable, that are relatively inexpensive to make, and that can be prepared in high throughput is a really tough chemical problem."

Moving systems biology from the powerful research tool it already is into the clinical setting is not going to happen overnight, but the progress Arnaud outlines in her story is remarkable. As Leroy E. Hood, cofounder and president of the Institute for Systems Biology in Seattle, told Arnaud, "Here's a model for medicine of the future."

Thanks for reading.

EXH.9

Rudy M. Baum

Editor-in-chief

Views expressed on this page are those of the author and not necessarily those of ACS.

Davis Graham & Stubbs LLP

November 2, 2006

Edward Ronwin
945 Rolland Moore Drive, L-2
Fort Collins, CO 80526

Re: *Edward Ronwin v. Bayer (MDL No. 1431)*

Dear Mr. Ronwin:

At Mr. Pilkington's instruction, the following is a summary of the information you requested regarding fees demanded and paid for deposition time:

1. Dr. Mark Keller - $2,000.
2. Dr. Sally Knauer - $3,000.
3. Dr. Jane Servi - $2,250.
4. Dr. Richard Torkelson - $1,000.
5. Dr. Eugene Wolfel - $2,000.
6. Dr. Kevin Deane - $500.
7. Dr. William Hiatt - $600.

As always, please call Jeff Pilkington if you have any questions or concerns.

Sincerely,

Deborah J. Werth
Paralegal to Jeffrey Pilkington
for
DAVIS GRAHAM & STUBBS LLP

EXH.10

Deborah J. Werth . 303 892 7218 . debbie.werth@dgslaw.com

1550 Seventeenth Street • Suite 500 • Denver, Colorado 80202 • 303 892 9400 • fax 303 893 1379
www.dgslaw.com