# Exhibit A

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

---

DEPOSITION OF: EDWARD RONWIN, Ph.D.
April 17, 2006

---

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : | Case No. 02-0200 |

TAKEN PURSUANT TO NOTICE on behalf of the Defendant Bayer Corporation at 419 Canyon Avenue, Suite 300, Fort Collins, Colorado 80521 at 9:04 a.m. before Sylvia E. Noneff, Registered Professional Reporter and Notary Public within Colorado.

WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:

EDWARD RONWIN, Ph.D.,

having been first duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MR. PILKINGTON:

Q. Good morning, Mr. Ronwin.
A. Good morning.
Q. We're here to take your deposition in your lawsuit against Bayer Corporation. Before this deposition began, we went over several issues, one of which included your request to have the deposition tape-recorded, right?
A. Right.
Q. And in fact, you have your tape recorder in the middle of the table here to have it recorded for your benefit; is that correct?
A. That's right.
Q. Mr. Ronwin, you're a lawyer?
A. Well, I'm not a practicing lawyer.
Q. Let me go over some basic ground rules of the deposition so we're on the same page. You understand that I'm here to ask you questions to better understand the facts and circumstances of your case?

A. Got a master's degree, yes, sir.
Q. A master's in chemistry?
A. Right.
Q. When did you receive that?
A. 1950.
Q. So you went straight from the City College of New York to get your master's at the University of Illinois?
A. Right.
Q. What did you do after you graduated from the University of Illinois?
A. I went to the University of California at Berkeley.
Q. What did you study there?
A. I studied biochemistry.
Q. And how does biochemistry differ from chemistry?
A. There really isn't, essentially, a great difference. But biochemistry involves a lot more organic chemistry than inorganic chemistry, although that's not an absolute. Both contribute. And the reason it's biochemistry is because it's the chemistry of living things. We are all essentially chemical compounds, a variety of chemical compounds.
Q. Did you receive a degree from the University

of California at Berkeley?
A. Yes.
Q. What degree did you receive?
A. Ph.D.
Q. In biochemistry?
A. Yes.
Q. What year did you receive that degree?
A. 1952.
Q. So it sounds like from when you left the Army until you received your Ph.D., you were pretty much a full-time student?
A. Well, I was full time in the sense that at the City College of New York I went night, but I was -- took as many courses as I could, and I worked at jobs where I was not working 8:00-to-5:00, so to speak, just simply getting enough money to get along.
I did have -- there was -- on the GI bill there was something -- the GI bill was a bill passed by Congress to assist veterans of World War II. And there was something like a -- we got $20 a week for 52 weeks, or something like that, which helped me. And when that ran out, just simply whatever job I could find. It was basically part-time.
Q. So you're a World War II vet?
A. Yeah, yes.

together and that kind of thing. And let's see what I did after that. Oh, then I decided to go to law school.
Q. And then you started law school in 1971?
A. '1, that's right, yes.
Q. Do you recall the company with whom you worked in New Jersey?
A. I can't even remember the names of the people there.
Q. So you decided to go to law school in 1971?
A. Yeah -- well, in 1970, but it took me time to apply during 1970, and I started in September of 1971.
Q. You went to law school at Arizona State University?
A. That's right.
Q. That's in Tempe?
A. In Tempe.
Q. You graduated in 1974 with your J.D.?
A. In January of 1974. I'd gone to summer school, too, and hastened the graduation.
Q. Mr. Ronwin, your CV goes in detail about your positions related to chemistry and biochemistry.
A. Yeah.
Q. From '74 to the present, could you walk me through what you did?
A. Yeah. After '74 -- well, in the middle of

'74 -- even before that, while I was a student at the -- in the law school at Arizona State University, I began doing -- writing briefs for attorneys. And at one time I had about 21 attorneys that I was writing for, and I was doing quite well financially as a result. Most attorneys, I regret to say, can't write worth a darn, in my opinion.

