# Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

---

DEPOSITION OF: MARK W. KELLER, M.D.
July 14, 2006

---

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : | Case No. 02-0200 |

TAKEN PURSUANT TO NOTICE AND SUBPOENA on behalf of the Defendant Bayer Corporation at 1444 South Potomac Street, Suite 300, Aurora, Colorado 80112 at 8:35 a.m. before Sylvia E. Noneff, Registered Professional Reporter and Notary Public within Colorado.

WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:

(At this time Ms. Zeppelin was not present in the deposition room.)

MARK W. KELLER, M.D.,

having been first duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MR. PILKINGTON:

Q. Good morning, Dr. Keller.
A. Good morning.
Q. As you know, my name is Jeff Pilkington. I'm with the law firm of Davis Graham & Stubbs, and I represent Bayer in this litigation. Do you understand that?
A. Yes.
Q. We met before the deposition in another case; is that correct?
A. That is correct.
Q. Have I ever spoken to you, other than at that deposition?
A. No.
Q. Have I ever spoken to you about your care and treatment of Mr. Ronwin?
A. No.

A. Yes.

Q. Is it fair to say that some patients who present with these problems, you keep them on -- on that particular statin?

A. Yeah, some. I mean, some, after discussion of the risks and benefits, and if the blood tests are okay, are willing to stay with the medication.

Q. Have you ever had any patients who have developed rhabdomyolysis as a result of taking a statin?

A. One.

Q. Only one patient in your 20 years of prescribing statins?

A. Yes.

Q. Doctor, in your 20 years of prescribing statins, almost 20 years of prescribing statins, have you -- has a patient ever complained to you about having a rotator cuff tear that was associated with the use of a statin?

A. No.

Q. In your 20 years of -- in your almost 20 years of prescribing statins, have you ever seen any published literature that in any way associates rotator cuff tear or related problems with the use of statins?

A. No.

Q. Doctor, let me turn now specifically to --

dictate a more formal report?
A. Yes.
Q. Is that more formal report what we've marked as Exhibit Number 10?
A. Yes.
Q. Let's turn to your office visit of November 17th of 2000. What -- what were Mr. Ronwin's complaints at that time?
A. Well, let me read this. So the main complaints were some chest pain, or angina, when -- with heavy exertion, and pain in his legs from claudication, which is lack of blood flow to the leg muscles.
Q. And did you take a history of Mr. Ronwin?
A. Yes.
Q. And what -- what history was of significance in your care and treatment of him that day?
A. Well, he had a history of coronary artery disease. He had stents in the past, an angioplasty -- well, he had angioplasty first. Then he had attempted stents that required emergency bypass surgery. Let's see. His father had heart disease. He had no diabetes or high blood pressure. He did have mild to moderate hyperlipidemia or hypercholesterolemia. He was not a smoker. He was on aspirin and Pletal as his medications.
Q. Doctor, is it fair to say that it was your

understanding in November of 2000 that Mr. Ronwin had a history of coronary artery disease?

A. Yes.

Q. He told you that he had prior coronary bypass surgery?

A. Yes.

Q. He told you that he had a possible heart attack?

A. Yes.

Q. He told you he had complaints of angina?

A. Yes.

Q. He told you that he had several angioplasties in the past?

A. Yes.

Q. He also told you that he had double stenting attempted several years ago?

A. Right.

Q. With that history of coronary artery disease, did you believe that Mr. Ronwin presented with significant coronary artery disease?

A. Yes.

Q. That it was a very serious condition?

A. Yes.

Q. Dr. Ronwin also told you about claudication in his legs?

Q. Is that an abnormal finding?
A. Yes.
Q. So when he presented in November of 2000, just in terms of his cardiac risk, he had a history of coronary artery disease?
A. Yes.
Q. He had a history of peripheral vascular disease?
A. Yes.
Q. He had a family history of cardiac problems?
A. Yes.
Q. He had documented heart function abnormality?
A. Yes.
Q. And he had high cholesterol?
A. Right.
Q. Based on those risk factors, did you believe that Mr. Ronwin had -- was a high-risk cardiac patient?
A. Yes.
Q. And by "high-risk cardiac patient," does that mean that these cardiac problems were severe and significant?
A. Yes.
Q. That they could be disabling in the future?
A. Yes.

