# Exhibit G

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

---

DEPOSITION OF: EUGENE WOLFEL, M.D.
June 8, 2006

---

| | |
|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : |
| | : MDL No. 1431 |
| This Document Relates to: | : (MJD) |
| | : |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : Case No. 02-0200 |
| | : |

---

TAKEN PURSUANT TO NOTICE on behalf of the Defendant at 4200 East 9th Avenue, Room 6430, Denver, Colorado 80262 at 9:10 a.m. before Lisa B. Kelly, Registered Professional Reporter and Notary Public within Colorado.

WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:

EUGENE WOLFEL, M.D.,

having been first duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MR. PILKINGTON:

Q. Good morning, Doctor. We met before the deposition. My name is Jeff Pilkington. I'm a lawyer who represents Bayer, and I am located in Denver, Colorado. Would you state your name and spell it for the record?

A. Sure. First name is Eugene, E-u-g-e-n-e. Last name Wolfel, W-o-l-f-e-l.

Q. Doctor, I'm taking your deposition today to better understand your care and treatment of Mr. Ronwin. Do you understand that?

A. Yes, I do.

Q. And you also understand that ethically I am precluded from speaking to you outside the presence of Mr. Ronwin?

A. I understand that now, yes.

Q. And that is the reason that I have to take your deposition as opposed to sitting down and talking to you. Do you understand that?

A. Yes, I do.

encouraging, despite Dr. Ronwin having some symptoms. The stent in the left common iliac artery was open. He had only a minimal amount of narrowing in the right common iliac artery, so the same artery on the other side.

And he had some mild narrowing of the external iliac artery, which is the branch right before it goes down into the leg, with a small amount of what's called a dissection. What a dissection is is that there's a little -- the lining of the blood vessel had split a little bit, probably during one of his procedures, but it was very stable.

And then they described as the runoff being good. What runoff is is how well the arteries in the leg fill. So there was no major narrowing that needed any treatment, but, you know, his vessels were not normal. So if there was any symptoms, it certainly wasn't related to a major blockage.

So as of May of 2005, his peripheral arterial disease was stable and he had responded well to the various procedures he's had over the last several years.

Q. And just to summarize, he has had multiple revascularizations of his legs, correct?

A. That's correct. That's correct.

Q. And would it be fair to say that when he presented to you in May of 2002, that he, indeed,

presented with peripheral arterial disease?
A. Yes. I think my notes document that in addition to the chest pain, he had complained of pain with walking or claudication. That's correct.
Q. Doctor, let's now turn to your assessment of Mr. Ronwin in May of 2002.
A. Okay.
Q. Let me back up. And I'll let you look at my notes as well -- or your office notes.
A. Okay.
Q. Doctor, Mr. Ronwin, did he advise you of the medications that he was taking at that time?
A. That's correct.
Q. And what did he tell you in terms of the medications that he was taking?
A. It says from the notes here that he was taking Simvastatin, also known as Zocor, 20 milligrams daily; Atenolol, 25 milligrams daily; aspirin, 325 milligrams daily; vitamin E, 400 international units daily; vitamin C, 500 milligrams daily.
Q. And was it your understanding that he would change the Zocor to 40 milligrams per day?
A. That's what is written in my notes, yes.
Q. And do you -- when you prepare your notes, do you make handwritten notes of your office visit as well?

Q. (BY MR. PILKINGTON) Doctor, is it fair to say that his recent lab results would not be indicative of whether 20 milligrams every other day is successful in keeping his LDL down?
A. You know, without measuring, that's difficult to determine. But clearly, his LDL control will not be as good on a lower dose of Lipitor, but we may have no choice if he has side effects.
Q. But this was the first time in your treatment of him that he ever complained about muscle aches and pains?
A. That's correct. But it's also the first time we switched statins. He's been on some dose of Simvastatin or Zocor the whole time, so this is the first time we used a different drug.
MR. RONWIN: Can I get that piece of paper?
Q. (BY MR. PILKINGTON) And I believe you testified his recent CPK test was what?
A. Was normal at 68 units per liter.
MR. RONWIN: Yeah. 68. Yeah. Okay. This will be 5.
Q. (BY MR. PILKINGTON) Did Mr. Ronwin ever tell you he took Baycol?
A. Not initially. And I've never actually documented it in my records. So obviously, I knew that he had, but I don't remember when I obtained that knowledge.

