# Exhibit N

DEPOSITION OF

DR. RAUL G. REYES

---

IN RE: BAYCOL PRODUCTS LITIGATION

EDWARD RONWIN

U. S. DISTRICT COURT
DISTRICT OF MINNESOTA
MDL NO. 1431
(MJD)
CASE NO. 02-200

VERSUS

BAYER CORPORATION

---

SEPTEMBER 12, 2006 9:00 A. M.

AT THE OFFICES OF
DR. RAUL G. REYES
530 NORTH AVENUE F
CROWLEY, LOUISIANA

NAT DOUGET COURT REPORTERS
Steno and Video Reporting
P O Box 3226
3207 Landfair Street (70601)
Lake Charles, LA 70602-3226
337/480-0080 FAX 337/480-0330
800/259-9900 FAX 800/259-5672

DR. RAUL G. REYES,

THE WITNESS HEREINBEFORE NAMED, AFTER BEING FIRST DULY CAUTIONED AND SWORN TO TELL THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE TRUTH, TESTIFIED ON OATH AS FOLLOWS:

EXAMINATION BY MR. MIZGALA:

Q. State your name for the record, please.
A. Dr. Raul G. Reyes.
Q. We're here in Crowley, Louisiana today. Is this one of your business addresses, sir?
A. This is one of my offices.
Q. Okay. Where else do you have offices?
A. I have a office -- used to have a office in New Orleans. I have a office in Baton Rouge, an office in Hammond, and the office here at the present time.
Q. Okay. So that your office in New Orleans is not open and operating right now?
A. Not at the moment, I am going to open an office in Kenner within the next 60 days I hope.
Q. Previously, you had an office in LaPlace?
A. Yes, I did.
Q. And that's not open anymore?
A. No, it's closed.
Q. Slidell?

particular reason under a number of patients that I have to see.
Q. How would you describe your patient population, Doctor?
A. At the present time, I'm doing about 50 percent emergency medicine and 50 percent personal injury work.
Q. Okay. And when you say emergency medicine, what do you mean by that?
A. I'm -- I work for the Schumacher Group out of Lafayette and they run an -- emergency services throughout southeast -- south of the United States, the southern part of the United States, and I contract as an independent emergency room physician.
Q. So that 50 percent are you seeing in your offices, or are you at a hospital when you see them?
A. Hospital.
Q. Okay. So the people you see at the off -- at your offices are the personal injury people?
A. At the moment, the personal injury people, about 98 percent of them.
Mr. Mizgala:
Okay.
A. Or maybe I should reduce that because of the large

amount of class -- class action work that we have been doing for the accidents that occurred.

Q. That's personal injury type, too, right?

A. If you call it that. You know, I -- I differentiate it, because the other one is accident work.

Q. Okay. So you have one patient -- have one set of patients you see that's accident work. What do you -- what do you mean by that?

A. Automobile accidents. We get -- most of it is automobile accidents.

Q. Okay. How do these people come to you?

A. They're referred by attorneys.

Q. Okay. Do they have lawsuits when they come to you, or they're thinking about suing?

A. I don't know that. All I know is that they've been involved in an accident, and the attorney asks me to evaluate them from a medical standpoint and treat them. And this is what they come to me for.

Q. Okay. And you also said there was some class action?

A. They have been suits. Like in this Baycol situation, for example, where I've been asked to see patients on a large basis, and I have to

A. No.
Q. Are you a toxicologist?
A. No.
Q. And you're not a cardiologist, correct?
A. No.
Q. Do you hold yourself out as an expert in cardiology?
A. No.
Q. Doctor, do you -- do you prescribe statins currently?
A. No.
Q. Have you ever prescribed statins?
A. No.
Q. Doctor, when those -- the Baycol users came to you, were you aware that those people had already filed a lawsuit?
A. I don't remember that.
Q. If they had, would you have taken that into account?
A. Well, I think that the fact that they -- they were -- they were referred by attorneys implied to me that they would probably pursue litigation, but I was not aware that -- I don't remember it having been filed. As for as for whether it would have made any difference in my approach to it, no, it

would not have.

Q. Why not?

A. Because all I was asked to do was to document the patient's history and to examine him as needed from that standpoint. That was -- that was my function as a physician.

Q. Okay. Did you tell any people -- anybody that Baycol didn't cause their conditions?

A. I think that the people that I saw all told me that they had taken Baycol, and the majority of them -- and again, I'm speaking in generalities -- the majority of them felt that their problem was related to Baycol. There were some people, a few, that didn't know, and some that felt what they were worried about was what would happen to them in the future.

Mr. Mizgala:

Uh-huh.

