UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | ) | |
| | ) | MDL 1431 (MJD/SRN) |
| This document relates to: | ) | |
| | ) | Case No. 02-0200 |
| Edward Ronwin v. Bayer Corp. | ) | |

**PLAINTIFF, EDWARD RONWIN'S RESPONSE TO BAYER CORP.'S MOTION FOR SUMMARY JUDGMENT ORAL ARGUMENT REQUESTED**

Plaintiff, Edward Ronwin, ("Dr. RONWIN"), hereby Responds to Bayer Corp.'s ("BAYER"), Motion for Summary Judgment, ("MOTION")[1].

This Response has many more pages of text than the 30 pages allowed in this MDL for briefs. That result arises from the fact that BAYER's MOTION is actually three (3) motions masquerading as one (1) motion. BAYER's MOTION does indeed contain a request for summary judgment, but it also includes a Daubert motion challenging Dr. Raul G. Reyes' credentials as an expert for Dr.RONWIN and another Daubert motion challenging Dr.RONWIN as an expert for himself. The matter was raised with Ms.Susan Weber, one of BAYER's lead counsel who suggested that I place this note in this Response with mention that Ms. Weber has agreed that BAYER will raise no objection to the number of pages contained herein.

Oral argument is requested because, in Dr. RONWIN's opinion, BAYER engaged in a foul game with respect to its Motion to Compel Dr. RONWIN's expert deposition without payment of fee. The foul game was to hold back citation and discussion of a reported case until after Dr. RONWIN's Response was filed. BAYER then put the case into its Reply. However, the case was not applicable to the ultimate question. But, without oral argument and a recognition by the

[1] Copies of deposition pages cited herein follow the Exhibits and are presented for each MD's deposition and Dr.RONWIN's in alphabetical order of their last names. The first page of each deposition precedes the cited pages.

FEB 1 2007
U.S. DISTRICT COURT MPLS

02/12/2007 07:01 FAX 970 224 3838 ED RONWIN 002

Fed.R.Civ.P. of sur-replies, BAYER would get an advantage to which it was not entitled nor do the rules comtemplate such artificial advantage to one side over the other. A BAYER attorney claims that the case was discovered after the filing of its motion. If so, BAYER had an immediate duty to notify Dr. RONWIN so that he could discourse on the case in his Response and BAYER could then reply in its Reply. Instead, BAYER took advantage of the rules, but only because the lack of oral argument, which would render such games null and void. Further, if a "new" case were brought up in oral argument, a recess in argument and time to view the case by the opposing party would prevent undue advantage to any party.

A starting example of the dishonest approach of BAYER, acting through its attorneys herein, is provided by the fact that the Certificate of Service, signed by Mr. David L. Barlett, of the Sidley Austin law firm, states that on <u>January 19, 2007</u>, a Friday, "copies of [MOTION] were mailed to Dr. Ronwin." However, the envelope carries a stamp made from a Pitney Bowes machine in the office of Sidley Austin and the date of the stamp is <u>January 22, 2007</u>. a Monday; copy of the envelope cover is attached hereto as Exh. 1. The MOTION was received by Dr. RONWIN on January 25, 2007. Had MOTION been sent as alleged, Dr. RONWIN would have received it by Monday, January 22. Ms. Weber has also agreed to refrain from objecting to late filing of this Response, which will probably not occur; however, that accommodation does not excuse the obvious falseness of the Certificate of Service which is a solemn declaration to the court.

Throughout MOTION, Plaintiff is referred to as "Mr. Ronwin." It is undoubted that Plaintiff is <u>"Dr"</u>. Ronwin. I rarely stand on that formality, but the obvious purpose in using Mr. Ronwin rather than Dr. Ronwin was to belittle Plaintiff's person as a biochemical expert. To stress a



02/12/2007 07:02 FAX 970 224 3838 ED RONWIN 003

response to that abuse, I use Dr.RONWIN to refer to Plaintiff herein. Had, Mr. Beck, who is lead counsel on MOTION referred to Plaintiff as "Ronwin" that would not have been as objectionable as using the appellation, "Mr".

BAYER's one-page summation in its Memorandum in Support of MOTION, ("MEMO"), is another example of the many presented by BAYER to this court of its significantly false, absurd, distorted and unsupported statements concerning the validity of RONWIN's specific case in this MDL. Thus, the 1st ¶, p. 1, MEMO is false. BAYER can believe that all the injuries suffered by RONWIN "go with being 82 years old," [now 83], but BAYER will have to prove that in trial since that raises genuine issues of material fact--which is for the jury to decide. Furthermore, the injuries started about 5-6 weeks after RONWIN started taking Baycol when RONWIN was 77 years old.

In bullet point 1, p. 1, MEMO, BAYER asserts that Dr. RONWIN's "treating physicians testified that his conditions are likely the natural result of the aging process." That is the opinion of some of those physicians, but not of all; nor are MD's particularly trained to determine causation of injurious drug action, and lastly, if they were, and while their expert status may be determined by the court, the determination of the credibility of their testimony is for the jury not for BAYER's wishes, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 2796-7, 125 L.Ed.2d 469 (1993).

Furthermore, the fraudulent and perjurous behavior of two of the experts relied upon by BAYER will be adequately demonstrated in this Response and that of other experts will refute BAYER's position.

The alleged "speculation" of Dr. RONWIN's "hired expert [as] inadmissible under Daubert,"

bullet point 2, p. 1, MEMO, is false, as will be demonstrated below. BAYER has not submitted any motion to challenge Dr. Raul G. Reye's expert status, nor that of Dr. RONWIN. Such challenge can hardly be made without violating F.R.C.P. 11 in view of the credentials of either expert. It will be shown that Dr. Reyes actually labelled Dr. RONWIN's rotator cuff tear as caused by Baycol as a "high probability," not "possibility" as BAYER's attorney attempted to push on Dr. Reyes and that at the end of his testimony, Dr. Reyes reiterated his "high probability" opinion and that "<u>he intended to stand by it</u>." This matter is dealt with subsequently herein.

With regard to bullet point 3, p.1, MEMO, Dr. RONWIN's "do-it-yourself" expert report was never challenged by motion and has, as its obvious major thrust, that Baycol caused Dr. RONWIN's injuries. Copy of said report is Exh. 2, (the pages of Exh.2 have been renumbered consecutively at the bottom right corner yielding 28 pages to which reference will be made at times to specific pages). Also, the allegation that Dr.RONWIN "has not worked for 35 years" in biochemistry is nonsense and will be considered at the appropriate spot in this Response.

Further, it will be demonstrated beyond doubt that biochemists and molecular biologists (one and the same as will be noted later), are the one's to provide the facts <u>on any drug causation of bodily injury to humans</u>, including Baycol, the dangerous and murderous drug put on the market by BAYER despite adequate knowledge that it was purveying a dangerous and murderous drug.

The conclusion in the last ¶, p. 1, MEMO, will be shown to be wishful thinking in this Response.

In preliminary preparation of this Response, it proved that answer to each and every allegation, frequently reiterated in MEMO, yielded over 20 pages of text and still Dr. RONWIN's position



02/12/2007 07:03 FAX 970 224 3838 ED RONWIN 005

had barely been presented. Therefore, BAYER's position in MEMO will be summarized:

Preliminarily, a reading of MOTION reveals continual use of one-line quotations from cases and depositions that ignore amplifying text that often negates BAYER's points.

1. BAYER alleges that Dr. RONWIN's medical problems include, inter alia, "degenerative joint and disk disease," 1st full ¶, p. 2, MEMO; "Since discontinuing Baycol, [Dr.RONWIN], continued to complain of leg pains his physicians, [all "MDs", which will be used in lieu of the word physicians], attribute to claudication," 2nd full ¶, p. 3, MEMO, leg pains (again), p. 9, MEMO; and complained of joint problems including elbow (left or right not stated) and back pains, 1st full ¶, p. 4, MEMO; "cataracts and blurred vision but [Dr. RONWIN] can't recall precisely when either condition began," last ¶, p. 4, MEMO; elbow pains (again), p. 10, MEMO; back pain (again), p. 10, MEMO; blurred vision and cataracts (again), p. 11, MEMO; Gait problems, p. 11, MEMO.

2. BAYER charges that Dr. RONWIN went to every other day dosing with Baycol, (and other statins later), "to save money," p. 3, MEMO.

3. In Sept., 1994, Dr. RONWIN tore his right rotator cuff; one MD (allegedly) informed Dr. RONWIN that degenerative conditions in his right shoulder may have caused the tear. Dr. RONWIN subsequently tore his left shoulder rotator cuff. Cites to Drs. Knauer, Servi and Torkelson, pp. 3-4, MEMO; "...no medical evidence that [Dr. RONWIN's] [left] rotator cuff tear was caused by Baycol," 1st full ¶, p. 7, MEMO; 2nd ¶, p. 7, on Dr. Knauer's testimony; 3rd ¶, pp. 7-8, MEMO on Dr. Servi's testimony and p. 8, on Dr. Torkelson's testimony.

4. Dr. RONWIN blames everything that ails him on Baycol, 1st full ¶, p. 5, MEMO.

5. "Under Wyoming law...specific causation must be proved to a reasonable degree of medical

probability through expert medical testimony," (perhaps), 1st full ¶, p. 6, MEMO.

6. Pages 13-20, MEMO, on Dr. Reyes testimony and expertise.

7. Pages 20-23, MEMO, on Dr. RONWIN's testimony and expertise.

**RESPONSE TO THE POINTS SET FORTH ABOVE:**

1. Starting approximately 5-6 weeks after commencing ingestion of Baycol, Dr.RONWIN complained of the following injuries:

> Left bursa and arm pains, [which were the rotator cuff tear]; had blurred vision on occasions, [which ceased with discontinuence of Baycol dosing]; tended to walk one leg over the other at times causing tripping, [which ceased with Baycol discontinuence]; pain in back of thighs both legs, [which continue]; some back pains above legs, [which continue]; some right arm pains, [entire arm, later exacerbated by a needle stick]; slight cataracts in both eyes, [the cataracts remain]. (bracketed comments added); see Plaintiff's Fact Sheet, Exh. L, MEMO, Section VI.1.

Despite surgery, the left arm has not returned to full, original capacity, Dr. Knauer Depo. 60:19-62:15; Dr. Prince Depo.29:16-20. Likewise, the pain in the back of both leg thighs and back pain in the buttock and lower back areas persists.

As quoted above, and contrary to BAYER's innuendos, p.4, MEMO, no degenerative joint nor disk disease was complained of by Dr. RONWIN. The back of leg pains that Dr. RONWIN complained of to MDs, all cardiologists, and Dr. Prince, were <u>calf</u> pains, last ¶, p.2; 2nd full ¶, p.3; 1st full ¶, p.4, MEMO, not thigh pains nor back pains. Calf pains were <u>not</u> complained of in this action, see above quotation. Calf pains are gastrocnemius muscle pains due to poor blood flow, are distinct pains and not associated with thigh pains. They are claudication pains. The back thigh pains and lower back pains are neuromuscular in origin, Dr.Hiatt Depo.34:2-7.

The only possible "joint" problem complained of was and is the rotator cuff tear, which is a tendon problem.



02/12/2007 07:03 FAX 970 224 3838 ED RONWIN 007

In the last ¶, p. 3, MEMO, BAYER refers to Dr.RONWIN's right shoulder rotator cuff tear and subsequent surgery to correct the condition. That occurred in 1994, not in 2001 nor since. BAYER alleges that "[a]t least one [MD] has informed [Dr.RONWIN] that a degenerative condition in his right shoulder may have caused the tear," (emphasis added), pointing to Dr. RONWIN's depo. 343:19-22 and 346:20-24. The first depo. reference, (part of Exh.A, MEMO), contains an acknowledgement by Dr.RONWIN that he had right shoulder spurs. In the second reference, Dr.RONWIN merely allows that the suggestion that a degenerative condition may have caused the right shoulder tear, (emphasis added), but clearly states, Exh.A, MEMO, 346:23-25:

> "...but, I don't know whether he did it, or how it was done. I don't think MacRandall, (one of the two surgeons at the operation), did it, [i.e., stated that a degenerative condition, (essentially spurs), caused the right shoulder rotator cuff tear]. Nor did Dr. Behrens, who actually did the surgery ever tell Dr.RONWIN that spurs caused the tear.

In fact, Dr.Behrens told Dr.RONWIN that his being rear-ended in his automobile by another vehicle was known to cause rotator cuff tears. (RONWIN AFFIDAVIT).

The right elbow pain that involved Dr.Deane in 2005 was due to a vicious needle stick by a laboratory assistant at the Univ.of Colorado Hospital in Denver, CO. The ass't. failed to get blood (for a lipid panel, etc.) from Dr.RONWIN's left arm on two or three attempts. She then tried the right arm and failed on the first attempt. In frustration, she rammed the needle into the antecubital fossa of Dr.RONWIN's right arm. That set off nerve pain which shoots down to the palm. As Dr.Deane also observed, Dr.RONWIN presented significant right lateral epicondyle pain. That episode, and the pain experienced, is not and was not ever placed in issue in this case. While he was not certain, Dr.Deane did agree that the needle stick could cause the antecubital fossa pain, Deane, Depo. 43:16-44:5, Exh. K, MEMO.

None of Dr.Deane's examination and its results had anything to do with Dr.RONWIN's ingestion of Baycol and BAYER's statement that Dr.Deane teated Dr.RONWIN "..for elbow pains," 1st full ¶, ls.3-4, p. 4, MEMO, fails to specify that it was the <u>right</u> elbow; not left elbow!

The back pain referred to in 1st full ¶, p.4, MEMO, which occurred in May, 2003, attributed to "degenerative disks," has no relation to the back pain Dr.RONWIN continues to experience from Baycol action. Since, approximately 1969, Dr.RONWIN has experienced very occasional, involuntary back muscle contractions, (and expansions in sequence), i.e. muscle spasms. In fact, when they occur, one can feel the muscle move back and forth in the affected area. Orthopedic surgeons have for a number of years claimed that traction does not work to stop back pain. However, one night in traction has always worked on Dr.RONWIN. Proof is provided by Exhs. 3 and 4, hereto, which deal with the episode in May, 2003 and an earlier one in Sioux Falls, SD in Nov., 1999. Dr. Knauer was such a disbeliever in the efficacy of traction that she at first refused to admit Dr.RONWIN to the hospital and only after coming to her office a few days later in agony, did she admit Dr.RONWIN. The next morning, and after a night in traction, Dr.RONWIN was walking through the ward as though nothing had ever happened to him. That similar disbelief bedeviled the situation that arose in Nov., 1999, but after considerable dispute with the hospital administration and some MDs, Dr.RONWIN was put into traction and, lo and behold, traction did the trick! So much for "authoritive medical determinations" or "reasonable degree of medical probability."

Dr.Prince never examined Dr.RONWIN for "arthritis," 1st full ¶, p.4, MEMO, and Dr.Prince's statement, Exh.C, MEMO, Prince Depo. 22:10-14, that Dr.RONWIN took

"arthritis" medicine is incorrect. With the exception of one or two days when prescribed by two different MD's, Dr.RONWIN took NASID's, (non-steroidal anti-inflammation drugs often prescribed for arthritic inflammations), and promptly ceased when significant stomach aches ensued. (AFFIDAVIT).

As to the notion that Dr.RONWIN discontinued Baycol in August, 2001, 1st full ¶. p. 3, MEMO, Dr.RONWIN did not decide to discontinue taking Baycol; rather, as BAYER well knows, it yanked Baycol from the market on Aug. 8-9, 2001, because the FDA was about to order its marketing discontinuence.

