UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

DEPOSITION OF: WILLIAM R. HIATT, M.D.
June 5, 2006

| | |
|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : |
| | : MDL No. 1431 |
| This Document Relates to: | : (MJD) |
| | : |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : Case No. 02-0200 |
| | : |

TAKEN PURSUANT TO NOTICE on behalf of the Defendant at 789 Sherman Street, Suite 200, Denver, Colorado 80203 at 8:05 a.m. before Lisa B. Kelly, Registered Professional Reporter and Notary Public within Colorado.

SCANNED
FEB 1 . 2007

Page 10

What is that again?
A. It's an independent but affiliated institution, nonprofit 501(c)(3) corporation that is a clinical trials research organization and a prevention center in focusing on prevention of cardiovascular disease in the citizens of Colorado.
Q. What are some of the examples of the clinical trials that you do?
A. We have, in 2005, $4.8 million in research grants, specializing in clinical trials to develop new therapies to treat cardiovascular disease. And we have 35 contracts, roughly.
Q. You mentioned to treat cardiovascular disease. What diseases are you focusing on?
A. Primarily peripheral arterial disease.
Q. In lay terms, what is peripheral arterial disease?
A. It's atherosclerosis in the arteries of the peripheral circulation.
Q. Meaning the extremities?
A. Correct.
Q. Legs, your arms?
A. Carotids. Renals. Mesenteric. Other vessels.
Q. Anything but the heart?
A. Anything but the heart.

Page 11

Q. And in your practice as a vascular specialist, do you see those sorts of diseases more frequently in the legs or arms or --
A. Most of the peripheral arterial disease is seen in the legs.
Q. Why is that?
A. No one knows, but it has a predilection for the lower extremity over the upper extremity, though you do see patients with disease in the aortic arch and major vessels to the arms. They're much less common.
Q. What are the classic symptoms of peripheral vascular diseases?
A. About half the patients have no leg symptoms. About a third have what's called intermittent claudication, which is an exercise-induced pain in the calf. It's relieved by rest. And a very small percent have what's called critical leg ischemia, which is pain at rest in the foot, ischemic ulceration and gangrene.
Q. Doctor, I know that you kindly accepted notice of this subpoena. We'll mark that as Exhibit Number 1.
MR. PILKINGTON: Can you mark some stickers?
THE DEPONENT: This one says to Eugene Wolfel.
MR. PILKINGTON: Sorry about that.
(Deposition Exhibit 1 was marked.)
(Discussion off the record.)

Page 12

Q. (BY MR. PILKINGTON) Dr. Hiatt, I've handed you what I've marked as Exhibit Number 1, correct?
A. Correct.
Q. Exhibit Number 1 is a notice of your deposition as well as a subpoena. It asks you to bring your complete file with respect to Mr. Ronwin. Do you have that?
A. No.
Q. Is that file located at the university?
A. Correct.
Q. Have you ever treated Mr. Ronwin here at The Colorado Prevention Center?
A. No.
Q. Has Mr. Ronwin ever participated in any sort of study here at The Colorado Prevention Center?
A. Yes.
Q. What study is that?
A. It was a muscle biopsy study, looking at the effects of peripheral arterial disease on gene expression and skeletal muscle.
Q. I'm sorry. Would you say that again?
A. It was a study looking at the effects of peripheral arterial disease on gene expression in peripheral arterial disease.
Q. Did it have anything to do with statins?
A. Yes.

Page 13

Q. What role did statins have in that study?
A. Some patients were taking statins. Some were not.
Q. Was the group who was not taking the statins considered the control group?
A. No. We had a healthy age-match control.
Q. What was the purpose of the study?
A. To better understand the effects of muscle ischemia on skeletal muscle gene expression, with a secondary question on the effects of statins on the same.
Q. And what did -- have you answered that secondary question of the effects of statins?
A. We've not completed the study. The analyses are ongoing.
Q. And was Mr. Ronwin's role in that study to simply give a muscle biopsy?
A. Correct.
Q. Has he had any other involvement in that study?
A. No.
Q. What records would reflect his role in that study?
A. We keep case report forms here.
Q. Would you have a file on Mr. Ronwin for that study?
A. Yes.


535c79c7-92f2-46d7-a7dc-a76bb554b50f

02/12/2007 08:37 FAX 970 224 3838 ED RONWIN 039

Page 22

A. He had a history of claudication. He had a history of revascularization procedures most recently by Dr. Kumpe. And he still had limitations from his claudication. And he was taking medical therapies for his vascular disease.
Q. If you look at the first paragraph of your July 26th, 2002 office notes, Mr. Ronwin reported to you that he had a coronary artery bypass in 1996.
A. Correct.
Q. Following that, he had problems with claudication?
A. Correct.
Q. And because of that claudication, he had numerous revascularization procedures, correct?
A. Correct.
Q. And here you note that he had those sorts of procedures in 1997?
A. Correct.
Q. 1998?
A. Correct.
Q. 2000?
A. Correct.
Q. And I believe 2001, correct?
A. I don't see the 2001 reference here.
Q. But he had numerous -- I'm sorry. At the end of

Page 23

the paragraph, you reference, and in January this year, he had his second procedure which has now been successful, correct?
A. Correct.
Q. So he had that procedure in 2002 as opposed to '01?
A. Correct.
Q. So he had numerous revascularization procedures?
A. Correct.
Q. What is that type of procedure?
A. Those were predominantly done by balloon angioplasty to open up occluded blood vessels.
Q. What is claudication?
A. Claudication means to limp. It's the symptom of peripheral arterial disease.
Q. Was it your understanding that Mr. Ronwin had that symptom since 1997 at least?
A. Correct.
Q. What symptoms did he present at this first office visit?
A. He continued to have claudication symptoms at presentation to me.
Q. And did he also, in this second paragraph, Doctor, report to you a pain in his buttocks bilaterally that radiated down through his leg into his thigh?

