UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

---

DEPOSITION OF: MARK W. KELLER, M.D.
July 14, 2006

---

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : | Case No. 02-0200 |

TAKEN PURSUANT TO NOTICE AND SUBPOENA on behalf of the Defendant Bayer Corporation at 1444 South Potomac Street, Suite 300, Aurora, Colorado 80112 at 8:35 a.m. before Sylvia E. Noneff, Registered Professional Reporter and Notary Public within Colorado.

SCANNED
FEB 1_ 2007
U.S. DISTRICT COURT

Q. During the course of your prescription of statins, have you been aware that stat -- that myopathies, defined as muscle aches or weakness, have been associated with statins?
A. Yes.
Q. And during the course of your prescribing these statins, have you been aware that there are increases in certain liver enzymes associated with the use of statins?
A. Yes.
Q. And, Doctor, have you also been aware that myalgia, just generalized aches and pains, have been associated or reported with the use of statins?
A. Yes.
Q. Has that been your knowledge of statins for the last 10 years?
A. Or more, yes.
Q. Doctor, overall, has your experience with statins been a good one?
A. Yes.
Q. How would you describe your experience with statins?
A. Well, I've -- the vast majority of my patients who have had a heart attack or a bypass or a stent are on them, and they lower cholesterol well.



People who get their cholesterol down do well.
Q. Have any of your patients who have taken statins experienced muscle aches or weakness?
A. Yes.
Q. Is that a common occurrence?
A. It's reasonably common.
Q. What do you do when patients present with these muscle aches, pains or weakness?
A. Well, a lot of times we'll have them come in, talk with them, see how tender they are, check a creatinine kinase enzyme, which is a muscle enzyme, to make sure there's no evidence of actual muscle damage. If the symptoms are not tolerable to the patient, usually they're dose-related, so I'll often try and decrease the dose or switch to a stronger statin at a lower dose.
Q. So if you have patients who present you with muscle aches, pains or weakness, you make sure that they come in to your office?
A. Yes.
Q. And you -- and you try to diagnose the reasons behind those complaints, correct?
A. That's correct.
Q. If you believe that those complaints are in any way associated with a statin, you will try another statin or make changes in the prescription; fair to say?



A. Yes.
Q. Is it fair to say that some patients who present with these problems, you keep them on -- on that particular statin?
A. Yeah, some. I mean, some, after discussion of the risks and benefits, and if the blood tests are okay, are willing to stay with the medication.
Q. Have you ever had any patients who have developed rhabdomyolysis as a result of taking a statin?
A. One.
Q. Only one patient in your 20 years of prescribing statins?
A. Yes.
Q. Doctor, in your 20 years of prescribing statins, almost 20 years of prescribing statins, have you -- has a patient ever complained to you about having a rotator cuff tear that was associated with the use of a statin?
A. No.
Q. In your 20 years of -- in your almost 20 years of prescribing statins, have you ever seen any published literature that in any way associates rotator cuff tear or related problems with the use of statins?
A. No.
Q. Doctor, let me turn now specifically to --



to Baycol. You prescribed Baycol, correct?
A. Yes.
Q. I'll represent to you that Baycol was introduced in, I believe, 1998. Do you recall when you first started prescribing Baycol?
A. I don't know the exact year.
Q. Was it shortly after it was introduced on the market?
A. Probably reasonably soon thereafter.
Q. And Baycol was sold in the .2-, .3-, .4- and .8-milligram doses. Do you recall that?
A. That sounds familiar.
Q. Did you prefer one dose over the other?
A. Well, the general concept with these medicines is to try and treat to get your LDL to a target and use the least amount of drug possible, so it would depend on the patient.
Q. So the level of Baycol that you prescribed depended on the patient?
A. And their response and what their cholesterol was.
Q. Doctor, like the other statins, before you prescribed Baycol, did you review the package insert for Baycol?
A. Yes.



a28f1ce5-cf5f-4f2e-bdf7-b9f906f212d5

02/12/2007 08:48 FAX 970 224 3838 ED RONWIN 003

Page 74

file?
A. I'm looking here to see. Actually, I see -- did you say April 18th? No. February 23, 2001. That's Number 17 (sic).
Q. So Number 17 is what, Doctor?
A. Or is it Number -- Exhibit 18?
Q. I'm sorry for the confusion.
A. It's February 23, 2001.
Q. So for the record, Exhibit 18 is a lab report dated February 23rd of 2001?
A. That's correct.
Q. Is this a report that you reviewed in your care and treatment of Mr. Ronwin?
A. Yes.
Q. And what did this show?
A. It showed that he had had a good reduction in his LDL cholesterol, from 172 to 80.
Q. It dropped over half; is that right?
A. That's correct.
Q. You described that as "good." Is that an excellent reduction?
A. That is good, a very excellent reduction, yes.
Q. And in terms of your treatment goals of Mr. Ronwin of LDL, would you -- do you believe that that's a

Page 75

good result?
A. Yes.
Q. So if Mr. Ronwin was taking Baycol during that time period, the Baycol was effective?
A. Yes.
Q. The next document that I've marked is, I believe, Exhibit 19. Do you have that in front of you?
A. Yes.
Q. And that's dated April 18th of '01?
A. Yes.
Q. Is that a lab report that you reviewed in your care and treatment of Mr. Ronwin?
A. Yes.
Q. What did that show in terms of his cholesterol?
A. It showed his LDL cholesterol was 94, total cholesterol was 149, HDL cholesterol was 34.
Q. In terms of the guidelines at that time, was that an acceptable reading for his LDL?
A. Yes.
Q. And if Mr. Ronwin testified that he was taking Baycol during that time period, would you agree that the Baycol was working to reduce his LDL?
A. Yes.
Q. That was as of April 18th of '01, correct?

Page 76

A. That's correct.
(Deposition Exhibits 20, 21 and 22 were marked.)
Q. Doctor, I've marked as Exhibit Number 20 a letter from Mr. Ronwin to you. I've marked as Exhibit Number 21 a publication in Science. And I've marked as Exhibit Number 22 your response letter to Mr. Ronwin. Would you just take a moment to review Exhibits 20, 21 and 22.
MR. RONWIN: If I knew you were going to bring these in, I wouldn't have carried them in myself. What about the 16 and 15? What you going to do about them?
MR. PILKINGTON: We'll mark them.
MR. RONWIN: We will? Okay.
Q. (BY MR. PILKINGTON) Doctor, have you had the opportunity to review Exhibits 20, 21 and 22?
A. I'm just looking at 22. Hang on one second. Okay. I'm through.
Q. Doctor, what is Exhibit Number 20?
A. That's a letter that Mr. Ronwin sent to me.
Q. And what did Mr. Ronwin tell you in this letter?
A. That he had read an article in Science magazine that related to the binding of Baycol, and he

Page 77

thought that it bound tightly. So therefore, it would probably be adequate to take his medication every other day, rather than taking it every day.
Q. Doctor, did you -- did Mr. Ronwin also state the following in this letter: "The blurb which accompanies the Baycol gives little detail on what experiments were conducted, but led the company to package .4 pills and to imply, if not state, that the dose needed to be taken every day"?
A. I'm sorry. What's the question?
Q. Is that what Mr. Ronwin told you in this letter?
A. Yes.
Q. And did Mr. Ronwin tell you in this letter that, given this article, he, on his own, was deciding to take Baycol every other day?
A. Yes.
Q. Was it your understanding after reading this letter that Mr. Ronwin was going to take Baycol every other day?
A. Yes.
Q. Did you review his letter when you received it?
A. Yes.
Q. Did you review the article which accompanied

Page 78

it?
A. Yes.
Q. Was the article that accompanied his letter what I've marked as Exhibit 21?
A. Yes.
Q. After reviewing that letter and his letter, did you respond to Mr. Ronwin?
A. Yes.
Q. Is Exhibit Number 22 your response to Mr. Ronwin?
A. Yes.
Q. And what did you tell Mr. Ronwin?
A. Well, I told him that I thought his letter and article were interesting, and I pointed out that the half-life of Baycol is low -- or short, rather, in the body, and that I was concerned that he might not have enough in his system, despite the binding, if he took it every other day. The binding also was not a covalent bond, but van der Walls forces, so it wasn't super tight, despite the constant in the paper.
Q. So you were pointing out to him that, number one, Baycol's half-life was short; that is, only two to four hours, correct?
A. Right.
Q. And by half-life, if a half-life is two to

Page 79

four hours, it's out of the body, so no Baycol is there for the next day?
A. Correct. Well, half of it's gone in two to four hours, so most of it's gone in, say, eight hours.
Q. Okay. But in any event, for the second day that he skipped the Baycol, there would be no Baycol in his system, correct?
A. Potentially not.
Q. And you also pointed out that there were binding differences?
A. Correct.
Q. Based on your review of the article and your understanding of statins, what did you recommend to Mr. Ronwin?
A. Well, the current practice was to prescribe statins daily, and that's what I recommended that he do, but I told him he could take his medicine however he wished.
Q. But was it your strong recommendation that he continue to take Baycol every day?
A. Yes.
Q. Was that based on your understanding of statins, as well as his significant coronary risk factors?
A. Yes.

