1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD); Case No. 02-0200

DEPOSITION OF: SALLY A. KNAUER, M.D.
June 23, 2006

In re BAYCOL PRODUCTS LITIGATION : MDL No. 1431 (MJD)

This Document Relates to:

Edward Ronwin, et al., v. Bayer Corp., et al. : Case No. 02-0200

TAKEN PURSUANT TO NOTICE AND SUBPOENA on behalf of the Defendant Bayer Corporation at 2121 East Harmony Road, Boardroom, Fort Collins, Colorado 80528 at 1:00 p.m. before Sylvia E. Nonaff, Registered Professional Reporter and Notary Public within Colorado.

2

APPEARANCES:

For the Plaintiff Ronwin (pro se): EDWARD RONWIN, Ph.D., ESQ.
945 Rolland Moore Drive L-2
Fort Collins, Colorado 80526

For the Defendant: JEFFREY PILKINGTON, ESQ.
Davis Graham & Stubbs LLP
1550 17th Street
Suite 500
Denver, Colorado 80202

Also Present: None

3

INDEX

EXAMINATION OF SALLY A. KNAUER, M.D.: PAGE
June 23, 2006


By Mr. Ronwin 98

By Mr. Pilkington 5, 178


DEPOSITION EXHIBITS: INITIAL REFERENCE


| | | |
|---|---|---|
| 1 | Subpoena, 5/31/06 | 14 |
| 2 | Curriculum Vitae of Sally Ann Knauer, M.D., not dated | 16 |
| 3 | Poudre Valley Hospital Operation Report re Ronwin, 6/28/03 | 32 |
| 4 | Report of left shoulder arthrogram of Ronwin by Singer, 6/23/03 | 38 |
| 5 | Poudre Valley Hospital admission note re Ronwin, 6/26/03 | 51 |
| 6 | Poudre Valley Hospital discharge summary re Ronwin, 6/28/03 | 52 |
| 7 | Northern Colorado Orthopedic Associates chart notes re Ronwin, various dates | 53 |
| 8 | Letter from Knauer To Whom It May Concern, 5/6/03 | 66 |
| 9 | X-ray report of left shoulder of Ronwin by Pacini, 9/11/02 | 79 |
| 10 | X-ray report of left shoulder of Ronwin, 3/16/01 | 85 |
| 11 | Product information insert re Baycol, 12/9 | 122 |
| 12 | Article, "Statins and risk of polyneuropathy: A case-control study," by Gaist, et al., Neurology, May 2002 | 128 |


4

INDEX (Continued)

DEPOSITION EXHIBITS: INITIAL REFERENCE


| | | |
|---|---|---|
| 13 | Article, "Scientific Facts on the Biological Effects of Fluorides," Natural Health and Longevity Resource Center website, printed 6/16/05 | 134 |
| 14 | Article, "The Basis for the Pernicious Action of Baycol (=Cerivastatin)," by Ronwin | 152 |
| 16 | The Back and Limbs, Anatomy for Surgeons, by Hollinshead, et al, reprinted 1964, pages 323-324 | 182 |
| 18 | Fax cover sheet from Powers to Ronwin, 6/22/06; letter from Misocky to Sever, 10/26/99 | 166 |
| 17 | Amended Judgment in a Criminal Case, 1/19/06 | 159 |
| 18 | Judgment in a Criminal Case, 6/6/05 | 162 |
| 19 | Judgment in a Criminal Case, 12/10/04 | 167 |
| 20 | Article, "Bayer faces Swiss criminal probe over cerivastatin," by Fleck, BMJ, Volume 324, January 2002, page 130 | 168 |
| 21 | Business Concentrates Article, "EC imposes pricing fines," C&EN, 1/2/06 | 169 |
| 22 | E = Mc2, by Bodanis, 2001, page 275 | 170 |


(Attached to original and Mr. Pilkington's copy transcript.)

REQUESTED PORTIONS OF TESTIMONY: PAGE

(None.)

REFERENCES TO EXHIBITS MARKED PREVIOUSLY:
(None.)

Coffman Reporting
303.893.0202
303.893.2230 FAX
WWW.COFFMANREPORTING.COM

SCANNED
FEB 1 2007



02/12/2007 09:01 FAX 970 224 3838 ED RONWIN 021

13

may be made, and those objections are made to preserve the objection for trial. Do you understand that?
A. I do.
Q. It is also very important that I explain this to you, Doctor. If you don't have the knowledge or the expertise to answer my questions or Mr. Ronwin's question, you don't have to answer that question, okay?
A. Yes.
Q. If you don't know the answer, an "I don't know" is a perfectly okay answer, and I want to make sure that that is clear to you, Doctor. Do you understand that?
A. That is clear.
Q. For example, if there are cardiology issues in this case that you feel uncomfortable answering, tell us that. Okay?
A. Yes.
Q. If there are biochemical or biochemistry questions that you don't know the answer to, please tell us that. Okay?
A. Yes.
Q. The worst thing that we could have you do today is guess or speculate about what the answer could or should be. Okay?
A. Yes.

14

Q. Finally, Doctor, you understand you've taken an oath to tell the truth?
A. I do.
Q. And that oath is the same oath that you would take if you were to testify in person before the judge and jury, correct?
A. Correct.
Q. With those preliminaries out of the way, let's move forward, Doctor.
A. Okay.
Q. First of all, Doctor, you're kindly appearing today pursuant to a subpoena that I issued, correct?
A. Yes, I am.
Q. And you accepted that subpoena, correct?
A. I did, um-hum.
(Deposition Exhibit 1 was marked.)
Q. I have marked as Exhibit 1 the subpoena that was -- that you accepted. Will you take a look at that? Is that the subpoena that you accepted?
A. Yes.
Q. Doctor, that subpoena asked you to bring certain information to your deposition today. What did you bring to your deposition?
A. I brought my CV.

