UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

DEPOSITION OF: MARK PRINCE, M.D.
June 23, 2006

| | | |
|---|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : | MDL No. 1431 (MJD) |
| This Document Relates to: | : | |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : | Case No. 02-0200 |

TAKEN PURSUANT TO NOTICE AND SUBPOENA on behalf of the Defendant Bayer Corporation at 419 Canyon Avenue, Suite 300, Fort Collins, Colorado 80521 at 9:11 a.m. before Sylvia E. Noneff, Registered Professional Reporter and Notary Public within Colorado.

SCANNED FEB 1 2007



02/12/2007 09:10 FAX 970 224 3838 ED RONWIN 034

Page 22

Q. Okay. Was it your understanding that pain related to the claudication issues he was having?
A. That was what I thought it was, yes, sir.
Q. At any point during your care and treatment of Mr. Ronwin, did he complain to you about having any back pain?
A. Yes, sir.
Q. Okay. What was your understanding of the source of that pain?
A. I thought it was due to the -- his arthritic condition. He had been taking some arthritis medicine in the past, and I thought it was due to that. Certainly the claudication could have done it also, but basically arthritis.
Q. At any point -- at any point during your care and treatment of Mr. Ronwin, did he complain about problems with his gait or being able to walk?
A. He may have. I don't recall, though.
Q. At any point during your care and treatment of Mr. Ronwin, did he complain about having right elbow pain?
A. If it's not in here, I can't say yes or no.
Q. But if -- if he did complain about that, it should be in your notes?
A. More than likely, yes.

Page 23

Q. And if it's not in your notes, that would suggest to you that he did not complain about that, correct?
A. Yeah. I would have to say yes.
Q. Doctor, at any point during your care and treatment of Mr. Ronwin, did he complain about -- I've asked that already, so I was going to repeat myself, and that, I don't want to do. Is it fair to say that the principal complaint that he presented to you repeatedly was this left shoulder pain?
A. As far as arthritic, yes.
Q. Doctor, going back to your qualifications and background, you're an internal medicine specialist, correct?
A. Yes, sir.
Q. You're not a cardiologist?
A. No, sir.
Q. You're not a neurologist?
A. No, sir.
Q. You're not an epidemiologist?
A. No, sir.
Q. You're not a pharmacologist?
A. No, sir.
Q. You're not a nephrologist?
A. No, sir.

Page 24

Q. You're not a toxicologist, correct?
A. No, sir.
Q. And you're not an endocrinologist?
A. No, sir.
Q. And if you have patients who present to you with needing care in those specific areas, what do you do?
A. We usually -- you know, some of that stuff I do handle, okay? I mean, it's within the scope of what we do. If it gets outside of my expertise that I've acquired over the years or I think I need help, then I refer, okay? I'm not afraid to do that, okay?
Q. That's one of the things that you do as an internal medicine doctor --
A. Yes, sir.
Q. -- is to recognize when you need to pass patients on to further care?
A. Yes.
Q. Let me -- let me now turn to your office note of July 26 of 2004.
A. Yes, sir.
Q. And it's page Number 14. Do you have that in front of you?
A. Yes, sir.
Q. And is this an office note that you dictated

Page 25

around that time?
A. Yes, sir.
Q. Doctor, I want to understand the opinion, if any, that you expressed in this report. So is it my understanding that this office note was prompted by the -- the July 19th encounter with Mr. Ronwin?
A. That is correct. It was after -- he wasn't present. It was after reviewing the . . .
Q. Okay. And when you said earlier "the fall," now -- now, based on this, you saw him in mid-July, and then you dictated this note maybe a week or so after that?
A. That is correct.
Q. And you told me before that you reviewed his chart.
A. Yes, sir, what was available within the VA.
Q. Okay. Now, is -- I'll have you look at the first paragraph.
A. Um-hum.
Q. It says, "I have been asked by the patient to review his medical records and some biochemical as well as some general chemical principles involving an injury to his rotator cuff." Do you remember what you reviewed?
A. Just basically what I did was, I looked at

Page 26

the -- oh, the PDR findings on -- on Baycol, and if there was anything in there that would suggest that -- you know, some type of chemical interaction. Again, I'm not a biochemist, so I was limited in that.
Plus the fact that I reviewed the information from -- that Mr. Ronwin did leave me. And some of it I understood. Some of it was outside the scope, because it had been 25 to 30 years since I've had -- it's been longer than that since I've had biochemistry. But I looked at those things. And then, again, his medical record and what had happened to him.
Q. And indeed, and the last paragraph of your note said, "However, I am willing to state now that I am neither a biochemist or an orthopedic surgeon. Also, I will state at this time there is also a possibility that this could be just a natural occurrence," correct?
A. Right.
Q. So in that paragraph were you trying to convey to the chart, as well as Mr. Ronwin, that you may not have the expertise to offer this opinion?
A. That is correct.
Q. And -- and what I need to know now is, as I understand it, after you reviewed these materials you said that, quote, It is my opinion that there is a possibility that Baycol could have contributed to his

