DEPOSITION OF

DR. RAUL G. REYES

IN RE: BAYCOL PRODUCTS LITIGATION

EDWARD RONWIN

VERSUS

BAYER CORPORATION

U. S. DISTRICT COURT
DISTRICT OF MINNESOTA
MDL NO. 1431
(MJD)
CASE NO. 02-200

SEPTEMBER 12, 2006 9:00 A. M.

AT THE OFFICES OF
DR. RAUL G. REYES
530 NORTH AVENUE F
CROWLEY, LOUISIANA

NAT DOUGET COURT REPORTERS
Steno and Video Reporting
P O Box 3226
3207 Landfair Street (70601)
Lake Charles, LA 70602-3226
337/480-0080 FAX 337/480-0330
800/259-9900 FAX 800/259-5672

FEB 1 2007



02/12/2007 09:14 FAX 970 224 3838 ED RONWIN 042

Page 22

A. Perhaps in some I did. Most of my task was related to getting a history from the patients and documenting their symptoms. Those that made a physical presence, I was able to make a determination as to what their potential for injury from Baycol was.
Mr. Mizgala:
Uh-huh (yes).
A. A lot of patients -- there were a few patients that I recall that had no problems whatsoever at the time that I saw them.
Mr. Mizgala:
Uh-huh (yes).
A. And a few had clinical findings. And, of course, there were some that were actually, as I recall, undergoing kidney dialysis at the time. But there were so many of them, you know, there was a great variety. And on the documentation side, the main thing was that they had taken Baycol, and they had taken it for varying periods of time, some for a few months, others longer, two or three years.
Q. Okay. Well, sir, in the -- in the Baycol MDL, part of the consolidated cases, the Federal cases, I have a record of you providing expert reports for 513 plaintiffs. Okay?

Page 23

A. Okay.
Q. And in each one of those reports, you attribute some injury to the person's Baycol use.
A. You'll have to show me the report before I can answer you specifically. I -- I do remember that in some of those instances, the -- the issue was primarily the fact that the patient had taken Baycol; but I would have to deal with each one individually, you know.
Q. Okay. But --
A. To answer your question correctly.
Q. Well, sir, when -- when people were brought in -- these Baycol users were brought in to you, what was your understanding of what you were to be doing?
A. I was going to see the person, I was going to take a history from him, and take -- find out what the symptoms might be, and then I would do an examination according to what the need was. In the majority of instances, there was no real need for a physical examination as such, except for blood pressure, pulse, or something like that.
Q. Why was there no need for a physical examination?
A. In the majority of cases, the symptoms had either disappeared or they -- they had had complaints,

Page 24

but again, I have to be specific. I would have to relate to it, and I don't have -- if I don't have those charts before me, I can't tell you.
Mr. Mizgala:
Okay.
A. I'm just vaguely recollecting the situations.
(MR. OLINDE LEAVES.)
MR. MIZGALA:
Q. So, in terms of what you were doing in these cases, what would the importance of a physical examination be?
A. If the patient had symptoms from a neurological standpoint, I would check them out. I was cognizant of the fact that with Baycol intake, the -- one of the things that do occur is the alteration of the liver profile test, which is something that is not included in a physical examination. Also, the question of the rhabdomyolysis, which is the predominant question, of course, relates to kidney damage, and therefore, that's also a laboratory test. So from my standpoint of physical examination, the heart and lungs was -- is always a basically important part if I felt that an examination was necessary at that time, you know, and I would go ahead and

Page 25

check that. And if there were any neurological symptoms, I would do a neurological examination. If there was any indication of -- of weakness or paralysis, I would try to determine what the muscular problem might be, or was it a neurological problem. But again, you know, it's very hard -- you're speaking to me in generality, and I would have to have each individual chart, because I -- I have to speak to you in generalities, and as a result, I have to be vague about it.
Q. Okay. In order to determine whether or not -- and you saw these people -- all these people you saw, it was at a time after they stopped using Baycol?
A. Definitely.
Q. Sometimes a couple of years, right?
A. Definitely.
Q. Okay. So how did you -- what did you need to do in order to come to an opinion that somebody had suffered an injury due to their Baycol use?
A. Well, again, you -- you talk to them, you know. In medicine, 85 percent of a diagnosis is based on history.
Mr. Mizgala:
Uh-huh (yes).

A. And that hasn't changed. And I don't think it will ever change. So we have to rely upon the history of the patient to a great degree, and then according to the history that we get, then we focus on a specific examination that may be necessary to determine that. Some of these people, again speaking vaguely and generally, you know, they had heart trouble, some of them serious, some of them not. Some of them had hypertension, some of it mild, some of it critical. And -- and by that I mean, that their pressure, even when I was seeing them, might have gone up to a 180 over 110 diastolic. So that's basically what -- what I was doing. I was focusing on the history of the patient to try to make a determination of what the problems were.
Mr. Mizgala:
Uh-huh (yes).
A. And that was basically my function.
Q. Okay. So, I just want -- and when you say taking a history, that's what the patient is telling you about their medical condition?
A. That is correct. Yeah.
Q. Okay. Did you go back and verify that with medical records?



A. Whenever I had medical records, I tried -- I tried to confirm that, and a lot of these patients had prior medical records. So I would say I had access to some of the documentation -- when their physician started them on Baycol and when they stopped the Baycol. Some of them took it only for a very brief period of time.
Mr. Mizgala:
Uh-huh.
A. So I had -- you know, I had those type records available to me from those patients that had records.
Q. But you were primarily relying on the history as retold by these patients, right?
A. Well, I think that every doctor has to do that. There are no exceptions.
Q. Okay. And -- and, I guess, that in some cases, you came to the conclusion, based upon what somebody told you, that they had suffered an injury due to their Baycol use?
A. Yes.
Q. Do you know what percentage that was?
A. No, I don't.
Mr. Mizgala:
Okay. I -- I know. A lot of this was a long



time ago.
Witness:
Yeah.
Q. Doctor, you've been involved in various corporations in the past?
A. Yes.
Q. Are you still involved with Trauma Clinic, Inc.?
A. Yes.
Q. Okay. And that's set up to see people involved in accidents, is that correct?
A. Primarily, yes.
Q. They get referred to you by attorneys?
A. Yes.
Q. Okay. Is that who you did your work with in the - - in the Baycol litigation through Trauma Clinic, Inc.?
A. Again, I don't know exactly -- to be very honest, I don't know how my business administrator ran that through, but I do think he ran it through Trauma Clinic.
Q. Okay. You still -- I guess International Maritime Medical Service is no longer in business, is that correct?
A. It might exist, but we're not -- it's not functioning as such. Actually, I was the Medical



Director for the National Maritime Union in New Orleans for several years, and also did work for - - seeing seamen from other steamship lines besides the National Maritime, and that -- that went on for maybe 15, 20 years.
Q. Okay. Expert Medical Advice, is that still operating?
A. Whenever someone asks me to review records, we do it under -- that firm is still functioning in the State of Louisiana. Yes.
Mr. Mizgala:
Okay.
A. But we haven't had too much activity in that regard.
Q. Okay. Any other corporations you're involved in?
A. Well, right now the new clinic that I'm forming is oriented to the Spanish-speaking population.
Q. And what is that?
A. It's going to be La Clinica, and it's going to be working out of Kenner.
Q. Okay. Now, Doctor, you said you retired as a surgeon 15, 20 years ago, is that correct?
A. Yes.
Q. Okay. And do you consider yourself a specialist in anything right now?





02/12/2007 08:15 FAX 970 224 3838 ED RONWIN 044

Page 34

A. They felt that Baycol caused the problem. My feeling, as a physician and what I have read of the situation, was that it could have caused their problem. I -- I didn't say it caused your problem period, you know.
Mr. Mizgala:
Okay.
A. But there were -- there were a lot of circumstances there where in some cases perhaps Baycol may have been contributing in a minor degree and others maybe it did not contribute, but they had taken Baycol.
Mr. Mizgala:
Okay.
A. So they -- they felt that it was due to that.
Q. So were you offering opinions to a reasonable degree of medical probability or not?
A. I was offering an opinion insofar as my deduction, and I -- I think in some of my reports, I stated patient took Baycol for such a period of time, and I think the reports are exactly on that basis, but again, I would have to look at each report individually. So my conclusions were based upon my feelings. There were some patients that had definitely felt that what -- well, from what the

Page 35

literature says, that the Baycol probably did cause the problem.
Q. Okay. And what do you mean what the literature says?
A. The literature states that people have died from taking Baycol. I read some of the information, and from the reports that I reviewed, it would seem very highly likely that it might have been due to that, because there were a few cases where rhabdomyolysis was definitely proven, and so those cases I felt it probably was related to Baycol, and then there were others that, you know, were not. There was a whole gambit, the whole rainbow of situations.
Q. There were -- there were reports of fatality secondary to rhabdo in literature, right?
A. Yes.
Q. Okay. But there weren't -- and that was usually accompanied by renal failure, right, rhabdo, renal failure --
A. Usually.
Q. -- and reports of fatality, right?
A. Yes. When was a fatality was involved, it was usually related to that.
Q. Okay. But those were reports. Their causation

Page 36

wasn't determined in every one of those, right?
A. Well, that's exactly right. I mean, that -- that was the report that I read and saw, you know. I -- I did not see any -- any death certificates.
Mr. Mizgala:
Okay.
A. So that actually -- well, maybe I did. I can't remember. Maybe I did see some death certificates.
Q. Okay. Well, that's not what we have in today's case, right? Mr. Ron -- or Dr. Ronwin is sitting there right next to you, right?
A. Yes. Uh-huh.
Q. Okay. And he didn't have rhabdo either, right?
A. As far as I know, no.
Q. Okay. No renal failure?
A. As far as I'm aware of, he hasn't.
Q. Okay. That's good. Well, why don't we turn to your report in this case.
Dr. Ronwin:
Do you have copies? I have extra.
Mr. Mizgala:
I got it. I got it.
Dr. Ronwin:
Extra copies. Okay.

