UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

DEPOSITION OF: JANE SERVI, M.D.
June 20, 2006

| | |
|---|---|
| In re BAYCOL PRODUCTS LITIGATION | MDL No. 1431 (MJD) |
| This Document Relates to: | |
| Edward Ronwin, et al., v. Bayer Corp., et al. | Case No. 02-0200 |

TAKEN PURSUANT TO NOTICE AND SUBPOENA on behalf of the Defendant Bayer Corporation at 419 Canyon Avenue, Suite 300, Fort Collins, Colorado 80521 at 9:08 a.m. before Sylvia E. Noneff, Registered Professional Reporter and Notary Public within Colorado.

SCANNED
FEB 1_ 2007

Page 114

answer?
MR. PILKINGTON: (Shook his head.)
THE DEPONENT: Thank you.
Q. (BY MR. RONWIN) Now, you said you took chemistry, right?
A. I took chemistry.
Q. And what is fluorene?
A. Fluorene is one of the chemical elements on the periodical chart.
Q. I see. Do you know -- let's see. I want to phrase it this way: Is fluorene the most active element known to man?
A. I could not answer that question. It might be a more appropriate question for a chemist.
Q. I see. Well, do you know how glass is etched?
A. I do not know how glass is etched.
Q. I see. Okay. Did you know that there's a fluorene atom in the Baycol molecule?
A. I don't prescribe Baycol. I don't know the chemical makeup of Baycol. I couldn't even start to answer that question.
Q. I see. You agree that it -- Baycol tears up muscle cells in various degrees?
MR. PILKINGTON: Objection, form and

Page 115

foundation.
A. Baycol has been, from my knowledge -- again, I don't prescribe it. From my knowledge, it has been associated in some people with rhabdomyolysis.
Q. (BY MR. RONWIN) Well, to get the -- in rhabdomyolysis, to get the proteins and enzymes pouring into the bloodstream from the -- from the muscle cells, then the muscle cells must have been torn open; is that right?
MR. PILKINGTON: Same objections.
A. To my understanding, there is destruction of the cell. How that occurs is beyond my medical expertise.
Q. (BY MR. RONWIN) All right. So if Baycol can -- can -- but you don't know how it does that, it tears up the cells, is what you're saying?
A. No. Again, that may be a better question asked to a chemist, a pharmaceutical, a research person.
Q. Okay.
A. That's not the type of medicine that we practice from day to day in our office.
Q. Okay. So it's not within your knowledge?
A. It is not within my expertise.
Q. But you do know -- do you know whether the composition of a cell is basically an organization of

Page 116

molecules?
A. That is beyond my --
MR. PILKINGTON: Same objections.
A. -- ability to answer.
MR. PILKINGTON: Same objections.
Q. (BY MR. RONWIN) Well, the cell has an outer cover in the animal kingdom, all right? It's not a wall, like in the plant kingdom, but it's a cover, right, a membrane. Is the membrane made up of chemicals?
A. That's --
MR. PILKINGTON: Same objections, form and foundation.
A. That's beyond my medical expertise.
Q. (BY MR. RONWIN) I see. All right. What else is a tendon made up of, in addition to cells?
MR. PILKINGTON: Form and foundation.
A. I think that perhaps Dr. Knauer might be able to better explain that than myself.
Q. (BY MR. RONWIN) I see.
A. Again, in our area of medicine, we don't always go down to the molecular level. That portion of our training occurred way beyond before we became clinicians and were actually dealing with evaluation and treatment and -- of our patients. So for me to go back to that cellular level, I would be grasping and may give

