IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

---

In re BAYCOL PRODUCTS LITIGATION

This Document Relates to: MDL No. 1431

Edward Ronwin, et al.

v. Case No. 02-0200

Bayer Corp., et al.

---

DEPOSITION OF RICHARD TORKELSON, M.D.
Taken in behalf of Defendant Bayer Corp.

1:10 p.m., Monday
June 19, 2006

PURSUANT TO NOTICE, the deposition of RICHARD TORKELSON, M.D. was taken in accordance with the applicable Wyoming Rules of Civil Procedure at the offices of Cheyenne Orthopaedics, 2301 House Avenue, Suite 505, Cheyenne, Wyoming, before Kathy J. Mullivan, a Registered Professional Reporter, and a Notary Public in and for the State of Wyoming.

COPY

APPEARANCES

For the Plaintiff: Pro Se

For the Defendant Bayer Corp.: MR. JEFFREY PILKINGTON, Attorney at Law, DAVIS, GRAHAM & STUBBS, LLP, 1550 Seventeenth Street, Suite 500, Denver Colorado 80202

INDEX


| DEPOSITION OF RICHARD TORKELSON, M.D.: | PAGE |
|---|---|
| Direct - Mr. Pilkington | 3 |
| Cross - Mr. Ronwin | 51 |
| Redirect - Mr. Pilkington | 100 |
| Recross - Mr. Ronwin | 103 |


EXHIBITS

| No. | Description | Identified |
|---|---|---|
| 1 | Subpoena | 5 |
| 2 | Curriculum Vitae | 6 |
| 3 | Medical Record | 23 |
| 4 | X-ray Report | 30 |
| 5 | February 17, 2004 Letter | – |
| 6 | Patient Personal History Form | – |



PROCEEDINGS

(Deposition proceedings commenced 1:10 p.m., June 19, 2006.)

RICHARD TORKELSON,

called as a witness on behalf of the Defendant, being first duly sworn, testified as follows:

DIRECT EXAMINATION

Q. (BY MR. PILKINGTON) Good afternoon, Doctor. We met before the deposition. My name is Jeff Pilkington. I'm with the law firm of Davis, Graham & Stubbs out of Denver and I represent Bayer Corporation. Do you understand that?
A. Yes. I guess I didn't, but I do now.
Q. I don't know if you know this or not, but Mr. Ronwin has filed a lawsuit against my client, Bayer. Were you aware of that before today?
A. No.
Q. And in this lawsuit he claims that certain of his injuries, including his rotator cuff injury, was caused by his injection of Bacal. Do you have any idea of the nature of his lawsuit before this?
A. No.
Q. I assume you've been deposed in the past?
A. Yes.
Q. Just so we're on the same page, I want to go



through some basic ground rules of the deposition. Okay?
A. All right.
Q. First of all, I'm going to ask you a series of questions to better understand your brief care and treatment of Mr. Ronwin. Okay?
A. Yes.
Q. I am ethically precluded from talking to you outside of Mr. Ronwin's presence, so this will be the only opportunity I get to discuss the care and treatment of Mr. Ronwin before the trial on this case. Do you understand that?
A. Yes.
Q. If you don't understand a question that I ask you, please ask me to restate or rephrase it and I'll be happy to do so.
A. Okay.
Q. This deposition may be used at trial and so it might be very important for you to explain some of your care and treatment in very elementary lay terms. Would you be glad to do that?
A. Yes.
Q. Finally, you understand that you've taken an oath to tell the truth?
A. Yes.
Q. And that's the same oath you would take if you



were to testify live in person before the judge and jury in this case?
A. That's correct.
Q. Do you have any questions before we go any further?
A. No.

(Deposition Exhibit No. 1 marked for identification.)

Q. First of all, Doctor, I will hand you what I've marked as Deposition Exhibit Number 1. Doctor, this is a subpoena that was served upon you and you kindly accepted service, correct?
A. That's correct.
Q. And Exhibit A to the subpoena asked to you bring certain information to your deposition today; is that correct?
A. Yes.
Q. What did you bring to your deposition?
A. I brought the hospital chart. Actually, I have the X rays next door.
Q. Okay. And you also brought a CV?
A. And a CV, yes.
Q. Do you have any other records relating to your care and treatment of Mr. Ronwin?
A. No.





02/12/2007 09:32 FAX 970 224 3838 ED RONWIN 024

22

A. Yes.
Q. Doctor, do you keep up on the published literature as it relates to rotator cuff injuries?
A. Yes.
Q. And have you seen studies that show that in many cases rotator cuff tears may be asymptomatic?
A. Yes, they often are.
Q. And would you better explain that to the jury?
A. Well, a chronic rotator cuff tear is, as I've explained, it's an attritional process, so that over time the tendon becomes thinner and thinner, we think may be contributed by impingement, but it also may just be a lack of blood supply, microscopic blood supply, especially with aging and the tendon thins and gradually tears, may even retract. And in the absence of an injury, often they're not symptomatic.
I guess the other reason that that occurs is that being 59 myself, I can tell you, as you get a little older, you develop aches and pains in multiple joints and most of us ignore them. They come and go and thought of just as, you know, this joint hurts or that joint aches.
Q. But is it generally regarded in the field of orthopedic medicine that rotator cuff tears can be asymptomatic, that is, the patient can have a rotator cuff tear but not experience any symptoms?

23

A. Yes.
Q. Doctor, let's now turn to Mr. Ronwin.
(Deposition Exhibit No. 3 marked for identification.)
Q. And I will mark as Exhibit Number 3 a copy of your office notes, okay?
Doctor, do you recognize Exhibit Number 3?
A. Yes.
Q. What is Exhibit Number 3?
A. Exhibit Number 3 is a copy of my office notes, clinic notes, March 16, March 21, August 8, all 2001.
Q. And is that a true and accurate copy of your office notes?
A. Yes.
Q. Were those office notes prepared in a course of you providing care and treatment for Mr. Ronwin?
A. Yes.
Q. Were those office notes prepared based on the information that you gathered during the course of your care and treatment of Mr. Ronwin?
A. Yes.
Q. Are those office notes maintained in the chart that you brought to your deposition today?
A. Yes.
Q. Is that chart maintained here at the clinic in

24

Cheyenne?
A. Yes.
Q. Finally, is there someone at your office whose responsibility it is to maintain that office chart in a true and accurate way?
A. Yes.
Q. You first saw Mr. Ronwin on March 16th of 2001?
A. That's correct.
Q. Is the first page of Exhibit Number 3 the office notes that relate to that visit?
A. Yes.
Q. Doctor, why don't you explain to the jury what Mr. Ronwin came in complaining about.
A. He complained of left shoulder pain, which he stated had been present approximately two to three months.
Q. Had you met Mr. Ronwin before?
A. No.
Q. Do you know how he came to your clinic?
A. No.
Q. And so when -- if we look at the handwritten notes on Exhibit Number 3, which of those handwritten notes are your notes?
A. Everything except the first line, which reflects BPPRT, that's blood pressure, pulse, temperature and the then the signature.

