UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MDL No. 1431 (MJD), Case No. 02-0200

DEPOSITION OF: EUGENE WOLFEL, M.D.
June 8, 2006

| | |
|---|---|
| In re BAYCOL PRODUCTS LITIGATION | : |
| | : MDL No. 1431 |
| This Document Relates to: | : (MJD) |
| | : |
| Edward Ronwin, et al., v. Bayer Corp., et al. | : Case No. 02-0200 |
| | : |

TAKEN PURSUANT TO NOTICE on behalf of the Defendant at 4200 East 9th Avenue, Room 6430, Denver, Colorado 80262 at 9:10 a.m. before Lisa B. Kelly, Registered Professional Reporter and Notary Public within Colorado.

FEB 1_ 2007

I tend to almost trip. And sometimes I would really have to grab something and catch myself. The question then becomes, Doctor, would that be an evidence of claudication or some other problem?
A. That's not usually the symptoms of claudication. It's usually not a tripping action. It's usually pain, usually in the calf of the leg, that makes someone stop.
Q. Right. You mentioned in your testimony that you understood that I had bleeding after the angiogram at Rose Hospital.
A. That's correct.
Q. Are you aware of the circumstances of why I bled?
A. I cannot recall exactly, but trying to remember our discussion, which goes back now almost four years, it had something to do with the fact that the procedure was done in a diseased artery, number one, and then secondly, it had something to do with whatever blood thinners you were given at the time.
Q. Yes. Yes. I might just say that you're correct on the second for certain.
A. Okay.
Q. It was a matter of Plavix.
A. Okay.
Q. And I think we can leave it there.



A. Okay.
Q. We don't have to correct anything further.
A. Okay.
Q. I want to go into the question of aspirin. Let's see. Aspirin. Yes. Did you recommend that Ronwin take a daily dose of aspirin?
A. Yes, I did.
Q. Do you recall the strength of the dose, sir?
A. No, I don't. And I think that based on my practice, it could either be a full adult aspirin or 81 milligram, the lower dose. There's evidence that both are effective.
Q. Yes. Well, you've recorded 325 milligrams per day.
A. That's what's in the chart, yes.
Q. That's correct.
A. Okay.
Q. That was the dose. Did Ronwin take the aspirin for a period of time?
A. I presume so, because a discussion about not continuing to take it occurred after a number of visits.
Q. So then Ronwin did cease to take it after a time?
A. That's my recollection, yes.
Q. Did Ronwin inform you why he ceased to take any



dose of aspirin?
A. Unfortunately, I don't have that documented in the one note. There's a key line that was not transcribed, so I don't recall the exact reason why.
Q. I see. Well, I can't testify, but I think I'll just amplify it for the record because if I get on the stand, I will certainly take this issue up, if the other side decides to take it up.
The reason was I saw that article on the great deal of negatives that were associated -- adverse events associated with the taking of aspirin. And I think I may have shown you that article.
And it was in -- it was one of these things you pick up in the, like, Sunflower store -- markets, but it referenced a number of credible journals, like the Journal of -- American Journal of Cardiology, that sort of thing.
A. Well, my own -- you know, my only comment about making recommendations is that there are guidelines that are proposed by national organizations like the American Heart Association, American College of Cardiology, and for the chronic treatment of coronary disease -- can't say for sure for peripheral arterial disease -- daily aspirin is recommended. So that was the basis of my recommendation.
Q. I don't object to that.
A. Okay. So that's where my recommendation came



from.
Q. Perfectly proper. I wasn't questioning your recommendation at all. I was just saying the reason I quit it is because I saw so many negatives, like it affected your liver. Just a number of negative effects by aspirin. I said, that's too hazardous. That was my attitude.
Did -- on the other hand, did Ronwin state to you that his friends gave Ronwin suggestions to cease aspirin?
A. I can't recall if that was mentioned or not.
Q. I see. That was raised as another reason in somebody else's testimony. Okay. Now, I think we'll start with this next one here. Let's see.
Do you do an extensive amount of medical biochemical research or is it solely that research program that you mentioned while testifying?
A. I do not do any biomedical -- I mean biochemical research, per se, no. Most of my research is centered on physiology. Or I've been a co-investigator on some clinical trials involving therapy for heart failure. But I don't do any bench type research myself.
Q. Have you ever published any scientific articles on any research that you were involved in or co --
A. Quite a few.



