UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| In re BAYCOL LITIGATION | MDL No. 1431 (MJD/SRN) |
| This Document relates to: | Case No. 02-0200 |
| Ronwin v. Bayer Corp. | |

**MOTION FOR REVIEW OF MAGISTRATE'S ORDER FEB.23, 2007 PURSUANT TO 28 U.S.C. § 636(b)(1)**
**ORAL ARGUMENT REQUESTED**

Plaintiff, Edward Ronwin, ("RONWIN"), hereby moves this court to review the Magistrate's Order, dated February 23, 2007, which granted Defendant's, ("BAYER"), motion to take RONWIN's expert deposition, and without payment of an expert fee.

Although the Order is dated and presumably filed on February 23, 2007, the Order was not originally served on RONWIN. Upon learning from BAYER's Denver counsel's office on February 28, 2007, of the existence of the Order, RONWIN called the secretary to the Magistrate on March 1, 2007 to get service. The secretary did not know that RONWIN was not served and said she would look into it. A copy of the Order was put in an envelope postmarked March 1, 2007; copy of the postmarked envelope is attached hereto as Exhibit 1. The copy reached RONWIN on March 5, 2007.

As the court well knows in this MDL, now in its 6th year, RONWIN does not have a modern computer capable of receiving e-mail notices and that RONWIN has been regularly served by U.S. Mail.

Apparently, the Magistrate's office had the Clerk's office serve the Order by the court's current electronic service system but did not order or take steps to have RONWIN served by U.S. mail. It appears that the Magistrate's secretary believes that the Liaison Counsel's office, specifically attorney, DEANNA DAILEY, has the obligation to serve court orders on RONWIN

SCANNED
MAR 09 2007
U.S. DISTRICT COURT MPLS

by mail. While PTO 156,I.A, directs notices of deposition setting by BAYER be served, "...on all counsel of record, [which would include pro se parties such as RONWIN], listed in PACER and on the PSC through [DEANNA DAILEY]," by e-mail and U.S. mail, that provision is not applicable, by its terms, to court orders whether emananting from the Magistrate's or the Judge's offices. Furthermore, § 636(b)(1) requires the Magistrate Judge to file and "forthwith serve 'orders' by mail on all parties."

The date of service of the Magistrate's Order is of prime importance since § 636(b)(1)(A) states in part:

> ...a judge of the court may reconsider any pretrial matter under this subparagraph (A) where it has been shown that the Magistrate Judge's order is clearly erroneous or contrary to law.

and, the overall subsection, i.e., 636(b)(1), further provides:

> Within <u>ten days after being served with a copy</u>, any party may serve and file written objections to such proposed findings and conclusions as provided by rules of court... (emphasis supplied).

The ten day period for raising objections to the Magistrate's holdings, whether or not they are "proposed findings and recommendations," must be observed if a party unsatisfied with the District Court's review of the Magistrate's holdings wishes to petition to appeal to the appropriate Circuit Court of Appeals, see <u>Tranello v. Frey</u>, 962 F.2d 244, 247-248 (2nd Cir. 1992), cert. den. 113 S.Ct. 813, which stresses the importance of the 10 day limit.

For purposes of the ten day limit, the time that service by mail is made begins to run on the day <u>after</u> the day of service, Fed.R.Civ.P. 6(a). Furthermore, when the period of time prescribed or allowed is less than 11 days, "intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation," of the 10 day period, Fed.R.Civ.P. 6(a). Likewise, said

rule dictates that if the last day, in this case the tenth day, falls on a Sat., Sun., or holiday, the tenth day is considered to be the very next business day. Furthermore, Fed.R.Civ.P. 6(e) provides:

> whenever a party must or may act within a prescribed period after service and service is made under Rule 5(b)(2)(B), (C) or (D), 3 days are added after the prescribed period would otherwise expire under subdivsion (a).

The service of the Magistrate's Order on RONWIN comes withing Fed.R.Civ.P. 5(b)(2)(B). Accord: Sicurella v. Chater, 896 F.Supp. 121, 122 (W.D.N.Y. 1995).

Consonant with the foregoing, the starting date for the 10 day period would be March 2, 2007, and eliminating Sat's., Sun's and holidays, the 10th day would be March 15, 2007. Adding 2 days for mailing, makes the last day to file this motion, Monday, March 19, 2007. This motion is expected to be filed much earlier.

According to Ms.DAILEY's comments in telephone communication on March 7, 2007 with RONWIN, it appears that Ms.DAILEY, acting for the Liaison Counsel's office, is making some arrangement for Ms.DAILEY to mail all matters on behalf of the court to RONWIN.

The question of what standard of review applies to a motion such as this one was considered in Delco Wire & Cable, Inc. v. Weinberger, 109 F.R.D. 680, 685 (E.D.Pa.1986), wherein the plaintiff's contended that under §636(b)(1)(A) the standard is always "clearly erroneous or contrary to law" and that under §636(b)(1)(B) the standard is always "de novo."

Disagreeing the court observed, in effect, that the statute does not mandate that nondispositive matters must always be referred for determination rather than for recommendation, since the purpose of §636's referral and review provisions are to define the powers that a [district] court may allow a Magistrate to exercise and not to restrict the ultimate authority of an Article III

court over a case pending before it, 109 F.R.D. @ 685.

In Thomas v. Arn, 474 U.S. 140, 154, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985), rehear.den. 106 S.Ct. 899, the court declared:

> Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard... (last emphasis added).

RONWIN requests de novo review.