And I'd write a brief in this way: It was so written that if the judge agreed with my estimate of the law, analysis of the law, he, in effect, had his decision written for him. That was the way I always approached writing a brief.

And I also did research that way with the objective -- and I never spent a lot of time with extraneous garbage. And I never put forth a theory or an argument of law that I couldn't substantiate in one way or another with legal justification.

Q. So when you graduated, you were freelancing, so to speak, for a number of attorneys?

A. Yes.

Q. Was that in the Arizona area?

A. I spent four years in Arizona doing that. And meanwhile, I'd gone to Iowa in 1974, and was admitted to the bar in Iowa.

Q. How long did you practice in Iowa?

A. Well, I started there formally in 1974 -- '78, and I practiced there till 1990 -- I'd say 1990, roughly, something like that -- a little more than that, actually, about 1994.
Q. And just so I understand the dates, Mr. Ronwin, after you graduated from Arizona State, you worked in Arizona for about four years?
A. Yeah, freelancing, as I was, yeah.
Q. And that took us to '78, when you moved to Iowa.
A. Yes.
Q. Where did you live --
A. I also did work for a real estate company in Arizona.
Q. Where did you live in Iowa?
A. Where did I live?
Q. Yes.
A. Let's see. In Urbandale. Urbandale is a suburb of Des Moines.
Q. I know it well. I grew up in Ankeny.
A. Oh, you did? Oh, yeah, okay. Are you from Iowa?
Q. Yes, I am.
A. Okay.
Q. So from '74 to '94 you lived in Iowa?

A. Yes.
Q. In the Des Moines metro area?
A. In the Des Moines metro area. I think I moved from Urbandale to Clive once.
Q. And during that 20-year period in Iowa, you practiced law?
A. Yeah, sort of.
Q. Did you do anything else during that 20-year period?
A. Well, not really, I think. I just practiced law. I didn't practice it too heavily, but practiced it.
Q. Did you have any business ventures or --
A. Business interests?
Q. -- business ventures or business interests at the time?
A. I wouldn't think so. I didn't start any businesses.
Q. Were you involved in any businesses?
A. Oh, once in a while I got some, like some friend of mine had some difficulties in Arizona and asked me to come down there and help him out a little bit on a legal difficulty that they had, and that sort . . .
Q. What did you do after you stopped practicing law in 1994 in Iowa?
A. I just lived there till about 1996, or

something like that. I'm not absolute on these dates, regrettably. They're not on my curriculum vitae. I went to live in Sioux Falls, South Dakota.

Q. And I'm going to interrupt you, Mr. Ronwin. Did you stop practicing law in 1994?

A. Well, yeah, pretty much, I think so.

Q. What did you do professionally from 1994 to the present, if anything? I mean, in 1994 you would have been --

A. I would have been --

Q. -- 70 years old.

A. -- 70 years old, yeah.

Q. Did you retire at that point?

A. Sort of.

Q. When you say "sort of," what do you mean?

A. Well, I didn't have a formal association with anybody, as far as I know. That's what I mean by "sort of."

Q. But from '94 to the present, you haven't practiced law, other than your pro se appearances; is that fair to say?

A. Yeah. I'd say that's probably so, yeah. I didn't take on any clients.

Q. Did you have any jobs from '94 to the present?

A. Not with anybody I know of.
Q. Did you have any business interests or businesses of your own?
A. Not really. I thought of some, but I didn't push them any.
Q. And before I interrupted you, Mr. Ronwin, you started telling me in 1996 you moved to Sioux Falls, South Dakota.
A. Well, I wouldn't say absolute 1996. I told you, I can't be absolute on them.
Q. That's fair enough, and I appreciate your correction. That was my fault.
A. Yeah.
Q. So sometime around 1996, you believe you moved to Sioux Falls?
A. Yeah, I think so, yeah.
Q. How long were you in Sioux Falls?
A. Well, I was in Sioux Falls for maybe two or three years. And then I moved about 15 miles east, to Beaver Creek, Minnesota.
Q. So you just moved across the line --
A. Pretty much, yeah.
Q. -- so to speak?
A. Yeah. And overall, in that area, before I moved out of that area entirely, I probably spent about