A. Well, I sent him to the lab.
Q. Okay. Do you have those findings in your file?
A. Yes.
(Deposition Exhibit 14 was marked.)
MR. RONWIN: Where's 13? I had 12. I had --
MR. PILKINGTON: Here.
MR. RONWIN: Oh, 13, okay.
Q. (BY MR. PILKINGTON) Dr. Keller, I've handed you what I've marked as Exhibit Number 14. Are those the lab tests from January 10th of 2001?
A. Yes.
Q. What do those lab tests tell you?
A. His thyroid function was normal. He had, basically, a normal blood count. His white count was just slightly elevated. His cholesterol was elevated. Specifically, the LDL cholesterol was elevated. The rest of his basic chemistries were normal.
Q. And when you -- I want to focus in particular on the cholesterol readings.
A. Yes.
Q. His LDL was what?
A. 172.
Q. You described several risk factors that he

Q. (BY MR. PILKINGTON) We'll get a copy of this, Doctor. But it appears that on January 16th you wrote a prescription for Baycol, .4, 30 quantity, every day, correct?
A. That's correct.
Q. And that's your signature?
A. Yes.
Q. And the date of this is January 16th of '01?
A. That's correct.
Q. And there's a note here that says "Sent to patient January 17th," correct?
A. That's right.
Q. What does that tell you?
A. That was mailed to him.
Q. There's another prescription, Doctor, dated April 19th of '01, correct?
A. Yes.
Q. And there's a note, "mail"?
A. Yes.
Q. What does that mean?
A. We mailed it to him.
Q. And we'll mark that as Exhibit --
A. I believe he lived in Wyoming, so . . .
Q. 15 will be the 1/16 prescription, and 16 will be the 4/19 prescription.

file?
A. I'm looking here to see. Actually, I see -- did you say April 18th? No. February 23, 2001. That's Number 17 (sic).
Q. So Number 17 is what, Doctor?
A. Or is it Number -- Exhibit 18?
Q. I'm sorry for the confusion.
A. It's February 23, 2001.
Q. So for the record, Exhibit 18 is a lab report dated February 23rd of 2001?
A. That's correct.
Q. Is this a report that you reviewed in your care and treatment of Mr. Ronwin?
A. Yes.
Q. And what did this show?
A. It showed that he had had a good reduction in his LDL cholesterol, from 172 to 80.
Q. It dropped over half; is that right?
A. That's correct.
Q. You described that as "good." Is that an excellent reduction?
A. That is good, a very excellent reduction, yes.
Q. And in terms of your treatment goals of Mr. Ronwin of LDL, would you -- do you believe that that's a

good result?

A. Yes.

Q. So if Mr. Ronwin was taking Baycol during that time period, the Baycol was effective?

A. Yes.

Q. The next document that I've marked is, I believe, Exhibit 19. Do you have that in front of you?

A. Yes.

Q. And that's dated April 18th of '01?

A. Yes.

Q. Is that a lab report that you reviewed in your care and treatment of Mr. Ronwin?

A. Yes.

Q. What did that show in terms of his cholesterol?

A. It showed his LDL cholesterol was 94, total cholesterol was 149, HDL cholesterol was 34.

Q. In terms of the guidelines at that time, was that an acceptable reading for his LDL?

A. Yes.

Q. And if Mr. Ronwin testified that he was taking Baycol during that time period, would you agree that the Baycol was working to reduce his LDL?

A. Yes.

Q. That was as of April 18th of '01, correct?

A. That's correct.
(Deposition Exhibits 20, 21 and 22 were marked.)
Q. Doctor, I've marked as Exhibit Number 20 a letter from Mr. Ronwin to you. I've marked as Exhibit Number 21 a publication in Science. And I've marked as Exhibit Number 22 your response letter to Mr. Ronwin. Would you just take a moment to review Exhibits 20, 21 and 22.
MR. RONWIN: If I knew you were going to bring these in, I wouldn't have carried them in myself. What about the 16 and 15? What you going to do about them?
MR. PILKINGTON: We'll mark them.
MR. RONWIN: We will? Okay.
Q. (BY MR. PILKINGTON) Doctor, have you had the opportunity to review Exhibits 20, 21 and 22?
A. I'm just looking at 22. Hang on one second. Okay. I'm through.
Q. Doctor, what is Exhibit Number 20?
A. That's a letter that Mr. Ronwin sent to me.
Q. And what did Mr. Ronwin tell you in this letter?
A. That he had read an article in Science magazine that related to the binding of Baycol, and he

thought that it bound tightly. So therefore, it would probably be adequate to take his medication every other day, rather than taking it every day.

Q. Doctor, did you -- did Mr. Ronwin also state the following in this letter: "The blurb which accompanies the Baycol gives little detail on what experiments were conducted, but led the company to package .4 pills and to imply, if not state, that the dose needed to be taken every day"?