Q. Did Mr. Ronwin ever tell you that he believed that certain complaints or symptoms that he had were caused by his use of Baycol?
A. Not that I can personally recall, and I certainly haven't documented that --
Q. Has Mr. --
A. -- in my notes.
Q. Has Mr. Ronwin ever asked you for any opinions about whether Baycol can cause or did cause any symptoms or problems?
A. Not that I can recall. No.
Q. Has Mr. Ronwin ever complained to you about any cataracts or --
A. Not that I can recall. I don't think I specifically asked him about his visual acuity.
Q. Did he ever complain to you about any eye problems?
A. Not that I can recall.
Q. Did he ever complain to you about having right elbow pain?
A. I knew about the right elbow pain because of the information in the medical record. And I knew his elbow was actually injected on multiple occasions for an inflammation in that area.
Q. Did Mr. Ronwin ever complain to you about having

problems walking?

A. Well, yes. And that's -- part of that I assumed was related to his peripheral arterial disease. Because intermittent claudication will limit walking ability based on circulatory problems.

Q. Was it your understanding that the problems walking related to the claudication?

A. That was my assumption.

Q. Doctor, did Mr. Ronwin ever complain to you about having pain above his legs, in his back area?

A. Not that I can recall.

Q. Did Mr. Ronwin ever complain to you of having pain in his legs that was not associated with claudication?

A. I don't know that I can accurately answer that question because it pretty much focused on exertional discomfort, which I presume was claudication, so I didn't ask him about other pains.

Q. And did Dr. Ronwin ever complain to you about having any shoulder pain, other than that one office note in had which he referenced a left shoulder surgery?

A. Not that I can recall.

Q. Did Mr. Ronwin ever tell you or suggest to you that his rotator cuff surgery was caused by his use of Baycol?

# Exhibit H

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

---

DEPOSITION OF: SALLY A. KNAUER, M.D.
June 23, 2006

---

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : | Case No. 02-0200 |

TAKEN PURSUANT TO NOTICE AND SUBPOENA on behalf of the Defendant Bayer Corporation at 2121 East Harmony Road, Boardroom, Fort Collins, Colorado 80528 at 1:30 p.m. before Sylvia E. Noneff, Registered Professional Reporter and Notary Public within Colorado.

WHEREUPON, the within proceedings were taken pursuant to the Federal Rules of Civil Procedure:

MR. PILKINGTON: Doctor, we'll go on the record. Mr. Ronwin has a couple of comments, and I'll let him do --

MR. RONWIN: Yeah, before she's sworn in. That's fine.

MR. PILKINGTON: Well, we'll swear her in first, and then you can make --

MR. RONWIN: You want to swear her in?

MR. PILKINGTON: Yeah.

MR. RONWIN: Go ahead.

MR. PILKINGTON: But again, thank you. And swear her in.

SALLY A. KNAUER, M.D.,

having been first duly sworn to state the whole truth, was examined and testified as follows:

EXAMINATION

BY MR. PILKINGTON:

Q. Good afternoon, Dr. Knauer.

A. Good afternoon.

Q. My name is Jeff Pilkington. I'm with the law firm of Davis, Graham & Stubbs in Denver. I represent Bayer in this litigation which Mr. Ronwin has filed against my client, Bayer. Do you understand that?

area?

A. Yes. It looks like there is a bone spur, too.

Q. Doctor, this X-ray -- Mr. -- let me back up. Mr. Ronwin continued to have symptoms of -- chronic symptoms relating to his left shoulder, correct?

A. Yes, um-hum.

Q. And we'll get to those symptoms in a moment. But because of those symptoms, you did an X-ray on May 12 of 2003, correct?

A. Yes.

Q. You then did an arthrogram in late May 2003, correct?

A. Yes.

Q. The -- the findings of the X-ray and the arthrogram, as well as the symptoms, led you to recommend surgery for Mr. Ronwin, correct?