A. And wherever that happened, I think that I documented that in -- in the record.

Q. Okay. But the ones that -- that had taken Baycol and felt like they had a problem due to their use of Baycol, you believed, right?

A. I didn't say that the Baycol caused their problem.

Q. What did you say?

A. They felt that Baycol caused the problem. My feeling, as a physician and what I have read of the situation, was that it could have caused their problem. I -- I didn't say it caused your problem period, you know.

Mr. Mizgala:
Okay.

A. But there were -- there were a lot of circumstances there where in some cases perhaps Baycol may have been contributing in a minor degree and others maybe it did not contribute, but they had taken Baycol.

Mr. Mizgala:
Okay.

A. So they -- they felt that it was due to that.

Q. So were you offering opinions to a reasonable degree of medical probability or not?

A. I was offering an opinion insofar as my deduction, and I -- I think in some of my reports, I stated patient took Baycol for such a period of time, and I think the reports are exactly on that basis, but again, I would have to look at each report individually. So my conclusions were based upon my feelings. There were some patients that had definitely felt that what -- well, from what the

Dr. Ronwin:
Let's go back on the record.
Mr. Mizgala:
You ready?
Court Reporter:
Yes.
MR. MIZGALA:
Q. Dr. Reyes, my question was can you point me to any published medical literature that says that the use of statins and/or Baycol is associated with rotator cuff injuries?
A. I cannot provide you with that information, except what I -- what I told was a personal experience of mine. That there were a number of patients that I saw that complained of problems of that nature.
Q. Did you publish that?
A. No.
Q. Okay. That's all just your personal experiences?
A. My personal experience. Right.
Q. Nothing in the published medical literature?
A. They -- I said no. I'm not -- I'm not aware of it. I don't want to say that it doesn't exist, but I personally am not aware of it.
Mr. Mizgala:
Okay.

A. The supraspinatus is a muscle.
Q. Okay. And -- and, Doctor, the -- if Baycol was involved, why would it only effect this one, as you call it, muscle?
A. I -- I don't have -- I cannot answer your question in that regard, but all I can -- generally speaking, it is stated that Baycol affects muscles, and you know, at the time that I started seeing these patients, I didn't know what Baycol could or could not do. But I do remember, like I mentioned before, that I was surprised to see so many patients, relatively speaking, that had shoulder problems. So if Baycol can affect all the muscles in the body, then the question is can Baycol effect a group of muscles. Does it make the patient more prone to develop an injury like a shoulder injury, which is so common. And that's the question mark. I don't know.
Q. Doctor, should injuries are common in people in general, aren't they?
A. Well, they do --
Q. Especially older people?
A. They do occur. Yes. They do occur, especially in older people that have a tendency to perhaps do more than they should be doing.

Q. Okay. Dr. Ronwin had a right rotator cuff tear years before he ever took Baycol, right?
A. Yeah. I believe that that is so.
Q. Okay. So Baycol didn't have anything to do with that one, right?
A. Obviously not.
Mr. Mizgala:
Okay.
A. He wasn't taking it.
Q. And age and degeneration can precipitate rotator cuff tears, correct?
A. That's correct.
Q. Dr. Ronwin has degenerative changes in his -- in his shoulders, right?
A. That's correct.
Q. He's got osteoarthritis, right?
A. Right.
Q. Degenerative joint disease, right?
A. That is correct.
Q. He had degenerative changes in his left shoulder, correct?
A. Right.
Q. And that could fully explain his rotator cuff injury, right?
A. It could.

Q. Baycol might have had nothing to do with this, right?

A. Maybe.

Q. Can you say one way or the other?

A. No, I can't. Well, I can say that there is a probability that it could have contributed to the problem.

Q. Well, aren't you --

A. It might have accelerated it, it may have not.

Q. Aren't you really saying, Doctor, there's a possibility?

A. That's correct.

Mr. Mizgala:

Okay.

Witness:

Again, semantics, you know, possibility, probability.

Mr. Mizgala:

Well, unfortunately, we're in -- we're in the legal community, Doctor, and that's why we're here.

Witness:

Yeah. Okay. Well, I like to -- I like to fool with the English language in a little bit different manner, but I understand your

point of view.

Q. Doctor, what's your understanding of when Dr. Ronwin started taking Baycol?

A. My report states that Dr. Ronwin commenced taking Baycol on January the 10th, 2001, from samples provided to him by his cardiologist's office.

Mr. Mizgala:

Okay.

A. And that about a month later, his shoulder, left shoulder, began to give him pain.

Q. Okay. So, is it -- is it because of that timing that you even consider Baycol to be a possibility, is -- is that he started taking Baycol, and then he had the shoulder problems?