2. BAYER writes, 1st full ¶, p. 3, MEMO: "In May, 2001, [Dr.] Ronwin unilaterally <u>decided to save money by cutting his dosage from once a day to once every other day</u>." (emphasis added). That is an outrageous and absolutely false statement, which BAYER had reason to know is not true! The reason why Dr.RONWIN, <u>a biochemical expert</u>, changed from every day dosing with Baycol to every other day dosing, is that Dr.RONWIN read an article in the well-respected, world-wide journal, <u>Science</u>, described by Dr.Wolfel as "...a very prestigious scientific journal," Depo. 133:16-18, and in which it was reported that the common statins on the market, which included Baycol, all bound extremely tightly to the liver enzyme, HMG Reductase, which enzyme action is part of the <u>biochemical</u> reactions that ultimately convert the acetyl group to cholesterol. Based on Dr.RONWIN's expert biochemical understanding that the Baycol-enzyme complex which halts the reactions to create cholesterol would last at least 48 hours, Dr.RONWIN predicted that every other day dosing would be as efficacious as every other day dosing with Baycol, (and with other marketed statins). Proof: See Exh. 5, which is a copy of Dr.RONWIN's letter to Dr.Keller, dated May 18, 2001, explaining the essence of the article in



02/12/2007 07:05 FAX 970 224 3838 ED RONWIN 010

Science, a copy of which was enclosed with the letter of May 18, 2001. That BAYER was well acquainted with the above explanation for Dr.RONWIN's switch to every other day dosing is proven by the fact that BAYER included a copy of the letter in its Exh M, MEMO. Hence, BAYER, with full knowledge of why Dr.RONWIN switched to every other day dosing, deliberately presented the lie quoted above to this court.

Attached hereto is a copy of the record kept over the years by Dr.RONWIN of his lipid panel results, (Cholesterol, LDL, HDL and Triglyceride levels), Exh. 6. After starting every other day dosing with Baycol in late May, 2001 and doing the same with Zocor, which was used after Baycol was yanked from the market and then with Lipitor since April of 2006, Dr.RONWIN's lipid panels are every bit as good as they ever were with Baycol every day dosing and the results with Lipitor are exceptionally good. In fact, the last result noted, which was due to Lipitor, is so good that if a party not taking statins presented such a lipid profile to an MD, the party would not even be considered for a prescription for a statin! The data in Exh.6 is supported by original clinical reports. To reduce the paper herein, the voluminous clinical reports are not provided but they form part of Exh. 13 Depo. of Dr.Wolfel.

It is true that there is cost-saving associated with every other day dosing, but, more important, is that all statins cause, in varying degree, adverse reactions. Every other day dosing significantly reduces exposure to such potential adverse reactions. Although, Dr.Hiatt gave testimony somewhat inimical to Dr.RONWIN, he had a short time prior to his depo. told Dr.RONWIN that Dr.RONWIN's every other day statin dosing was becoming popular.

3. That Dr.RONWIN had his right shoulder rotator cuff torn in Sept., 1994, is without effect herein. Dr. Behrens, who performed the operation to repair the tear, informed Dr.RONWIN that

the cause was the automobile rear-ending to which Dr.RONWIN had been subjected.

4. From the foregoing, it is clear that BAYER attributes to Dr.RONWIN claims of injuries Dr.RONWIN does not and has not claimed, e.g., calf claudication problems; the very occasional involuntary back muscle spasms and arthritic problems.

5. The applicable aspects of Wyoming law, with respect to motions for summary judgment will be discussed subsequent hereto.

6. and 7. The expertise of, the reports filed herein by and the testimony of Drs. Reyes and RONWIN will be discussed subsequently herein.

BAYER rests some of its allegations on the opinions of the MDs, who treated Dr.RONWIN; see Sec.I.A., pp. 7-9 and I.B, pp. 9-12.

The deposition testimony of these MDs and other MDs are discussed in the ensuing:

**ON SOME OF DR. RONWIN's TREATING MDs:**

**ON DR. RICHARD TORKELSON**

Dr. Torkelson briefly saw Dr.RONWIN on March 16, 2001 and on Aug. 8, 2001, Torkelson Depo. 23:10-24; the March 21, 2001 visit was with Dr. Rangitsch, a partner of Dr. Torkelson, Torkelson Depo. 65:16-21. Exh. 7, contains the notes of each MD for each visit.

As can be seen from Exh. 7, the notes on each visit consist of two portions; a handwritten part and a typed part.

Dr. Torkelson alleges that he writes the handwritten part of each visit note and dictates the transcribed portion,[2] Depo. 24:20-25:19. However, Dr. Torkelson gave different and incompatible versions of how his notes are prepared. Thus: Dr. Torkelson asserts that his notes record

---

[2]Hereinafter, if a series of text deals with the same deponent, then the deponents name will not be repeated and the citation will be as follows: Depo. (page(s)):(lines).

what the patient tells him, Depo. 25:8-23; which he reiterates Depo.61:15-16,22-23; 67:9-11; 78:23-79:5. No qualifications, "no error," he writes down what the patient tells him!

Not only does he write down what the patient tells him, but Dr. Torkelson further claims that his handwritten notes are <u>exactly</u> as the patient is speaking, Depo. 59:9-11.

Subsequently, Dr. Torkelson testifies that his handwritten notes are not exact and that if he wants exact patient statements in his notes, he puts the statement in quotation marks, Depo. 79:6-21.

At this point we have Dr. Torkelson only writing what the patient tells him and what he writes is <u>exactly</u> what the patient tells him. Therefore, his handwritten notes of March 16, 2001 and Aug. 8, 2001 on Dr.RONWIN are <u>exact</u>. But, Dr. Torkelson also testifies that if he puts down exact patient statements, then the statements are enclosed in quotation marks. Therefore, his handwritten notes at this point are both exact and not exact--an extraordinary result!

Incongruities don't give Dr. Torkelson pause. He continued by testifying that his handwritten notes are "not an absolute transcription," (meaning of what the patient tells him), and he admits putting into the dictated transcription of his notes things not in the handwritten notes, Depo. 82:10-83:6.

So now Dr. Torkelson's notes are what the patient tells him, exactly at that, and, at the same time, not what the patient tells him.

If there is any truth in Dr. Torkelson's testimony, it is difficult to discern. Furthermore, the foregoing examples of his testimony fuels the notion that Dr. Torkelson was less than honest in other parts of his testimony.

In the continuation of the transcription portion of Dr. Torkelson's notes on the Aug. 8, 2001



02/12/2007 07:06 FAX 970 224 3838 ED RONWIN 013

visit, Exh.7, 3rd page, there is written, "[h]e [Dr.RONWIN] has mild pain with elevation and mild pain with resisted abduction-flexion." However, in his handwritten notes for Aug. 8, 2001, Exh.7, 2nd page, there is no mention of "mild pain." That sparked questions.

Asked where he got the "mild pain" description, Dr. Torkelson first answered, "That's what the patient indicates." Depo. 79:8-9, but realizing that he did not note "mild pain" anywhere in his handwritten notes, he quickly presents the excuse that he puts exact quotes of patient comments "in quotation marks," Depo. 79:9-15, but then he admits that he did not write, "anything about mild pain," Depo. 79:16-18. To explain the discrepancy with his earlier description of his practice in taking notes, he testifies that his "handwritten notes are not exact," Depo. 79:19-80:1. Then Dr.RONWIN raised his right thumb and asked, "How much pain do I have in my thumb?", to which Dr. Torkelson answered, "I have no idea," Depo 80-2-5. Then, Dr.RONWIN asked how he knew whether the patient had,"horrendous, almost horrendous, nearly unbearable, mild or virtually nonexistent pain," to which Dr. Torkelson replied, "I have no way of knowing that amount of pain the patient has unless they tell me," Depo. 80:6-13. Yet, in his dictated notes for Aug. 8, 2001, he twice describes Dr.RONWIN's pain as mild!, Exh. 3rd page.

So now we are told that he knows what pain the patient has and, at the same time, he doesn't know what pain the patient has! If there is truth in Dr.Torkelson's visit notes, handwritten or dictated, it is difficult to discern!

Similarly, Dr. Torkelson's March 16, 2001 handwritten notes clearly read, "NO NSAID," yet, in the dictation it appears in the opposite as, "He has taken nonsteroidal medication," (1st ¶, 4th line, under "History" section. How did a simple notation, "NO NSAID" get transcribed to a

much longer statement and opposite in meaning, especially when Dr. Torkelson testified that every word in the March 16, 2001 note was dictated by him, Depo. 55:14-17.

The first written line in the March 16, 2001 notes are not Dr. Torkelson's, the rest of the writing are his writing, Depo. 24:7-25:7. The first handwritten comment by Dr. Torkelson is, "left shoulder pain for 2 months" with a dash placed above the 2 pointing to a raised number 3. That "odd" manner of writing, "2 to 3" called for explanation which BAYER's attorney attempted to elicit. Dr. Torkelson's explanation was to plead that the handwriting was five years ago and he averred that he didn't "have any direct memory of that," Depo. 25:8-26:1; however, Dr. Torkelson soldiered on and he claimed that a patient, (like Dr.RONWIN), will tell him something and later in the conversation his "guess" is that Dr.RONWIN initially told him "about two months" but as he talked to Dr.RONWIN it became "two to three months, a little longer," Depo. 26:2-7.

Dr.Torkelson's unusual written notation and his explanation sparked inquiry by Dr.RONWIN. In summation, using short excerpts preceded by reference to his deposition pages:

i. 57:21-58:2; Agrees he wrote the 2 upper dash 3 notation.

ii. 58:3-14: Admits Dr.RONWIN noted taking Baycol, (on the Patient Personal History Form), but, Dr.RONWIN did to state when he started taking Baycol on the form.

iii. 58:16-25: If Dr.RONWIN started on Baycol in January and saw Dr.Torkelson in March, he agrees that would encompass at least two months, (of taking Baycol, but <u>not</u> when the pain from taking it commenced).

iv. 59:1-8: Reiterates his explanation given above for the 2 dash 3, note.

v. 59:9-10: Claims he writes the notes, "exactly as the patient is speaking,"



02/12/2007 07:07 FAX 970 224 3838 ED RONWIN 015

vi. 59:11-17: Dr.RONWIN suggests he must have come back and put the 3 in his notes. But, claims he did it at the time of the examination.

vii. 59:20-60:3: Then, admits he had to come back and write the 3 after he wrote the 2; otherwise he'd states he would have written "2 to 3 months."

viii. 60:4-19: Claims the months are approximate. Insists Dr.RONWIN also said 3 months.

ix. 60:20-61:8: Asked why Dr.RONWIN would tell him two months and later tell him three months. Met with his story as above. States the 2 dash 3 is "an approximation."

x. 61:9-62:3: Asked what in the interview made it apparent it was 3 months. Answers he has "no actual memory." Clings to the assertion that the note in question was Dr.RONWIN's words, (compare to his comments above at pp. 11-14, above); continues with his story as before.

xi. 62:4-63:7: Dr.RONWIN asked if it wouldn't be more logical if Dr.RONWIN told him 2 months then later 3 months to "simply cross out the two months and put 3 months?" Answer: Claims he has "no specific memory of the event." Then he further elaborates using speculation and alleges that the 3 months was said by Dr.RONWIN in a "generalized" way!

Conclusion: In line with his demonstrated capacity to lie, as above, his explanation of the 2 upper dash 3, is false, as will be further demonstrated below.

Dr.Torkelson's memory is definitely faulty. At three points in his deposition, Dr.Torkelson claimed he does not recall a conversation with Dr.RONWIN <u>after</u> Aug.8, 2001, Depo. 43:15-44:3; 69:1-24 and 80:14-19.

That there was communication between Dr. RONWIN and Dr. Torkelson's medical office well after Aug. 8, 2001, is shown by Exh.8, which is a letter dated Feb. 17, 2004 from Dr. RONWIN to Dr.Torkelson's office which contained a request for a copy of Dr.RONWIN's



02/12/2007 07:08 FAX 970 224 3838 ED RONWIN 016

medical records. After receiving the records, Dr.RONWIN noted the discrepancies, discussed above, such as the "mild pain," the "2 dash 3" and the "NO NSAID" variance. Therefore, Dr.RONWIN telephoned Dr.Torkelson's office. Dr.RONWIN's telephone records for the period from Feb. 17 to March 15, 2004, are presented as Exh.9[3] On Feb. 17, 2004, a 3.7 minute conversation with Dr. Torkelson's office was had. The records which comprise only 4 pages, Exh.7, arrived by mail. In the Feb. 17, 2004 conversation, Dr.RONWIN told either Dr.Torkelson or his office aid that he needed the records because he was suing BAYER.

On Feb. 20, 2004, a 1.5 minute conversation was had and on Feb. 24, 2004, two calls in succession are noted; one 0.7 minutes and the other 1.5 minutes, to Dr.Torkelson's office. It was during part of those calls that Dr.RONWIN believes he discussed the discrepancies in the records with Dr.Torkelson. For some reason there was a disconnect between the two calls on Feb. 24, 2004.

Notably, Dr.Knauer testified that, in the last meeting with Dr.RONWIN on March 5, 2004, Dr.RONWIN had told her about the "inconsistencies" and "discrepancies" in Dr.Torkelson's medical records and that Dr.RONWIN had, "...mentioned those concerns with Dr.Torkelson," Knauer Depo.68:19-69:2.

The reason Dr.Torkelson wrote the 2 on March 16, 2001 note and then added the dash and the 3, neither number did he hear from Dr.RONWIN, was because Dr.Torkelson was annoyed with Dr.RONWIN over a dispute they had in the Aug. 8, 2001 visit. At the March 16, 2001 visit, Dr.RONWIN asked for a Cortisone injection because he thought he had an inflammed shoulder. Notably, Dr.Torkelson agrees, Depo. 70:21-71:1 and 71:14-19, that "if Dr.RONWIN was a

---

[3]Only the Cheyene calls are shown. The others are blacked out since they have no pertinence to this case.

Professor of Biochemistry for 20 years, Dr.RONWIN would know what Cortisone is." Dr.Torkelson refused to give the injection in two stages; which Dr.RONWIN had previously had elsewhere, (long before ever taking Baycol), i.e, first the pain killer, (lidocaine, Xylocaine, etc.), then the Cortisone. Instead, he insisted on a single injection containing both medications. As Dr.RONWIN turned to leave his office, he gave Dr.RONWIN a prescription for Naproxan, (an NSAID), which Dr.RONWIN took for a day or two and stopped because it caused severe stomach cramps. Still needing a Cortisone injection, Dr.RONWIN called Dr.Torkelson's office and made an appointment with Dr.Rangitch, who gave Dr.RONWIN a choice of either method of injection. The injection was had. In the Aug. 8, 2001 visit, Dr.RONWIN got another injection of Cortisone, but argued that Dr.Torkelson should not have billed Medicare for the March 16, 2001 visit. That disagreement fueled Dr.Torkelson's willingness to provide his "distorted" testimony.

Dr.Torkelson' deposition starts with his denial that he knew that Dr.RONWIN had sued BAYER before the deposition, Depo. 3:14-17. However, the reason for Dr.RONWIN's request for his medical records, Exh.7, was relayed to Dr.Torkelson in the Feb.17, 2004 telephone call. That also explains the "2 dash 3;" the "3" was deliberately inserted well after the original notes were written.