Page 24

A. Correct.
Q. Doctor, what medications was he on at the time?
A. His medications, when he presented to me, included Simvastatin, Atenolol, aspirin and vitamins.
Q. This statin he was taking, was Zocor --
A. Correct.
Q. -- the brand name?
A. Yes.
Q. And he was taking 40 milligrams each day?
A. Yes.
Q. What was your understanding as to why he was taking the Atenolol?
A. That has a dual purpose, controlling blood pressure and it's part of the treatment for coronary artery disease.
MR. RONWIN: Excuse me. Let's go off the record for a second.
MR. PILKINGTON: I'm going to stay on the record. Go ahead.
MR. RONWIN: It says here I took Zocor 40 milligrams per day. I took it every other day.
MR. PILKINGTON: We'll get to that. We'll get to that in a minute. You can ask him questions.
Q. (BY MR. PILKINGTON) The aspirin, he reportedly was taking three -- let me ask you that. Was it your

Page 25

understanding that Mr. Ronwin was taking the Zocor 40 milligrams each day?
A. Well, according to this note, that's what I put down.
Q. Is that something that would have been reported to you by Mr. Ronwin?
A. Correct.
Q. And according to this note, he was taking the Atenolol, 25 milligrams each day?
A. Correct.
Q. The aspirin, 325 milligrams each day?
A. Correct.
Q. What was the purpose of the aspirin?
A. It's an anti-thrombotic medication commonly given to people with cardiovascular disease.
Q. To further reduce the risk of both coronary and peripheral diseases?
A. Primarily to reduce the risk of myocardial infarction, stroke and death.
Q. Doctor, did you do a complete examination of Mr. Ronwin on that day?
A. Yes.
Q. Did you form any conclusions or make an assessment as to his current condition?
A. Yes.



535c79c7-82f2-46d7-a7dc-a76bb554b50f

Q. And Doctor, was it your conclusion that Mr. Ronwin has systemic cardiovascular disease?
A. Yes.
Q. Was it your conclusion that that cardiovascular disease was manifested primarily as both coronary artery disease as well as peripheral arterial disease?
A. Correct.
Q. Was it your understanding that the coronary artery disease was being primarily cared for by Dr. Wolfel?
A. I don't recall when he first saw Dr. Wolfel.
Q. I'll represent to you that it was before you first saw him.
A. All right.
Q. Do you have any reason to disagree with that?
A. No.
Q. And what was your approach of how to best manage these systemic cardiovascular diseases?
A. Well, the discussion here, which is consistent with usual cardiovascular care, is to focus on each risk factor and anti-platelet therapy.
Q. What risk factors were you focusing on?
A. Management of his LDL cholesterol, which as noted here would have a goal of less than 100 milligrams per deciliter.



Q. Okay.
A. Control of his blood pressure, which at the time was well controlled. He did not smoke or have diabetes. And use of anti-platelet therapies.
Q. So your focus in terms of Mr. Ronwin was to better control his cholesterol?
A. Correct.
Q. To control or maintain control of his hypertension?
A. Correct.
Q. And the use of anti-platelet therapy?
A. Correct.
Q. What does anti-platelet therapy mean, refer to?
A. It refers to drugs that block platelet function.
Q. Such as --
A. Aspirin and Clopidogrel.
Q. So in terms of managing his cholesterol, you understood that he was taking Zocor, 40 milligrams each day?
A. Correct.
Q. And at least according to your notes here, that that Zocor at that dose was managing his cholesterol adequately?
A. The report in the record says that his LDL cholesterol was 70 milligrams per deciliter, which would



be adequate.
Q. And is it fair to say that the 70 LDL is a better target for Mr. Ronwin than 100?
A. Today it's fair to say that. Back in 2002, that wasn't the guideline.
Q. What is the guideline today?
A. The guideline today is that patients who are high risk -- and one definition would be the combination of peripheral arterial disease and coronary disease -- should maintain an LDL cholesterol less than 70 milligrams per deciliter. And that's an American Heart Association guideline.
Q. Do you know when that became the American Heart Association guideline?
A. In the last year. I actually have a copy of the article in my office.
Q. So would you agree that Mr. Ronwin is a high-risk patient?
A. Yes.
Q. And he's a high-risk patient given the established diseases of both coronary artery disease as well as peripheral vascular disease?
A. Correct.
Q. Because of his high-risk categorization, Mr. Ronwin's target for LDL should be 70 or less?



A. That's true today.
Q. In 2002, when you first saw him, was the target less than 100?
A. Correct.
Q. Do you have an understanding as to why the current guideline is a reduction by almost 30 percent of LDL?
A. Newer information has indicated that lower levels are associated with improved benefit, specifically the Heart Protection Study that Med Analysis published in Lancet 2005.
Q. Have you adopted this new guideline in your practice?
A. Yes.
Q. And is it your advice to your patients to -- who are of a high-risk category, such as Mr. Ronwin, to get that LDL down to 70 or below?
A. Yes, it is.
Q. Are there any -- what are the guidelines with respect to HDL?
A. They are not as well developed as those for LDL cholesterol. They do indicate that patients with cardiovascular disease should have an HDL cholesterol -- and I believe that in men it's greater that 40 and women greater than 50, but I would have to look that up.



535c79c7-92f2-48d7-a7dc-a76bb554b50f

02/12/2007 08:39 FAX 970 224 3838 ED RONWIN 041

Page 30

Q. And what guidelines, if any, relate to the triglycerides?
A. The level of evidence there is not as good there either. And so in general, patients that have very high levels of triglycerides are treated for that. But the guidelines on triglycerides are less established.
Q. So in terms of treating his peripheral vascular disease in May -- I'm sorry, in July of 2002, your focus was on managing his cholesterol, controlling his hypertension, and the use of the anti-platelet therapy aspirin, fair to say?
A. In terms of his systemic disease, that's correct.
Q. Doctor, I want to now focus on the two types of symptoms that he presented in July of 2002, okay?
A. Okay.
Q. And I'm focusing on the last paragraph of your report. Do you have that in front of you?
A. On page 3?
Q. Yes.
A. Okay.
Q. Doctor, he was complaining to you about some pain that was focused in his buttocks that radiated down into his legs, correct?
A. Correct.