Page 80

(Deposition Exhibit 23 was marked.)
Q. Doctor, let me hand you what I've marked as Exhibit Number 23. Do you recognize Exhibit Number 23?
A. It looks like a letter I wrote.
MR. RONWIN: Excuse me. I forgot you.
Q. (BY MR. PILKINGTON) Is that a letter that you wrote to Dr. Prince, at the VA?
A. I'm not sure where he was located, but apparently he was a local doctor up in Wyoming who was taking care of Mr. Ronwin at the time.
Q. And because of VA formularies, were you changing his prescription from Baycol to Zocor?
A. That's correct.
Q. Was it your recommendation that he take Zocor 20 milligrams each day?
A. Yes.
Q. Was it your understanding that Mr. Ronwin was going to begin taking Zocor shortly after this letter?
A. Yes.
(Deposition Exhibit 24 was marked.)
Q. Doctor, I've marked as Exhibit Number 24 an office note of August 27th. Do you recognize that --
A. Yes.
Q. -- as your office note of August 27 --

Page 81

A. Yes.
Q. -- of 2001?
A. Yes.
Q. So to understand where we stand in the chronology, you saw him in November of 2000, correct?
A. Yes.
Q. At that point in time, you were concerned about his cardiac condition --
A. Yes.
Q. -- so you had a blood test done in January?
A. A blood test done and stress test, yes.
Q. And on January 10th, that's the second time you saw Mr. Ronwin?
A. Yes.
Q. The third time that you saw Mr. Ronwin was on August 27th of 2001?
A. Yes.
Q. Before turning to this office visit, I want to have you look at Exhibit Number --
MR. RONWIN: 25.
MR. PILKINGTON: 25. Thank you.
(Deposition Exhibit 25 was marked.)
MR. RONWIN: Now, wait a minute. Do you have an extra one?
MR. PILKINGTON: No, I don't have an extra.



a28f1ce5-cf5f-4f2e-bdf7-b9f906f212d5

02/12/2007 08:49 FAX 970 224 3838 ED RONWIN 005

Page 110

Q. (BY MR. RONWIN) I will ask you a question.
MR. PILKINGTON: And, Doctor, you're right. If you don't -- if you feel uncomfortable answering any question that I pose or Mr. Ronwin poses, you're certainly free to tell us that.
Q. (BY MR. RONWIN) Okay. I'm only going to deal with the first six pages, for your information. But I want to ask you, what is that document?
A. It says it's an Adverse Event Reporting System, Freedom Of Information report --
Q. Yes.
A. -- selections for cerivastatin, Baycol, from November 1997 to present.
Q. Right.
A. It says, "The information contained in these reports has not been scientifically or otherwise verified as to a cause-and-effect relationship and cannot be used to estimate the incidence of adverse reactions."
Q. All right. Let's turn to page 1. And could you read what the -- the column headings are?
A. It says "Med DRA, Preferred Term Reaction, Count, Percent Reports."
Q. Okay. And these are all on Baycol, correct?
A. I guess so.
Q. Okay. Now, on page 1, will you count down to Item 14, please.

Page 111

A. Item 14?
Q. Yes.
A. 14, "Nervous System Disorder"?
Q. Yes. And how many -- how much -- how many count do they have? These are the number of adverse incidents reported.
A. "1,207."
Q. And what percent of reports is that?
A. "5.7 percent."
Q. Okay. Then, could you look at Item 16, then, please.
A. "Back pain."
Q. Could you give us the data on that?
A. Let's see. "1,188 reports, 5.6 percent."
Q. Right. And could you look at Item 17, please.
A. "Arthralgia, 1,000" --
Q. No. No, it's --
A. I'm sorry. Which one are we on, now?
Q. "Difficulty in walking," isn't it?
A. Well, they're not numbered, so let me see. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16 -- 17 is the only one, "Difficulty in walking."
Q. Right.

Page 112

A. "1,123, 5.3 percent."
Q. Okay. Now, let's go to the next page, please. Would you look at Item 20. I regret that I didn't mark them, but I -- I couldn't mark them, because I have to keep the -- I have to keep the document as it is, you see, without my additions. Could you read what that is, please?
A. Yes. "Vision blurred, 190, 0.9 percent."
Q. Could you look at Item 23, please.
A. I'm sorry. Which one was that one? Was that 20?
Q. Item 23.
A. Which one was "vision blurred," because I'm going to count to there?
Q. Oh, that was 20. That was 20.
A. "Balance disorder, 179, 0.9 percent."
Q. Right. And then Item 39, please.
A. "Neuropathy -- peripheral"? Did I count right?
Q. No. Neuro -- Neuro -- "Neuropathy -- peripheral," yes.
A. That's what I said.
Q. Oh, "neuropathy." Oh, I see. All right. You pronounce it a little different from me. Go ahead, then, please.

Page 113

A. "Neuropathy -- peripheral, 125, 0.6 percent."
Q. And then, would you look at Item 41.
A. "Visual disturbance" --
Q. Yes.
A. -- is that the right one?
Q. Yes.
A. "122, 0.6 percent."
Q. Right. Could we go to page 3 now, please. I'm only going to be doing this for six pages. Could you look at Item 6, please.
A. "Nerve injury, 108, 0.5 percent."
Q. And then Item 10, please.
A. "Arthropathy, 105, 0.5 percent."
Q. Okay. Could you give us an English translation of arthropathy?
A. I assume that's pain of a joint.
Q. Okay. All right. And then page 4, I have only one there, Item 16. 9, 12 -- 16, yes.
A. "Visual acuity reduced" --
Q. Yes.
A. -- "63, 0.3 percent."
Q. Okay. Then we go to page 5, Item 33, please. There we are.
A. "Tendon disorder"?



a28f1ce5-cf5f-4f2a-bdf7-b9f906f212d5

02/12/2007 08:50 FAX 970 224 3838 ED RONWIN 008

Page 114

Q. Yes, please.
A. "40, 0.2 percent."
Q. And then Item 44.
A. "Polyneuropathy"?
Q. Yes.
A. "39, 0.2 percent."
Q. Okay. And then we go to -- the last page that we're going to go on is 6. Could you look at Item 6, please.
A. "Bursitis"?
Q. Yes.
A. "35, 0.2 percent."
Q. Okay. Are bursas mainly in the shoulder?
A. No, I don't think so.
Q. There are bursas elsewhere in the body?
A. Yes.
Q. Are you sure?
A. Yes.
Q. Okay. Item 15, please. 8, 10, 13 -- 15.
A. You said "15"?
Q. Yes.
A. "Rotator cuff syndrome, 34, 0.2 percent."
Q. Yes. Did you say "rotator cuff syndrome"? Did you say "rotator cuff syndrome"?
A. Yes.