15

Q. Okay. What else did you bring?
A. And I brought the patient chart.
Q. Okay.
A. And I brought X-ray studies.
Q. Is the patient chart the same chart that Dr. Knauer (sic) brought to her deposition?
MR. RONWIN: You mean Dr. Servi.
A. Dr. Servi.
Q. (BY MR. PILKINGTON) Thank you. I might do that again.
A. It is.
Q. Okay. And let me rephrase the question. Is the patient chart you brought today the same chart that Dr. Servi brought at her deposition earlier this week?
A. Yes.
Q. And you were talking you brought some X-rays as well?
A. I did. I brought some X-rays from our office, Northern Colorado Orthopedics, and then I also brought X-rays from Harmony Imaging Center.
Q. Thank you very much, and we'll get to those a little later in the deposition.
(Deposition Exhibit 2 was marked.)
Q. Doctor, I have marked as Exhibit Number 2 your curriculum vitae. Is Exhibit Number 2 a true and

16

accurate copy of your CV?
A. It is.
Q. Would Exhibit Number 2 assist the jury in better understanding your background and qualifications in this case?
A. It would.
Q. Doctor, what, if anything, did you do to prepare for your deposition?
A. I reviewed the chart and reviewed the X-rays.
Q. Have you spoken to Mr. Ronwin about this deposition at all?
A. I have not.
Q. Did you do any research or other investigation for this deposition?
A. I did one thing that -- briefly that cross-referenced two orthopedics journals with the topic of rhabdomyolysis and rotator cuff tears.
Q. And what did that show to you?
A. I wasn't able to find anything in the literature about those two things occurring together.
Q. So in other words, before your deposition you did a search of the medical literature for a possible association between rotator cuff tears and rhabdomyolysis?

A. And, again, it was two orthopedic journals, yes.
Q. Okay. And you were not able to find any publications about that association?
A. I was unable to find that.
Q. Doctor, let's turn to your background. First of all, where did you go to college?
A. Baylor University.
Q. That's in Waco?
A. Waco, Texas.
Q. When did you graduate?
A. I graduated in 1976.
Q. What did you do after you graduated?
A. I went to medical school in San Antonio from 1976 to 1980.
Q. What was the school that you went to?
A. University of Texas Health Science Center in San Antonio.
Q. How long were you at that medical school?
A. Four years.
Q. Until 1980?
A. Yes.
Q. What did you do after that?
A. I did my orthopedic surgery residency, and that was five years at the University of Oklahoma Health



Science Center in Oklahoma City.
Q. And what is involved in an orthopedic surgery residence?
A. It's a comprehensive training program that involves both evaluating patients, learning diagnostic skills, and also learning surgical skills.
Q. But it was focusing on orthopedics?
A. Yes, um-hum.
Q. And what is orthopedics?
A. It's the study and practice of, primarily, musculoskeletal problems and treatment of such.
Q. You completed that residency in 1985?
A. I did.
Q. What did you do after that?
A. I started my private practice in Fort Collins, Colorado.
Q. What is your private practice called?
A. Currently it's called Northern Colorado Orthopedic Associates.
Q. So you started this in 1986?
A. '86.
Q. So you've been practicing here in the Fort Collins area for 20 years?
A. Yes.
Q. At the same practice?



A. I started with another practice and was with -- and was there for a year, and then went out on my own in '86.
Q. So from '85 to '86, you were with another clinic?
A. Yes.
Q. And then you started your own in '86?
A. Correct.
Q. Doctor, do you have any hospital affiliations?
A. I do: Poudre Valley Hospital in Fort Collins, Colorado.
Q. And by "affiliations," what does that mean?
A. That means I'm on the active staff of that hospital.
Q. Where else do you -- does that mean you perform surgeries at that hospital?
A. Yes.
Q. And what -- do you have any other affiliations with any other surgical centers?
A. Harmony Ambulatory Surgery Center --
Q. Is that --
A. -- also in Fort Collins.
Q. Is that an outpatient sort of clinic?
A. It is an outpatient surgery center.



Q. Okay. You're board certified?
A. Yes.
Q. In what area?
A. Orthopedic surgery.
Q. When were you first board certified?
A. 1987.
Q. And since then, did you need to be recertified?
A. Yes. That's a 10-year requirement, and so I've recertified one time and am up for recertifying again next year.
Q. Looking forward to it?
A. (Deponent nodded.)
Q. Doctor, briefly explain, what does recertification involve?
A. For orthopedic surgery, you can do different pathways. There can be an oral recertification, where the examiners actually come and evaluate charts in your office. But most people choose the written pathway, which is a computer-based test.
Q. So you have to study and be up on all areas of orthopedics, correct?
A. Yes. And most people, you know, go to review courses and that type of thing.
Q. But in any event, you're currently board



02/12/2007 08:02 FAX 970 224 3838 ED RONWIN 023

41

X-rays were some areas of sclerosis, or increased density. And they're fairly commonly seen. They're just benign findings.
Q. And when you -- where were they found?
A. Let's see. In the glenoid.
Q. So actually in the bone itself?
A. Yes.
Q. Okay. So that is -- those findings are increased areas of densities in the bone itself, not on the exterior, or outside, of the bone; is that correct?
A. Correct.
Q. And when you say "benign," clinically insignificant for your — for your purposes?
A. Yes.
Q. Doctor, the next finding is, quote, There are degenerative changes in the AC joint. The joint space is narrowed, and there are small, marginal osteophytes, correct?
A. Yes.
Q. What do you -- what is meant by "degenerative changes in the AC joint"?
A. Well, typically what that means is that the joint is narrower than you'd expect it to be, which would indicate that there's some wear or thinning of the cartilage in the joint. He goes on to say that the joint