Page 27

rotator cuff tear, correct?
A. That is right. We're talking about legal terms, because I've been down this road. You know, anything's possible in this world, okay? Now, if you want to put percentages on it, I think it's very low, okay, very low.
Q. And you've -- you've been in the courtroom before, correct?
A. Unfortunately, yes.
Q. And, Doctor, the standard that is applied is a reasonable degree of medical probability. Okay?
A. That is correct.
Q. Doctor, could you state to a reasonable degree of medical probability that Baycol contributed to his rotator cuff tear?
A. No, sir, I can't.
Q. Is the only thing that you're saying by this note that it's possible that it did?
A. It is possible.
Q. And, as you stated before, anything's possible, correct?
A. That is correct.
Q. Including the possibility that this rotator cuff tear was simply a natural occurrence?
A. That is correct.

Page 28

Q. Is it fair to say, Doctor, that you are not offering any opinions as to the cause of his rotator cuff tear?
A. That is correct.
Q. And another point of clarification, Doctor: In your second paragraph, you state that "Mr. Ronwin does have decreased range of motion in his shoulder," correct?
A. He does -- he did.
Q. And that's what he presented to you, correct?
A. Right. This was after he had his surgery, which is expected.
Q. Okay. And following a rotator cuff surgery, you would expect some decreased range of motion?
A. That is right.
Q. Based on the range of motion that you saw during your care and treatment of him, was he still -- was his left shoulder still functional?
A. Yes, but not at the level that it probably was prior to the tear, obviously.
Q. And that's -- that's really the next question that I have. You say, "I do not think that he will ever get back to the range of motion that he had prior to his repair." Okay?
A. And that's -- that's not a -- that's a poor

Page 29

statement on my part. Prior to his tear of his rotator cuff.
Q. And that's -- and that's why I wanted to bring that to your attention.
A. Yes.
Q. It does say here, "I do not think that he will ever get back to the range of motion that he had prior to his repair." You told me before that you had never evaluated or measured his range of motion before.
A. Right, I did not.
Q. And what you're telling me now is that this note should be corrected to say that it's your opinion that he will not get back to the range of motion before that rotator cuff tear was damaged?
A. Or -- or before he tore his rotator cuff.
Q. And poor question on my part. So what you're saying here is that it's your opinion that he will not regain the full range of motion that he had prior to his rotator cuff tear?
A. That is correct.
Q. Okay. And is that your experience with patients as well?
A. From my age to his age, that is correct, okay? We're not professional baseball players.
Q. And to close the loop, you have no opinion



239952f1-ecc1-4d0b-a3d3-bc2d299a1b94

Q. Yeah.
A. Okay. Now I understand.
Q. Doctor, you note, "Subjective: He returns today for follow-up. He is doing extremity well," correct?
A. Yes, sir.
Q. Anywhere in that office note does Mr. Ronwin complain about any shoulder pain?
A. Not in that note, no, sir.
Q. Go to the next note, Doctor, which is April 12th of 2005. Do you have that in front of you?
A. Yes, sir.
Q. In the Problems you note, "Returns today. Has no problems other than his claudication," correct?
A. That is correct.
Q. Is there any note in that record of continued left shoulder pain or problems?
A. No, sir.
Q. Finally, Doctor, if you'd go to your final office visit note of October of 2005 --
A. Yes, sir.
Q. -- you note, "Has ASHD. Really is doing extremely well," correct?
A. Yes, sir, according -- from his cardiovascular standpoint, yes, sir.



Q. And the ASHD refers to atherosclerotic heart disease?
A. That is correct.
Q. Is there any reference to problems with his left shoulder?
A. Not in that note, no, sir.
Q. Based on your review of these notes, is it your understanding that his left shoulder has improved over time?
A. I think it has. You know, like I said, it will never be the same as it was --
Q. I understand.
A. -- prior to the repair.
Q. I understand. But based on your review of these notes following the surgery, he has improved?
A. Right.
Q. Doctor, Mr. Ronwin asked you a series of questions about this June 26th, I believe --
A. July.
Q. -- July, thank you, 26 office note. And he -- did Mr. Ronwin ever tell you that orthopedic specialists had found on X-ray narrowing of the AC joint?
A. He may have, but I don't recall.
Q. And what I'm getting at is your comment that one possibility of his problem was the -- I think you



called it natural occurrence.
A. Yes.
Q. And what would you define as natural occurrence?
A. Oh, you know, I mean, it could be anything. But you can slip and grab -- grab ahold of something to keep from falling, and you can tear it. It can also just be repetitive use over the years. The rotator cuff is a series of muscles, cartilage, joint, and it just wears down.
Q. Is that -- is that what's commonly described as a degenerative process?
A. Yes, sir.
Q. And have -- in your clinical experience, have you seen persons of Mr. Ronwin's age who -- close to 80 years old have degenerative changes --
A. Absolutely.
Q. -- in their joints?
A. Absolutely.
Q. In their shoulders?
A. Yes, sir.
Q. And is that what you were referring to as a possibility here, that the rotator cuff tear could have just been the result of a -- of degenerative changes in his shoulder?