Page 37

Mr. Mizgala:
I got it. Let's go ahead and mark that as Exhibit 3. Do you need one, Edward? Do you need one?
Dr. Ronwin:
No, I have three. I have three.
Mr. Mizgala:
Okay.
Dr. Ronwin:
What exhibit is that, 2?
Mr. Mizgala:
That's 3.
Dr. Ronwin:
Three? What's Exhibit 2?
Mr. Mizgala:
Exhibit 2 were --
Dr. Ronwin:
Oh, those two. I don't have a copy of that.
Mr. Mizgala:
Well, we're not going to copy it today. You can look at them after while.
Dr. Ronwin:
All right.
MR. MIZGALA:
Q Doctor, can you identify Exhibit No. 3 for the





02/12/2007 09:16 FAX 970 224 3838 ED RONWIN 045

Page 38

record?
A. All right. (Witness reviewing document.) Okay.
Q. Okay. What is it, Doctor?
A. I think that this is a report from me, with my curriculum vitae included, regarding Mr. -- Dr. Ronwin's situation.
Q. Okay. And it's dated September 7th, 2004, is that correct?
A. Yes.
Q. Okay. Did you prepare this report, Doctor?
A. It was prepared -- yes. It was prepared by me.
Q. Okay. Did you type it up, or did somebody type it up for you?
A. No, I did not type it up.
Q. Who typed it up for you?
A. One of my people that do that, the secretaries. I do think the date on the report is in my own handwriting, though.
Q. Okay. And that's your signature, right?
A. Yes.
Q. Okay. Doctor, the -- oh, yeah, it does say my fee for this review. Thanks. Thank you, Dr. Ronwin. In paragraph number two -- my fee for this review and report is Two Hundred and Fifty Dollars ($250.00). Okay. And then in paragraph three, it

Page 39

says I have reviewed Dr. Ronwin's records. Do you see that, Doctor?
A. I'm sorry?
Q. Do you see in paragraph three, the first sentence?
A. Yes, I see it.
Q. Okay. There are records attached to this report.
A. Uh-huh (yes).
Q. Is that what you're referring to there, those records that were attached?
A. I would imagine so, but I -- I would imagine that is correct.
Q. Okay. Did you ever ask Dr. Ronwin for any more records?
A. I don't -- I don't remember.
Q. And I take it he provided those records to you, correct?
A. Yes.
Q. Okay. Now, Doctor, it's clear that Dr. Ronwin suffered a rotator cuff tear, right?
A. That's correct.
Q. Is it your opinion that his use of Baycol caused that rotator cuff tear?
A. My opinion would be that considering the effects of Baycol, that it could have contributed to it.
Q. Okay. When you say "effects of Baycol," what do

Page 40

you mean?
A. I'm talking about the musculoskeletal-type of injury that it causes, that it is stated to be caused.
Q. Okay. And what -- what is that?
A. Rhabdomyolysis.
Q. Okay. And rhabdomyolysis is a syndrome involving skeletal muscle, correct?
A. That's correct.
Q. Okay. Not tendons, right?
A. That's correct.
Q. And in -- in a rotator cuff injury, what is affected or what is torn is a tendon, right?
A. Muscles and tendons, both.
Q. Doctor, are you aware of any literature suggesting that Baycol or any statin is associated with rotator cuff injuries?
A. I am not aware of any specific instances, although in the -- again, recollecting the patients that I saw, I remember there was a number of people that had rotator cuff injuries and ascribed their problem to Baycol.
Dr. Ronwin:
Let's go off the record for a minute.
(OFF THE RECORD)

Page 41

Dr. Ronwin:
Let's go back on the record.
Mr. Mizgala:
You ready?
Court Reporter:
Yes.
MR. MIZGALA:
Q. Dr. Reyes, my question was can you point me to any published medical literature that says that the use of statins and/or Baycol is associated with rotator cuff injuries?
A. I cannot provide you with that information, except what I -- what I told was a personal experience of mine. That there were a number of patients that I saw that complained of problems of that nature.
Q. Did you publish that?
A. No.
Q. Okay. That's all just your personal experiences?
A. My personal experience. Right.
Q. Nothing in the published medical literature?
A. They -- I said no. I'm not -- I'm not aware of it. I don't want to say that it doesn't exist, but I personally am not aware of it.
Mr. Mizgala:
Okay.

Page 42

A. Now I may have -- I don't know whether in -- in the reports that he sent to me that there's something to that effect, but if -- if there is, I might have forgotten it.
Q. Okay. Well, in what's attached to your report here dated September 7, 2004 --
A. Uh-huh (yes).
Q. -- you didn't attach any literature that says Baycol or any other statin is associated with rotator cuff injuries, right?
A. If I didn't attach it, then that is correct. I did not.
Q. Okay. Doctor, have you -- have you reviewed any of the depositions of the treating physicians that have been taken in this case?
A. No, I have not. No one has asked me to.
Q. Okay. Would you think that would be important before you came to a conclusion about causation?
A. Oh, I think any information is important and, you know, subject to debate.
Q. Okay. You know that Dr. Ronwin was treating with a couple of orthopedic surgeons and an orthopedist, right?
A. Yes.
Q. But you haven't read their -- their depositions?

Page 43

A. No, I have not.
Q. So you don't know what their feelings are with respect to Baycol and its role in Mr. Ronwin's rotator cuff injury?
A. I do not.
Q. Okay. So you -- you said that the -- because of the effects of Baycol, it could have contributed. What do you mean that it could have contributed to his rotator cuff injury?
A. Well, as I have stated, I think in a rotator cuff injury, there's more damage. There's also -- there's muscle -- there's muscle damage also, and under those conditions, that's a possibility, but, you know, that -- that's just my -- my opinion.
Q. Was there any indication of muscle damage in Mr. Ronwin?
A. He had the rotator cuff injury.
Q. But he had -- yeah, and he had a -- but the surrounding musculature was intact, wasn't it?
A. I -- I wasn't there at the time of surgery. I don't know exactly what -- what happened, you know.
Q. Well, you reviewed his records. Both Dr. Knauer--
A. Well, he couldn't have a rotator cuff injury and have the -- the structure intact.

Page 44

Q. Are you saying there's muscle inside the -- inside the -- do you know which tendon ruptured?
A. I know which tendon it is. Yeah.
Q. Which one was it?
Witness:
Do we have the MRI report in here?
Dr. Ronwin:
No, sir. Let me just add for the record that it was the supraspinatus.
Mr. Mizgala:
Doctor, I -- please, not your deposition.
Dr. Ronwin:
I know it isn't.
Mr. Mizgala:
Don't interrupt anymore.
Dr. Ronwin:
I won't.
Mr. Mizgala:
Don't interrupt anymore.
Dr. Ronwin:
I won't.
Mr. Mizgala:
It's his deposition, Doctor.
A. I'm looking for the operative report. I can't find it so far.

Page 45

MR. MIZGALA:
Q. Doctor, did you do anything to prepare for today's deposition?
A. Yes.
Q. What did you do?
A. Well, I certainly did not -- could not review Mr. -- Dr. Ronwin's report, because I did not have it. But I reviewed again my PDR and the Merck manual and the other papers that I had in hand.
Q. Exhibit 2, the other documents that you brought today.
A. Yes, I reviewed those.
Q. Do those -- do those say anything about Baycol and rotator cuff injuries?
A. They don't address the issue of rotator cuff, the ones that I saw.
Q. Okay. Did the Merck manual say anything about Baycol, statins, and rotator cuff injuries?
A. Let's see. (looking at documents) Is the operative report in here?
Q. Why would that be important to you?
A. Because I want to see exactly what the doctor said about the damage to the rotator cuff area. You know, the supraspinatus is a muscle, you know.
Dr. Ronwin:





02/12/2007 09:18 FAX 970 224 3838 ED RONWIN 001

Page 46

Is that the operative report that you're looking for?
Witness:
Yes.
Dr. Ronwin:
It's right here.
Witness:
Okay.
DR. Ronwin:
It's part of what you have. You can use mine. This is exact.
A. I'm trying to address the question that you asked me. If you'll notice here, the patient was found to have what is -- on the first page of the operative report in the last paragraph, the patient was found to with inspection have an intact biceps tendon to palpation, and also was noted to have a full thickness rotator cuff tear, which had pulled away, leaving inadequate soft tissue stump for repair, involving essentially the full aspect of the supraspinatus. That is a muscle.
MR. MIZGALA:
Q. Okay. It's your testimony that the supraspinatus is a muscle and not a tendon?