Page 117

you inaccurate information.
Q. Okay. But would you agree that the entire human body, as any other living entity, consists of chemicals?
MR. PILKINGTON: Same objections.
A. Do I need to answer that? Can I defer that question? It -- we are organic.
Q. (BY MR. RONWIN) Well, organic is a special type of chemical, meaning it has carbon atoms in it, which, of course, there are lots of them in the body. But just chemicals in general put together into various molecules, and they in turn form the cells, and that -- they in turn form the various anatomical parts, and they in turn form the body --
MR. PILKINGTON: Objection --
Q. (BY MR. RONWIN) -- is that right?
MR. PILKINGTON: Objection, form and foundation.
A. I'm going to defer on that.
Q. (BY MR. RONWIN) You're going to what?
A. I'm not going to answer that question. That's beyond my -- my medical expertise to answer that within correct reason. I'm -- I'm not sure, in terms of chemicals and the -- the way that you are using that term, as if that's what we were made up of. So I would

defer that to an organic chemist.
Q. I see. Well, even -- even if you're not an organic chemist or a biochemist, you've taking chemistry, and you've certainly taken biochemistry, didn't you, in the -- in medical school?
A. Yes, I have. Actually, it's in undergrad that you take your inorganic and organic chemistry. It's before you get to medical school.
Q. Right. And then in medical school you took biochemistry; is that right?
A. No.
Q. You didn't?
A. In undergrad I took physical chemistry, P. chem.
Q. Oh, physical.
A. You don't take biochemistry.
Q. You never took biochemistry?
A. I took P. chem., which I believe would be an analogy to biochemistry.
Q. Well, there's --
A. But that is all done as undergrad. It's not done in medical school. Then your area of expertise will then branch. If you become a chemist, you will take other types of chemistry and go down to the cellular level.



When you go to medical school, then you start to develop into organ, organ systems, and then we develop into how we are going to look for medical conditions and treatments for them. So many times at -- at our level of being a physician, we are no longer dealing with chemicals and cellular membranes and all of the carbons that make up a body.
Q. You're dealing --
A. That goes into our research branch of medicine.
Q. Your overall work deals with -- with organs and functional anatomical parts of a body; is that right?
A. We deal with evaluation of patient complaints and treatment. I am a specialist who deals with sports medicine problems --
Q. Yeah.
A. -- and musculoskeletal problems --
Q. Yes.
A. -- on a macrolevel as a person presenting to me with a complaint.
Q. But that doesn't prevent those muscles that you just spoke about, muscular problems, it doesn't prevent that from being basically chemical in nature.
A. I'm not sure how that relates to my area of medicine.



Q. I see.
MR. RONWIN: Well, okay. You want to go see your patients, then?
THE DEPONENT: Thank you.

EXAMINATION

BY MR. PILKINGTON:
Q. Doctor, I just have a couple of follow-up questions.
A. Absolutely.
Q. One, a point of clarification. I believe you testified about your October 31st office note. And it reads here, "He states that his pain nearly resolved with this injection, but over the past month he has had increased symptomology." By "this injection," are you referring to your injection of September 4th of 2001?
A. It's referring to September 4th of 2001. His pain nearly went away, didn't completely go away, and has since increased again.
Q. And the reason I ask that question, I think you testified that it referred to an injection that he'd had before he visited your office, so --
A. Yes, there were -- well, there were two questions, I think. I think you asked the same question about the injection that was incurred before he saw me, and it sounds like a very similar thing happened, where



he had resolution and then recurrence, or near-resolution and reoccurrence.
Q. But your October 31st note about "his pain nearly resolved" was in reference to your injection in September of '01, correct?
A. That's correct.
Q. And finally, Doctor, there was a long line of questioning about an MRI and a closed MRI and an open MRI. Do you remember that questioning?
A. I do.
Q. Regardless of whether an MRI was ordered or not, did you continually offer to Mr. Ronwin an arthrogram?
A. I believe that we -- in the first line of offering of an MRI, he reflected the fact that he had a bad experience with closed areas, and we offered an arthrogram at that point. I believe in subsequent visits an MRI was offered.
And so it would be inferred, again, that if he said, "I don't want an MRI, but an arthrogram would be okay," that that was an option. But it was not specifically stated until, again, my last visit with him prior to his being referred over to Dr. Knauer.
Again, he brought up the fact, I believe, that he wasn't -- he wasn't happy with going through a



04611547-742a-4e96-903b-ddf0b207a131

02/12/2007 09:31 FAX 970 224 3838 ED RONWIN 022