25

Q. So from really the first line – second line of handwritten notes down to the typewritten -- handwritten notes those are your own notes?
A. That's correct.
Q. And, in fact, if you look at the original, those are in a blue colored pen; is that correct?
A. That's correct.
Q. Doctor, Mr. Ronwin told you that he had left shoulder pain?
A. That's correct.
Q. And how long did he tell you that he had this shoulder pain?
A. Two to three months.
Q. What did you write down with respect to that?
A. I wrote, "Patient complains of left shoulder pain present for approximately two to three months."
Q. Did you then dictate that note later that day or the next day?
A. Yes.
Q. And how did you dictate the duration of this left shoulder pain?
A. I dictated it the same, present for approximately two to three months. I will notice that the handwritten portion there's a two and a dash three, which indicates to me – I don't have any -- it's been five

years, so I don't have any direct memory of any of that, but generally when I do that, the patient will tell me something, and then as we're discussing it may become apparent that it's changed somewhat, so that it -- my guess is initially told me about two months and then as we talked more about it, it was obviously there had been two to three months, a little longer.

Q. But in any event, Doctor, based on your notes, Mr. Ronwin told you he had this left shoulder pain for two to three months, correct?

A. That's correct.

Q. What did -- what else did he describe about this injury that he came to see you about?

A. He indicated that he had not had any injury or any unusual activity. I'll ask to see if they've done something unusual; throwing, for instance, or a lot of fishing, those sorts of things. He indicated he was a right-handed individual, indicated that the character was such that it was worse with elevation, putting his hand over his head, particularly if he tried to elevate it by lifting objects overhead. He had taken some -- well, my typewritten notes indicates he had taken some nonsteroidal medication, but as a -- look at the written note it says "no NSAIDs," so I would say that's probably a typographical error. My guess is -- in fact, I would say



probability is he had not taken any anti-inflammatory medication.

Indicated there was no crepitus. That's medical term for a grinding sensation or popping. He did feel as though he had some weakness in the shoulder. He denied any previous shoulder symptoms and denied any shoulder symptoms on the right side.

Q. Based on that history, did you then do a physical examination?

A. Yes.

Q. Describe your examination to the jury.

A. He indicate -- he was a healthy-appearing individual. Did not appear to have any acute pain or distress. Was comfortable. He was thin. Examination of the left shoulder, examination of the nerves, the vascular supply was normal. There was no deformity in about the shoulder region. There was no warmth in the joint or redness. No fluid in the joint. No detectable soft tissue swelling. Flexion, which is the forward motion --

Q. Doctor, could I stop you at that point? What is the significance of your findings of the absence of warmth, swelling, that sort of thing?

A. With warmth and erythema or redness, you're looking for acute, very active inflammation, something you might see with an over -- acute overuse or injury, looking



for the possibility of an inflammatory arthritis that would produce that or infection.

The same with an effusion. Effusion is fluid in the joint. Swelling, again, you're really looking for more inflammatory condition rather than a chronic condition.

Q. You were about to describe the level of motion that he had in his shoulder. Would you do that?

A. Yes. For instance, which is forward movement, such as a Nazi salute, was to 170 degrees, that being from the side of the body to near straight overhead. 180 is normal.

Q. You said 170, I think.

A. 160, I'm sorry.

Q. So he had 170 degrees?

A. No. I'm sorry. He did have 160. Sorry.

Q. So flexion was 160?

A. That's correct.

Q. Mr. Ronwin was how old at the time -- at this time?

MR. RONWIN: How old?

Q. (BY MR. PILKINGTON) In 2001?

A. He was --

MR. RONWIN: 77.

Q. (BY MR. PILKINGTON) So Mr. Ronwin was 77 at the



time of this visit.

How do you characterize the flexion of 160 degrees in a 77-year-old man?

A. It would be within normal range.

Q. What else did you see in terms of his movement?

A. Abduction, which is elevation away from the side of his body, was 110 degrees actively, that's something he could do under his own power. 125 degrees, passively. In other words, he could go to 20 degrees beyond a right angle parallel to the floor. He could go 20 degrees past that, and then if I helped him he could get another 15 degrees beyond that.

Q. What are the normal range of abduction?

A. Patient 77, I'd expect 160 to 180 degrees, so this was decreased.

Q. What else did you find?

A. I found internal rotation described to L1 or first lumbar vertebra. Basically that indicates when he he's putting his hand behind his back he can bring it to the mid-back region. That's a normal -- external rotation, that is with his arm at the side, rotating his hand away from the body, was 40 degrees, which is within normal limits. Extension, that is elevation behind his back, was 50 degrees, which is basically within normal limits as well.

approximately one month.
Q. And how did you describe that pain?
A. It was pain that was worse with elevation, the arm above the head that's what he was talking about there. Indicated that -- I indicated in my note he had not been on an exercise program. The injection that Dr. Rangitsch performed in March had given him complete relief of symptoms up until about a month before I saw him.
Q. So was it your understanding that sometime in early July the shoulder pain returned to Mr. Ronwin's left shoulder?
A. That's correct.
Q. And was it your understanding, based on what Mr. Ronwin told you, that from March 21 to early July the cortisone injection gave him complete relief of his symptoms?
A. That's correct.
Q. And that understanding is based on what Mr. Ronwin told you, correct?
A. That's correct.
Q. Did you do a physical examination?
A. Yes, I did.
Q. What did that examination show?
A. Examination of the shoulder indicated that his motion was essentially normal. He lacked the last 15 to



20 degrees of elevation, so whereas when I'd seen him six months before -- five, six months before, he was able to elevate to 160 degrees forward elevation or flexion. He was only able to get to about 110 degrees in abduction, whereas in August he could get to 1six0, 165 degrees.
Elevation did cause pain and pain with resisted elevation. In other words, I asked him to elevate his arm, hold against it and that increased his pain.
Q. What was your impression?
A. Subacromial impingement.
Q. The same impression you had before?
A. Yes.
Q. By impression, that's your diagnosis, correct?
A. That's correct.
Q. What plan or action did you take in August of 2001?
A. I injected the shoulder joint area, the bursa, really the subacromial bursa, with Depo-Medrol, and that's cortisone and Xylocaine, which is local anesthetic, and asked him to return in a month.
Q. So you directed Mr. Ronwin to return to your clinic in a month?
A. Yes.
Q. Is that the last time you saw Mr. Ronwin?
A. Yes.