d88a314d-ed65-49ee-9dfc-8ca258a9ba33

4/18/01 and 7/19/01 differ substantially from the values from January 22nd, '02 to the present?
MR. PILKINGTON: Objection. Form and foundation. Are you just talking the total cholesterol or all of it?
MR. RONWIN: Yeah. Just the cholesterol value is all we're interested in in this deal.
A. Well, there's a lot of numbers here to interpret. But in general, the values of those two dates that you've listed are lower than the previous ones and not dissimilar from all the ones from 2002 to the present.
Q. (BY MR. RONWIN) Right. So what I was getting at was that in my experience, would you conclude that my every-day dosing with Baycol and subsequent every-other-day dosing with Zocor didn't really show any great variance?
MR. PILKINGTON: Same objections.
A. You know, since I don't have the exact dosing of drugs next to these columns, it's hard for me to comment exactly in the response to that question. But if what you're proposing is that the drug was used every other day versus every day previously, there doesn't seem to be a substantial difference in the numbers.
Q. (BY MR. RONWIN) Thank you. Now, I would like to -- you indicated that you had not seen any prior



studies on every-day dosing -- every-other-day dosing; is that right --
A. That's correct.
Q. -- in your testimony? These were originally marked Exhibits 4 through 7.
MR. RONWIN: I want to mark them for this deposition. And that would be 14, 15, 16, and 17, okay?
MR. PILKINGTON: May I suggest that we cover up the label with your original sticker?
MR. RONWIN: All right. If she wants to do that, that's fine with me. So why don't you do that, please.
(Deposition Exhibits 14 through 17 were marked.)
Q. (BY MR. RONWIN) Could you peruse those, please. What I would ask is if you would please read the -- on each one of these, the title, the -- identify the journal, the volume, the year and the initial page, if you will, please, and then the conclusion, most of which can be found quite readily on the first page.
A. All right. The first article is in the American Heart Journal, volume 144, page 674, year 2002. The title of this article is, Is Alternate Daily Dose of Atorvastatin Effective in Treating Patients with Hyperlipidemia, question mark. The Alternate Day Versus Daily Dosing of Atorvastatin Study. Then in parenthesis



it has capital letters, A-D-D-A-S, close parenthesis.
This is published by a group from Fresno and Stockton, California. The conclusion of this article, although higher doses of Atorvastatin were used on alternate days, these results suggest that the alternate day administration of Atorvastatin can produce a reduction in LDL cholesterol, comparable to that of daily administration in patients with hypercholesterolemia and yet provide some cost savings. So that's one.
The next is an abstract --
Q. Could I interrupt for a second?
A. I'm sorry.
Q. That's all right. Could you just identify the common name of Atorvastatin?
A. Lipitor.
Q. Thank you.
A. The second is taken from the American College of Chest Physicians Annual Meeting Abstracts in 1999.
Q. Yes. And I want to point your attention to the -- on the left-hand column, there's a line there and then there's an abstract --
A. That's right.
Q. -- that runs there, up to the upper right-hand column.
A. That's correct. So I don't have the actual



journal volume to relate to here.
Q. That's correct.
A. The abstract is number 32.
Q. Yes.
A. And the title of the abstract is, Efficacy of Alternate Day Dosing Versus Every Day Dosing with Atorvastatin.
Q. Yes.
A. And this was presented by a group from Pomona California, University of California at Irvine.
Q. And --
A. And the conclusion of this abstract --
Q. Yes.
A. -- based on our preliminary results, comma, the percent reduction in LDL is similar in every day -- in every-other-day dosing with Atorvastatin. Every-other-day dosing should result in significant drug cost savings without compromising the therapeutic effects.
Q. Right. Thank you.
A. Okay. The third article is published in the American Journal of Cardiology, volume 76, page 312, 1995. The title of this article is Effect of Lovastatin Administered Every Other Day on Serum Low-Density Lipoprotein Cholesterol >160 mg/dl.
Q. And the conclusion is on that first page, right

Page 130

there.
A. I see it's highlighted.
Q. Yes.
A. And this was from a group at the Veterans Affair Medical Center in Prescott, Arizona. And the conclusion is as stated: In conclusion, comma, Lovastatin administered at 20 milligrams every other day is effective in lowering LDL levels in patients with serum LDL greater than 160 milligrams per deciliter.
Q. Yes. What is the common name for that Lovastatin?
A. Mevacor is the common name for Lovastatin.
Q. Thank you, Doctor. And we have just one more there.
A. And the fourth article is published in the journal Pharmacotherapy, volume 18, page 836, 1998. Title of the article, A Comparison of Fluvastatin, 40 mg Every Other Day Versus 20 mg Every Day In Patients With Hypercholesterolemia. This is published from the Veterans Affairs Medical Center, Prescott, Arizona.
And the conclusion of this article, Fluvastatin, 40 milligrams every other day, is effective in lowering total cholesterol and LDL in patients with hypercholesterolemia.
Q. What is the common name of Fluvastatin, please?