**OBJECTIONS TO THE MAGISTRATE'S ORDER**

I. The Magistrate's Order, 1st ¶, p. 1, states that "...the parties [have] received due notice." If "due notice" applies to Order itself, then, as above, the statement is incorrect. RONWIN did not receive notice of Order at the same time as BAYER. Also questionable is the statement that the parties were given "...the opportunity to be heard," 1st ¶, p. 1, Order. RONWIN considers that the proper hearing involves the ears, i.e., oral argument which was denied, 1st full ¶, last sentence, p. 2, Order. Written argument is confined to the written word, but oral argument allows a more thorough exposition of the position of parties to a lawsuit. Oral argument has another beneficial purpose if the object of judicial determination is to achieve justice, as the object should be: In this case, and RONWIN assumes in many others, BAYER has held back reference to case reports until they file a reply to a response to a motion. Then, providing a false representation to the court as to the meaning and thrust of a case, they take advantage of the plaintiff who, under the rules, cannot technically file a sur-reply. BAYER followed that procedure with respect to the Kooritzky case, which receives attention below. In general, plaintiffs are also able to pay that filthy game. Oral argument allows exposure of such negative advocacy.

II. Contrary to the Magistrate's notion, 1st sentence, 3rd ¶, p. 1, Order, RONWIN has designated himself as an expert "on a number of issues,", (not identified in the Order), but NOT including the "medical" cause of RONWIN's injuries. RONWIN takes the "medical" adjective to mean the type of expertise an MD, DO or similar health practitioner might exhibit. What RONWIN is expert upon and what BAYER is unable to deny if BAYER told the truth to this court and hasn't as will be evident below; and what the Magistrate does not understand nor given any indication of an effort to understand or the Magistrate couldn't have made the "medical" statement is that:

(a) Baycol is a chemical molecule composed of various atoms and when its action within living entities, such as human beings is considered, it is a biochemical.

(b) The body is composed almost entirely of chemical, rather biochemical, molecules; each, in turn, is composed of various atoms.

(c) The interaction of the molecules in the body between themselves, as well as between themselves and outside chemicals, such as Baycol, is the science of Biochemistry/Molecular Biology.[1] The interactions of molecules within the human body and of any such molecules with outside agents such as Baycol falls within the province of biochemical experts, such as RONWIN, and almost never with the expertise of MD's or similar health practitioners because their training and clinical experience gives them limited biochemical knowledge, except for the very few MD's who, as medical students, enroll in a dual MD-PhD (in biochemistry) program

[1] RONWIN is a member of the ASBMB, i.e., the American Society of Biochemistry and Molecular Biology. The difference between the two fields is only one of research interest. Molecular biologists tend to concentrate on large biochemicals such as proteins, enzymes (which are almost always, but not always proteins), polysaccharides, DNA, etc. Biochemists also work with these entities and additionally concentrate on reactions of small biomolecules. To be a molecular biologist one must be a biochemist and vice versa.

which usually requires six (6) years of formal medical school training. Successful candidates receive both the MD and PhD degrees. More on this below.

Proof that the basic action of Baycol, (and of thousands of other chemicals which enter the human body either because of medical prescriptions or from additives to foods, etc.), on the human body is not a "medical affair" but one for biochemists, comes from Dr. JANE SERVI.

(The testimony set forth below was brought to the Magistrate's attention in RONWIN's Response to BAYER's Motion to Compel RONWIN's expert deposition, pp. 6-8).

Dr. Jane Servi, (SERVI), who is an associate of Dr. Knauer, (who, in turn, performed the operation on RONWIN's left shoulder rotator cuff), testified in part in her deposition as follows:

P. 114, line 18 to p. 115, line 18: (These page references are to the deposition; (Questions by RONWIN; Answers by SERVI):

Q. I see, Okay. Did you know that there's a fluorene, (misspelled by Reporter), atom in the Baycol molecule?

A. I don't prescribe Baycol. I don't know the chemical makeup of Baycol. I couldn't even start to answer that question.

Q. I see. You agree that it -- Baycol tears up muscle cells in various degrees?

Mr. PILKINGTON: Objection, form and foundation.

A. Baycol has been, from my knowledge -- again, I don't prescribe it. From my knowledge, it has been associated with people with rhabdomyolysis.

Q. Well, to get the -- in rhabdomyolysis, to get the proteins and enzymes pouring into the bloodstream from the -- from the muscle cells, then the muscle cells must have been torn open; is that right?

MR. PILKINGTON: Same objections.

A. To my understanding, there is destruction of the cell. How that occurs is beyond my medical expertise.

Q. All right. So if Baycol can -- can -- but you don't know how it does that, it tears up

the cells, is what you're saying?

A. No. Again, that may be a better question asked to a chemist, a pharmaceutical, a research person.

P. 115, line 22 to p. 116, line 13:

Q. Okay. So it's not within your knowledge?

A. It is not within my expertise.

Q. But you do know -- do you know whether the composition of a cell is basically an organization of molecules?

A. That is beyond my --

MR. PILKINGTON: Same objections.

A. -- ability to answer.

MR. PILKINGTON: Same Objections.

Q. Well, the cell has an outer cover in the animal kingdom, all right? It's not a wall, like in the plant kingdom, but it's a cover, right, a membrane. Is the membrane made up of chemicals?

A. That's --

MR. PILKINGTON: Same objections, form and foundation.

A. That's beyond my expertise.

P. 116, lines 20-21:

A. Again, in our area of medicine, we don't always go down to the molecular level...

P. 117, line 22 to p. 118, line 1:

A. That's beyond my -- my medical expertise to answer that within correct reason. I'm -- I'm not sure, in terms of chemicals and the -- the way you are using that term, as if that's what we were made up of. So I would defer to an organic chemist.

P. 119, lines 1 to 7:

A. When you go to medical school, then you start to develop into organ, organ systems, and then we develop into how we are going to look for medical conditions and treatments for them. So many times at -- at our level of being a physician, we are no longer dealing with chemicals and cellular membranes and all of the carbons that make up the body.

P. 119, lines 11 to 14:

Q. Your overall work deals with -- with organs and functional anatomical parts of the body; is that right?

A. We deal with evaluation of a patient complaints and treatment...

P. 119, lines 19 to 25:

A. -- on a macrolevel as a person presenting to me with a complaint.

Q. But that doesn't prevent those muscles that you spoke about, muscular problems, it doesn't prevent that from being basically chemical in nature.