seven years there. And then, if you want to know?
Q. Please.
A. Then I moved to Cheyenne, Wyoming, and I lived there for about two to three years. And came down here to Fort Collins one day.
(Discussion off the record.)
MR. PILKINGTON: Yes, on the record.
Q. (BY MR. PILKINGTON) Mr. Ronwin, just be careful. So you left Iowa around 1996?
A. Yeah, um-hum.
Q. And after you left Iowa, in sequential order you lived in Sioux Falls; then Beaver Creek, Minnesota; then Cheyenne, Wyoming; then Fort Collins, Colorado?
A. That's right.
Q. Did you ever live in Phoenix in the '90s? I know there are some medical records that show you had some --
A. No. There's a reason for that.
Q. Please explain that.
A. I have some friends in Scottsdale. They're very good friends. And whenever I come, I have a room there, so to speak, that I stay at, and I usually stay for several days.
And I -- I began having heart trouble in 1983. And I was living in Iowa then. But when I went

down to visit my friends -- which I would do about three, four, five times a year -- I decided I'd go to the Heart -- Heart Institute, Arizona Heart Institute in Phoenix. And so I saw them a number of times. And one M.D. that I saw there, who officiated at my double bypass operation in 1996, he started his own heart center called the Phoenix Heart Center or Institute.

And then when I was on a visit to Scottsdale and Phoenix one -- one day, I got terrible claudication in my calves. And it was so bad that I'd walk about maybe 100 feet, and I'd have to stop because the pain was excruciating.

So I called him up, and since he knew me well, he had me come right into the office. And that next -- and that was on a Friday. And that next Monday he put me in the hospital, and they did some angioplasty on the legs to relieve some clots -- not clots, plaque that accumulated in the leg arteries.

Q. When was the angioplasty on your legs completed?

A. Gosh. They're in those records. I really can't remember absolutely these dates.

Q. That's fair enough, Mr. Ronwin. And was this Dr. Richard Heuser?

A. "Hois-er."

Q. "Hois-er." H-e-u-s-e-r?
A. That's the way he pronounces it, "Hois-er."
Q. So when you went to the Phoenix area, you simply stayed with your friends?
A. Right.
Q. Mr. Ronwin, are you taking any medications at this time?
A. Yes.
Q. What are your current medications?
A. I take Zocor, which is known pharmaceutically as simvastatin.
THE DEPONENT: Do you have the spelling of that?
THE REPORTER: Yes.
THE DEPONENT: You have it?
THE REPORTER: I do.
A. And I take 40 milligrams every other day.
Q. (BY MR. PILKINGTON) What other medications do you take?
A. And I take a compound whose generic name is atenolol, and I take 25 milligrams every day.
Q. Do you take any other medications?
A. Well, some M.D.s consider them medications. But I've been taken for over 25 years now 500 milligrams of vitamin C daily, 400 international units of vitamin E

read back.)

Q. Mr. Ronwin, we had a problem with the court reporter's computer. You were about to explain how the statins bound to the enzymes. Would you pick up with that thought?

A. Right. Well, these statins -- Zocor, Baycol, et cetera -- bind so tightly to the enzyme that it appeared to me that that enzyme inhibitor complex would last more than 24 hours. It was a reasonable chance it would last at least 48 hours, if not longer than that.

That meant that if you took it every other day instead of every day, you would still get the value -- the full value out of the statin in its prevention of the formation of cholesterol. And so I did that, and my blood results show that every other day is definitely adequate and does it.