A. I'm sorry. What's the question?

Q. Is that what Mr. Ronwin told you in this letter?

A. Yes.

Q. And did Mr. Ronwin tell you in this letter that, given this article, he, on his own, was deciding to take Baycol every other day?

A. Yes.

Q. Was it your understanding after reading this letter that Mr. Ronwin was going to take Baycol every other day?

A. Yes.

Q. Did you review his letter when you received it?

A. Yes.

Q. Did you review the article which accompanied

four hours, it's out of the body, so no Baycol is there for the next day?
A. Correct. Well, half of it's gone in two to four hours, so most of it's gone in, say, eight hours.
Q. Okay. But in any event, for the second day that he skipped the Baycol, there would be no Baycol in his system, correct?
A. Potentially not.
Q. And you also pointed out that there were binding differences?
A. Correct.
Q. Based on your review of the article and your understanding of statins, what did you recommend to Mr. Ronwin?
A. Well, the current practice was to prescribe statins daily, and that's what I recommended that he do, but I told him he could take his medicine however he wished.
Q. But was it your strong recommendation that he continue to take Baycol every day?
A. Yes.
Q. Was that based on your understanding of statins, as well as his significant coronary risk factors?
A. Yes.

MR. RONWIN: You don't have any extras?
MS. ZEPPELIN: That's okay.
MR. RONWIN: He doesn't have any.
Q. (BY MR. PILKINGTON) Dr. Keller, Exhibit Number 25 is another lab test that was done?
A. Yes.
Q. And is that your handwriting as well?
A. That is.
Q. Did you review this lab report as part of your care and treatment of Mr. Ronwin?
A. Yes.
Q. What did this lab show in terms of his cholesterol levels?
A. It showed that his total cholesterol had dropped from 246 to 171 from January to July. His triglycerides had gone from 150 to 134. His LDL cholesterol had gone to 44 to 38. His LDL cholesterol was -- had gone from 172 to 106.
Q. Now, if you go to August 27th of 2001, was this a follow-up visit?
A. Yes.
Q. And what were his complaints?
MR. RONWIN: Oh, this is --
A. His complaints? He was having increasing angina.

A. Yes.
Q. And he refused that recommendation?
A. Yes.
Q. You also rec -- told him that you could do a test, such as an angiogram, correct?
A. Yes.
Q. Did he refuse that as well?
A. He wanted to think it over, but his initial opinion was he didn't want to do it right there and then.
Q. In August of 2001, at least August 27, 2001, he reported to you that he was taking Zocor?
A. That's correct.
Q. And that would be consistent with the prescription note that you had sent to Dr. Prince?
A. Yes.
Q. The final time that you saw Mr. Ronwin was in September of 2001, correct?
MR. RONWIN: The 26th.
A. I believe that's correct. September of 2001, yes.
Q. (BY MR. PILKINGTON) Let's mark this as Exhibit Number 26, Doctor.
(Deposition Exhibit 26 was marked.)
Q. I did not find in your chart a specific office note for this visit. Do you have one?

a moment. And let me take a moment to get organized.
A. All right. There are some labs here, too.
(Discussion off the record.)
Q. Doctor, I'm having you look again at Exhibits 14, 18, 19 and 25. Okay?
A. Okay.
Q. These are the lab results that are found in your file, correct; specifically, the lab results relating to his cholesterol?
A. Yes.
Q. And Exhibit 14 is the lab results of January 10th of '01?
A. Yes.
Q. Exhibit 18 are the results of February 23rd of '01?
A. Yes.
Q. Exhibit 19 are the results of April 18th of '01?
A. Yes.
Q. And Exhibit 25 are the lab results of July 19th of '01 --
A. Yes.
Q. -- correct?
A. Yes.
Q. Would you agree that your prescriptions of

statins during this time period reduced Mr. Ronwin's bad cholesterol?

A. Yes.

Q. And if you look and compare January 10th to February 23rd, his LDL was reduced from 172 to 80, correct?

A. That's correct.

Q. And if Mr. Ronwin was taking Baycol, as he has testified, Baycol did an excellent job reducing his LDL?

A. That's correct.

Q. If -- now, Doctor, I want to focus on April and July. It appears that in April and July his LDL went up from 80 to 94 in April and 106 in July, correct?

A. That's correct.

Q. Doctor, if you take as true Mr. Ronwin's statement that sometime in May he began taking Baycol every other day, could that explain why his LDL went from 100 -- I'm sorry, 80 in February to 106 in July?

A. It could. He may have even been on Zocor in July, so I'm not sure what . . .

Q. But if -- but if he has testified -- and I'll represent to you that he's testified in this case that sometime in May he went to switch from Baycol every day to Baycol every other day.