A. Yes.

Q. And that surgery was completed, I believe, on June 26th?

MR. RONWIN: 28th.

A. June 26th.

MR. RONWIN: 26th?

Q. (BY MR. PILKINGTON) According to your report?

Q. What does differential diagnosis refer to?
A. It refers to -- as you're trying to figure out what the diagnosis is, it refers to what are all the different considerations that you might have for that problem.
Q. And when considering a diagnosis for a condition, do you consider possible causes for that condition?
A. Yes.
Q. Doctor, what are possible causes of a tear of the supraspinatus tendon?
A. Possible causes would be trauma and impingement syndrome, aging, acromioclavicular degenerative joint disease, shoulder dislocation. That's fairly inclusive.
Q. And, Doctor, are those possible causes all causes that you consider in making a diagnosis and caring and treating for your patients?
A. Yes.
Q. Doctor, are -- on this differential diagnosis chart, are you aware of any evidence that supports Baycol as being a possible cause of supra -- of a supraspinatus tendon tear?
A. I'm not aware of any.
Q. Doctor, in your clinical judgment, would you

place Baycol on your list of differential diagnoses or causes of a supraspinatus tendon tear?

A. I would not.

Q. Doctor, we've gone through some of your notes, and we'll go through others. Doctor, based on your expertise as an orthopedic surgeon, a doctor who is board certified in orthopedics, as well as your clinical judgment, do you have an opinion as to the cause of Mr. Ronwin's rotator cuff tear?

A. I would state that the most likely cause would be that of a combination of factors, including the impingement, bone spurs, age of the patient.

Q. Doctor, that opinion is based on your clinical care and treatment of Mr. Ronwin?

A. Yes.

Q. As well as your background, education and professional experience?

A. Yes.

Q. Doctor, let's turn for a moment to the first time you saw Mr. Ronwin. We deposed Dr. Servi last week -- I'm sorry, Tuesday of this week, and Dr. Servi was the first doctor in your clinic to see Mr. Ronwin.

A. Yes.

Q. How would you describe your professional relationship with Dr. Servi? How do the two of you

Q. There it is.

A. Oh, thank you.

Q. Do you have May 5 -- I'm sorry, May 2nd?

A. May 2nd, I do. I do.

Q. You have that in front of you?

A. I do.

Q. And is that -- when were Mr. Ronwin's complaints at that time?

A. Let's see. He was in the office for the onset of severe left low back and buttock pain with a sudden onset after his daily walk.

Q. So was it your understanding, based on what he told you, that this low back pain and buttock pain came on all at once?

A. Yes, it was sudden, um-hum.

Q. Doctor, had -- at any point in time prior to this office visit in May of '03, had he complained to you about any sort of back pain?

A. I don't believe so.

Q. Did he complain to you about any sort of buttock pain?

A. I don't think so.

Q. Did he complain to you about any sort of leg pain?

A. No.

Q. What was your plan of course with respect to this back and buttock pain?

A. He had -- he very strongly desired to be put in the hospital because traction had helped him many years ago. And I talked to him about options of care and ultimately admitted him for traction.

Q. Did you follow him in the hospital for that?

A. I did.

Q. Do you know the outcome of that care and treatment?

A. I think he was just briefly hospitalized and went home feeling better.

MR. RONWIN: Almost -- almost a miraculous cure, wasn't it?

Q. (BY MR. PILKINGTON) But in any event, you -- you obtained some X-rays of his lower back, correct?

A. I did.

Q. And what did those X-rays show?

A. They showed some diminished joint space at L4-5 and L5-S1 with osteophyte formation, and I also stated, "There was a type of mesh-appearing graft on the radiograph."