A. You know, obviously, if people had not developed rhabdomyolysis, the whole Baycol problem might not have come up. I don't know. But once a problem like this comes up, then my feeling is that most everybody is on equal terms about speculating what can happen in the future, and I don't know what Baycol did to a lot of people. I don't know what Baycol can do to a lot of people. I do know that there are risks involving in taking Baycol, so that's why Baycol was taken off the market. So, all I'm saying is that he was exposed to a

substance that was proven to be bad, and what's going to happen to all these people, I don't know, and nobody -- and nobody, being a doctor at his practice for 56 years, there are no experts in the matter to be 100 percent absolute. I think all one can do is render an opinion.

Q. Okay. But, Doctor, we agreed awhile ago that Mr. Ronwin never had -- Dr. Ronwin, excuse me, never had rhabdo, right?

A. Right. Yes.

Q. Okay. But I'm just saying -- you said he started taking Baycol on January 10th.

A. Uh-huh (yes).

Q. And then a month later, he developed shoulder pain?

A. Right. That's what he said.

Q. Okay. So the only reason you considered Baycol -- if he had developed shoulder pain before, you wouldn't have attributed it to the Baycol, right?

A. That's correct. I would not.

Q. Okay. So it's the temporal relationship between those two events?

A. Well, it's the recognition of a toxic substance with the development of a problem for an individual that he strongly feels injured him.

problem, we have to look at the situation and say, you know, I fainted. I fainted after I took a Vicodin 20 minutes ago. Well, that's a cause and effect relationship, and who's to say that that person fainted because she took the Vicodin, or because she was going to pass out because she had a problem, maybe a new sick -- an illness coming up. But that person had never fainted before in her life, so these issues keep cropping up all the time in -- in relationship to what people do when they take -- when they do things. So he apparently did not feel that he had a problem to a great degree with his shoulder, and he -- and my interpretation of his story is that the Baycol precipitated a rotator cuff injury. That's my understanding of it. Now maybe he feels that it caused it. I -- I don't know. Again, it's something that I would only be speculating to say that it caused it. I -- I do feel that if it didn't cause it, it probably contributed to it.

Q. Okay. The -- you also have in paragraph seven on the second page of your report --

A. Uh-huh (yes).

Q. -- you have the other problems that Dr. Ronwin related to you, blurred vision, tendency to

stumble, inadvertently moving one leg. There's a whole slew of them.

A. Uh-huh (yes).

Q. And you say all of these symptoms may be related to his ingestion of Baycol.

A. Uh-huh (yes).

Q. Is that the same sort of "it's possible" opinion?

A. Well, the PDR mentions these things as possible problems related to Baycol, so --

Reporter:

Excuse me. One moment.

Mr. Mizgala:

Hold on -- hold on, Doctor. She needs to change the tape.

(Reporter changes tape.)

MR. MIZGALA:

Q. Okay. I think you said the PDR mentions these as possible problems related to Baycol? Were you done, Doctor?

A. Yes. That's correct. Uh-huh (yes).

Q. Well, you know, I looked through the medical records that you had attached, and I don't see a mention of any of those during the time he was on Baycol.

A. Well, I didn't get this history from the air, you

know. Somehow or another it must have been provided.
Q. Well, that's what he told you, right?
A. Right. Uh-huh (yes).
Q. Did you look to verify if that was in any of the medical records?
A. I -- I reviewed the medical records, so I'm sure that --
Q. Well --
A. -- that, you know, if they're -- if they're there, I don't -- we can review them now, if you wish, but at the time, this is the -- the history that I had.
Q. Right. I looked through the medical records from March until August 8th of 2001, and I don't see any of those complaints listed in the medical records.
A. All right. Do you want me to take a look through them?
Q. Go right ahead.
A. Okay. (Witness reviewing medical records.) As I review the medical history here, I see that he was having some digestive problems, which were attended to by the utilization of Naproxin.
Q. Well, that was attributed to his use of Naproxin,

Q. Okay. But, Doctor, I just want to nail this one thing. During the time he was on Baycol, from the -- and we have the March through August, there aren't any of these other complaints that you have listed in paragraph seven?

A. Well, the records that I have available do not reveal that, but as I said, from somewhere, I got the history --

Mr. Mizgala:

Right.

A. -- and it might have been from him that I got the history that these problems existed.

Q. Okay. And it says -- in -- in number seven, it says Dr. Ronwin has explained.

A. Uh-huh (yes). Right.

Q. Suggesting he told you that, right?

A. Right.

Q. Okay. And your opinion about the symptoms being related, is that the same sort of level as with the rotator cuff injury, that it's possible that these played a role?

A. Again, I'm -- I'm guided primarily by what the PDR states where they implicate that these symptoms do occur with people that take Baycol.

Q. Right, but as you said, Doctor, they're saying --