What Dr.RONWIN told Dr.Torkelson on March 16, 2001, was that, as is absolutely true, Dr.RONWIN commenced taking Baycol on Jan. 10, 2001 and that about 5-6 weeks later, (mid-Feb, 2001), various pains and difficulties began to appear as claimed in this action. The time on Dr.Torkelson's notes, "2 months" was probably a mistake--we saw above that he makes them--for he took that as the time that the pains started instead of the time that dosing with

Baycol began. After hearing from the Feb 17, 2004, telephone call that Dr.RONWIN had sued BAYER and wanted his records for that purpose which led to the Feb. 17, 2004 letter, Exh.8. and being annoyed at Dr.RONWIN because of the dispute over billing Medicare, he added the "dash 3" and then has difficulty explaining just how it happened to get into his notes.

As far as his medical competence, Dr.Torkelson claims that he knows that Baycol, (the Reporter kept spelling it Bacal), wasn't the cause of Dr.RONWIN's rotator cuff tear because of his experience of "30 years training as an orthopedic surgeon." Depo. 96:20-24. Aside from the fact that his answer is nonsense; he could have been practicing for 100 years and whether or not Baycol caused Dr.RONWIN's rotator cuff tear is totally unrelated to the years of his practice.

Then Dr.Torkelson admits that he "not an expert in Baycol" and can't talk about the chemistry of Baycol, Depo. 98:15-25. Dodges an answer to the question "..do you know if Baycol tears up tissues, cells and other tissues in the body?", Depo. 99:8-13. Then he admits that he doesn't know the chemistry of Baycol, Depo. 99:18.

Clearly, Dr.Torkelson testified that he is not competent to declare on whether or not Baycol is the cause of Dr.RONWIN's rotator cuff tear. Since, the AERs, Exh.10[4], show that Baycol does cause rotator cuff syndrome and tendon rupture, he is unable to rule out Baycol as the cause of Dr.RONWIN's rotator cuff tear. Therefore, he is not able to do a differential diagnosis.

In addition, as related in both pages of Exh.11, his conduct in court is utterly contemptuous of the judicial process.

In sum, Dr.Torkelson committed perjury, deliberately dodged questions, rules out the action of Baycol even though he admits he knows nothing about it, conducts himself with contempt for

[4]Only the front page, last page and first 6 pages of listed adverse events are shown. Those first 6 pages contain the vast bulk of the adverse events; the rest of the 41 pages add little of value.



02/12/2007 07:09 FAX 970 224 3838 ED RONWIN 019

judicial process and failed to make a differential diagnosis.

It is submitted that Dr.Torkelson's testimony should be rejected in this action.

**ON DR. MARK KELLER**

The testimony of Dr.Keller raises questions about his veracity and competence. Thus:

Dr.Keller admits that he never examined Dr.RONWIN's left shoulder in any way for a rotator cuff tear or any kind of injury; never saw an X-ray on the tear; not present at the rotator cuff surgery; Depo. 201:8-19.

Asked "[h]ow do you know what caused the rotator cuff tear? Dr.Keller answers: "I have no knowledge of your rotator cuff tear." Depo. 201:20-22, (emphasis added). Without any knowledge of Dr.RONWIN's left shoulder rotator cuff tear, Dr.Keller is not competent to give testimony on its cause.

Dr.Keller averred that he never saw any literature associating rotator cuff tears with Baycol, Depo. 40:14-19. Therefore, he was shown and asked to read such literature into the record by reading the number and percentage of several adverse events attributed to Baycol which are listed in the FDA's Adverse Event Report, ("AERs") on Baycol. The first 6 pages of those AERs were used because they contain the bulk of the significant types and numbers of the AER's, which is Exh.10.

From p. 5, item 33, Exh.10, he read, "Tendon Disorder," Depo. 113:23-114:2 . From p. 6, item 15, he read, "Rotator Cuff Syndrome" and repeated it, Depo. 114:19-25. From p.6, item 16, he read, "Tendon Rupture," Depo.115:1-10.

A tendon rupture is a tear and rotator cuffs are tendons. Those AERs implicate Baycol in rotator cuff tears and injuries. Dr.Keller agreed that AERs are collected to keep track of adverse



02/12/2007 07:10 FAX 970 224 3838 ED RONWIN 020

event reports, Depo. 200:6, but, Dr.Keller isn't going to be disturbed by the facts, so, while admitting that he knows nothing about Dr.RONWIN's rotator cuff tear, and despite seeing evidence, that he agreed is not collected without purpose, that implicates Baycol as a cause of rotator cuff tears and injuries, he gives the uninformed opinion that Baycol didn't cause Dr.RONWIN's rotator cuff tear!; Depo. 194:10-14.

To understand Dr. Keller's persistence in his untenable and utterly unscientific assertions on cause, it is necessary to explain two events in the relatively brief interaction between Dr.RONWIN and Dr.Keller.

The visits to Dr.Keller's office are three: Nov. 11, 2000; Jan.10, 2001 and Aug. 27, 2001. Thereafter, the only interaction between Dr.RONWIN and Dr.Keller was in respect to a coronary arteries angiogram performed by Dr.Keller and an associate on Sept. 26, 2001.

The first event concerns Dr.RONWIN's determination, based on his expert reading of the significance of the statin-HMG Reductase binding in the article in the journal <u>Science</u>, that every other day dosing would be as good as every day dosing with statins, including Baycol. Dr. K doesn't like to have a patient contradict his concepts--regardless of the validity of the patient's concept.

Thus, (i) Dr.Keller admits that Dr.RONWIN told him in a letter, Exh.5, that on the basis of the paper[5] in <u>Science</u>, Dr.RONWIN was adopting every other day dosing, Depo. 76:20-77:3.

(ii) As a counter argument Dr.Keller posited that Baycol had a short half life in the body, (an average of 3 hours) and that there wouldn't be enough Baycol after a day to do its work., Depo.78:9-79:8.

[5]Scientists usually prefer to describe a scientific article or report as a "paper," which will be done in this Response.



02/12/2007 07:10 FAX 970 224 3838 ED RONWIN 021

(iii) Exh.12 is a chart using the 3 hour half-life of Baycol and calculating how many molecules of Baycol would be left in Dr.RONWIN's body, (or anyone else's), after taking 0.4mg of Baycol. There would be 8 trillion molecules left (and more than 16 times the number of cells in even the largest human liver), which shows that Dr.Keller knows nothing about the applicable biochemistry. Additionally, Dr.Keller fails to realize that every Baycol molecule that succeeds in binding to an HMGReductase molecule will, because of the very tight binding reported in the Science paper[6], will not be metabolized as are the unbound Baycol molecules pervading the body.

(iv) Dr.Keller agrees that the authors of the Science paper are not frauds, Depo. 134:18-20.

(v) Dr.Keller admitted that he didn't have expertise on the question of how many Baycol molecules would be left in the body or on Dr.RONWIN's calculations, Exh.12; Depo. 135:6-15.

(vi) Dr.Keller agreed that the cholesterol values for the every other day dosing shown in Dr.RONWIN's lipid panel profile, Exh.6, is as good as, and even lower than that for Baycol every day dosing, Depo. 153:23-155:7. (The values that Dr.Keller saw in the lipid panel profile were for Baycol every day two times, and after one for Baycol every other day and the rest for Zocor and Lipitor every other day).

(vii) Despite the evidence confronting him that every other day dosing is somewhat better than every day dosing and that every other day dosing would save money and "might lesson the risk," [of experiencing adverse effects], Depo. 160:14-161:7, Dr.Keller persists in prescribing every day statin dosing, Depo. 194:25-195:9.

Dr.Keller doesn't want to be confused by the evidence. Dr.RONWIN's move to every other

---

[6] See p.15, Exh.2, where, at the bottom, the inhibitory capacity of 6 statins of the HMG Reductase enzyme is given as "IC50." The data shows that the binding of the statins to the enzyme is extremely tight.



02/12/2007 07:11 FAX 970 224 3838 ED RONWIN 022

day dosing, which is a boon to Dr.RONWIN, didn't matter. Dr.RONWIN went against Dr.Keller's built-in, unscientific myopia, therefore, Dr.Keller testified against Dr.RONWIN.

The second event shows that Dr.Keller is malicious, incompetent and unfit to practice medicine.

Dr. Keller suggested that Dr.RONWIN undergo an angiogram on Dr.RONWIN's coronary arteries. Dr.RONWIN agreed. The date set for the procedure was Sept.26, 2001 and Dr.RONWIN needed to be at the Rose Hospital in Denver, CO by 6:30 a.m. To be there on time, Dr.RONWIN, who then lived in Cheyenne, WY--a distance of somewhat over 100 miles from Denver,CO--had to rise by 2:00 a.m. and to take no breakfast or liquids, (other than a bit of water). Dr.RONWIN came to Rose Hospital with a half hour to spare.

In preparation for the procedure, the nurse brought in several pills. Four were for Plavix, an anticoagulent. In Aug, 2001, a month earlier, Dr.RONWIN had undergone an angioplasty on his left leg to clear plagues at the Univ.of Colo.Hosp. in Denver, Operating Room Schedule, Exh.13[7], and the presiding MD prescribed 75 mg. Plavix daily for a month. Dr.RONWIN took the plavix for 13 days. During those 13 days, Dr.RONWIN experienced several spontaneous nose bleeds and on the 13th day had blood in his stool. A call to the MD led to the agreement that Dr.RONWIN cease taking Plavix.

The nurse at Rose Hospital wanted Dr.RONWIN to take <u>four</u> 75mg. pills of Plavix, along with other medications. Dr.RONWIN refused, explaining about the above incident with Plavix. The nurse called Dr.Keller. He demanded that Dr.RONWIN take the Plavix despite Dr.RONWIN's

---

[7]The notes in handwriting in Exh.13 include the phrase, "claudication-angioplasty 8/2001" and were written on the form by a Rose Hosp. employee where the angiogram was scheduled to take place. Dr.RONWIN has highlighted the comment and the comment that Plavix was taken with respect to the leg angioplasty at Univ. of Colo. Hosp in 8/2001.



02/12/2007 07:11 FAX 970 224 3838 ED RONWIN 023

explanation of its effects on Dr.RONWIN. Dr.RONWIN was in a quandry. He had not had an angiogram for several years. He had arisen at 2:00 a.m.; driven somewhat over 100 miles; had no breakfast and was now faced with this nonsense--just how nonsensical will be clear subsequent hereto. Dr.RONWIN decided to take the Plavix. Result: Dr.RONWIN began to ooze blood right after the procedure was completed around 8:00 a.m. and oozed blood to the next morning when a nurse appeared around 10:30 a.m. with needle for injecting epinephrine. After a while the oozing of blood stopped. That Dr.RONWIN was bleeding throughout the time from the end of the procedure to the next morning is proven by the hospital records, Exh.14, where appropriate notations in the records are deliberately underlined.

A brief review of the testimony at Dr.Keller's deposition is further enlightening.

(i) Depo. 162:12-18. If the patient fares well in the procedure and not bleeding afterward, the hospital stay is about 4-6 hours.

(ii) Exh.13, Rose Hosp. Operating Room Schedule shows that Dr.RONWIN had Plavix in connection with his left leg angioplasty in Aug., 2001. The document informs that Plavix caused Dr.RONWIN bloody stools and nose bleeds, Depo. 163:5-166:8.[8]

(iii) Dr.Keller agrees that Dr.RONWIN refused the 300 mgs of Plavix, Depo. 169:19-21. The testimony shows that Dr.Keller alleges not to recall the nurse telling him that Dr.RONWIN refused to take the Plavix and what medications Dr.RONWIN did take, Depo.170:4-18. Then Dr.Keller explains why he wanted Dr.RONWIN to take Plavix, Depo.170:20-171:5. Dr. Keller admits knowing of the left leg angioplasty procedure on Dr.RONWIN in Aug., 2001,

---

[8] Altough in the dialogue, Dr.Keller denies seeing the Operating Room Schedule, it is obviously prepared and intended for the MDs who will be operating on a patient. As the operating MD, and the MD "in charge of the angiogram procedure," Depo. 168:1-3, Dr.Keller should have made himself acquainted with the document or his associate MD should have shared the Plavix information with Dr.Keller.



02/12/2007 07:12 FAX 970 224 3838 ED RONWIN 024

Depo.171:8-25.

(iv) Dr.Keller admits that Plavix caused bleeding, Depo.175:14-22; but claims, (falsely as will be seen) that if Dr.RONWIN wanted the procedure, it was necessary to have the Plavix in his system, Depo.175:23-176:16. But, Dr.Keller then admits that before Plavix came on the market angioplasties were performed, Depo. 176:17-21; and that an angioplasty, (similar to an angiogram), can be done without Plavix, Depo. 176:22-24. Dr.Keller first denied, then admitted, that Dr.RONWIN had already been given a very strong anticoagulent, (Heparin), Depo.176:25-177-25.

(v) Dr.Keller agrees that Dr.RONWIN had a sandbag, (5 lbs), on the operative site, (the right groin), after returning from the operative procedure, Depo.179:21-24. At 11:01 a.m., after the procedure, Dr.Keller ordered bed rest for 6 hours, Depo.179:25-180:21.

(vi) During the night, (9/26/01-9/27/01), Dr.RONWIN still in the hospital bed had his right groin dressing removed; was still oozing blood, and received a new dressing. Depo.180:25-181:25.

(vii) Dr.Keller alleges that he doesn't know if Dr.RONWIN was oozing blood all night, [despite the dressing and sandbag], Depo. 182:1-3 However, as the MD in charge of the angiogram, he had a duty to know.

(viii) Originally, Dr.Keller ordered 6 hours bedrest, but changed his orders to overnight stay, Depo.182:15-183:12.

(ix) Dr.Keller admits that at 10 a.m.,(should be 11 a.m.), he ordered 6 hours of bed rest, then changed the orders to "patient to stay overnight," 182:17-183:10. The change was made at 5 p.m., on the day of the operation, Depo.183:20-184:16. Asked why Dr.RONWIN had to stay



02/12/2007 07:12 FAX 970 224 3838 ED RONWIN 025

overnight, Dr.Keller alleges that's because Dr.RONWIN, "didn't have a ride home, like he was supposed to," Depo. 183:11-14. THAT EXCUSE HAS TO BE FALSE. Dr.Keller well knew that Dr.RONWIN was from Cheyenne and came unaccompanied to the hospital and, if he didn't know, he could have inquired when he ordered 6 hours bedrest at 10 a.m., (or 11 a.m.), after the operation. He did not ask by 5 p.m., when he changed the orders to overnight stay. The real reason for the overnight stay was that Dr.RONWIN continued to bleed at 5 p.m. on the day of the operation, despite the sandbag and the dressing on the groin.

(x) Dr.Keller admits that the hospital record shows that Dr.RONWIN was oozing blood, Depo. 185:5-8.

(xi) Although admitting the oozing, Depo.189:6-8 and that Dr.RONWIN had a 5lb sandbag from the time he left the operating room through the next day with a dressing underneath, which Dr.Keller admits, Dr.Keller claims he doesn't know what the dressing and sandbag were for!, Depo. 189:9-16.

(xii) Asked if he would have sent Dr.RONWIN home with oozing, Dr.Keller says,"yes," Depo. 189:17-18. Asked how Dr.RONWIN would have stopped the oozing, Dr.Keller says, "just change the dressing," Depo.189:19-21, [Yet, the dressing had been changed, the hospital gown, too, and the sandbag constantly applied and that didn't stop the oozing]. Then, Dr.Keller suggested a BAND-AID!, Depo.189:22-190:1

(xiii) When Dr.RONWIN pointed out to Dr.Keller that the hospital gown had to be changed because it was soaked with blood, despite the dressing and sandbag, and asked if he considered it to be "perfectly good practice" to send somebody home oozing blood after an operative procedure and the question is repeated because he alleges that he didn't get it the first time,



02/12/2007 07:13 FAX 970 224 3838 ED RONWIN 026

Dr.Keller claims that the question, which is as clear as a cloudless day, is "too vague a question to give an answer to," Depo.190:2-15.