Page 31

Q. What was your conclusion about that type of pain?
A. That he might have had two kinds of pain, one was claudication, the other was consistent with neuromuscular etiology of pain.
Q. What is the classical symptoms of claudication?
A. Muscle cramping or discomfort on exertion that's relieved by rest.
Q. As opposed to the neuromuscular type of pain that you were suspecting, what is that? What is the symptom of that?
A. Those symptoms often radiate from the buttocks or low back down into the legs. May have more of a positional component, but can mimic claudication.
Q. So was it your conclusion that he may be having symptoms of both claudication as well as neuromuscular pain?
A. Correct.
Q. Doctor, the next time you saw Mr. Ronwin was in August of 2002?
A. Correct.
Q. Doctor, rather than going through this for each office visit, is it fair to say that Mr. Ronwin's coronary artery disease and peripheral vascular disease has remained constant during that time?

Page 32

A. During what time?
Q. During your entire care and treatment of him.
A. It has remained fairly stable.
Q. And by stable, he still has coronary artery disease, correct?
A. Correct.
Q. And he still has peripheral vascular disease, correct?
A. Correct.
Q. But through your care and treatment, along with others at the university, those conditions have been stable over the last four years?
A. Define stable.
Q. You used the word "stable". What did you mean by stable?
A. Stable meant that his level of claudication symptoms, specifically when walking uphill, remained relatively constant over that interval.
Q. And Doctor, I apologize. Your care and treatment of him really didn't focus on the coronary aspect. It's on the peripheral aspect?
A. Correct. But because they're all cardiovascular diseases, I wouldn't ignore a change in coronary symptoms, either.
Q. So by stable, you mean that the symptoms

Page 33

relating to both his coronary disease, as well as vascular disease, have remained fairly constant during the last four years?
A. Correct. And by stable, I mean he did not have another cardiovascular event during that time.
Q. A good thing.
A. That's a good thing.
Q. Okay. In any event, he came back to you in August of 2002 with the same complaint of pain radiating down into his buttocks, correct?
A. Correct.
Q. And to make this move faster, Doctor, you note that this pain was radiating into his buttocks and thigh upon walking that is relieved by rest. Do you see that?
A. Yes.
Q. However, it is a rather persistent pain and does not seem to be aggravated by further exertion. He clearly distinguishes this from his claudication pain, which is mostly calf induced and does limit his exercise.
A. Yes.
Q. Did I state that correctly?
A. Yes.
Q. You had some tests done on his spine?
A. Correct.
Q. And what did those tests reveal?



535c79c7-92f2-46d7-a7dc-a76bb554b50f

02/12/2007 08:39 FAX 970 224 3838 ED RONWIN 042

Page 34

A. Degenerative disk disease in his lower spine.
Q. What conclusions, if any, were you making with respect to this pain in his buttocks and into his legs?
A. The conclusion from that visit was that his pain, on exertion, was primarily musculoskeletal.
Q. As opposed to claudication?
A. Correct.
Q. Doctor, focusing on this middle paragraph where you talk about Mr. Ronwin's most recent lipid profile, do you see that?
A. Yes.
Q. What did you report with respect to his profile and the dosage of Zocor that he was taking?
A. The note begins with, taking Simvastatin, 40 milligrams per day, his LDL cholesterol was 70, his HDL was 36, triglycerides were 80.
Q. So Mr. Ronwin reported to you that he was taking the Zocor, 40 milligrams per day, correct?
A. According to this note, that is correct.
Q. And based on that dosage of Zocor, his LDL was down to 70, which would be ideal according to today's guidelines.
A. Correct.
Q. Did you also have a discussion with Mr. Ronwin about his desire to reduce his dose of Zocor to

Page 35

40 milligrams every other day?
A. I did.
Q. And what do you recall about that discussion?
A. As I recall, that was a discussion that began at that visit and continued through many visits, that based on Mr. Ronwin's review of the biochemistry of this class of medicine, he could take it less frequently.
Q. Did Mr. Ronwin approach you and explain to you that he wanted to reduce Zocor to every other day?
A. Yes.
Q. Would you turn to your last paragraph of your August note? In this you note that in terms of the patient's lipid disorder, I was concerned about cutting back on his statin dose on his own. Did you have that concern?
A. Yes.
Q. Why did you have that concern?
A. I was afraid he would lose control of his LDL cholesterol.
Q. That is, it would go up?
A. Correct.
Q. And did you try to dissuade him of moving to Zocor every other day?
A. I did.
Q. What did you tell him?

Page 36

A. I did not recommend that.
Q. Despite that recommendation, do you have an understanding as to what Mr. Ronwin did?
A. I believe he reduced it to every other day.
Q. Against your advice?
A. Yes.
Q. Doctor, have you prescribed statins over the years?
A. Yes.
Q. Is that a -- are statins a tool that you use to control one's cholesterol?
A. Yes.
Q. And do statins have an important role in controlling both coronary artery disease as well as peripheral vascular disease?
A. Yes.
Q. Doctor, one of the recognized side effects of these medications is rhabdomyolysis?
A. Correct.
Q. What are some of the symptoms of rhabdomyolysis?
A. Extreme muscle tenderness, often associated with kidney failure. Muscle weakness.
Q. And --
A. Very high CK levels in the blood.
Q. CK meaning --