Page 115

Q. Okay. Thank you. Item 16?
A. I thought that was Item 16.
Q. No. That was 15.
A. That was 15, okay.
Q. 16.
A. "Tendon rupture."
Q. How many?
A. "34."
Q. And what was the percent?
A. ".2."
Q. Okay. Then Item 19.
A. "Diverticulitis"?
Q. No. "Eye disorder," wouldn't that be? 15, 16, 17, 18, 19, "Eye disorder."
A. "Eye disorder," right, "33, 0.3 percent."
Q. Yes. And then the last one I'm going to ask you on is Item 45, so Item 20, 2, 4, 6, 8, 30, 2, 4, 6, 8 40, 42, 44, 45.
A. Which one? 40 what?
Q. 45, "Diabetic."
A. "Diabetic neuropathy."
Q. Yes.
A. "29, .1 percent."
Q. Right. Thank you. So I believe you testified that you hadn't ever heard of anybody getting a

Page 116

rotator cuff problem or a shoulder problem taking Baycol; is that right?
A. I don't think that's what I said.
MR. RONWIN: We ought to get it. I'd like -- I think -- can you easily get that? Could you easily read that out for us?
THE REPORTER: Not unless you tell me what to look for.
MR. RONWIN: You'd have to go back for it quite a while.
THE REPORTER: Mr. Ronwin, I have 115 pages --
MR. PILKINGTON: I mean, he's testified what he testified about, so I'd recommend you keep asking questions.
MR. RONWIN: Well, all right. We can do it that way.
Q. (BY MR. RONWIN) Did you ever hear of anyone having a shoulder problem as a result of taking Baycol?
A. No.
Q. No, okay. Does that mean that it doesn't occur?
MR. PILKINGTON: Objection, form and foundation.
A. Does that mean it doesn't occur? That what

Page 117

doesn't occur?
Q. (BY MR. RONWIN) Well, if you've never heard of it, does that mean it can't occur?
A. If I've never heard of something, does that mean it can't occur? No, of course not.
Q. Okay. Therefore, it is possible, is it, to have rotator cuff tears as a result of Baycol?
MR. PILKINGTON: Objection, form and foundation.
A. Not as far as I know.
Q. (BY MR. RONWIN) Well, you just read some adverse event reports, and there were a number of them; 34, as a matter of fact.
A. That's not a question.
Q. Well, I'm saying -- all right. We'll leave it at that on -- on that thing. I want to go back to where I wanted to start, the dear health care provider letters. Okay. I don't know what happened to those letters. Well, let me ask you this: Have you ever gotten a dear health care provider letter from Baycol?
A. I don't recall.
Q. Okay. Fine. Then we'll leave that, then. Have you ever gotten a visit from -- from Bayer Corporation detail men?
A. Probably.



a28f1ce5-cf5f-4f2e-bdf7-b9f906f212d5

02/12/2007 08:51 FAX 970 224 3838 ED RONWIN 007

Page 134

you come to 48 hours of 4/10ths dosing of Baycol, and you have 8 trillion molecules, then you certainly have a lot of molecules still left in the body to -- to invade the liver and to inhibit the 3-hydroxy-3-methylglutaryl-coenzyme A reductase enzyme --
MR. PILKINGTON: Objection --
Q. (BY MR. RONWIN) -- is that correct?
MR. PILKINGTON: -- to form and foundation.
A. I don't know that your calculations are correct, so I can't answer that question.
Q. (BY MR. RONWIN) Well, will you show me how they're incorrect?
A. Well, just because --
MR. PILKINGTON: Same objections.
A. -- you pulled a paper out of a journal and got something out of Grey's Anatomy, I have no idea if that's the correct number of liver cells, okay?
Q. (BY MR. RONWIN) Well, do you think the people who wrote the journal are frauds?
A. No.
MR. PILKINGTON: Same objection.
Q. (BY MR. RONWIN) What I'm getting at is that your conclusion that there would be nothing left of Baycol if you took it every other day by the end of a day or even less than the end of a day must be an error; is

Page 135

that right?
MR. PILKINGTON: Objection, form and foundation.
A. I don't agree with you.
Q. (BY MR. RONWIN) Why not?
A. Well, think of how many molecules are in the body. If a tiny Baycol tablet has that many, how many molecules are in the whole body? And that's where the Baycol is diluted. It's diluted throughout your whole body. It doesn't just go to the liver. So your statement --
Q. Yes.
A. -- you know, I'm not a pharmacologist. I don't have the expertise in this, so I really can't answer your question.
Q. But your -- your statement is here that there would be nothing left in -- no Baycol left in your system. But that's not correct; is that right?
MR. PILKINGTON: Objection, asked and answered.
A. I can't answer the question.
Q. (BY MR. RONWIN) I've just shown you mathematics, and it comes out to at least 8 trillion molecules at the end of 48 hours --
MR. PILKINGTON: Same objections.

Page 136

Q. (BY MR. RONWIN) -- no matter where they go in the body.
MR. PILKINGTON: Same objections.
Q. (BY MR. RONWIN) All right. We'll leave it at that. Now, you also talk about the type of binding in Exhibit 22, your letter to me, of Bayool to the enzyme complex. But what objection did you raise? "However" -- could you start with reading "However," with the word "However"?
A. "However, this is not covalent binding, but is binding that is achieved only by" --
THE REPORTER: I'm sorry. "Binding achieved only by"?
A. "achieved only by van," v-a-n, "der," d-e-r, "Waals," W-a-a-l-s, "forces."
Q. (BY MR. RONWIN) Okay. Now, what do you know about van der Waals forces?
A. Well, my recollection is that they're kind of ionic attractions, a lot of times between hydrogen and electrons.
Q. Well, is a hydrogen bond a van der Waals force?
A. No. That would be a covalent bond.
Q. A hydrogen bond would be a covalent bond?
A. I'm not sure.

Page 137

Q. Well, would a hydrogen atom -- let's put it -- let's turn it another way. Let's take water. What's the molecular construction of water?
MR. PILKINGTON: Objection, foundation.
A. It's two hydrogen molecules and an oxygen molecule.
Q. (BY MR. RONWIN) And the -- are the two hydrogen atoms bound to each other or to the oxygen atom?
A. I believe to the oxygen.
Q. Right. Now, that bond between the hydrogen and the oxygen -- a hydrogen atom and an oxygen atom, what kind of bond is that?
A. I believe that's covalent.
Q. That's covalent, all right. Now, if you have two molecules of water very close to each other, and the hydrogen from one water molecule was attracted to and formed a sort of bond with the oxygen from the other molecule, what kind of bond is that, then?
A. That's a hydrogen bond.
MR. PILKINGTON: Objection, form and foundation.
Q. (BY MR. RONWIN) A hydrogen bond. Well, is that a covalent bond?
A. No.
Q. That's separate from it, is that right, a

Page 150

Q. Well, we just talked about my taking it -- starting taking it every other day in May.
A. Okay.
Q. And I started after May 18th, because that's the date of that scientific article. And I didn't run out and get it that day. I get it in the mail. It has to come to me in a few days, all right? Then the -- the next one, the next result, is with every -- every other day.
A. Um-hum.
Q. Is that markedly different from the -- the two starting -- the February 23, 2001 result and the April 18, 2001 result?
A. Well, it's different. I don't know what you mean by "markedly." It's -- 80 would be in the therapeutic range. 106 would be outside of the target --
Q. No, no. I'm talking about cholesterol.
A. Oh, the cholesterol.
Q. Yeah, just that column.
A. Okay. 167 and 171 are just about the same.
Q. Yes. And then you can skip the next two for good and sufficient reasons. And then go from January 22, 2002 all the way down to March 13, 2006. And what do you notice is the characteristic of those cholesterol levels?

Page 151

A. Well, they're all less than 200, but they do vary quite a bit.
Q. Huh?
A. They are all less than 200, but they do vary quite a bit.
Q. They vary quite a bit. But they are all -- but now, where would you roughly park the average, if you were going to average them, roughly? Would about 150 do the trick?
A. I would think maybe a little higher than that.
Q. 160?
A. Maybe 160.
Q. All right. And do you notice, on September -- on January -- excuse me -- July 26, 2002, what's my cholesterol value?
A. July 26, 2002, I wasn't taking care of you then, but it's 122.
Q. 122. These are milligrams per deciliter, all right?
A. Right.
Q. On September 26, 2002, what value did I have there?
A. 130.
Q. Correct. On August 1, 2003?