42

space is narrowed. And then "marginal osteophytes" means that along the borders of the two bones that are joining, there are bone spurs. And those bone spurs form in response to the arthritis, increased stress on the bone.
Q. So, really, there are two findings there. One is that the AC joint was narrow than -- narrower than expected, correct?
A. Right.
Q. And two, there was a finding of bone spurs in that joint area, correct?
A. Yes.
Q. Doctor, in your clinical judgment, do you see -- let me back up. In your clinical experience, do you see narrowing of the AC joint in older patients?
A. Yes, you certainly can, um-hum.
Q. Is narrowing of that joint more frequently found in older patients?
A. It is.
Q. In other words, the narrowing of the AC joint is a degenerative process?
A. Yes.
Q. It happens as we get older?
A. Not in everybody, but certainly it does happen — you see it definitely more frequently in people who are older.

43

Q. Stated differently, the prevalence of AC joint narrowing is greater as you get older, as opposed to as — when you were younger?
A. Yes, um-hum.
Q. And, Doctor, what causes these bone spurs to develop?
A. Typically it's thought that because the cartilage acts as a cushion, if there is thinning of that joint, then there is a little bit more stress on the bone, since it doesn't have the cushion, and the body responds to that stress by forming bone spurs. A similar thing happens in the knee with knee arthritis.
Q. So these bone spurs are an arthritic result?
A. Kind of a secondary sign of what's going on with the arthritis.
Q. Okay. So you found this AC joint narrowing as well as bone spurs in that area, correct?
A. Correct.
Q. You also found "small subchondral cysts at the tip of the clavicle and in the adjacent acromion process"?
A. Yes.
Q. Would you explain that?
A. That can also be associated with arthritis. It's just a radiographic finding.

44

Q. And the acromion process is where?
A. The superolateral aspect of the shoulder.
Q. Is that near the rotator cuff area?
A. That's above the rotator cuff.
Q. So with the — the AC joint narrowing, as well as these bone spurs, that would be in the area of the supraspinatus tendon, correct?
A. Yes, um-hum.
Q. Whereas the cysts, that would be above the acromion bone; is that correct?
A. Yes. Well, the cysts are in the -- the cysts are actually in the tip of the clavicle.
Q. Okay.
A. So the clavicle joins the acromion through this joint that has the bone spurs in it, and then the cysts are actually in that bone in the end of the clavicle. And then, also, apparently there was some in the acromion itself.
Q. And finally, Doctor, you note that "Bone spurs project from the greater tuberosity of the humeral head," correct?
A. Yes.
Q. What does that refer to?
A. Well, the greater tuberosity is the portion of the humeral head where three of the rotator cuff

A. Yes.
Q. And his abduction was what?
A. 90 degrees.
Q. Were you pleased with that progress as well?
A. I was. We actually limit some of these things to protect the rotator cuff repair for a time.
Q. But two months postsurgery he was doing very well, in your opinion?
A. Yes, it appears so from my note.
Q. Indeed, he was -- you prescribed physical therapy for Mr. Ronwin, correct?
A. I did.
Q. And who did you prescribe for physical therapy? I'll represent to you that it was Adams & Giddings.
A. Adams & Giddings PT.
Q. Do you frequently refer your patients to that clinic?
A. I do.
Q. And how long was Mr. Ronwin in physical therapy?
A. Hum.
MR. RONWIN: About five to six weeks.
A. It looks like the first note was -- well, let's see here. I see an August 4th note, and an August



22nd note, a September 19th, and that looks like all the PT.
Q. (BY MR. PILKINGTON) So it looks like about the beginning of August through mid-September, correct?
A. Yes.
Q. And what was the purpose of the physical therapy?
A. To assist him in his recovery with both passive range of motion, active assisted range of motion, primarily both of those.
Q. Doctor, was the -- in your opinion, was the physical therapy helpful in improving Mr. Ronwin's condition?
A. Yes.
Q. Indeed, in September of '03, about three months postsurgery, Mr. Ronwin was doing well, correct?
A. Yes, he was.
Q. That's -- that's what he told you, correct?
A. Yes, um-hum.
Q. What did he tell you about physical therapy?
A. What date?
Q. September 22nd of '03.
A. "He states overall he is doing well. He felt the physical therapy had been helpful, but also felt he had some increased soreness after therapy and thought



he was at the point where he could do his home exercise program well."
Q. So that's the point in time where he stopped the physical therapy and continued his home exercise program?
A. Yes.
Q. I note in there that his flexion was now 160 degrees without discomfort, correct?
A. Yes.
Q. Again, how would you describe the level of achievement in terms of postsurgery flexion?
A. I would describe that as good.
Q. And indeed, only 20 degrees short of normal?
A. Yes.
Q. Doctor, you then saw Mr. Ronwin four months after the surgery, in late October of '03?
A. Yes.
Q. What did Mr. Ronwin tell you about how he felt in his -- about his progress?
A. My note indicates, "He returned stating he was actually feeling well and encouraged by his progress. He states he has better range of motion and less discomfort of the shoulder all of the time."
Q. Now, based on those comments, did you believe that he was progressing -- that is, improving --



following the surgery?
A. I did.
Q. And Mr. Ronwin told you that he is feeling better, correct?
A. Yes.
Q. That he thought he was progressing -- that is, improving -- correct?
A. Yes.
Q. That his range of motion was improving, correct?
A. Yes.
Q. And that he has less and less discomfort of his shoulder --
A. Yes.
Q. -- as time passes, correct?
A. Yes.
Q. All very positive signs?
A. Yes.
Q. He did describe one limitation to you, correct?
A. Yes, he did.
Q. And what did he describe to you?
A. He said that he couldn't get used to putting his jacket on utilizing the left arm first, and so he preferred to put the right arm in first, even though it --