A. Yes, sir.
Q. And just so I'm clear, Doctor, you are not offering any opinions as to the cause of his rotator cuff surgery (sic); is that correct?
A. That is correct.
MR. PILKINGTON: Again, I thank you for your time, Doctor.
THE DEPONENT: Yes.

EXAMINATION

BY MR. RONWIN:
Q. Now, first, in our visits, do they last more than 10 or 15 minutes?
A. Oh, probably about 15 minutes on the average, yes, sir.
Q. Right. And do we go into every single aspect of my medical situation?
A. No, sir.
Q. So if we don't mention shoulders at some time, does that have any significance?
MR. PILKINGTON: Objection, form and foundation.
A. Only that you didn't mention it.
Q. (BY MR. RONWIN) I see.
A. Okay?
Q. Okay. But that would mean -- it wouldn't



239952f1-ecc1-4d0b-a3d3-bc2d299a1b94

Page 46

number would have been low.
Q. Right, very low?
A. Yes, sir.
Q. Okay. Is the basis of all -- first of all, is the basis of the structure of the human body basically molecular?
A. Yeah.
Q. In other words, we're made up of nothing pretty much but molecules; is that right?
A. Yes, sir.
Q. Okay. And is the basis really of medicine biochemical and biomolecular?
MR. PILKINGTON: Form and foundation.
A. Some of it is, yes.
Q. (BY MR. RONWIN) Now, in the training of M.D.s at the time, roughly, you were trained, and some of your colleagues --
A. Um-hum.
Q. -- was the emphasis on the training biochemical, or was it more of the anatomical type of -- of concentration?
A. I think that, to be very frank with you, neither one, okay?
Q. I see.
A. We were exposed to the biochemistry, the

Page 47

anatomical, the microbiology, the immunology, the physiology, the pharmacology, all of that within the basic sciences. But then it was the clinical presentation that we were most --
Q. Yes.
A. -- exposed to.
Q. And -- and the clinical -- these clinical aspects that you just referred to --
A. Um-hum.
Q. -- don't they cons -- do they concentrate on, basically, the outward manifestations of disease; in other words, things like fever, inflammation, et cetera --
A. Yes, sir, they do.
Q. -- rather than on the more intrinsic element of what is the molecular interaction of this compound with this body molecule that causes the inflammation, or that sort of thing?
MR. PILKINGTON: Objection, form and foundation.
A. Oh, I think that I -- I really don't think that that's the case. The unfortunate thing about medicine is that it's not as structured as everyone thinks it is. And it is -- what medical school does and what we've done is, we've been exposed to all these -- if

Page 48

you want to call them subspecialty fields of how you understand what goes on within medicine, and then the clinical part of it.
But then what you do is, you go into your training. You're exposed more and more to cases and presentations. And sometimes it's 10 years down the road before you really understand, hey, that's why they had us do all of this stuff. Okay? It's just -- it's exposure to it.
As far as sitting down and, in your case the biochemistry part of it, that, again, is -- gets into the more clinical -- not the more clinical, but the -- it's more of the research field, the teaching field --
Q. (BY MR. RONWIN) Yeah.
A. -- of medicine, and that's something that I never really got involved in.
Q. Okay.
A. But do you use certain biochemical things? On the periphery you are. But are you sitting down and looking at the biochemical reactions? No, I don't do that.
Q. Right.
A. Okay?
Q. And what I'm also trying to get at is, for example, today diseases are -- are diseases shown to be

Page 49

the cause by genetic makeup, and in terms not only of saying the gene, but the composition of the gene in terms of its chemical makeup or biochemical, because it's something to do with life?
MR. PILKINGTON: Objection, form and foundation.
A. Oh, I think that there's -- there's been literature out there about that, yes, sir.
Q. (BY MR. RONWIN) Yes. So that a gene made up of such-and-such DNA sequence is known to cause a disease nowadays, and the makeup of a change in that gene causes a different situation; is that right? Is that more common --
MR. PILKINGTON: Same objections.
Q. (BY MR. RONWIN) -- common today?
MR. PILKINGTON: Same objections.
A. I have -- I have read and been exposed to information like that, but I've never delved into --
Q. (BY MR. RONWIN) Yes. And when --
A. -- the biochemical.
Q. And when you were going to medical school, was that really a hot topic at the time, or even taken up?
MR. PILKINGTON: Same objection.
A. No, sir.