Page 47

A. The supraspinatus is a muscle.
Q. Okay. And -- and, Doctor, the -- if Baycol was involved, why would it only effect this one, as you call it, muscle?
A. I -- I don't have -- I cannot answer your question in that regard, but all I can -- generally speaking, it is stated that Baycol affects muscles, and you know, at the time that I started seeing these patients, I didn't know what Baycol could or could not do. But I do remember, like I mentioned before, that I was surprised to see so many patients, relatively speaking, that had shoulder problems. So if Baycol can affect all the muscles in the body, then the question is can Baycol effect a group of muscles. Does it make the patient more prone to develop an injury like a shoulder injury, which is so common. And that's the question mark. I don't know.
Q. Doctor, should injuries are common in people in general, aren't they?
A. Well, they do --
Q. Especially older people?
A. They do occur. Yes. They do occur, especially in older people that have a tendency to perhaps do more than they should be doing.

Page 48

Q. Okay. Dr. Ronwin had a right rotator cuff tear years before he ever took Baycol, right?
A. Yeah. I believe that that is so.
Q. Okay. So Baycol didn't have anything to do with that one, right?
A. Obviously not.
Mr. Mizgala:
Okay.
A. He wasn't taking it.
Q. And age and degeneration can precipitate rotator cuff tears, correct?
A. That's correct.
Q. Dr. Ronwin has degenerative changes in his -- in his shoulders, right?
A. That's correct.
Q. He's got osteoarthritis, right?
A. Right.
Q. Degenerative joint disease, right?
A. That is correct.
Q. He had degenerative changes in his left shoulder, correct?
A. Right.
Q. And that could fully explain his rotator cuff injury, right?
A. It could.

Page 49

Q. Baycol might have had nothing to do with this, right?
A. Maybe.
Q. Can you say one way or the other?
A. No, I can't. Well, I can say that there is a probability that it could have contributed to the problem.
Q. Well, aren't you --
A. It might have accelerated it, it may have not.
Q. Aren't you really saying, Doctor, there's a possibility?
A. That's correct.
Mr. Mizgala:
Okay.
Witness:
Again, semantics, you know, possibility, probability.
Mr. Mizgala:
Well, unfortunately, we're in -- we're in the legal community, Doctor, and that's why we're here.
Witness:
Yeah. Okay. Well, I like to -- I like to fool with the English language in a little bit different manner, but I understand your

Page 50

point of view.

Q. Doctor, what's your understanding of when Dr. Ronwin started taking Baycol?

A. My report states that Dr. Ronwin commenced taking Baycol on January the 10th, 2001, from samples provided to him by his cardiologist's office.

Mr. Mizgala:
Okay.

A. And that about a month later, his shoulder, left shoulder, began to give him pain.

Q. Okay. So, is it -- is it because of that timing that you even consider Baycol to be a possibility, is -- is that he started taking Baycol, and then he had the shoulder problems?

A. You know, obviously, if people had not developed rhabdomyolysis, the whole Baycol problem might not have come up. I don't know. But once a problem like this comes up, then my feeling is that most everybody is on equal terms about speculating what can happen in the future, and I don't know what Baycol did to a lot of people. I don't know what Baycol can do to a lot of people. I do know that there are risks involving in taking Baycol, so that's why Baycol was taken off the market. So, all I'm saying is that he was exposed to a

Page 51

substance that was proven to be bad, and what's going to happen to all these people, I don't know, and nobody -- and nobody, being a doctor at his practice for 56 years, there are no experts in the matter to be 100 percent absolute. I think all one can do is render an opinion.

Q. Okay. But, Doctor, we agreed awhile ago that Mr. Ronwin never had -- Dr. Ronwin, excuse me, never had rhabdo, right?

A. Right. Yes.

Q. Okay. But I'm just saying -- you said he started taking Baycol on January 10th.

A. Uh-huh (yes).

Q. And then a month later, he developed shoulder pain?

A. Right. That's what he said.

Q. Okay. So the only reason you considered Baycol -- if he had developed shoulder pain before, you wouldn't have attributed it to the Baycol, right?

A. That's correct. I would not.

Q. Okay. So it's the temporal relationship between those two events?

A. Well, it's the recognition of a toxic substance with the development of a problem for an individual that he strongly feels injured him.

Page 52

Mr. Mizgala:
Okay.

Q. But --

A. And that's the way I have to look at it as a physician. It seems to me the burden of proof is more on the other side than on his side, especially if there is strong clinical evidence and strong laboratory evidence that damage has occurred.

Q. Well, Doctor, you agreed that there -- well, you agreed earlier that there are other reasons that rotator cuff injuries can take place, right?

A. Oh, definitely. And Baycol is not the most -- the predominant problem. I mean, most of the trauma occurs in young individuals who do heavy laboring work, and who have never taken Baycol in their life.

Q. Right. And also in older people due to repetitive movements?

A. Definitely.

Q. Right? And degeneration?

A. Yes.

Q. Especially in the AC joint?

A. That can happen.

Q. Right. And that's what Dr. Ronwin has,

Page 53

degeneration in his AC joint?

A. He has arthritis.

Mr. Mizgala:
Right.

A. Yeah.

Q. And that was Dr. Knauer's significant finding in March of 2001, that he had degeneration in that joint?

A. Uh-huh (yes).

Q. Correct?

A. Well, if that's what he said, then, you know, obviously, you know.

Q. That's what she said?

A. Or she said. Um-hum.

Q. So, you still have to rule out other potential causes, right?

A. Without a doubt.

Mr. Mizgala:.
Okay.

A. And remember what -- that what I have said is that it may have contributed.

Q. Okay. And you said -- you mentioned Dr. Ronwin's strong feelings about Baycol causing him injury. What importance is that to your decision making?

A. Well, I think all of us whenever we have a

Page 54

problem, we have to look at the situation and say, you know, I fainted. I fainted after I took a Vicodin 20 minutes ago. Well, that's a cause and effect relationship, and who's to say that that person fainted because she took the Vicodin, or because she was going to pass out because she had a problem, maybe a new sick -- an illness coming up. But that person had never fainted before in her life, so these issues keep cropping up all the time in -- in relationship to what people do when they take -- when they do things. So he apparently did not feel that he had a problem to a great degree with his shoulder, and he -- and my interpretation of his story is that the Baycol precipitated a rotator cuff injury. That's my understanding of it. Now maybe he feels that it caused it. I -- I don't know. Again, it's something that I would only be speculating to say that it caused it. I -- I do feel that if it didn't cause it, it probably contributed to it.
Q. Okay. The -- you also have in paragraph seven on the second page of your report --
A. Uh-huh (yes).
Q. -- you have the other problems that Dr. Ronwin related to you, blurred vision, tendency to

Page 55

stumble, inadvertently moving one leg. There's a whole slew of them.
A. Uh-huh (yes).
Q. And you say all of these symptoms may be related to his ingestion of Baycol.
A. Uh-huh (yes).
Q. Is that the same sort of "it's possible" opinion?
A. Well, the PDR mentions these things as possible problems related to Baycol, so --
Reporter:
Excuse me. One moment.
Mr. Mizgala:
Hold on -- hold on, Doctor. She needs to change the tape.
(Reporter changes tape.)
MR. MIZGALA:
Q. Okay. I think you said the PDR mentions these as possible problems related to Baycol? Were you done, Doctor?
A. Yes. That's correct. Uh-huh (yes).
Q. Well, you know, I looked through the medical records that you had attached, and I don't see a mention of any of those during the time he was on Baycol.
A. Well, I didn't get this history from the air, you

Page 56

know. Somehow or another it must have been provided.
Q. Well, that's what he told you, right?
A. Right. Uh-huh (yes).
Q. Did you look to verify if that was in any of the medical records?
A. I -- I reviewed the medical records, so I'm sure that --
Q. Well --
A. -- that, you know, if they're -- if they're there, I don't -- we can review them now, if you wish, but at the time, this is the -- the history that I had.
Q. Right. I looked through the medical records from March until August 8th of 2001, and I don't see any of those complaints listed in the medical records.
A. All right. Do you want me to take a look through them?
Q. Go right ahead.
A. Okay. (Witness reviewing medical records.) As I review the medical history here, I see that he was having some digestive problems, which were attended to by the utilization of Naproxin.
Q. Well, that was attributed to his use of Naproxin,

Page 57

right?
A. Apparently so, yes.
Q. Okay. Not to his use of Baycol?
A. Yeah, to the -- no. That was -- I'm -- I'm just reading the --
Mr. Mizgala:
Okay.
A. -- the significant medical history --
Mr. Mizgala:
Okay.
A. -- as I go along here.
Mr. Mizgala:
Okay.
A. On the rec -- from the records that you have here.
Q. Okay. Those are the records you have, right?
A. The records that are here. Yes.
Dr. Ronwin:
Let's just shorten this thing. I'm -- going off the record for a moment.
MR. Mizgala:
No, no, no, no. No. Dr. Ronwin, I don't want you interfering with the witness.
Dr. Ronwin:
I'm -- I'm going to talk to the witness if I want to.