Q. Have you spoken to Mr. Ronwin since that office visit?
A. Not to my recollection.
Q. You diagnosed Mr. Ronwin as having subacromial impingement syndrome with osteoarthritis of the AC joint, correct?
A. That's correct.
Q. I'll represent to you that in 2003, Mr. Ronwin was diagnosed with a full tear of the supraspinatus tendon. Okay?
A. Uh-huh.
Q. In your clinical judgment, could the subacromial impingement syndrome and osteoarthritis you saw lead to a complete tear of the supraspinatus tendon?
A. Yes.
Q. Doctor, did Mr. Ronwin ever advise you that he was taking Bacal?
A. Yes.
Q. And how did he --
MR. RONWIN: Wait a minute, wait a minute. Do you have notes in addition to what you put here in this exhibit? He's reading from the back of the page now.
MR. PILKINGTON: I'll ask him to look at that.
MR. RONWIN: That should be an exhibit.



MR. PILKINGTON: We'll get there. Hold on.
MR. RONWIN: Okay.
Q. (BY MR. PILKINGTON) What are you looking at?
A. I'm looking at -- what we do is we have a -- we have patients fill out two forms before we see them. Generally the first is a patient information form, name, address, birth date, that sort of thing, and insurance information, a copy of their insurance card. So that's the relevant patient information for business office.
And in addition, we ask them to fill out a personal history form.
Q. Okay.
A. And then generally what I'll do after that is after that's been filled out, generally I will review that before I see the patient or when I -- at the time of the visit, and then I may or may not ask questions to --
Q. So, Doctor, in this --
A. -- supplement.
Q. -- patient information form, he told you that he was on Bacal, correct?
A. That's correct.
Q. At any point in time during your care and treatment of Mr. Ronwin, did he attribute any of these complaints or symptoms to his use of Bacal?
A. No.



02/12/2007 09:34 FAX 970 224 3838 ED RONWIN 027

sort of transcription made that then goes to some other party, who then makes this typewritten portion; is that right?
A. That's correct.
Q. Okay. I didn't understand that when you first explained it. I thought it was typed here on -- physically on the typewriter or computer.
A. No.
Q. In composing this particular sheet, did you actually put your handwritten notes on this -- on the original of this very sheet?
A. Yes.
Q. So how did the transcript -- the typed transcribed portion get on there?
A. It's on a -- they type it on a -- on paper that has an adhesive backing.
Q. I see. And then you have --
A. So when they send it back and then one of my -- one of my employees then takes the adhesive backing and places it in the chart.
Q. I see. So it really -- the way these are here, it's as though it's one thing done at one time, but it isn't actually. It's someone then comes along and puts on the typed part and then you present it as a whole?
A. That's correct.



Q. Okay. And in between there, is there room for error between what you've written here and what is on the typed part?
A. You mean could the -- could the transcriptionist type a word erroneously? Sure.
Q. And this transcription, is it strictly taken from the handwritten notes only or do you somehow voice what is actually typed out here?
A. I dictate it. That's my --
Q. Oh, you do?
A. Those are my words. I dictate it --
Q. All right.
A. -- and it is transcribed exactly word for word.
Q. So every word here, for example, in this March 16, '01 typed portion of the notes, every word under history was something that you dictated?
A. That's correct.
Q. Even though you had written handwritten notes?
A. That's correct.
Q. Okay. Let's see. What sort of percentage of your practice would you say -- and it doesn't have to be exact, requires you to do rotator cuff tear surgery?
A. Oh, I haven't any idea.
Q. Well, if you don't have an idea --
A. I probably would say either rotator cuff --



either repair of rotator cuff or depression surgically of subacromial impingement, probably do between 50 and a hundred a year.
Q. And what percentage of the surgeries would that be? Do you have any idea how many surgeries occur then?
A. I generally do about average six a week.
Q. How many a week?
A. Six.
Q. Six?
A. Probably.
Q. So six times 50 is 300; is that right?
A. Six times 50 is 300.
Q. Huh?
A. Yes, that's correct.
Q. Good at mathematics, too, aren't I?
A. You are.
Q. All right. All righty. Now -- now, in -- you just said you do subacromial decompression. Is that what you called it?
A. Yes.
Q. That's not really a rotator cuff tear surgery, is it?
A. Well, no. The rotator cuff tendon is torn, generally we will perform a subacromial decompression and then repair --



Q. And repair it at this time?
A. That's correct.
Q. But you could just have arthritis in the subacromial area that's causing pain without a tear?
A. That's correct.
Q. Is that right? All right. And -- okay. Take that up.
All right. I think you said you can have a rotator cuff tear, but not the symptoms; is that correct?
A. That's correct.
Q. Well, if you had a -- a -- if you had a full tear, wouldn't you always have pain, if you, for instance, wanted to lift your hand up to push something up -- let's say push something up on a shelf in a closet or maybe you like to press weights in a gym, or something, wouldn't you always have pain?
A. No.
Q. You wouldn't?
A. No.
Q. Hmm. That's surprising. Hmm.
All right. Now, you said you wrote on your notes shoulder pain -- left shoulder pain, by -- well, X, which I guess means for --
A. Yes.
Q. -- in that sense, two, and then you put a dash,





02/12/2007 09:34 FAX 970 224 3838 ED RONWIN 028

upwards three months; is that right?
A. That's correct.
Q. Now, do I indicate when I started taking Bacal on these notes that have been marked as Exhibit 6?
A. No.
Q. Did I -- does it indicate that I took Bacal?
A. Pardon?
Q. Does it indicate that I took --
A. In your personal history, yes.
Q. Oh, yes, it does. What medicines you regularly take, Bacal. All right. You wrote statin underneath. All right.
But there isn't any request for how long you took it, is there?
A. No.
Q. Okay. Let's -- let's ask this. If I started in January and I saw you in March, would that certainly encompass the two months?
A. If you started what in January?
Q. Taking Bacal.
A. Yes.
Q. And I saw you in March?
A. Correct.
Q. Would that encompass at least the two months?
A. Yes.



Q. Why did you write that three with that --
A. Well, as I said before, generally when I -- when I see -- it's been five years. I have no -- I have no actual memory of the encounter, but generally when that occurs, it occurs because the patient will tell me two months, for instance. And then as we talk, it may become -- it will become apparent to me perhaps as long as three months, so then I just add it to the note.
Q. Okay. So -- but are you writing these handwritten notes exactly as the patient is speaking?
A. Yes.
Q. I see. Well, then, you must have come back and put that three in there.
A. I did it at the time of the exam, yes. These notes are -- I don't write notes on this except when I'm in the room with the patient. So whatever is handwritten there is written at the time of the patient exam.
Q. But if I said -- if I -- by the way, I'm going to use third person, okay? I'll probably forget at times in the heat of battle. But if I told you -- if Ronwin told two months, you would have written two months; is that right?
A. Yes.
Q. Then would you have come back with three months afterward?