Page 131

A. Lescol, L-e-s-c-o-l.
Q. Right. Thank you, Doctor.
A. I had to think about that for a minute. I don't use that very much.
Q. Now, are each -- for the three journals, are each of those respectable journals in your opinion?
MR. PILKINGTON: Objection. Form and foundation.
A. Each of these journals have peer review, which means that at least two independent reviewers review the scientific merit and the credibility of the article before it's published.
So for the three articles that were full, completed manuscripts, they've gone through independent review. I'm not certain, as to the review of abstracts for the American College of Chest Physicians, whether that's peer reviewed or not.
Q. (BY MR. RONWIN) I see. Probably not. But is that --
A. I don't know.
Q. -- a credible organization?
A. Yes. It is a credible organization.
Q. Thank you, Doctor. What I've just shown you, from my own experience, would you care to give us your opinion on every-day dosing compared to every-other-day

Page 132

dosing? You don't have to, but if you would like.
MR. PILKINGTON: Objection. Form and foundation.
A. You know I have not read the paper --
Q. (BY MR. RONWIN) Right.
A. -- to determine the strength of the information. And there's -- I've not seen -- most of these studies look at the -- sort of the chemical effect of the various dosing regimens, you know, how well they affect cholesterol.
One would then have to make an assumption, based on that, that the -- the favorable end points of using lipid lowering drugs, in other words, prolonging life, decreasing cardiac events, would be similar, but there is no direct information to show that.
Q. All right. Okay.
A. And there's nothing I can tell you about these articles that discuss toxicity. They're talking about efficacy of treatment. And if they talk about toxicity, I have not had the opportunity to review them.
Q. Right. You mentioned I had seen a paper and that was what set me off on this every-other-day process. And did I ever show you that paper?
A. I don't recall. I usually put most of the articles that are given to me in the patient's chart, but

Page 133

I don't always do that. So let me just review here to see if I find anything in that regard.
Q. This is what it starts with. I'm going to have it marked, I think. Then you can just look at it, if you would like.
A. I don't have it in the patient record. It potentially could be in my academic file, but I don't have it here.
(Deposition Exhibit 18 was marked.)
MR. RONWIN: I'm coming down toward the end here.
MR. PILKINGTON: That's fine.
Q. (BY MR. RONWIN) Well, could you just take a quick look at that and read the headline -- the title of the article?
A. Okay. The article is published in the Journal of Science, which is a very prestigious scientific journal. The title of the article is Structural Mechanism for Statin Inhibition of -- these are capital letters -- HMG-CoA -- capital C, small o, capital A -- and new word, reductase.
Q. All right. And on page -- the next page, you have a number of chemical formulas set out for various statins; is that right?
A. That's correct.

Page 138

A. That's correct.
Q. Did you ever receive a letter or letters from Bayer concerning Baycol that was addressed to either Dear Doctor or Dear Health Care Professional?
A. I presume I have. I've personally not ever prescribed Baycol extensively just because it was not on our hospital formulary at the time it was available.
My only experience with that drug is that we see patients who are funded by Tricare, which is a military funding insurance plan, and Baycol was one of the formulary drugs for those patients.
So I know of at least one other patient that was on Baycol at the time it was withdrawn, but I don't have extensive experience with it.
But as far as the letter is concerned, I'm sure I received the letter. I don't have a copy of it to document that I received a letter. But usually these letters actually go to physicians' homes rather than to their offices or so forth.
Q. I assume, of course, you have colleagues in your cardiology group.
A. Right.
Q. Do you know if any of your colleagues received any of these?
A. I cannot state whether or not that occurred.

Page 139

Q. Okay. Now, in your experience as a cardiologist, have you ever come across data which consists of adverse event reports, which we abbreviate as AERs?
A. Yes, I have.
Q. Have any of those AERs involved Baycol?
A. I can't definitively state that I have received any of those, but this has been several years ago, so I don't recall.
Q. I see.
A. That's my honest answer.
Q. Do you know if the U.S. Food and Drug Administration, FDA for short, requires health care practitioners, such as physicians, to report adverse events associated with any drug ingestion?
A. Yes. That's their policy.
Q. I see. In prescribing statins to patients -- which you've testified you do --
A. Right.
Q. -- have you ever given consideration to AERs?
A. I don't think I've ever --
MR. PILKINGTON: Form and foundation.
A. I don't think I've ever had a situation where there's a sufficient adverse event that I generated such a report. So, for example, if patients develop muscle pain

Page 140

with statins, that's a known possible adverse effect, I act on that clinically, but I do not submit a report for that.
If I had a patient that had developed severe renal failure, despite appropriate follow-up with a statin, I certainly would report that. But that's never occurred with my practice.
Q. (BY MR. RONWIN) Okay. Do you consider AERs to be reliable indicators of adverse effects on patients dosed with statins?
MR. PILKINGTON: Same objections.
A. I don't know that I have the expertise to fully comment on that. I think this whole issue of postmarket analysis of drugs that have been evaluated by the FDA previously is going to receive more attention.
Because many more people are treated with medications after the drug is released than in any large clinical trial. And I know the FDA is making an attempt to try and simplify that process so they can evaluate medications after they've been released.
And, you know, probably the most recent classic example of that would be the drug Vioxx that has received a lot of press.
Q. (BY MR. RONWIN) Right. Yes.
MR. RONWIN: Off the record for a second.