A. I'm not sure how that relates to my area of medicine.

SERVI clearly recognized that MD's, (she is one), concentrate on an overall clinical level; i.e., they see a patient; the patient explains: I took drug X; a part of my anatomy hurts; the anatomical part did not hurt before I took drug X; I did not experience any other trauma to the hurting anatomical part such as a fall, being hit by a brick or vehicle, etc. Hence, MD concludes: Drug X is causing the patient's pain at the patient's anatomical site.

But, as SERVI states, MD's don't get more fundamental; i.e., they do not venture into the basic chemical essence of tissues and cells.

Further support for RONWIN's contention presented just above comes from the deposition of Dr.MARK PRINCE, who is a Veteran's Administration medical doctor who examined RONWIN on a number of occasions from roughly 1999 to 2005. As Dr.SERVI, Dr. PRINCE recognized that MD's focus on the <u>clinical</u>, but do not hold forth on the <u>fundamental</u> causes of disease.

(The ensuing copy of a portion of Dr.PRINCE's testimony at his deposition was presented to

this court in RONWIN's Response to BAYER's Motion for Summary Judgment. The Response was filed on Feb. 12, 2007).

Depo.41:2-5: Dr.Prince did not offer any opinions as to Dr.RONWIN's rotator cuff tear. Consistent with Dr.Servi's observations that MDs concentrate on the "clinical" and are ill-equipped to discourse on the "fundamental, biochemical" aspects of drug action such as that of Baycol, Dr. Prince testified as follows:

Depo.46:4-14:

Q. Okay. Is the basis of all -- first of all, is the basis of the structure of the human body basically molecular?
A. Yeah.
Q. In other words, we're made up of nothing pretty much but molecules, is that right?
A. Yes, sir.
Q. Okay. And is the basis really of medicine biochemical and biomolecular?
MR. PILKINGTON: Form and foundation.
A. Some of it is, yes.

Clinical aspects of medicine concentrates on the outward manifestations of disease,

Depo.47:7-14:
Q. And -- and the clinical -- these clinical aspects that you just referred to --
A. Um-hum.
Q. -- don't the cons -- do they concentrate on, basically, the outward manifestations of disease; in other words, things like fever, inflammation, et cetera --
A. Yes, sir, they do.

But Dr.Prince does not look at the, [underlying], biochemical reactions,

Depo.48:18-22:
A. (by Dr.Prince): But do you use certain biochemical things? On the periphery you are. But are you sitting down and looking at the biochemical reactions? No, I don't do that.
Q. (by Dr.RONWIN): Right.

Dr.Prince knows that the analysis of disease these days has moved to the reaction between disease and genetic makeup in terms of the chemical or biochemical makeup,

Depo. 48:24-49:8:

A. Okay?
Q. And what I'm also trying to get at is, for example, today diseases are -- are diseases shown to be the cause by genetic makeup, and in terms not only of saying the gene, but the composition of the gene in terms of its chemical makeup or biochemical, because it's something to do with life?
MR.PILKINGTON: Objection, form and foundation.
A. Oh, I think that there's -- there's been literature out there about that, yes, sir.

Although Dr.Prince knows of and has been exposed to the biochemical aspects of disease, he has never delved into it,

Depo. 49:9-20:

Q. (BY MR.RONWIN) Yes. So that a gene made up of such-and-such DNA sequence is known to cause a disease nowadays, and the makeup of a change in that gene causes a different situation, is that right? Is that more common --
MR.PILKINGTON: Same objections.
Q. (BY MR.RONWIN) -- common today?
MR.PILKINGTON: Same objections.
A. I have -- I have read and been exposed to information like that, but I've never delved into --
Q. (BY MR.RONWIN) Yes. And when --
A. -- the biochemical

When Dr.Prince went to medical school, the current biochemical approach to disease was not even taken up,

Depo. 49:21-25:

Q. And when you were going to medical school, was that really a hot topic, or even taken up?
MR.PILKINGTON: Same objection.
A. No, sir.

Clearly, both Drs. Prince and Servi recognize that MDs concentrate on the clinical aspects of disease which often answers the "what" happened when disease or injury strikes a human being, but it is the biochemist/biomolecular biologist that is best equipped to explain to a jury, or anyone else, the "how and why" the disease or effects of an injury occurred!

The following was brought to the Magistrate's attention in RONWIN's Response to BAYER's Motion to Compel RONWIN's expert deposition, pp. 8-10:

RONWIN's expert view of Baycol action is far more fundamental than espoused by the Plaintiff's Steering Committee, (PSC), and BAYER medical experts. Molecules, without exception, are built from atoms. Baycol is a specific molecule. When Baycol enters the body it works its way into liver cells and inhibits the enzyme, HMG Reductase, which, in turn, reduces the amount of cholesterol released into the bloodstream. That cholesterol can travel in the bloodstream free, or as esters, or attach to lipoproteins and form, among other things, "LDL" and "HDL." However, Baycol action does not stop there. Baycol attacks cell membranes, (the walls of animal cells), which themselves consist of molecules; some of which are proteins, some are phospholipids, some are saccharides (sugars - not "table sugar" known as sucrose). Also found in cell membranes are various ions such as $Na^+$ and $Cl^-$, etc. Baycol's attacks on cell membranes, whether muscle cells, nerve cells or other types of cells, can cause openings in the cell membranes. These openings can be large enough so that some of the intracellular contents can work there way out of the cells, which can effectively kill the cells. Even if Baycol does not cause a wide gap in cell membranes, it can still enter the cells and cause disruption of normal cellular activity.

Baycol can also attack non-cellular entities in the body such as the major structural protein known as Collagen. The attack here results from Baycol's interference with the hydrogen bonding that gives Collagen its structure. When the natural structure of Collagen, which makes up a significant amount of any tendon, ligament, bone, etc., is deformed, the structure of these anatomical parts lose their normal form and structure which, in turn, reveals itself as weakness

and pain.

In distinction to the foregoing, all the PSC and BAYER medical experts have been saying is that Baycol was ingested and muscle cells and tissue destruction, as in RHABDO or weakening of muscle tissue and cells, (myopathy), has occurred. But no statement issues from these experts to show just how and why the muscle cells and tissue were destroyed and/or weakened.