That gives two advantages. One, it cuts the cost of the -- of these statins, which are quite expensive, in half. And two, it also reduces the chances that you will be hurt by the -- by the contraindications of these statins, all of which have contraindications, such as muscle damage, nerve damage, cartilage damage, collagen destruction, et cetera.

Q. So by taking half, as opposed to a full

dose, you're reducing the possible side effects or risks associated with the medication?

A. In addition to cutting in half the cost of the medication, which is significant.

Q. Do you -- and since you've been switched to Zocor, have you taken Zocor every other day?

A. Right.

Q. Mr. Ronwin --

MR. PILKINGTON: Can I have these?

THE REPORTER: Sure.

Q. (BY MR. PILKINGTON) Let me hand you what I'll mark as Exhibit Number 3.

A. This is yours, isn't it? Did we mark that as an exhibit?

Q. We did mark this as Exhibit Number 2. I'll leave it right there in the middle of the table.

A. Okay.

Q. And, I'm sorry. Exhibit Number 3 is going to be your handwritten notes there. Let's mark that before we forget.

(Deposition Exhibit 3 was marked.)

A. Right. I might point out, I think this is times, but it might have been plus, okay? But I'm not too worried about that. It's been many years since I've messed with --

p.m.)

Q. (BY MR. PILKINGTON) Mr. Ronwin requested that we go off the record. I accommodated his request. During the break he asked me to spend some time with him going through the circumstances of this so-called disbarment that I put in my question. In the interests of moving this forward, I'm not going to require an answer from Mr. Ronwin at this time, but I may do so in the future. And we want to keep this deposition moving forward; fair to say, Mr. Ronwin?

A. Go ahead, right.

(Discussion off the record.)

Q. Mr. Ronwin, what injuries do you claim were caused by your ingestion of Baycol?

A. Well, the primary injury is that it ultimately caused my left shoulder rotator cuff tear which had to be operatively repaired. I also had other effects, some of which are no longer present. One effect was, I was beginning to get blurred vision. So I'd be reading -- and as I indicated to you, I read a lot -- and suddenly the words began to blur. That lasted for awhile. I can't tell you how long. But it -- it did go away.

A second effect I had was that in walking, I would put, let's say, my right foot forward, and then my

Q. The third symptom --
A. That no longer exists. I told you that.
Q. The third symptom that you allege was caused by your use of Baycol was pain in the back of your thighs, or both legs?
A. Yes.
Q. The fourth symptom or problem that you attribute to your use of Baycol is some back pain above your legs?
A. Yes.
Q. The fifth symptom or problem that you attribute to your use of Baycol --
A. Tripping.
Q. -- deals with walking that you -- that you described earlier --
A. Yes.
Q. -- where your left foot would go in front of your right foot?
A. Yes, but no longer -- no longer in effect.
Q. The sixth problem that you attribute to your use of Baycol is some right arm pain?
A. Right arm pain, yes, in the elbow. I didn't specify, but that's in the elbow is where that was.
Q. And the seventh problem that you attribute to your use of Baycol is slight cataract formation in

both eyes?

A. Both eyes. And I'm not certain on that.

MR. PILKINGTON: Let's take our break right now, and we'll come back to those after lunch.

THE DEPONENT: Yes.

(Break taken from 12:45 p.m. until 1:26 p.m.)

Q. (BY MR. PILKINGTON) Mr. Ronwin, we're back on the record. Would you -- would you briefly describe your understanding of your cardiac health?

A. My cardiac health?

Q. Yes. For example, you -- how many -- you had a triple bypass surgery in --

A. Double.

Q. You had a triple -- you had a double bypass surgery in 1996?

A. Yes.

Q. What other heart surgeries have you had?

A. Well, if you consider the invasions of angioplasties and angiograms, I've had quite a few. I've had stent implantations.