A. Yes.

Q. If you accept that as true, could the rise in his LDL levels from 80 to 106 be attributed to this every-other-day dosage?

A. It certainly could.

MR. RONWIN: Wait a minute. Wait a minute. Did you say I started the every other day in July?

MR. PILKINGTON: May.

MR. RONWIN: In May; that's right. Okay.

Q. (BY MR. PILKINGTON) Doctor, if -- when you -- you testified earlier that when patients come in to you and complain about muscle aches and pains or weakness and are taking statins, you'll have a -- you'll do a test?

A. Yes.

Q. What is that test?

A. Creatinine kinase.

Q. Is that a simple blood test?

A. Yes.

Q. Did Mr. Ronwin, during your care and treatment of him, ever complain to you about muscle aches or pains?

A. Only his claudication pain, which is from blocked arteries in his legs.

Q. But did you have any belief that that was in

any way related to statins?
A. No.
Q. What did you believe it was related to?
A. To blocked leg arteries.
Q. When you wrote -- when you prescribed Baycol for Mr. Ronwin, did you follow your general practice of advising him of the risks and side effects associated with the statins?
A. Yes.
Q. And what did you advise Mr. Ronwin of the risks associated with Baycol?
A. Well, my practice would be to tell someone that they have a heart problem. They've got high cholesterol. These medications have been shown to lower cholesterol, reduce your risk of a heart attack, and make you live longer, so I'd advise you take them. We've studied it extensively, and the risks are low in taking these medications. The main things are, some people get liver abnormalities, so we check that. And some people get sore muscles, and I want to hear about that.
Q. So that would have been your general practice when you prescribed Baycol?
A. Yes.
Q. Stated differently, it was your general practice to advise your patients of that -- of those

advise you of any complaints he had?
A. Yes.
Q. I'm just about done. Bear with me.
MR. RONWIN: What did you say?
MR. PILKINGTON: I'm just about done. Bear with me.
MR. RONWIN: Okay.
MR. PILKINGTON: That's all I said.
Q. (BY MR. PILKINGTON) Doctor, based on these lab findings, do you agree that Baycol worked in improving his hypercholesterolemia?
A. Yes.
Q. Based on your care and treatment of Mr. Ronwin, did you find any adverse effects or side effects that you in any way could attribute to Baycol?
A. No.
Q. Did he complain to you about any problems or symptoms that in any way could be attributed to Baycol?
A. No.
Q. Did he ever complain to you during your care and treatment of Mr. Ronwin of shoulder pain?
A. No.
Q. Of left arm pain?
A. No.
Q. Of blurred vision?

A. No.
Q. Of cataracts?
A. No.
Q. Of pain in the back of both of his legs?
A. I don't know where his claudication pain was the first time I saw him.
Q. But the only pain that he complained about in terms of leg pain was his claudication pain?
A. Correct.
Q. Did he ever complain to you about muscle pain in his back, above his legs?
A. No.
Q. Did he ever complain to you about left foot problems?
A. No.
Q. Did he ever complain to you about gait problems?
A. No.
Q. Did he ever complain to you about right elbow pain?
A. No.
Q. Are these the types of complaints that you would expect your patients to tell you about; that is, your patients who are taking statins?
A. Yes.

Q. And are these the type of complaints that if Mr. Ronwin was experiencing, that you would expect him to tell you?
A. Yes.
Q. But he never complained of them to you, correct?
A. That's correct.
Q. Did Mr. Ronwin ever tell you that he believed that his injuries were in any way related to Baycol?
A. What injuries?
Q. Let me -- let me rephrase the question, and that's a fair answer. Did Mr. Ronwin ever tell you that he believed Baycol injured him in any way?
A. No.
Q. Did he ever tell you that he had filed a lawsuit against Bayer?
A. No.
Q. Doctor, are you still prescribing statins?
A. Oh, yes.
Q. And you're still doing so despite the withdrawal of Baycol from the market?
A. Yes.
Q. And you're still doing so despite the risks and side effects associated with those statins?

A. Yes.
Q. On the other hand, if the myalgia or myopathy were not being caused by the statins, that would continue?
A. Right.
Q. Doctor, based on your clinical experience and your use of statins over the years, have you ever heard of statins causing any type of shoulder surgery?
MR. RONWIN: You know, you've asked that before. It's been asked and answered.
Q. (BY MR. PILKINGTON) You can answer, Doctor.
A. No.
Q. Doctor, in your review of the medical literature, have you seen any sort of literature that would support a conclusion that Baycol can cause a rotator cuff tear or similar injury?
A. No.
MR. PILKINGTON: I'm about done, and I will --
MR. RONWIN: Okay.
MR. PILKINGTON: -- take a minute to see if I have any loose -- loose ends.
MR. RONWIN: Let me clean up this place a little.
Q. (BY MR. PILKINGTON) Doctor, did Mr.