Q. Your Impression was that this was "Low back and left buttock pain of unknown etiology," correct?

A. Yes.

Q. But what did you think that it may be stemming from or originating from?

A. Degenerative disk disease of the low back.

Q. Doctor, that brings us to May 12th of 2003, when he returned to your clinic, correct?

A. Yes.

Q. And at that time he noted that -- you noted that his back was -- was greatly improved, correct?

A. Yes.

Q. And at this point in time, you had another X-ray of -- you had an X-ray of his left shoulder, correct?

A. Yes.

Q. And I think we've already been through those findings, correct?

A. Yes.

Q. Do you agree that the X-ray of May 12, 2003 is consistent with the arthrogram that was done just a few weeks later; specifically, on May 28, 2003?

A. I do, um-hum.

Q. Doctor, do you also agree that the findings of the May 12, 2003 X-ray were consistent with the September 11, 2002 X-ray?

A. I do.

consistent with each other?

A. I do.

Q. Doctor, I'm about done, if you'd just give me a moment.

(Discussion off the record.)

Q. Doctor, we have gone through your office notes in some detail during this deposition, correct?

A. We have.

Q. Doctor, at any point in time during your care and treatment of Mr. Ronwin, did he complain about having problems with his vision?

A. I don't remember seeing that in any of my notes.

Q. Doctor, at any point in time during your care and treatment of Mr. Ronwin, did he complain to you about cataract problems?

A. I don't remember.

Q. Doctor, at any point in time during your care and treatment of Mr. Ronwin, did he complain to you about having right elbow pain?

A. I don't remember.

Q. Doctor, at any point in time during your care and treatment of Mr. Ronwin, did he complain about having a problem with walking, or a gait problem?

A. It just was associated with his severe back

pain episode.

Q. On that singular episode?

A. Yes.

Q. And at any point in time did Mr. Ronwin complain to you about having pain in the back of his legs?

A. Again, associated with his hospitalization for the back pain. But other than that, I don't recall other episodes.

Q. And, Doctor, when you say you don't recall, had Mr. Ronwin made these complaints to you, are those the sorts of complaints that you would have put down in your notes?

A. I try to be complete in my notes, yes.

Q. Okay. And let me ask you again.

A. Okay.

Q. Doctor, I've asked you a series of questions about whether or not Mr. Ronwin complained to you about certain things, correct?

A. Yes.

Q. And you've told me that you don't recall whether -- that he made those complaints, correct?

A. Correct.

Q. Doctor, are those the types of complaints that you would put down in your office notes had he made

Exhibit 10 are consistent with the findings that are set forth in the X-rays of September '02, May of '03, and the arthrogram of May of '03?

A. Yes.

Q. Doctor, do you know why Mr. Ronwin kept coming to you -- stopped coming to your clinic?

A. I believe it may be related to the fact that we had a difference of opinion with regard to the origin of the rotator cuff tear.

Q. Explain to the jury what that difference of opinion is.

A. He felt that it was due to the Baycol, and I had discussed with him that I had no knowledge of the connection of Baycol with rotator cuff tears, and our opinions differed. And I can't speak to what he was feeling at the time, but I think that was frustrating, and he felt that he had completed his care.

Q. Doctor, once again, is it your opinion to a reasonable degree of medical probability that the cause of his rotator cuff tear was not the Baycol?

A. Yes.

Q. Doctor, would you state again for the record your opinion to a reasonable degree of medical probability as to what you believe the cause of his supraspinatus rotator cuff tear was? Let me rephrase the

question, okay?

A. Yes.

Q. It was a poor question. Doctor, in your opinion to a reasonable degree of medical probability, what is the cause -- what was the cause of his rotator cuff tear?

A. I believe the likely cause would be the age of the patient, the degenerative changes that have already been noted on the X-ray, associated with some impingement.

Q. Doctor, I appreciate your time and your patience this afternoon. I may want to look into your file, but I do want to give Mr. Ronwin the opportunity to ask you questions.

A. Okay. Thank you.

Q. Before turning you over to Mr. Ronwin, I want to repeat to you and to Mr. Ronwin that it is very important that you provide answers to his questions, just as you have my questions.

A. Yes.

Q. If you do not know the answer to a question, or if a question is beyond your area of expertise, you certainly have the right to explain that to Mr. Ronwin, and you are under no obligation to answer a question that you do not understand or do not feel qualified to answer.