The record shows that Dr.Keller would push a medication on a patient even if clearly unnecessary and clearly harmful, as long as his idea is put into play. The foregoing reveals deliberate, malicious and dangerous medical malpractice.

The deposition record reveals that Dr.Keller lies under oath, exhibits considerable failures to recall, disregards facts if they don't accord with his preconceived notions and admitted knowing nothing about Dr.RONWIN's rotator cuff tear.

Clearly, Dr.Keller is incompetent as an expert or lay witness in this case and his testimony is riddled with falsehood, "forgetfulness" and malice.

His testimony deserves no airing in this case.

**ON DR. SALLY KNAUER**

Dr.Knauer treated Dr.RONWIN's rotator cuff tear by doing surgery on his left shoulder. Basically, she attributed the rotator cuff tear to two things: degenerative changes which include osteoarthritic elements such as spurs, which might cause impingement on close by tissues, in Dr.RONWIN's left shoulder, and age. In her own words, Depo.97:3-10:

> Q. It was a poor question. Doctor, in your opinion to a reasonable degree of medical probability, what is the cause -- what was the cause of his rotator cuff tear?
>
> A. <u>I believe the likely cause would be the age of the patient</u>, the degenerative changes that have already been noted on the X-ray, associated with some impingement. (emphasis added).

However, Dr.Knauer said that the AC joint is narrowed, "<u>small [and] marginal</u>". Depo.41:15-19. (emphasis supplied).

In the comments on Dr.Reyes, below, it will be seen that the X-ray measurements indicate that



02/12/2007 07:13 FAX 970 224 3838 ED RONWIN 027

the acromiohumeral distance was within normal range and the the AC joint spur was no more than 3 millimeters, in effect that the spur did not cause the rotator cuff tear.

While Dr.Knauer refers to "degenerative changes," she points to no specific ones other than the AC joint.

The court in Glastetter v. Novartis Pharm.Corp., 252 F.3d 986, 989 (8th Cir.2001), provided the requirements for a differential diagnoses:

> A differential diagnosis requires that the physician consider all potential causes and then rule out the least likely, until the most probable cause of injury can be identified.

From Dr. Knauer's language quoted just above, it is clear that her differential diagnosis, i.e., her description of the "likely cause," places the cause on age. As noted below at pp.44-45, age is not a cause that one can pin down. While in any particular person, age may cause an injury or disease, it is just as likely not to cause an injury or disease. One cannot ever really tell that age was the cause; it is in the realm of speculation! Even Dr.Knauer recognized that; thus on being asked if being old would absolutely cause a rotator cuff tear, she answered, "It's not absolutely." Depo.155:10-13 and subsequently she added, "It [rotator cuff tears] increases with age, that's all we can say! Depo.155:20-23.

Dr. Knauer searched "the literature", which were "two orthopedic journals," on the topics of rhabdomyolysis,("rhabdo"), (which has never featured in this particular case) and rotator cuff tears, and she wasn't able to find anything "about those two things occurring together." Depo.16:14-21; 17:1-5. Since no such connection was ever claimed by Dr.RONWIN, and it is very improbable that any such connection would ever be found, Dr.Knauer's admirable effort was a waste of time doomed to fail from its start!

Furthermore, Dr.Knauer alleged that she had no evidence that Baycol caused rotator cuff tears,



02/12/2007 07:13 FAX 970 224 3838 ED RONWIN 028

Depo. 70:18-21; 96:18-21. All Dr.Knauer had to do was check the AER's on Baycol, see the comments above at pp.19-20 and Exh.10.

Clearly, from a legal standpoint, Dr.Knauer made no differential diagnosis!

But there must have been a cause for Dr.RONWIN's rotator cuff tear. Since Dr.RONWIN played no sport such as football, baseball, basketball, etc., ran into no walls, didn't get hurt by a blunt or heavy instrument of any kind on his shoulder, or any part of his body, wasn't in an automobile accident but did take Baycol for seven (7) months and began to have the pains and injuries described above including the rotator cuff tear, and as Baycol is proven to be both dangerous and murderous, Baycol is the only viable candidate as the cause of Dr.RONWIN's rotator cuff tear. The nature of how Baycol can cause such a tear, a biochemical matter, will be visually demonstrated below in the discourse on Dr.RONWIN's expertise.

Although Dr.Knauer agreed that the body was arranged into molecules. Depo.121:14-20. But, when asked if Baycol was a molecule, Dr. Knauer replied, "I don't know!, Depo,121:21-22. (emphasis provided).

If, as Dr.Knauer admits she didn't know that Baycol was a molecule, she couldn't possibly eliminate Baycol as the cause of Dr.RONWIN's rotator cuff tear. Baycol certainly is a molecule and it acts by chemical reaction with other molecules when it gets into the human body. It causes rhabdo by such reactions and other myopathies; and it also causes neuropathies as acknowledged by Dr.Knauer, Depo.133:14-134:4; and, as the AERs, Exh.10, show, Baycol causes all manner of injuries and diseases including rupturing tendons like rotator cuffs and causes rotator cuff syndrome (or problems), Exh.10,p.6!

Dr.Knauer's deposition does not support BAYER's cause.

## ON DR. EUGENE WOLFEL

Testimony pertinent to this matter by Dr.Wolfel includes the following:

1. As to gait problems, Dr.Wolfel testified, Depo. 102:5-7, "That's not usually the symptoms of claudication. It's usually not a tripping action. It's usually pain, usually in the calf of the leg, that makes someone stop."

2. Viewing Dr.RONWIN's lipid panel profile, Dr.Wolfel stated that, "there doesn't seem to be a substantial difference in numbers," Depo. 126:8-23. Dr.Wolfel was referring to the comparison of the results with every day dosing compared to every other day dosing.

3. Dr.Wolfel labelled the journal, Science as "...a very prestigious scientific journal," Depo. 133:16-18.

4. Dr.Wolfel's comments on Adverse Event Reports, AER's, are that they are receiving more attention from the FDA. One reason is that, "many people are treated with medications after the drug is, [put on the market], than in any large clinical trial." As a recent example, Dr.Wolfel points to Vioxx, Depo. 140:12-23. In effect, the releasing of a drug to market effectively creates a massive, clinical trial.

5. Earlier in his deposition, Dr.Wolfel read aspects from three papers published in peer-reviewed journals on every day dosing which carried the conclusion that every other day dosing was as good as every day dosing. Depo.127:14-131:15. Subsequently, in interrogation by BAYER's att'y, Dr.Wolfel testified, Depo. 155:22-156:4:

> But I can also state that if there's several papers that come to the same conclusion, that seem to corroborate each other, that there's probably something to the conclusion. I mean that's probably a fair thing to say...

Dr. Wolfel's testimony does not assist BAYER's cause.



02/12/2007 07:14 FAX 970 224 3838 ED RONWIN 030

## ON DR. WILLIAM HIATT

Testimony pertinent hereto by Dr.Hiatt includes the following:

1. Dr.Hiatt defines claudication as "an exercise-induced pain in the calf," Depo.11:14-16, and "...pain which is mostly calf induced and does limit exercise," Depo.33:17-19.

2. Dr.Hiatt recognizes that Dr.RONWIN's back pain radiating down into his buttocks is primarily neuromuscular, as opposed to claudication, Depo.34:2-7.

3. Dr.Hiatt claims that Dr.RONWIN took Zocor every day, Depo.24:25-25:7. The claim is absolutely false!

4. Dr.Hiatt's claim that Dr.RONWIN's "hypertension" was being controlled, Depo.27:5-10; 30:8-13. Dr.RONWIN has never had hypertension in his life; his blood pressure usually runs about 90-100 systolic over 50-60 diastolic and that has been fairly constant throughout his life.

5. Dr.RONWIN's pain radiating from the buttock down the back of the legs is neuromuscular and can mimic claudication. Dr.Hiatt states that Dr.RONWIN has symptoms of "both claudication as well as neuromuscular pain," Depo.30:22-33:18. In fact, Dr.RONWIN's back and leg pain is primarily neuromuscular, "as opposed to claudication." Depo.34:2-7

6. The implication that Dr.RONWIN asked Dr.Hiatt if he could take Zocor every other day, Depo.34:24-35:10, is false! Dr.RONWIN told Dr.Keller he was going to switch to taking Baycol every other day and never asked any MD, including Dr.Hiatt, if he could take Zocor, or any other statin, every other day. Dr.RONWIN began every other day Baycol, then Zocor and now Lipitor dosing because his biochemical expertise in analyzing the result shown in the paper in Science, Exh.2,p.15, led to the conclusion that every other day statin dosing would produce the same or better lipid results than every day dosing; and Dr.RONWIN's lipid panel profile proves

that to be true!

7. Coronary disease wouldn't cause claudication,Depo.39:78-18.

8. Dr.Hiatt couldn't associate Baycol action with rotator cuff tear and he had never had a patient that had a rotator cuff tear problem that was attributable to statin use nor seen any reports to that effect, Depo.66:6-20. Dr.Hiatt ought to have checked the AER's on Baycol, which he had cause to see later. Although his position is based on the non-reporting of a Baycol caused rotator cuff tear, Dr.Hiatt admits that such non-reporting does not exclude the possibility for rotator cuff tears to occur due to statin, [including Baycol] use, Depo.72:25-73:18. In fact, the AER's make that connection!

9. Dr.Hiatt can't conclude that every other day statin dosing has been effective in Dr.RONWIN's case, Depo.79:2-18. Any look at Dr.RONWIN's lipid panel profile proves the absolute falseness of that position. Dr.RONWIN has no problem wondering if Dr.Hiatt was given some token of appreciation by BAYER for his testimony, such as a grant for Dr.Hiatt's research company.

10. Dr.Hiatt admits to coming across data based on AERs and uses AERs in considering whether or not to prescribe a statin and he has used AER data on essentially all statins, Depo. 83:24-85:4. How come Dr.Hiatt has not seen, or at least taken a look, at the Baycol AERs, where he would have seen on p.6,Exh.10, a clear indication that rotator cuff and tendon rupture, hence tears, are caused by Baycol?

11. Dr.Hiatt alleges that both he, and Dr.Wolfel "believe" that Dr.RONWIN should take Zocor every day, Depo.91:17-20, [neither Dr.Hiatt nor Dr.Wolfel ever told that to Dr.RONWIN]. Yet, Dr.Hiatt told Dr.RONWIN in March, 2006 that every other day statin



02/12/2007 07:15 FAX 970 224 3838 ED RONWIN 032

dosing was becomng popular!

12. Dr.Hiatt doesn't know if Baycol's chemical structure is such that it could cause negative interactions with various tissues in the human body, Depo.97:22-98:1.

Dr.Hiatt does not rule out Baycol as a cause, point 8 at p. 31, above. Neither has he made any differential diagnosis or stated any cause for Dr.RONWIN's rotator cuff tear and his back, buttock, leg pains.

Dr.Hiatt's testimony is not support for BAYER's position.

There are two other MDs whose depositions were taken by BAYER, i.e., Drs. Jane Servi and Dr. Mark Prince, (BAYER also took two other depositions, i.e., those of Dr.Reyes and Dr.RONWIN). Part of the testimony of each affects the questions raised by BAYER's Daubert challenges to Dr. Raul G. Reyes and Dr.RONWIN, experts on behalf of Dr.RONWIN. Therefore, the testimony of each will be considered in the appropriate place during the address to the two, Daubert motions which BAYER incorporated into its MOTION.

## ON DR.RONWIN's EXPERTS

Before proceeding with a response to BAYER's challenge to Dr.RONWIN's expert witnesses, it is necessary that the basic nature of this, and related actions, be set forth.

## THE NATURE OF ACTIONS ASSERTING HARM FROM DRUGS, PAINTS, INSECTICIDES, CLEANERS AND SIMILAR ENTITIES BASED ON CHEMICALS OFFENSIVE TO HUMAN BODIES

Molecules without exception are built from atoms. Baycol is a specific molecule. When Baycol enters the body, it works its way into liver cells and inhibits the enzyme, HMG Reductase, which, in turn, reduces the amount of cholesterol released into the bloodstream. The cholesterol can travel in the bloodstream free, or as esters, or attach to lipoproteins and form, among other



02/12/2007 07:16 FAX 970 224 3838 ED RONWIN 033

things, "LDL" and "HDL." However, Baycol action does not stop there. Baycol attacks cell membranes, (the walls of animal cells), which themselves consist of molecules; some of which are proteins, some are phospholipids, some are saccharides, (sugars - not "table sugar" known as sucrose). Also found in cell membranes are various ions such as $Na^+$ and $Cl^-$, etc. Baycol's attacks on cell membranes, whether muscle cells, nerve cells or other types of cells, can cause openings in the cell membranes. These openings can be large enough so that some of the intracellular contents can work there way out of the cells, which can effectively kill the cells. Even if Baycol does not cause a wide gap in the cell membranes, it can still enter the cells since that is how it gets at HMG Reductase in liver cells, and cause disruption of normal cellular activity.

Baycol, or fluorine ion from Baycol, can also attack non-cellular entities in the body such as the major structural protein known as collagen. The attack here results from Baycol's interference with the hydrogen bonding that gives Collagen its structure, (this will be demonstrated below). When the natural structure of Collagen, which makes up a significant amound of any tendon, ligament, bone, etc., is deformed, the structure of these anatomical parts lose their normal form and structure which, in turn, reveals itself as weakness, pain and tendon rupture and tears.

In distinction to the foregoing, all the PSC and BAYER medical experts have been saying is that Baycol was ingested and muscle cells and tissue destruction, as in rhabdo or weakening of muscle tissue and cells, (myopathy), has occurred. But no statement issues from these experts to <u>show</u> just <u>how and why</u> the muscle cells and tissue were destroyed and/or weakened.

However, Dr.RONWIN has offered the basic biochemical reasons for Baycol's destructive

tissue and cell action based on Baycol's molecular structure and the chemical propensities of the atoms in the Baycol molecule; which is partly set forth in Dr.RONWIN's expert report, Exh.2, filed in this action.

It is biochemists/molecular biologists who are far more capable then MDs to state with expert competence whether or not a drug is the cause of anatomical injury. In fact, every drug case, (and cases involving chemicals found deleterious to the human body), is really a biochemical case and not the superficial, clinical level case that BAYER has promoted in this MDL.

Fed.R.Civ.P. 26(a)(2)(B) does not specify the area of expertise required for experts to testify in drug or related (bio-)chemical cases. MDs have a place, but so do biochemists and molecular biologists and possibly other types of expert where contentions, e.g., on packaging, production procedures, etc., concerning chemicals inimical to the human body are before a court.

Dr.RONWIN is not an MD. But, as all manifestations of life are based on biochemical reactions, (biochemical because the chemical reactions occur in living entities), it is the biochemists/molecular biologists who are, by training and experience, far more suited to deliver expert opinions on any chemical reaction in living things than most MDs.

A series of excerpts from recent papers are a very, very small example of the prodigious move of medicine from the sheer clinical to the biochemical/molecular biological realm, Exh.14A, (A, because the exhibit was added after all other exhibits were marked).

BAYER's game in this MDL has been to argue that Baycol only causes rhabdo and myopathies. There are two aspects to BAYER's position:

(i). That only MDs can determine if Baycol causes the above muscle actions and (ii) that only muscle tissue and cells are injured by Baycol.

Both propositions are nonsense!