Page 37

A. Creatine kinase. C-r-e-a-t-i-n-e, k-i-n-a-s-e.
Q. Have you had any of your patients who have taken statins report muscle tenderness, weakness, those sorts of symptoms?
A. Be careful not to make the association between muscle weakness or tenderness and rhabdomyolysis.
Q. Okay.
A. Those are often two distinct things.
Q. Okay. And thank you for that distinction. Have patients of yours reported the symptoms of muscle tenderness and weakness associated with the use of statins?
A. Not muscle tenderness, but muscle aches.
Q. And after they've reported muscle aches, do you do a CK analysis?
A. I often do.
Q. And if the CK analysis is elevated, what do you do?
A. It never has been. Because the risk of true rhabdomyolysis as extremely low.
Q. Have you ever had a case of rhabdomyolysis associated with statin use?
A. I have not personally.
Q. Okay. Is it your understanding that in cases of rhabdomyolysis, as soon as the statin is removed, the --

that assuming no renal failure or problems, the symptoms, the tenderness and the weakness of muscles resolve?
A. It should be, but I would have to review the literature to confirm that every case where statins were discontinued resolved.
Q. But it's your understanding that that usually happens?
A. Yes.
Q. So Doctor, at this point in time, at least in August of 2002, Mr. Ronwin told you he was going to use Zocor every other day, correct?
A. He indicated at the end of that visit that he wanted to take it every other day.
Q. Okay. Well, let's go to your next visit in August of 2002. Do you have that in front of you?
A. Do you mean September?
Q. Thank you very much. Do you have that in front of you?
A. Yes.
Q. What were his complaints on this visit?
A. At that visit, he had an angina complaint and a new symptom, which is orthopnea, which is shortness of breath when lying down.
Q. What is angina?
A. That's the symptom of coronary artery disease.



It's chest discomfort on exertion. It's relieved by rest.
Q. And is both angina and orthopnea symptoms associated with coronary artery disease?
A. Angina is associated with coronary artery disease. Orthopnea is associated with congestive heart failure.
Q. Okay. And indeed, your assessment on that date, if you turn the page, was that Mr. Ronwin had significant obstructive coronary disease, correct?
A. Yes.
Q. And that that coronary disease resulted in occasional symptoms?
A. Yes.
Q. Including angina?
A. Yes.
Q. Including the claudication-type symptoms?
A. Well, the coronary disease wouldn't cause claudication.
Q. The vascular disease would, correct?
A. Yes.
Q. And you also were -- you were also concerned about Mr. Ronwin developing some mild congestive heart failure?
A. Correct.
Q. What is that?



A. That's when the heart pump does not work properly.
Q. What was your recommendation at that time?
A. His blood pressure was a little higher than previously, 140 over 70. And because of this blood pressure and symptoms, I put him on an ace inhibitor, which would treat both.
Q. And if you go to the top paragraph on the first -- second page, it says, review of his medication today reveals he is taking Zocor, but on his own accord 40 milligrams every other day?
A. Correct.
Q. Do you see that? Did Mr. Ronwin report to you that he had, in fact, changed his dosage to Zocor every other day?
A. Based on this record, yes.
Q. And did he explain that he wanted to -- he did so to limit his exposure to statins?
A. Yes.
Q. He also reported reducing his aspirin intake as well to 81 milligrams.
A. Yes.
Q. Was that at your recommendation?
A. I don't recall, but that's a typical dose.
Q. Doctor, did Mr. Ronwin explain to you in



September of 2002 why he wanted to limit his exposure to statins?
A. I don't make a specific mention of it in this visit.
Q. Do you have a recollection of him doing so?
A. Yes.
Q. And what is your recollection?
A. My recollection is that he wanted to take as little statin as necessary.
Q. Did he explain why?
A. It was not clear to me why reducing the frequency of dosing was necessary, except that he felt that based on the way the drug was handled by the body, that it might -- you might be able to take less and continue at the same level of LDL cholesterol control.
Q. Doctor, you then saw Mr. Ronwin in November of 2002?
A. Yes.
Q. This time he really didn't have any primary complaints. You say he didn't have any chief complaints.
A. Uh-huh.
Q. Is that correct?
A. That's correct.
Q. But he still had some angina, correct?
A. Yes.

me to write an opinion about that and I refused.
Q. Why did you refuse to do so?
A. I was uncomfortable making the association around the statins and his particular musculoskeletal complaints, so I didn't want to commit myself to that.
Q. When you say you were uncomfortable about making those associations between his particular symptoms and the drug, meaning that it was your preliminary opinion that you didn't think that his symptoms were caused by his ingestion of Baycol?
A. I'd be careful about the broad term "symptom". But in terms of the rotator cuff, I could not make that association.
Q. In your experience in prescribing statins, have you ever had a patient have a rotator cuff problem that you believe was attributed to use of a statin?
A. No.
Q. Have you heard or are you aware of any case reports that make such an association?
A. I'm not.
Q. And is it fair to say that Mr. Ronwin approached you and asked you to offer on opinion that his symptoms, his neuromuscular symptoms were the result of taking Baycol?
A. My recollection was that he was asking my



opinion about the association of Baycol with his rotator cuff injury.
Q. That only?
A. That's my recollection.
Q. Okay. So stated differently, Mr. Ronwin approached you and asked you whether you would offer an opinion that his rotator cuff injury was associated with his use of Baycol, correct?
A. I believe that's correct.
Q. And you were uncomfortable doing so?
A. That's correct.
Q. Have you ever stated or suggested to Mr. Ronwin that any symptoms that he may be having are in any way associated with his use of Baycol?
A. I could not associate his use of any statin with the specific symptoms he was having.
MR. PILKINGTON: Doctor, I may have a couple more questions, but I do know that in courtesy to Mr. Ronwin, he may have a couple of questions.
MR. RONWIN: I got a few questions, yeah.
MR. PILKINGTON: I might have some questions, but I thank you for your time.
MR. RONWIN: I'll just go over to the other side. You want me to switch sides?
MR. PILKINGTON: Why don't we have the doctor



switch sides and I'll move this out of the way.
THE DEPONENT: What do I do with these exhibits?
MR. PILKINGTON: Just keep them right there.
THE DEPONENT: Keep them here?
MR. PILKINGTON: Yes.
THE DEPONENT: Do you want me over there as well?
MR. PILKINGTON: You can stay right there.
MR. RONWIN: Off the record for a second.
(Discussion off the record.)
MR. PILKINGTON: We're on the record now.