Page 152

A. 136.
Q. Right. On October 7, 2005?
A. 147.
Q. Right. And on -- well, we don't have it on yours.
MR. RONWIN: You know, you didn't give me the latest.
MR. PILKINGTON: I gave you what Wolfel had. It was marked at Wolfel's.
A. On Exhibit 32, you have "6/8/06, 125."
Q. (BY MR. RONWIN) Well, let's just add this sheet. Number 32 gives us the very last one. And what is that value?
A. 125.
Q. Right. And would you agree that first I took -- as indicated here, I was taking Zocor -- by the way, at 40 milligrams per dose, not 20. I never took a 20-milligram dose of Zocor.
A. I never prescribed you any Zocor.
Q. No, you weren't involved in that.
A. Right.
Q. And these were taken, by the way, every other day. And would you agree that those figures are actually superior to when I was taking Baycol every day, which the first two, starting with February 23, 2001 and

Page 153

April 18, 2001, and then every other day on -- by that July 19, 2001 value?
MR. PILKINGTON: Objection, form and foundation.
A. Well, I tend to look at LDL more than total cholesterol.
Q. (BY MR. RONWIN) I'm just asking you to look at cholesterol, though.
A. Yeah. I would say that the average of 167 and 149 is about 160, and that's what I had the average was, roughly, so I'd say they're about the same.
Q. Okay. So would you conclude, then, that -- is it reasonable to conclude that taking Zocor most of this time every other day was just as good as taking Baycol every day?
MR. PILKINGTON: Objection, form and foundation.
A. Just as good at what?
Q. (BY MR. RONWIN) As taking Baycol every day.
A. No. As good at doing what?
Q. As taking it, dosing it, dosing it.
A. I don't understand your question.
Q. All right. Let's go see if you can understand it. From January -- from the January 22, 2002 reading, in cholesterol only, all the way down to June



a26f1ce5-cf5f-4f2e-bdf7-b9f906f212d5

02/12/2007 08:52 FAX 970 224 3838 ED RONWIN ☒009

of -- 8th of 2006, all of these values are certainly within the range of the three Baycol values that I had; is that right?
MR. PILKINGTON: Same objections.
Q. (BY MR. RONWIN) They're below 200?
A. Yes.
Q. Okay. Two of those Baycol values that I had when I was taking Baycol every day; is that right?
A. Yes.
Q. And all the rest of them, the one -- the third Baycol value and all of the Zocor values, were every other day, all right?
MR. PILKINGTON: Are you asking him to assume that?
MR. RONWIN: What did you say?
MR. PILKINGTON: Are you asking him to assume that, because he doesn't know?
Q. (BY MR. RONWIN) Yes, I'm asking him to assume it, certainly.
MR. PILKINGTON: Which is contrary to the record, but --
MR. RONWIN: Okay. Whatever it is.
A. I am assuming that, okay?
Q. (BY MR. RONWIN) All right. Then aren't those every-day values, even though there are just two,



within the same range as all the every-other-day values?
A. Yes.
Q. And in fact, aren't six of those every -- well, one, two, three, four -- five of those every-other-day values even lower than the every-day values that happen to be shown there?
A. Yes.
Q. Thank you. Now, let's get rid of that, get it out of our hair, and go on to this. I want to show you these papers.
MR. RONWIN: We'll mark these -- these -- what is that, 34? Okay, 34.
(Deposition Exhibit 34 was marked.)
MR. RONWIN: Here's your 34. Okay. Sorry, I didn't know you were coming.
MS. ZEPPELIN: That's fine.
MR. RONWIN: That's that. Let's mark 35, 36 and 37.
(Deposition Exhibits 35, 36 and 37 were marked.)
THE DEPONENT: Doesn't this kind of go outside the scope of my care?
MR. RONWIN: Huh?
MR. PILKINGTON: It does, but we're -- we're trying to get this done, Dr. Keller.



THE DEPONENT: Okay.
MR. RONWIN: We'll going to get it out. We're going to get it if we don't muck around and just go real quick.
MR. PILKINGTON: I appreciate your patience.
MR. RONWIN: Well --
THE DEPONENT: He's not paying me as an expert witness to do this.
MR. RONWIN: What's that?
MR. PILKINGTON: I think, if it's consistent with what he's done in the past, he's just going to ask you to simply read something from these articles, so --
THE DEPONENT: Okay. All right.
MR. PILKINGTON: And the caveat goes that if you don't know an answer to his question or feel that you don't have the expertise, you just tell him. Fair enough, Mr. Ronwin?
MR. RONWIN: Yeah, fair enough, fair enough. I don't expect him to say anything about anything he doesn't know anything about. Okay. 36, park it over there. Why don't you look them over while we're doing this drudge work. There you are, and there we are. And now the last one, 37 -- oops. 37, 37, and there's one on the bottom there.
Q. (BY MR. RONWIN) You don't have to read them



all, you know, just the first page will pretty well do it. On that page, it's the one between the lines that I put on the side. That's just an abstract.
MR. PILKINGTON: Mr. Ronwin, are you just going to ask him to read from them, like you have in the past?
MR. RONWIN: Yeah, that's all.
MR. PILKINGTON: Why don't you just ask him --
Q. (BY MR. RONWIN) Could you just do that, please?
MR. PILKINGTON: Point out what you want him to read.
Q. (BY MR. RONWIN) Well, if you take Number 34, could you just read the following: the title, please, the journal, which -- where is that journal thing? I think on this one it may be Number -- no, it should be here. Oh, here it is. It's under -- under Conclusions there. Do you see the Conclusions part on the abstract?
A. Oh, American Heart Journal?
Q. Yeah, yes. The title, the journal, the year, the volume, and the starting page, and then read the conclusion, please, on each of these items.
A. The title of 34 is "Is alternative daily



a28f1ce5-cf5f-4f2e-bdf7-b9f906f212d5

02/12/2007 08:53 FAX 970 224 3838 ED RONWIN 010

Page 158

dose of atorvastatin effective in treating patients with hyperlipidemia? The Alternate Day Versus Daily Dosing of Atorvastatin Study."
Q. Okay. And then the journal, the year?
A. The journal is the American Heart Journal, year 2002, Volume 144, page 674.
Q. Right. And what is the conclusion, sir?
A. It says, "Although higher doses of atorvastatin were used on alternate days, these results suggest that the alternative-day administration of atorvastatin can produce a reduction in LDL cholesterol comparable to that of daily administration in patients with hypercholesterolemia, and yet provide some cost savings."
Q. Right. Could you do the same for that abstract, please?
A. The abstract is from the American College of Physicians, 1999 Annual Meeting Abstracts. The title is "The efficacy of alternate-day dosing versus every-day dosing with atorvastatin." The conclusion: "Based on our preliminary results, the percent reduction in LDL is similar in every-day and every-other-day dosing with atorvastatin. Every-other-day" –
THE REPORTER: Wait. "Every-other-day"?
A. "Every-other-day dosing should result in

Page 159

significant drug cost savings without compromising the therapeutic effects."
THE REPORTER: Thank you.
Q. (BY MR. RONWIN) Would you do that for the next one, please, Exhibit 36? That's this one here.
A. Okay. This is titled "Effect of Lovastatin Administered Every Other Day on Serum Low-Density Lipoprotein Cholesterol greater than 160 milligrams per deciliter," from the American Journal of Cardiology, Volume 76, page 312.
Q. And the conclusion is at the bottom there.
A. "In conclusion, lovastatin administered as milligrams every other day is effective in lowering LDL levels in patients with serum LDL greater than 160."
Q. Okay. And then the last one, please?
A. 37, the title is "A Comparison of FLuvastatin 40 milligrams Every Other Day versus 20 milligrams Every Day in Patients with Hypercholesterolemia." This is from the Journal of Pharmacotherapy, from 1998, Volume 18, page 836. And the conclusion is, "Fluvastatin 40 milligrams every other day is effective in lowering total cholesterol and LDL in patients with hypercholesterolemia."
Q. Yes. Now, have you -- had you ever come across articles dealing with every-other-day dosing

Page 160

previously?
A. Yes.
Q. And did you find them to be acceptable in terms of their scientific credibility?
A. In general, most of the studies I've seen were rather weak studies, with very few patients, published in lesser journals.
Q. Um-hum, I see. And do you know if every-other-day – every-other-day dosing is becoming popular?
A. No, I don't know if it's --
Q. All right.
A. -- becoming popular.
Q. And what are the advantages of every-other-day dosing compared to every-day dosing?
A. Advantages to whom?
Q. To the patient.
A. I guess they have to take fewer pills, and perhaps they would spend less money.
Q. That's right. And taking fewer pills, would that mean less chance of getting hit with an adverse effect?
MR. PILKINGTON: Objection, form and foundation.
A. I don't know if it would or not. Some side