was a little uncomfortable, than putting the left arm in.
Q. And do you recommend that many of your patients try to make adaptions following a rotator cuff surgery?
A. Yes. It's oftentimes just more comfortable.
Q. Doctor, would you read the last sentence of your October note to the jury?
A. "He seems to actually be doing quite well at this time functionally and will return in approximately three months for reassessment."
Q. Was your conclusion three months postop that he was doing quite well functionally?
A. Yes.
Q. The last time -- I'm sorry. You then saw Mr. Ronwin in February of '04?
A. Yes, um-hum.
Q. And was this a routine follow-up?
A. I did ask him in October to return in three months. It looks like it would be that follow-up.
Q. So this would have been about a little over six months postsurgery, correct?
A. Yes. Let's see.
Q. I want to go through your discussion of Baycol, but I also want to go through your examination of Mr. Ronwin. What did your physical examination reveal?



A. On the February 2, '04 visit I said, "Today reveals he has excellent range of motion of the right shoulder. He can abduct fully with a 2-pound weight." Wait a minute. Let me -- let me stop. "Today reveals he has excellent range of motion of the right shoulder. He can abduct fully with a 2-pound weight. On the left he will abduct to 90 degrees, and then does complain of some pain, causing him to stop. He has 145 degrees of flexion left, 180 degrees flexion right. He states the left shoulder is still not normal." And then I just said, "He has undergone a rotator cuff repair as well as manipulation for adhesive capsulitis."
Q. So at this point in time, he was still a little short in terms of flexion, as well as abduction, correct?
A. Yes.
Q. And based on your experience, six months following a rotator cuff surgery, would you expect someone to be still short of normal flexion and abduction?
A. I think some people definitely will still be short of that, and especially if they're also fighting a frozen shoulder.
Q. So these findings were not unexpected, correct?



A. Correct.
Q. But is it your opinion that he was still progressing well?
A. I would say so. I think from the previous note, he had -- he had lost a few degrees in the flexion range, but still was -- was progressing reasonably.
Q. Now, you saw Mr. Ronwin about a month later, correct?
A. Yes.
Q. Why did he come to see you at that point in time?
A. My report states, "Returns at this time to discuss his concerns with his case against the manufacturers of Baycol."
Q. And did you write a letter for him?
A. I had.
Q. Doctor, I want to go back to February. Is --
THE DEPONENT: Could we go off the record for a minute?
MR. PILKINGTON: Yes, you may.
(Break taken from 2:39 p.m. until 2:44 p.m.)
(The last question was read back)
MR. PILKINGTON: I will start over.
MR. RONWIN: You're on the note 3 -- March



22, '04.
Q. (BY MR. PILKINGTON) Doctor, we're back on the record. And again, if you ever need to take a break, just do exactly what you did. Okay?
A. Thank you.
Q. Doctor, we are on the office note of February 2nd of '04. Okay? Do you have that in front of you?
A. I do.
Q. And he told you that he was still proceeding with his case against my client, Bayer, correct?
A. Yes.
Q. Who manufactured Baycol, correct?
A. Yes.
Q. In your practice, do you ever prescribe statins?
A. No.
Q. Have you ever prescribed Baycol?
A. No, huh-uh.
Q. Doctor, what did Mr. Ronwin tell you at this visit about his case against my client?
A. Let's see. He had asked both Dr. Servi and myself to just assist him in some clarification of some abbreviations that were in the chart which we had provided him copies of, and we reviewed some of that. He



02/12/2007 09:04 FAX 970 224 3838 ED RONWIN 026

did tell me he had some difficulties with the left shoulder.

Let's see. Specific to your client, my note says, "We did discuss the rhabdomyolysis problem with the Baycol and also the myositis symptoms." And I said, "He notes in June apparently they are going to trial."

Q. Do you recall your discussion about rhabdomyolysis as well as the myositis symptoms?

A. I don't.

Q. Was it your -- did Mr. Ronwin tell you that he believed that Baycol caused his rotator cuff tear?

A. He did.

Q. Did he also ask you for a letter that set forth an opinion that Baycol caused his rotator cuff tear?

A. Well, he did -- he asked me for a letter. And I told him I would -- I think that I would provide a summary letter of -- of care.

Q. Did he ask you for a letter that set forth the cause of his rotator cuff tear, or do you recall?

A. I can't remember.

Q. You wrote a letter, correct?

A. I did.

(Deposition Exhibit 8 was marked.)

Q. Let me hand you what I've marked as Exhibit



Number 8. Doctor, would you explain to the jury what Exhibit Number 8 is?

A. This is a letter to Edward Ronwin dated March 5, 2003, a To-Whom-It-May-Concern letter, and summarizing his care in the office of Northern Colorado Orthopedic Associates.

Q. And is this a letter that you wrote pursuant to his request?

A. Yes.

Q. Doctor, is it fair to say that this letter is simply a summary of the care and treatment that you provided?

A. Yes, it is.

Q. And I note it's dated March 5, 2003. Should that be 2004?

A. I don't know. I don't think so.

Q. Well, your office note is March 22nd of '04.

A. Let's see here.

Q. And you note in that office note, "I had written a letter for him dated March 5, 2004."

MR. RONWIN: It's probably an error.

A. Oh, you know --

Q. (BY MR. PILKINGTON) It's just a typo.

A. Oh, I see. It probably is. Yes, yes, I see what you're saying.



Q. So again, my question, Doctor, should the -- should the letter be 2004, as opposed to March 5, 2003?

A. It must be, yeah. I apologize.

Q. We all do that, Doctor.

A. Okay.

Q. No problem, nothing -- I just wanted to make sure I was right on that.

A. Yeah.

Q. So, Doctor, in March of '04 he returned to you to discuss his concerns about his case against my client, Bayer, correct?