02/12/2007 09:20 FAX 970 224 3838 ED RONWIN 004

Q. But do you see quotation marks in his handwriting?
Mr. Mizgala:
Objection to form.
A. I don't see it in this -- in the records you -- that you have shown me.
Witness:
Could there be any other --
Dr. Ronwin:
No. That's all he furnished me.
A. I don't see any quotation marks here.
Q. All right. There was also a question about Ronwin not telling some of these M.D.s that he saw with regard to his pain about what sort of -- what sort of pain he did have, like blurred vision, et cetera, is that right? We had that --
A. Come again with the question.
Q. There was also a reference here about Dr. Ronwin not telling these various physicians that he's seen, Dr. Torkelson -- well, we can't say Surrey -- and Dr. Knauer, that he was exhibiting various types of pain as a result of taking Baycol. Would it be expected that -- that on seeing an orthopedic surgeon for the sole purpose of getting a cortisone shot, that necessarily all of these symptoms would be related to that -- that



orthopedic surgeon?
Mr. Mizgala:
Objection to form and foundation. Calls for speculation.
A. I would presume that if a patient is needing cortisone injection, that it would be to attend to a problem that would merit it.
DR. RONWIN:
Q. Yes. So if you -- if the patient came up and told the orthopedic surgeon, "My shoulder hurts and I think I need a cortisone shot to see if we can relieve the pain," that would be reasonable, is that right?
A. Yes.
Mr. Mizgala:
Objection to form and foundation.
DR. RONWIN:
Q. But would -- would the patient necessarily start talking about pain in the back of the thighs?
Mr. Mizgala:
Objection to form and foundation.
A. I think most patients are problem oriented, and that the -- the patient would discuss with the doctor the thing that was bothering the most at that time. I would not expect the patient to



obviously volunteer --
DR. RONWIN:
Q. Every single --
A. -- the other factor unless, you know, it -- but when you're having pain in your shoulder, that usually is pretty bad, and you forget about everything else.
Q. Right. All right. Now -- we had Exhibit 2 -- well, first, was surgery one of your specialties?
A. Yes.
Q. All right. And --
A. I'm a Board certified general surgeon.
Q. Right. A Board certified general surgeon?
A. Board certified general surgeon.
Q. Right. But that would include orthopedic surgery, would it not?
A. Not necessarily. Actually, I'm one of a few general surgeons that, at least in the New Orleans area. I think there were only three of us that practiced orthopedics and were accepted in our hospitals by orthopedic surgeons as being capable of doing orthopedic surgery.
Q. I see. Now is your curriculum vitae a part of the medical report that you wrote on Ronwin?
A. I submitted my curriculum vitae.



Q. It's in the report, is that right?
A. I presume so. Yes. I've seen it in this report. Yes.
Q. Right. And are you a member of the American College of Surgeons?
A. Yes.
Q. And is it correct you -- that you stated that you've been doing that for about 56 years?
A. I have been a doctor for 56 years.
Q. How long did you do surgery approximately?
A. Well, I finished my surgical training in 1956, if I remember correctly, so would that would make it 50 years.
Q. Fifty years?
A. Yes.
Q. And according to your curriculum vitae, did you perform approximately 10,000 surgeries during your medical -- active medical life as a surgeon?
A. Twenty. Twenty thousand.
Q. Twenty thousand. I see. And did you supervise residents --
A. Yes.
Q. -- on surgery?
A. Yes.
Q. And about how many operations did you supervise?





02/12/2007 09:20 FAX 970 224 3838 ED RONWIN 005

Page 98

A. Oh, a significant amount. I don't -- if I bunch them altogether, I think that -- you know, I was associated with Louisiana State University Medical School for 30 years or so, and during that time, I had a ward under my supervision at Charity Hospital of 12 beds, and at the same time, I had an orthopedic service of 40 beds, so I was -- I would donate about one day a week --
Dr. Ronwin:
I see.
A. -- to the school of medicine.
Q. When you supervised these residents were you actually present at --
A. Yes.
Q. -- at their surgeries?
A. Yes. I was -- I was in with them in surgery and supervised their surgery.
Q. What -- surgery would basically involve -- to do surgery, it would involve basically a very good -- a very good anal -- a very good background in the general anatomy of the human body?
A. I think a surgeon has to know anatomy better than most physicians.
Q. Yeah. Would that include the anatomy of the human shoulder?

Page 99

A. Yes.
Q. I see. Let me ask you this. You indicated some -- that you've been given some materials from me such as in your report. Do you feel that you could make an expert judgment by reviewing medical records without seeing the patient of -- by whom the medical records are made?
Mr. Mizgala:
Objection to form.
A. It depends upon what I'm asked to be expert about. Like I've testified, you know, this -- in surgery, I consider that I can render that opinion as an expert opinion in practically every -- every patient that has had surgery, the work that I'm familiar with.
DR. RONWIN:
Q. Yes. All right. On your report -- oh, when you composed that report, which is Exhibit 2 in this deposition, were you under coercion or was that a matter of your own free will?
A. I did it on my own free will.
Q. And on paragraph six of the report, which is in the first two or three pages, was the part you actually wrote?
A. Yes.

Page 100

Q. Did you conclude, "That there is a high probability that this injury was caused by Baycol ingestion for a period of seven months?"
A. I think that's what I stated in my report, and I have no reason to backtrack on it.
Q. And is the injury to which you refer, Ronwin's left shoulder, rotator cuff tear?
A. That's what was described to me.
Q. And as to paragraph seven in your report, did you conclude, "That the occasional blurring of vision and pain in the back of thighs and both legs may be symptoms related to Ronwin's ingestion of Baycol?"
Mr. Mizgala:
Objection, form.
A. That's what the report states, and I will stand by it.
Dr. Ronwin:
I'd like to get -- okay. I'm going to have this marked as Exhibit --
Reporter:
Six.
Dr. Ronwin:
-- 6. And here's a copy for you, and that's for me, and that's for Exhibit 6. Okay. Let

Page 101

me just drop that on your table for a minute, Doctor. What is marked -- let's go off the record for a second.
(OFF THE RECORD)
DR. RONWIN:
Q. I have here a shortened version of this Exhibit-6. In order to hasten this matter, I put in these hyphens, you understand?
A. Um-hum. I'm paying attention.
Dr. Ronwin:
Okay. So that when I say "turn to page one, please" and he turns to page one, I don't have to say "look at Item 20, and then he has to start counting down to 20. You understand?
Mr. Mizgala:
I understand.
Dr. Ronwin:
You want that marked as an exhibit, too?
Mr. Mizgala:
Well, yeah, why don't you just mark both.
Dr. Ronwin:
All right. I'll mark this as an exhibit, too, and this will hasten the matter. Here's your copy of that. I'll mark my copy here.





02/12/2007 09:21 FAX 970 224 3838 ED RONWIN 006

Page 98

A. Oh, a significant amount. I don't -- if I bunch them altogether, I think that -- you know, I was associated with Louisiana State University Medical School for 30 years or so, and during that time, I had a ward under my supervision at Charity Hospital of 12 beds, and at the same time, I had an orthopedic service of 40 beds, so I was -- I would donate about one day a week --
Dr. Ronwin:
I see.
A. -- to the school of medicine.
Q. When you supervised these residents were you actually present at --
A. Yes.
Q. -- at their surgeries?
A. Yes. I was -- I was in with them in surgery and supervised their surgery.
Q. What -- surgery would basically involve -- to do surgery, it would involve basically a very good -- a very good anal -- a very good background in the general anatomy of the human body?
A. I think a surgeon has to know anatomy better than most physicians.
Q. Yeah. Would that include the anatomy of the human shoulder?

Page 99

A. Yes.
Q. I see. Let me ask you this. You indicated some -- that you've been given some materials from me such as in your report. Do you feel that you could make an expert judgment by reviewing medical records without seeing the patient of -- by whom the medical records are made?
Mr. Mizgala:
Objection to form.
A. It depends upon what I'm asked to be expert about. Like I've testified, you know, this -- in surgery, I consider that I can render that opinion as an expert opinion in practically every -- every patient that has had surgery, the work that I'm familiar with.
DR. RONWIN:
Q. Yes. All right. On your report -- oh, when you composed that report, which is Exhibit 2 in this deposition, were you under coercion or was that a matter of your own free will?
A. I did it on my own free will.
Q. And on paragraph six of the report, which is in the first two or three pages, was the part you actually wrote?
A. Yes.

Page 100

Q. Did you conclude, "That there is a high probability that this injury was caused by Baycol ingestion for a period of seven months?"
A. I think that's what I stated in my report, and I have no reason to backtrack on it.
Q. And is the injury to which you refer, Ronwin's left shoulder, rotator cuff tear?
A. That's what was described to me.
Q. And as to paragraph seven in your report, did you conclude, "That the occasional blurring of vision and pain in the back of thighs and both legs may be symptoms related to Ronwin's ingestion of Baycol?"
Mr. Mizgala:
Objection, form.
A. That's what the report states, and I will stand by it.
Dr. Ronwin:
I'd like to get -- okay. I'm going to have this marked as Exhibit --
Reporter:
Six.
Dr. Ronwin:
-- 6. And here's a copy for you, and that's for me, and that's for Exhibit 6. Okay. Let

Page 101

me just drop that on your table for a minute, Doctor. What is marked -- let's go off the record for a second.
(OFF THE RECORD)
DR. RONWIN:
Q. I have here a shortened version of this Exhibit-6. In order to hasten this matter, I put in these hyphens, you understand?
A. Um-hum. I'm paying attention.
Dr. Ronwin:
Okay. So that when I say "turn to page one, please" and he turns to page one, I don't have to say "look at Item 20, and then he has to start counting down to 20. You understand?
Mr. Mizgala:
I understand.
Dr. Ronwin:
You want that marked as an exhibit, too?
Mr. Mizgala:
Well, yeah, why don't you just mark both.
Dr. Ronwin:
All right. I'll mark this as an exhibit, too, and this will hasten the matter. Here's your copy of that. I'll mark my copy here.