A. Well, I would have come back with three months after I wrote the two, otherwise I would have put two to three months. It would have been on the same line.
Q. Yes. In other words, you had to come back --
A. So what this implies to me is that originally, when I talked with the patient, the patient would say two months, and then as we continue the history process, something the patient has said is indicated as to two to three months, so it's approximate.
Q. So that three is actually after --
A. If the patient --
Q. Pardon. Go ahead. You want --
A. The three is what?
Q. An afterthought, isn't it?
A. What do you mean an afterthought?
Q. At the time I said two months, if I said two months --
A. Well, I would not have put three months had you not said three months.
Q. Why would I -- why would Ronwin tell you two months and then later on in the meeting tell you three months?
A. Because generally this is an approximation, in other words, if a patient has a specific date of injury, they may say -- I'll say how long have you been having



symptoms, and they'll say since December 23. I know the date because it was two days before Christmas. Ordinarily with the degenerative process, something that has become symptomatic over a more gradual period of time, it is an approximation, and so generally they will say about two months, and then it would become apparent at some point that it was longer than that. If it wasn't, I wouldn't have put it down.
Q. What -- what in that interview caused you to be -- make it appear to you apparent that it was three months?
A. Well, as I've stated, I have no actual memory of that --
Q. I see.
A. -- but what is in that portion of the written exam is the patient's words.
Q. Yeah.
A. So what it would have been would have been a statement from you that it was at one point a statement from you two months. And then later, during that interview process, three months. I don't put it in there unless it comes -- this history portion is what the patient tells me. I don't put it in there if the patient hasn't told me that, so I don't recall what it was specifically why that was two and then three. I can't

tell you, but I can tell you that it is my habit, over 30-plus years of practice, that what I write down is what the patient tells me.
Q. But wouldn't it be more -- more logical to have instead of have the two months, if you were subsequently told three months by Ronwin, to have simply crossed the out the two months and put three months?
A. I have no exact memory. If a patient generally -- you're talking about you specifically or you talking about --
Q. I'm talking about me, this note.
A. So you want to talk about this time specifically?
Q. Yes. I'm not talking about anybody else.
A. I don't have any specific memory of the event.
Q. Okay.
A. But in general, if the patient tells me a time period and later tells me a different time period, then I will list both, because this is the patient's own words.
Q. All right. Again, if -- if Ronwin --
A. My guess is that it was something that was less specific. My guess is it was about two months it's been bothering me and later, you know, as I think about it, it may have been as long as three months. If it was something specific where a person would say it started two



months ago exactly, and then said, you know, as I think about it, it wasn't two months ago, I know it was three months ago, then I would change it to say patient indicates it was three months.
Q. Did Ronwin --
A. It was said in such a way that it was more generalized that I added that.
Q. Did Ronwin tell you the exact date he started Bacal?
A. No.
Q. Do you think Ronwin knows the exact date he started Bacal and has evidence of it?
A. I have no -- I have no way of knowing.
Q. I may have it with me somewhere. I think I do. That's 24 -- hmm.
MR. RONWIN: Are you looking for anything in particular?
MR. PILKINGTON: What are you looking for, the date you claim you started taking Bacal?
MR. RONWIN: Yes. I know the date was January 10, 2001. Have you got the lipid sheets -- my lipid panel sheets? No?
Q. (BY MR. RONWIN) All right. Will you accept the fact that Ronwin started Bacal -- taking Bacal on January 10, 2001?



A. I have no way of knowing whether Ronwin did or did not. If you tell me that's when you started, then I accept that. I have no reason not to.
Q. You have no reason to not believe that; is that right?
A. That's correct.
Q. All right. Well, you can certainly believe it.
And if we look at two months, January and February, would be roughly two months; is that right?
A. That's correct.
Q. And if we added March, we went out three months; is that right?
MR. PILKINGTON: Object to form.
A. January 10 to February 10 would be one, and February 10 to March would be two months. So if you're asking me the time frame between January 10 and March 16, would be two months and six days.
Q. (BY MR. RONWIN) Yeah, but when you write down the word -- wrote down the word months, were you thinking months from the day one to the last day of the month and then from the day one of the next month and the last day of the month?
A. I was thinking two months, generally, as a person would in conversation, i.e., 30-day months, but this is not in any means meant to be an exact date. If I



had known an exact date, I'd have stated an exact date. So that meant if you're asking me if I would put it another way, I would have put it 60 to 90 days.
Q. All right. Let's see. All right. I'll go with the -- into these notes themselves.
Is this note formation and preservation procedure that you've described here, both to my colleague and to myself, done for all patients in your office?
A. Yes.
Q. And all of your -- of your associates, colleagues, also do it that way?
A. I have three partners. Two partners, Rangitsch and Basta do it this way. We use the same transcription service. Dr. Winter, who actually was not in our practice March of 2001, uses a handheld dict -- cassette recorder.
Q. Okay. So Dr. Rangitsch's report was prepared in a similar -- or identical way in which yours was?
A. That's correct.
Q. And it was he who did the dictation on his report?
A. That's correct.
Q. Now, the next sentence in the first paragraph of the March 16th report, the -- let's see, first paragraph, rather, and you wrote that sentence, "He has taken nonsteroidal medication."



030

ED RONWIN 970 224 3838 FAX 08:36 02/12/2007

A. Right.
Q. And what was the medication that I supposedly had taken?
A. Well, I think I've explained that earlier. Obviously that's a typographical error in transcription. In other words, when there's a difference between my handwritten note and the -- and the transcribed note, then I always rely on my handwritten note, because it's contemporaneous with the exam. So the handwritten note says no NSAIDs, indicating there was no nonsteroidal medication.
Q. First, N-S-A-I-D stands for a non -- does it stand for nonsteroidal anti-inflammatory drug?
A. Yes.
Q. Okay. And when you do this dictation, do you have these handwritten notes in front of you?
A. Yes.
Q. And you've written in the handwritten notes having not -- no NSAID?
A. That's correct.
Q. So how could they dictate that he has taken nonsteroidal medication?
A. Well, as I've explained, my guess is -- my guess is that I did not dictate it that way, but that's how it was transcribed.



Q. So errors can come into your notes; is that right?
A. You mean the -- there could be a transcription error? Sure.
Q. Transcription error. Possibly an error in your own handwriting -- handwritten notes, too?
A. Well --
Q. Are you --
A. -- there's no error in my handwritten notes with regard to what I put on the paper. I mean, what I write down is what the patient tells me.
Q. Well, did I tell you that -- did Ronwin tell you that the flexion was 160 degrees?
A. Under the exam, that is, first two sentences on that wrote are what the patient states. That's the history part of an exam. Where it says "exam," that is objective exam. That is what I find objectively on my physical exam. That has nothing to do with what you tell me. It's what I observe on physical exam.
Q. Let's take your handwritten statement in the second line, on that March 16, 2001 note, where it says "no crepitus."
A. That's correct.
Q. Did Ronwin tell you -- did Ronwin say to you "no crepitus"?