Page 141

(Discussion off the record.)
Q. (BY MR. RONWIN) Since you've been -- you've testified that you've been an author on scientific publications, so you're familiar with the publication process?
A. That's right.
Q. And with the ethics of publishing?
A. That's right.
Q. Do you believe that it is unethical for an author or authors of scientific publications or research results, sponsored and paid for by pharmaceutical companies, who fail to reveal in the published articles any monetary or professional relationship or both that the author or authors have with the pharmaceutical company?
MR. PILKINGTON: Form and foundation.
A. Well, that's a moving target. I think it became recognized, just within the last few years, that there is either adherent or potentially perceived conflict of interest when a study has been funded by a pharmaceutical company or someone is an advisor or a consultant to a pharmaceutical company for which they write a paper, and that full disclosure of that needs to be given in the article.
And most journals, within the last year or two or three, have required that be part of the publication.

Page 154

required, I would have to agree. I mean, I know Avogadro's number, and I know some aspects of chemistry. But, you know, particularly being under oath and say that I exactly know correctly how to interpret all that information, I would have to say I do not have the knowledge base.

Q. Finally, Doctor, Mr. Ronwin gave you several articles. Do you recall that testimony?

A. Yes, I do.

Q. And he asked you to read the title, state the publication, and read the conclusion into the record, correct?

A. That's correct.

Q. Did you have an opportunity to review any of those articles?

A. No, I did not.

Q. And when you were reading the conclusion of those articles, were you accepting those conclusions as true?

A. That's a difficult question to answer. The fact that it was accepted for publication means that there was enough credibility during the review process to say that the information provided in those articles was reliable to be published.

Whether I -- since I did not have the

Page 155

opportunity to look through the methodology and look through the results and determine the conclusions, you know, I can't say to what degree I entirely agree with everything.

Q. In other words, those conclusions don't necessarily reflect your opinions or conclusions, correct?

A. No, they don't, because I haven't read the article.

Q. And, indeed, in the course of your practice as a cardiologist and a researcher, you review articles all the time, correct?

A. That's correct.

Q. And in your course of reviewing those articles, sometimes you would agree with the conclusions, other times you don't?

A. That's correct.

Q. It depends on the study?

A. That's correct.

Q. And that underlies the importance of taking and reviewing and carefully analyzing studies before you form an opinion as to those studies?

A. That's true. But can I also state that if there's several papers that come to the same conclusions, that alone, you know, they seem to corroborate each other, that there's probably something to the conclusions. I

Page 156

mean, that's probably a fair thing to say.

Q. That may further support the conclusions that are drawn?

THE DEPONENT: Exactly. Exactly.

MR. PILKINGTON: Doctor, I thank you for your time today.

MR. RONWIN: Can I ask two more questions, please?

MR. PILKINGTON: Yes.

EXAMINATION

BY MR. RONWIN:

Q. First of all, I want to ask you, regardless of what a pharmaceutical company suggests should be the dosing, if a variance produces the desired result for the patient, is that wrong?

MR. PILKINGTON: Form and foundation.

A. I think wrong is a very strong term. I think that involves a discussion between the doctor and the patient about, number one, why another approach is taken and what the risks are involved in taking that approach.

If it involves less medication, then the question is what are the risks of less -- potential less efficacy. Clearly, if it's a higher dose, then that's a much more difficult issue. And I think myself included, that most physicians would be very hesitant to exceed

Page 157

dosing recommendations because realizing a higher dose of any medicine, the more risk of adverse events.

Q. (BY MR. RONWIN) Right.

A. The only thing I can think of is that there's been recent evidence with high doses of certain statins used in acute coronary syndromes. There's this trial called the miracle trial where patients were given 80 milligrams of Lipitor because they had unstable angina or a certain type of heart attack, and there was some favorable information available from that.

That is not the way to dose that medicine according to the package insert, but there is a paper that suggests that at least initially this dose of the drug can be used at a higher dose.

So that's -- I mean, I think physicians struggle with this all the time, about how to interpret new information based on a drug that was approved at a different level.

Q. Right. But did the evidence that I gave you in the form of my own lipid panel results indicate that every-other-day dosing was certainly not injuring me?

A. Well, the reason --

MR. PILKINGTON: Same objections.

A. -- that we initially embarked on this was that I was willing to see what would happen. And there's been