However, RONWIN has offered the basic biochemical reasons for Baycol's destructive tissue and cell action based on Baycol's molecular structure and the chemical propensities of the atoms in the Baycol molecule; which is partly set forth in RONWIN's expert report filed in this specific case,...

It is the biochemists/molecular biologists who are far more capable than MD's (or OD's) to state with expert competence whether or not a drug is the cause of anatomical injury. In fact, every drug case is really a biochemical case and not the superficial, clinical level case that BAYER has promoted in this MDL.

The Magistrate, and this court, have shown no real understanding that Baycol is a chemical that acts in the human body by chemical interaction with other chemicals in the body. There is nothing "medical" about that! When such interaction causes pain, muscle, nerve and other cell destruction, vision impairments, tendon (and rotator cuff--which are tendons) tears, these consideration are primarily chemical because that is the unquestionable nature of Baycol's interaction with the molecules in the body. The "medical" component of that interaction reflected in symptoms such as pain and other disabilities present themselves to MD's for application of medical healing procedures such as use of heat, cold, surgery, drug prescriptions, etc. Of the two approaches, the biochemist/molecular biologist expertly explains how Baycol causes injuries;

the medical practitioners expertly offer ways to ameliorate or cure, if possible, the outwardly manifested injuries. MD's cannot say with expertise how Baycol, or any other drug or chemical causes the symptoms evidenced by the ingestion or interaction with a drug or other chemical.

III. The statement that the, "...parties do not dispute that the defense is entitled to take an expert deposition of [RONWIN] but disagree about whether Ronwin is entitled to an expert fee for his testimony..., 3rd sentence, 3rd ¶, p. 1, Order, is not entirely correct. An inkling of the problem which the Magistrate failed to recognize and which is a most serious matter, is revealed in the next sentence in the Order, 4th sentence, 3rd ¶, p. 1, where it is noted that, "...Bayer argues that Ronwin lacks the medical expertise to offer any medical opinion in this case..."

As above, this case, as all cases involving chemical actions on the human body, are essentially biochemical cases, not medical cases.

(a) But, more is involved.

BAYER argues that RONWIN is not an expert. Thus, in the last ¶, p. 1 of BAYER's MEMO to its Motion to Compel RONWIN's deposition, BAYER states:

> Moreover, Bayer seriously questions and will challenge Ronwin's qualifications. He is not a physician or otherwise qualified to offer expert opinions.

Not only is BAYER stating that RONWIN is not a "medical" expert--which RONWIN does not challenge, but that RONWIN is not any expert of any type whatsoever that can act as an expert in this case.

At p.5, 2nd ¶, BAYER MEMO to its Motion to Compel, BAYER assures this court that:

> Moreover, it would be manifestly unfair to require Bayer to pay Ronwin because he is not qualified [as an expert]...

In BAYER's MEMO, ("MEMO"), to its Motion for Summary Judgment filed herein on

January 19, 2007, BAYER informs this court as follows, 1st sentence, last ¶, p. 20, MEMO:

> Finally, Mr. Ronwin has submitted his own "expert" report in support of his claims... (quotation marks in original).

Continuing the paragraph on p. 21, BAYER writes:

> ...This is nothing more than an unsupported, untested hypothesis and should be excluded...

In the last ¶, last line, p. 21, BAYER describes RONWIN's expert report as "..inadmissible speculation."

On p. 23, BAYER entitles the section as:

> " Mr. Ronwin's purported "expert" report does not create a triable issue of fact"; the word, expert, is put in quotation marks by BAYER.

The whole of MEMO, pp. 20-23, present BAYER's Daubert motion and position to this court which is the same position that BAYER has taken in its Motion to Compel; i.e., RONWIN is not an expert.

But, by its Motion to Compel, BAYER insists on taking RONWIN's expert deposition. One cannot be allowed to take an expert deposition of a party or person who is not an expert.

The net effect: When it suits BAYER, it tells this court that RONWIN is not an expert; when it suits BAYER it tells this court that RONWIN is an expert.

That is duplicitous and fraudulent. In effect, BAYER either lies when it tells this court that it considers RONWIN to not be an expert, or it lies when it tells this court that it considers RONWIN to be an expert. No party in any lawsuit may be allowed to take to opposing views on the same matter at the same time. That inherently is lying to the court which is unlawful. For the Magistrate to approve BAYER's position by ignoring BAYER's contention in its MEMO to its Motion to Compel that RONWIN is not an expert while at the same time BAYER demands

an expert opinion from RONWIN is clearly erroneous and contrary to law.

(b) BAYER must be required to take a consistent position.

(i) If BAYER takes the position that RONWIN is not an expert then it cannot be allowed a third fact deposition. Third because BAYER has taken RONWIN's fact deposition twice. The second time could have been incorporated into the first deposition because BAYER had, or could have had, the medical reports on RONWIN from the Sioux Falls, SD area. Under PTO 149, p.4, (I)(C)(1)(d), the time to take fact depositions of Plaintiffs in Phase I is now over 8 months past.

(ii) If BAYER failed to ask questions it would not like to ask RONWIN in deposition, that's BAYER's problem.

The following was presented in RONWIN's Response to BAYER's MEMO to its Motion to Compel RONWIN's expert depostion, pp. 15-18 and reflects BAYER's failure to act promptly to take RONWIN's expert deposition:

When RONWIN filed his expert report on or about June 26, 2004, BAYER was fully informed that RONWIN was advancing in this specific case as both a fact witness and an expert witness. BAYER admits, 1st full ¶, p. 3. MEMO, that BAYER has taken RONWIN's fact deposition and agreed to take RONWIN's expert deposition, "later in a separate deposition." As to that matter, BAYER appended a copy of pp. 1-4 and 173-180 of RONWIN's deposition as Exh. C, MEMO.

The following can be noted from Exh. C, p. 176, lines 5-16:

(Questioning by PILKINGTON; Answers by RONWIN)

Q. How -- what -- on what basis have you concluded that Baycol can cause blurred vision?

A. Right. We've got to get into that chemistry that I talked to you about the other time. You want to get into all that?

Q. Well, let's do this: We have agreed before this deposition that we will return to take your expert witness deposition, correct?