Q. So you've had several angiograms?

A. And angioplasties. And in some of those angioplasties, I had stent implantations. Do you know what a stent is?

Q. The second symptom or problem that you mentioned was blurred -- blurred vision.
A. Yeah. I told you that's gone.
Q. When did you first experience the blurred vision?
A. About approximately, I'd say, the time that I began experiencing pain.
Q. Did you complain to any physician about the blurred vision?
A. What?
Q. Did you tell any physician or health care provider that you were experiencing blurred vision?
A. I don't believe so.
Q. And when you say "about the same time you were experiencing the shoulder pain," that would have been in February, mid-February of 2001?
A. Yes.
Q. Describe the blurred vision that you had.
A. Well, I'd be reading, and then some of the letters begin looking like they're getting spread out.
Q. How often would that occur?
A. Oh, it would be intermittent, not every time, you know, that I read.
Q. Did you seek any medical treatment for your blurred vision?

A. I don't believe I did, no.
Q. Did the blurred -- you said the blurred vision has resolved?
A. Yes.
Q. It's gone away?
A. Um-hum.
Q. She has to take down "yes."
A. Yes.
Q. When did it go away?
A. I can't tell you for sure. It didn't last terribly long. Several months, but that was it. You've got to remember, I took Baycol for seven months before I found out about it being a deadly drug.
Q. Did you, however -- did your blurred vision go away before you stopped taking Baycol, or do you know?
A. I can't answer it, really.
Q. And correct me if I'm wrong. Did you tell me earlier that you don't know whether that's related to Baycol or not?
A. The cataracts is what I think I told you.
Q. Do you believe that your blurred vision was caused by Baycol?
A. I don't know for sure, but this is what I saw. See, everything comes back to what I tried to tell you before. You can have maybe two, three, four

potential answers to what the cause is. But we do know that Baycol can be the cause. It may be old age, see. You know, you can line up causes, all right? But we know that Baycol can cause this stuff.

Q. How -- what -- on what basis have you concluded that Baycol can cause blurred vision?

A. Right. We've got to get into that chemistry that I talked to you about that other time. You want to get into all that?

Q. Well, let's do this: We have agreed before this deposition that we will return to take your expert witness deposition, correct?

A. You want to do that?

Q. At a later point, correct?

A. Then, that would be fine with me. Yeah, otherwise, we've got a whole lot to go into.

Q. And, Mr. Ronwin, do you recall us having a telephone conversation during which you told me that you're going to try to testify as an expert at trial?

A. What? As an expert, yes.

Q. And when you told me that --

A. And you want to take my deposition.

Q. -- I said, Let's take your plaintiff's deposition first, and then take your expert deposition.

A. I don't believe you told me that. What I

also get claudication, by the way, at times. And once in a while I'd get angina, too.

Q. Well, you would agree that the angina is not related to your use of Baycol?

A. I'd agree -- probably agree to that, yes.

Q. Would you agree that your claudication is not related to your use of Baycol?

A. Likely not.

Q. But in any event, you said you first experienced this when you were going on your walks?

A. Um-hum, right.

Q. When? What date?

A. Date?

Q. Yes.

A. Oh, I'd take walks -- up to the West Nile bit, I'd take walks every day.

Q. No. I'm talking about, when did you first notice this pain in the back of your legs? For example, you told me with your left arm, you first noticed that in mid-February. When did you first experience this pain in the back of your legs?

A. Pretty soon, pretty soon around that time. I can't tell you exactly. By the way, I was living then in Cheyenne. We also had a hill, not quite as steep as the one I'm facing now, but -- but a nice incline in the

Q. And it's your belief that that blood sticking or that trying to draw the blood may have aggravated it?

A. Originally I thought that was it, but now I don't think that was it. I think -- and that's what Kevin Deane said. He said, I don't think that actually caused this tendon problem. And then I began to think of it, and I thought, you know, I had this problem when I took Baycol, and I've had it off and on all along. So I felt, well, this may have injured this nerve here to some extent. And he agrees with that. Kevin Deane thinks that may be the case.