MR. RONWIN: Keep that open, will you? Keep that available, that 28.
Q. (BY MR. PILKINGTON) Doctor, I'll represent to you that Mr. Ronwin claims that his rotator cuff tear is caused by his use of Baycol, okay?
A. Okay.
Q. Are you aware of any valid scientific evidence that would support that conclusion?
A. No.
Q. Based on -- based on your clinical practice and use of statins over the years, is it your conclusion based on a reasonable degree of medical probability that Baycol did not cause his rotator cuff tear?
A. Yes.
Q. Doctor, you were asked to read several conclusions from several articles, correct?
A. Yes.
Q. Did you have the opportunity to read those articles in full?
A. No.
Q. The mere recitation or reading those articles and those conclusions into the record does not mean that you agree with those conclusions, correct?
A. That's correct.
Q. Is it still your practice to recommend to

# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

---

DEPOSITION OF: MARK PRINCE, M.D.
June 23, 2006

---

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : | Case No. 02-0200 |

TAKEN PURSUANT TO NOTICE AND SUBPOENA on behalf of the Defendant Bayer Corporation at 419 Canyon Avenue, Suite 300, Fort Collins, Colorado 80521 at 9:11 a.m. before Sylvia E. Noneff, Registered Professional Reporter and Notary Public within Colorado.

WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:

MARK PRINCE, M.D.,

having been first duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MR. PILKINGTON:

Q. Good morning, Doctor.

A. Good morning.

Q. We met just before the deposition. My name is Jeff Pilkington. I'm from a law firm in Denver called Davis Graham & Stubbs, and I represent Bayer in this lawsuit. Okay?

A. Yes.

Q. We met right before this deposition, correct?

A. That is correct.

Q. Have I ever talked to you before today?

A. No, sir.

Q. Doctor, thank you for taking time out of your busy day and coming here. Have you ever had your deposition taken before?

A. Yes, I have.

Q. How many times?

A. I have no idea.

A. Yes, sir.
Q. Likewise, his -- you understand he had a fairly extensive coronary history?
A. Yes, sir.
Q. And a peripheral vascular system history?
A. Yes, sir.
Q. Was it your understanding that that -- those problems were being cared for by other doctors?
A. Yes, sir.
Q. Once again, in order for him to get those medications, he was seeing you?
A. That is correct.
Q. Doctor, this August visit, you told him to return in six months, correct?
A. Yes.
Q. Was that the standard practice that you had for Mr. Ronwin in order for him to stay eligible for prescription benefits?
A. Yes, sir. The VA requires that -- or tries to require that people come in every six months so that -- it is the minimum care that they'd like to see for somebody to receive their medications.
Q. Doctor, if you would look through Exhibit Number 1 with me --
A. Um-hum.

didn't seem like it was any time constraint or anything of that nature, so I said, We'll talk about it in the fall.

Q. So you were doing that more as a favor to Mr. Ronwin?

A. That is correct.

Q. Is that the first time that he had told you that he had taken Baycol?

A. Oh, I'm sure that he had told me in the past. But because it was -- the medication wasn't offered by the VA, you know, we -- I didn't mention it as far as medications being done. But yeah, he probably told me.

Q. Doctor, we'll get to your subsequent visit with Mr. Ronwin. But in the meantime, I want to ask you these questions.

A. Um-hum.

Q. At any point during your care and treatment of Mr. Ronwin, did he complain to you about having blurred vision or any vision problems?

A. Not to my knowledge.

Q. At any point during your care and treatment of Mr. Ronwin, did he complain to you about having back -- pain in -- in his legs?

A. Yes, sir, he had that.

Q. Okay. Was it your understanding that pain related to the claudication issues he was having?
A. That was what I thought it was, yes, sir.
Q. At any point during your care and treatment of Mr. Ronwin, did he complain to you about having any back pain?
A. Yes, sir.
Q. Okay. What was your understanding of the source of that pain?
A. I thought it was due to the -- his arthritic condition. He had been taking some arthritis medicine in the past, and I thought it was due to that. Certainly the claudication could have done it also, but basically arthritis.
Q. At any point -- at any point during your care and treatment of Mr. Ronwin, did he complain about problems with his gait or being able to walk?
A. He may have. I don't recall, though.
Q. At any point during your care and treatment of Mr. Ronwin, did he complain about having right elbow pain?
A. If it's not in here, I can't say yes or no.
Q. But if -- if he did complain about that, it should be in your notes?
A. More than likely, yes.

rotator cuff tear, correct?