On item (i):

**ON THE DEPOSITION OF DR. JANE SERVI**

Dr. Jane Servi, who is an associate of Dr. Knauer, testified in deposition. Excerpts from Dr.Servi's testimony follows:

Depo,114:18-115:18: (emphasis added at various points in the transcription below)

Q. (by Dr.RONWIN): I see, Okay. Did you know that there's a fluorene, (misspelled by Reporter), atom in the Baycol molecule?
A. I don't prescribe Baycol. I don't know the chemical makeup of Baycol. I couldn't even start to answer that question.
Q. I see. You agree that it -- Baycol tears up muscle cells in various degrees?
Mr. PILKINGTON: Objection, form and foundation.
A. Baycol has been, from my knowledge -- again, I don't prescribe it. From my knowledge, it has been associated with people with rhabdomyolysis.
Q. Well, to get the -- in rhabdomyolysis, to get the proteins and enzymes pouring into the bloodstream from the -- from the muscle cells, then the muscle cells must have beentorn open; is that right?
MR. PILKINGTON: Same objections.
A. <u>To my understanding, there is destruction of the cell. How that occurs is beyond my medical expertise</u>.
Q. All right. So if Baycol can -- can -- <u>but you don't know how it does that, it tears up the cells, is what you're saying</u>?
A. <u>No. Again, that may be a better question asked to a chemist, a pharmaceutical, a research person.</u>

Depo. 115:22-116:13:

Q. Okay. So it's not within your knowledge?
A. It is not within my expertise.
Q. But you do know -- do you know whether the composition of a cell is basically an organization of molecules?
A. <u>That is beyond my --</u>
MR. PILKINGTON: Same objections.
A. <u>-- ability to answer</u>.
MR. PILKINGTON: Same Objections.
Q. Well, the cell has an outer cover in the animal kingdom, all right? It's not a wall, like in the plant kingdom, but it's a cover, right, a membrane. Is the membrane made up of chemicals?



02/12/2007 07:17 FAX 970 224 3838 ED RONWIN 036

A. That's --
MR. PILKINGTON: Same objections, form and foundation.
A. That's beyond my expertise.

Depo.116:20-21:

A. Again, in our area of medicine, we don't always go down to the molecular level...

Depo 117:22-118:1:

A. That's beyond my – my medical expertise to answer that within correct reason. I'm - I'm not sure, in terms of chemicals and the -- the way you are using that term, as if that's what we were made up of. So I would defer to an organic chemist.

Depo.119:1-7:

A. When you go to medical school, then you start to develop into organ, organ systems, and then we develop into how we are going to look for medical conditions and treatments for them. So many times at -- at our level of being a physician, we are no longer dealing with chemicals and cellular membranes and all of the carbons that make up the body.

Depo. 119:11-14:

Q. Your overall work deals with -- with organs and functional anatomical parts of the body; is that right?
A. We deal with evaluation of a patient complaints and treatment...

Depo. 119:19-25:

A. – on a macrolevel as a person presenting to me with a complaint.
Q. But that doesn't prevent those muscles that you spoke about, muscular problems, it doesn't prevent that from being basically chemical in nature.
A. I'm not sure how that relates to my area of medicine.

Dr.Servi clearly recognized that MD's, (she is one), concentrate on an overall clinical level; i.e., they see a patient; the patient explains: I took drug X; a part of my anatomy hurts; the anatomical part did not hurt before I took drug X; I did not experience any other trauma to the hurting anatomical part such as a fall, being hit by a brick or vehicle, etc. Hence, MD concludes: Drug X is causing the patients pain at the patient's anatomical site.



02/12/2007 07:18 FAX 970 224 3838 ED RONWIN 037

But, as Dr.Servi states, MD's don't get more fundamental; i.e., they do not venture into the basic chemical essence of tissues and cells.

**CONSIDERATION OF DR. MARK PRINCE's DEPOSITION**

At his deposition, Dr. Mark Prince, made the following observations which are germane hereto:

Depo.41:2-5: Dr.Prince did not offer any opinions as to Dr.RONWIN's rotator cuff tear.

Consistent with Dr.Servi's observations that MDs concentrate on the "clinical" and are ill-equipped to discourse on the "fundamental, biochemical" aspects of drug action such as that of Baycol, Dr. Prince testified as follows:

Depo.46:4-14:

Q. Okay. Is the basis of all -- first of all, is the basis of the structure of the human body basically molecular?
A. Yeah.
Q. In other words, we're made up of nothing pretty much but molecules, is that right?
A. Yes, sir.
Q. Okay. And is the basis really of medicine biochemical and biomolecular?
MR. PILKINGTON: Form and foundation.
A. Some of it is, yes.

Clinical aspects of medicine concentrates on the outward manifestations of disease,

Depo.47:7-14:

Q. And -- and the clinical -- these clinical aspects that you just referred to --
A. Um-hum.
Q. -- don't the cons -- do they concentrate on, basically, the outward manifestations of disease; in other words, things like fever, inflammation, et cetera --
A. Yes, sir, they do.

But Dr.Prince does not look at the, [underlying], biochemical reactions,

Depo.48:18-22:
A. (by Dr.Prince): But do you use certain biochemical things? On the periphery you are. But are you sitting down and looking at the biochemical reactions? No, I don't do that.

Q. (by Dr.RONWIN): Right.

Dr.Prince knows that the analysis of disease these days has moved to the reaction between disease and genetic makeup in terms of the chemical or biochemical makeup,

Depo. 48:24-49:8:

A. Okay?
Q. And what I'm also trying to get at is, for example, today diseases are -- are diseases shown to be the cause by genetic makeup, and in terms not only of saying the gene, but the composition of the gene in terms of its chemical makeup or biochemical, because it's something to do with life?
MR.PILKINGTON: Objection, form and foundation.
A. Oh, I think that there's -- there's been literature out there about that, yes, sir.

Although Dr.Prince knows of and has been exposed to the biochemical aspects of disease, he has never delved into it,

Depo. 49:9-20:

Q. (BY MR.RONWIN) Yes. So that a gene made up of such-and-such DNA sequence is known to cause a disease nowadays, and the makeup of a change in that gene causes a different situation, is that right? Is that more common --
MR.PILKINGTON: Same objections.
Q. (BY MR.RONWIN) -- common today?
MR.PILKINGTON: Same objections.
A. I have -- I have read and been exposed to information like that, but I've never delved into --
Q. (BY MR.RONWIN) Yes. And when --
A. -- the biochemical

When Dr.Prince went to medical school, the current biochemical approach to disease was not even taken up,

Depo. 49:21-25:

Q. And when you were going to medical school, was that really a hot topic, or even taken up?
MR.PILKINGTON: Same objection.
A. No, sir.

Clearly, both Drs. Prince and Servi recognize that MDs concentrate on the clinical aspects of disease which often answers the "what" happened when disease or injury strikes a human being, but it is the biochemist/biomolecular biologist that is best equipped to explain to a jury, or anyone else, the "how and why" the disease or effects of an injury occurred!

A discussion valid as to item (ii), is to be found at p.47, below.

Dr.RONWIN proffers two experts: Dr. Raul G. Reyes and Dr.RONWIN himself. BAYER attacks both experts, pp. 13-23, MEMO.

**ON DR. RAUL G. REYES AS AN EXPERT**

BAYER's claims can be summarized as follows:

1. Dr.Reyes saw only 33 pages of Dr.RONWIN's medical record out of an alleged, "more than 3,000 pages produced in this action," p. 13, MEMO.

2 BAYER charges that Dr.Reyes relied on Dr.RONWIN's "self-reporting," pp. 13,14,18,19, MEMO.

3. At his deposition, Dr.Reyes "corrected" his use of the term, "probable" to "possible," pp. 13,14,17,20, MEMO, which, if true, would deleteriously affect Dr.Reyes' testimony.

4. BAYER alleges that Dr.Reyes failed to perform a differential diagnosis, pp. 16-18,MEMO.

5. BAYER alleges that Dr.Reyes engaged in "speculation." pp. 14-16,19,20, MEMO.

**RESPONSE TO BAYER's CLAIMS SET FORTH ABOVE**

Preliminarily, the curriculum vitae of Dr.Reyes, part of Exh.F to MEMO, shows a person who is well trained professionally in medicine; who has practiced medicine for approximately 56 years and given service to his community, Depo. 97:7-9. That experience includes university teaching and other appointments; performance of more than 20,000 surgeries, (mainly



02/12/2007 07:19 FAX 970 224 3838 ED RONWIN 040

orthopedic); supervision of resident training accompanied by an additional 10,000 plus surgeries and several hospital associations.

1. The medical reports in this specific case are surely not 3,000 pages. The 33 pages that Dr.Reyes reviewed are copies of the medical records of the three (3) orthopedic MDs that Dr.RONWIN saw in connection with his rotator cuff tear. The other medical records are reports by cardiologists, (seen for that purpose) and for <u>calf claudication</u> and an number of other ailments not in any way connected with Dr.RONWIN's injuries in contention in this action. The reports of Dr.Prince at the Veterans Administration ("VA"), hospital in Cheyenne, WY, were general visits required every 6 months by the VA's prescription drug program. Dr. Kevin Deane was seen in 2005 at the Univ. of Colo.Hosp. for a purpose absolutely not germane to this case. BAYER's criticism is without merit.

2. As to Dr.Reyes' alleged reliance on Dr.RONWIN's "self-reporting:" As the patient, Dr.RONWIN explained his injuries from Baycol ingestion as he experienced them. Should Dr.Reyes have talked to John or Jane Doe on the street to learn of Dr.RONWIN's injuries which started without any intervening cause 5-6 weeks after Dr.RONWIN commenced taking Baycol? As Dr.Reyes explained, Depo. 25:21-23, "In medicine 85 percent of a diagnosis is based on history, and, Depo. 27:13-16, every doctor, [MD, that is], has to, [rely on the (medical) history as retold by these patients]. There are no exceptions."

3. As to the alleged "correction" of Dr.Reyes' term, "probable", (actually he used the term, "high probability", per below), to "possible" to describe whether Baycol caused Dr.RONWIN's rotator cuff injury, quotations from Dr.Reyes' deposition are the best response. Specifically, see points E and I below. Some of the quotations from Dr.Reyes deposition present material useful



02/12/2007 07:19 FAX 970 224 3838 ED RONWIN 041

herein beyond the "probable-possible" matter. Thus:

A. Depo.34:16-21:

Q. (by BAYER att'y): So were you offering opinions to a reasonable degree of medical probability or not?

A. I was offering an opinion as my deduction...and I think the reports are exactly on that basis...(i.e., to a reasonable degree of medical probability).

B. Depo.40:15-22:

Q. Doctor, are you aware of any literature suggesting that Baycol or any statin is associated with rotator cuff injuries?

A. I am not aware of any specific instances, although in the – again, recollecting the patients that I saw, I remember there was a number of people that had rotator cuff injuries and ascribed their problem to Baycol.

NOTE: Dr.Reyes' office in New Orleans had its roof torn off and his records destroyed by Hurricane Katrina. As a result, Dr.Reyes came to his deposition armed with the Merck manual.

C. Depo.43:15-17:

Q. Was there any indication of muscle damage in Mr. Ronwin?

A. He had the rotator cuff injury. (That led to Dr.Reyes proving his point).

D. Depo.45:17-24

Q. Okay. Did the Merck manual say anything about Baycol, statins, and rotator cuff injuries?

A. Let's see. (looking at documents) Is the operative report in here?

Q. Why would that be important to you?

A. Because I want to see exactly what the doctor said about the damage to the rotator cuff area. You know, the supraspinatus is a muscle, you know.

At that point, Dr.RONWIN handed a copy of Dr.Knauer's operative report to Dr.Reyes and following ensued:

Depo.46:12-22:

A. I'm trying to address the question that you asked me. If you'll notice here, the patient was found to have what is -- on the first page of the operative report in the last paragraph, the patient was found to with inspection have an intact biceps tendon to palpitaion, and also was noted to have a full thickness rotator cuff tear, which pulled away, leaving inadequate soft tissue stump for repair, involving essentially the full aspect of the supraspinatus. That is a muscle.

Dr. Reyes' testimony reflects his having applied his extensive medical knowledge, particularly anatomy, in formulating his Expert Medical Report per Fed.R.Civ.P. 26(a)(2)(B), which is filed in this action and is presented in Exh.F to MEMO.

E. For Dr.Reyes, a non-lawyer, "possibility", "probability", are just semantics in an exchange where the BAYER att'y is attempting to have Dr.Reyes use "possible" rather than "probable."

Depo. 49:1-17:
Q. Baycol might have had nothing to do with this, right?
A. Maybe.
Q. Can you say one way or the other?
A. No, I can't. Well, I can say that there is a probability that it could have contributed to the problem.
Q. Well, aren't you --
A. It might have accelerated it, it may have not.
Q. Aren't you really saying, Doctor, there's a possibility?
A. That's correct.
Mr. Mizgala:
Okay
Witness:
Again, semantics, you know possibility, probability.

F. Depo.53:22-54:20:
Q. Okay. And you said -- you mentioned Dr. Ronwin's strong feelings about Baycol causing him injury. What importance is that to your decision making?
A. Well, I think all of us whenever we have a problem, we have to look at the situation and say, you know, I fainted. I fainted after I took a Vicodin 20 minutes ago. Well, that's a cause and effect relationship, and who's to say that that person fainted because she took the Vicodin, or because she was going to pass out because she had a problem, maybe a new sick -- an illnes coming up. But that person had never fainted before in her life, so these issues keep cropping up all the time in -- in relationship to what people do when they take -- when they do things. So he apparently did not feel that he had a problem to a great degree with his shoulder, and he -- and my interpretation of his story is that the Baycol precipitated a rotator cuff injury. That's my understanding of it. Now maybe he feels that it caused it. I - I don't know. Again, it's something that I would only be speculating to say that it caused it. I - I do feel that if it didn't cause it, it probably contributed to it.

G. Depo.98:18-99:1:

Q. What -- surgery would basically involve -- to do surgery, it would involve basically a very good -- a very good anal -- a very good background in the general anatomy of the human body?

A. I think a surgeon has to know anatomy better than most physicians.

Q. Yeah. Would that include the anatomy of the human shoulder?

A. Yes.

H. Depo.99:2-15:

Q. I see. Let me ask you this. You indicated some -- that you've been given some materials from me such as in your report. Do you feel that you could make an expert judgment by reviewing medical records without seeing the patient of -- by whom the medical records are made?

Mr.Mizgala:

Objection to form

A. It depends upon what I'm asked to be expert about. Like I've testified, you know, this -- in surgery. I consider that I can render that opinion as an expert opinion in practically every -- every patient that has had surgery, the work that I'm familiar with.

I. Depo.99:17-100:17:

DR. RONWIN:

Q. Yes. All right. On your report -- oh, when you composed that report, which is Exhibit 2 in this deposition, were you under coercion or was that a matter of your own free will?

A. I did it on my own free will.

Q. And on paragraph six of the report, which is in the first two or three pages, was the part you actually wrote?

A. Yes.

Q. Did you conclude, "That there is a high probability that this injury was caused by Baycol ingestion for a period of seven months? (emphasis added).

A. I think that is what I stated in my report, and I have no reason to backtrack on it. (emphasis added).

Q. And is the injury to which you refer, Ronwin's left shoulder, rotator cuff tear?

A. That's what was described by me.

Q. And as to paragraph seven in your report, did you conclude, "That the occasional blurring of vision and pain in the back of thighs and both legs may be symptoms of Baycol?"

Mr. Mizgala:

Objection, form.

A. That's what the report states, and I will stand by it.

Clearly, as above in point I, Dr.Reyes, in his expert medical report, Exh. F to MEMO, in ¶ 6, on the second page following the cover page of his report, declared that, as to Dr.RONWIN's

rotator cuff tear, there is a "high probabiity" that it was caused by Baycal ingestion for seven (7) months. Furthermore, Dr.Reyes testified in point I that he had no reason to backtrack on his position. Just the three pages of his written report are attached hereto as Exh. .