EXAMINATION

BY MR. RONWIN:
Q. You've indicated that you're familiar with statins.
A. Correct.
Q. And some of their negative effects; is that right?
A. Correct.
Q. And would a neuromuscular disease be a potential evidence of statin action?
A. Not that I'm aware of.
Q. Well, don't statins attack muscles, muscle tissue?
A. Statins primarily block an enzyme that makes LDL



cholesterol.
Q. But don't they attack the muscle cells and actually tear up the muscle cell wall and that's how the CK gets out of the muscle, out of the muscle cells?
MR. PILKINGTON: Form. Foundation.
A. Not exactly.
Q. (BY MR. RONWIN) Well, how does the CK arise then in the blood in extremely high concentrations when statins are taken in some cases?
MR. PILKINGTON: Same objections.
A. It's a fairly broad question.
Q. (BY MR. RONWIN) Uh-huh.
A. The vast majority of patients that take statins don't have elevations in CK.
Q. I'm just talking about the ones that do. How does that CK get out of the cells as a result of the statin action?
A. In the cases of elevations in CK?
Q. Yes.
A. It's felt to be due to inflammation.
Q. Well, but that's -- but doesn't that inflammation make the cell wall subject to more easy rupture?
A. Not necessarily.
Q. Well, then, how does the CK get out of the cell?

Page 70

A. It can leak out without changing the integrity of the cell wall.
Q. Well, that's almost like tearing the wall open, though, if it can leak out. It normally doesn't leak out; isn't that right?
A. Normally CK does not leak out of the muscle, that's correct.
Q. On the 40 milligrams every other day, are you aware that in my connection of getting my cardio -- cardiology treatment at UC, at the University of Colorado Hospital, that I have -- I had it with Dr. Hergott for just a very short time, maybe a week or two at the most, something like that, and then the rest of the time has been with Dr. Wolfel; is that right?
A. My understanding is you've primarily seen Dr. Wolfel.
Q. Yes. And do you know whether or not Dr. Wolfel has acquiesced in my using statin every other day throughout the time that I have seen him?
A. I would hate to speak for him.
Q. Huh?
A. I would hate to speak for Dr. Wolfel.
Q. You don't know, then, the answer to that question though, do you? Or do you?
A. I know Dr. Wolfel and I both felt that taking it

Page 71

every other day was not the appropriate way to take a medicine. We both agreed to that.
Q. I see. Do you know if he ever -- if Dr. Wolfel ever told me to take it every other day?
A. I'm not aware of that conversation.
Q. Okay. On the May 26, '05 report that you made, your comment was something to the effect that the Plavix -- I stopped taking Plavix because it caused bruising. What did you mean by bruising?
A. Common side effects of Plavix is bruising. And you must have complained of that because I made a note of that.
Q. But what do you mean by bruising medically?
A. Bruising would be bleeding under the skin after trauma.
Q. Okay. So are you aware that one of the contraindications of Plavix is that it causes bleeding?
A. Well, that's a -- I would characterize that as a side effect --
Q. But it's --
A. -- not necessarily a contraindication.
Q. I see. One of its side effects then.
A. Correct.
Q. In other words, if you take Plavix, you could experience bleeding?

Page 72

A. That is correct.
Q. Yes. Could the bleeding be -- show up as fresh blood in the stool?
A. It could.
Q. Okay. Were you aware that in 2001, that would have been April of 2001 -- you won't have that in your record -- Dr. Kumpe did an angioplasty on my left leg?
A. I was aware of that.
Q. Were you aware that Dr. Kumpe, well, prescribed Plavix for me in connection with that and asked me to take it for a 30-day period at 75 milligrams per day?
A. I'm not aware of that recommendation, but it would be consistent with what he would recommend.
Q. Right. Were you aware that after 13 consecutive days of taking Plavix for 75 milligrams, fresh blood appeared in my stools?
A. I was not aware of that.
Q. Would that have been a reason -- if that were the case, would that have been the reason to stop taking Plavix?
A. Not necessarily.
Q. Would you be aware that Dr. Kumpe agreed with me to stop taking it?
A. I'm not aware of that interaction.
Q. Okay. Thank you. Now, you indicated something

Page 73

to the effect that statins, as far as you knew, didn't cause rotator cuff tears; is that right?
A. Correct.
Q. Are you -- do you have any medical reason to indicate why that's the case?
A. Why there's not an association?
Q. Yes.
A. It's just not been a reported side effect of statins that I'm aware of.
Q. Okay. Does that exclude the possibility that rotator cuff tears can occur in the use of certain statins?
A. Does that exclude that possibility?
Q. Yes.
A. It does not exclude it, but it makes it extremely unlikely.
Q. But it doesn't exclude it?
A. It does not exclude it.
Q. Yes. Right. That's all I wanted to ask you. Let me get to this point here. There was a question presented to you by my opponent here which seemed to indicate that taking statins every other day was not a very good -- very good process.
Do you believe that taking statins every other day is not a good idea if someone is being treated for



535c79c7-92f2-46d7-a7dc-a76bb554b50f

Page 78

statin I ever took, on January 10th, 2001. So you can compare that cholesterol level and LDL level, et cetera, before and after starting statins in Ronwin's case.

A. Where did these data come from?

Q. They came from the -- from the laboratories which reported the lipid panels.

MR. PILKINGTON: To clarify, this is something you prepared, correct, Mr. Ronwin?

MR. RONWIN: Yes, that's true. I prepared it from the lipid panel reports of various diagnostic laboratories.

A. So you're asking me to accept the fact that these have been transcribed properly and these are accredited laboratories?