Page 161

effects are dose-related, and some aren't, so it might lessen the risk.
Q. (BY MR. RONWIN) But is it possible to lessen the risk by taking every-other-day dosing?
MR. PILKINGTON: Same objection.
A. I think I just answered that. It might. It might lower the risk.
Q. (BY MR. RONWIN) Yes. Okay. All right. Now -- okay. Now -- now, you -- did you do an angiogram procedure on me --
A. Yes.
Q. -- on September 26, 2001?
A. Yes.
Q. And is that what – the procedure that you were referring to earlier as the catheterization?
A. Yes.
Q. All right. Was there an angioplasty done at the same time?
A. No.
Q. Okay. When a patient is subjected to an angiogram, how long is the procedure, cardiovascular -- well, a coronary artery angiogram, how long does that procedure usually last?
A. Well, it depends on when you start counting the time, from the patient entering the room, gets



a28f1ca5-cf5f-4f2a-bdf7-b9f906f212d5

02/12/2007 08:53 FAX 970 224 3838 ED RONWIN 011

Page 162

prepped and draped, the doctor does the procedure, you've got to get hemostasis, it can last -- the shortest might be about 30 minutes. It could last several hours.
Q. Yeah. For the hemo -- for the -- for bleeding, you mean?
A. Pardon me?
Q. Several hours overall, in other words, to recuperate?
A. No. It could take several hours to do the procedure if it was complicated.
Q. Oh, okay. Oh, I see. I didn't understand you. Well, if the patient fares well during the procedure and is not bleeding afterwards, how long does the patient usually remain in the hospital before discharge?
A. Typically, it depends on the site. Different doctors are different. About four to six hours.
Q. Four to six hours, okay.
MR. RONWIN: Now, let's mark this thing here.
MR. PILKINGTON: What are you up to?
MR. RONWIN: We had 37, I believe, isn't that right, for the last one?
MR. PILKINGTON: That's correct.

Page 163

MR. RONWIN: Yeah, 37. It's 38. You might as well mark a few there, because we'll need them. Where have you got them, over here? Okay.
(Deposition Exhibit 38 was marked.)
MR. RONWIN: Let me just give him what I've marked. 38, 38.
Q. (BY MR. RONWIN) Okay. Could you tell us what that -- the document is that I've handed you?
A. No. I've never seen it before.
Q. You've never seen it before? Is that handwriting yours?
A. No.
Q. Huh. You did give us a document here that was very similar, I thought, in handwriting. Well, what is the document titled?
A. "Operating Room Schedule."
Q. Yes. And what is the date, please?
A. September 18, 2001.
Q. Right. Now, that would -- would have been about seven days -- six, seven days before the angiogram that was done on -- on me?
A. I can't remember when your angiogram was done.
Q. September 26th.
A. Well, I guess it would have been eight days,

Page 164

then.
Q. Eight days, all right. And do you see on here -- let me get my -- I just want to get this thing here for a minute. On the query sheet, and what else do we have -- oh, that's it. Now, do you see the card on there, "claudication angioplasty"?
A. Yes.
Q. Right. And that is August 2001; is that correct?
A. 8/2001, yes.
Q. Yes. By the way, where would they get this data from, whoever puts this together?
A. I don't know where they got this data.
Q. Well, who would be putting something like this together?
A. I don't know whose writing this is.
Q. Well, it says from -- see -- notice on the top it says "from Kathleen M. Carmody"?
A. Um-hum.
Q. It would seem that she is -- she's the one who put that together; is that right?
A. I don't know. I've already answered that.
Q. Well, does the -- does the hospital use useless forms?
A. I don't know.

Page 165

Q. Is it possible?
A. That the hospital uses useless forms? I suppose that's possible, yes.
Q. That's possible? Can you think of any other useless forms that the hospital --
A. Is this a serious question?
Q. Well, it's serious for this reason: Here's a form that was supplied us by the hospital.
MR. PILKINGTON: He's already testified he's never seen the form, he doesn't know what it is, he doesn't know whose handwriting it is, so --
MR. RONWIN: Look, it's operating room scheduling. He does a lot of operating.
Q. (BY MR. RONWIN) Is that right? Do you do a lot of operating?
A. No.
Q. Well, isn't an angiogram in the nature of an operation? It's an invasion of the body, isn't it?
A. It's an angiogram. I don't know if you'd call it an operation. I wouldn't, but --
Q. It's an operative procedure. All right. Now, I want to bring your attention on this thing to just something else on the bottom. Do you notice where it says "Plavix"?
A. Yes.



a28f1ce5-cf5f-4f2e-bdf7-b9f906f212d5

02/12/2007 08:54 FAX 970 224 3838 ED RONWIN 012

Q. And what does it say about Plavix? There's an arrow leading to what Plavix does.
A. It says, "Bloody stools, nosebleeds."
Q. Yes. And who do you think it's -- it's relating to?
A. I couldn't say.
Q. Would it be relating to me?
A. I don't know.
Q. All right. Now, let's go to the catheterization procedure. Now, this has -- had been marked Exhibit 26, so do you have it there, please, if they're in order?
A. Okay.
Q. Yes. Now, under -- that, we've gone through. That's the cardiac catheterization procedure; is that right?
A. Yes.
Q. Okay. Now, under the Procedure Note section -- that's the long -- the long paragraph --
A. Um-hum.
Q. -- could you look at the last two -- the last sentence -- the last two sentences, starting with "Hemostasis"?
A. "Hemostasis was attempted with an angioseal, but the device did not deploy correctly."



Q. Okay.
A. "Therefore, hemostasis was obtained with direct manual compression."
Q. Okay. Now, first, for the jury, what is hemostasis?
A. It's stopping bleeding.
Q. Okay. And, by the way, what is -- what is an angioseal? What does that -- how -- what does that look like, or --
A. It's a little hard to explain, but it's got a little anchor. It's a bioabsorbable kind of tissue that's put into the artery. There's a small string attached that comes outside the artery, and then a collagen plug is slid down the string onto the top of the artery to get hemostasis.
Q. Okay. And since it didn't work, there was an attempt to get hemostasis with hand pressure; is that right?
A. Well, hemostasis was obtained with direct hand compression.
Q. With hand compression.
A. It wasn't just attempted. It was obtained.
Q. I see. Now, who did that, that function?
A. Probably one of the cath lab techs or nurses.



Q. I see. And did they report to you? Were you in charge of that angiogram?
A. Yes.
Q. And did they report to you that they had obtained hemostasis?
A. Yes.
Q. All right. Okay. Now, let's go take a look at page 5. Here we are. Well, I've got an extra one here. I've actually got two extra ones.
MR. RONWIN: Let's mark this as Exhibit 39.
(Deposition Exhibit 39 was marked.)
MR. RONWIN: There you are, Doctor. And this is 39. And this is 39 for you, Jeff.
MR. PILKINGTON: Thank you.
MR. RONWIN: Good.
Q. (BY MR. RONWIN) Okay. I want -- first, would you tell us what that document is, just from its heading -- title, please?
A. It says "Clinical Documentation Record."
Q. Yes. And on who -- on who is that record made?
A. On you.
Q. Right. Thank you. I just want to draw your attention to the -- the Additional Preoperative Information, which is in the left-hand column. And it's



that section coming just before the bar that has a kind of a --
A. Yes, I see it.
Q. Huh?
A. I see it.
Q. Okay, great. And what does it say about the medicines given? That m-e-d-s stands for medicines, does it not?
A. It says, "Meds given in preop: Benadryl, 25 milligrams PO at; Valium, 5 milligrams PO at; Plavix, 300 milligrams PO, refused by patient."
Q. All right. First, what does "PO at" stand for?
A. PO means per oral. I don't know if the "at" is supposed to mean at a certain time, and they didn't write the time in. I'm --
Q. All right. Okay.
A. I'm not sure.
Q. Okay. Now, apparently I refused the 300 milligrams of Plavix; is that correct?
A. Yes.
Q. Okay. And -- and when these were offered to me and I took the Benadryl and the Valium, was I in the operating room, or was I in another room where an IV is put in, and the nurse --



a28f1ce5-cf5f-4f2e-bdf7-b9f906f212d6

02/12/2007 08:55 FAX 970 224 3838 ED RONWIN 013

Page 174

A. "Adverse Events Occurring in Greater Than 2.5 Percent of Plavix Patients in Capris."
Q. Okay. And what are the table headings of the columns?
A. "Body System Event, Plavix, Aspirin."
Q. Okay. Just looking at Body System Event and Plavix, let's go down the line to where we see "platelet bleeding and clotting disorders."
A. Yes.
Q. And then we have two -- two types: Purpura; is that right?
A. Purpura.
Q. Purpura. Would you give -- tell the jury what purpura is, please?
A. Bruising.
Q. Okay. And that is bleeding; is that right?
A. Inside the skin, but --
Q. Yes, all right. And then, what is the -- the number -- the number there? They have a number.
A. 5.3.
Q. And that's a percent, is it not?
A. I think the -- yeah, that's the percent incidence, right.
Q. That's right. And then the -- and that's what they're giving you there. Now, look underneath the