A. He did.

Q. And you document that in your note?

A. I did.

Q. What else did he want to make certain and make clear to you?

A. He -- he made it clear that he did not start this action against Bayer because of the announcement that Baycol was a destructive agent, noting that his pain started about six months before Bayer's notice was made public. He also wanted it to be clear and in the medical record that he stated there had been no other known trauma to his shoulder during that period of time in which he ingested the Baycol. He emphasized -- again, just reading from the chart -- that in his research he



had found that Baycol causes degeneration of tissue in muscle, and that it had also been shown to do this about the shoulder.

Q. Did he share any of that research with you?

A. I can't remember.

Q. But he told you that he had found research that showed that this Baycol had caused degenerative -- degeneration of tissue in the shoulder? Is that what he told you?

A. He said "about" the shoulder.

MR. RONWIN: You want to go off the record on that for a moment?

MR. PILKINGTON: No.

MR. RONWIN: Oh, okay.

Q. (BY MR. PILKINGTON) Doctor, you did -- did you do a physical examination of him at that time, or not?

A. I did not.

Q. And did he also come to you and explain some issues that he had with Dr. Torkelson, of Cheyenne Orthopedics?

A. Yes.

Q. Do you recall what you discussed about that?

A. He just said that Dr. Torkelson -- there had been some either inconsistencies or some things that he

69

didn't agree with in the medical record, and that he had mentioned those concerns with Dr. Torkelson.
Q. At this time -- this was the last time you saw Mr. Ronwin, correct?
A. Yes.
Q. And you note at this time, "He did have some limited range of motion and function," correct?
A. Yes, yes.
Q. And you note that, "as described before," meaning as described at the previous visit?
A. Yes.
Q. But, Doctor, in March of '04, were you -- describe for the jury your satisfaction with the results of your arthro -- with your rotator cuff surgery and acromioplasty.
A. I think I felt that the results were -- were satisfactory. You always hope that people will get full range of motion after a frozen shoulder, but that does not always happen. And likewise, with the rotator cuff repair, I think they were satisfactory.
Q. Meaning it could have been worse, it could have been better; fair to say?
A. Fair to say.
Q. Doctor, under your Recommendation, you told him to continue his home exercise program, correct?

70

A. I did.
Q. And then I'm going to read this for the benefit of the jury. "I indicated to the patient that" --
THE REPORTER: Wait. "I indicated to the patient that"?
Q. (BY MR. PILKINGTON) -- "that I would plan to review the material which he brought with him today. I have again reiterated that in my discussions with other doctors, Baycol has affected muscle tissue, but there has been no reported incident of rotator cuff tear being linked to this to my knowledge." Did I read that correctly?
A. Yes.
Q. And did you explain that to Dr. Ronwin that day?
A. I did.
Q. Doctor, as of March of 2004, were you aware of any scientific evidence that rotator cuff tears were in any way associated with Baycol?
A. I was not.
Q. With a statin?
A. I was not.
Q. Doctor, as we sit here today, are you aware of any scientific evidence that associates Baycol with a

71

rotator cuff tear?
A. I am not.
Q. Doctor, sitting here today, are you aware of any scientific evidence that in any way associates a rotator cuff tear with statins in general?
A. I am not.
Q. Doctor, you have talked to other doctors about this as well, correct?
A. I have.
Q. And what have your colleagues told you?
A. That -- the same answer.
Q. That they're not aware of any association?
A. Yes, to their knowledge.
Q. Doctor, when you're caring for and treating a patient -- for a patient -- let me start over. In the course of your care and treatment of a patient such as Mr. Ronwin, you diagnose his condition, correct?
A. Yes.
Q. As part of your diagnosis, you are considering the possible causes of that diagnosis, correct?
A. Yes.
Q. Doctor, have you -- do you use the term "differential diagnosis" in your practice?
A. Yes.

72

Q. What does differential diagnosis refer to?
A. It refers to -- as you're trying to figure out what the diagnosis is, it refers to what are all the different considerations that you might have for that problem.
Q. And when considering a diagnosis for a condition, do you consider possible causes for that condition?
A. Yes.
Q. Doctor, what are possible causes of a tear of the supraspinatus tendon?
A. Possible causes would be trauma and impingement syndrome, aging, acromioclavicular degenerative joint disease, shoulder dislocation. That's fairly inclusive.
Q. And, Doctor, are those possible causes all causes that you consider in making a diagnosis and caring and treating for your patients?
A. Yes.
Q. Doctor, are -- on this differential diagnosis chart, are you aware of any evidence that supports Baycol as being a possible cause of supra -- of a supraspinatus tendon tear?
A. I'm not aware of any.
Q. Doctor, in your clinical judgment, would you

consistent with each other?
A. I do.
Q. Doctor, I'm about done, if you'd just give me a moment.
(Discussion off the record.)
Q. Doctor, we have gone through your office notes in some detail during this deposition, correct?
A. We have.
Q. Doctor, at any point in time during your care and treatment of Mr. Ronwin, did he complain about having problems with his vision?
A. I don't remember seeing that in any of my notes.
Q. Doctor, at any point in time during your care and treatment of Mr. Ronwin, did he complain to you about cataract problems?
A. I don't remember.
Q. Doctor, at any point in time during your care and treatment of Mr. Ronwin, did he complain to you about having right elbow pain?
A. I don't remember.
Q. Doctor, at any point in time during your care and treatment of Mr. Ronwin, did he complain about having a problem with walking, or a gait problem?
A. It just was associated with his severe back