Page 102

DR. RONWIN:
Q. I'm showing you, Doctor, this Exhibit 6, can you tell us what that document is?
Mr. Mizgala:
I'm going to object to the introduction of this document on the basis of hearsay and also on the fact that the doctor testified earlier that he did not receive -- or, although he may have received, he did not review or rely upon this document for his opinions in this case.
Dr. Ronwin:
I want to point out for the record that I have a certified copy of this Exhibit 6 from the Food and Drug Administration. I did not bring the copy with me, but it is -- it is present and will be used at trial.
Mr. Mizgala:
Same objection.
Dr. Ronwin:
All right.
DR. RONWIN:
Q. Now what is that document?
A. You have submitted to me a document that's labeled Adverse Event Reporting System.

Page 103

Dr. Ronwin:
Yeah.
A. Freedom of Information Report.
Q. Right. And from whom is that document given?
A. FDA.
Q. And that is the Food and Drug Administration?
A. Yes.
Q. Are -- are you familiar with Adverse Event reports?
A. Somewhat. I presume that this where the PDR gets the information.
Q. Right. And do you -- do you know if Adverse Event reports are reliable?
Mr. Mizgala:
Objection to form.
A. I would presume that they're distributed to the medical community by a government agency. Under - - under that assumption, I would have no reason to consider them unreliable.
DR. RONWIN:
Q. Well, would you think that the FDA would be collecting these reports if they were of no value?
Mr. Mizgala:
Objection to form.
A. I -- I don't they would be collecting this

Page 104

information. I think that it's probably significantly -- of significant value.
DR. RONWIN:
Q. All right. Now let's turn to Exhibit 7, and that's this short one here.
A. Uh-huh (yes).
Dr. Ronwin:
For the record, this is simply a short -- shortened form of just the six pages, first six pages of the Adverse Event reports in this overall report, which has been marked Exhibit 6. And it includes however, the first page and the last page, which is page 48.
Dr. Ronwin:
And the reason for that is I'll ask you to turn to page one of the -- of Exhibit 7, and when you -- when I ask for an item, you won't have to count, because I will tend to go in order, or I'll indicate how far from the hyphen, the first hyphen it is.
Witness:
I see.
Dr. Ronwin:
So as to page one, would you look at item

Page 105

12 -- that's on this page, 12. Item 12, which if you look at the first item -- hyphen on your left-hand side, that -- you've got to go up two.
Witness:
You're talking about nervous system disorder?
Dr. Ronwin:
Well, that's 14, then go up two.
Witness:
Go up two?
Dr. Ronwin:
Yeah. And there's a hyphen there.
Witness:
Pain and --
Dr. Ronwin:
Yes.
Witness:
I don't -- I don't have a hyphen on that one.
Dr. Ronwin:
Right.
Witness:
That would be pain in extremity?
Dr. Ronwin:
Right.
Witness:





02/12/2007 09:22 FAX 970 224 3838 ED RONWIN 008

Page 110

Mr. Mizgala:
Objection to form.
DR. RONWIN:
Q. Right. Look at the next item, item 10 -- no, that's on the same page, page three.
A. Same page?
Q. Yes. Page three, item 10.
A. Yeah. Arthropathy.
Q. Yes. What is arthropathy?
A. That means diseases of the joints.
Q. Of the joints?
A. Uh-huh (yes).
Q. Would that be a joint like the rotator cuff?
A. Primarily, it's talking about injury to cartilage and the bone.
Dr. Ronwin:
Cartilage, yes.
A. And the bone surrounding the cartilage.
Q. Right. And is a rotator cuff tear made of cartilage?
A. There's -- the shoulder girdle is involved and the shoulder in a cuff tear, so it does involve cartilage.
Q. Okay. And so would this indicate that Baycol can attack a rotator cuff?

Page 111

Mr. Mizgala:
Objection to form.
A. There's a 105 count, 0.5 percent.
DR. RONWIN:
Q. Yes, but would that indicate that Baycol can --
Mr. Mizgala:
Same objection.
A. That's the FDA figures. It does indicate so.
DR. RONWIN:
Q. Okay. And then let's look at page four, the item -- let's see that number is 16. Could you read that one?
A. Visual acuity reduced 63, 0.3 percent.
Q. Does that indicate that Baycol can again attack the visual acuity?
A. Yes.
Mr. Mizgala:
Objection to form.
DR. RONWIN:
Q. All right. Let's go to page five, please, and item 33, where the hyphen is, the first hyphen would be.
A. Uh-huh (yes). Tendon disorder.
Q. Yes. And how many?
A. Forty, 0.2 percent.

Page 112

Q. So would that indicate to you that Baycol can attack tendons?
A. Yes.
Mr. Mizgala:
Objection to form.
DR. RONWIN:
Q. And item 44.
A. Polyneuropathy, 39, 0.2 percent.
Q. Would that indicate again that Baycol can attack nerves?
A. Yes.
Mr. Mizgala:
Objection to form.
DR. RONWIN:
Q. And then page six, would you look at item 6.
A. Bursitis.
Dr. Ronwin:
Yes.
A. Thirty-five, 0.2 percent.
Q. Yes. And is there a bursa in the shoulder?
A. Yes.
Q. What is the name of that bursa, Doctor?
A. There is a sub-acromion bursa, and there are other -- other bursa around that I cannot recall their name. You got me, but I know there's a

Page 113

subacromial bursa.
Q. Yeah. And does the subacromial bursa sit right above the rotator cuff?
A. It -- it sits right above the glenoid fossa, more or less.
Q. Yes. And --
A. And then there's the capsule of the joint itself.
Q. Yes. All right. And then let's look at the next item and it's item 15.
A. That's rotator cuff syndrome, 84, 0.2.
Q. Would that indicate to you that Baycol can attack rotator cuffs?
Mr. Mizgala:
Objection to form.
A. That's what the FDA says.
DR. RONWIN:
Q. Yes, sir. Now the next item.
A. Tendon rupture.
Dr. Ronwin:
Yes.
A. Thirty-four, 0.2 percent.
Q. Now is the rotator cuff a tendon?
A. Yes.
Q. And so would that --
A. Well, let -- let me say that's part of it, you

Page 114

know.
Q. Yes. And if you rupture a tendon, are you not tearing it?
A. Yes. You're tearing it completely most of it -- well, no, you can -- you can -- you can tear it longitudinally considerably, rupture it.
Q. Yes. And then would you look at item 19.
A. Eye disorder.
Dr. Ronwin:
Yes.
A. Thirty-three, 0.2 percent.
Q. Yes. And so would that again indicate that Baycol can attack vision?
A. Yes.
Mr. Mizgala:
Objection to form.
DR. RONWIN:
Q. And then the last one is item 40 -- the last one on the bottom, not the very bottom, but the one that's marked with the hyphen.
A. Diabetic neuropathy.
Dr. Ronwin:
Yes.
A. Thirty-nine, 0.1 percent.
Q. And would that indicate again that Baycol can

Page 115

attack the nerve system?
Mr. Mizgala:
Objection to form.
A. Yes. That's what the FDA says.
DR. RONWIN:
Q. Okay. Now -- let's see. Now, so if Bayer in this litigation promoted the idea that only nerves were attached by Baycol, in other words rhabdomyolysis or myopathy of various kinds, would that be contrary to this report from the FDA?
Mr. Mizgala:
Objection to form.
A. Well, I -- I think the report implicates a variety of systems, not just necessarily limited to the musculoskeletal system, which is what I pointed out initially.
DR. RONWIN:
Q. Well, generally from your own background as a scientist and a medical doctor as a scientist, would you anticipate that if muscles are attacked by a drug of any kind that there's -- that it's not unreasonable that such a drug could also attack nerves?
Mr. Mizgala:
Objection to form, foundation. It calls for

Page 116

speculation.
A. I think if a -- a substance is toxic to the body, I would say that in most probability that substance will attack perhaps specific organs, but my feeling as a physician would be that that substance would attack -- has the capability of attacking every cell of the body.
DR. RONWIN:
Q. Of the body. Yes. Is collagen -- is the protein in collagen a major structural component of human anatomy?
A. Very definitely.
Q. And is -- is cartilage -- does cartilage consist of about 50 percent collagen?
A. I do not recall the figure, but I do know it has substantial composition with cartilage. Yes.
Q. And are tendons composed essentially of cartilage?
A. Yes. They are composed essentially of cartilage.
Dr. Ronwin:
All right.
Witness:
I'm sorry. Did you say tendons?
Dr. Ronwin:
Tendons.
A. Well, no. Tendons are mostly fibrous tissue.