A. No, what you-- what Ronwin probably told me was no grinding or popping. This is a -- that's the medical term for that.
Q. Yes. Crepitus. All right.
What is the next one that follows that? What is that, don't P -- oh?
A. It says, "Doesn't PT." These are notes that I can recall for a dictation. What that indicates is that Ronwin doesn't want physical therapy.
Q. Okay. Uh-huh. I have a hard time reading your handwriting.
Could you just recite what you've written on the -- after you -- you have your flexion, abduction data, you have the XL stands for the left shoulder, I assume, but could you read what -- the rest of what you've written on that line?
A. You want me to read it exactly or you want me to use the abbreviations? What I've written is mod DJD AC joint, the symbol would be with, Nth spur, minimal G/N narrowing, mild subacromial narrowing.
Q. Okay. I see. I just wanted to find out what you were -- what you were saying there. See if it had any importance.
Now, this no SNAID -- no NSAID versus the statement has taken nonsteroidal medication -- first let



me back that up and ask you, did you claim that you did not have a telephone conversation with me after the last time I had seen you in August of 2001?
A. I think what I said is I don't recall any other communication after the last visit.
Q. Would you accept the fact that you did have a conversation with me?
A. If you tell me that --
MR. PILKINGTON: Objection. Asked and answered.
A. -- we did, I have no reason to disbelieve it. I just don't recall it.
Q. (BY MR. RONWIN) And in that conversation, since you don't seem to recall it, but would you try hard to recall that you admitted that there was that error between your written notes on the NSAID matter and the typed portion?
A. I have absolutely no recollection of any telephone call with you.
Q. All right. Now --
A. I can tell you generally if a patient phones in about a medical problem, I generally dictate it at that time, but obviously not always if you called me in this instance.
Q. Did Ronwin ask for a cortisone injection to

relieve his left shoulder pain at the March 16, 2001 visit?
A. The note does not indicate so.
Q. Well --
A. Generally if a patient specifically requests an injection, I may suggest what I think is appropriate medical treatment, and between me and the patient, may not give an injection. Ordinarily if the parent insists they want an injection, then it's indicated, I would give it at that time.
Q. You would give the injection if the patient insisted; is that right?
A. That's correct. If I thought it were medically indicated.
Q. Yes.
Now, also, did you get a -- any sort of history of Ronwin's educational background and experience? Your -- in the patient's personal history form Exhibit 6?
A. No, but we don't ask for it, either.
Q. Doesn't appear that you asked for it.
If Ronwin told you that he had been a professor of biochemistry for about 20 years, would you think he would know -- he would know what cortisone is?
MR. PILKINGTON: Objection. Foundation.
A. Well, I would -- professor of bio -- sure. I



would think so.
Q. (BY MR. RONWIN) All right. And so if he knew what cortisone was, is there a possibility that he would have asked for a cortisone injection when he visited you on March 16, 2001?
MR. PILKINGTON: Objection. Form, foundation.
Doctor, I may have to object to the form or foundation of certain questions to preserve those objections for trial, and that's all I'm doing.
Q. (BY MR. RONWIN) Perfectly natural legal procedure.
A. Right. Now, I've forgotten the question.
Q. The question was, if -- if you had that knowledge of Ronwin's background and he asked for a cortisone injection, would you think he -- he knew what he was asking for, in effect?
MR. PILKINGTON: Same objections.
A. I would assume -- I would assume so.
Q. (BY MR. RONWIN) All right.
A. Are you assuming medical knowledge? I'm not -- I'm not quite sure I know what you're asking, to tell you the truth.
Q. Well, you know what biochemistry is, don't you?
A. Yes.



Q. Did you take some when you went to medical school?
A. Yes.
Q. And did they take up the topic of steroids?
A. You know, I recall very little of biochemistry in medical school.
Q. I see. By the way, did you have any other chemistry in medical school besides biochemistry?
A. In medical school?
Q. Uh-huh.
A. Man, I haven't thought about medical school in years. Not that I recall.
Q. Did you have chemistry before you went to medical school?
A. Yes.
Q. What chemistry did you have?
A. I had -- I took organic chemistry and quantitative analysis and qualitative analysis, as I recall.
Q. Okay. That's good.
Did you -- by the way, did you have inorganic chemistry? I would think it likely, in order for you to have taken analytical chemistry.
A. I don't recall what I took in high school.
I ought to tell you, this is scheduled for two



hours and I have another appointment in 10 minutes. I don't mean to rush you, if we're going to have to do much longer than that, we're going to have to reschedule.
Q. We're going to have to, because I've got questions here.
Did Ronwin get a cortisone injection on March 16, 2001?
A. No.
Q. Do you recall if Ronwin made the request that for the cortisone injection it be given in the following manner, first an injection of lidocaine or could have been Xylocaine, which is essentially the same -- well, they're not identical, but very similar molecules, followed by the injection of the cortisone?
A. I have no independent recollection of this visit.
Q. Do you recall that you refused to do that -- to give me -- to give Ronwin an injection by that procedure?
A. I have no independent recollection of that visit.
Q. If you had used that procedure, would that have caused you any loss?
A. I'm sorry. Any loss?
Q. Well, suppose you gave Ronwin a cortisone injection the way in which he asked, first the -- the





02/12/2007 09:37 FAX 970 224 3838 ED RONWIN 032

MR. PILKINGTON: Same objections.
A. Well, the -- what that statement is is a statement of his physical examination of you. In other words, after examining you, it's his opinion that the rotator cuff strength was intact.
MR. RONWIN: I see. All right. Now -- now I'm pressed. Once again, I'm pressed.
MR. PILKINGTON: I bet I took less than an hour. When did we start this deposition?
MR. RONWIN: No, you took more than an hour.
MR. PILKINGTON: Rather than do this on the record, let's keep going and perhaps we can get done with the doctor.
THE DEPONENT: That's fine.
MR. PILKINGTON: He's being very hospitable.
MR. RONWIN: Can we keep going? I'd like to get --
THE DEPONENT: Fine, let's go through it. I'm just telling you my time constraints. Let's move it along, please.
Q. (BY MR. RONWIN) Let's go to that report of 8 -- August 8, 2001. When did you get the comment in the first paragraph of, quote, pain for about one month.