A. You want to do that?

Q. At a later point, correct?

A. Then, that would be fine with me. Yeah, otherwise, we've got a whole lot to go into. (emphasis added).

Clearly, BAYER was (i) recognizing RONWIN as an expert and (ii) an agreement was made to take RONWIN's deposition as an expert. The deposition continued, pp. 176, line 17 to p. 177, line 16:

Q. And, Mr. Ronwin, do you recall us having a telephone conversation during which you told me that you're going to testify as an expert at trial?

A. What? As an expert, yes.

Q. And when you told me that -

A. And you want to take my deposition.

Q. – I said, Let's take your plaintiff's deposition first, and then take your expert deposition.

A. I don't believe you told me that. What I think you told me was that you didn't -- you weren't going to agree that I was an expert. That's the idea.

Q. Well, let's see if we can make sure we agree now.

A. Let's agree now.

Q. You've designated yourself as an expert, right?

A. Yes.

Q. And I was not planning on getting into any of your expert opinions today.

A. That will be fine.

Q. Okay. Provided, however, I have the opportunity to come back and ask you about your expert opinions.

A. You can always come back at a suitable, mutual time.

As can be seen, BAYER's attorney insisted that he said, "let's take your plaintiff's deposition first and then your expert deposition." Being honest, RONWIN noted that PILKINGTON, (in the telephone conversation) said that he "wasn't going to agree that [RONWIN] was an expert." Then the deposition continued and BAYER makes a definite agreement with RONWIN to take RONWIN's expert deposition.

If BAYER believed that RONWIN was not an expert then BAYER was obligated to (i) approach the court and formally challenge RONWIN's status as an expert, or (ii) be satisfied with RONWIN's fact deposition, (a second portion of which was taken in late July, 2006).

BAYER cannot have it two (2) ways. If BAYER wants an expert deposition from RONWIN, BAYER cannot at the same time maintain that RONWIN is not an expert!

Furthermore, per PTO 149, the time to take a fact deposition for Phase I specific cases, which this case is, was no later than July 31, 2006, (p. 4, PTO 149); and the time to take an expert deposition has also long run, Sept. 29, 2006, (p. 4, PTO 149) and all depositions of BAYER's experts had to be completed by November 29, 2006 (p. 4, PTO 149).

As noted in the 1st full ¶, p. 3, MEMO, RONWIN's expert deposition was set for Sept. 28,

"by mutual agreement." However, on the morning of Sept. 13, 2006, the day after RONWIN attended the deposition of his medical expert, Dr. Raul G. Reyes in Louisiana, RONWIN was taken with a serious, flu-like ailment and actually saw an MD twice during an approximately two (2) week period that the illness persisted. It was then intended to reset the deposition for sometime during the week of Oct. 2-6, 2006. On Sept. 6, 2006, RONWIN faxed a letter to PILKINGTON asking for a $3,000 fee; however, later in the day, RONWIN learned from Dr. Reyes' business manager of Dr. Reyes' medical activities that BAYER had agreed to pay Dr. Reyes a $5,000 fee. Therefore, RONWIN faxed a second letter to PILKINGTON indicating that RONWIN's fee for an expert deposition would be $5,000 since RONWIN was going to discourse expertly on more than Dr. Reyes would be able to.

After attending Dr. Reyes' deposition on Sept. 12, 2006, RONWIN felt that the $5,000 fee would be too much and sent another fax to PILKINGTON setting his fee at $1,000 for whatever time the expert deposition required; the fee to be paid at the start of the deposition, Exh. H to MEMO.

Pursuant to RONWIN's request, PILKINGTON notified RONWIN by letter, copy of which is appended hereto as Exh. [3]; of the fees that BAYER paid to seven (7) MD's who had provided medical services of sorts to RONWIN within the time parameters apropos to this case. The letter notes that the fees paid were those demanded (by the deponents). The deposition time is not given. However, the depositions of Drs. Keller, Knauer and Wolfel took approximately 4 hours with interruptions in the first two depositions especially when RONWIN was interrogating. Dr. Hiatt's deposition took about 2¼ hours, with RONWIN getting very little interrogation time. Dr. Deane's deposition took about 1 hour. Dr. Torkelson's deposition took

about 2 hours. Dr. Servi's deposition took about 2.5 hours.

A $1,000 fee for what will be an illuminating expert deposition for 5-6 hours, possibly more, is reasonable.

During telephone conversation with PILKINGTON in Sept., 2006 on the resetting of RONWIN's expert deposition during the week of Oct. 2-6, 2006, PILKINGTON said that BAYER would not pay an expert fee for RONWIN's expert deposition and would file a motion challenging a deposition fee to RONWIN, "within two (2) weeks." BAYER's motion to which this Response is addressed was filed on December 4, 2006. That's more like two months. Moreover, the time for all depositions under PTO 149, p. 4, for Phase I specific cases ran on November 29, 2006.

(iii) If BAYER persists in demanding to take RONWIN's expert deposition, BAYER must be required to withdraw its Daubert motion against RONWIN, which is found on pp. 20-23 of BAYER's MEMO to its Motion for Summary Judgment and to remove all other comments in said MEMO which cast aspersion on RONWIN's expertise.

(iv) Ms.WEBER, at Sidley-Austin attorney for BAYER argued in telephone conversation that BAYER's duplicitous position on whether or not RONWIN was an expert is permissible because RONWIN has insisted that he is an expert. That is nonsense. As above, no party can be permitted to take absolutely opposing positions at the same time in the same lawsuit!