Q. What may be the case?

A. That jabbing me with the needle caused -- causes me to get this occasional nerve down to here (indicated). It shoots down to the palm here, and it's definitely a nerve pain. It's a diffuse -- there you can use the word "diffuse" -- pain that just covers the arm. But I think that was simply coincidental to what happened here, see.

Q. The last symptom that you attribute to your use of Baycol is a slight cataract formation in both eyes?

A. Yes. And I'm not sure that that's caused by Baycol, necessarily. I don't know that for sure.

Q. How -- who's told you you have a slight cataract formation?

A. What?

Q. Who has told you that you have this cataract formation in your eyes?

A. I believe my ophthalmologist.

Q. Who is that?

A. Dr. -- oh, nuts. I've got an appointment with him. Just a minute. I can't remember these people's names, you know. I'm seeing so many doctors. I'm seeing more doctors than I ever cared to have. Well, I've just got "eye exam" written down. It starts with an S.

Q. Here in Fort Collins?

A. Yeah. Have you got a telephone book?

Q. Why don't you just call me with that name and just leave it for me. Okay?

A. Well, all right.

Q. When did you first notice these cataracts?

A. Well, I may have been told that even earlier, but I'm not sure.

Q. Before you took Baycol?

A. Maybe. That's a possibility. I'm not sure. I just can't tell. Call on doctor. I'll get it to you somehow, maybe fax it to you.

A. No. What radiated was where she hit me with the needle. That was a radiation down here (indicated), not a radiation up here (indicated), see, a radiation down here (indicated).

Q. Did it radiate up to your shoulder?

A. Not up to the shoulder, no.

Q. Mr. Ronwin, has any health care provider ever told you what the cause of your cataract formation is?

A. Well, first of all, the -- no, not cause. But the -- the only insight that I got is that it's so slight that it's not anything to be concerned about. That was the -- the message.

Q. So you haven't had any treatment for those cataracts?

A. No. They wouldn't give you any treatment unless -- unless you really got some blurring.

Q. Do you have to have any treatment for those cataracts?

A. No, not as long as it stays . . .

Q. Mr. Ronwin, has anyone attributed the slight cataract formation that you described to your use of Baycol?

A. Not -- you mean an M.D.?

Q. Yes.

A. No.
Q. And what treatment, if any, have you received for this right elbow pain?
A. What's that?
Q. What treatment, if any, have you received for your right elbow pain?
A. Well, I gave you two instances. And -- and now -- then the last time I talked by phone to Dr. Kevin Deane, when it got irritated again or flared up again, he suggested I see Dr. Wolf, who I saw -- oh, I don't know, a few weeks ago.
And she said -- let's see. She's an arm person; that's right. And she looked at it, and she gave me -- had somebody give me a sleeve that's made out of plastic that I had on for a while. But that irritated my skin.
It said put it on at night, so I put it on for several nights. And my skin just wouldn't take it, so I quit -- quit using that. And she had me -- she asked me to go to physical therapy, so I went for two sessions. And it was not very -- very good.
Q. Has any health care provider told you --
A. And I'm going to see Wolf again, by the way, at the end -- at the beginning of next month.
Q. Has any health advise -- has any health care

provider told you what the cause of your right elbow pain is?

A. No. They just said -- they just gave me that everyday man's description: tennis elbow.

Q. Has any health care provider told you that the cause of the right elbow pain was your use of the Baycol?

A. No, of course not.

Q. Before you had that intense pain when the blood was drawn -- I think in 2004, was it?

A. I think so. No, it might have been '5.

Q. Okay. I'm sorry.

A. Yeah.

Q. Before you had that intense pain in 2005, have you ever told any health care provider about this pain in your right elbow?