A. That is right. We're talking about legal terms, because I've been down this road. You know, anything's possible in this world, okay? Now, if you want to put percentages on it, I think it's very low, okay, very low.

Q. And you've -- you've been in the courtroom before, correct?

A. Unfortunately, yes.

Q. And, Doctor, the standard that is applied is a reasonable degree of medical probability. Okay?

A. That is correct.

Q. Doctor, could you state to a reasonable degree of medical probability that Baycol contributed to his rotator cuff tear?

A. No, sir, I can't.

Q. Is the only thing that you're saying by this note that it's possible that it did?

A. It is possible.

Q. And, as you stated before, anything's possible, correct?

A. That is correct.

Q. Including the possibility that this rotator cuff tear was simply a natural occurrence?

A. That is correct.

Q. Is it fair to say, Doctor, that you are not offering any opinions as to the cause of his rotator cuff tear?

A. That is correct.

Q. And another point of clarification, Doctor: In your second paragraph, you state that "Mr. Ronwin does have decreased range of motion in his shoulder," correct?

A. He does -- he did.

Q. And that's what he presented to you, correct?

A. Right. This was after he had his surgery, which is expected.

Q. Okay. And following a rotator cuff surgery, you would expect some decreased range of motion?

A. That is right.

Q. Based on the range of motion that you saw during your care and treatment of him, was he still -- was his left shoulder still functional?

A. Yes, but not at the level that it probably was prior to the tear, obviously.

Q. And that's -- that's really the next question that I have. You say, "I do not think that he will ever get back to the range of motion that he had prior to his repair." Okay?

A. And that's -- that's not a -- that's a poor

just make an exhibit.

MR. RONWIN: That's for her to mark. If you'll mark that one, and then you can give it to Mr. -- to Dr. Prince. And that's for you, and that's for me.

(Deposition Exhibit 2 was marked.)

Q. (BY MR. RONWIN) And could you just peruse that brief letter.

A. Yes, sir.

Q. Now, who is that letter from, and who is it to?

A. It's to me, from Dr. Keller.

Q. Yes. And he is with what organization?

A. Aurora-Denver Cardiology Associates.

Q. All right. And what -- what does he basically -- why is he basically writing to you?

A. Well, basically what it is was, Baycol wasn't offered by -- by the formulary -- on the formulary at the Cheyenne VA, so as I recall, we -- I gave you the formulary options that they had. And he chose to switch you from Baycol to Zocor, so we accommodated.

Q. Right. So did this letter allow you to then inform the VA pharmacy that they are to fill my Zocor prescriptions from Dr. Keller?

A. That is correct.

Q. I see. It didn't -- did it mean I

EXAMINATION

BY MR. PILKINGTON:

Q. One final -- one final question, Doctor. In your clinical experience, have you ever seen a rotator cuff tear that was caused by the use of Baycol?

A. No, sir, I have not.

Q. By the use of a statin?

A. Not that I can document, no.

MR. PILKINGTON: Okay.

MR. RONWIN: Now let me --

A. That's not -- that's -- again, that -- I'm going to try to answer this for both of you. When I've seen rotator cuff tears in individuals, it never crossed my mind to even think that that would contribute to it. And the other thing is, again, that's getting out of my field where I could even make a call on that.

Q. (BY MR. PILKINGTON) I understand.

A. Unless somebody told me that they -- they had a specific injury or an occurrence that I could document to it, it wouldn't have crossed my mind.

Q. Let me ask you this: Has -- has any physician ever advised you that Baycol can cause rotator cuff tears?

A. I've never heard of that before.

Q. And have you ever heard in the published

medical literature that Baycol can cause rotator cuff tears?

A. I've never been told or heard that.

Q. Or that statins, more generally?

A. Not to my knowledge, no, sir.

MR. PILKINGTON: Maybe you answered both of our questions. I don't know.

MR. RONWIN: Oh, okay.

MR. PILKINGTON: I'm done.

MR. RONWIN: You're done?

MR. PILKINGTON: I'm done.

MR. RONWIN: Okay.