The "possible-probable" bit earlier in the deposition, point E, above, was a game as Dr.Reyes described of semantics between a polished attorney and a non-lawyer; with the polished attorney trying to force Dr.Reyes into a legal, linquistic straight jacket divorcing him from anything comparable to the "magic" phrase, "to a reasonable degree of medical probability."

Dr.RONWIN submits that an MD opinion holding a cause of injury to be of "high probability" is the non-lawyer equal or better than just, "medical probability," because it is not only medical, since given by an MD, but it is "high" probability which is more than just "medical probability."

4. Dr.Reyes did do a differential diagnosis.

The definition of a differential diagnosis in the 8th Circuit is quoted above at p. 27.

Dr.Knauer did the most work, including the surgery, on Dr.RONWIN's rotator cuff tear; see pp. 26-28, supra. She testified that the "likely cause" of the rotator cuff tear was "age," see p. 26, above. She also noted that degenerative changes were also a cause, p. 26, above.

In Dr.Knauer's medical notes, dated May 12, 2003, (which was about 2 weeks prior to the rotator cuff surgery), she acknowledges that "mild degenerative changes" were noticed in the X-ray of that date. Since that note was in the medical reports provided to Dr.Reyes and he reviewed those notes in preparing his expert medical report, he must have considered degenerative changes in his diagnosis. Also, Dr.Reyes knew that Dr.RONWIN was 77 years old when he began taking Baycol.

As to age, the comments above at p.27, demonstrate that one "cannot ever really tell that age"



02/12/2007 07:21 FAX 970 224 3838 ED RONWIN 045

is the cause of injury or disease. Thoughts about age as a cause are in the realm of speculation.

Dr.Reyes also testified on age when considered as a cause of injury, Depo. 172:10-20:

> Q. Yes, well that happened. Yes, it's got a good foundation. Yes. All right. Let's see. Also, the fact that one is older does that necessarily mean that that is the cause of one's symptoms after taking a drug?
> A. No.
> Q. It could be, but it could not be, is that right?
> A. That's correct.
> Q. Yes. And you would have to really show that in order to make the claim that age is the reason?
> A. I would think so.

As Dr.Reyes agrees, age is something that could or could not be a cause of injury such as a rotator cuff tear. Age is something nobody escapes--it's always there. While some old people get rotator cuff tears due to weakened structures; others do not. In Dr.RONWIN's case, Dr. Knauer reported that the "degenerative changes" were mild, p. 37, above. Therefore, Dr.RONWIN's internal shoulder anatomy was not seriously weakened by age.

Dr.Reyes must have considered age in his diagnosis and, as compared to Baycol as a cause, considered age as less likely.

As to specific degenerative change in the form of the arthritic spur at the AC joint Dr.Reyes testified, Depo.174:11-16:

> Q. But for the -- for the spur, the arthritic spur, to affect the rotator cuff, it would have to be of some length?
> A. Of course.
> Q. That's what I'm saying.
> A. It's got to be very long, (emphasis added).
> Q. Yes. And if it's of insufficient length, then it would not affect the rotator cuff? Is that right?
> A. It would be more likely affected by tendinitis, by inflammation.

Clearly the arthritic spur was not the cause of Dr.RONWIN's rotator cuff tear, which is supported by measurements made on the X-ray film of May 12, 2003, discussed infra.

As to the opinions of the orthopedic surgeons who Dr.RONWIN visited in connection with his rotator cuff tear, Dr.Reyes exclaimed, Depo.168:24-169:15:

> Q. Exactly. And the fact that some -- some of these do not state that there is a connection. In other words, if these orthopedic surgeons, such as Dr.Knauer, states that there's no connection, or she didn't think there was a connection between Baycol and my -- Ronwin's rotator cuff tear, does that settle the question?
> A. It doesn't for me --
> Mr. Mizgala:
> Object to form.
> A. -- because I've -- I've practiced too long.
> DR.RONWIN
> Q. In other words, it could still be that that's the case?
> Mr. Mizgala:
> Objection as to form.
> A. <u>It's always a probability</u>. (emphasis supplied).

Dr.Reyes did do a differential diagnosis!

5. Did Dr.Reyes use speculation?

One or two times, Dr.Reyes, speaking in the vernacular, did use the word, speculate, but it is submitted, as shown by the several excerpts from his deposition set forth above, that his whole approach was that of a well-informed, highly experienced surgeon and MD.

In the deposition, Depo.104:4-5 and subsequently, Dr.Reyes was shown the front and back pages plus the first 6 pages of the FDA AERs on Baycol, Exh.10, essentially for the entire existence of Baycol on the market and since. The Baycol AERs absorbed several of the deposition pages. Among the dozens of adverse events, the following discourse occurred with respect to a relationship between Baycol and rotator cuffs, Depo.113:8-23:

> Q. Yes. All right. And then let's look at the next item and it's item 15.
> A. That's rotator cuff syndrome, 84, (no. of reported events) and 0.2, (percent).
> Q. Would that indicate to you that Baycol can attack rotator cuffs?
> Mr. Mizgala:
> Objection to form.
> A. That's what the FDA says.



02/12/2007 07:22 FAX 970 224 3838 ED RONWIN 047

DR.RONWIN
Q. Yes, sir. Now the next item.
A. Tendon rupture.
Dr.Ronwin:
Yes.
A. Thirty-four, 0.2 percent.
Q. Now, is the rotator cuff a tendon?
A. Yes.

It is clear that Baycol can attack rotator cuffs and the result can be a tear. Moreover, AERs are largely compiled from the reports of pharaceutical manufacturers, who gather them mostly from MDs and some from consumers. Hence, BAYER, while arguing in this MDL that only muscles are attacked by Baycol has known all these 6 years that nerves, tendons, rotator cuffs, vision blurring, gait problems, back and other pain problems are attacked by Baycol. Moreover, BAYER has used AERs with respect to Baycol in its clinical considerations! Any argument BAYER makes herein that AERs are worthless, is false.

Dr. Reyes testified that Baycol action was not limited to the musculoskektal system, Depo.115:13-16. Additionally, Dr.Reyes declared that if a substance is toxic it is "most probability" (words of Dr.Reyes) that it has the capability of attacking every cell of the body, Depo.116:2-7.

Furthermore, there is significant amounts of the protein, collagen, in a rotator cuff, which is important in a subsequent discussion herein. As to collagen, Dr.Reyes said, Depo.117:18-20:

Q. So in the rotator cuff, collagen is one of the supporting elements, is that right?
A. That is correct.

In the presence of Dr.Reyes and BAYER's attorney, Dr.RONWIN measured the acromiohumeral distance and the length of the spur at the AC joint, as these anatomical featue appear on the X-ray taken of Dr.RONWIN's left shoulder on May 12, 2003, Depo.121:6-10,

about two week prior to the rotator cuff surgery.

The X-ray showed the features of the shoulder at "full size," Depo.119:15-21. In Dr.Reyes medical career, he has read something like 100, 200 thousand X-rays, Depo.119:22-120:5, and he considers himself, "pretty good" at reading X-ray films, Depo.120:17-18. The measurement results were 9 to 9.5 milimeters for the acromiohumeral distance and approximately 3 millimeters or less for the AC joint spur, Depo.123:10-125:13.

Dr.Reyes "never dealt in measurements," Depo. 126:4-5. After the measurements, Dr.Reyes was shown Exh.10 to his deposition, which consists of the front page and p. 1736 of Campbell's Operative Orthopaedics, Vol. 3, 8th Edition, 1992, edited by A.H.Crenshaw,MD. The two pages are Exh.16.

Dr.Reyes said of the tome that it "is basically the bible of orthopedic surgery," Depo.126:17, and, in his career, Dr.Reyes used Campbell's "extensively," Depo. 127:9; and [for surgeons], the tome is "almost imperative that you have it," Depo.127:14-15.

From p.1736, Exh.16, it can be gleaned that an acromiohumeral distance between 7 and 14 millimeters is normal and no rotator cuff tear would appear, [unless something like Baycol chewed on the tendon], and a distance of 5 millimeters is compatible with a major rotator cuff tear, Depo.128:14-20.

Dr.Reyes would not conclude that Dr.RONWIN's "rotator cuff tear was most likely not due to the structure of Ronwin's acromion with respect to the humerus," rather, Dr.Reyes would have preferred MRI measurements, Depo.129:10-18. Therefore, Dr.Reyes would not give an opinion on the measurements, but he agreed that the authors of Campbell's would conclude as Dr.RONWIN has from the measurements, Depo.130:24-131:1.



02/12/2007 07:24 FAX 970 224 3838 ED RONWIN 001

A lengthy discussion with exhibits ensued on the proper way to make comparison between statins and their relative ability to cause adverse events, after which Dr.Reyes labelled Dr.RONWIN "an expert," Depo.146:23-147:2.

Dr.Reyes' testimony is that of a competent expert and his views are the basis for a genuine issues of material facts. Furthermore, Daubert is satisfied--this matter will receive more attention subsequent hereto.

**ON DR. EDWARD RONWIN AS AN EXPERT**

BAYER also questions Dr.RONWIN's expert status because Dr.RONWIN left formal association with biochemistry 35 years ago, p.21, MEMO and because BAYER absurdly thinks that Dr.RONWIN's theme on how Fluorine operates is by "etching" in the human body, p.20, MEMO.

Dr.RONWIN may be "retired" in that he doesn't get into the laboratory and perform experiments as he once did. As a matter of fact, most professors do not get themselves into the laboratory and "stand at the bench" doing research work. Graduate students generally perform that physical function. For some time, Dr.RONWIN did stand at the bench even though he was a professor and had graduate students.

Dr.RONWIN continues his membership in three, major scientific societies, to-wit: The American Association for the Advancement of Science, ("AAAS"); the American Chemical Society, ("ACS") and the American Society for Biochemistry and Molecular Biology[9],

---

[9] As the name of the society indicates, its members are either biochemists or molecular biologists. However, there is no difference between the two. A biochemist is a molecular biologist and vice versa. That is why the two "different" types can exist in a single society. The "difference" such as may be alleged is that most scientists who consider themselves molecular biologists concentrate on biochemical moleleules found in living entities and less on biochemical reactions in the abstract. However to be a molecular biologist one must know biochemistry, organic chemistry, inorganic chemistry, physical chemistry and materials chemistry, (at least). Likewise, to be a biochemist one must know the same. Of course, one cannot know all of the aspects of these various areas of concentration, but all or virtually all biochemists and molecular biologists are familiar with the basics of



02/12/2007 07:25 FAX 970 224 3838 ED RONWIN 002

("ASBMB"). Furthermore, Dr.RONWIN's alleged "amnesia," claimed by BAYER, p.21, MEMO, to have occurred when Dr.RONWIN left formal teaching and research association with biochemistry and related sciences, and for which claim BAYER presents absolutely no proof, was so bad that in 2001, Dr.RONWIN taught a course which was an overview of the latest in chemistry that included biochemistry, physical chemistry, organic chemistry, etc., to airman posted at the E.F.Warren Air Force Base situated on the western boundary of Cheyenne, WY. Evidently, Dr.RONWIN's "retired" status did nor affect his grasp of chemical studies. In proof of that service at said air force base, a copy of a pay form for Dr.RONWIN's service from Park University, which ran the program, is Exh.17.

Dr.RONWIN started chemistry training in high school in 1938 and graduated in 1941. Then Dr.RONWIN did some college work in chemistry until called to the colors for army service in WWII. Back from the war in 1946, Dr.RONWIN again began college chemistry training in 1947. The work at the Univ. of Illinois, Urbana, IL, in 1949-1950, included research in polymer chemistry under Dr. Carl "Speedy" Marvel, who, at the time, was considered a foremost authority on polymer chemistry. That work was important even though more in organic than in biochemistry because much of the chemistry of life depends upon proteins, (and enzymes which are almost all, but not all proteins), polymeric saccharides, DNA, etc., all of which are polymers. Dr.RONWIN left the Univ. of Illinois with an MS degree in chemistry and went to the Univ. of Calif. at Berkeley for a PhD degree. In essence, Dr.RONWIN's formal learning, teaching and research experience covers some 24 years. Dr.RONWIN has continued throughout the time since he left formal teaching and research in biochemistry and related areas to keep

---

these various areas of concentration and study.

abreast of developments in the field. Part of that process is that Dr.RONWIN receives as a life subscription a weekly issue of Science, which is a world-wide, respected publication of the AAAS and on par with Nature, its British equivalent. As above at p. 29, Dr.Wolfel labelled Science as a "very prestigious, scientific journal." Every week, the journal reports new developments in science, publishes series discussing specific areas of science and publishes orginal reports of current researches, (papers). It covers many areas of science, but much of its focus is on biochemistry, organic chemistry, physical chemistry, materials chemistry, physics and astronomy. In addition, Dr.RONWIN receives the periodic publication of the ASBMB which reports on current biochemical and medical advances. Dr.RONWIN's membership in the ACS brings a weekly copy of Chemical & Engineering News which highlights new biochemical and other chemical research developments, as well as chemical business news. In addition, Dr.RONWIN reads various articles in biochemistry and medicine in the Journal of Biochemistry and other journals which are available to him at the Colorado State Univ. library situated about 1½ miles from his home.

As can be seen from RONWIN's Curriculum Vitae, Exh.2,pp.4-5, RONWIN taught biochemistry in medical schools or in university departments which served medical schools associated with the universities. MD's generally receive a single course in biochemistry[10] and are ill-equipped to hold forth expertly on the fundamental, molecular level of drug action on the molecular composition of living tissue cells and on other anatomical features such as tendons. The testimony of Drs. Servi and Prince, exhibited above at pp. 34-38, amply proves the truth of the foregoing contention.

---

[10]Some medical schools/universities now have a combined program wherein the student spends about six (6) years and is graduated with both an MD and PhD degree. The latter degree is in biochemistry.

Also notable, as to RONWIN's expertise, is RONWIN's list of scientific publications, Exh.,p.5. As of this time, no person has refuted RONWIN's "Dipositive-Bond Theory of Hydrolytic Enzyme Action" (item no. 4) on the list. As to the structure of Nucleic Acids, (DNA), which was a major question when RONWIN was a graduate student at the Univ. of Calif, Berkeley in 1950-1952, there is an intriguing story presented in the footnote below[11].

The Direct Acylation of Amino Acids, etc., items 2 and 6 on said list, were also done while RONWIN was a graduate student and were original works which provided a basis upon which two Rockefeller Center scientists based their approach to their synthesis of the protein Insulin, which in turn, was the first protein synthesized by mankind.