Q. (BY MR. RONWIN) Yes.

A. And that you note here a possible error, but that you're asking me to believe this is accurate information?

Q. Well, there's one where the doctor himself admitted it was an error, with an unusually high cholesterol of 315. That was Dr. Lukeson. And that was done with a finger stick deal in his own office.

And first he tried to tell me it was the true value. But I insisted it couldn't possibly be. And so ultimately he said, yeah, it isn't. It isn't correct.

Page 79

MR. PILKINGTON: What is your question?

Q. (BY MR. RONWIN) Well, the question is, in looking it over, this reflects from January 10th, 2001, down to the last data given there, on March 2006, it reflects my history of -- lipid panel history.

And it's done basically -- except for the first two or three items in 2001 -- with every-other-day dosing, primarily Zocor.

MR. PILKINGTON: What is your question? Are you just commenting?

Q. (BY MR. RONWIN) I would like him to take a look at it and indicate whether or not the every-day dosing has been reasonably effective in my case.

A. Every-day dosing?

Q. Every other day. Excuse me.

A. I can't --

MR. PILKINGTON: Objection.

A. I can't conclude that.

Q. (BY MR. RONWIN) I see. Okay. If you can't conclude it, you can't conclude it.

MR. PILKINGTON: Is that marked as Exhibit 9?

THE DEPONENT: Exhibit 8.

MR. PILKINGTON: Exhibit 8. Okay. Thank you.

MR. RONWIN: All right.

THE REPORTER: Can we go off for just a second?

Page 80

(Discussion off the record.)

Q. (BY MR. RONWIN) All right. Now, I want to ask you, in your practice, you have -- have you prescribed statins for any of your patients?

A. Yes.

Q. And have you ever prescribed Baycol?

A. I do not recall, though at the time it was available, I might have.

Q. Do you know if you're listed in any way with the Bayer Company or have been listed in any way with the Bayer Company as a cardiologist or cardiovascular specialist?

A. I'm not aware. I don't do any work with Bayer.

Q. I see.

A. This organization received grant support back in the 1990s to study a blood pressure medicine that Bayer sponsored. But that support ended in 1998.

Q. I see. Okay.

A. I don't have an ongoing relationship with Bayer.

Q. All right. Well, I want to show you --

MR. RONWIN: We'll have these marked also, one, two, three --

THE DEPONENT: I can go another five or ten minutes.

MR. RONWIN: -- four items. And these will be 9

Page 81

to 12, inclusive, 9, 10, 11, 12. Just a brief question on this.

MR. PILKINGTON: These are Dear Doctor letters, Mr. Ronwin?

MR. RONWIN: What?

MR. PILKINGTON: These are Dear Doctors letters?

MR. RONWIN: Yeah. That's all they are, really. Just one question on it.

MR. PILKINGTON: Take your time, Doctor.

MR. RONWIN: Two questions, actually.

(Deposition Exhibit 9 through 12 were marked.)

Q. (BY MR. RONWIN) Are those documents basically, quote, Dear Doctor letters?

A. I'm just seeing them for the first time. They have the Bayer logo on each of them. And they appear to be information to health care professionals, but I haven't read them.

Q. Huh?

A. They appear to be information to health care professionals, but I've not read these letters.

Q. All right. Would you accept that they're generally considered to be Dear Doctor letters warning of aspects concerning their drug?

A. I have to read them to conclude that.

Q. Well, just briefly. I'm sure you'll get the



535c79c7-92f2-48d7-a7dc-a76bb554b50f

02/12/2007 08:43 FAX 970 224 3838 ED RONWIN 047

Page 82

gist of it.
A. This first letter dated December 15, 1999 describes the risk of rhabdomyolysis with combination lipid therapy.
Q. Let me put it this way: Is it basically a letter giving warnings to doctors concerning their drug for the purposes of helping doctors consider prescribing a drug?
MR. PILKINGTON: Form. Foundation.
A. The first letter describes the risk of combination therapy. The second letter is May 21, 2001. This one refers to reports of muscle weakness and rhabdomyolysis during the postmarketing period. Substantial number of these cases occurred in patients receiving Baycol.
June 17, 2001, information on the prescribing of Baycol without Bayer making voluntary changes. Again, references that it would be contraindicated to take in combination with Gemfibrozil, G-e-m-f-i-b-r-o-z-i-l.
And the last letter is August 8, 2001, again, about rhabdomyolysis is a serious side effect of statins. And it talks about reports on the rate of rhabdomyolysis with Baycol relative to other statins, especially when Gemfibrozil is co-administered.
And then it says, effective immediately, Bayer

Page 83

has discontinued the marketing and distribution of all dosage strengths of Baycol.
Q. (BY MR. RONWIN) Did you ever receive any of those letters?
A. I probably would have.
Q. You probably would have?
A. Yes.
Q. Are you sure that you received them?
A. I can't document I personally received these, but the probability is quite high I would have as a prescribing physician.
Q. Do you have colleagues in your work in cardiology?
A. Yes.
Q. Do you know if any of them received Dear Doctor letters?
A. Do you mean specifically these Dear Doctor letters?
Q. These or any other from Bayer.
A. I can't speak for them.
Q. Okay. All right.
MR. RONWIN: We're going to need copies of all of those, okay?
Q. (BY MR. RONWIN) Now, let's see. I want to ask you, in connection with your work with statins, have you

Page 84

ever come across data that's based on adverse events reports? AERs is the acronym.
A. Yes.
Q. Have you used such data in your research?
A. That's kind of a broad question. I'm not sure what you mean.
MR. PILKINGTON: Form.
Q. (BY MR. RONWIN) Well --
THE DEPONENT: Pardon?
MR. PILKINGTON: I have to object to form and foundation. You highlighted my objection to form.
THE DEPONENT: Okay.
Q. (BY MR. RONWIN) Well, in your research, do you look at AERs to get a grasp of the actions of a statin?
A. My research?
Q. Yes. Or in your treatment of patients. Either way. I'm just mixing the two together.
A. Well, those are two different things.
Q. I know they are.
A. So specifically what would you ask?
Q. Well, have you ever used AER data in considering whether or not you should prescribe a statin?
A. Yes.
Q. You have?
A. Yes.