Page 175

epitaxes (sic).
A. Epistaxis?
Q. Yeah. Could -- yeah. That's underneath the same thing you were looking at.
A. Right.
Q. And just for the jury, what's an epitaxis (sic)?
A. Epistaxis.
Q. How do you pronounce it? Oh, epistaxis, okay.
A. Epistaxis is a nosebleed.
Q. That's right. And what do you get there?
A. 2.9 percent.
Q. Okay. So does Plavix have a tendency to cause bleeding?
A. Well, it's about the same as aspirin, but I guess -- I know it causes bleeding, but the nosebleed rate is about the same as aspirin.
Q. I see. But it does -- it can cause nosebleeding; is that right?
A. Sure. It can cause bleeding. It's a blood thinner.
Q. All right. Now, if -- if someone -- if a patient tells you that a drug that you propose for them to take, that you want to either prescribe or have them

Page 176

take prior to an operation, tells you that the drug has adverse effects on them which could become serious, like bleeding, do you believe you should insist on their taking that drug?
MR. PILKINGTON: Objection, form and foundation.
A. It would really depend on the side effect and the procedure and the patient.
Q. (BY MR. RONWIN) I see. And in this case, where I indicate to you now and I indicated to your nurse why I didn't want to take it, as I've indicated now, do you believe you should have insisted on my taking the Plavix?
A. Well, we didn't have to have the procedure, but if you wanted to do the procedure, we had to have the Plavix in your system.
Q. Well, before Plavix came on the market, weren't angioplasties performed?
A. Yes, but --
Q. They weren't performed?
A. They were performed, yes.
Q. So you could do an angioplasty without the Plavix, isn't that right, and -- go ahead.
A. Yes.
Q. And did you already give me a -- a pretty

Page 177

strong anticoagulant?
A. No.
Q. Didn't -- well, let's take a look at the -- your write-up on the -- let's see where that one is. Oh, Number 26, your cardiac catheterization procedure. Under Procedure Note, do you see the -- on the fifth line, starting with "3,000 units"?
A. Um-hum.
Q. What were those 3,000 units?
A. That's heparin.
Q. Heparin. And isn't -- is heparin an anticoagulant?
A. Yes.
Q. A very strong anticoagulant, isn't it?
A. Yes.
Q. Okay. So therefore, you already had given me one; is that not right?
A. No. When you took the Plavix, you hadn't had the heparin, because the heparin was given in the cath lab, and the Plavix was given downstairs. So no, we hadn't already given it to you.
Q. Well, not -- not in there, but before the operative procedure you gave me heparin as a safety guard; isn't that right?
A. That's right.

Page 178

Q. Okay. So I went in there, and I had that?
A. That's correct.
Q. All right.
MR. PILKINGTON: How are you doing, Mr. Ronwin, on time?
MR. RONWIN: I'm moving, really moving.
MR. PILKINGTON: We're just about out of time.
MR. RONWIN: Yeah. Just a minute. We're going to finish this up. Now, what you did is, you get me -- my notes get all mucked up because we've got so much wonderful space here. All right. The Plavix insert, the operating room schedule, the catheterization procedure. Okay. Number 6, okay. One, two, three, four.
If you wouldn't ask so many silly questions, we'd be way ahead of the game, you see.
MR. PILKINGTON: You called your questions silly?
MR. RONWIN: Yours, most of them are, yeah. I have no doubt about it. 41.
(Deposition Exhibit 41 was marked.)
MR. PILKINGTON: I suspect four out of the five people in this room would disagree, but let's finish this up, Mr. Ronwin.

Page 179

MR. RONWIN: You can disagree all you want to. Let's convene a jury. Don't take that down.
MR. PILKINGTON: She's taking down everything that's said.
MR. RONWIN: Yeah, I know. She likes to take things down. All right.
MR. PILKINGTON: Let's move on. Let's go.
Q. (BY MR. RONWIN) Okay. Now, again, could you give us the heading of that title and who it concerns?
A. "Edward Ronwin, Clinical Documentation Record."
Q. Okay. Now, under the part that says "Circulatory Comment," could you read what it says there? That -- there's just two lines in bold type in the left-hand column.
A. It says, "Good pedal pulses bilaterally. The patient post cath. No angioseal right groin. The patient instructed many times to keep flat in bed." And "Sandbag at site."
Q. Okay. So I was given a sandbag, right, and this was after returning from the operative procedure; is that correct?
A. That's right.
Q. All right. Now -- okay. Then at 11:01,

Page 180

look at the -- look at the date 9/26. That's the second colored bar. Time, 11:01; is that right?
A. Oh, okay. Yeah.
Q. On the left-hand column.
A. I see where you're saying.
Q. Yes. And that's a.m.; is that right?
A. Well, I don't know. There's some time over here, "1656."
Q. That's a -- that's a code for what is done.
A. Oh.
Q. For a procedure that's done by the nurses, or whoever makes this up.
A. So it says, "Bed rest times six hours. The first time he gets out of bed will be with assistance."
Q. Okay. So after the operative procedure, you ordered just bed rest. These were your -- part of your orders that were carried out, right?
A. Correct.
Q. And you ordered just bed rest for six hours, et cetera?
A. That's correct.
Q. Okay. Now, let's go to Number 8. All right. That's 42.
(Deposition Exhibit 42 was marked.)
Q. 42. Okay. Again, just --

Page 181

A. "Edward Ronwin, Clinical Documentation Record," it says at the top.
Q. Okay. Now, could you look at the first -- the first notation on the left-hand column, please, okay? And would you read -- would you read up to -- well, let's see, the first four lines, except the end of that fourth line.
A. Well, I'm not sure what to read here, but "The patient's occlusive dressing to right groin site from cath on 9/26/01 removed by night" --
Q. Could you go a little slower?
A. Okay. This is the 27th, okay. So "Received patient per query at 0700. The patient's occlusive dressing to right groin site from cath on 9/26/21 removed by night R.N. Patient still oozing blood. Another occlusive dressing applied to site with 2-by-2 underneath and a 5-pound sandbag applied."
Q. Okay. That's it. So this is the next day after the operation; is that right?
A. That's correct.
Q. And the time is, what, 12:00, 12:03? It's in that gray bar.
A. Um-hum.
Q. And I was still oozing blood; is that right?
A. That's right.



a28f1ca5-cf5f-4f2e-bdf7-b9f906f212d5

Q. And I had been oozing blood all night; is that correct?
A. That, I don't know.
Q. All right. Let's see. There we go. Progress report. This is 5. Got that out of the way. All right. Let's do — go to here. Let's take a look at this thing. I've only got two more deals on that, so I'll put it over here.
MR. RONWIN: Oh, you didn't mark it. That was -- 41 was the last one?
THE DEPONENT: 42.
MR. RONWIN: 42. 43. Exhibit 43. And then I'll put 43. There you are.
(Deposition Exhibit 43 was marked.)
Q. (BY MR. RONWIN) Okay. Now, did you -- could you tell us what this is?
A. This is postcardiac catheterization orders.
Q. Yes. And what is the time that's underneath the date on the very upper right-hand corner there?
A. 10:00 a.m.
Q. 10:00 a.m. All right. And you had originally -- and that's on the date of the catheterization; is that right?
A. This is correct.
Q. And you had originally -- is this you who



wrote the --
A. Yes.
Q. -- directions? Okay. And you had originally the six hours of bed rest; is that right?
A. That's correct.
Q. But then, on the same date, down below that line that was drawn, did you write those additional directions?
A. "The patient needs to stay overnight, convert to admission," yes.
Q. Yes, okay. Why did the patient have to stay overnight?
A. Because the patient didn't have a ride home, like he was supposed to.
Q. Wasn't it because I was bleeding?
A. No.
Q. No, huh? Let's take another look.
MR. RONWIN: Now, that's 44.
(Deposition Exhibit 44 was marked.)
Q. (BY MR. RONWIN) Okay. Tell us what that document is, please.
A. It's part of the progress notes in your chart.
Q. Yes. And is that your initials underneath?
A. Yes.