pain episode.
Q. On that singular episode?
A. Yes.
Q. And at any point in time did Mr. Ronwin complain to you about having pain in the back of his legs?
A. Again, associated with his hospitalization for the back pain. But other than that, I don't recall other episodes.
Q. And, Doctor, when you say you don't recall, had Mr. Ronwin made these complaints to you, are those the sorts of complaints that you would have put down in your notes?
A. I try to be complete in my notes, yes.
Q. Okay. And let me ask you again.
A. Okay.
Q. Doctor, I've asked you a series of questions about whether or not Mr. Ronwin complained to you about certain things, correct?
A. Yes.
Q. And you've told me that you don't recall whether -- that he made those complaints, correct?
A. Correct.
Q. Doctor, are those the types of complaints that you would put down in your office notes had he made



them?
A. I would.
Q. And, Doctor, if those complaints are not found in the office notes, does that lead you to believe that he did not make them to you at the time of your office visit?
A. That would lead me to believe that.
Q. And of the complaints that I went through, the back pain and the buttock pain, he made that complaint only one time, in early May of 2003, correct?
A. Correct.
Q. And that led to a hospitalization relating to traction?
A. Yes.
(Deposition Exhibit 10 was marked.)
Q. Doctor, I will hand you what I've marked as Exhibit Number 10. Would you take a moment to look at that? Doctor, have you had the opportunity to review Exhibit 10?
A. Yes.
Q. I'll represent to you that this is an X-ray report completed by Dr. Torkelson, from Cheyenne Orthopedics. Do you know Dr. Torkelson?
A. I think I've met him once.
Q. Doctor, do you agree that the findings of



Exhibit 10 are consistent with the findings that are set forth in the X-rays of September '02, May of '03, and the arthrogram of May of '03?
A. Yes.
Q. Doctor, do you know why Mr. Ronwin kept coming to you -- stopped coming to your clinic?
A. I believe it may be related to the fact that we had a difference of opinion with regard to the origin of the rotator cuff tear.
Q. Explain to the jury what that difference of opinion is.
A. He felt that it was due to the Baycol, and I had discussed with him that I had no knowledge of the connection of Baycol with rotator cuff tears, and our opinions differed. And I can't speak to what he was feeling at the time, but I think that was frustrating, and he felt that he had completed his care.
Q. Doctor, once again, is it your opinion to a reasonable degree of medical probability that the cause of his rotator cuff tear was not the Baycol?
A. Yes.
Q. Doctor, would you state again for the record your opinion to a reasonable degree of medical probability as to what you believe the cause of his supraspinatus rotator cuff tear was? Let me rephrase the



02/12/2007 09:06 FAX 970 224 3838 ED RONWIN 029

question, okay?
A. Yes.
Q. It was a poor question. Doctor, in your opinion to a reasonable degree of medical probability, what is the cause -- what was the cause of his rotator cuff tear?
A. I believe the likely cause would be the age of the patient, the degenerative changes that have already been noted on the X-ray, associated with some impingement.
Q. Doctor, I appreciate your time and your patience this afternoon. I may want to look into your file, but I do want to give Mr. Ronwin the opportunity to ask you questions.
A. Okay. Thank you.
Q. Before turning you over to Mr. Ronwin, I want to repeat to you and to Mr. Ronwin that it is very important that you provide answers to his questions, just as you have my questions.
A. Yes.
Q. If you do not know the answer to a question, or if a question is beyond your area of expertise, you certainly have the right to explain that to Mr. Ronwin, and you are under no obligation to answer a question that you do not understand or do not feel qualified to answer.



Do you understand that?
A. I do.
MR. PILKINGTON: Thank you again.
THE DEPONENT: Thanks.
(Discussion off the record.)

EXAMINATION

BY MR. RONWIN:
Q. I was going to ask you first, in your training for -- for your M.D. -- and not just in medical school, but even prior to that -- did you take chemistry?
A. Yes.
Q. What courses in chemistry did you take, and for how long? In other words, how many semesters of each?
A. Oh, let's see. I graduated from college in 1976. And I took inorganic chemistry, organic chemistry --
Q. Biochem --
A. -- physical chemistry and biochemistry in medical school.
Q. I see. That about sums it up.
A. Okay.
Q. Is that a -- well, it would have been about a year of inorganic and organic?
A. I think two semesters of each of those.



Q. Yeah, a year. In other words, yeah, a college year. And physical chemistry, probably a half, one semester?
A. I think -- I can't remember.
Q. And biochemistry, was that a semester?
A. I think so.
Q. Okay. Thank you. And, let's see. Now, he's gone through a number of these reports, and I just wanted to ask you first in general on those reports, before I go into -- just -- I won't go into all of them, then. You see, I was all prepared to go into every one of them, but there's no -- I want to save some time.
Is it true that in the course of my visits to your firm, your medical firm, from the start, which was on September 4, 2001, until the last time, which was somewhere in 2000 -- well, March of 2004, did I receive about -- oh, six to seven injections of cortisone?
A. You did receive them. I'd have to go through here to count up. But that sounds --
Q. Well, you don't have to count the exact number. Is that about approximately correct?
A. Probably so.
Q. Because there were four from Dr. Servi, one each time --
A. Okay.



Q. -- on each of the visits to her. There were at least two, I think, from you, you see?
A. Okay.
Q. So that will take care of that. Now, as to those -- the effect of that, was it the net result that -- that I'd get temporary relief from pain, but that I always found I had to come back?
A. Yes, um-hum.
Q. Okay. I just wanted to check that matter. Now, I thought I'd like to do this: Take a look at those X-rays to where these are.
MR. RONWIN: And I think -- if you want to go -- we could just stand by the doctor, and -- and she could show us -- you know, point. You know what I'm saying?
MR. PILKINGTON: Doctor, could I ask you, these are the only X-rays, correct? Are these the originals?
THE DEPONENT: This one from my office, yes.
MR. PILKINGTON: Okay.
THE DEPONENT: This is a copy of the MRI -- or not -- of the arthrogram.
MR. RONWIN: Yeah, right.
MR. PILKINGTON: So you have a copy of the arthrogram and only one of the X-rays?