Page 117

They don't have cartilage by them -- in themselves. It's mostly a very thick fibrous tissue, which is collagenous.
Dr. Ronwin:
Yes.
A. Yeah.
Q. But it has tissue. Does it -- does it have collagen in it?
A. That's what I said. It has collagen. I think your thought -- I thought you had said cartilage.
Q. Yes. Well --
A. And -- and the cartilage is a minor component perhaps at the end of the tendon.
Dr. Ronwin:
Oh, I see. All right.
A. But the tendon is mostly collagenous fibrous tissue.
Q. So in the rotator cuff, collagen is one of the supporting elements, is that right?
A. That is correct.
Dr. Ronwin:
Now let's take a look at the next exhibit. I only have one of these. This is Exhibit 3 -- no, not 3.
REPORTER:

Page 118

Eight.
Dr. Ronwin:
Eight. Now here's the thing. I want to ask about this. I want to get copies of these subsequent, all right? So I'd like to take it back with me. Do you have an objection to that?
Mr. Mizgala:
Yeah.
Dr. Ronwin:
Well, we need to get copies of these, because I want to use them at trial, if we have a trial, and I didn't have time to get the copies of these.
Mr. Mizgala:
Well, the court reporter -- can you have copies made?
REPORTER:
That's a good question. I was thinking maybe we could check with the hospital and see --
Dr. Ronwin:
Oh, you can get them in the hospital, but this one -- there's only one film.
REPORTER:
No. We'll have to see if they're willing to.

Page 119

Dr. Ronwin:
Only one film.
WITNESS:
We can call American Legion for you and find out.
REPORTER:
Yeah. Why don't you -- why don't y'all call American Legion and see before you all leave or whatever?
WITNESS:
Let me -- I'll have Marilyn do the work right now and see.
(OFF THE RECORD)
DR. RONWIN:
Q. Dr. Reyes, could you tell me what that is, please?
A. This is an x-ray of your shoulder.
Q. You mean Ronwin's shoulder?
A. Ronwin's shoulder.
Q. Yes. Let me ask you this. Is that a -- is that a full size of my shoulder?
A. Yes.
Q. Now in your medical career, Doctor, approximately how many X-ray films of parts of the human anatomy have you read?
A. Well --

Page 120

Q. Well, let me make a suggestion. Would it be tens of thousands?
A. Yes. It would be in the thousands.
Q. In the thousands?
A. Yes. In the high thousands, close to 100, 200, something like that.
Q. And do you believe that you're essentially as qualified to read an X-ray of any part of the human anatomy as most radiologists?
Mr. Mizgala:
Objection to form.
A. Well, I'm pretty good. You know, they do this for a living, but sometimes their eyes get tired, and I pick up some things that they miss.
Dr. Ronwin:
I see.
A. Just like -- I don't consider myself as good as they are, but I'm pretty good.
Dr. Ronwin:
Okay. All right. Let me show you what has been a drawing here in which I got out and we can talk about this drawing. Let's mark this please as Exhibit 9.
DR. RONWIN:
Q. This is Exhibit 9. Doctor, is that a reasonable

Page 121

depiction of the human shoulder?
A. I'll accept it.
Q. You'll accept it. All right. So we could name things, in order words, from it.
A. Uh-huh (yes).
Q. All right. Let's put that one aside for a minute. And now would you look at the date? Does it have on there the date of the X-ray? I believe it does.
A. This is dated May the 12th, 2003.
Q. Yes. And are you aware that that was prior to the rotator cuff repair?
A. If you say so.
Q. Yes. Well, it's in your -- it's in your report.
A. Yes. Okay.
Q. In the report.
A. Right.
Dr. Ronwin:
Now let's turn to this exhibit.
(Dr. Reyes' secretary enters the room.)
SECRETARY (Marilyn):
That'll be Eighteen Fifty ($18.50) per copy, and they're going to call me as soon as they're able to do it.
Dr. Ronwin:

Page 122

All right. Okay. Thank you. Let's turn to this Exhibit 7 now and do something with my ruler here. Did you see my ruler?
Mr. Mizgala:
It's underneath.
Dr. Ronwin:
Oh, it's underneath.
Witness:
Well, you had it. Underneath.
Dr. Ronwin:
It was right there. What happened to the ruler? Oh, here it is. Okay. Now for the record, this is a ruler that's marked off both in inches and in millimeters. And we are going to make some measurements in millimeters. Okay. It's a little hard to do, but would you come over here, please, Jim, so you can see?
Witness:
Would you like to go by a view box maybe?
Dr. Ronwin:
Yes. Could we do that? Oh, but she's (indicating reporter) not by a view box.
Witness:
Let me see if I can bring it over here.

Page 123

Dr. Ronwin:
Okay. We just put that up like this.
Witness:
Yes. Just stick it on there.
Dr. Ronwin:
Oh, I see. Okay. Great. Now, Jim, do you want to come over and take a look while we make some measurements?
DR. RONWIN:
Q. Now is this item here (indicating) the acromion?
A. Yes.
Q. And is this the humerus?
A. Yes. That's the humeral --
Q. Now since that ruler is longer, we'll go from this side. Let's do the 29 right here at the bottom. Okay? And we go to the humerus, and we get approximately nine -- nine millimeters in that case; is that right? This is 29, down to 28, and this is divided into millimeters, the little -- little ones.
A. Okay.
Q. So that's approximately nine millimeters?
Witness:
Is this a centimeters ruler? Yeah.
Dr. Ronwin:

Page 124

No. It's millimeters.
Witness:
You're on the centimeter side.
Dr. Ronwin:
Yeah. Right.
Witness:
All right.
Q. And then if we go here, we have approximately even -- even more. We've got 9.5 millimeters; is that right?
A. Uh-huh (yes).
Mr. Mizgala:
I'll object to form.
Dr. Ronwin:
What did you say?
Mr. Mizgala:
I'm going to object to form.
Dr. Ronwin:
You can object all you want to.
DR. RONWIN:
Q. Okay. Now there's one other thing I wanted to measure. Do these look like spurs to you?
A. That's the accentuated changes in the bones. Those are degenerative changes.
Q. Yes. And would you measure this since I'm

Page 125

measuring it to there to -- well, let's see, to this point going down straight, that's approximately -- see, if you can capture it -- it comes underneath the bone, the right part. So I'm measuring it from there, and that's approximately three millimeters?
A. Uh-huh (yes).
Q. Is that right?
Mr. Mizgala:
Object to form.
DR. RONWIN:
Q. Would you agree with that, Doctor?
A. Yeah. Uh-huh (yes).
Dr. Ronwin:
All right. Now let's take a look at the next -- at the next exhibit. We'll leave that up there. Can you mark this as Exhibit 10, please?
(Reporter marks exhibit.)
Dr. Ronwin:
Okay. Thank you.
Q. Okay. First, I'd like to ask you, Doctor, what is the distance between the -- of the subacromial bursa? We don't actually see that here. That's the one that lies right underneath the acromion.

Page 122

All right. Okay. Thank you. Let's turn to this Exhibit 7 now and do something with my ruler here. Did you see my ruler?
Mr. Mizgala:
It's underneath.
Dr. Ronwin:
Oh, it's underneath.
Witness:
Well, you had it. Underneath.
Dr. Ronwin:
It was right there. What happened to the ruler? Oh, here it is. Okay. Now for the record, this is a ruler that's marked off both in inches and in millimeters. And we are going to make some measurements in millimeters. Okay. It's a little hard to do, but would you come over here, please, Jim, so you can see?
Witness:
Would you like to go by a view box maybe?
Dr. Ronwin:
Yes. Could we do that? Oh, but she's (indicating reporter) not by a view box.
Witness:
Let me see if I can bring it over here.

Page 123

Dr. Ronwin:
Okay. We just put that up like this.
Witness:
Yes. Just stick it on there.
Dr. Ronwin:
Oh, I see. Okay. Great. Now, Jim, do you want to come over and take a look while we make some measurements?
DR. RONWIN:
Q. Now is this item here (indicating) the acromion?
A. Yes.
Q. And is this the humerus?
A. Yes. That's the humeral --
Q. Now since that ruler is longer, we'll go from this side. Let's do the 29 right here at the bottom. Okay? And we go to the humerus, and we get approximately nine -- nine millimeters in that case; is that right? This is 29, down to 28, and this is divided into millimeters, the little -- little ones.
A. Okay.
Q. So that's approximately nine millimeters?
Witness:
Is this a centimeters ruler? Yeah.
Dr. Ronwin:

Page 124

No. It's millimeters.
Witness:
You're on the centimeter side.
Dr. Ronwin:
Yeah. Right.
Witness:
All right.
Q. And then if we go here, we have approximately even -- even more. We've got 9.5 millimeters; is that right?
A. Uh-huh (yes).
Mr. Mizgala:
I'll object to form.
Dr. Ronwin:
What did you say?
Mr. Mizgala:
I'm going to object to form.
Dr. Ronwin:
You can object all you want to.
DR. RONWIN:
Q. Okay. Now there's one other thing I wanted to measure. Do these look like spurs to you?
A. That's the accentuated changes in the bones. Those are degenerative changes.
Q. Yes. And would you measure this since I'm

Page 125

measuring it to there to -- well, let's see, to this point going down straight, that's approximately -- see, if you can capture it -- it comes underneath the bone, the right part. So I'm measuring it from there, and that's approximately three millimeters?
A. Uh-huh (yes).
Q. Is that right?
Mr. Mizgala:
Object to form.
DR. RONWIN:
Q. Would you agree with that, Doctor?
A. Yeah. Uh-huh (yes).
Dr. Ronwin:
All right. Now let's take a look at the next -- at the next exhibit. We'll leave that up there. Can you mark this as Exhibit 10, please?
(Reporter marks exhibit.)
Dr. Ronwin:
Okay. Thank you.
Q. Okay. First, I'd like to ask you, Doctor, what is the distance between the -- of the subacromial bursa? We don't actually see that here. That's the one that lies right underneath the acromion.