A. That's what the patient told me.
Q. All right. Where did you get the notion that Dr. -- "Dr. Rangitsch's injection of cortisone gave Ronwin complete relief of his symptoms"?
A. That's what the patient told me.
Q. What symptoms?
A. Symptoms of pain.
Q. Where did you get the description mild pain?
A. That's what the patient indicates. That may not --
Q. Well, now --
A. If a patient tells me something and I -- and I want it as an exact quote, I will put it in quotation marks. So some things like that would be characterization.
Q. But in your -- in your written -- handwritten notes, do you have anything about mild pain?
A. No.
Q. And haven't you told us that you report what the patient says there in your handwritten notes?
A. My handwritten notes are not an exact -- it's not like I'm taking a transcription, so my handwritten notes are not an exact statement of everything the patient says. What they are -- what -- they're used to assist me in dictation of the note. That's why the dictated note is



almost always much more detailed.
Q. How much pain do I have in my thumb?
MR. PILKINGTON: Objection. Form and foundation.
A. I have no idea.
Q. (BY MR. RONWIN) That's right. And if -- if the patient doesn't tell you the degree of pain that the patient feels, what means do you have to know whether the pain is horrendous, almost unbearable, nearly unbearable, mild or virtually nonexistent?
MR. PILKINGTON: Same objections.
A. I have no way of knowing the amount of pain the patient has unless they tell me.
Q. (BY MR. RONWIN) In that telephone conversation that I assured you we had after the last time I saw you, after this August 8 meeting, did you admit to Ronwin that the idea that the pain was mild was your idea?
A. I have no recollection of any telephone conversation.
Q. Oh, so this is a -- a variance, though, between your handwritten notes and, again, the -- the typed portion of your notes; is that right?
MR. PILKINGTON: Objection. Form, foundation. Are you talking August 8?
MR. RONWIN: What?



MR. PILKINGTON: You talking August 8.
A. I'm not seeing anywhere -- I guess I'm confused, because I don't see anywhere in here --.
Q. (BY MR. RONWIN) About mild --
A. Mild.
Q. It's on the second page of the 8/8/2001 note.
MR. PILKINGTON: Doctor under physical examination?
Q. (BY MR. RONWIN) Yeah, last --
MR. PILKINGTON: Mild pain with elevation.
A. Okay. So the question is, I'm sorry, what?
Q. (BY MR. RONWIN) I just said -- so there is a discrepancy between your handwritten notes where you don't refer to mild pain at all, but there in the physical examination you're assuring whoever reads these reports that Ronwin has mild pain with elevation and mild pain with resisted depression and reflection.
MR. PILKINGTON: Same objections.
A. Okay. Well, the reason I would say mild pain is that would be the patient's characterization during the exam. So I wouldn't -- I wouldn't put mild pain if the patient exhibited significant pain. So I -- it's a judgment based on what the patient says. If the patient moves the shoulder without any pain at all, I would say shoulder motion does not produce pain. If the patient





02/12/2007 09:38 FAX 970 224 3838 ED RONWIN 033

can't get it up at all and says this is severe or killing me, then I would say it's severe. If it's mild, I indicate it's mild, it's a subjective term.

Q. (BY MR. RONWIN) The patient says there's no grinding sounds and that sort of thing. You're right, no crepitus. How come you didn't write something about pain in your handwritten notes for August 8, 2001?

MR. PILKINGTON: Objection. Asked and answered. Same objections as before.

A. As I explained to you, the handwritten notes are not an absolute transcription. It's not like dictation. I put down sufficient amount so I can recall the exam, physical exam, and the history prior to dictation. I dictate at the same time.

Q. (BY MR. RONWIN) What would give you -- from the handwritten notes, give you an adequate -- an adequate ability to state that the pain was mild?

MR. PILKINGTON: He's answered that question. Asked and answered objection.

A. The handwritten -- handwritten notes and the typed notes are not exactly the same. The handwritten notes are used to help me recall physical exam or the -- but I don't know who.

Q. (BY MR. RONWIN) You're not answering the question. You're not answering the question. The



question is what in the handwritten notes would even give you the idea to write mild pain?

A. There is nothing in the handwritten note to indicate that.

Q. Okay. That's what I wanted to get at. There is nothing.

All right. Now, let's see. Did we argue at that August 8th, 2001 visit -- well, let's turn the reel back. Did you charge for the visit on March 16, 2001?

A. I'm sure I did.

Q. And did we argue at the August 8th, 2001 visit because Ronwin contended that he came to get a cortisone injection and received none, yet he had to come back five days later to get a cortisone injection?

A. I have no independent recollection of this.

Q. All right. Let's see, put that down.

Has anybody redacted your notes since these were put together originally?

A. I guess I should know redacted, but I don't.

Q. Huh?

A. No, I'm not familiar with the term redacted.

Q. Well, altered them, changed them?

A. Has anyone altered the notes?

Q. Changed them, rewritten the terms for some reason or other?



A. No.

Q. Used different words instead of words there to perhaps enhance the -- the quality of the expression?

A. Since the records were requested?

Q. Yes.

A. No.

Q. Well, since you -- they were actually first put together in this form.

A. No.

Q. Now, do your reports bear any indication of a left shoulder rotator cuff tendinitis or tear in Ronwin's left shoulder?

MR. PILKINGTON: Objection. Form.

A. They do not indicate a tear, subacromial impingement implies a tendinitis.

Q. (BY MR. RONWIN) Yeah.

A. Tendinitis and bursitis.

Q. Do you -- do you list the tendinitis as a -- as an assessment or a impression?

A. No.

Q. Why not?

A. Well, because the subacromion impingement encompasses tendinitis and bursitis, as I explained about an hour ago.

Q. But that wouldn't be a rotator cuff tendinitis,



would it, necessarily?

A. Yes, it would be a rotator cuff tendinitis.

Q. Well, all right. But you don't list the tear --

A. No.

Q. -- possibility of a tear?

And was that a possible diagnosis?

A. Sure.

Q. Why wasn't it stated?

A. Subacromial impingement can produce a tear, a small tear.

Q. All right. Now, I've got -- I wanted to view those X rays. I had some questions on the X rays.

A. All right.

(Off-the-record discussion.)

MR. PILKINGTON: Doctor, for the record, you brought three separate films into the room?

THE DEPONENT: That's correct.

MR. PILKINGTON: Thank you.

Q. (BY MR. RONWIN) Yes. Okay. Now, first I wanted to ask you, the views, is this a front view? In other words, a view this way, or is it a back view?

A. It's what's called anter/post review. It's taken -- the patient's back to the film, the beam coming from front to back.