IV. The Magistrate failed to address RONWIN's arguments on the only case presented by BAYER to support its contention that a party-expert is not entitled to an expert fee under

Fed.R.Civ.P.26(b)(4)(C).[2]As to that, the argument was presented in RONWIN's Reply to BAYER's Response to RONWIN's Motion Based on Fed.R.Civ.P. 11 Against BAYER, etc., because BAYER held back its citation and comments on the case of Kooritzky v. Herman, 178 F.3d 1315 (D.C.Cir.1999) from its Motion to Compel and then cited the case in its Reply to RONWIN's Response to said Motion to Compel, thereby getting an advantage that the Fed.R.Civ.P. do not intend for any party to have. The advantage is cancelled when oral argument is allowed.[3]

The Kooritzky matter was presented in RONWIN's Reply to BAYER's Response to RONWIN's Motion Based on [Rule 11] against BAYER, etc., pp. 8-12, and is set forth in the following:

NOW AS TO KOORITZKY:

Again, Kooritzky is alluded to in the 2nd full ¶, p. 2, RESPONSE. In said ¶, BAYER writes:

> Bayer's citation to Kooritzky caused Dr. Ronwin no prejudice. Bayer's argument was made in its motion [to compel].

That statement can be read to imply that BAYER discussed Kooritzky, upon which it heavily relies as to its Motion to Compel, in said motion. That would be a lie. It is because BAYER held back Kooritzky[4] until its Reply to RONWIN's Response to BAYER's Motion to Compel which gave BAYER an advantage that the Fed. Rules of Civ. Proc. does not intend for BAYER

---

[2]In fact, the Magistrate totally failed to address in any depth the arguments presented as to BAYER's Motion to Compel. The Magistrate's action was a short-shrift judgment and an insult to the concept of justice for which this court is absolutely obligated to strive to advance in each and every case including this specific case.

[3]Thus, we have a clear reason why oral argument, at least when one or more of the parties requests same, is essential to keep equality of treatment of the parties and to present a court with a complete argument on any issue.

[4]Notably, RONWIN charged in MOTION, p. 1, last ¶, that BAYER "most likely had knowledge of Kooritzky when it composed its Motion to Compel. That allegation by RONWIN is not challenged in BAYER's RESPONSE which substantiates RONWIN's argument made in this paragraph.

or any other party unless oral argument is had on BAYER's motion to compel so RONWIN could show BAYER's misuse of Kooritzky. (In this specific case, the court has refused to have oral argument on every motion RONWIN filed and on every motion filed against RONWIN).

PRELIMINARILY, RONWIN HAS NOT, NOR INTENDS TO ASK FOR ATTORNEY'S FEES IN THIS SPECIFIC CASE. FURTHERMORE, UNLIKE IN KOORITZKY, RONWIN IS NOT AN ATTORNEY PRO SE, BUT A PLAINTIFF PRO SE.

Mr. Kooritzky, (KOORITZKY), was an immigration attorney who acted pro se in challenging a U.S.Dept. of Labor, ("DOL") immigration ruling and prevailed on the merits, Kooritzky, 178 F.3d @ 1316. Thereafter, KOORITZKY moved for an award of attorney's fees and the District Court awarded fees to KOORITZKY and to his alleged co-counsels, 178 F.3d @ 1316-1317.

The DOL challenged the award of attorney fees to KOORITZKY in the District Court and lost. Thereafter, the DOL appealed to the D.C. Circuit, 178 F.3d @ 1317. KOORITZKY's case proceeded under the Equal Access to Justice Act, ("EAJA"), 178 F.3d @ 1317. The D.C. Circuit held that the fee-shifting provision of the EAJA did not "differ in any material way from the statute, (Civil Right Attorney's Fee Awards Act, 42 U.S.C. § 1988), featuring in Kay v. Euler, 499 U.S. 432, 111 S.Ct. 1435, 113 L.Ed.2d 486 (1991), and the attorney fee awards provision in the Freedom of Information Act, ("FOIA"), featured in Burka v. U.S. Dept. of Health and Human Services, 142 F.3d 1286 (D.C. Cir. 1998), 178 F.3d @ 1317.

The D.C.Circuit explained that the interpretation of the attorney fee shifting provision in each of the three statutes, EAJA, FOIA and § 1988, barred award of attorney's fees to pro se attorneys because the U.S. Supreme Court in Kay declared that the word, attorney, in these fee shifting provisions required a client-attorney relationship, i.e., an agency arrangement, and,

obviously, a pro se attorney cannot form an agency with him or herself, 178 F.3d @ 1318. The D.C.Circuit further explained that the need for the agency relationship was to enable potential civil rights plaintiffs to obtain competent legal counsel in suits intended to protect civil rights from government encroachment, 178 F.3d @ 1318-1320.

Since RONWIN never sought nor intends to seek attorneys fees for his pro se legal work, what has Kooritzky got to do with this specific case?

It appears that KOORITZKY claimed expert fees for acting pro se as an "immigration law expert," and, even if not entitled to attorney's fees, KOORITZKY nevertheless claimed entitlement to expert witness fees as an immigration law expert, 178 F.3d @ 1321. The amount of attorney's fees denied were claimed as the expert fees, 178 F.3d @ 1321. The District Court, earlier rejected KOORITZKY's notion that any expertise on KOORITZKY's part was involved and that the case was a "routine APA [Administrative Procedure Act] case," 178 F.3d @ 1321.

The D.C.Circuit rejected KOORITZKY's expert fee demand based on its analysis of the EAJA purpose and the purpose of the similar statutes; mainly on the grounds that the fee-shifting provisions in these statutes were intended to encourage plaintiffs to "hire objective outside counsel" and by analogy to hire outside experts, 178 F.3d @ 1322.

The D.C.Circuit made clear that the EAJA, (and analogous statutes) does not allow a pro se attorney litigant to recover attorney's fees when disguised as expert fees, 178 F.3d @ 1322. The court also noted that KOORITZKY alleged immigration law expertise was not applicable and that KOORITZKY had no administrative law experience, (which was legal setting of the case), 178 F.3d @ 1322. The D.C.Circuit was clearly annoyed with KOORITZKY's attempt to obtain legal fees under the rubric of expert fees, 178 F.3d @ 1322-1323.

Pertinent hereto, it is to be noted that Kooritzky was decided on the basis of the EAJA, and analogous statutes, § 1988 and FOIA, See Conclusion, 178 F.3d @ 1325. Underlying the legal holding in Kooritzky is that the fundamental purpose of the fee shifting provision of EAJA and analogous statutes is the Congressional objective to promote the hiring of competent outside counsel and experts to augment the enforcement of civil rights and to redress their abuse by government action!