A. Well, I don't think so. Just experience it, and it would go away, experience it, and it would go away.

Q. Has any doctor ever told you that -- what the cause of your walking problems were?

A. My walking problems?

Q. Yes.

A. Yes. The claudication is due to plaque forming in your leg arteries, and that's the cause of the

pain and claudication.

Q. I want to make sure that I'm clear. You attribute the fact that your left foot would sometimes get in front your right foot to your use of Baycol, correct?

A. I say that there's a chance that that's the reason that that happened, yes.

Q. Has any doctor ever told you what the cause of that walking problem was?

A. No.

Q. Has any --

A. No.

Q. -- health care provider ever told you that the cause of that walking problem was Baycol?

A. Hold on a minute. I want to look at something. I'm going to give you an answer. Yeah. Dr. --

THE REPORTER: I'm sorry. I didn't hear you. Dr. who?

THE DEPONENT: Raul, R-a-u-l; G. Reyes, R-e-y-e-s.

THE REPORTER: Thank you.

A. He feels that -- I'd given him different situations and a tendency to stumble at times, inadvertently moving one leg other the other. I gave him

knock that over.

Q. It's empty, but thank you. This is a November 17th record from Dr. Keller, and it says, "He also reports that he gets angina when he carries heavy things up the stairs, such as a 100-pound weight up two flights of stairs."

A. Yeah, that's true. I can't carry heavy weights a long distance or up something like two or even three flights of stairs. I just couldn't.

Q. But in the past you've lifted heavy things?

A. When I was younger, yes. I used to do weight-lifting for a while. I could press 100 pounds with no sweat.

Q. When was that?

A. Oh, God. Back in the 1950s, '60s.

Q. Who do you consider your current primary care physician?

A. Well, that's an interesting question. I personally don't think I need a primary care physician, because if I get some kind of an ache or pain or some kind of a dislocation or something that bothers me, okay, then I pretty much will go to a specialist because I'll be able to generally say which specialist. I might be off, but often I hit it right on the head, okay?

But Dr. Hiett has sort of made himself my --

my family care physician in this way: He's a part of the senior clinic over there at the University of Colorado Hospital. That's not the only thing he does, but he's in that senior clinic. He comes in a day or two and sees people.

And they tend to want one clinic, like the orthopedic clinic or the rheumatism clinic or the hand clinic, et cetera, the eye clinic, they like to have reference from some doctor. You see what I'm saying? Usually a family doctor.

So I get answered that -- asked that question a lot: Do you have a family physician? I usually answer "No." But as far as my activities with the University of Colorado Hospital, Dr. Hiett has sort of tended to become a family physician.

Q. If you had a problem tomorrow, who would you go to?

A. It depends on what's wrong with me. If my -- if my skin is itching me, I'll go straight to the dermatology department.

Q. Who's handling your prescription of the statin?

A. What's that?

Q. Who is handling your prescription of the statin?

seemed, Oh, take it every day. You know, if the guy's a nice guy, I don't want to buck him.

Q. What's the claudication that you have in your legs?

A. What do you mean, "what's the" --

Q. Can you describe what that is?

A. Oh, okay. Claudication is when you walk and you've got claudication, you're getting terrific pains in the legs. Actually, the word means limping, because, you see, when you're getting a lot of pain, you tend to start to limp instead of taking a good straight stride, you understand?

And it is caused by the fact that you're not getting enough blood to the gastrocnemius muscle, which is the main muscle in the back of -- the calf muscle. It's called the gastrocnemius muscle. And if you don't get the blood going through the vessels, it doesn't go into the smaller vessels, and then into the capillaries, so it never gets to the nerves, or you don't get enough. And if you don't get enough oxygen into those nerves, you don't get enough energy, and therefore it begins to give you an intention of that fact or a notice of that fact by hurting.