EXAMINATION

BY MR. RONWIN:

Q. How many of your patients do you know for certain were taking Baycol when it was on the market?

A. I couldn't answer that, other than you.

Q. Other than me, right, okay.

A. Yeah. But I'll state this: I do recall over the years having -- or knowing several people --

Q. That took --

A. -- that had been -- that were placed on it. I don't recall myself personally placing somebody on it. But, as in your case, people who have seen -- were seeing cardiologists with me, I do recall that. But I think the

# Exhibit D

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

---

DEPOSITION OF: WILLIAM R. HIATT, M.D.
June 5, 2006

---

| | |
|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : |
| | : MDL No. 1431 |
| This Document Relates to: | : (MJD) |
| | : |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : Case No. 02-0200 |
| | : |

---

TAKEN PURSUANT TO NOTICE on behalf of the Defendant at 789 Sherman Street, Suite 200, Denver, Colorado 80203 at 8:05 a.m. before Lisa B. Kelly, Registered Professional Reporter and Notary Public within Colorado.

WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:

WILLIAM R. HIATT, M.D.,

having been first duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MR. PILKINGTON:

Q. Good morning, Doctor. We met for the first time this morning; is that correct?

A. Correct.

Q. My name is Jeff Pilkington. I'm with the law firm of Davis Graham & Stubbs here in Denver, and I represent Bayer in this litigation. Do you understand that?

A. Yes.

Q. Have you ever had your deposition taken before?

A. Yes.

Q. I want to go through some basic ground rules to make sure that the three of us are on the same page today. You understand the court reporter is taking down everything that is said, so she can't take down a nonverbal response. Do you understand that?

A. I do.

Q. My role here is to ask you questions about your care and treatment of Mr. Ronwin. Do you understand that?

university, to split the care of a patient who has both coronary and peripheral vascular diseases?

A. Well, I don't know if it's common or not.

Q. It was done with Mr. Ronwin?

A. In general?

Q. Well, maybe you don't understand my question and that's probably my fault. But my understanding is that Dr. Wolfel is caring for his coronary artery disease and associated risk factors.

A. Correct.

Q. And you're caring for his peripheral arterial disease and associated risk factors.

A. Correct.

Q. Is that something that is commonly done at the University of Colorado Health Sciences Center?

A. I would say it's not common because I'm the only vascular medicine specialist. So that most cardiologists would care perhaps for both. But because I'm available, when available, I'll focus on the peripheral arterial problems.

Q. Has your focus with Mr. Ronwin been on his peripheral vascular issues and associated risk factors?

A. Correct.

Q. When Mr. Ronwin came to you, what was your understanding of his medical history?

A. He had a history of claudication. He had a history of revascularization procedures most recently by Dr. Kumpe. And he still had limitations from his claudication. And he was taking medical therapies for his vascular disease.

Q. If you look at the first paragraph of your July 26th, 2002 office notes, Mr. Ronwin reported to you that he had a coronary artery bypass in 1996.

A. Correct.

Q. Following that, he had problems with claudication?

A. Correct.

Q. And because of that claudication, he had numerous revascularization procedures, correct?

A. Correct.

Q. And here you note that he had those sorts of procedures in 1997?

A. Correct.

Q. 1998?

A. Correct.

Q. 2000?

A. Correct.

Q. And I believe 2001, correct?

A. I don't see the 2001 reference here.

Q. But he had numerous -- I'm sorry. At the end of

the paragraph, you reference, and in January this year, he had his second procedure which has now been successful, correct?
A. Correct.
Q. So he had that procedure in 2002 as opposed to '01?
A. Correct.
Q. So he had numerous revascularization procedures?
A. Correct.
Q. What is that type of procedure?
A. Those were predominantly done by balloon angioplasty to open up occluded blood vessels.
Q. What is claudication?
A. Claudication means to limp. It's the symptom of peripheral arterial disease.
Q. Was it your understanding that Mr. Ronwin had that symptom since 1997 at least?
A. Correct.
Q. What symptoms did he present at this first office visit?
A. He continued to have claudication symptoms at presentation to me.
Q. And did he also, in this second paragraph, Doctor, report to you a pain in his buttocks bilaterally that radiated down through his leg into his thigh?

Q. And what guidelines, if any, relate to the triglycerides?

A. The level of evidence there is not as good there either. And so in general, patients that have very high levels of triglycerides are treated for that. But the guidelines on triglycerides are less established.

Q. So in terms of treating his peripheral vascular disease in May -- I'm sorry, in July of 2002, your focus was on managing his cholesterol, controlling his hypertension, and the use of the anti-platelet therapy aspirin, fair to say?

A. In terms of his systemic disease, that's correct.

Q. Doctor, I want to now focus on the two types of symptoms that he presented in July of 2002, okay?

A. Okay.

Q. And I'm focusing on the last paragraph of your report. Do you have that in front of you?

A. On page 3?

Q. Yes.

A. Okay.

Q. Doctor, he was complaining to you about some pain that was focused in his buttocks that radiated down into his legs, correct?