Additionally, the atoms which make up molecules, did not change their chemical characteristics because Dr.RONWIN retired. Carbon, Hydrogen, Oxygen, Nitrogen, Fluorine, Sodium, Chorine and all other chemical elements act today in their chemical reactions as they did when

---

[11] RONWIN prepared for publication items 1 and 5 on his list of publications, see Exh. A to MEMO. These publications deal with the structure of Nucleic Acids. RONWIN's basis for proposing the structure was that the proposed structure fit the X-ray patterns of Nucleic Acids. Dr. Watson, of the Crick and Watson team, stated somewhere that when RONWIN's formula was published they thought that RONWIN had "beat them to the punch." Also, at the behest of the Chairman of the Biochemistry Dept. at Univ. of Calif., RONWIN visited with Dr. Linus Pauling. Dr. Pauling was very annoyed with RONWIN, which RONWIN found perplexing. However, the Nobel Prize for the determination of the structure of Nucleic Acids (at least to that point in time) was given, not only to Drs. Crick and Watson, but also to a Dr. Maurice Wilkins, who was at Cambridge Univ. in England at the same time as Drs. Crick and Watson. Somewhat over a year ago, Dr. Wilkins published a book entitled, The Third Man on the Double Helix. In the book, Dr. Wilkins notes that Dr. Pauling had also come up with a Nucleic Acid formula which entailed a structure that was like RONWIN's. Dr. Wilkins does not mention that it was like RONWIN's but his description of Dr. Pauling structure makes it clear that it was. Evidently, Dr. Pauling was a bit miffed that I beat him to publication and exhibited his annoyance at my meeting with him. But more, the structure of Nucleic Acids, as Dr. Wilkins admits, was really discovered by Dr. Rosalind Franklin at Cambridge Univ. at the same time. She isolated strands of Nucleic Acids and noted the double helix structure. Dr. Wilkins relates that Dr. Watson was present when she was apparently describing her results to Dr. Wilkins. Dr. Watson immediately saw relationship and hastened to Dr. Crick's office. Thereafter they made a model of the double helix structure and published a paper (a scientific report) on the subject. Few in the field dispute that Dr. Franklin, who died not many years after her discovery, really deserved the Nobel Prize which she did not get or even share.

Dr.RONWIN first took chemistry in high school in 1938 and afterward in his formal pursuits of the BS, MS and PhD degrees and in subsequent teaching and research in biochemical and related matters. In fact, the chemical properties known today of the approximately 116 chemical elements had the same chemical properties when the Earth was created, when the Sun was created and when the Universe was created. The chemical elements were created from the lightest element known, Hydrogen, by nuclear fusions in the bowels of stars which threw them off into their surrounding media when these stars underwent supernova explosions. We may rest assured that the chemical elements will continue to show the same chemical properties that they do today, did when they were created and will do in the near future unless some extraordinary, universal event occurs.

BAYER's claim that Dr.RONWIN suffered "chemical amnesia" as soon as he left biochemistry and related areas in a formal manner, is downright disgusting, dishonest and lacking in any proof; and typical of the type of foul advocacy that BAYER has practiced for 6 years in this MDL. There is a Rule 11 and the court is obligated to take action based on the rule.

Dr.RONWIN's "retirement" in law has not caused him to forget legal process any more than chemical matters and BAYER has not demonstrated the contrary.

Furthermore, RONWIN filed an expert report or opinion in this specific case pursuant to Fed.R.Civ.P. 26(a)(2)(B). BAYER was served with a copy, Exh.2. BAYER made no effort at the time said report was filed to refute any part of the report or to challenge RONWIN's expert status. And in MEMO, pp.20-23, offers nonsense as its alleged refutation of RONWIN's expert status. Recently, BAYER filed a "motion to compel," which essentially was a Daubert challenge; yet, before that matter has been determined, they come upon the scene with their alleged,



02/12/2007 07:27 FAX 970 224 3838 ED RONWIN 006

Motion for Summary Judgment, which includes to Daubert challenges; one against Dr.Reyes and one against Dr.RONWIN. In Dr.RONWIN's opinion, BAYER had a duty to challenge Dr.RONWIN, (and Dr.Reyes's) expert reports when each was filed.

The absurd notion that BAYER promotes about Dr.RONWIN's use of the word, "etch" is a perfect example of BAYER's deliberate mislabelling of an example.

In Dr.RONWIN's Case Specific Expert Report filed in this case, Exh.2,p.14,last ¶[12], Dr.RONWIN wrote:

> Just how destructive the $F^-$ ion can be is shown by the fact that hydrofluoric acid, HF, which dissociates in water to $H^+$ and $F^-$ ions, is used to etch metal and glass. Even though body fluids are generally slightly basic, (an exception is stomach fluid which is very acidic), $F^-$ ions can be expected to "etch" body components.

The word, "etch", was put into quotation marks. To anyone familiar with the English language and its spelling formats, the placing of quotation marks around a word has the effect of changing the meaning of a word. The effect intended to convey was that Flourine ion is so active that it can etch metal and glass. In fact, Fluorine is the most active element known to mankind. Thus, the idea conveyed by the term, "etch," is that in the human body, Fluorine ion can be expected to be quite reactive and therefore quite disruptive of body cell and tissue organizations. To any one schooled in English, the use of the word, "etch" in quotation marks would have and should have been readily recognized as indicating: not that Fluorine ions would etch any body part, but that those ions in blood and lymph, essentially aqueous media, could react readily with molecules that make up the structure of cells and tissues. BAYER's attorneys ought to attend beginner's classes in English.

---

[12] A copy of the document is claimed to be part of Exh.O, MEMO; however, it was not included in Dr.RONWIN's copy of Exh.O, MEMO.



02/12/2007 07:27 FAX 970 224 3838 ED RONWIN 007

The bullet point criticisms aimed at Dr.RONWIN's explanation of the pernicious action of Baycol will be completely answered in the following and the basis upon which the answer rests will be shown to be peer-reviewed papers, textbooks and other writings that have gone through several editions, which indicates good acceptance in a field; and all in terms and concepts that have been for many, many years and currently are accepted in biochemical circles:

Exh.18 shows the electron arrangement in the Hydrogen,(H), Carbon,(C), Nitrogen,(N),Oxygen,(O) and Fluorine,(F) atoms. There are two "shells" shown. The first consists of two electrons in each. The number of electrons in the "outer" shell varies. The H atom has only the first shell. To fill its "desire" to have two electrons in its single shell--because filling that shell puts the atom into its lowest energy level[13], the H atom will combine with another atom and share its electron with an electron from another atom, which if the other atom is an H atom, will create $H_2$, which puts both atoms in lower energy levels and is the form in which we almost always encounter H gas. All matter seeks to go into its lowest energy level.

The C, N, O and F atoms have a full inner shell and have a "desire" to fill their outer shell. F atom has the strongest desire to fill its outer shell. So strong is F's "desire" that it is the most reactive element known to mankind. When F, as $F_2$, reacts with $H_2$ it forms HF, (hydrofluoric acid), which in water solution exists as $H^+$ and $F^-$. If F reacts with sodium, Na, which has a third shell with but one electron in it, and a strong "desire" to lose that electron, the compound formed is NaF, which exists in aqueous solutions as $Na^+$ and $F^-$. $F^-$ is called the "fluoride ion"

[13]First, atoms don't have "desires" as human beings, as with the word, "etch", in quotes, it is just a manner of speaking with the intent only to convey the thought of the urge of H atoms to fill their single shell. An example on the macro scale of the "desire" of things to attain a lower energy level is a ball being held above the ground by a strong, continuous spray of water from a fountain. The water imparts its energy to the ball enabling it to resist gravity. When the water is shut off, the ball loses its energy source and falls to a lower energy level: the ground.



02/12/2007 07:28 FAX 970 224 3838 ED RONWIN 008

and has a great tendency to form "hydrogen bonds."

Water, as we all know, or should, is $H_2O$. $H_2O$ has the structure, H••O••H, where the two dots repesent a covalent bond between the atoms on each side of the dots. In writing the formula for water, the dots are replaced by a line so that a molecule of water is symbolized as: H—O—H. The O atom has six electrons in its outer shell so that binding with two H atoms "fills" its outer shell as well as "fills" the outer shell of each H atom in the water molecule. But, in water the bonds are not in a straight line, but are at an angle as shown: 

Compared to H, O is an electronegative, (= electrophilic), atom, i.e., it tends to draw electrons from surrounding bonds to it. Thus we can represent the $H_2O$ molecule as:



By pulling the H-O bond closer to it, the O atom becomes partially negative and the H atoms become partially positive.

In a beaker containing approximately 18 grams of $H_2O$, there are $6.02 \times 10^{23}$ molecules, i.e., 6.02 x 10 with 22 zeros after the 10. That's a lot of molecules. In that beaker each $H_2O$ molecule will have the charge relationship shown above. Taking just three molecules in that beaker, we have:



The bond between the H's and the O's in each molecule is a covalent bond. But, as the H atoms are partially positively charged and the O atoms are partially negatively charged with electrons exposed, there is formed inter-molecular bonds which are called, "hydrogen bonds:"



02/12/2007 07:28 FAX 970 224 3838 ED BONNIN 009




Instead of OH groups, other groups can engage in hydrogen bonding, as shown in Exh.19,p.4, where carboxyl groups, R–C(=O)OH (R stands for some other group such as a methyl group, $H_3C$– etc.), are shown to be hydrogen bonded to OH groups, amino groups, >N–H and sulfide groups –S–H.

Hydrogen bonds are not as strong as the covalent bonds, but they are strong enough to effect molecular behavior, Exh.19,p.3.

$F^-$ can also form hydrogen bonds when formed with an amide group >N–H. Those hydrogen bonds are the second strongest hydrogen bonds known as noted in the abstract of a scientific paper published in the prestigious Journal of the American Chemical Society, Exh.20. Only the front page carrying the abstract is presented in order to reduce the bulk of paper in this Response; that has and is being done with other papers mentioned herein.

The chemical structure of the amino acids commonly found in the human body are shown in Exh.21. Each acid has a carboxyl group attached to a C atom and an amino group attached to the same C atom; the "common" C atom is referred to as an $\alpha$ atom. The difference between the amino acids is the identity of the group replacing an H atom on the $\alpha$ C atom.

The carboxyl group, (the organic acid group), –C(=O)OH releases its H atom as $H^+$ to the aqueous medium and the amino group –N: takes up the $H^+$ to yield –N–$H^+$.



02/12/2007 07:28 FAX 970 224 3838 ED RONWIN 010

Amino acids tend to combine with each other, Exh.22. The combination results from a removal of a water molecule to which the carboxyl group of one amino acid yields its OH group and the amino group of another amino acid yields an H atom thereby forming the $-\overset{O}{\overset{\|}{C}}-\underset{H}{N}-$ peptide link. The number of amino acids that can yield chains can be small, such as 5 or 10 in a row, or they can form proteins with upwards of 500+ amino acids in their chains. The molecules with small numbers of amino acids are labelled, "peptides," and the molecules with larger numbers of amino acids, (usually 80[14] or more) are labelled, "proteins." Note that the R group on each amino acid in a peptide or protein chain can vary in nature up to 20 different R groups, so that a very large number of combinations is possible. Just substituting one amino acid in a protein chain can change the entire function of the protein.

OH groups, F, and other groups and atoms can be bound to C atoms which are single, or to C atoms which are, in turn, bound to each other in chains or in rings, which can also have other atoms in the ring, such as N atoms. Exh.23, depicts an F atom bound to a C atom in a ring known as the "phenyl" ring and an F atom bound to a C atom in a chain of 3 C atoms.

Experimentation has shown that the replacement of an F atom from the phenyl ring by an $OH^-$ group is an easy reaction, Exh.24, the 2nd page of the exhibit in the area marked out. We also note that the breaking of the C-X, (where X stands for a halide; F, Cl, Br, I and Astatine, are halides), in an aliphatic compound, is opposite in ease of breaking of the F-phenyl bond, an aromatic carbon compound, and replacement with an $OH^-$ group. The latter observation is further substantiated by the text in Exh.25,p.3.

Exh.26 shows the molecular structure of Lipitor, a very popular statin.

---

[14]This figure is not fixed in stone.



02/12/2007 07:29 FAX 970 224 3838 ED RONWIN 011

Exh. 27 shows the molecular structure of Baycol.

Exh. 28 shows the mechanism by which the F atom attached to the para position of the phenyl group in Baycol, and which atom is highly electrophilic, tends to pull the electrons of the F-C bond to it and gets a "push" from the pyridine group attached to the phenyl group. This results in the F atom going into aqueous solution, (in the body: blood, lymph), and being replaced by an $OH^-$ group or other nucleophilic group in the aqueous medium such as an amino group

 etc.

The research reported in Exh.24 shows that the reaction in Exh.28 is favored.

The tendency for the F atom to pull away from the phenyl ring in Lipitor will not receive assistance from the pyrrole ring because such assistance would create a fully positive C atom that would instantly pull back any electron movement that attempted to move into the bond between the phenyl group and the pyrrole ring, see Exh.29.

In Exh.2,pp.18-26, taken from Advanced Organic Chemistry, Reactions and Mechanism, Bernard Miller, Pearson, Prentice-Hall, 2nd Ed., (2004), (idetified in Exh.2,p.8,1st Full ¶), there are reproductions of pages from said textbook and it can be noted that the movement of electrons and bonds is used in organic chemistry, as in biochemistry, to explain how chemical reactions proceed. The textbook is in its 2nd edition and published in 2004. When Dr.RONWIN entered high school in 1938 and began studying chemistry, the same methods were in vogue and were used earlier than 1938. BAYER's criticism of Dr.RONWIN' use of these methods is the mark of chemical ignorance.

As explained in the printed matter in Exh.30, taken from Voet and Voet, Biochemistry, 2nd Ed., John Wiley & Sons, N.Y., Collagen is the most abundant protein in human beings and is



02/12/2007 07:30 FAX 970 224 3838 ED RONWIN 012

essentially, a structural support agent providing as noted in Exh.30, "the tensile strength of tendons" such as rotator cuffs. As further explained in Exh.30, the collagen in tendons is the "Type 1" which is, in turn, "approximately 90% of the collagen found in humans," and the helix structure of that collagen creates its strength.

In the lower part of Exh.30, a picture is shown of the triple helix structure of collagen, consisting of three strands of polypeptides which constitutes collagen molecules. The three strands are held together by <u>hydrogen bonds</u> formed between grouping on the amino acids which are part of each of the three peptide strands. This is depicted in Exh.31, where a common type of hydrogen bond, $>C{=}O \cdots H{-}N<$ , features. Recall that research has established that the $F^-$....H--N hydrogen bond is the "second strongest hydrogen bond known," abstract shown in Exh.20. As a result $F^-$, in the blood or in lymph, can attack the collagen helix formations in tendons, ligaments, etc., and break some or all of the hydrogen bonds holding the three strands together in the helix structure, which would destroy the helix in whole or in part and thereby diminish or destroy the collagen molecules ability to provide structural support for the tendon. That action would result in ruptures and tears of the tendon; and in human shoulders, the rupture and tears would be in the rotator cuff. Exh.32 shows the $F^-$ displacement of either the carboxyl group or the hydroxyl group from their amide hydrogen bonds with adjoining strands in the collagen helix.

The F atom when attached to the Baycol molecule can also form the hydrogen bond depicted in the above discussion for $F^-$ and cause disruption of cells and tissues; however, it would be a far lesser degree than for $F^-$ because of the bulk of the Baycol molecule compared to $F^-$ alone. Lipitor, which also has an F atom in an analogous position also causes some adverse events as



02/12/2007 07:30 FAX 970 224 3838 ED RONWIN 013

did Baycol; however, when one adjust for the difference in time of marketing; market share and molecules per the most popular dose, Lipitor's causation of adverse events is miniscule compared to Baycol. The preceding is easily demonstrated.

In 1983, Dr. John Yiamouyiannis authored a book entitled, Fluorine The Aging Factor, which was published by Health Care Press, (now believed to be out of business). The book is no longer in print, but a 3rd edition was printed in 1993. Dr.RONWIN obtained a copy of the original edition from the Univ. of Colo. library at Boulder, CO. Amazon.com and Consumerhealth.org, (a Canadian company), appear to still have copies of the 3rd edition for sale.

The book discusses the arguments and scientific research aimed at stopping the fluoridation of drinking waters.