Page 85

Q. Which statins have you used it on, have you used AER data on?
A. Essentially all of them would influence your decision making.
Q. I see. Has that included Baycol?
A. Well, since Baycol has been off the market and I've not used it very much, that information would have been more relevant to other statin classes.
Q. I see. Okay. Do you believe that AER data on statins are reliable indicators of statin contraindications?
MR. PILKINGTON: Objection. Form. Foundation.
Q. (BY MR. RONWIN) All right. Do statins have contraindications?
A. They do.
Q. And do you believe that AER information concerning these contraindications is generally reliable information?
MR. PILKINGTON: Same objections.
A. That's too broad a question about reliability in particular. I'm not sure what you're driving at.
Q. (BY MR. RONWIN) Well, do you think that AER information should not even be considered when you're considering the utility of a statin for purposes of prescription?



535c79c7-92f2-46d7-a7dc-a76bb554b50f

mean, how much more do you have? Maybe the doctor could give us five more minutes and get this done.
MR. RONWIN: Well, it isn't critical. The questions I was asking him, these last questions, are not absolutely critical. I think they're interesting. I think he would -- he could have an answer. But I can ask them -- I could ask them of someone else perhaps.
MR. PILKINGTON: Okay.
MR. RONWIN: And we'll leave it go.
MR. PILKINGTON: Okay. I have a couple of follow-up, Doctor, and I'll be very, very short.
EXAMINATION
BY MR. PILKINGTON:
Q. Doctor, you testified before that you had a grant from Bayer to do some clinical testing on a blood pressure medication in the early to mid-1990s.
A. Actually, I was not the principal investigator, Dr. Robert Schier was. But that was a study conducted at this institution.
Q. Does that grant in any way affect your testimony about your care and treatment of Mr. Ronwin?
A. It does not.
Q. Doctor, could we mark a copy of your CV at the end of this deposition as Exhibit Number -- the next number?



MR. RONWIN: It would be 13.
MR. PILKINGTON: 13.
A. Yes.
Q. (BY MR. PILKINGTON) Doctor, would Exhibit 13 be a true and accurate copy of your CV as of this date?
A. Correct.
Q. Doctor, I notice in your records that there were some testing, CK testing of Mr. Ronwin along with his lipid panel. Do you recall that?
A. The notes in the record note that they were normal.
Q. Okay. Mr. Ronwin asked you about Dr. Wolfel and his belief as to whether Mr. Ronwin should take the Zocor every day as opposed to every other day. Do you recall that testimony?
A. I do.
Q. And is it your recollection that both you and Dr. Wolfel believed that Mr. Ronwin should take the Zocor every single day?
A. Correct.
Q. 40 milligrams each day?
A. Correct.
Q. Dr. Hiatt, Mr. Ronwin asked you a question about whether there was a possibility that a statin could cause a rotator cuff injury. Do you recall that testimony?



A. I do.
Q. And it was your testimony that it was extremely -- an extremely unlikely possibility?
A. Correct.
Q. Have you in your -- you've been working with statins for how many years?
A. Since they came out.
Q. And when was that?
A. Oh --
MR. RONWIN: About 1980.
A. Yeah.
Q. (BY MR. PILKINGTON) For nearly all of your clinical practice?
A. Correct.
Q. 20-plus years?
A. Correct.
Q. You've been doing research relating to statins?
A. More recently I have.
Q. And you've been treating patients, prescribing patients statins over those years, correct?
A. Correct.
Q. In your clinical experience, have you seen any evidence to suggest that a rotator cuff injury could be related to the use of statins?
A. I have not personally nor have my colleagues.



Q. Doctor, you were given some articles, specifically articles marked as Exhibits 4, 5, 6, and 7, correct?
A. Correct.
Q. Did you read those articles?
A. No, I did not.
Q. Have you ever seen those articles before today's deposition?
A. Mr. Ronwin may have shown me one or two of those previously. I can't recall.
Q. But you would not be able to opine as to whether the conclusions set forth in those articles which you read on the record were, in fact, consistent with your clinical experience without reading the entire articles?
A. Correct.
Q. In other words, you would like to read them before you offer any opinions as to whether the conclusions are correct?
A. That's correct.
Q. And finally, two more points, Doctor. You were given Exhibit Number 8, I believe, which was a chart prepared by Mr. Ronwin.
A. Correct.
Q. And if you look at his most recent entry on March 13 of '06, his LDL was reportedly 94, his HDL was



535c79c7-92f2-46d7-a7dc-a76bb554b50f

43, correct?
A. Correct.
Q. According to today's guidelines, is his LDL elevated?
A. Yes.
Q. What should it be?
A. 70.
Q. Would that also support your conclusion that Mr. Ronwin should take Zocor every single day?
A. Correct.
Q. Is it your recommendation today that he take Zocor every single day?
A. That's one possible recommendation.
Q. And finally, Doctor, I'll mark as Exhibit Number 14 –
MR. PILKINGTON: Mr. Ronwin, let me give you a copy of that as well, okay?
Q. (BY MR. PILKINGTON) Exhibit Number 14 is a, again, telephone note dated May 13 of '04. Do you see that?
A. That's not this.
MR. PILKINGTON: That's the wrong one, Mr. Ronwin. I'm sorry. I gave you the wrong exhibit. I'll give it to you in a minute. But just to expedite this, you can look at mine as well, okay?