Q. Okay. And would you just focus on the three lines in the -- that are ruled.
A. Yes.
Q. Okay. And could you give us the date on that, please?
A. 9/26/2001.
Q. And that's the day of the catheter -- of the angiogram; is that right?
A. That's right.
Q. And what time did you have over there?
A. 5:00 p.m.
Q. Okay. And what does it say?
A. "Patient has ooze on right groin."
Q. Yes.
A. "He is from Cheyenne and needs to stay overnight."
Q. "He is," what, "from" — oh, "Cheyenne"?
A. From Cheyenne.
Q. Oh. I couldn't read your handwriting.
A. "And needs to stay overnight."
Q. "And needs to stay overnight." So therefore, I was -- I was oozing at 5:00 in the afternoon, and I was oozing the next morning, too. Did you think it magically stopped during the night?
MR. PILKINGTON: Objection, form and



foundation, argumentative. I think you should move on.
MR. RONWIN: I asked him a question.
A. I don't -- I wasn't there all night, and I don't recall what it was doing all night.
Q. (BY MR. RONWIN) You don't recall, okay. But the record shows that I was oozing, doesn't it, oozing blood, doesn't it?
A. Yes.
Q. Okay. Now, let's go to patient -- to this document.
(Deposition Exhibit 45 was marked.)
THE DEPONENT: What does any of this have to do with Baycol?
MR. PILKINGTON: It doesn't. It has absolutely nothing to do with Baycol. Mr. Ronwin, how much more time do you have?
MR. RONWIN: Well, let's see.
THE DEPONENT: I think he has no more time, because I'm tired of these questions.
MR. RONWIN: That's just about it. This is just about the end of it.
THE DEPONENT: This is pointless.
MR. PILKINGTON: Okay. Just give me an idea. The last time you said a half an hour. We're well into an hour. How much more time --



a28f1ce5-cf5f-4f2e-bdf7-b9f906f212d5

02/12/2007 08:57 FAX 970 224 3838 ED RONWIN 016

Page 186

THE DEPONENT: I need to eat some food. It's almost 1 o'clock. This is going way on. It's not about the case at all.
MR. RONWIN: We won't –
THE DEPONENT: It's ridiculous.
MR. RONWIN: We won't -- we won't go beyond 1 o'clock, okay?
MR. PILKINGTON: Just get it done, then.
MR. RONWIN: And we probably will go less than that, because this is my last exhibit. All right? But I'll tell you --
MR. PILKINGTON: Why don't you keep asking questions, Mr. Ronwin.
MR. RONWIN: All right. But I'll tell you, we're in a -- technically, we're in a trial phase, of a sense, because you wouldn't be asked to appear at trial.
MR. PILKINGTON: The court would have cut this off a long time ago.
MR. RONWIN: And if a judge was sitting here, there would be no antics of that kind.
MR. PILKINGTON: He would have cut it off a long time ago. Keep going.
MR. RONWIN: Yeah, I know all about it.
Q. (BY MR. RONWIN) Okay. Can you tell us what that document is, please?

Page 187

A. It says it's a Physician Query Form.
Q. Okay. And who is -- who is – what physician was it addressed to?
A. Myself, Dr. Mark Keller.
Q. Yes. And what date was the document dated?
A. February 4, 2002.
Q. Okay. And so that's -- that's about five to six months after the angiogram; is that right?
A. Yes.
Q. Okay. Now, why was this form sent to you?
A. I don't know.
Q. All right. Well, then, let's read -- could you please read the part that says "Medical record reflects"?
A. "The patient admitted to inpatient status following cardiac catheterization due to, quote, oozing from right groin. The patient treated with occlusive dressing and epinephrine. Please see attached chart copies for your review."
Q. And what does it say the next -- the next paragraph?
A. "Please respond to the following question: Would the oozing be considered postop hemorrhage or postop hematoma following cardiac cath procedure?"
Q. I see. So they were – was – was this form

Page 188

requiring you to answer that question?
A. Yes.
Q. And how did you answer that question?
A. "No."
Q. Okay. And what was the explanation you gave for answering "no"?
A. It said, "He is elderly and lived in Cheyenne and drove himself to the hospital. There was a slight ooze, and the patient was kept as a precaution. Had he lived nearby, I would have discharged him."
Q. I see. You would, therefore, have discharged with me with -- with ooze -- blood oozing from my femoral artery?
A. It wasn't oozing from your femoral artery.
Q. Where was it oozing?
A. From your skin.
Q. Well, wasn't it coming from the artery?
A. No.
Q. Well, wasn't the artery -- didn't the artery have a sheath inserted in order to get the angiogram going and have –
A. Yes. But the sheath was removed, and the artery was not bleeding. Arteries don't ooze. They pump blood.
Q. They pump, all right.

Page 189

A. Yeah.
Q. So where was all that oozing coming from, then?
A. From your skin and your subcutaneous tissues.
Q. I see. Okay. But I would still had it -- I still had it oozing; isn't that right?
A. Yes.
Q. And I had a sandbag put on me, a 5-pound sandbag, from the time I left the operating room all the way through the next day, with a dress -- a dressing underneath it; is that right?
A. Yes.
Q. Well, what was that for, if I wasn't oozing blood all that time?
A. I don't know.
Q. So you would have sent me home with oozing?
A. Yes.
Q. How would I stop the oozing?
A. You could just change the dressing. It would stop on its own.
Q. A change of dressing?
A. Haven't you ever cut yourself and put a Band-Aid on? I mean . . .
Q. A Band-Aid would have taken care of that?

Page 190

A. Yes.
Q. Do you realize that the gown got soaked, also, that the hospital gown got soaked, and I had to change that?
A. No.
Q. Well, it happened as a result of -- of this oozing. Okay. And -- and you consider that to be a perfectly good practice, to send somebody home with oozing blood after an operative procedure?
A. I'm sorry. What was your question?
Q. Do you consider that to be good medical practice, to send a patient home with oozing blood from his body or her body after an operative procedure?
A. That's too vague a question to give a good answer to.
Q. I see.
MR. RONWIN: Okay. We'll call it quits.
MR. PILKINGTON: Are you done, Mr. Ronwin?
MR. RONWIN: Yeah. Oh, do you have any other questions?
MR. PILKINGTON: I have a couple follow-up, Doctor. Bear with me, and I appreciate your patience today.
MR. RONWIN: All right.

Page 191

EXAMINATION
BY MR. PILKINGTON:
Q. Mr. Ronwin asked you questions about samples that you distribute in your practice. Do you recall that?
A. Yes.
Q. Do most of the samples that you distribute in your practice come with patient information forms?
A. Yes.
Q. And those patient information sheets outline what side effects may be associated with the drugs?
A. Yes.
Q. You were asked a question about Exhibit 17, and that's a copy of a prescription that you did not have in your file. Do you remember that?
A. Yes.
Q. Was one of the reasons you may not have that in your file -- a copy of that in your file because you handed it to Mr. Ronwin?
A. I don't know why it's not in the file.
Q. Doctor, you were asked several questions about adverse drug events or adverse experience (sic) reports. Do you recall those questions?
A. Yes.
Q. Is it fair to say that not every symptom or

Page 192

complaint that a patient experiences while taking a drug is necessarily caused by the drug?
A. That's fair to say, yes.
Q. And is it fair to say that adverse events are simply reports of complaints or symptoms that may happen when a patient is taking a drug?
A. Yes.
Q. Stated differently, there may be other causes of those complaints or symptoms, correct?
A. Yes.
Q. Those other causes may be other medications?
A. Possibly.
Q. Or other medical conditions, correct?
A. Yes.
Q. Do you agree that that is why adverse event reports do not provide enough information to simply establish a causal link between a symptom or a complaint and the use of a drug?
A. Yes.
Q. So to establish a causal relationship between an event and a drug needs something more; fair to say?
A. Yes.
Q. Something more than simply case reports --
A. Right.