02/12/2007 09:07 FAX 970 224 3838 ED RONWIN 030

together and get strings or -- or rings, or whatever; is that right?
A. I suppose.
Q. And they could then form proteins?
A. I suppose.
Q. Right. And they could form sugars?
A. I suppose.
Q. And -- and strings then would be known as saccharides; is that right?
A. I can't remember.
MR. PILKINGTON: Objection to this whole line of questioning, form and foundation.
MR. RONWIN: Oh, okay.
Q. (BY MR. RONWIN) He likes to do that, you see. At any rate, so basically, the human body is made up of molecules; is that correct?
A. I think so.
Q. And so the membranes of cells would be made up of molecules, would they not?
A. I think so.
Q. And so -- and Baycol, is that a molecule?
A. I don't know.
MR. PILKINGTON: Same objections.
Q. (BY MR. RONWIN) You don't know?
A. I don't know.



Q. Okay. Let's take a look at this thing. This is the Baycol insert that, you know, the drug companies provide -- provide when you buy the stuff for it sometimes.
MR. RONWIN: Why don't we have it just marked, okay. I believe there are three here, yes.
(Deposition Exhibit 11 was marked.)
(Break taken from 3:59 p.m. until 4:03 p.m.)
Q. (BY MR. RONWIN) Would you look at that document for a moment and please tell us --
MR. RONWIN: You're on?
THE REPORTER: (Nodded head.)
Q. (BY MR. RONWIN) -- and please tell us what it is.
A. It has "Baycol" at the top, and it looks like it describes the clinical pharmacology, and then it goes through indications, contraindications, warnings, precautions.
Q. Oh, that's all right. It's just an insert, right?
A. There you go, yes.
Q. Okay. That's fine. And do you notice on the very top, at the left-hand column, there's a diagram of a molecule; is that right?
A. Yes, it looks like that.



Q. Right. So Baycol is a molecule; is that right?
A. It looks like it is on this page.
Q. Right. And I'd like to focus your attention on the central area there. Do you see the two 6-membered rings? One of them has a nitrogen in place of a carbon atom; is that right?
A. You know, I am --
Q. You don't remember?
A. -- an expert in orthopedic surgery, and I am not an expert in chemistry or biochemistry.
Q. Oh, that's all right. That's okay.
A. It was 30 years ago --
Q. Right. Okay.
A. -- and I don't really feel I can answer questions regarding this, because it's not in my field of expertise.
Q. That's all right. But -- but the questions that I'm asking don't require a -- a chemical expert, or even -- even someone that's worked in a chemical lab who may not have an Ph.D. or -- or an M.S. or something like that. Just if you've taken chemistry -- I'm not going to be asking you about how this is put together, or things like that. I just want to point something out to you. That's all.



A. Okay.
Q. So if you look at where that N is, you see the N in the center, in part of a ring?
A. I see the N.
Q. Okay. And you can accept my word that -- if you like -- that that ring has five carbons, one at each point.
A. I will accept your word.
Q. Huh?
A. I will accept your word.
Q. Good. And then it's -- from that carbon that is -- we call that the paraposition to the end. There's a link there -- do you see that? -- to another ring, is that right --
A. I see --
MR. PILKINGTON: Objection to form.
Q. (BY MR. RONWIN) -- just below it? Right. That -- that line, by the way, represents a bond --
A. Okay.
Q. -- between that carbon atom at one end -- and the end of one of the rings and the other carbon atom. Okay? And then at the bottom of that second ring, you notice there is a line, and then an F?
A. Yes.
Q. Okay. Now, will you accept my statement

Q. -- in the doctorate area, et cetera.
That -- to -- to get back to the question, would you agree that, as to persons of professional standing, there is evidence presented that cerivastatin, or Baycol, can cause -- in addition to the known muscle problem, can cause nerve damage?
MR. PILKINGTON: Objection, form and foundation.
(Interruption by a knock at the door.)
THE DEPONENT: Excuse me just a moment.
MR. PILKINGTON: That's fine. We can go off the record.
(Discussion off the record.)
Q. (BY MR. RONWIN) Will you accept, then, as a result of this paper, which is not the only sort of -- you know, the "it" of the world, so to speak, that it appears that Baycol can also cause nerve damage, nerve cell damage?
MR. PILKINGTON: Objection, form and foundation.
A. I think what I can state is that you've given me an article that was from 2002 Neurology that had as its conclusion that "Long-term exposure to statins may substantially increase the risk of polyneuropathy."
Q. (BY MR. RONWIN) Right. And among those



statins was named Baycol.
A. And I will accept that you told me --
Q. Yeah. The second --
A. -- that was the same as Baycol.
Q. The second page. Right. That -- that's all I was trying to get at at that point.
A. Okay.
Q. Now, let's take a look at this interesting thing. These are mine. I always keep a fourth one separate, so I don't mark on that one, you see. That's the reason. And here are three.
MR. RONWIN: Would you mark this as Exhibit 13, please.
(Deposition Exhibit 13 was marked.)
Q. (BY MR. RONWIN) What is the title of that document, please?
A. This is from the Natural Health and Longevity Resource Center, titled "Scientific Facts on the Biological Effects of Fluorides."
Q. Right. And you notice, for example, on the first one we -- you have in bold type certain representations there. And underneath there are a whole bunch of citations to publications; is that right?
A. Yes.
Q. Which support -- which are alleged to