Page 126

A. Well, you're not going to see it on X-ray.
Dr. Ronwin:
No, that's tissue. Yes.
A. Well, I don't -- I don't remember distances. I've never dealt in measurements.
Dr. Ronwin:
In distances. Okay.
A. Perhaps the orthope -- the radiologist might comment on that.
Dr. Ronwin:
Right.
A. But generally speaking, we do not comment on -- on spaces.
Q. Okay. I want to show you what's been marked as Exhibit 10. Could you tell us what that document is?
A. This is basically the bible of orthopedic surgery.
Q. I see. Could you give us the name of the bible?
A. It's Campbell's.
Q. Campbell's?
A. Campbell's Operate of Orthopedics.
Q. Yes. And what is the volume of that number?
A. Volume 3.
Q. Three, and what is the edition?
A. The edition is labeled Eighth Edition.

Page 127

Q. All right. And who is the editor of that?
A. Edited by A. H. Crenshaw, M.D.
Q. Okay. Now -- now in your medical career, have you had any experience with this text?
A. I have one. I -- I would not have done orthopedics without it.
Q. I see. So you have used it in your medical practice?
A. Yes, I have extensively.
Q. Wouldn't that be pretty true of a great many surgeons in this country?
Mr. Mizgala:
Objection to form.
A. Like I said, it's a very well-read book, and it's almost imperative that you have it.
DR. RONWIN:
Q. Yes. And if a book goes through eight editions, would that be considered a very highly respected text?
A. Respected and successful.
Q. Yes. Right. Now let's turn to the single page that has been copied out from -- from that Volume 3, that's the next page. Would you give us the page number right up there?
A. Yes.

Page 128

Q. What page is that?
A. 1,736.
Q. Right. And that's from Volume 3, right?
A. That's correct.
Q. And could you take a look at the right-hand column, the paragraph near the last paragraph which starts roentgenographic evaluation. And could you look at the sentence which is starting on the eleventh line of -- of that paragraph.
A. They found this acromion humeral --
Mr. Mizgala:
Objection to form, foundation, hearsay. Go ahead.
A. They found this acromion humeral interval to be normally between seven and fourteen millimeters.
DR. RONWIN:
Q. And could you --
A. An interval of five millimeters or less was considerably -- considered compatible with a major tear of the rotator cuff.
Q. Okay. And we measured prior to Ronwin's surgery an interval of nine to nine and a half millimeters, is that correct, Doctor?
A. Uh-huh (yes).
Q. So would you conclude from this statement in this

Page 129

highly respected text that -- that Ronwin's rotator cuff tear was probably not due to the -- to the arrangement of the acromion with respect to the humerus in Ronwin's left shoulder?
Mr. Mizgala:
Objection to form.
A. Yes. I would like for you -- would you repeat the question again for me, please?
DR. RONWIN:
Q. All right. Would you conclude therefore that Ronwin's rotator cuff tear was most likely not due to the structure of Ronwin's acromion with respect to the humerus?
A. I don't think you can reach that conclusion. I think very seriously that most of us who deal with this problem would try to attempt to make a diagnosis on the basis of the measurements. We would rely more on a MRI.
Q. Today we rely on an MRI?
A. Right. Yes. This is an attempt to -- I don't know how old the edition -- this edition is, but--
Q. This is from 1992.
A. Yeah. I -- I think -- of course, I think we had MRIs maybe by that time, but I think most of us now would rely on the MRI totally, rather than the





02/12/2007 09:26 FAX 970 224 3838 ED RONWIN 014

Page 130

measurements, so I would not be able to give you an opinion based on measurements. Obviously, he was able to do that, and obviously, the radiologist may be able to reach that conclusion, but I'm not.
Q. I see. Well, it also states, does it not, that if it -- if the interval is less than five millimeters, then it's considered compatible with a major tear in the rotator cuff?
A. That's what he says.
Q. But since this -- the interval measured here applied to Ronwin's rotator cuff tear was about nine to nine point five millimeters, then isn't that likely that -- that a rotator cuff tear due to the arrangement of the acromion vis-a-vis the humerus in Ronwin's left shoulder is not very likely?
A. According to --
Mr. Mizgala:
Objection to form.
A. -- according to him, that's what he says. I would not be able to reach a conclusion of that nature.
DR. RONWIN:
Q. But the -- but the authors of the text would conclude that way, is that right?

Page 131

A. Yes.
Mr. Mizgala:
Objection to form.
Dr. Ronwin:
Now going down to this one. All right.
Would you make this as Exhibit 11, please?
(Reporter marks Exhibit-11)
DR. RONWIN:
Q. This is actually in a case that was filed. Could you tell us what that document is, Doctor?
A. This is a Case Specific Expert Report.
Q. Yes. And who was it written by?
A. I think that this is you that -- that are make -- that you are making this report.
Dr. Ronwin:
Yes.
A. Yes.
Dr. Ronwin:
There has been some -- we're on this third page here.
Witness:
And you are stating -- well, you want me to read the -- the latter part?
Dr. Ronwin:
No. The reason I'm presenting this is that

Page 132

there's been some question here about what you received from me.
Witness:
Uh-huh (yes).
Q. Do you recall receiving this document from me?
A. No.
Q. Would that -- if you had received it, would that have been one of the documents that was destroyed by Hurricane Katrina?
A. Probably.
Mr. Mizgala:
Objection to form.
Dr. Ronwin:
I see. All right.
A. I have -- no, it's too vague. I can't -- I can't remember.
Dr. Ronwin:
All right.
A. Too much time.
Dr. Ronwin:
All right. Now let's go to this -- this deal here. Okay. Now these you can mark as 11. No, this would be 12, and a copy for you -- 12, and 13. Thirteen is this, and this will be 14, please, and I'll explain what this is

Page 133

all about in a moment. That's your copies.
Mr. Mizgala:
I'm going to go ahead and object to 11 through 14 right now as documents that the doctor did not review or rely upon in forming his opinions in this case.
Dr. Ronwin:
Okay. Here's your 12, 13, and 14. This is 14, the next one's 13, and then that's 12. All right. And then I want to get mine out here. Can you mark this as 15, please? And that's your document 15.
DR. RONWIN:
Q. Now, Doctor, there's been some talk here about the -- an insinuation that all statins damage the human anatomy in some way.
A. Right.
Q. And there's been an implication that somehow Baycol is not any different than any other statins in causing harm, and for that reason, I want to deflate that -- that concept in this way.
Mr. Mizgala:
Objection to the sermon.
Dr. Ronwin:
What did you say?





02/12/2007 09:26 FAX 970 224 3838 ED RONWIN 015

Page 146

think?
Mr. Mizgala:
Objection. Remarks.
A. All I know it was taken off the market because of the death that it was producing with rhabdomyolysis.
DR. RONWIN:
Q. Yes. Right. Where the others are still on the market, is that right?
A. That's correct.
Dr. Ronwin:
Okay. Thank you, Doctor.
Mr. Mizgala:
You done?
Dr. Ronwin:
Let me just take a minute here. I did pretty good, didn't I? I told you about how I was going to handle it. I think that on the things that I sent to you with regard to Dr. Surrey's deposition and with regard to the editorial in the Chemical Engineering News, which you didn't see, it would take too much time for you to, you know, review them. I think I'll do that in my own deposition as an expert.