Q. Front to back, so it's sort of a -- what view --

the X rays are hitting the front first of the body; is that right?
A. Well, radiographs produce a two-dimensional reproduction of three-dimensional objects, so it's neither front nor back.
Q. Well, I asked you which way the X ray come. They're coming from the camera -- from the x-ray device, the catho tube, straight at the body this way and you're taking a picture in the back?
A. That's correct.
Q. Okay. That's what I wanted to know.
Now, this one here, which -- which way were the X rays coming and which way --
A. With the patient partially oblique to the film, again coming -- the film is at the back, the beam is coming from the front.
Q. So this way and at an odd angle?
A. That's correct.
Q. Okay. Just to be sure we're talking about the same things -- and this one here, would that be with the -- the X rays coming this way?
MR. PILKINGTON: Would you describe where you --
MR. RONWIN: Huh?
MR. PILKINGTON: Would you describe where



you pointed?
MR. RONWIN: I'm pointing to the front of my shoulder. In other words, being encompassing both the area of the -- you see the arm first.
Q. (BY MR. RONWIN) In other words, is that the way it's coming, the X rays?
A. It's taken over a curved cassette, that is a cassette that is a half moon shape. Patient -- cassette is placed in the armpit, the film comes from the top of the shoulder through the armpit to the film.
Q. So it's -- the X rays are coming down this way?
A. From the top of the shoulder through the shoulder and the film.
Q. And the camera's down somehow; is that right?
A. No, the camera is at the top. The film is in the armpit.
Q. I see. Okay. All right. I got the idea.
Are those the X rays of Ronwin's left shoulder --
A. Yes.
Q. -- at the time he visited on 3/16/01?
A. Yes.
Q. And were they taken in your offices?
A. Yes.
Q. Okay. Now, do X rays pick out bone?



A. Do they pick out bone?
Q. In other words, they show bone?
A. Yes.
Q. Do they pick out cartilage?
A. Do they show cartilage? No.
Q. Do they show collagen?
A. No.
Q. Do they show tendons?
A. No.
Q. What are tendons -- what are tendons constructed?
A. What are tendons constructed of?
Q. Of what, yes.
A. They're protein.
Q. Protein?
A. Uh-huh.
Q. What protein?
A. I don't know. I've got -- I'm going to give you about 10 minutes and then I'm out of here.
Q. Yeah.
A. I don't mean to be disrespectful, but that's the time I have scheduled.
Q. I'd like to do something if I wanted more, but we'll see what we can do. If I get through this, we may leave it at that.



MR. PILKINGTON: I'm sure you can get through this.
MR. RONWIN: What?
MR. PILKINGTON: I'm sure you can get through this.
MR. RONWIN: I can't hear you.
MR. PILKINGTON: I'm sure you can get through your questioning in 10 minutes.
MR. RONWIN: I think so. I'll give it a try.
Q. (BY MR. RONWIN) You're saying they're proteins. Are there cells in tendons?
A. Yes.
Q. What kind of cells?
MR. PILKINGTON: Objection. Foundation.
A. Oh, my gosh. Tendons cells.
Q. (BY MR. RONWIN) You just call them tendon cells?
A. Yes.
Q. Okay.
A. There are many types of cells. Tendon is a very complex structure.
Q. Yes, I understand that.
A. It's made of many different types. Now, if you want to go through the pathophysiology, the anatomy,





02/12/2007 09:39 FAX 870 224 3838 ED RONWIN 035

the microanatomy of a tendon, we could sure as hell do it, but I don't have time, and it doesn't appear to me to be relevant and you're making me a little angry, to tell you the truth. You've got 10 minutes and then I'm out of here.
Q. All right. Are there nerve cells in tendons?
A. There are nerve cell endings in tendons, yes.
Q. Are there muscle cells in tendons?
A. At the tendinous -- musculotendinous junction, yes.
Q. Is the -- is the tend --
A. Tendon by definition is tendon cells, not muscle cells. Muscle cells are in muscle.
Q. All right.
A. So nerve cells are in nerve. Bone cells are in bone.
Q. All right. So there's a variation between the --
A. Right.
Q. -- the tendon cells?
A. That's correct.
Q. Okay. Fine. Don't get excited about it, you know.
I think you said there are blood vessels in tendons; is that right?



A. Yes. Well there are blood vessels in some tendons.
Q. All right. Do X rays of the sort we have -- you have taken here on March 16, 2001 reveal a rotator cuff tear in a supraspinatus tendon?
A. No.
Q. Okay. And any other portion of the left shoulder area?
A. In any other portion of the left shoulder area what?
Q. Are there any tears or -- or frays shown by the X rays in Ronwin's left shoulder?
A. No, X rays don't -- don't reveal that kind of detail in soft tissue.
Q. Right. Is an arthrogram used to spot a shoulder rotator cuff tear?
A. Can be.
Q. Is an arthrogram basically an X ray procedure?
A. Arthrogram is an X ray procedure, yes.
Q. Yes.
A. It's an enhanced X ray procedure.
Q. Yes, and how did the arthrogram show the rotator cuff tear, then?
A. Arthrogram -- during an arthrogram, a liquid medium, which is opaque to the X ray beam, is injected



into the joint. It escapes through the tear and the tendon, then that can be seen.
Q. Okay. All right. So there was no way from those X rays that you saw, that on March 16, 2001, that you could have concluded that Ronwin had a left shoulder rotator cuff tear?
A. They're not designed -- well, there are rotator cuff tears that can be seen by --
Q. By X rays?
A. -- plain X ray. A tear can't be seen, but can be inferred by a loss of the space. That was not present in this film.
Q. I see. And do you consider the -- you spoke of the arthritic nature, the -- the acromioclavicular spurs and the osteophytes, which are just spurs basically, as being present. And you implied that they could cause the rotator cuff tear. Now, can you see a tear in those X rays from the -- the spurs and arthritis conditions?
MR. PILKINGTON: Form and foundation.
A. As I said, those are not designed to produce -- to show tears in the rotator cuff tendon.
Q. (BY MR. RONWIN) Either way. In other words, whether it was due to a tear of the tendon?
A. That's correct.
Q. Okay. That's -- that's what I want to know.



And, now, in describing the -- the impressions that you had, would you consider them to be mild, more than mild, so to speak, or very -- very severe, the condition that you described, the -- I believe you described the condition here, subacromial impingement?
MR. PILKINGTON: Objection. Form and foundation.
A. I didn't characterize it in my note.
Q. (BY MR. RONWIN) Huh?
A. I said it wasn't characterized in the note.
Q. In your note?
A. As mild.
MR. PILKINGTON: Are you referring to the x-ray report right here?
MR. RONWIN: No, I'm referring to the impression in the March 16, 2001 report.
A. Right. It wasn't -- I didn't characterize it one way or another.
Q. (BY MR. RONWIN) Right. So you -- at this time, are you able to say whether it was mild, severe or in between?
A. Well, based on my note, I would probably have classified that as mild to moderate.
Q. Mild?
A. Mild to moderate.

MR. PILKINGTON: Moderate.

Q. (BY MR. RONWIN) Okay. Let's see. I have a couple of things here I might want to ask you about, and I better come back -- impression -- all right.

Oh, do you have any evidence that Ronwin's left shoulder rotator cuff tear was essentially due to age, rather than to any other -- any other possible cause?

A. No, I wouldn't say it's due to age, specifically. I would say it's --

Q. It's --

A. In my opinion, it's a degenerative condition.

Q. Yes, but you have no proof that it was due to age, degeneration as a result of age?

A. We see -- we see this type of degenerative condition more commonly as a patient gets older, but we can see it in younger ages, too.