This specific case does not come to this MDL, nor to the transferor court, under EAJA or any analogous statute. Rather this specific case comes here as an ordinary tort action. Even EAJA excepts "cases sounding in tort" from its fee shifting provision, 178 F.3d @ 1318.

Furthermore, the contentions of Kooritzky concerning expert fees are also restricted to the fee shifting provisions of the EAJA and analogous statutes. For that reason, too, as discussed above, expert fees were denied to KOORITZKY.

However, there is a significant difference herein. The expert fee sought in this case by RONWIN is governed by Fed.R.Civ.P. 26(b)(4)(C). Unlike the EAJA fee shifting provision, 26(b)(4)(C) is unconcerned with the hiring of outside experts or attorneys and is unconcerned with promoting protection for civil rights; nor does said rule require agency relations between pro se litigants and attorneys or experts.

Notably, the facts in Kooritzky, as discussed above, and at 178 F.3d @ 1321-1323, clearly establish that KOORITZKY was no expert in his case.

Notably, too, the Kooritzky court quotes the Amer. Bar Ass'n. Model Code of Professional Responsibility as follows:

> The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts

<u>objectively</u>. (emphasis supplied).

As a non-attorney pro se litigant, RONWIN, who is trained and somewhat experienced in the law, has done what he would do as though he were an outside attorney handling RONWIN's legal efforts in this specific case. But, as a fact witness, RONWIN has simply stated the overall facts as he knows them and as he would have done if represented by outside counsel. However, RONWIN's expertise arises from considerable educational training, occupation experiences and publication activities and continued pursuit of developments in the fields of biochemistry, related medicine, molecular biology (same as biochemistry), and related sciences. For testimony in those areas of RONWIN's expertise, RONWIN is entitled to a fee.

V. The Magistrate shows confusion when the Order states, 1st sentence, 1st full ¶, p.2:

> Plaintiff Ronwin styles his response to Bayer's motion to compel alternatively as a response to that motion and as a motion itself under Rule 11

Not the case!

RONWIN filed a "Response to the motion to compel" on December 11, 2006 <u>and</u> after the game played by BAYER as to the <u>Kooritzky</u> case, as discussed above, RONWIN filed on January 8, 2007, a "Motion Based on Fed.R.Civ.P. 11 against [BAYER] and demand for oral argument on BAYER's Motion to Compel or, in the alternative, to Consider this Document as a Counter Reply to BAYER's Motion to Compel." By "Counter-Reply" RONWIN meant a Sur-reply. A Sur-reply was necessary to discuss the <u>Kooritzky</u> case from RONWIN's reading of same and not permit BAYER's sole reading incorporated into its Reply to RONWIN's Response to BAYER's Motion to Compel to go without challenge.

VI. Under PTO 149,I.C.a-f, incl., BAYER claimed the right to take up to ten (10) fact depositions for Phase I deponents; and took nine (9) depositions, with RONWIN's taken twice,

quite unnecessarily. BAYER also took one (1) deposition of an MD expert appearing on behalf of RONWIN. According to PTO 156, II.A.2 and II.B.2, BAYER is limited to five (5) fact depositions for both Phase III and IV deponents. RONWIN submits that such disparate treatment amounts to a denial of equal protection under the U.S. Constitution. At this point, and for that reason, BAYER has taken more than an adequate number of depositions.

Furthermore, BAYER claims that it could not take RONWIN's expert deposition because RONWIN demands an expert fee. However, as the time approached September 29, 2006, the end date per PTO 149,I.C.1.f, for the taking of Plaintiff expert deposition, BAYER had a duty to approach the court on the matter. Not only did BAYER fail to do so, but it even failed to approach the court until after November 29, 2006, when per PTO 149,I.C.1.h all depositions were to be concluded for Phase I deponents. BAYER has provided no reasonable basis for it failure to act within the time limits for Plaintiff depositions and, worse, within the time limits for all depositions. The court should consider BAYER as having struck-out.

**VII.** Fed.R.Civ.P.26(a)(2)(B) allows any expert with relevant information concerning any matter to testify. It is not confined in drug cases, or, indeed, in any chemical type case, to MDs or similar practitioners. In RONWIN's Response to BAYER's Motion for Summary Judgment, pp. 49-62, RONWIN has presented a detailed explanation of how Baycol destroys tendons such as rotator cuffs, which it did in RONWIN's case. BAYER has not shown that RONWIN's explanation is error. RONWIN's exposition of the applicable chemistry is found in pp.55-62 and rests on reports in reseach papers published in peer-reviewed journals, on academic texts which have gone through several editions—always a mark of acceptance in the field and on RONWIN's own extensive knowledge of chemistry and biochemistry backed by considerable training and

experience. BAYER has yet to point to expert documentation to refute RONWIN's explanation of how and why Baycol destroys body tissues and cells and causes the numerous adverse events that it causes.

The declarations in Daubert v. Merrell Dow Pharaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which have pertinence to the considerations herein are:

113 S.Ct. @ 2794:

Rule 702, governing expert testimony provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

113 S.Ct. @ 2795:

> ...Rule 702...clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. 'if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue' an expert 'may testify thereto.' (emphasis in original). The subject of an expert's testimony must be 'scientific...knowledge' The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation. The term 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'...citation omitted...Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science...citation omitted...Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance.

113 S.Ct. @ 2796:

> Unlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on first-hand knowledge or observation. See Rules 702 and 703.

Faced with a profer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

113 S.Ct. @ 2797:

> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity--and thus the evidentiary relevance and reliability--of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

(emphasis supplied).