Q. Is that why you had the angioplasties?

A. Huh?

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

DEPOSITION OF: EDWARD RONWIN, Ph.D., VOLUME II
July 14, 2006

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : | Case No. 02-0200 |

TAKEN PURSUANT TO NOTICE AND SUBPOENA on behalf of the Defendant Bayer Corporation at 12001 Tejon Street, Suite 110, Westminster, Colorado at 2:47 p.m. before Sylvia E. Noneff, Registered Professional Reporter and Notary Public within Colorado.

WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:

(Deposition Exhibit 28 was marked.)

EDWARD RONWIN, Ph.D.,

having been previously duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MR. PILKINGTON:

Q. Good afternoon, Mr. Ronwin.
A. (Deponent nodded.)
Q. We're here this afternoon to resume your deposition in light of the Court's order granting --
THE REPORTER: I'm sorry. Oh, okay. "In light of the Court's order granting"?
Q. (BY MR. PILKINGTON) -- the defendant's motion to compel. I have marked that as Exhibit 28. Is that the reason we're here today?
A. It appears that way.
Q. And according to that order, you have been ordered by Judge Davis to respond to questions about a prior injury to and subsequent surgery to your right shoulder; is that correct?
A. Right.
Q. And is that your understanding as to why we're here today?

operation charge. All right.
Q. Did Dr. Behrens do the surgery?
A. Yes, he did it.
Q. And if you look at that date, 9/6/04 (sic), and if you combine that with the Sioux Valley Hospital date of 9/6/04, do you agree that your surgery was around September 6 --
A. It was probably on that date, yeah.
Q. That would be September 6 of '04?
A. Yeah.
Q. Now, Mr. Ronwin, who -- who did you see between Dr. Rodman and your rotator cuff repair?
A. That, I don't know. We've got -- we've got some doctors there and -- that are listed on this Medicare thing, like Steve -- Steve Olson. I don't know what kind of an M.D. is he. And Alfred Hartmann. I have no idea who these people are. Aspaas, I know who he is.
Q. Who is Aspaas?
A. Aspaas is a family-type physician. He was also a vice president, I think, of the Sioux Valley Hospital. And he got shoved in. I never went to him. He comes in to me, I think, when -- oh, I know where he came in. He came in where I got into the hospital because of this involuntary muscle contraction, see. That's where he came in.

don't keep a diary to begin with.
Q. But would it be fair to say at some point following the surgery your right shoulder, in terms of function, got back to the baseline it was before?
A. Yes, yeah, at some time after. And, of course, immediately after you get some back. I mean, you're not -- you never have a complete loss of ability to use it.
Q. But stated differently, at some point after your surgery your right shoulder was the same as it was before the accident?
A. I'd say that, yeah. Ultimately, I feel good. And by taking -- and I don't like Behrens, but I think his cut was real good. I think he's a good surgeon.
Q. Have you had any problems with your right shoulder since the surgery?
A. No.
Q. Has any doctor ever advised you that you have any sort of degenerative condition in your right shoulder?
A. Yeah. I had spurs.
Q. Who told you that?
A. Behrens, maybe McDan -- Mc -- McRandall. Actually, it's MacRandall, M-a-c.

several people changed their story.

Q. Did they change their story to conclude that the right rotator cuff surgery -- let me rephrase the question. When you say he and others changed their story, was the new story that the car accident was not the cause of the right rotator cuff --

A. I think that's the story. I think they began -- I think Behrens may have, and it's so vague. And unfortunately, I threw all my records away from that whole lawsuit and from everything else, see.

Q. But what I hear you saying is that Dr. Behrens later stated that it was his opinion that your right ro -- right shoulder injury was not the result of the accident?

A. You know what? I'm vague on that. All I've got to say is, he was friendly, you know, in -- in viewing me before the operation. He was friendly somewhat after the operation. And then he became antagonistic, and that's the idea.

Q. Did any physician ever advise you that the cause of your right rotator cuff injury was some sort of degenerative condition?

A. That may have occurred, but I don't know whether he did it, or how it was done. I don't think MacRandall did it, because I don't think MacRandall was