A. Correct.

Q. What was your conclusion about that type of pain?
A. That he might have had two kinds of pain, one was claudication, the other was consistent with neuromuscular etiology of pain.
Q. What is the classical symptoms of claudication?
A. Muscle cramping or discomfort on exertion that's relieved by rest.
Q. As opposed to the neuromuscular type of pain that you were suspecting, what is that? What is the symptom of that?
A. Those symptoms often radiate from the buttocks or low back down into the legs. May have more of a positional component, but can mimic claudication.
Q. So was it your conclusion that he may be having symptoms of both claudication as well as neuromuscular pain?
A. Correct.
Q. Doctor, the next time you saw Mr. Ronwin was in August of 2002?
A. Correct.
Q. Doctor, rather than going through this for each office visit, is it fair to say that Mr. Ronwin's coronary artery disease and peripheral vascular disease has remained constant during that time?

A. That's all that's documented in the record.

Q. Did Mr. Ronwin ever complain to you about having blurred vision?

A. Not that I recall.

Q. Did Mr. Ronwin ever complain to you about having problems walking, for example, his left foot landing in front of his right foot or any problems with his gait?

A. Well, I would be hesitant to speculate because if the notes indicated that we were dealing with a vascular problem and potentially a neuromuscular problem, there may have been some discussion around gait that I can't recall.

Q. Did Mr. Ronwin ever complain to you about cataracts or any problems with his eyes?

A. Well, I would have to go through all of my notes, particularly a review of systems, which I'm not seeing here. But I don't recall a discussion around problems with his vision.

Q. I have reviewed Mr. Ronwin's pleadings in this case, as well as Dr. Wolfel's records. Is it your understanding -- is it consistent with your understanding that Dr. Wolfel is the doctor who actually prescribes the Zocor?

A. No. I believe I do. And it would be common in this situation where the cardiologist and myself would be

me to write an opinion about that and I refused.
Q. Why did you refuse to do so?
A. I was uncomfortable making the association around the statins and his particular musculoskeletal complaints, so I didn't want to commit myself to that.
Q. When you say you were uncomfortable about making those associations between his particular symptoms and the drug, meaning that it was your preliminary opinion that you didn't think that his symptoms were caused by his ingestion of Baycol?
A. I'd be careful about the broad term "symptom". But in terms of the rotator cuff, I could not make that association.
Q. In your experience in prescribing statins, have you ever had a patient have a rotator cuff problem that you believe was attributed to use of a statin?
A. No.
Q. Have you heard or are you aware of any case reports that make such an association?
A. I'm not.
Q. And is it fair to say that Mr. Ronwin approached you and asked you to offer on opinion that his symptoms, his neuromuscular symptoms were the result of taking Baycol?
A. My recollection was that he was asking my

opinion about the association of Baycol with his rotator cuff injury.

Q. That only?

A. That's my recollection.

Q. Okay. So stated differently, Mr. Ronwin approached you and asked you whether you would offer an opinion that his rotator cuff injury was associated with his use of Baycol, correct?

A. I believe that's correct.

Q. And you were uncomfortable doing so?

A. That's correct.

Q. Have you ever stated or suggested to Mr. Ronwin that any symptoms that he may be having are in any way associated with his use of Baycol?

A. I could not associate his use of any statin with the specific symptoms he was having.

MR. PILKINGTON: Doctor, I may have a couple more questions, but I do know that in courtesy to Mr. Ronwin, he may have a couple of questions.

MR. RONWIN: I got a few questions, yeah.

MR. PILKINGTON: I might have some questions, but I thank you for your time.

MR. RONWIN: I'll just go over to the other side. You want me to switch sides?

MR. PILKINGTON: Why don't we have the doctor

A. I do.
Q. And it was your testimony that it was extremely -- an extremely unlikely possibility?
A. Correct.
Q. Have you in your -- you've been working with statins for how many years?
A. Since they came out.
Q. And when was that?
A. Oh --
MR. RONWIN: About 1980.
A. Yeah.
Q. (BY MR. PILKINGTON) For nearly all of your clinical practice?
A. Correct.
Q. 20-plus years?
A. Correct.
Q. You've been doing research relating to statins?
A. More recently I have.
Q. And you've been treating patients, prescribing patients statins over those years, correct?
A. Correct.
Q. In your clinical experience, have you seen any evidence to suggest that a rotator cuff injury could be related to the use of statins?
A. I have not personally nor have my colleagues.