Salient points from the book are as follows:

p.4: "$F^-$ levels as low as 1 part per million, (ppm), in the drinking water gives rise to an increase in urine concentration of certain biological chemicals that signal breakdown of collagen."
P.4: Collagen makes up 30% of body protein. It is a major structural component of skin, ligaments, tendons, muscle, cartilege, bones and teeth.
P.8: This page contains a list of a number of important enzymes which are inhibited by F ions and a table showing the accumulation of F in body tissues. See Exh.2,p.27.
p.15: $F^-$ attacks hydrogen bonds, thereby distorting protein and DNA shapes and their function.
P.20: Collagen breakdown in bone, tendon, muscle, skin, cartilege, lung, kidney & trachea, Citing several research reports.

Additional scientific reports are discussed in the book.

Exh.33 presents a copy of the first page of a paper published in a respected, peer-reviewed, scientific journal whose abstract emphasises the negative effects of Fluorine on Collagen.

A copy of a report in C&EN, publication of the ACS, Exh.34, reveals the concern with the effects of organic Fluorine compounds on humans in a situation where deaths from kidney failures were attributed to the use of perfluorohydrocarbons. This recalls the fact that in rhabdo,

it is kidney failure that usually causes the deaths.

## THE APPLICABLE LAW

As above at p.1, BAYER has actually filed three (3) motions wrapped into the rubric of a motion for summary judgment. The first consideration of law will deal with Rule 56 law and thereafter the two Daubert type motions against Dr.Reyes and Dr.RONWIN will addressed.

## ON FED.R.CIV.P.56

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the court held that the requirement for a grant of summary judgment "is that there be no genuine issue of material fact," 106 S.Ct. @ 2510, (emphasis in original). The court also observed that, 106 S.Ct. @ 2511:

> ...at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial...

In ruling on summary judgment motions, 106 S.Ct.@ 2513, the court declared that taking into account the standard of proof, (preponderance of the evidence in this case), the trial court:

> ...does not denigrate the role of the jury. It by no means authorizes trial on affidavits. credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor... (citation omitted)...Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

We are in federal court, therefore Anderson absolutely binds this court's approach to Rule 56 motions. The case does arise from state court in Wyoming, where that state's Supreme Court is in concordance with Anderson. Thus, in Hatton v. Energy Elec.Co., 148 P.2d 8, 13 (Wyo.

2006), the court held:

> We evaluate the propriety of a summary judgment by employing the same standards and using the same materials as the district courts...
> Wyo.R.Civ.P.56...A summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. When reviewing a summary judgment, we consider the record in the perspective most favorable to the party opposing the motion and give that party the benefit of all favorable inferences which may be fairly drawn from the record...

**A LIST OF SOME GENUINE ISSUES OF MATERIAL FACT PREVALENT HEREIN**

These material facts are gleaned from the discussions above and assume that no matter how true and correct Dr.RONWIN's position is, BAYER will maintain otherwise.

1. Did Dr.Torkelson commit perjury in his testimony and in general is his testimony as an alletged expert not credible and invalid?

2. Did Dr.Keller commit perjury in his testimony and show no relevant relationship to Dr.RONWIN's lasting shoulder and back injuries from the ingestion of Baycol, thus making his testimony invalid as an expert?

3. Did Dr.Knauer fail to perform a differential diagnosis when she admitted that she did not know that Baycol was a molecule and thereby was prevented from considering Baycol as a cause of Dr.RONWIN's rotator cuff tear due to her admitted lack of knowledge. And, was her naming age as the "likely cause," flawed since it is impossible to prove that age is a cause of any disease or injury?

4. Do not the AERs show that Baycol does cause rotator cuff ruptures and tears which mandates such consideration in all differential diagnosis?

5. Likewise, did Dr.Servi also fail to consider Baycol action on rotator cuffs and tendons, as did Dr.Knauer, which made her diagnosis less than differential; and did she admit that her

educational background and experience was only at the clinical level of medicine and that she could not address the fundamental biochemical level of Baycol's molecular action on rotator cuffs?

6. Did Dr.Prince declare that he was offering no diagnosis as to Dr.RONWIN's injuries with regard to Baycol and did Dr.Prince testify, as did Dr.Servi, that the effort of MDs is on the clinical aspects of medicine, but that medicine is moving deeper into the more fundamental level of molecular interactions between molecular structures of body parts and drug, or other, chemicals?

7. Is Dr.Deane's entire testimony without application to the major question herein, i.e., that Baycol caused Dr.RONWIN's lasting injuries consisting of his rotator cuff tear from which he will never regain full left shoulder strenght and movement, (as testified to by Drs.Knauer and Prince), and his non-spasm, non-calf claudication, lower back, buttock and thigh pains?

8. Is Dr.Wolfel's testimony without any assistance to BAYER's views on Dr.RONWIN's injuries suffered from seven months of Baycol ingestion?

9. Is Dr.Hiatt's testimony that Baycol did not cause Dr.RONWIN's injuries but admitting that it could have, without support for BAYER's case and does not Dr.Hiatt's non-involvement with Dr.RONWIN's injuries from Baycol with failure to even review the medical records on Dr.RONWIN's rotator cuff problem, and failure to perform a differntial diagnosis, nullify his testimony of support for BAYER's position and does not Dr.Hiatt's diagnosis that Dr.RONWIN's back, buttock and thigh pain is neuromuscular support Dr.RONWIN's contention that that permanent injury is Baycol related?

10. Leaving aside Daubert considerations, does the testimony of Dr.Reyes establish that there

is a "high [medical] probability" that Baycol was the cause of Dr.RONWIN's rotator cuff tear?

11. Did the measurements on the anatomical parts of Dr.RONWIN's left shoulder, as shown in the May 12, 2003 X-ray film, demonstrate that the acromiohumeral distance was too normal to account for the rotator cuff tear?

12. Did the X-ray measurement show that the AC joint spur was too short to cause the rotator cuff tear, thereby eliminating "degenerative changes", which Dr.Knauer labelled, "mild", as a cause of Dr.RONWIN's rotator cuff tear; and, did Dr.Reyes rule out degenerative changes as a cause?

13. Did Dr.Reyes rule out age as a definite cause of Dr.RONWIN's rotator cuff tear?

14. Leaving aside Daubert considerations, does Dr.RONWIN's factual exposition herein above show the molecular mechanism by which Baycol can cause disruption and destruction of the structural integrity of Collagen in tendons, such as rotator cuffs, thereby removing a major contribution to the stability of rotator cuffs and leading to rupture and tear, as in Dr.RONWIN's left shoulder rotator cuff?

15. Are mankind's understanding of the causes of disease moving deeper and deeper into the fundamental reactions of the great variety of molelcules constituting the human body and their interactions as well as reactions with agents such as prescription drugs?

Can there be any doubt that, contrary to BAYER's position, p. 23, MEMO, there are numerous genuine issues of material fact in this case?

**ON THE DAUBERT CHALLENGES TO DR.REYES AND DR.RONWIN**

The declarations in Daubert v. Merrell Dow Pharaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which may or due have pertinence to the considerations herein



02/12/2007 07:32 FAX 970 224 3838 ED RONWIN 018

are:

113 S.Ct. @ 2794:

Rule 702, governing expert testimony provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

113 S.Ct. @ 2795:

...Rule 702...clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. 'if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue' an expert 'may testify thereto.' (emphasis in original). The subject of an expert's testimony must be 'scientific...knowledge' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation. The term 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'...citation omitted...Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science...citation omitted...Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance.

113 S.Ct. @ 2796:

Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation. See Rules 702 and 703.

Faced with a profer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

113 S.Ct. @ 2797:

The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity--and thus the evidentiary relevance and reliability--of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

(emphasis supplied).



02/12/2007 07:33 FAX 970 224 3838 ED RONWIN 019

113 S.Ct. @ 2798:

> Petitioners and, to a greater extent, their amici exhibit a different concern. They suggest that recognition of a screening role for the judge that allows for the exclusion of 'valid' evidence will sanction a stifling and repressive scientific orthodoxy and will be inimical to the search for truth...

With the foregoing guidance, we can proceed to determine the Daubert motions tucked into MOTION as to Dr.Reyes and Dr.RONWIN.

## DR.REYES AND DAUBERT

There can be no question that Dr.Reyes is a highly qualified orthopedic surgeon with massive experience as shown by his curriculum vitae, in Exh F to MEMO, and that in his testimony he asserted that a surgeon had to be especially grounded in anatomy.

His specialized knowlege allowed him to review the relevant records on Dr.RONWIN's rotator cuff tear, the surgery thereon and subsequent results; and to draw a competent medical opinion which, as shown above, was a differential diagnosis. He expressed disagreement with Dr.Knauer's opinion thereby ruling out, as far as his medical expertise is concerned her assessment that Dr.RONWIN's injury was due to "degenerate changes," (which includes the AC joint spur--osteoarthritis), and age. Dr.Reyes additionally addressed age and relegated it to a diagnosis that is, in effect, not capable of being established. The reason that age cannot be established in a medical context as the cause of a disease or injury is that it is always, in any particular case, in the may or may not be category!

Dr.Reyes' overall experience with drugs that cause injuries and deaths; the temporal relationship between the taking of Baycol by Dr.RONWIN and the onset and persistence of left shoulder pain, plus the absence of any other cause, allowed Dr.Reyes to conclude, as a medical expert, that Dr.RONWIN's rotator cuff tear was due to Baycol. Thus, he performed a differential

diagnosis.

Dr.Reyes' testimony reveals a person with knowledge, skill, experience, training and education to qualify to testify as he has in this case. Dr.Reyes' testimony is clearly relevant and grounded in medical knowledge. Dr.Reyes' testimony will clearly allow the jury demanded in this action to understand or determine a major fact herein: the cause of Dr.RONWIN's rotator cuff tear.

Dr.Reyes gave his medical opinion as "high probability" which is certainly equivalent, as he is an MD,to a "reasonable degree of medical probability."

As noted above, Daubert notifies the trial courts that it is not their province to focus on the conclusions of the expert, 113 S.Ct. @ 2797.

Dr.Reyes' expert views should be allowed to be presented to the jury. It is for the jury to decide the credibility of his views.

---

Before advancing to a consideration of Dr.RONWIN's expertise and its relevance herein, the court's attention is directed to the comment in Daubert, quosted above, 113 S.Ct. @ 2798, wherein the court notes that both petitioners in the case and their amici expressed fear of the creation of a "stifling and repressive scientific orthodoxy.." by judicial exercise of a "gate-keeping function" as to expert testimony.

Dr.RONWIN's concern is the effort of BAYER to have the court enforce an orthodoxy commanding that only MDs can act as experts in cases involving medical matters such as injuries from prescription drugs. Such view would deprive the jury of the benefit of hearing about the relationship between the enormous and expanding volume of knowledge researched and gathered by biochemists and scientists in kindred fields which explain the functioning and dysfunctioning

(= disease and injury) of the human race in biochemical terms, rather than in the old, clinical and less useful formats.

## ON DR.RONWIN AND DAUBERT

Dr.RONWIN's education, experience, research and teaching in chemistry and biochemistry in medical schools and universities having medical schools, qualifies him as an expert in the area of biochemistry and related sciences.

Baycol is a biochemical molecule and the only way it performs as a drug is to interact with other molecules in the human body.

The thesis that Dr.RONWIN presents above on the action of Baycol, which can and has been recognized to cause severe bodily harm and death to many human beings, is based on firm scientific knowledge gleaned from papers in peer-reviewed journals, books that have gone through several editions which is a mark of excellence, and uses methods commonly used by chemists and biochemists the world over for many decades.

The specific theme presented by Dr.RONWIN is based to a large extent on chemistry known before Dr.RONWIN first attended chemistry classes in 1938 and on subsequent, well-researched knowledge. Dr.RONWIN's theme is also fully relevant with respect to both Dr.RONWIN's rotator cuff tear and to his back, buttock and thigh pains. The jury will be aided to understand the material issues of fact in this case by Dr.RONWIN's expert testimony which is scientifically valid. Also, Daubert reminds us that an expert is to be given "wide latitude to offer opinions including those not based on first-hand knowledge or observation," 113 S.Ct. @ 2796.

## IMPORTANT CONSIDERATION

This court declared at the Dec. 19, 2005 hearings that Daubert rulings in specific cases would



02/12/2007 07:34 FAX 970 224 3838 ED RONWIN 022

be advisory only, Tr. Hearing, Dec. 19, 2005.

Federal courts are without authority to issue advisory opinions; not because Dr.RONWIN so proclaims, but because the United States Supreme Court, whose decisions this court must follow has so declared, to-wit:

Early in its history, the Supreme Court held that it had no power to issue advisory opinions, Hayburn's Case, 2 Dall. 409 (1792), as interpreted in Muskat v. United States, 219 U.S. 346, 351-353, 31 S.Ct. 250, 251-252 (1911). As the court noted in North Carolina v. Rice, 404 U.S. 244, 246, 92 S.Ct. 402, 404 (1971), a federal court has neither the power to issue advisory opinions nor "to decide questions that cannot affect the rights of litigants in the case before them, 404 U.S. @ 246. See also Peiser v. Newkirk, 422 U.S. 395, 401, 95 S.CT. 2330 (1975) and U.S.Nat.Bank of Oregon v. Independent Ins. Agents of America, Inc., 508 U.S. 439, 113 S.Ct. 2173 (1993).

As advisory opinions, determination of BAYER's Daubert motions against Dr. Reyes and Dr.RONWIN, in this specific case, cannot serve case-dispositive purposes. Hence, removing the two Daubert motions from MOTION reduces MOTION to a "pure" Rule 56 affair governed by the criterion requiring that a case contain, (at least one), genuine issues of material fact or be summarily dismissed, Anderson, supra, 106 S.Ct. @ 2510.

If anything characterizes this case, it is that it has genuine issues of material fact coming out of all its sides, as noted, in part, at pp. 63-65, above.

## CONCLUSION

Both Drs.REYES and RONWIN are fully qualified to testify before the jury demanded in this action and their testimony will greatly assist the jury to determine the material facts in this case.

Further, aside from hurling largely unsupported charges and demonstrating considerable failure to understand elements of English, BAYER's MOTION presents no grounds to justify its prayer; particularly, as this case is pregnant with numerous and genuine issues of material fact.

**WHEREFORE,** Plaintiff asks the court to deny the Defendant's Motion for Summary Judgment.

Dated: February 12, 2007

Edward Ronwin, pro se,
945 Rolland Moore Dr., L-2
Fort Collins, CO 80526
970-221-3837

CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Response upon the following by FAX, this 12th day of February, 2007: The Court Clerk's office at FAX No. 612-664-5044; Defendant's counsel at FAX No. 312-853-7036 (Weber or Mizgala); Plaintiff's Liaison Counsel, Deanna Dailey at Larson-King at FAX No. 651-312-6618.

Edward Ronwin



02/12/2007 07:35 FAX 970 224 3838 ED RONWIN 024

To: The Court Clerk's Office at FAX No. 612-664-5044
Defendant's Attorney, Sidley Austin (Weber or Mizgala) at FAX No. 312-853-7036
Plaintiff's Liaison Counsel, Deanna Dailey @ Larsoln King at FAX No. 651-312-6618

From: Dr. Edward Ronwin, at FAX No. 970-224-3838; (Telephone: 970-221-3837)

Date: February 12, 2007

RE: Ronwin v. Bayer Corp, MDL 1431; Case No. 02-0200

Faxing herewith Plaintiff's Response to Bayer Corp.'s Motion for Summary Judgment

The total number of pages being faxed is approximately 278. My current fax machine will only handle 50 pages at a time. Therefore, I will be faxing 48 pages for 5 calls and 38 pages for the 6th call.

Please make certain that you have received every single page.

If you have doubts or problems, please call me at the above telephone number.

Edward Ronwin, PhD, JD