Q. (BY MR. PILKINGTON) This will be marked as Exhibit Number 14.
A. Okay.
Q. This is a telephone note of May 13, 2004, correct?
A. Okay.
Q. That's your nurse's signature?
A. Correct.
Q. This is your signature?
A. Correct.
Q. This is something you would review in your care and treatment of Mr. Ronwin?
A. Correct.
Q. And this is referencing you were asked for a referral to an orthopedic surgeon?
A. Correct.
Q. Ultimately, did you refer him to Dr. Eckhoff?
A. Yes.
Q. Did you ever talk to Dr. Eckhoff about his findings?
A. I would have looked at his note.
Q. Do you know what his findings were?
A. I would have to read the note to refresh my memory.
MR. PILKINGTON: And Mr. Ronwin, did you ever



see Dr. Eckhoff?
MR. RONWIN: Not on that. I saw him recently on the fact that I began getting some rheumatism in my knees, but nothing like that.
THE DEPONENT: So remind me. Did you follow through with that appointment?
MR. RONWIN: I never saw Dr. Eckhoff until about a month or so ago.
THE DEPONENT: Okay. That's why I don't have a recollection.
MR. RONWIN: And I saw him on rheumatism.
THE DEPONENT: Okay.
MR. PILKINGTON: Doctor, I am done. I thank you for your time. Do you have a follow-up?
MR. RONWIN: I wanted to ask him just a couple of questions.

EXAMINATION

BY MR. RONWIN:
Q. You had indicated that it's not very likely that a statin would cause rotator cuff tears.
A. I'm not aware of that in the literature or in my personal experience.
Q. Right. But would you agree with me that a statin is basically a biochemical, meaning a chemical -- a molecule, chemical molecule that has action in the body,



in the living body?
A. I agree with that.
Q. All right. And do you know how statin -- other than it being an inhibitor of 3-hydroxy-3-methylglutaryl coenzyme A reductase, other than it being an inhibitor of that enzyme, which resides in liver cells, do you know whether various statins can have other kinds of biochemical action on various organs and tissues of the human body?
MR. PILKINGTON: Foundation.
A. That's a broad question.
Q. (BY MR. RONWIN) Huh?
A. That's a broad question. It's hard to focus a specific answer.
Q. Well, I'm just asking you if you know if it could have.
MR. PILKINGTON: Same objections.
A. I really am uncomfortable answering questions that are very broad sweeping in nature. If you have a specific question about a specific drug effect, please ask that.
Q. (BY MR. RONWIN) All right. Do you know if the structure, the chemical structure of Baycol is such that it could cause negative interactions with various tissues in the body?



535c79c7-82f2-46d7-a7dc-a76bb554b50f

A. I'm not aware of that.
Q. Okay.
THE DEPONENT: Is it okay if we wrap up now?
MR. RONWIN: Yeah. Let's wrap up.
MR. PILKINGTON: Doctor, just for the record, you have the right to review and sign your transcript, if you would like.
THE DEPONENT: Okay.
MR. PILKINGTON: You have that option. If you choose not to do so, the record will stand as it exists as reported by the court reporter.
THE DEPONENT: All right. I'm fine with that.
MR. PILKINGTON: Okay. Mr. Ronwin, one final question on the record. Will you give us access to your file here that is a part of this research program? I'll make you a copy as well.
MR. RONWIN: Oh, yeah. You're asking him of his file?
MR. PILKINGTON: I need your permission.
MR. RONWIN: Sure.
MR. PILKINGTON: Okay.
MR. RONWIN: Get whatever you want.
MR. PILKINGTON: Would you like written authorization from him?
THE DEPONENT: Probably should.



MR. PILKINGTON: Okay. Thank you very much, Doctor.
THE DEPONENT: Okay.
(Discussion off the record.)
(Deposition Exhibits 13 and 14 were marked.)
BY STIPULATION OF THE PARTIES AND THE DEPONENT, by and through their respective counsel, the reading and signing of the within deposition is waived.
WHEREUPON, the within proceedings were concluded at the approximate hour of 10:20 a.m. this 5th day of June, 2006.

* * *



CERTIFICATION

I, Lisa B. Kelly, RPR, appointed to take the deposition of

WILLIAM R. HIATT, M.D.,

certify that prior to the deposition the witness was sworn by me to tell to the truth; that the deposition was taken by me at 789 Sherman Street, Suite 200, Denver, Colorado 80203 on June 5, 2006; that the proceedings were reduced to typewritten form by computer-aided transcription consisting of 101 pages herein; that the foregoing is an accurate transcript of the proceedings.

I further certify that I am not related to any party herein or their counsel and have no interest in the result of this litigation.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of June, 2006.

____________________________

Lisa B. Kelly
Registered Professional Reporter

Re: Ronwin v. Bayer
Date of Deposition: June 5, 2006
Trial Date: None
Volume: --
Reporter: LBK
Proofer: SF
Audio: SC



COFFMAN REPORTING & LITIGATION SUPPORT, INC.
1440 Blake Street, Suite 320
Denver, Colorado 80202
303.893.0202

JEFFREY PILKINGTON, ESQ.
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, Colorado 80202

Re: Ronwin v. Bayer
Deposition of: William R. Hiatt, M.D.
Date of Deposition: June 5, 2006
Trial Date: None
Enclosed is:

(XX) ORIGINAL TRANSCRIPT. Please retain unopened original until it is required by any party in a trial or hearing in the above matter.

( ) ORIGINAL SIGNATURE PAGE _____with _____without corrections; copies provided to attending counsel. Please append these sealed originals to original transcript in your possession.

( ) Signature/correction sheets not received prior to filing.

(XX) Review of transcript not requested.

( ) 30-day review unavailable. Signature and correction pages forwarded to counsel agreeing to obtain signature. Original filed in anticipation of trial date. See letter within deposition.

( ) Copy of deposition, signature and correction pages sent to deponent. See letter within deposition.

( ) Signature not applicable

Original transcript filed on____________via_________
Followup documentation filed on_________via_________
cc: Attending counsel



535c79c7-92f2-46d7-a7dc-a76bb554b50f

02/12/2007 08:47 FAX 970 224 3838 ED RONWIN 001