Page 193

Q. -- or adverse drug event reports?
A. Right.
Q. Would you need controlled studies to determine whether there's a statistically significant association between the use of the drug and that adverse event or complaint?
A. Yes.
Q. And is that the way doctors and scientists draw up conclusions with respect to causation?
A. That's correct.
Q. Doctor, you were asked to read several adverse event reports in a particular exhibit. And I think it was Exhibit 28, correct?
A. Yes.
Q. And after reviewing those -- well, at the -- on the front of this, this document even stated, "The information contained in these reports has been not been scientifically or otherwise verified as to" cause -- "a cause-and-effect relationship and cannot be used to establish the incidence of adverse drug reaction." Is that what that says?
A. Yes.
Q. Do you agree with that statement?
A. Yes.
Q. Doctor, you've --

MR. RONWIN: Keep that open, will you? Keep that available, that 28.
Q. (BY MR. PILKINGTON) Doctor, I'll represent to you that Mr. Ronwin claims that his rotator cuff tear is caused by his use of Baycol, okay?
A. Okay.
Q. Are you aware of any valid scientific evidence that would support that conclusion?
A. No.
Q. Based on -- based on your clinical practice and use of statins over the years, is it your conclusion based on a reasonable degree of medical probability that Baycol did not cause his rotator cuff tear?
A. Yes.
Q. Doctor, you were asked to read several conclusions from several articles, correct?
A. Yes.
Q. Did you have the opportunity to read those articles in full?
A. No.
Q. The mere recitation or reading those articles and those conclusions into the record does not mean that you agree with those conclusions, correct?
A. That's correct.
Q. Is it still your practice to recommend to



patients that they take a statin every day?
A. Yes.
Q. Regardless of whether that statin is Lipitor, Zocor, or whatever the statin may be?
A. That's true.
Q. Stated differently, it is not your practice to recommend to patients that they take a statin every other day; fair to say?
A. That's correct.
Q. And as I understand it, all of this testimony relating to the left heart cath and this overnight stay, the reason he stayed in the hospital or the reason you admitted him to the hospital that evening is because he didn't have a ride home to Cheyenne, correct?
A. That's correct.
MR. RONWIN: That's a lie.
Q. (BY MR. PILKINGTON) And --
MR. PILKINGTON: Did you get that on the record?
THE REPORTER: I did.
MR. PILKINGTON: Okay.
Q. (BY MR. PILKINGTON) And, Doctor, had he lived nearby or had a ride home from -- to Cheyenne, would you have discharged him that day?



A. Yes.
Q. Doctor, I have to ask you some legalese questions about the admissibility of certain documents.
A. Okay.
Q. And -- and what I want to go through is the list -- I'm going to identify the documents that all of these questions pertain to.
A. Okay.
Q. Okay. These questions pertain to Exhibit 10 --
A. All right.
Q. -- Exhibit 11 --
A. Okay.
Q. -- Exhibit 12 --
A. All right.
Q. -- Exhibit 13 --
A. Okay.
Q. -- Exhibit 14 --
A. All right.
Q. -- Exhibits 15, 16, which are also lab reports --
A. Okay.
Q. -- Exhibit 17 --
A. All right.
Q. -- Exhibit 18 and 19, which are lab



reports --
A. Okay.
Q. -- Exhibit 22 --
A. All right.
Q. -- Exhibit 23 --
A. Okay.
Q. -- Exhibit 24 --
A. Um-hum.
Q. -- Exhibit 26 --
A. All right.
Q. -- and Exhibit 27, Doctor.
A. Right.
Q. Okay. All of those exhibits that I just went through are medical records that are contained in your file here at the clinic, correct?
A. I believe that's true. That one prescription, I guess -- I'm not sure if that was the one that was not in my chart.
Q. Okay. But you did issue this prescription?
A. I did write that prescription, right.
Q. Doctor, are all of these exhibits medical records that you or your staff authored at or about the time you rendered medical treatment for Mr. Ronwin?
A. Yes.
Q. And were all of these records made af --



a28f1ce5-cf5f-4f2e-bdf7-b9f906f212d5

02/12/2007 08:59 FAX 970 224 3838 ED RONWIN 019

Page 198

made with information or knowledge that you or your staff gained at or about the time you rendered that treatment?
A. Yes.
Q. Are all of these records, with the exception of that one prescription, maintained in the chart that you brought to your deposition today?
A. Yes.
Q. And is it the responsibility of your clinic to maintain that chart in an accurate and organized way?
A. Yes.
Q. And it the practice of your clinic to retain records such as these in that chart?
A. Yes.
Q. Are these acc -- records true and accurate records -- are these exhibits true and accurate copies of the records in that chart?
A. Yes.
Q. Doctor, other than -- I just want to show you a couple of more exhibits, and we'll get copies of these.
A. Okay.
Q. Doctor, we'll mark this as Exhibit Number --
MR. PILKINGTON: What are we up to?
MR. RONWIN: I can't put my finger on it.
THE DEPONENT: Oh, 45.

Page 199

(Deposition Exhibit 46 was marked.)
Q. (BY MR. PILKINGTON) 46. Is Exhibit 46 simply a typewritten letter of the handwritten letter that was previously marked today?
A. I'm reading it over here. Yes.
Q. And that's a letter in which you terminated Mr. Ronwin?
A. Yes.
Q. And finally, I notice there's a section of your records that cover telephone encounters.
A. Yes.
Q. Are these true and accurate records of the telephone encounters with Mr. Ronwin?
A. Yes.
MR. PILKINGTON: We'll mark that as Exhibit Number 47, and we'll get copies of those. Dr. Keller, I appreciate your time.
MR. RONWIN: Wait a minute.
MR. PILKINGTON: I'm afraid Mr. Ronwin might have a question or two, but I appreciate your patience.
THE DEPONENT: All right.
EXAMINATION
BY MR. RONWIN:
Q. All right. Now, you agree that FDA collects the AERs; is that right?

Page 200

A. Yes.
Q. Okay. Do you think that the AERs collects the A -- FDA collects the AERs for nothing?
A. No.
Q. They have a purpose, don't they?
A. Well, to keep track of these reports.
Q. Yes. And are you aware of the source of those reports?
A. I guess they come from patients or doctors.
Q. I see. Well, I had talked with -- I'll just put on the record, but it doesn't matter because I'll testify later myself. Lieutenant Commander Robert Mackey of the Public Health Service discussed this matter with me and indicated that 90 percent of AERs come from M.D.s and pharmaceutical companies; 10 percent come from the -- the public, which would probably be patients, you see. And those that come from the M.D.s are probably done professionally. In other words, they don't take a -- an adverse event and just yell, Well, it's not due to the -- due to the Baycol. Now, secondly --
A. Do you have any questions, or are you going to testify?
Q. I've got two other questions. Did you -- did you --
A. Then ask the questions, or I'm leaving,

Page 201

okay? You're just talking. You're not asking questions.
MR. PILKINGTON: Go ahead, Mr. Ronwin. Ask questions.
MR. RONWIN: I'll get a motion, then, on it. If he walks out, I'll get a motion in on him.
MR. PILKINGTON: Just ask your questions. Move on. Okay?
Q. (BY MR. PILKINGTON) Did you ever examine my shoulder, my left shoulder?
A. Examine it in what way?
Q. For a rotator cuff tear --
A. No.
Q. -- or any kind of injury.
A. No.
Q. Did you ever see X-rays on it?
A. No.
Q. Were you present at the rotator cuff operation?
A. No.
Q. How do you know what caused the rotator cuff tear?
A. I have no knowledge of your rotator cuff.
Q. Okay. Then how can you tell him that it wasn't caused by Baycol?
A. I have never heard of statins causing a



a28f1ce5-cf5f-4f2e-bdf7-b9f906f212d5