support the statement in Item 1; is that right?
A. And I would just have to say I'm unaware of this -- is this from the Internet? I'm unaware of any origin of this, but it does look like there is a statement, followed by a grouping of citations. And that's all I can state.
Q. Right. And would you do us -- please read for us just those -- that Number 1, and then -- just without the citations, just what it says in Number 1?
A. "Number 1. Fluoride exposure disrupts the synthesis of collagen and leads to the breakdown of collagen in bone, tendon, muscle, skin, cartilage, lungs, kidney and trachea."
Q. Right. And then let's take Number 2, please. Could you read that also?
A. Again, from this same source, Natural Health and Longevity Resource Center.
Q. Yes.
A. "Number 2. Fluoride stimulates granule formation and oxygen consumption in white blood cells, but inhibits these processes when the white blood cell is challenged by a foreign agent in the blood."
Q. Right. And let's take Number 5, just to make this short.
A. "Number 5. Fluoride inhibits antibody



formation in the blood."
Q. Right. And Number 6?
A. "Number 6. Fluoride depresses thyroid activity."
Q. Right. And 7, please?
A. "Number 7. Fluorides have a disruptive effect on various tissues in the body."
Q. And Number 8?
A. "Number 8. Fluoride promotes development of bone cancer."
Q. Right. And 9, that would be the one --
A. "Number 9. Fluorides cause premature aging of the human body."
Q. Right. And you noticed when we looked at the structure of Baycol, the chemical structure of Baycol, it had a fluorene atom in it?
A. You told me that that's what that F stands -- stood for.
Q. Yes, that's what it stood for.
MR. PILKINGTON: Fluorene, or fluoride?
MR. RONWIN: What?
MR. PILKINGTON: Fluorene, or fluoride?
MR. RONWIN: Well, the atom itself is fluorene. Fluoride is when you add an electron to it, and so you have the ion, i-o-n. Do you see the

I -- what have you been presented with?
A. Well, let's see. It's page 323 and 324.
Q. Yes.
A. And it looks like it's from Anatomy for Surgeons, Back and Limbs.
Q. Yes, right. And starting on -- on page 323, right underneath the Figure 223, there's a sentence that begins on the right-hand column, right? And it starts with "In their series" --
A. Okay.
Q. -- right? Could you read that up to page 324, to the line 1, 2, 3, 4 -- to the -- where the sentence ends on line 4, where it says "50 percent"? Do you see that?
A. Certainly.
Q. Okay. Please.
A. All right. "In their series, there were tears of the cuff in 4 of 12 shoulders representing the fifth decade, in 4 of 18 of the sixth decade, in 30 of 30 of the seventh decade, and in 23 of 24 of the eighth and ninth decades."
Q. Yes.
A. "Grant and Smith, confining their observations to rupture of the supraspinatus tendon, found 11 individuals with bilaterally ruptured tendons, 8



with rupture on the right side only, and 6 with rupture on the left side only, among 95 dissecting room subjects. Further, among 18 subjects aged 17 to 46 years, they found no incidence of rupture; among 12 subjects, 47 to 56 years, they found rupture of at least one tendon in 25 percent; among 22 subjects, 57 to 66 years, they found 18 percent with a rupture; among 31 subjects, 67 to 77 years, 39 percent; and among 12 subjects, 77 to 86 years, 50 percent."
Q. Right. And will you accept that in 2001, when I first came to your offices -- and that was during which I had taken Baycol for seven months, a period of approximately seven months almost to the day -- I was 77 years old?
A. All right.
Q. Okay. So under this finding by Grant and Smith reported here in the Anatomy For Surgeons -- and you're a surgeon, right?
A. Yes.
Q. Out of the 31 subjects in that age category, which includes the 77 -- people 77, 39 percent were found with rotator cuff tears, is that right, of the supraspinatus tendon?
A. From 77 to 86 years, it was 50 percent among 12 subjects.



Q. No, 67 to 77.
A. Okay. And then it said "and among 12 subjects" --
Q. Yeah.
A. -- "77 to 86," so there's a little overlap there, and that was 50 percent.
Q. Yeah. So I might be -- there might have been 45 percent in that 77 category, then?
A. Okay.
Q. Okay. So therefore, is -- is it the -- is it the case that just being old would absolutely cause a -- a rotator cuff tear?
A. It's not absolutely. There are lots of studies out there that do show -- and there's varying percents, depending on which study you read -- but there's an increasing incidence of rotator cuff tears as we age.
Q. With age?
A. Yes.
Q. But it would not necessarily be the cause of -- of the rotator cuff tear?
A. It increases with age, and that's all we can say.
Q. Yes, yes. So in my case, could one say it's absolutely the age?



A. We could just say that it's a higher incidence in that age group, and that's all we can say.
Q. And that's all you can say, right. Now, let's go to a little bit about the good -- the good defendant in this case. I'll just show you what the FDA had to say.
MR. RONWIN: Please mark that as Exhibit -- what is that, 16? Is that not right? Is that right, 16?
THE REPORTER: (Nodded head.)
(Deposition Exhibit 16 was marked.)
Q. (BY MR. RONWIN) Now, you have Number 16; is that right?
A. I do.
Q. What does that appear to be, please?
A. Let's see. The first page says "Division of Drug Information FDA," slash, a number of other letters.
Q. Yes.
A. Okay. Dated 6/22/06. It's a fax to Edward Ronwin from Joan Powers. "Message: Baycol letters."
Q. Yes, right. And then on the next page, what sort of a document do we have?
A. It looks like a fax, and it is to a Ms. Sever, S-e-v-e-r, who's of Bayer Corporation.
Q. October -- do you have the date on that?
A. October 25, 1999.