Page 147

Witness:
Well, you certainly are that.
Dr. Ronwin:
Okay. We will call it a day.
Mr. Mizgala:
No, no, no. I got some re-direct.
Dr. Ronwin:
Oh, you do.
Mr. Mizgala:
Re-cross, I should say.
Dr. Ronwin:
Okay. Re-cross then.
RE-EXAMINATION BY MR. MIZGALA:
Q. Doctor, Exhibit 6.
A. (Witness reviewing documents.) All right.
Q. Doctor, have you seen that before today?
A. No.
Q. Okay. And, Doctor, I just want to make sure I get you right. Based upon what you -- the exercises you went through with Dr. Ronwin, you -- you believe that every one of these things listed in here on these 47 pages, just because the FDA listed them in here, that Baycol caused it?
A. I don't necessarily believe that. The FDA is the one that's making the report, and I think if the

Page 148

FDA goes through the problems or trouble of making a report like this, I think we ought to pay attention. I think it is stated here that there is -- on the disclaimer, that the information contained in the report has not been scientifically or otherwise verified. So, you know, to me this is a guideline. It doesn't necessarily mean 100 percent.
Q. Okay. And, Doctor, actually the disclaimer says the information contained in these reports has not been scientifically or otherwise verified as to a cause and effect relationship, and cannot be used to estimate the incidents of adverse drug reactions, correct?
A. Well, there again, you know, this -- I don't --I don't like that kind of situation, because why do they go through the trouble of doing this if they're going to tell you not to pay any attention to it.
Q. Well, because the FDA uses Adverse Event reports as signal generators, right?
A. Well, I don't know. I don't know what their -- what their criteria are for publishing this report. We, as physicians, as clinical physicians, we have to pay attention to the things

Page 149

that they are putting out, so to me, this is like saying gentlemen, here we are, we're giving you this, but don't pay any attention to it, and I think that's ridiculous.
Q. But, Doctor, do you have any -- any -- can you -- is that incorrect that the information contained in -- in these reports, I mean the ADRs, has not been scientifically or otherwise verified as to a cause and effect relationship?
A. That's what they state. Yes.
Q. Any basis to disagree with that?
A. I have seen no scientific proof. No.
Q. Okay. So you don't --
A. But the very fact that they're taking a toll and that they're -- they're phoning people and see, it means that they have some concerns.
Q. And, Doctor, how many of these reports came in after Baycol was withdrawn from the market, and the company was sued by thousands of plaintiffs? Do you know?
A. How many of which reports?
Q. The reports. That report that Dr. Ronwin gave you is to present, right?
A. Yeah.
Q. He doesn't give it to you for -- for the period of





02/12/2007 08:27 FAX 970 224 3838 ED RONWIN 016

Dr. Raul Reyes
September 12, 2006

Page 166

DR. RONWIN:
Q. Well, would they not go about it -- a patient comes in and says I've been taking "X" drug for such and such a time, and now I'm feeling pains in the neck. Would they then conclude, well, there's a possibility there of a connection. Is that right?
Mr. Mizgala:
Objection to form.
A. Well, it's a gen -- a generality that that would be the way that you have to, in retrospect, assume that's the way they got it.
Dr. Ronwin:
Yes.
A. But, you know, again, I would be speculating in that regard.
DR. RONWIN:
Q. Well, did you know that the FDA when they use the word scientific here, what they really mean are incidence reports? Do you know what incidence reports are?
A. Uh-huh (yes).
Mr. Mizgala:
Object to form.
A. Yes.

Page 167

DR. RONWIN:
Q. Yes. And what they're saying is the ADRs were not a result of incidence reports, but they're nevertheless,results of medical reports basically. Secondly, on this disclaimer, there's a misreading been perpetrated here. It says "and cannot be used to estimate the incidents of adverse drug reactions." That's the second part of the disclaimer. And did you know that what the FDA means by that is that many adverse events never get reported to the FDA?
A. I don't have to --
Mr. Mizgala:
Object to form.
A. I don't have to understand that from the FDA. As a physician, I know that there are a lot of things. The majority of them don't get reported.
DR. RONWIN:
Q. Right. Exactly. So in this report, for example in Exhibit 6, we have -- on page one, we have, for example, rhabdomyolysis, and we have a count of 8121, in other words, eight thousand one hundred and twenty-one. That could very well have been even twice, but there's no way of knowing, because many of these are not reported. Sometimes the

Page 168

people with rhabdomyolysis could have died and not even known what -- make any connection with Baycol use.
A. Right.
Mr. Mizgala:
Objection to form.
DR. RONWIN:
Q. Is that right?
A. Yes.
Q. And isn't that true for just about every one of these Adverse Event reports that have been -- that are listed here --
Mr. Mizgala:
Objection to form.
DR. RONWIN:
Q. -- in this rather comprehensive compilation of adverse events?
Mr. Mizgala:
Objection to form.
A. I would say that the incidents of adverse effects is a lot more than anyone has figured out for documentation at the moment.
DR. RONWIN:
Q. Exactly. And the fact that some -- some of these do not state that there is a connection. In other

Page 169

words, if these orthopedic surgeons, such as Dr. Knauer, states that there's no connection, or she didn't think there was a connection between Baycol and my -- Ronwin's rotator cuff tear, does that settle the question?
A. It doesn't to me --
Mr. Mizgala:
Object to form.
A. -- because I've -- I've practiced too long.
DR. RONWIN:
Q. In other words, it could still be that that's the case?
Mr. Mizgala:
Objection as to form.
A. It's always a probability.
DR. RONWIN:
Q. And if you took the medical level of analysis of drug causation for adverse events or symptoms, is that not a generalized level that does not deal with the ultimate level of -- of analysis where you're dealing with the fact that all drugs are molecules, and the whole anatomy of the human body is a combination of molecules -- is that not right, Doctor?
Mr. Mizgala:

Page 170

Objection to form.
A. Well, let me put it this way. I -- I basically feel that if you can, at least the way I practice medicine, try to avoid all medication at all cost, because you never know what's going to happen.
Dr. Ronwin:
Yes.
A. And I've also had the knowledge now that small studies of 10,000 or even 20,000 do not imply the safety of the product. It's only when you try it in millions of people, as an example of that Thalomide drug, for example, --
Dr. Ronwin:
Yes.
A. -- that caused all the problems in pregnant women, and then we had another one, what was the -- Lithium.
Dr. Ronwin:
Yes.
A. We had that other problem, you know. And I'm fully aware of the fact that all medications are going to cause effects on people and sometimes very serious.
Dr. Ronwin:
Yes, sir.

Page 171

A. So I don't -- I don't like to prescribe medication if I can help it, let me put it that way.
DR. RONWIN:
Q. Yes. And are you aware that some incidence reports are -- consist of actual experimentation dealing with frequently less than a hundred -- a hundred volunteers?
Mr. Mizgala:
Object to form.
A. I'm aware of the fact that short studies are being conducted and I think that, you know, attempts are being made to improve on that.
Dr. Ronwin:
Yes, sir.
A. And I'm still very disappointed --
Dr. Ronwin:
Yes, sir.
A. -- about the fact that so many people get into new drugs without -- personally, I -- when my patients ask me for a new drug, I tell them come see me in ten years, and I'll tell you whether it's safe enough.
DR. RONWIN:
Q. Now are you aware that the Bayer Corporation did not report in their -- at least one or more of

Page 172

their incidence reports on Baycol -- did not include the effects they saw on some of the participants, because they deemed them detrimental to their getting approval for the drug to be marketed?
Mr. Mizgala:
Object to form and foundation.
A. I don't know that.
DR. RONWIN:
Q. Yes, well that happened. Yes, it's got a good foundation. Yes. All right. Let's see. Also, the fact that one is older does that necessarily mean that that is the cause of one's symptoms after taking a drug?
A. No.
Q. It could be, but it could not be, is that right?
A. That's correct.
Q. Yes. And you would have to really show that in order to make the claim that age is the reason?
A. I would think so.
Q. Yes. Likewise for the degeneracy, or in other words, the effect of these arthritic spurs in Ronwin's left shoulder, would they not have to be of sufficient length in order to have as protrusions from either the acromion or the

Page 173

clavicular bone, such that they would be able to touch and irritate the actual rotator cuff tendon?
Mr. Mizgala:
Object to form.
A. I don't think time is necessarily an index of presentation of symptomatology. Obviously, the longer you have a problem, the more likely you are to have symptoms, but again, you're dealing with an individual, and some individuals will get the symptoms within a short period of time, and others will take longer.
DR. RONWIN:
Q. Yeah. What I was saying is that wouldn't the spurs or, in other words, the arthritic protrusion from either the acromion or the clavicular bone, have to be of sufficient length to create injury to the rotator cuff?
Mr. Mizgala:
Object to form.
A. I -- I am not so sure we're talking about the same thing. You know, one is a bone fixture.
Dr. Ronwin:
Yes.
A. The acromion is a bone.
Dr. Ronwin:

Yes, sir.
A. And the rotator cuff injury is a tendon muscle injury.
DR. RONWIN:
Q. But they are separated by a distance in the normal shoulder, is that not right?
A. Well, obviously, as you get older, your tissues get harden all the way through, so the injury to a muscle can occur a little bit more readily since it's not --
Q. But for the -- for the spur, the arthritic spur, to affect the rotator cuff, it would have to be of some length?
A. Of course.
Q. That's what I'm saying.
A. It's got to be very long.
Q. Yes. And if it's of insufficient length, then it would not affect the rotator cuff? Is that right?
A. It would be more likely affected by tendinitis, by inflammation.
Q. Yes. Of the tendon. Than actually by the spur. And wouldn't the tendinitis be affected by the fact that the tendon, the -- the composition of the chemical, biochemical composition of the tendon, is being attacked by Baycol?



Mr. Mizgala:
Objection to form.
A. Well, let's see, tendinitis is an inflammatory reaction.
Dr. Ronwin:
Yes.
A. And one would have to identify the cause of the mechanism.
DR. RONWIN:
Q. Yes, and it could be Baycol, could it not?
A. (No audible answer.)
Mr. Mizgala:
Objection to form.
DR. RONWIN:
Thank you, Doctor. That ends it.
MR. MIZGALA:
Okay. Thank you, Doctor.
(DEPOSITION CONCLUDED)





02/12/2007 08:29 FAX 970 224 3838 ED RONWIN 019