MR. PILKINGTON: Form and foundation objection.

Q. (BY MR. RONWIN) Specifically as to me, are you able to say that it was age degeneration that caused the rotator cuff tear?

A. It's a --

Q. If you can't say it, then you can't say it.

A. It is a degenerative condition that is the result of, in my opinion, osteoarthritis or degenerative



arthritis, acromioclavicular joint and impingement.

Q. Yeah. Yeah. All right.

A. The arthritis is much more common as a person gets older.

Q. Yes.

A. At age 77, and I'm sure that played a part, yes.

Q. Would your analysis in this situation exclude other possible causes?

A. Such as injury?

Q. Such as injury or such as --

A. It excludes injury, as you gave no indication there had been an injury.

Q. Yeah, right, but such as a tearing of bodily tissues by the Bacal molecule or by the fluorine atom in the Bacal molecule coming off that molecule and then acting in the body?

A. Are you asking me my opinion as to whether or not this is related to Bacal?

Q. No, I'm just saying can you rule out no other causes other than that — that -- than that the injury -- I mean, the physical injury type -- you've ruled out physical injury type in your opinion just now.

A. I don't think.

Q. Can you rule out other things --

A. I don't think this is an acute injury. This is



a degenerative process, secondary to bony impingement.

Q. Yeah, but can you rule out other possible causes?

A. I can't think of any other possible cause. Yes, I would rule out Bacal as a cause, if that's your question.

Q. You would?

A. Yes.

Q. On what grounds?

A. Because Bacal doesn't cause this.

Q. How do you know?

A. Based on my experiences as an orthopedic surgeon.

Q. Uh-huh. And have you had -- how many patients have you had that had taken Bacal for sure and then you had to do a rotate -- you found a rotator cuff tear for sure?

A. As I'm standing here -- as I'm sitting here now, I can't give you any example one way or another.

Q. Okay. Then how do you know Bacal wasn't the cause?

A. I've answered that question. My opinion is this is a degenerative tear based on experience of 30 years training as an orthopedic surgeon.

Q. That's fine.



A. And based on literature with regard to Bacal, but I'm not going to argue with you about it.

Q. I'm not asking you to argue. I'm asking you can you rule out any other cause?

MR. PILKINGTON: Objection. Asked and answered. He said he ruled out other -- in his opinion, the most probable cause is degenerative change.

MR. RONWIN: That's his opinion.

MR. PILKINGTON: That's what you're asking.

MR. RONWIN: Yeah, but I asked how did he rule out other causes? And then he says, well, there was no physical injury. And then he says he rules out Bacal, so I asked him how he can rule out Bacal, and he doesn't give us an answer.

MR. PILKINGTON: Oh, he did.

MR. RONWIN: No, he didn't. This is more like what he would like —

THE DEPONENT: Mr. -- we are pretty much done.

MR. RONWIN: Yeah, this is more like what he would like to rule out.

MR. PILKINGTON: Are you done?

MR. RONWIN: Well, I suppose, but I'd really like to go into that Bacal thing.

THE DEPONENT: We can reschedule if you'd

like. I'm perfectly happy to do that.
MR. PILKINGTON: I'm not paying for the doctor's time. If you want --
MR. RONWIN: We'll discuss that afterwards.
MR. PILKINGTON: Are you done?
MR. RONWIN: Well, I think that we haven't -- I got to go to this cause thing. I'd like to get this cause bit out, because there are a couple of things I could explain to him and see if he can explain --
MR. PILKINGTON: Doctor, would you give us five minutes and I think this will be done.
THE DEPONENT: I'll give you five minutes.
MR. PILKINGTON: I think it can be done. That will save us having to come back again.
Q. (BY MR. RONWIN) Okay. The Bacal molecule has a fluorine atom in it, do you know that?
A. No, I'm not an expert in Bacal.
Q. Okay. Will you accept that it has a fluorine atom in it?
A. I have no idea. I'm not an expert in Bacal.
Q. I didn't ask you that. I just said will you accept it.
A. I'm not going to accept anything that I have no knowledge of. I'm not an expert in Bacal. I can't talk about the chemistry of Bacal.



Q. Right. Well, do you know?
A. I'm an orthopedic surgeon. I can answer those questions.
Q. That's fine.
A. And within the five minutes, I'm happy to do that.
Q. That's fine.
And therefore, do you know if Bacal tears up tissues, cells and other tissues in the body?
MR. PILKINGTON: Objection. Form and foundation.
A. I've just told you I'm an expert in orthopedic surgery.
Q. (BY MR. RONWIN) So, therefore, the answer is really no, you don't know?
A. Right, I don't know.
Q. That's all you need --
A. I don't know the chemistry of Bacal, no.
Q. Right. And you don't know, therefore, whether a it tears up cells or other body tissues?
MR. PILKINGTON: Same objections.
A. Same answer.
Q. (BY MR. RONWIN) Okay. And, therefore, you don't know whether it tears up muscle cells or -- and nerve cells?



MR. PILKINGTON: Same objections.
A. I know in general the questions and the allegations with regard to statins and muscle damage.
Q. (BY MR. RONWIN) Yes. Do you know about statins and nerve cell damage?
A. Yes.
Q. You do?
A. I've read in general, yes.
Q. Yes. But now do you know --?
A. But I'm not an expert in that area. I'm an expert in orthopedic surgery. I've testified with regard to my opinion as to what caused your injury.
MR. RONWIN: Well, I don't think we're going to get a better answer be than that.
THE DEPONENT: No, you're not.
MR. RONWIN: He's simply no willing to answer.
MR. PILKINGTON: I think he's answered, but do you have any more questions?
MR. RONWIN: I think call it a night.
MR. PILKINGTON: Doctor, just a couple follow-up questions.
THE DEPONENT: Fine.

REDIRECT EXAMINATION

Q. (BY MR. PILKINGTON) Doctor, there's been a lot



of testimony about your handwritten two to three months. Do you recall that testimony?
A. Yes.
Q. Is it my understanding you wrote two to three months based on what Mr. Ronwin told you?
A. That's correct.
Q. To the best of your knowledge, is that a true and accurate note of what he told you?
A. Yes.
Q. Doctor, let me show you a reference to a document Mr. Ronwin filed in court. It's a letter pursuant to PTO114, Section 1B1 and on page 4. Mr. Ronwin said, "I began to experience left shoulder pain and restriction -- restriction of the range of motion in my left arm on or about February 15, 2001." Do you see that.
A. Yes.
Q. That's about one month before he saw you, correct?
A. That's correct.
Q. Did Mr. Ronwin ever tell you that he began to experience his pain one month before he saw you?
A. No.
Q. Instead he told you it was two to three months before, correct?
A. That's correct.