From the foregoing, RONWIN meets the Daubert requirements at 113 S.Ct. @ 2794, text presented above. From the foregoing, RONWIN meets the Daubert requirements at 113 S.Ct. @ 2795, text presented above,in that RONWIN presents scientific knowledge to aid the jury to understand the causation issue in this case. And, as in 113 S.Ct. @ 2796, RONWIN must be accorded "wide latitude,." text presented above. BAYER has come to this court with no scientific objections based on peer-reviewed research, other academic studies or scientific principles which deflate RONWIN's exposition of the fundamental, biochemical cause of Baycol's destructive action. Hence, the court must find for RONWIN per 113 S.Ct. @ 2976, text presented above. As to 113 S.Ct. @ 2997, text presented above, RONWIN's principles and methodology is long standing and rests on first class scientific principles which are impervious to BAYER's absurd objections. The court has absolutely NO reason to find otherwise. The court is further reminded by the passage from Daubert that the conclusions from RONWIN's expert exposition are for the jury, not for this court to weigh!

Lastly, the Denver counsel for BAYER has set RONWIN's expert deposition per the Magistrate's Order for March 23, 2007 and refuses to vacate that date. The notice is attached hereto as Exhibit 2. RONWIN does not intend to appear for an expert deposition on said date. By this motion, RONWIN is following his lawful rights under 28 U.S.C. § 636(b)(1)(A) and (b)(1), which is in the nature of an appeal of the Magistrate's Order; and also meets the ground rules for a petition to the Eighth Circuit Court of Appeals per 28 U.S.C. § 1292(b), for

permission to file an interlocatory appeal, if necessary. If BAYER proceeds with its intent to maintain said deposition date then it could interfere with this court's determination of this motion, which would be unlawful. RONWIN suggests that this court issue an Order vacating said deposition date.

RONWIN is willing to attend his expert deposition provided BAYER pays the expert fee of $1,000, which is equal to the fee BAYER paid to one of the MD deponents and one-half the fee BAYER paid to two other MD deponents and less than half the fee paid to three other MD deponents, see Exhibit 3.

**WHEREFORE**, Plaintiff asks this court to perform a de novo determination of this matter and to deny Defendant's demand to take Plaintiff's expert deposition unless Defendant is willing to pay Plaintiff his expert fee demand.

DATED: March 9, 2007.

Edward Ronwin, pro se
945 Rolland Moore Dr., L-2
Fort Collins, CO 80526
970-221-3837

CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Motion upon the following by FAX, this 9th day of March, 2007:

The Court Clerk's office at FAX No. 612-664-5044; Defendant's counsel at FAX No.312-853-7036 and Plaintiff's Liaison Counsel, Deanna Dailey at Larson-King at FAX No. 651-312-6618.

Edward Ronwin

MAGISTRATE JUDGE SUSAN RICHARD NELSON
UNITED STATES DISTRICT COURT
300 South Fourth Street – Suite 9E
Minneapolis, Minnesota 55415

OFFICIAL BUSINESS

US POSTAGE
$ 00.39
FIRST CLASS
Mailed From 55415
03/01/2007
031A 0002303240

Dr. Edward Ronwin
945 Rolland Moore Drive L-2
Fort Collins, CO 80526

80526+8112

EX#1

DCS LAW

Davis Graham & Stubbs LLP

March 7, 2007

**VIA U.S. MAIL**

Edward Ronwin
945 Rolland Moore Drive, L-2
Fort Collins, CO 80526

Re: Ronwin v. Bayer Corp

Dear Mr. Ronwin:

It is my understanding that you spoke to Debbie Werth of my office about your upcoming deposition. In that discussion, you explained that you planned on filing some type of motion for reconsideration of the Order dated February 23, 2007 (a copy of which is enclosed). You also told her that you believed that you did not need to appear at the deposition noticed for March 23, 2007 (a copy of which is also enclosed) because of the papers that you will be filing.

I disagree with your conclusion. According to the Order, you must appear for your deposition on or before March 25, 2007. I plan on taking your deposition as scheduled in the notice. I trust that you will also comply with the Court's Order.

As always, please call if you have any questions or concerns.

Sincerely,

Jeff Pilkington /dv

Jeffrey R. Pilkington
for
DAVIS GRAHAM & STUBBS LLP

JRP/dv
Enclosures
cc: Deanna D. Dailey, Esq., ddailey@larsonking.com (via email only)
Megan E. Hills, MHills@wc.com (via email only)
James W. Mizgala, Esq., jmizgala@Sidley.com (via email only)

EXH. 2

DCS

Davis Graham & Stubbs LLP

November 2, 2006

Edward Ronwin
945 Rolland Moore Drive, L-2
Fort Collins, CO 80526

Re: *Edward Ronwin v. Bayer (MDL No. 1431)*

Dear Mr. Ronwin:

At Mr. Pilkington's instruction, the following is a summary of the information you requested regarding fees demanded and paid for deposition time:

1. Dr. Mark Keller - $2,000.
2. Dr. Sally Knauer - $3,000.
3. Dr. Jane Servi - $2,250.
4. Dr. Richard Torkelson - $1,000.
5. Dr. Eugene Wolfel - $2,000.
6. Dr. Kevin Deane - $500.
7. Dr. William Hiatt - $600.

As always, please call Jeff Pilkington if you have any questions or concerns.

Sincerely,

Deborah J. Werth
Paralegal to Jeffrey Pilkington
for
DAVIS GRAHAM & STUBBS LLP

EXH. 3

Deborah J. Werth . 303 892 7218 . debbie.werth@dgslaw.com

From: Dr. Edward Ronwin, 945 Rolland Moore Dr., L-2, Fort Collins, CO 80526
Telephone: 970-221-3837; FAX: 970-224-3838

To the following parties by FAX:
The Clerk's office, U.S. Dist. of Minnesota
Sidley Austin, Defendant's attorneys in Chicago, IL, (Weber/Mizgala)
Plaintiff's Liaison Counsel, Deanna Dailey at Larson-King

Re: (Plaintiff's) Motion for Review of Magistrate's Order Feb.23, 2007 Pursuant to 28 U.S.C. § 636(b)(1).

Date: March 9, 2007

Said motion is being faxed herewith.

If there is any problem, please call me at 970-221-3837.

Edward Ronwin

Edward Ronwin, PhD, JD